

Page 2

PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY

**KUNTZ, J.**

| United States District Court | District **Eastern** |
|---|---|

| Name (under which you were convicted): Enrique Rivera | Docket or Case No.: 1453/05 |
|---|---|

| Place of Confinement: Green Haven Correctional Facility | Prisoner No.: 09-A-3190 |
|---|---|

**CV 15.- 2657**

| Petitioner (include the name under which you were convicted) Enrique Rivera | v. | Respondent (authorized person having custody of petitioner) Thomas Griffin |
|---|---|---|

| The Attorney General of the State of Andrew M. Cuomo |
|---|

## PETITION

1. (a) Name and location of court that entered the judgment of conviction you are challenging: Supreme Court, County of Kings, 320 Jay Street, Brookly, New York

   (b) Criminal docket or case number (if you know): 1453/05

2. (a) Date of the judgment of conviction (if you know): June 8, 2009

   (b) Date of sentencing: June 8, 2009

3. Length of sentence: 25 years and 5 years of post-release supervision

4. In this case, were you convicted on more than one count or of more than one crime?     Yes ☐     No ☒

5. Identify all crimes of which you were convicted and sentenced in this case: _____

   _____

   _____

   _____

   _____

6. (a) What was your plea? (Check one)

   (1)  Not guilty ☒            (3)  Nolo contendere (no contest) ☐

   (2)  Guilty ☐               (4)  Insanity plea ☐

   (b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to? _____

   _____

_____

_____

_____

_____

(c) If you went to trial, what kind of trial did you have? (Check one)

Jury ☑          Judge only ☐

7. Did you testify at either a pretrial hearing, trial or a post-trial hearing?

Yes ☑   No ☐

8. Did you appeal from the judgment of conviction?

Yes ☑   No ☐

9. If you did appeal, answer the following:

(a) Name of court: _Appellate Division, Second Department_

(b) Docket or case number (if you know): _09/05779_

(c) Result: _Affirmed_

(d) Date of result (if you know): _Nov 7, 2012_

(e) Citation to the case (if you know): _100 A.D. 3d 659, lv. granted 20 N.Y.3d 1103_

(f) Grounds raised: _See Exhibit A_

_____

_____

_____

_____

(g) Did you seek further review by a higher state court?   Yes ☑   No ☐

If yes, answer the following:

(1) Name of court: _New York State Court of Appeals_

(2) Docket or case number (if you know): _09/05779_

(3) Result: _Affirmed_

(4) Date of result (if you know): _April 8, 2014_

(5) Citation to the case (if you know): _23 N.Y.3d 112_

(6) Grounds raised: _See Exhibit B._

_____

_____

_____

(h) Did you file a petition for certiorari in the United States Supreme Court?   Yes ☐   No ☑

If yes, answer the following:

(1) Docket or case number (if you know): _____

Page 4

(2) Result: _____

_____

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

10.  Other than the direct appeals listed above, have you previously filed any other petitions, applications, or
motions concerning this judgment of conviction in any state court?

     Yes ☒   No ☐

11.  If your answer to Question 10 was "Yes," give the following information:

  (a) (1) Name of court: _Supreme Court, Kings County_

     (2) Docket or case number (if you know): _1453/2005_

     (3) Date of filing (if you know): _June 11, 2014_

     (4) Nature of the proceeding: _N.Y. C.P.L. 440.10 (a) (b), (d)(f)(H._

     (5) Grounds raised: _See Exhibit C_

_____

_____

_____

_____

_____

_____

_____

_____

     (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

        Yes ☐   No ☒

     (7) Result: _Denied_

     (8) Date of result (if you know): _9/4/14_

  (b) If you filed any second petition, application, or motion, give the same information:

     (1) Name of court: _____

     (2) Docket or case number (if you know): _____

     (3) Date of filing (if you know): _____

     (4) Nature of the proceeding: _____

     (5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

      Yes ☐   No ☐

(7) Result: _____

(8) Date of result (if you know): _____

(c) If you filed any third petition, application, or motion, give the same information:

    (1) Name of court: _____

    (2) Docket or case number (if you know): _____

    (3) Date of filing (if you know): _____

    (4) Nature of the proceeding: _____

    (5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

_____

    (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

      Yes ☐   No ☐

    (7) Result: _____

    (8) Date of result (if you know): _____

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

    (1)  First petition:       Yes ☑  No ☐

    (2)  Second petition:   Yes ☐  No ☐

    (3)  Third petition:    Yes ☐  No ☐

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not: _____

_____

_____

_____

12.  For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States.  Attach additional pages if you have more than four grounds.  State the <u>facts</u> supporting each ground.

<u>CAUTION</u>: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court.  Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

GROUND ONE: _____ *See Exhibit A. pg. 26-34.* _____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): _____

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground One, explain why: _____

_____

_____

(c)  **Direct Appeal of Ground One:**

   (1) If you appealed from the judgment of conviction, did you raise this issue?

      Yes ☒  No ☐

   (2) If you did <u>not</u> raise this issue in your direct appeal, explain why: _____

_____

(d)  **Post-Conviction Proceedings:**

   (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

      Yes ☐  No ☐

   (2) If your answer to Question (d)(1) is "Yes," state:

   Type of motion or petition: _____

   Name and location of the court where the motion or petition was filed: _____

_____

   Docket or case number (if you know): _____

   Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?

    Yes ☐  No ☐

(4) Did you appeal from the denial of your motion or petition?

    Yes ☐  No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

    Yes ☐  No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One: _____

_____

_____

**GROUND TWO:** _____ See Exhibit A- Pg-25- 28

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): _____

_____

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Two, explain why: _____
_____
_____
_____

(c) **Direct Appeal of Ground Two:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        Yes ☑  No ☐

    (2) If you did <u>not</u> raise this issue in your direct appeal, explain why: _____
_____
_____

(d) **Post-Conviction Proceedings:**

    (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

        Yes ☐  No ☐

    (2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____
_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____
_____

    (3) Did you receive a hearing on your motion or petition?

        Yes ☐  No ☐

    (4) Did you appeal from the denial of your motion or petition?

        Yes ☐  No ☐

    (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

        Yes ☐  No ☐

    (6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____
_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____
_____
_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two: _____

_____

_____

_____

**GROUND THREE:** _____ See Exhibit B. pg. 16-31

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): _____

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Three, explain why: _____

_____

_____

(c) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☑   No ☐

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Yes ☐   No ☐

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?

    Yes ☐   No ☐

(4) Did you appeal from the denial of your motion or petition?

    Yes ☐   No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

    Yes ☐   No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three: _____

_____

_____

**GROUND FOUR:** _____ See Exhibit C p.p. 4-27.

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): _____

_____

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Four, explain why: _____

_____

_____

_____

(c) **Direct Appeal of Ground Four:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

       Yes ☐  No ☑

    (2) If you did <u>not</u> raise this issue in your direct appeal, explain why: _____

_____

(d) **Post-Conviction Proceedings:**

    (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

       Yes ☑  No ☐

    (2) If your answer to Question (d)(1) is "Yes," state:

    Type of motion or petition: _CPL 440.10(1)(b), (d)(F)(H)._

    Name and location of the court where the motion or petition was filed: _____

    _Kings County_

    Docket or case number (if you know): _1453/2005_

    Date of the court's decision: _9/4/14_

    Result (attach a copy of the court's opinion or order, if available): _Denied_

_____

_____

    (3) Did you receive a hearing on your motion or petition?

       Yes ☐  No ☑

    (4) Did you appeal from the denial of your motion or petition?

       Yes ☑  No ☐

    (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

       Yes ☐  No ☐

    (6) If your answer to Question (d)(4) is "Yes," state:

    Name and location of the court where the appeal was filed: _Appellate Division_

    _Second Department_

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available): _____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

(e)  **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four: _Appeal to_

_New York State Court of Appeal_

_____

_____

_____

13.  Please answer these additional questions about the petition you are filing:

(a)  Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?     Yes ☑   No ☐

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them: _____

_____

_____

_____

(b)  Is there any ground in this petition that has not been presented in some state or federal court?  If so, which ground or grounds have not been presented, and state your reasons for not presenting them: _____

_____

_____

_____

14.  Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition?  Yes ☐   No ☑

If "Yes," state the name and  location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed.  Attach a copy of any court opinions or orders, if available. _____

_____

_____

_____

_____

_____

_____

15. Do you have any petition or appeal <u>now pending</u> (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?   Yes ☑  No ☐

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised. _C.PL. 440.10 (i) (b), (d) (F) (H),_

_____

_____

_____

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: _Joel Drannon, Esq._

_____

(b) At arraignment and plea: _____

_____

(c) At trial: _Joel Drannon, Esq._
_two trial._

(d) At sentencing: _Joel Drannon, Esq._

(e) On appeal: _Mr. Warren G. Lundy, Esq._

(f) In any post-conviction proceeding: _Pro-Se. C.PL. 440.10_

(g) On appeal from any ruling against you in a post-conviction proceeding: _____

_____

_____

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?   Yes ☐  No ☑

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

_____

_____

(b) Give the date the other sentence was imposed: _____

(c) Give the length of the other sentence: _____

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?   Yes ☐  No ☑

18.  TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must

explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

My Habeas Corpus is timely,
pursuant to 28 U.S.C. § 2244 (d)!

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

    (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of —
        (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
        (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;
        (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
        (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
    (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

EXHIBIT A

that sent a "chilling message" to the community and appellant had shown a "lack of accountability" by his "inconsistent statements," the court imposed the maximum 25-year determinate prison term, to be followed by 5 years of post-release supervision (S35).

## ARGUMENT

### POINT I

THE COURT VIOLATED APPELLANT'S DUE PROCESS RIGHT TO A FAIR TRIAL WHEN IT REFUSED TO SUBMIT SECOND-DEGREE MANSLAUGHTER AS A LESSER INCLUDED OFFENSE OF SECOND-DEGREE MURDER, ALTHOUGH THERE WAS A REASONABLE VIEW OF THE EVIDENCE THAT APPELLANT, WHO WAS DRINKING ALCOHOL AND TOLD THE POLICE THAT HE WAS "SWINGING [HIS KNIFE] AT THE CROWD NOT KNOWING THAT [HE HAD] REALLY HURT SOMEONE," STABBED THE DECEDENT RECKLESSLY.

Drawing all inferences favorable to the defense, there was a reasonable view of the evidence that appellant acted recklessly in causing Edgar Ojeda's death. The prosecution and defense witnesses agreed that everyone, appellant included, was drinking heavily, and the court issued an intoxication charge. And in his statements to the authorities, appellant denied intending to kill Ojeda and said he waved a knife at the Ojeda group because he became scared when Ojeda's friends punched and

N.Y.2d 717, 720 (2002); People v. Beslanovics, 57 N.Y.2d 726 (1982).

## POINT II

GIVEN APPELLANT'S COMMUNITY SUPPORT AND THE EVIDENCE THAT HE HAD BEEN DRINKING AND THE STABBING STEMMED FROM A BARROOM BRAWL, THE COURT EXCESSIVELY SENTENCED HIM WHEN IT IMPOSED THE MAXIMUM PERMISSIBLE PRISON TERM OF 25 YEARS.

The crime of which appellant was convicted merited significant punishment, but not the maximum prison term. Appellant, well-liked, had a supportive family and his current offense, according to the Probation Department, was "not similar to previous crimes" (PSR3, 5), which involved no injury to anyone. Moreover, the tragic death of Ojeda resulted from a bar room brawl triggered by significant alcohol consumption, not avarice, malevolence, or premeditation. Thus, by imposing a 25-year prison term, the court excessively sentenced appellant. C.P.L. §470.15(2)(c), (6)(b).

An intermediate appellate court has "broad, plenary power to modify a sentence that is unduly harsh or severe under the circumstances, even though the sentence may be within the permissible statutory range." People v. Delgado, 80 N.Y.2d 780, 783 (1992). Accord C.P.L. §470.15(6)(b); People v. Thompson, 60 N.Y.2d 513, 519 (1983). Moreover, this power may be exercised "without deference

33

EXHIBIT B

ARGUMENT

THE COURT VIOLATED APPELLANT'S DUE
PROCESS RIGHT TO A FAIR TRIAL WHEN IT
REFUSED TO CHARGE TO THE JURY
SECOND-DEGREE MANSLAUGHTER AS A
LESSER INCLUDED OFFENSE OF SECOND-
DEGREE MURDER, ALTHOUGH THERE
WAS A REASONABLE VIEW OF THE
EVIDENCE THAT APPELLANT, WHO HAD
BEEN DRINKING, RECKLESSLY KILLED
THE DECEASED DURING A BARROOM
BRAWL.

Viewed in the light most favorable to the defense, there was a reasonable

view of the evidence that appellant acted recklessly in causing Edgar Ojeda's

death during a chaotic barroom brawl, which defense witness Julio Rivera

described, among numerous men all of who had been drinking. This was not,

as the trial judge believed, the rare case in which the nature of the wounds

themselves ruled out all but an intentional homicide. Indeed, appellant's first

jury appears to have struggled for days over precisely the issue of whether the

homicide here was intentional or reckless, although the nature of Ojeda's

wounds obviously did not change between the first trial and the second.

Accordingly, the trial court's denial of defense counsel's request to submit

second-degree manslaughter to the jury denied appellant his federal and state

due process rights to a fair trial. U.S. Const., Amend. V, XIV; N.Y. Const. Art.

1, § 6.

EXHIBIT C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM: PART 35
------------------------------------------X
**THE PEOPLE OF THE STATE OF NEW YORK,**

                     Respondent,

       - against -

**ENRIQUE RIVERA,**

                   Defendant.
------------------------------------------X

                               **NOTICE OF MOTION
PURSUANT TO C.P.L.
§440.10(1)(b)(f)&(h)
TO VACATE JUDGMENT**

                               **Ind. No. 1453/2005**

    **PLEASE TAKE NOTICE,** that upon the annexed affidavit and exhibits of **ENRIQUE RIVERA**, and upon all the proceeding had herein, the undersigned will move this Court or on about July _ll_, 2014, at the Supreme Court, Kings County, 320 Jay Street, Brooklyn, New York 11201, at 9:30 a.m., or soon thereafter as the undersigned can be heard, for:

**AN ORDER:** Pursuant to CPL §440.10(1)(b)-(d)-(f)-(h), vacating the judgment entered against the above named defendant on June 8, 2009, based on the facts and argument advanced in the attached affidavit in support, and

**AN ORDER:** Pursuant to CPLR §1101 and §1102, and County Law 722 et seg., assigned an attorney, and

**AN ORDER:** Pursuant to CPL §440.30(5), producing the defendant at any hearing for the purpose of determining this motion, and

**AN ORDER:** For any other and further relief as to this Court may deem just and proper.
Dated: June _ll_, 2014
        Stormville, New York 12582
                  Respectfully submitted,


                  Enrique Rivera
                  Green Haven Corr. Fac.
                  P. O. Box 4000
                  Stormville, NY 12582

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM: PART 35
----------------------------------------X
**THE PEOPLE OF THE STATE OF NEW YORK,**

                          Respondent,

                                              **AFFIDAVIT IN SUPPORT**
                                              **FOR NOTICE OF MOTION**
               - against -                    **PURSUANT TO C.P.L.**
                                              **§440.10(1)(b)(f)&(h)**
                                              **TO VACATE JUDGMENT**
**ENRIQUE RIVERA,**
                                              **Ind. No. 1453/2005**
                          Defendant.
----------------------------------------X
STATE OF NEW YORK   )
                    ) SS.:
COUNTY OF DUTCHESS  )

### INTRODUCTION

**ENRIQUE RIVERA**, being duly sworn, and hereby states the following is true and correct:

1.   The defendant pro-se in the above entitled proceeding. Defendant makes this affidavit in support of motion, pursuant to CPL §440.10(b)-(d)-(f) & (h). Defendant respectfully submits that he is a layman in the matters of law, and such seeks this Court's indulgence to overlook any and all technical errors, faults and or defects herein, pursuant to CPLR §2001(f), see also **Haines v. Kerner,** 404 **U.S. 519 (1972), People v. Renaud,** 145 A.D.2d 367. Every pro-se defendant ought to be fully and fairly heard for until justice is made the trial never ends.

### QUESTION PRESENTED

(a) whether **People v. Thomas,** 2014 NY Slip Op 01208 (N.Y. 2014) this Court erred in denying his motion to suppress his confession because the use of deception by law enforcement

2

officers in the case at bar denied the defendant due process.

(b) Whether the new process law as announced in **People v. Hamilton**, 115 A.D.3d 12, 979 N.Y.S.2d 97 (2d Dept 2014) call for boldness in challenging long held legal assumption and putting the brakes on in the states CPL §440.10(2)(c) that can lead to a wrongful conviction.

### PROCEDURAL HISTORY

2.   Defendant Enrique Rivera was charged with second degree murder (P.L. §125.25[1]) and criminal possession of a weapon in the fourth degree (P.L. §265.10[2]) in connection with the stabbing death of Edgar Ojeda at a Brooklyn bar in the early morning hours of February 27, 2005.

3.   On May 2009, a judgment was rendered in this Court, convicting defendant, after a jury trial, of first-degree manslaughter (P.L. §125.20[1]). On June 8, 2009, this Court adjudicated defendant a second violent felony offender and sentenced him to a determinate prison term of 25 years to be followed by five years of postrelease supervision.

4.   The Supreme Court, Appellate Division, Second Department unanimously affirmed the judgment of conviction, **People v. Rivera**, 100 A.D.3d 658 (2d Dept 2012), aff'd, ___ N.Y.3d ___ (N.Y.2014).

### STATEMENT OF LAW
### VACATE JUDGMENT

5.   Section 440.10 of the Criminal Procedure Law provides in pertinent part, that a judgment may be vacated upon the ground that:

(b)     the    judgment    was    procured    by    duress,
misrepresentation or fraud on the part of person acting for
or on behalf of the prosecutor; or;

(d) material evidence adduced by the People at trial was
procured in violation of the defendant's right under the
Constitution of this State and of the United States, or,

(f) improper and prejudiced conduct not appearing in the
record occurred during a trial resulting in the judgment
which conduct, if it had appeared in the record, would have
required a reversal of the judgment upon an appeal therefore,
or,

(h) the judgment was obtained in violating of a right of
the defendant under the Constitution of this State or of the
United States.

### ARGUMENT - POINT ONE
### RIVERA'S CONFESSION WA OBTAINED
### VIOLATION OF DEFENDANT'S MIRANDA RIGHTS

6.   It is hornbook law that statements obtained from a
suspect as a result of custodial interrogation may not be
admitted into evidence unless the suspect was first apprised
of his right pursuant to **Miranda v. Arizona, 384 US 436
(1966)**, and Article 1, §6 of the New York State Constitution
permits the individuals accused of a crime to receive a fair
trial by affording among other inalienable rights, the
suppression of all statement and other evidence obtained as a
result of the illegal confession. Even statement made after
constitutional error were rectified - **Miranda** warnings were
read or counsel was appointed - may be tainted by the prior

4

illegal conduct. It is mandatory that a defendant be granted a new trial under these circumstances.

6.    It is submitted that the time of that verdict, there have been remarkable strides in recognizing the reality or error in the criminal system, including the common phenomenon of a lengthy coercive police interrogation on a subsequent confession, **People v. Guilford**, 21 N.Y.3d 205 (N.Y. 2013), **People v. Thomas**, 2014 N.Y. LEXIS 01208 (N.Y. 2014), **People v. Aveni**, 2014 N.Y. LEXIS 207 (N.Y. 2014), **People v. Zeh**, **2014 N.Y. Slip Op 02097 (N.Y. 2014)**. There is nothing inherently implausible or contradictory about the defendant allegations. The Court of Appeals did not attempt to establish any bright line rule to delineate the point at which trickery becomes coercive, nor did it back away from its long history of acquiescing to police deception.

7.    On the night of Sunday, February 27, at about 11:30 p.m., the police came to defendant's brother's home and asked what he was wearing in the bar. He offered to get the clothing from his hamper, but the police declined, instead, they went through his clothing and found his jacket (Julio R.: 476, 514, 530). They handcuffed him and, on his consent, brought him to the precinct, without the jacket (477-78, 516).

8.    There, Detective Darino and another detective told defendant's brother he could not leave and he could be charged with murder if he did not help them find defendant (Julio R.: 478-484, 515-529). They briefly interrogated him

about defendant's location, the bar events, and description (481-83, 516, 527, 530). Eventually, the police and a female A.D.A. conducted and audio taped interrogation before he was released between 11:30 a.m. and 12:00 noon (485, 487, 517-18).

9.   Defendant testified that he confessed, after he was brought to the precinct on February 28th, 2005, because Detective Darino threatened that if he did not, both he and his brother Julio would be charged with murder, and Julio would face life imprisonment (T. 577-78-79). Accordingly to defendant, Detective Darino told him that the police knew that he was "kicked out" of the Brooklyn bar and Julio was left behind, that his brother was now at the precinct, "being charged with murder" because he tried to protect defendant in the he fight, and that if defendant "[took] the weight" for (i.e., confessed to) killing Ojeda in self-defense, and took responsibility, he told defendant what to say, and promised to release his brother when defendant wrote and signed a confession (T. 577-79, 583). Tire, defendant complied after waiving his **Miranda** rights (579-81). Hours later, he gave untrue videotape statement to the prosecutor in accordance with the police instructions and illustrated his knife swinging (582-84).

10.   This Court's investigation is warranted finally to rescue Rivera from the legal limbo he has found himself in with regard to Miranda. On the one hand, the Court of Appeals recognized that, as Chief Judge Jonathan Lippman eloquently

**6**

stated in **Thomas**, "the choice to speak where speech may incriminate is constitutionally that of the individual, not the government, and the government by any coercive device." Similarly, in **Aveni**, in dismissing the appeal in that case, the Court of Appeals noted that the interrogating officer had used deception about the victim's physical condition, when the victim had died, to obtain incriminating admission from the defendant.

11. Rivera claim, however, constitutes and independent ground for vacating Rivera's conviction and ordering a new trial. First, the introduction of Rivera's confession at trial violated his federal and state Miranda rights. As noted above, Mr. Rivera's confession was the centerpiece of the prosecution's case. On February 28, 2005, Detective John Darino, the detective assigned to the Edgar Ojeda case, learned from defendant's brother Julio that defendant was at a house in Queens, where the police found him at 4:30 a.m. Detective Darino informed defendant that he was investigating an incident at a Brooklyn bar, and handcuffed and transported him to the precinct, where he was taken to the detective squad interview room.

12. Detective Darino read defendant his Miranda rights, and defendant agreed to speak with police. Defendant argues at trial that he was not read his Miranda rights until after he made oral and written statements. Detective Darino told defendant that people had placed him in the Brooklyn bar, and he wanted defendant's version of what happened. The

7

prosecution harps on the idea that Defendant's confession was voluntary and free of deception is dubious, or at worst misleading. The Court of Appeals when on to reaffirm the choice to speak where speech may incriminate is constitutionally that of the individuals, not the government, and the government may not effectively eliminate it by any coercive devise.

13. Based on recent Court of Appeals precedent that merits review of such claim in cases represents an early opportunity for trial courts like this one to begin to work out and practice the meaning and concrete application of the new principles of **Thomas/Aveni**, in which usually occurs after the prior court **Huntley** hearing has rendered its new decision in **Thomas/Aveni**, involving issues the prior court has not considered previously, and clarified that case and distinguished it from the case at bar in its earlier decision in **Huntley** hearing. In **People v. Bedessie, 19 N.Y.3d 147 (N.Y. 2012)** ruling is important because it is a judicial validation of the conventional wisdom that false confession can be obtained by prosecution teams that use improper interrogation techniques to obtain confessions and, it will now allow scientific evidence to evaluate questionable confession. Despite the Court of Appeals passed the opportunity to decide whether **Thomas** was entitled to an expert on psychological coercion based on the evidence he educed need not be revisited.

14. In applying **Thomas/Aveni** the Court of Appeals

8

correctly decided the question of deception and subterfuge as a law enforcement officers in the case at hand. The record of the motion to suppress demonstrates that the People failed to carry their heavy burden of proving that defendant's statement were voluntary beyond a reasonable doubt. In **Thomas**, the deception utilizing his wife to undermine the defendant will was improper when defendant continuously denied involvement in the underlying offense. In **Aveni**, the deception directed towards the victim to obtain incriminating admission from the defendant are two of the psychological tactics the Court of Appeals strongly disapproved. The Court dismissed the appeal on technical grounds, allowing the Second Department ruling to stand. **[100 A.D.3d 228]**. Relying on **Guilford**, the Court concluded that the Appellate Division used the correct legal standard in its reversal. And by determination that the potential to overwhelm defendant's free will was realize was plainly one of fact.

15. The **Bedessie** Court underscores the need to reinvestigate wrongful conviction under the safeguards in place that: (1) transparency of process at every stage, and (2) a standard of review that is clearly pronounced at the start of the investigation in which all safeguards failed in Defendant's case pre **Bedessie**, and amid the Kings County District Attorney's Office is reviewing more than 60 wrongful conviction by the hand of police misconduct. If Kings County District Attorney's Office accept the conventional wisdom advanced by **Bedessie**, if they meet their ethical obligation

9

and conduct the kind of investigation suggested by **Hamilton** - fairly, with transparency and free of conflicting interest, and if they adhere to an openly announced justice system will be significantly strengthened. The Court of Appeals authorize the lower court to exercise a vehicle to overcome resistance proffered by the prosecution disqualifying expert opinion without specialized knowledge by sufficient aiding the jury in reaching its verdict. See **People v. Oddone, 2013 N.Y. Slip Op 08291 (N.Y. 2013).** Adopting this approach an expert can provide an opinion by reviewing Kings County admission tendered upon a slew of wrongful conviction (known and unknown), and not predicated on unsavory character witness but directed the constitutional offender and the very same office it attempt to explored at an evidentiary hearing.

### POINT TWO

**THE JUDGMENT WAS PROCURED BY DURESS, MISREPRESENTATION AND FRAUD ON THE PART OF A PERSON ACTING FOR OR ON BEHALF OF THE PROSECUTOR.**

16. The conviction herein was obtained in violation of the defendant's due process rights under the Constitution of this State and of the United States. The conduct of the police in this case while dealing with Julio Rivera and the defendant constituted a violation of the defendant's constitutional rights. The question of whether article 440 Criminal Procedure Law was enacted to aid in the promotion of justice and the courts have held that a certain amount of flexibility in its application is appropriate. The defendant herein seeks a

10

statutory remedy. He has complied strictly with the statute herein and has met his burden of proof at the post-judgment hearing conducted by this Court in June 8, 2009. (See Sentence Minutes, pgs. 1-16, Court File).

17. C.P.L. §440.10(h) authorizes a court to vacate a judgment obtained in violation of an accused constitutional rights: C.P.L. §440.10(1)(b) authorize a court to vacate a judgment procured by, inter alia "fraud on the part of the . . . . prosecutor or a person acting for or in behalf of a . . . prosecutor", and §440.10(1)(c) authorize a court to vacate a judgment obtained via false material evidence. While it is not claimed that the prosecutor in this case was directly involved or even knew of the actions of Detective Darino, it is clear that, as an agent of New York State law enforcement, that he was acting for or in behalf of the prosecution. His involvement, according to defendant testified that Detective Darino told him that if defendant did not confess, then both defendant and Julio, who was already in custody, would be charged with murder and that Julio would face life imprisonment, "just cause he tried to save your as a fight that you had" (E. Rivera: 562-63, 598, 600). Defendant wrote down a statement, misspelling his firs name because he was nervous (654-65). According to defendant, when he wrote down his statement, he was exhausted and suffering from a hangover (E. Rivera: 565).

18. In a similar case where a Court of Appeals was asked to determine the point at which police deception - a law

enforcement tool that the court has sanctioned for nearly 150 years ago, the New York Court of Appeals held that the use of deception, in and of itself, will not render a confession involuntary. **People v. Wentz**, 37 N.Y. 303 (1867) - is so psychologically coercive as to render a confession involuntary and there unconstitutional. It should be noted, however, that in applying **People v. Thomas**, 2014 WL 641516 (N.Y. 2014) the Court stressed that a coerced statement is inadmissible whether it is true or false. Further, the court observed, "there is not a single inculpatory fact in defendant's confession that was not suggested to him" by police.

19.   It should be clear from the evidence at trial that Detective Darino was a part of a prosecution team which held together the People's witnesses and much of the physical evidence in the case, such as the created photo arrays and police documents. As a New York City Police Officer he is an arm of the State. Traditionally, the phrase "The People of the State of New York", has been interpreted to include the Police, City and State Corrections Department and various other law enforcement agencies, as well as prosecutors, in determining state action for various different purpose, such as motion pursuant to CPL §330.30.

20.   It should be clear that Detective Darino was one who was acting in behalf of a prosecutor in influencing Julio Rivera to lie in Court, in order to obtain the conviction of Enrique Rivera. He was clearly acting in what he felt to be the prosecution's interest in doing what he did. The People should

not now be heard to claim that he was not "a person acting for or in behalf of a prosecutor", because he was successful in keeping his actions secret. Detectives Darino had testified that he had not told defendant that Julio would be charged with murder unless defendant confessed (Darino: 416). Detective Darino also had testified that he had not promised defendant that, if defendant told the police that he killed Ojeda in self defense, then defendant would be sentenced to only eight to ten years (Darino: 416).

21.   The language of the statute itself that it was the intent of the legislature to include such activity. CPL §440.10(1)(b) authorizes vacatur of judgment if the judgment was procured by duress, misrepresentation or fraud on the part of a prosecutor or "a person acting <u>for or in behalf of</u> . . . a prosecutor" (emphasis added). For the legislature to distinguish between "for" and "in-behalf of" indicates an intent to include someone with authority who is acting without the actual knowledge of a prosecutor, as in the case at hand.

22.   Considering the review ability by the Second Department of CPL §440.10(1)(b) decision as opposed to those under CPL §440.10(1)(g), the Court, discussing a case where, as here, the Jahira Serrano recantation related such testimony as "a now classic ground for relief in CPL §440.10(h) because of the fraud on the court." **People v. Hamilton, 115 A.D.3d 12 (2d Dept 2014)** court id not pigeonhole its decision to fact specific claim of actual innocence but ruled on three discrete provision of New York Constitution which forbid a wrongful

13

conviction in pertinent part at issues herein, holding that:

> "A freestanding claim of actual innocence, is rooted in several different concepts, including the constitutional right to 'substantive' and 'procedural due process', and the constitutional right not to be subject to cruel and unusual punishment."

23.   Because right now, New York courts are fighting 21st century with 20th century tools is just doesn't make sense. The common element to many wrongful conviction - young defendants, false confession, mistaken eyewitness identification. CPL §440.10(b)-(h) is a statutory safety valve which provides for a post sentence review of conviction and sentences to address the problem of a potential wrongful conviction, either as a matter of improper process or as a matter of facts or insufficient evidence to convict. Perhaps the 20th century of acceptance is coming to an end. The firs time in New York State, and appellate court has recognized that a freestanding claim of actual innocence is ground for defendant to challenge their conviction. This again is not something that can be determined without an evidentiary hearing. The Second Department's recent decision in **People v. Jones, 115 A.D.3d 984 (2d Dept 2014)** was of a similar character to the evidence warranting a hearing in **Hamilton.** A hearing necessary to promote justice inasmuch as the issues raised are "sufficiently unusual and suggest searching investigation."

### POINT THREE

**THE WITHHOLDING OF BRADY/GIGLIO MATERIAL REQUIRE THE VACATION OF JUDGMENT AND A NEW TRIAL.**

14

24. Detective Darino perjured himself at defendant's trial when he told defendant that Julio Rivera would be charged with murder unless defendant confessed, (S. 8 - describing Serrano's eyewitness statements). As demonstrated below, by failing to reveal the recantation by Jahira Serrano to the defense, the prosecution violated its federal and state constitutional duties to disclose exculpatory evidence. See **Brady v. Maryland**, 373 US 83 (1963). Additionally, by failing to correct Detective Darino's perjured testimony in this subject, the prosecution violated its constitutional duties to correct false testimony. See, **Giglio v. United States**, 405 US 150 (1972). This Court refused and asked the prosecutor any question of Ms. Chu, why is it she waited until May 4, 2009 to raise these facts?

25. It is axiomatic that for a motion made pursuant to CPL §440.10, as pointed out in **People v. Rodolfo Taylor**, Ind. No. 1185-84, 1355-84, ___ A.D.3d ___ (2nd Dept 2014), the Second Department, reversed the trial court's order, which denied the defendant's motion to set aside verdict based upon a Brady/Rosario material as reasonable possibility that the People's failure to disclose the material contributed to the verdict against him, without a hearing. The Court held that the defendant's motion to vacate the judgments of conviction was supported of conviction was supported by his own sworn allegation that the subject Brady/Rosario material was not provided to the defense at his criminal trials (citing CPL §440.30[1][a]). In addition, the Court in Brady/Rosario,

15

indicated that a hearing is necessary to determine whether the Brady/Rosario material were disclosed to the defense, and if it is determined that they were not, whether there was a reasonable possibility that the nondisclosure contributed to the verdict against the defendant, including whether the Brady/Rosario violations had an impact on the defendant's ability to defend other counts to which they did not directly apply, or otherwise influenced the verdicts on those counts. **Id.**

26.   There is no dispute here that the discovery, during post-judgment hearing, that the prosecution failed to inform the defense of recantation by the witness Jahira Serrano. It is equally clear that this evidence was "favorable" to the defense because it would have impeached the objectivity and credibility of the case lead interrogator and investigator. **Giglio**, **405 US at 154** ("favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness."), see also, **People v. Taylor, supra** ("This Court has held that the Rosario/Brady material are all relevant to the issues of the identification of the defendant as the perpetrator of the robberies, the information contained in that material was not mentioned at the defendant's jury trial, or used by defense counsel to impeach the People's witnesses") (quoting **People v. Cardona, 138 A.D.2d 617, 618-619**). The defense had no access to this witness or to the information which she supplied during her recantation, C.P.L. 440.10(1)(f).

27. Defendant was prejudiced in that it would be fruitless to pursue leads which had become stale with the passage of more than four year. Nor can it be said that the failure to disclose did not contribute to the verdict. When the reliability of the People's witnesses may, as here, be determinative of guilt or innocence, any nondisclosure of evidence affecting credibility would require a new trial and that the good faith or bad faith of the prosecutor is not relevant. Had the recantation by Jahira Serrano been turned over, it could have cast doubt on what Julio Rivera said and might as well have resulted in a different trial strategy. **People v. Vilardi, 76 N.Y.2d 67, 77 (1990).**

28. Additionally, it well established that the due process imperative to disclosure favorable evidence extends to information held only by the police - here, by Detective Darino. As the Supreme Court has recently reaffirmed, "Brady suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor." **Youngblood, 126 S.Ct. at 2190** (quoting **Kyles v. Whitley, 514 US 419, 438 [1995]),** see also **Kyles, 514 US at 437** ("[T]he individuals prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.") **Banks v. Drake, 540 US at 668, 693 (2004).** Indeed, if Detective Darino was allowed to conceal unilaterally evidence that would be beneficial to defendant's defense, this would amount to "substitut[ing] the police for the

17

prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trial." **Kyles**, **514 US at 438.** The Due Process Clause tolerates concealment by no government agent.

29. To establish prejudice under Brady, there must be a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." **Kyles**, **514 US at 433** (internal quotation marks omitted). This burden is lower than the one applicable to defendant's new trial claim. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermine confidence in the outcome of the trial.'" **Id.** at 434.

30. Defendant's claim plainly satisfies, as detailed in lead Detective Darino was a crucial prosecution witness who not only gave important testimony about defendant's allegedly suspicious demeanor and statements, but also made critical judgments about the direction of the investigation. It was, after all, Darino who decided to push Enrique Rivera for a confessing only two days into the investigation.

31. Given the significant weakness in the prosecution's evidence and given that the jury's verdict was already close, the revelation of Detective Darino's unabashed perjury quite

likely would have tipped the verdict in favor of acquittal.
Cf. **Napue v. Illinois**, 360 US 264, 269 (1959) ("The jury's
estimate of the truthfulness and reliability of a given
witness may well be determined of guilt or innocence, and it
is upon such subtle factors as the possible interest of the
witness in testifying falsely that a defendant's life or
liberty may depend.") Thus, defendant has demonstrated a
"reasonable probability that, had the evidence been disclosed
to the defense, the result of the proceeding would have been
different", **Kyles**, 514 US at 433, (internal quotations and
citation omitted). At a post-hearing this Court (Marrus, J.)
defense counsel placed on the record.

> MR. DRANOVE: [Defense Counsel] Your Honor:
> I'm making this motion on the grounds
> indicated initially in my May 6, 2009
> letter, in that we start with in your robing
> room after this case on May 4, sent to this
> Court, the prosecutor informed us that
> witness Serrano had recanted.
> And the Prosecutor, when asked what was the
> recantation, repeated, 'she recanted.' (S.
> 4, Court files).
> [DEFENSE COUNSEL] I spoke to Ms. Serrano in
> my office.
> Several things come for that interview
> Number one, during this trial, over my
> objection I think on page 207, if I'm
> correct of the transcript, the prosecutor
> asked my client's brother, Julio Rivera, did
> you tell Jahira Serrano that you brother
> Enrique stabbed someone in the bar. Julio
> Rivera said no. Now you Honor then allowed
> my client to testify. "I didn't see my
> brother after the incident in the bar until
> I dropped off or was dropped off by Jahira
> and she with Rudy, Rudy Cordova."
> Now, Ms. Serrano told me she was in, with
> Rudy, went to the police several days after
> the incident, but after she learned somebody
> had died because she read about it in the
> newspaper. She went with her then two year
> old son, was put in a room, knew that Rudy

was put in a different room. Rudy is the
father of her son.
This was in the morning of that date. She
recalls she and her son didn't anything to
eat or drink for hours, and for hours. She
told me she didn't see that happened. She
told the detective who spoke to her she
didn't see what happened. She was in the
back dancing with the girls, and the girls
were dancing, because they wanted guys to be
interested in them, so she was in the back.
Something happened, the lights went on, She
wanted to see what the commotion was,
bouncer, or a bouncer or more than one
bouncer prevented her form going up front.
Then a time came when she was allowed to
leave. She saw blood drops, she got a phone
call from Julio Rivera. Julio, you got to
bring my jacket and car keys. I'm not
allowed back in, or I can't get back in. She
the, in the car ended up dropped off at some
location, leading Julio in his car Julio
didn't say a thing about his brother Enrique
in the precinct - excuse me. She said, Julio
didn't say anything about this brother
except I am going to meet up with him or I'm
looking for him, words to that effect.
Thereafter, a day or two later, it is four-
plus years ago, think it's a day or two
later, when ends up in the police station.
She was questioned hours on hours, and she
said, I don't know what happened, I didn't
see it happen. The cops would go in and out
of the room. One of them, she remembers,
appears Puerto Rican to her, the others
where white, she recalls. And say Rudy said
that Julio said that his brother stabbed
someone, and she said, no, he didn't. This
went on for hours, late in the afternoon,
she, with her two year old there, heard, and
I'm paraphrasing her, "If you don't tell us,
we're going to take you kid away from you.
"Your were there. Someone died.
"As far as we're concerned, you're
involved." Words to that effects. "We're
going to take you son from you." She told
quite candidly, she had been in foster care
when she was a child, taken from her own
mother, and id not see her mother until she
was 10 years old, after that. And she had
just - that history combined with what she
was threatened with, caused her to say.
"I'll say what you want to say and it was
then some words were passed, someone came in

with a tape recorder, said something, her
name, time, and she made her statement. Now,
that led me, and this all happened very
suddenly, last week after we tracked her
down, to take another look at Rudy Cordova's
statement, and have my investigator track
him down. He was tracked down, and what I've
heard form my investigator because I haven't
met him is, as he recalls it, he was kept
there for an even longer period of time, was
told basically Jahira said, you heard, Julio
say his brother Enrique stabbed a person.
And he said, that's not true, because he
didn't say it, and that his went for a long
time. Now, ultimately, he under pressure,
also changed his statement.
Rudy Cordova at trial was mentioned by John
Dominguez as having been right up there at
the bar with Dominguez, Rudy Cordova in a
police report, same report that say Julio
Rivera says Enrique says He stabbed him,
Cordova says, I was right there. I saw
Enrique, he punched him. I saw it He didn't
have a knife.
Now, but for the police misconduct and
pressuring and forcing there people to say
Julio said his brother said to him, his
brother, my client stabbed someone somebody
I would have called Rudy Cordova, because I
would have known the truth I would have been
able to establish in Jahira the
extraordinary menacing pressure put on her,
pressure my client testified to, in which
Detective Darino said no pressure, we just
asked him to talk. And he said yes, sure,
I'll tell you what happened, and the
prosecutor would not have asked my client in
the courtroom, didn't your brother say he
stabbed the victim?
Now, I couldn't discover this information
sooner, and there's more, Judge, Jahira
Serrano told me that after she was at the
police station, sometime later but years
ago, that's her recollection, I wasn't
there, this is her recollection, she came to
downtown Brooklyn. She doesn't remember
anything about the woman but she told the
woman, I don't know what happened that
night, and she's not at this moment, Ms.
Serrano, clear about what else she told the
woman. That's years ago.
So what I submit is, in light of the
prosecutor telling us beyond the even of
trial, literally the later morning of the

> first day of trial that Ms. Serrano
> recanted, that there's a problem.
> Either the recantation is several years old
> before the first trial and I was entitled to
> know that as defense trial counsel before
> the first trial, or at some later sometime.
> But certainly not at some amorphous trial
> and "recant" being the sole word, the word
> being placed before your Honor and counsel.
> (Sentence Minutes, pgs. 1-12, Court files).

32. Under the circumstances, this was the only way possible for the defense to discover this evidence. If the case were retried today, with Jahira Serrano as a witness for the defense, instead of the prosecution, she would give evidence of how the police tried to frame the defendant Enrique Rivera. Even if the people had presented overwhelming evidence of the defendant's guilt, there is at least a reasonable possibility that the deprivation of the defendant's constitutional right to present a defense might have contribute to the defendant's conviction.

33. The People's theory established that Ojeda was stabbed during a later night bar brawl between two groups of intoxicated men. When several of the People's witnesses attempted to downplay the chaos of the scene, they were impeached with testimony from defendant's first trial, in which they said the stabbing occurred amidst "a big ruckus," with "[p]eople running back and forth," "screaming," and "yelling". The testimony of defendant's brother Julio similarly depicted a melee in which "all the punches [were] going off" so that he was unable to discern the direction from which the blows were coming. Consistent with the depiction of drunken chaos and

confusion,None of the four eyewitnesses who testified actually observed a knife in defendant's hand.

34. Since that, Ms. Serrano's recantation was one which was normally prepared in the regular course of business form information supplied by the witness and was exculpatory in nature, it constituted both **Brady v. Maryland,** 373 US 83, **People v. Rosario,** 9 N.Y.2d 286, and should have been turned over prior to trial. C.P.L. §440.10(1)(f) are the vehicles for moving against prosecutorial misconduct when it is first discovered after judgment. **People v. Taylor,** Id. No. 1185-84, 1355-84, ____ A.D.3d ____ (2nd Dept 2014) (The County Court erred in denying the motion on the ground that the defendant unduly delayed making the allegation of Brady/Rosario violations, as "[t]here is no time limit on the filing of CPL §440.10 motion"). The claim of the defense counsel that the conclusion of the first trial the prosecutor knew that there was **Giglio** material. The claim of the prosecutor that she had no knowledge of the existence of the document is of no avail where we are dealing with Brady/Rosario material.

35. The defendant always maintained that the confession he made was not read his Miranda warning until after he made oral and written statement in question. It was alleged that the statement was the product of deception and subterfuge as a police utilized various means to induce the statement, all of which violated his right. While New York courts had traditionally been tolerant of deception in confession cases. The Court of Appeals recently suppressed a confession by law

23

enforcement officers in that case denied the defendant due process. Judge Lippman wrote for the court. "What transpired during defendant's interrogation was not consonant with and, indeed, completely undermined, defendant's right not to incriminate himself - to remain silent." **Thomas, supra**. Here, these violation were alleged by the defendant at the **Huntley** hearing.

36.  If the prosecution attempt to pigeonhole **Hamilton** to a discrete factual finding and rejects its broad reading which encompass infallibility of witnesses testimony and direct and directed at the constitutional offender the officer of the Kings County, which publicly announced it inherent a throve of questionable cases that its still pouring the prosecution attempt to impress upon this Court must rebuffed. (A copy of recent admission is annexed herewith as Exhibit A-B-C).

37.  In one article dated April 9, 2014, D.A. Kenneth P. Thompson's Office served notice of two more potentially unjust conviction. Here, a study connected to the work of now retired Brooklyn Detective Louis Scarcell uncovered handwritten police notices from 1985 that "could" well exonerate two men. The old notes, revealed for the first time in a letter the D'A Office sent to Brooklyn Chief Administrative Judge, state that two witness say the killing - and named perpetrator other than the two convicted man.

38.  Distinguishable, another new article the defendant recanted his false confession before the DNA match and passed a polygraph requested by the Brooklyn D.A. apart this two

unnerving convictions that has no bearing on argument cited in
the case law proffered by the prosecution and analogous to the
factual predicate now under review by the innocence foundation
which aligned cross reference false confession employed herein
requires a reinvestigation by a qualified expert to educate
this Court whether defendant's confession is the product of
false inducement.

39.   In every criminal prosecution the defendant enjoys
the right to have counsel represent him. To interfere with an
intricate aspect of counsel's duties would be to infringe on
that right of an accused. The many responsibilities that a
defense counsel has often times requires that he conduct an
extensive investigation. In order to be able to do as such, the
courts of this sovereignty, adhering to the United States
Supreme Court's holding in **Brady**, and its progeny, has
recognized the enormity of defense counsel's responsibilities
with this realization in mind, the United States Supreme Court
has found it necessary that the prosecution attorney has some
sort of regulatory rule he/she must confront to when disclosing
material of significant to defense counsel. Hence, the
**Brady/Giglio** was born.

40.   For a prosecutor to delay disclosing Brady material
that is of sort which should be disclosed to counsel at time
when he can explore the may avenues such material creates,
would put limits n counsel's ability to perform as counsel
afforded an accused via the constitution language mirrors that
of the Federal Constitution (compare U.S. Const. 6th ["The

25

# EXHIBIT
# -A-

# 'I'm free!'



Jonathan Fleming embraces family after exoneration. Bottom, Disney World, where he was vacationing at time of Brooklyn murder he didn't commit.

# innocent man's joy after 24-yr. ordeal

BY AARON SHOWALTER/DAILY NEWS

BY OREN YANIV
NEW YORK DAILY NEWS

JONATHAN FLEMING had nearly 25 years in prison to imagine what it would feel like to be a free man.

After more than two decades behind bars for a murder he didn't commit, Fleming was exonerated Tuesday as Brooklyn prosecutors dropped the case.

"The day is finally here. I've dreamt about it many nights," Fleming, 51, said as he walked out of court. "I'm finally a free man."

"I feel wonderful," Fleming said. "I'm going to have dinner with my mother and my family and I'm going to live the rest of my life."

Fleming, who was vacationing in Disney World when the August 1989 homicide took place, was freed after prosecutors found evidence that was not disclosed during his trial.

The Brooklyn district attorney's office started reviewing his case last year and later uncovered a phone receipt from an Orlando hotel, showing he was there just hours before the murder, and a report from local police, who interviewed hotel staffers who remembered him. Both documents were found in the case file.

"It could not have possibly been a mistake," one of Fleming's lawyers, Taylor Koss, said of those nondisclosures by the authorities before and during his client's trial.

The DA's reinvestigation also discovered police reports that confirmed a recanting witness whose felony case was dropped after she falsely identified Fleming. A source said prosecutors

believed to be the actual killer and may now go after him.

Relatives of Fleming, including his mom and two of his kids, filled the courtroom and erupted in applause and cries of "Thank you, God!" when Brooklyn Supreme Court Justice Matthew D'Emic officially released him.

"I've waited for this so many years," Fleming's mother, Patricia, 72, said through tears after she hugged her son. "I feel like a burden was lifted."

Patricia Fleming, who testified at trial about their vacation, was still frustrated. "An innocent man did all this time," she said. "I was with him, and that's what hurts so bad."

Prosecutors at the 1990 trial were able to convince a jury that Fleming — who had videos and photos from the Disney vacation — could have hopped on one of 53 flights, shot dead Darryl Rush, 22, in a Williamsburg housing project, take a flight back and then

Brooklyn again the next day.

Brooklyn District Attorney Kenneth Thompson, who took office at the beginning of the year, said the decision to drop the charges was based on "a careful and thorough review."

Thompson has inherited a trove of questionable cases that a revamped conviction review unit is still poring over.

On Tuesday, the unit's work was praised.

"This is a glorious day," said Fleming's ex-wife, Valerie Brown, 46, who also testified during the trial about the Florida trip.

"Somebody heard our cries and today is a new beginning," she said. "It's going to be a process, but we're a strong family."

Fleming and his family gathered for a joyous meal at a nearby steakhouse, where the freed man ordered a T-bone steak and a piña colada.

"I don't drink alcohol, but I tried it today," he said with a smile.

oyaniv@nydaily...



## Union: firing by DA 'political payback'

A CITY DETECTIVES union is blasting Brooklyn District Attorney Kenneth Thompson's firing of a low-level investigator. It says was given the boot because he's related to one of former DA Charles Hynes' top lieutenants.

New York City Detective Investigators Association President John Fleming said the dismissal of 25-year-old Andrew Vecchione — son of former Rackets Bureau Chief Michael Vecchione — from his $55,000-a-year job was "based solely on political payback."

"He was a grunt ... the most basic of low-level investigators, and he was called into the chief's office and was told that he had to resign or get fired," Fleming said about the younger Vecchione's termination.

Thompson targeted the elder Vecchione in his campaign against Hynes, claiming that the bureau chief had intimidated witnesses.

Thompson said he would fire Michael Vecchione once he took office, but the seasoned prosecutor retired at the end of last year, before Thompson became DA.

The DA's office did not immediately return a call for comment.

Thomas Tracy

Friday, February 9, 20...

# Murder verdict tossed after 22 yrs.

The judge vacated his triple-murder conviction, the guards unlocked his hand and foot shackles, the courtroom broke into tears and applause. And for the first time in nearly 22 years, Tony Yarbough was a free man.

One week before his 40th birthday, he hugged his aunt Sandra Vivas and cousin Sylvia Vivas and walked with stunted steps like he was still shackled out into the hallway of the 19th-floor Kings County Supreme Court building. He staggered into a storm of cameras and turned into a lawyer-client conference room with Phil Smallman and Zach Margulis-Ohuma, who worked four tenacious years to spring him.

He plopped in a chair in an crazy daze of freedom. I asked him what he missed most.

"My mom and my little sis-



**DENIS HAMILL**

ter," he said on Thursday. "I did 22 years for killing them and my little niece, which I never did. And now that I'm free, I still miss them. I always, always will. I don't even know where they're buried."

He dropped his head in his arms and sobbed softly and then excused himself as he knelt and rested his head in his hands on his chair and said a prayer as his big body rattled with the electrified emotions of liberty and exoneration.

"Forgive me," he said. "I said a prayer to my mom. Asked her to watch over me as I try to make the best of the rest of my life. My mother was a lady with problems like we all have. But she had a wonderful heart."

On the morning of June 18, 1992, Yarbough came home from a night of partying in Manhattan with his friend Sharrif Wilson to find the bodies of his mother, Annie Yarbough, 40, her daughter, Chavonn Barnes, and Latasha Knox, both 12, stabbed and strangled with electrical wires.

He was arrested for those crimes although there were no witnesses, physical evidence or real motive connecting him to the crimes. Wilson, a scared boy of 15, would eventually confess to committing the murders with Yarbough. But in 1999, while both were still in prison, another woman was murdered in Brooklyn in similar fashion.

Last year, the medical examiner's office discovered that the DNA found in the woman murdered in 1999 matched the DNA found under Yarbough's mother's fingernails in 1992.

The two lawyers who had been working on the case for four years appealed to the court and the Brooklyn district attorney's office to free both men. Wilson recanted his false confession before the DNA match and passed a polygraph requested by the Brooklyn DA.

On Thursday — 7,903 days after Tony Yarbough was incarcerated — Justice Raymond Guzman vacated the conviction with the blessing of the new Brooklyn DA, Kenneth Thompson.

"I cannot thank my two lawyers enough," Yarbough said. "They believed in me, stuck by me, fought for me."

He took a deep breath and said, "If there had been a death penalty in New York I would be dead by now. But instead I have lived long enough to get my freedom and be exonerated."

He walked from the room and spoke to the press and rode the elevator down stairs and stepped out onto frigid Jay St. where he gulped the free winter air of Brooklyn. "I want the person who did this to my family to be caught and have to live through the hell I went through for 22 years," he said. "I want to start my life with a clean slate."

Yarbough will reside in a Fortune Society residence until he can find employment. The

group helps former inmates adjust to life on the outside.

Someone dialed a cell phone, something he'd never used, and he spoke to his grandmother who still lives in the Coney Island Houses where the murders occurred.

"Grandma, it's Tony," he said. "I'm out. I'm free. I love you. And I will be seeing you soon."

Then Tony Yarbough walked through the streets of downtown Brooklyn to Junior's on Flatbush Ave. to eat his first meal as a free man.

"God is good," he said. "It just feels so weird walking on the streets of Brooklyn again as a freeman."

Welcome home.

*Anthony Yarbough enjoys some pineapple cheesecake at Junior's restaurant Thursday after a judge vacated his conviction for the 1992 killings of his mother, half-sister and her friend.*

## TASTE OF FREEDOM

PHOTO BY JESSE WARD

24, Wednesday, April 9, 2014

## DAILY NEWS
## EDITORIAL

# Too much faith

A cardinal and nine bishops walk into the state Capitol – and the very bad joke was on them.

Timothy Cardinal Dolan of the Archdiocese of New York, Bishop Nicholas DiMarzio of Brooklyn and Bishop William Murphy of Long Island were among the Catholic prelates who traveled to Albany to seek tax credits for private school donations.

It was their top priority, a crucial step toward rescuing financially troubled parochial schools. In a year when lawmakers were focusing on education, the cardinal and bishops had reason to believe their timing was right.

They met with Gov. Cuomo, Assembly Speaker Sheldon Silver and Senate co-leaders Dean Skelos and Jeff Klein. The elected officials smiled and nodded and gave assurances.

And the bishops came away feeling suckered. The politicians led them to believe one thing, then did another.

"No guts in Albany," was the suitably stinging headline in The Tablet, the newspaper of the Brooklyn Diocese. "Though Gov. Andrew Cuomo had indicated he would support (education tax credits), in the midst of closed-door horse trading, he meekly backed away from the effort," a Tablet editorial read. Also righteously angry was Catholic New York, the newspaper of Dolan's archdiocese.

"Winter may finally be over, but Catholic schools and Catholic school families are still out in the cold as far as Gov. Cuomo and state lawmakers are concerned," the editors wrote.

"We're at a loss to understand why this tax credit was left out of the budget," they added. "It had the support of 80% of lawmakers, of the governor, and some 80 other organizations, including faith groups, business leaders and labor unions."

In his column for The Long Island Catholic, Murphy, too, was puzzled as to why the needs of Catholic and other private schools were "thrown under the bus."

"We do know that, to the end, Sen. Skelos was firm in his commitment and in his support arguing for the education tax credit....

"We do know that Speaker Silver offered 'extra help' in giving us money we already are owed. He did not support the education tax credit.

"We do know that the public teachers unions are politically very strong and continue to have a visceral negative attitude to any school that is not a government school.

"And we also know that the governor verbally supported us whenever the bishops of New York spoke with him (last on March 18) or the cardinal contacted him."

Now these men of faith also know better than to have faith in the men who run New York.

# Thompson's tough task

Taking over as district attorney is a big job. Taking over one of the country's largest prosecutorial offices is harder still. Taking over the mess left by former Brooklyn DA Joe Hynes is about as rough as it gets.

Three months into the job, DA Ken Thompson has the burden of combing through Hynes' case files in search of miscarriages of justice. Of which there appear to be more than a few.

The new DA will need unerring judgment in distinguishing between wrongfully convicted defendants and those who have fantastic stories to tell. Of which the supply is limitless.

On Tuesday, Thompson secured dismissal of charges against Jonathan Fleming, who spent 24 years in prison on a murder conviction.

Early in Hynes' tenure, the DA's office indicted Fleming for allegedly shooting dead a man named Darryl Rush in Williamsburg in 1989.

From the start, Fleming maintained that he was in Florida when the murder took place. The key witness against him was a crack addict who recanted after his trial – saying she was pressured by the cops, who dropped felony charges against her after she fingered Fleming.

Prosecutors began reviewing the case last year. They confirmed that the charges against the witness had indeed been dismissed. Further, they came up with a telephone receipt that put Fleming in Orlando just hours before the shooting.

Thompson's office has also served notice of two more potentially unjust convictions.

A broad-based study connected to the work of now-retired Brooklyn Detective Louis Scarcella uncovered handwritten police notes from 1985 that could well exonerate two men.

Alvena Jennette was convicted and served almost 21 years in prison. His brother Darryl Austin, also convicted, died there.

The old notes, revealed for the first time in a letter the DA's office sent to Brooklyn's chief administrative judge, state that two witnesses saw the killing – and named perpetrators other than the two convicted men.

Knowingly withholding exculpatory evidence would be a profound perversion of justice.

A single innocent man serving decades in prison is a travesty. This happening to multiple men is a horror. Thompson has tapped Harvard Prof. Ronald Sullivan to head an expanded conviction review unit, which will seek to determine whether anyone else has been wrongly jailed.

It is a herculean and sensitive job for which Sullivan – a former public defender, private practice lawyer, veteran of Harvard and Yale schools, and specialist in criminal law and criminal procedure – seems well-suited.

The task is to uphold the honor of the office's many professional prosecutors while changing a culture that permitted corner-cutting and worse.