```
 1     SUPREME COURT OF THE STATE OF NEW YORK

 2     COUNTY OF KINGS - CRIMINAL TERM - PART 29
       ------------------------------------------------X
 3     THE PEOPLE OF THE STATE OF NEW YORK,

 4                      -against-

 5     ENRIQUE RIVERA,

 6                          DEFENDANT.
       ------------------------------------------------X
 7     PAYTON, WADE, HUNTLEY HEARING
       Indict. No.  1453/05
 8                                    320 Adams Street
                                      Brooklyn, New York
 9                                    June 6, 2006

10

11     B E F O R E:

12          HONORABLE ROBERT J. COLLINI,
       Justice
13

14
       A P P E A R A N C E S:
15
                    OFFICE OF CHARLES J. HYNES, ESQ.
16                  DISTRICT ATTORNEY - KINGS COUNTY
                    For the People
17                  BY:  PHYLISS CHU, ESQ.
                         Assistant District Attorney
18
                    JOEL K. DRANOVE, ESQ.
19                  For the Defendant
                    299 Broadway
20                  New York, New York 10007

21


22                              JUDITH BRUSCA
                                OFFICIAL COURT REPORTER
23


24

25
```

JB

1          THE CLERK: Clerk number one on the calendar,

2    indictment 1453/05, Enrique Rivera. Mr. Rivera is

3    incarcerated, produced and before the Court.

4          MR. DRANOVE: Good morning, Judge. Joel

5    Dranove for Mr. Rivera.

6          MS. CHU: For the office of the District

7    Attorney Phyllis Chu. Good morning.

8          THE COURT: This case is on for hearing and

9    trial. Both parties ready?

10          MS. CHU: Yes.

11          MR. DRANOVE: Your Honor, I could not be ready

12    under the circumstances I previously outlined many months

13    ago which continue through today.

14          Just briefly, but accurately recapitulating,

15    in this case where a dozen or more witnesses were

16    interviewed and none of them put a knife in the hands of

17    my client I am striving to speak to the witnesses, but

18    all of their identities have been deleted from all the

19    police reports but for one or two oversights by the

20    prosecutor, which I'll turn to.

21          Now, unfortunately Mr. Ojeda was, in fact,

22    killed, but the open question is who did it?

23          My investigator not more than two weeks ago

24    upon my requesting so and based upon my identifying from

25    police reports a witness by name and phone number,

1       called that witness.  That witness informed my client

2       that he was instructed by the prosecutor to speak to

3       nobody, not just the defense attorney, but to nobody

4       about the case.  I don't know if he is speaking the

5       truth or not when he said that to my investigator.

6               I know my investigator is a former federal

7       agent, highly respected, past president of the Federal

8       Law Enforcement Association, a colonel in the New York

9       National Guard and not prone to exaggerate.

10              I don't know if I'll ever get an opportunity

11      to speak to witnesses even if they are identified, but I

12      would like to know who they are.

13              Through now I don't know who they are except

14      for guesswork on my part and it's very limited.  I don't

15      know what the prosecution submitted to your Honor with

16      respect to its ex-parte application that witnesses

17      identities be concealed.

18              Through now I've been able to learn at least

19      three and maybe more witnesses made statements that were

20      recorded by audiotape.  I don't have the tapes.

21              THE COURT:  I would like you to point to some

22      authority that shows me you should.  Give me case law

23      that says you should.  I could show you case law that

24      says you shouldn't.

25              MR. DRANOVE:  Prosecutor turned over interview

1    notes of them, but not the tapes. If they want to have

2    it both ways --

3              THE COURT:  It's not a matter of both ways.

4    It's a matter of abiding by the prescribed procedure.

5    That is what counsel has done.

6              We are going to proceed to trial.  If you have

7    an objection you could note it for the record.

8              MR. DRANOVE: I'll expand on my objection.

9              Since these are witnesses who I believe I

10   would like to interview because whatever they said

11   indicates clearly my client did not have a knife in his

12   hands.

13             THE COURT:  Counsel, is there any exculpatory

14   or Brady material you haven't handed over to counsel?

15             MS. CHU: He has pretty much -- he has

16   everything.  There is no Brady material.

17             MR. DRANOVE: I ask your Honor to determine

18   that.  In a case where my client is accused of stabbing

19   a gentleman, the witnesses say I didn't see a knife in

20   his hands or I saw him punch at a person or I didn't see

21   him do anything, that is not Brady material.

22             THE COURT:  That is why is we are going to

23   have a trial.

24             MR. DRANOVE: I'm entitled to know that.

25             THE COURT:  Please don't interrupt me while

1      I'm speaking.  I'll try my best not to interrupt you.

2              We will have the trial.  If during the trial

3      nobody saw your client do something and there is only

4      circumstantial evidence then that will be the situation.

5      If there is no evidence that should be easy for you.

6              MR. DRANOVE: But, your Honor, we have a right,

7      courts spoke on it in Brady, to know now the names of

8      those witnesses who I believe are exculpatory witnesses.

9              THE COURT:  I just asked counsel if there are

10     any exculpatory or Brady material that hasn't been

11     handed over and she indicated to me that there is not.

12             MR. DRANOVE: I'm asking your Honor to inquire

13     of the prosecutor are there any witnesses she is aware

14     of who do not put a knife in the hands of my client at

15     the time of the altercation?  I believe that is critical

16     defense evidence.

17             THE COURT:  Counsel, we will see what the

18     evidence is.  Obviously, you'll receive all the material

19     that you're entitled to at the time you're entitled to

20     receive it.  We are going to proceed now.

21             If there is Rosario material that has to be

22     handed over prior to the hearing --

23             MS. CHU: It's all been handed over.

24             THE COURT:  Let's move forward.  I don't mean

25     to cut you short.  You have your objection.  We will

1    move forward.  My understanding is this is a Wade

2    Huntley and Payton hearing.

3              MR. DRANOVE: There is a difference between

4    Rosario and Brady material.  Whatever is Rosario still

5    doesn't identify who the people are.  I'm talking about

6    Brady material.

7              THE COURT:  If counsel moves forward and has

8    not handed over Brady material she is absolutely moving

9    forward at her own peril.  I cannot imagine she would.

10   She indicated to me two moments ago there was no Brady

11   material that has not been handed over.  I know counsel

12   for a long period of time and I know her

13   professionalism.  I know she knows what Brady material

14   is.  If she didn't hand it over I suspect there isn't

15   any.  If it comes out down the line there was and the

16   prosecution has not handed it over intentionally and

17   willfully now before the Court then there will be

18   situations that have to be dealt with.

19              I can only assume as an officer of the court

20   that Miss Chu has made a proper representation.  We are

21   going to move forward.  I understand your concern about

22   Brady material.  Miss Chu indicated it doesn't exist.

23   I'm not about to go on a witch-hunt to see if it does.

24              MR. DRANOVE: The people who are not disclosed

25   by name, address or phone number to me who said either I

1    didn't see him push the person, I didn't see a knife, I

2    only saw a punch, those are exculpatory witnesses.  But

3    she turns over the exculpatory report without the name

4    of the person so she can tell you disingenuously there

5    is no Brady material, I turned it over I can't do

6    anything with it.

7              THE COURT:  I'll stop now.  At this point your

8    record has been made.  I don't want to get involved in

9    any accusations as to disingenuosity.  I'm going to

10   proceed with the assumption that both parties are acting

11   professionally.  If it turns out in the future one of

12   the parties is not acting professionally there will be

13   repercussions, serious repercussions.  Let's just assume

14   for the purpose of moving forward that everything is

15   being done as it should be done.

16             MR. DRANOVE:  Also I'm missing four DD-5

17   reports.  I'll take that up with Miss Chu before jury

18   selection starts.  Hopefully, we could resolve it.

19             THE COURT:  Anything else?

20             MR. DRANOVE:  We are ready.

21             THE COURT:  Thank you.  Call your first

22   witness.

23             MS. CHU:  The People call Detective John

24   Darino.

25             THE COURT:  Counsel come up for a moment.

1                    (Discussion held at the bench, off the

2          record.)

3                    DETECTIVE JOHN DARINO, having been first duly

4          sworn, testified as follows:

5                    THE COURT:  State your name, shield number for

6          the record, spell your last name.

7                    THE WITNESS:  Detective Darino, D-A-R-I-N-O.

8                    THE COURT:  Slowly.

9                    THE WITNESS:  D-A-R-I-N-O.  Shield number 186.

10                   THE CLERK:  Your assignment.

11                   THE WITNESS:  Investigator.

12                   THE COURT: For where?

13                   THE WITNESS: 72 Detective Squad.

14                   THE COURT:  Miss Chu.

15                   MS. CHU: I may inquire; right?

16         DIRECT EXAMINATION

17         BY MS. CHU:

18         Q    Good morning Detective.

19         A    Good morning.

20         Q    How long have you been with the New York City

21    Police Department?

22         A    Approximately ten years.

23         Q    You're currently assigned to the 72 Squad?

24         A    That's correct.

25         Q    Are you a Detective there?

1          A     Yes, I am.

2          Q     I just want to direct your attention to February

3     27th of 2005.  Were you working on that day?

4          A     Yes, I was.

5          Q     Did there come a time that day when you became

6     involved --

7                     THE COURT:  One second.  Slowly.

8          Q     Did there come a time that day when you became

9     involved in the investigation into the death of Edgar Ojeda?

10                    THE COURT:  What date are we talking about

11          again?

12                    THE WITNESS:  February 27th.

13                    THE COURT:  Of when?

14                    THE WITNESS:  2005.

15         Q     Did you become involved in the investigation into

16          the death of Edgar Ojeda?

17         A     Yes, I did.

18         Q     Where did that take place?

19         A     Confines of the 72 precinct.

20         Q     Do you know the address?

21         A     Yes, I do.

22         Q     What is it?

23         A     314 39th Street, El Borinquen Bar.

24         Q     El Borinquen?

25         A     Bar.

```
 1                    THE COURT:   You're going to have to spell
 2   that.
 3                    THE WITNESS: B-O-R-I-Q-U-E-N.
 4        Q    N as in Nancy?
 5        A    Correct.
 6        Q    How is it that you became involved?
 7        A    I was assigned the case.
 8        Q    You were the case Detective?
 9        A    I was the case Detective.
10        Q    About what time was it that you got brought into
11   the case?
12        A    It was at approximately 0800 hours.
13        Q    That is when you started?
14        A    That's correct.
15        Q    Now, during the course of your investigation did
16   there come a time when you or your colleagues spoke with
17   witnesses who were present when Mr. Ojeda was killed?
18        A    Yes, I did.
19        Q    Were any nicknames or names given for the
20   perpetrator?
21        A    Yes, there was.
22        Q    What were the names or nicknames given?
23        A    Kekay.
24        Q    Kekay.  Based upon that information did you find
25   out who Kekay was?
```

```
 1        A    Yes, I did.

 2        Q    Who was that?

 3        A    Enrique Rivera.

 4        Q    Did you create a photographic array with Enrique

 5   Rivera?

 6        A    Yes, we did.

 7        Q    When did you do that?

 8        A    It was on February 27th at approximately 2110

 9   hours.

10             THE WITNESS:  Can I refresh my memory to look

11        at the notes?

12             THE COURT:  Yes.

13             THE WITNESS:  It was on February 27th at

14        approximately 2050 hours.

15        Q    2050 hours is when?

16             THE COURT: 2050 hours is what?

17             THE WITNESS: 8:50 p.m.

18        Q    Did there come a time when you showed the array to

19        witness number six?

20        A    Yes, I did.

21        Q    What date and time did you show this array to that

22   witness?

23        A    February 27th at 910 hours.

24        Q    9:10 p.m.?

25        A    P.m.
```

1        Q    Where did you show this array?

2        A    72 precinct.

3        Q    When you showed the array to witness number six did

4   you explain to witness number six what you were going to do?

5        A    Yes, I did.

6        Q    What did you tell her?

7        A    I explained to him there was going to be six

8   individuals, six photographs of individuals and I wanted to

9   see if he recognized anybody in the photographs.

10       Q    Anybody with you when you did this array?

11       A    Detective Gaynor.

12       Q    Once you showed the witness the array did the

13   witness recognize anyone in the array?

14       A    Yes, he did.

15       Q    What number photograph did the witness recognize?

16       A    Number 2.

17       Q    Number 2. And whose photograph was in position

18   number 2?

19       A    Enrique Rivera.

20       Q    Did the witness indicate to you where they

21   recognized the person from?

22       A    Yes, he did.

23       Q    What did he say?

24       A    He said he recognized him as the male he saw

25   punching and swinging his hands at the guy who got stabbed.

1      Q    Do you have the array that you showed to witness

2    number six with you today?

3      A    Yes, I do.

4      Q    Would you please.

5            MS. CHU: Your Honor, if I could have that

6      deemed marked People's 1 for identification.

7            THE COURT: Deem it marked.

8            MS. CHU: Your Honor, just to keep along the

9      lines of witness number one, all the reference numbers,

10     may I use a copy to put into evidence and you can look

11     at the original? The copies are redacted. The original

12     is obviously not.

13           THE COURT:  We will deem the copy marked

14     People's 1.

15           MS. CHU: Sorry, I didn't bring a redacted copy

16     with me.

17           THE COURT:  Do you have a --

18           MS. CHU: I'm sorry, I didn't bring a redacted

19     copy.

20           THE COURT:  Do you have one with you?

21           MS. CHU: No.

22           MR. DRANOVE: Of what?

23           THE COURT: The photo array.

24           Counsel, do you have a copy of the photo

25     array?

1           MR. DRANOVE: I believe I do.  I could look

2      through it right now.  The prosecutor is a couple steps

3      ahead of me.  I'll take a look.

4           THE COURT:  We will deem the original marked

5      as People's 1 for identification for purpose of the

6      hearing.  Hand me the original.  I'll use it.  Counsel

7      can review his copy, if he finds it, and then he could

8      show me and I'll compare it with the original and I'll

9      see whether or not --

10          MR. DRANOVE: Judge.

11          THE COURT:  Otherwise we will suspend that

12     portion of the hearing until you could have your copy

13     provided.

14          MR. DRANOVE: I'm looking at a copy of an

15     original.

16          THE COURT:  Why don't you hand it up.

17          MR. DRANOVE: Name crossed out and number six.

18          THE COURT:  Hand it up.

19          (Handing.)

20          THE COURT: It's a terrible copy.  I would hope

21     that your office could do better next time with copies,

22     but it is a copy of the original.

23          The photographs are very dark, hard to make

24     out.

25     Q    Detective were any marks made on the array at the

1          time you showed it to witness number six?

2          A    Yes, there was.

3               THE COURT:  Do you want to move the array into

4          evidence for purpose of the hearing?

5               MS. CHU: Yes.  I want to ask him a few

6          foundation questions.

7               MR. DRANOVE: May I see it?

8               THE COURT:  Your copy is the same as the copy

9          the officer is looking at.

10              MR. DRANOVE: He has my copy.

11              THE COURT:  He has the original.  The original

12         is unredacted.  I'm not going to hand it over for you to

13         look at.

14              I've looked at both items and they are the

15         same documents except for the redaction.

16              MR. DRANOVE: My copy has two redactions.

17              THE COURT:  Except for the redactions.

18              MR. DRANOVE: I didn't hear the plural.

19              THE COURT:  I stand corrected.  Thank you

20         counsel.  Continue.

21         Q    Detective, I'm sorry.  Did you answer me?  Were any

22         notations made on the actual array at the time that the

23         array was shown to the witness?

24         A    Yes, there was.

25         Q    Who made those?

1      A    I did and number six did those notations.

2      Q    Is there also a date and time indicated on the

3    array?

4      A    Yes, there were.

5      Q    The one you have in front of you, is that the

6    actual array you showed to the witness on February 27th,

7    2005?

8      A    Yes, it is.

9             MS. CHU: At this time I would offer that into

10       evidence as People's number 1.

11            THE COURT: Counsel.

12            MR. DRANOVE: Your Honor, a request, is it

13       possible someone can put some sticky material over what

14       identifies the individual?

15            MS. CHU: The witness actually has a duplicate

16       copy of the array without signatures.

17            THE WITNESS: Would you like that?

18            THE COURT: Yes. For purpose of the hearing

19       we are going to need the actual signed array as

20       evidence.

21            MS. CHU: I understand that.

22            (Handing.)

23            THE COURT: Counsel, you can step back.

24            MS. CHU: May I continue, your Honor?

25            THE COURT: Yes. Any objection counsel?

1           MR. DRANOVE:  No.

2           THE COURT:  Deemed marked People's 1 in

3       evidence for purpose of the hearing.

4       Q    Detective, directing your attention to February

5       28th of 2005.  Did your office also receive information

6       regarding the whereabouts of Enrique Rivera?

7       A    Yes, I did.

8       Q    And what information did you get?

9       A    That Enrique Rivera was at 172-18 Effington Avenue,

10      Flushing, New York.

11          THE COURT:  How do you spell it?

12          THE WITNESS:  E-F-F-I-N-G-T-O-N Avenue.

13      A    Flushing, New York 11358.

14      Q    Based upon that information did you go to that

15      location?

16      A    Yes, I did.

17      Q    And did you go there with anyone else?

18      A    Yes, I did.

19      Q    Who did you go with?

20      A    Detective Gaynor.

21      Q    Detective Gaynor?

22      A    Yes.

23      Q    Where is he from?

24      A    Brooklyn South Homicide Squad.

25      Q    About what time did you arrive at that location?

| | | |
|---|---|---|
| 1 | A | Approximately 0420 hours. |
| 2 | Q | About 4:20 in the morning? |
| 3 | A | That's correct. |
| 4 | Q | Can you just describe for me the location? |
| 5 | A | Excuse me? |
| 6 | Q | Can you describe the location? |
| 7 | A | Sure.  It was a private house. |
| 8 | Q | Private? |
| 9 | A | Private house detached. |
| 10 | Q | Did you knock on the door? |
| 11 | A | Yes, I did. |
| 12 | Q | Did anyone open the door? |
| 13 | A | Yes, they did. |
| 14 | Q | Did this person identify themselves to you? |
| 15 | A | Yes, she did. |
| 16 | Q | And what did she tell you her name was? |
| 17 | A | Patricia Glasgow. |
| 18 | Q | Did you identify yourself? |
| 19 | A | Yes, I did. |
| 20 | Q | What did you say? |
| 21 | A | I told her I was Detective Darino from the 72 |

22 Detective Squad, I was conducting an investigation, I wanted

23 to see if Enrique Rivera was there.

| | | |
|---|---|---|
| 24 | Q | Did Miss Glasgow say anything to you? |
| 25 | A | Yes, she did. |

JB

```
 1                    THE COURT:  I'm sorry Glasgow or Blasgow?
 2      Spell it.
 3                    THE WITNESS: G-L-A-S-G-O-W.
 4                    THE COURT:  Counsel.
 5      Q      What did she say?
 6      A      She told me he is right there on the couch.
 7      Q      Did you see someone on the couch?
 8      A      Yes, I did.
 9      Q      Can you tell me do you see that person here in the
10      courtroom today?
11      A      Yes, I do.
12      Q      Please point him out and indicate something he is
13      wearing.
14      A      Enrique Rivera.  He is wearing the suit with the
15      gray tie.
16                    THE COURT:  Indicating the Defendant.
17      Q      Now, did you speak with Enrique Rivera?
18      A      Yes, I did.
19      Q      What did you tell him?
20      A      I told him we are conducting an investigation and I
21      needed him to come outside with us.
22      Q      Did you tell him you wanted to bring him back to
23      the 72 precinct?
24      A      Yes.  I told him he needed to come back to the 72
25      precinct.
```

1    Q    You have to wait for me to finish my question.

2    A    Sorry.

3    Q    Once he got outside did you handcuff him?

4    A    Yes, I did.

5    Q    And you then transport him to the precinct?

6    A    Yes, I did.

7    Q    Once you arrived at the precinct where did you put

8  him?

9    A    72 Detective Squad interview room.

10    Q    Where is that located in the precinct?

11    A    Second floor in the Detective Squad.

12    Q    Was the Defendant handcuffed once you left him in

13  the room or did you take the handcuffs off?

14    A    Handcuffs were off of him.

15    Q    About what time was it when you arrived back at the

16  precinct?

17    A    Approximately 0500 hours.

18    Q    About five o'clock in the morning?

19    A    Yes.

20    Q    I want to direct your attention to about 5:15 in

21  the morning.  Did there come a time when you actually spoke

22  with the Defendant?

23    A    Yes, I did.

24    Q    Did you speak with him in that interview room?

25    A    Yes, I did.

1      Q      And was anybody else with you when you spoke with

2   him?

3      A      Yes.

4      Q      Who was with you?

5      A      Detective Gaynor.

6      Q      Before you speak to the Defendant did you read him

7   his Miranda rights?

8      A      Yes, I did.

9      Q      How is it you were able to read his Miranda rights

10  to him?

11     A      I read it off a sheet of paper.

12     Q      Is it a preprinted sheet of paper?

13     A      Yes, it is.

14     Q      Do you have that sheet of paper with you today?

15     A      Yes, I do.

16            MS. CHU: If I could have that deemed marked 2

17         for identification.

18            THE COURT: Deemed marked.

19     Q      Were any marks made on the Miranda sheet on

20         February 28th, 2005?

21     A      Yes, there were.

22     Q      Who made those marks?

23     A      Myself, Enrique Rivera and Detective Gaynor.

24     Q      They were made when you actually read him his

25  rights?

1        A     That's correct.

2        Q     That is the actual sheet you read to him?

3        A     Correct.

4              MS. CHU: At this time I would offer that into

5        evidence as People's number 2.

6              MR. DRANOVE: May I see that please?

7              THE COURT:  Certainly.

8              (Handing.)

9              MR. DRANOVE: Thank you.

10             THE COURT:  Any objection counsel?

11             MR. DRANOVE: No.

12             THE COURT:  So moved People's 2 in evidence

13       deemed marked.

14       Q     Detective Darino, would you please demonstrate the

15       way you advised the Defendant of his rights and include

16       anything that he said to you back.

17       A     Yes.  You have the right to remain silent and

18       refuse to answer any questions; do you understand?

19             His reply was yes and he placed his initials

20       Enrique Rivera next to it.

21             Anything you say --

22             THE COURT:  I'm going to stop you.

23             There are yeses written on that sheet.  Who

24       wrote those yeses?

25             THE WITNESS:  Enrique Rivera.

1      THE COURT: After you asked the question he

2   would sign yes and then initial it?

3      THE WITNESS: Yes.

4      THE COURT: Continue with your answer.

5   Q    Did he do that after each question or all together?

6   A    After each question.

7   Q    Continue.

8   A    Anything you do say may be used against you in a

9   court of law; do you understand?

10      You have the right to consult an attorney before

11   speaking to the police and to have an attorney present

12   during any questioning now and in the future; do you

13   understand?

14      If you cannot afford an attorney one will be

15   provided to you without costs; do you understand?

16      If you do not have an attorney available you have

17   the right to remain silent until you have the opportunity to

18   consult with one; do you understand?

19      Now that I have advised you of your rights are you

20   willing to answer any questions?

21      In Enrique's own handwriting he wrote I understand

22   my rights underneath all the questions.

23   Q    On all of the questions did he answer yes to all

24   your questions?

25   A    Yes.

1      Q    Did he write the word yes after each question?

2      A    Yes.

3      Q    And he wrote his initials after each yes?

4      A    Yes, he did.

5      Q    He also signed this piece of paper?

6      A    Yes, he did.

7      Q    Once he was read his Miranda rights did Enrique

8  Rivera agree to speak to you?

9      A    Yes.  Yes, he did.

10      Q    Could you tell us what sum and substance did he

11  tell you?

12      A    He stated he went to the bar on February 27th at

13  night on 39th Street and Third Avenue and he was there

14  having a few drinks when he got into a small confrontation

15  with a guy from the bar.  He said it was just -- he said he

16  was getting eye contact from a male and as he went to get a

17  second round of drinks the guy was still looking at him and

18  he looked back at the guy and the guy said to him what's up?

19  And he asked the guy what seems to be the problem?  And he

20  said the crowd rose and he felt punching and grabbing so he

21  took out a knife.  He said he used it in self-defense,

22  swinging it at the crowd not knowing that he really hurt

23  anyone.  He got in his car and went home.  He didn't know

24  anyone was hurt and it was self-defense.  He didn't mean it.

25  He was just scared.  He knew by saying sorry wasn't going to

JB

1    bring the person back, but he didn't really mean things to

2    go down that way and he was very sorry.

3         Q    After the Defendant made the statement -- was the

4    statement made in a narrative form just like how you read it

5    or was it more like a question and answer?

6         A    It was a question and answer.

7         Q    Did you tell him what the investigation was about?

8         A    Yes, I did.

9         Q    Before he actually spoke to you?

10        A    Correct.

11        Q    What did you tell him?

12        A    I told him we are conducting an investigation of an

13   incident that occurred at El Borinquen Bar on 39th and Third

14   Avenue and then he told me he was in the bar and that is

15   how --

16        Q    How the story goes?

17        A    Exactly.

18             THE COURT:   We are going to stop you one

19        second.

20             What is the name of the bar again?

21             THE WITNESS:   El Borinquen.

22        Q    Once he gave you this oral statement did you ask

23        him to write it down for you?

24        A    Yes, I did.

25        Q    Did you provide him with paper and pen?

JB

1          A    Yes, I did.

2          Q    Did you remain in the room when he actually wrote

3    it out for you?

4          A    Yes, I did.

5          Q    Do you have the statement that the Defendant wrote

6    for you on February 28th, 2005?

7          A    Yes, I do.

8               MS. CHU: At this time if I could have that

9          deemed marked People's 3.

10              THE COURT: Deemed marked.

11         Q    Detective, was that written in the Defendant's own

12   hand?

13         A    Yes, it is.

14         Q    And did he sign it on the bottom?

15         A    Yes, he did.

16         Q    Did you make any marks on it as well?

17         A    Yes, I did.

18         Q    When did you make those marks?

19         A    Prior to the statement -- on the top of the

20   statement and after the Defendant signed his name.

21         Q    You also wrote something on the bottom?

22         A    Correct.  My name.

23         Q    You put your name?

24         A    And Detective Gaynor signed his name.

25         Q    That was done at the time the statement was made?

1      A    Correct.

2      Q    That is the actual statement that he wrote out for

3      you?

4      A    Yes, it is.

5            MS. CHU: At this time I would offer that into

6      evidence as People's 3.

7            MR. DRANOVE: May I see the original?

8            (Handing.)

9

10            MR. DRANOVE: Thank you.

11            THE COURT:  Any objection counsel?

12            MR. DRANOVE: No.

13            THE COURT:  So moved People's 3 in evidence

14      deemed marked.

15            May I see that please?

16            (Handing.)

17            MS. CHU: May I continue?

18            THE COURT: Yes. You don't have to read the

19      statement; I just read it.

20      Q    Detective, I want to direct your attention to about

21      ten o'clock in the morning on February 28th, 2005.  Did

22      there come a time the Defendant spoke with an Assistant

23      District Attorney from the Kings County DA's office?

24      A    Yes, he did.

25      Q    Was the conversation recorded in any way?

1    A    Yes, it was.

2    Q    How was it recorded?

3    A    On videotape.

4    Q    Were you present when this conversation took place?

5    A    Yes, I was.

6    Q    Did the Assistant District Attorney have any

7    conversations with the Defendant that was not on videotape?

8    A    No.

9    Q    Do you recall what tape number was assigned to the

10   video?

11   A    Yes, I do.

12   Q    What was it?

13   A    Robert R 05-0027.

14        MS. CHU: At this time, your Honor, I would

15   like this deemed marked People's 4 and open and play it.

16        THE COURT:   Counsel.

17        MR. DRANOVE: I see an envelope.  I've already

18   seen what was supposed to be a copy of the tape.  I have

19   no objection so far.

20        THE COURT:   We will deem it marked People's 4

21   and play it.

22        MS. CHU: Want me to do it here or there?

23        MR. DRANOVE: Judge, is there a way I could

24   seat myself and my client a little more reasonably so we

25   can see?

1          THE COURT OFFICER: Can you slide over?

2          THE COURT:  It's up to the security of the

3     courtroom.

4          THE COURT OFFICER: Mr. Rivera, you could sit

5     over here please.

6          THE COURT:  If you would like to sit in the

7     jury box you can, counsel.

8          MR. DRANOVE: I think it's appropriate for me

9     to sit here.

10          THE COURT:  Whatever you want.

11          (Tape played.)

12          (Tape stopped.)

13          THE COURT:  Let the record reflect we just

14     viewed the tape.

15     Q    Was that a fair and accurate recording of the

16     entire conversation had between Assistant District

17     Attorney Sipress and the Defendant Enrique Rivera on

18     February 28th, 2005?

19     A    Yes, there was.

20     Q    Were there any additions or deletions from the

21     tape?

22     A    No.

23          MS. CHU: At this time I would offer into

24     evidence as People's 4.

25          MR. DRANOVE: No objection.

1           THE COURT:  So moved People's 4 in evidence

2      for purpose of the hearing deemed marked.

3      Q    I direct your attention Detective to about four

4      p.m. on the same day, February 28th of 2005.  Did there

5      come a time when you prepared to conduct lineups in this

6      case?

7      A    Yes, I did.

8      Q    And who was going to be the subject of the lineups?

9      A    Mr. Enrique Rivera.

10     Q    Did you contact any witnesses to come to view the

11     lineup at the precinct?

12     A    Yes, I did.

13     Q    Using the numbers that we were using before, can

14     you just tell me how many people did you try and contact to

15     view the lineup?

16     A    Six.

17     Q    Six people.  What did you tell them when you

18     contacted them?

19     A    I informed that I needed them to come to the 72

20     precinct to view a lineup.

21     Q    How did they come to the precinct if you recall?

22     A    Number five and six was picked up and taken back to

23     the 72 precinct.  One, two, three and four came on their

24     own.

25     Q    Once they all were at the precinct where did you

1      put them?

2           A    In separate rooms.

3           Q    Where was the Defendant when these witnesses

4      arrived at the precinct?

5           A    In the interview room.

6           Q    The separate rooms you put the six witnesses in,

7      where is that in relation to where the Defendant was being

8      held?

9           A    Feet wise?

10          Q    I'm sorry, let me withdraw that.  The room that the

11     Defendant was in is there a door to that room?

12          A    Yes, there is.

13          Q    Was the door opened or closed?

14          A    Closed.

15          Q    Is there a window on the door at all?

16          A    Yes.

17          Q    Is there a covering on the window or can you see

18     out?

19          A    There is a covering on the window.

20          Q    There is only one door to that room?

21          A    Correct.

22          Q    From the rooms that you put all the other six

23     witnesses in can you see into that interview room at all?

24          A    No.

25                    THE COURT:  Is the interview room the same

```
 1      room that the subject to the lineup was going to be viewed?

 2                      THE WITNESS:  That's correct.

 3                      THE COURT:  It's the viewing room and

 4           interview room.

 5      Q    Once the witnesses were at the precinct did you

 6           give them any instructions regarding not wandering

 7           around the precinct, etc.?

 8      A    Yes.

 9      Q    What did you tell them?

10      A    I told them to stay in the room they were in until

11      we conducted the lineup.

12      Q    Were each of the witnesses placed in different

13      rooms or were any of them together?

14      A    Number five and six were together.

15      Q    Did there come a time when you actually went to go

16      get fillers for this?

17      A    Yes, there was.

18      Q    Where did you get the fillers from?

19      A    Two fillers were from the neighborhood.  Three were

20      police officers.

21      Q    Did you already prearrange for the officers to

22      participate in the lineup before the witnesses got to the

23      precinct?

24      A    Yes, I did.

25      Q    And did you ask them to remain in an area where
```

1          they would not be seen in the precinct?

2               A     Yes, I did.

3               Q     Where did you ask them in remain?

4               A     In the police locker room.

5               Q     Where is that?

6               A     Basement of the precinct.

7               Q     Once the fillers were brought back to the

8          precinct --

9                     You said there were two fillers that were brought

10         from the neighborhood

11              A     Yes.

12              Q     Where were they placed?

13              A     In the interview room.

14              Q     Where the Defendant was?

15              A     Correct.

16              Q     What was done with the three officers that were

17         down in the basement?

18              A     Then they were brought up into the interview room.

19              Q     When the fillers are brought into the interview

20         room and when the three officers were brought into the

21         interview room where the Defendant was did they have to pass

22         at all the areas where the witnesses were being held?

23              A     No.

24              Q     Once they were all in the interview room did you

25         offer the Defendant the position that he wanted to sit in?

1    A    Yes, I did.

2    Q    What position did he select?

3    A    He selected position number 4.

4    Q    What did you do with the other numbers?

5    A    I handed out the numbers to other positions.

6    Q    Random --

7    A    Randomly.

8    Q    Did you take any photographs of this lineup once

9  they were situated in their positions with their numbers?

10   A    Yes, I did.

11   Q    Do you have those photographs with you today?

12   A    Yes, I do.

13        MS. CHU: At this time, your Honor, if I could

14   have that deemed marked People's 5 collectively.

15        THE COURT:  Counsel.  I'm sorry.  Deemed

16   marked.

17   Q    Detective, who took those photographs?

18   A    One of the detectives that was assisting me.

19   Q    How were the photographs taken?

20   A    With a Polaroid camera.

21   Q    Were they taken of all six together or separate?

22   A    Three and three.

23   Q    To first three?

24   A    First three and last three.

25   Q    Do those photographs fairly and accurately depict

1          how the lineup appeared before they began?

2          A    Yes, they do.

3                    MS. CHU: At this time, your Honor, I would

4          offer them into evidence as People's 5.

5                    MR. DRANOVE: May I examine them?

6                    THE COURT:  Certainly.

7                    (Handing.)

8

9                    MR. DRANOVE: Thank you.

10                   THE COURT:  Counsel.

11                   MR. DRANOVE: Are they being numbered as 5A and

12         5B?  I have no objection.

13                   THE COURT:  We will deem them marked 5A and

14         5B.

15                   1 through 3 would be A and 4 through 6 will be

16         B.  Any objection counsel?

17                   MR. DRANOVE: No.

18                   THE COURT:  So moved People's 5A and B in

19         evidence.

20         Q    Once the lineup was set up which number witness did

21         you get first to view the lineup?

22         A    Number one.

23         Q    What did you tell number one before you brought

24         them in to look at the lineup?

25         A    Explained that he was going to view a lineup, there

1    would be six individuals in the room and if he recognized

2    anybody I wanted him to let me know.

3        Q    What number?

4        A    What number did he choose?

5        Q    You asked him if they recognized anybody tell you

6    which number?

7        A    Correct.

8        Q    Did you ask them to tell you anything else they

9    recognized?

10       A    And where did they recognize that individual from.

11       Q    Number one went first?

12       A    Yes.

13       Q    About what time did number one view the lineup?

14       A    Approximately 4:18 p.m.

15       Q    Did witness number one identify anybody in the

16   lineup?

17       A    Yes, he did.

18       Q    Who did he identify?

19       A    Position number 4, Enrique Rivera.

20       Q    What did this witness tell you where he recognized

21   position number 4 from?

22       A    He said he recognized him from the El Borinquen

23   Bar.  He said that is the guy who stabbed the victim.

24       Q    Where did witness number one go next?

25       A    He exited through the side door.

1     Q    Who was gotten next, which number?

2     A    Witness number two.

3     Q    Witness number two, about what time did they view

4  the lineup?

5     A    At 4:20 p.m.

6     Q    Did you say the same thing to witness number two?

7     A    Yes, I did.

8     Q    Did witness number two identify anybody in the

9  lineup?

10    A    Yes, he did.

11    Q    Who did he identify?

12    A    Position number 4.

13    Q    Which was?

14    A    Enrique Rivera.

15    Q    Did they tell you where they recognized Enrique

16  Rivera from?

17    A    Yes, he did.

18    Q    From where?

19    A    He said from the El Borinquen Bar.  He said that is

20  the guy who punched the kid.

21    Q    Where was witness number two placed?

22    A    Witness number two exited through the side door.

23    Q    Same place that witness number one just left from?

24         MR. DRANOVE: Your Honor, could I have read

25    back the question and answer preceding the current

1       question and answer?

2                       (Whereupon, the Reporter read back as

3       requested.)

4       Q     I believe we just completed witness number two?

5       A     Correct.

6       Q     Who was gotten next?

7       A     Witness number three.

8       Q     Did you say the same questions that you stated to

9   us earlier regarding if he recognized anybody?

10      A     Yes, I did.

11      Q     Did witness number three identify anybody in the

12  lineup?

13      A     Yes, he did.

14      Q     Who did they identify?

15      A     Position number 4.

16      Q     Who was in position number 4?

17      A     Enrique Rivera.

18      Q     Did they tell you where they recognized Enrique

19  Rivera from?

20      A     Yes, he did.

21      Q     From where?

22      A     He said in the El Borinquen Bar.  He stated that's

23  the stabber.

24      Q     Where was witness number three placed?

25      A     He exited through the side door.

| | | |
|---|---|---|
| 1 | Q | Where one and two also exited from? |
| 2 | A | That is correct. |
| 3 | Q | Was witness number four next? |
| 4 | A | Yes, he was. |
| 5 | Q | And can you tell me witness number four did they |
| 6 | recognize anyone in the lineup? | |
| 7 | A | No, he didn't.  He did not. |
| 8 | Q | They did not? |
| 9 | A | No. |
| 10 | Q | Where was witness number four placed? |
| 11 | A | He exited through the side door. |
| 12 | Q | Was witness number five next? |
| 13 | A | Yes, she was -- yes, they were. |
| 14 | Q | And did witness number five identify anybody in the |
| 15 | lineup? | |
| 16 | A | Yes, they did. |
| 17 | Q | And what number did they recognize? |
| 18 | A | Position four. |
| 19 | Q | Did they tell you where they recognized the |
| 20 | Defendant from? | |
| 21 | A | Yes, they did. |
| 22 | Q | I'm sorry, who was in position number 4? |
| 23 | A | Enrique Rivera. |
| 24 | Q | Where did they recognize Enrique Rivera? |
| 25 | A | From El Borinquen Bar.  They stated that's Enrique. |

| | | |
|---|---|---|
| 1 | Q | Where was witness number five taken? |
| 2 | A | To view the lineup. |
| 3 | Q | Where is number five who just viewed the lineup? |
| 4 | A | Exited through the side door. |
| 5 | Q | Six, were they next? |
| 6 | A | Yes. |
| 7 | Q | Did they get brought in to view the lineup? |
| 8 | A | Yes. |
| 9 | Q | Did they recognize anyone in the lineup? |
| 10 | A | Yes. |
| 11 | Q | Who? |
| 12 | A | Position number 4. |
| 13 | Q | Who was in position number 4? |
| 14 | A | Enrique Rivera. |
| 15 | Q | Did they tell you where they recognized Enrique |
| 16 | | Rivera from? |
| 17 | A | Yes, they did. |
| 18 | Q | From where? |
| 19 | A | Said that's the guy swinging his arm and punching |
| 20 | | the victim. |
| 21 | Q | Where was witness number six taken after that? |
| 22 | A | He exited through the side door. |
| 23 | Q | Once each witness was done were they able to |
| 24 | | converse at all with any of the other witnesses who had not |
| 25 | | viewed the lineup yet? |

1    A    No.

2    Q    Was the Defendant given an opportunity to change

3  his position after each lineup was conducted?

4    A    Yes, he was.

5    Q    Did he opt to change his position?

6    A    No, he did not.

7    Q    He remained in position number 4 for all six

8  lineups?

9    A    That's correct.

10    Q    Did the Defendant have any opportunity to eat,

11  drink or use the facilities while he was in your custody?

12    A    Yes, he did.

13    Q    What?

14    A    He ate egg and cheese on a roll and coffee.  He had

15  three slices of pizza and a bottle of Sprite.  He had water

16  and coffee throughout the course of the day and an

17  opportunity to use the restroom.

18    Q    Once the lineups were completed did you place the

19  Defendant under arrest at this time?

20    A    Yes, I did.

21        MS. CHU: Thank you very much.  I have nothing

22        further.

23        THE COURT:  Counsel.

24        MR. DRANOVE: May I have a brief recess, your

25        Honor?  I'll be finished before the lunch hour for sure.

1       Five minutes.

2                    THE COURT:  Five minutes.

3                    MR. DRANOVE:  Thank you.

4                    (Witness excused.)

5                    (Short recess taken.)

6                    (Witness resumes the witness stand.)

7                    THE CLERK:  Let the record reflect the

8        Defendant is present with counsel, Assistant District

9        Attorney present.  You're reminded you're under oath.

10                   THE COURT:  Counsel.

11

12

13       CROSS-EXAMINATION

14       BY MR. DRANOVE:

15       Q     Detective, did you make any notes with respect to

16       whether the individuals identified as numbers one

17       through six identified anybody in the photo array that

18       you showed them?

19       A     Excuse me?  Can you rephrase that?  Can you

20       rephrase that question?

21       Q     Did witness number one identify a photo?

22       A     No.

23                   THE COURT:  Who did you show the photo array

24       to?

25                   THE WITNESS:  Number six.

JB

1           THE COURT: Any of the other witnesses that

2       viewed the lineup?

3           THE WITNESS: No.

4       Q    Why not?

5       A    Because once I did it with number six I believed

6       that was appropriate.

7           THE COURT: Counsel please just pick a spot.

8    Either stand over there or there.

9           MR. DRANOVE: I've been sitting a long time.

10          THE COURT: Or you could use the podium here.

11      You could stand over by the edge of the jury box or

12      stand where you are.

13      Q    Were you present throughout the interview that was

14      videotaped and shown to us?

15      A    Yes, I was.

16      Q    Did you at any time hear Mr. Enrique Rivera say yes

17   in response to the question now that I've advised you of

18   your rights are you willing to answer my questions?

19      A    On the video?

20      Q    When you were there did you hear him say yes to

21   that question?

22      A    Well, on the video you're saying; correct?

23      Q    All right. On the video did you hear him say it on

24   the video?

25      A    I believe he said yeah.

1          THE COURT:  Stop for the record.

2          I just saw the video.  He nodded his head at

3    first and someone, not the interviewer, said you have to

4    answer the question and that is when he said yes.

5          MR. DRANOVE:  Different question and answer.

6    I've seen the video several times.  Unfortunately, it's

7    been removed from the room as if it's not relevant to

8    the Court's examination.

9          May I show the video to the witness?

10          THE COURT:  Stop.  Move on.

11          MR. DRANOVE:  I have a clear recollection that

12    the witness did not say yes to that question.

13          THE COURT:  Please pick a spot.

14          MR. DRANOVE:  I'll stand right here.

15          THE COURT:  No.  Back further.  I gave you

16    three choices.  Pick a spot.  It's good we do this now

17    so when we are doing this during the trial we won't have

18    to do this.  It's one of my pet peeves.  I apologize

19    with that.  I have real problems with attorneys

20    wandering around the courtroom when they are questioning

21    the witness.

22          MR. DRANOVE:  Whatever your recollection or my

23    recollection, the tape speaks for itself.

24          THE COURT:  Absolutely.

25          MR. DRANOVE:  My recollection is "we here", not

1          yes.  I ask your Honor to decide whether my client

2          answered in the affirmative the question, now I've

3          advised you of your rights are you willing to answer my

4          questions?  If you listen again it's "we here".

5                    THE COURT:  We here?

6                    MR. DRANOVE: Yes, we here.

7                    THE COURT:  Whether it was we here or yes it

8          was clearly an acknowledgment.  There was an up and down

9          shaking of the head to the question.  That is clearly my

10         recollection.  In any event, you can move on.

11                   MR. DRANOVE: I have no further questions.

12                   THE COURT:  Any redirect?

13                   MS. CHU: No.

14                   THE COURT: You're excused.

15                   (Witness excused.)

16                   THE COURT: Let's play the beginning of the

17         video one more time.  Let the record reflect I'm

18         reviewing the beginning portion of the video again.

19                   MR. DRANOVE: Can we all see it?

20                   THE COURT:  Yes.  We are all going to view it

21         right now.

22                   MR. DRANOVE: I thought you were going to look

23         at it on the computer.

24                   THE COURT:  I don't know if I could.

25                   (Tape played.)

1               (Tape stopped.)

2               THE COURT:  Let the record reflect that I did

3    view the first portion of the video again where the

4    Defendant was read his rights.  The tape speaks for

5    itself.  Record should reflect counsel was absolutely

6    correct that the Defendant indicated his acquiescence.

7    What the Court viewed his acquiescence to the proceeding

8    by saying "we here".  In any event, we will proceed.

9    Counsel was correct.

10              Call your next witness Miss Chu.

11              MS. CHU: People call Detective James Gaynor.

12              DETECTIVE JAMES GAYNOR, having been first duly

13   sworn, testified as follows:

14              THE CLERK:  In a loud clear voice give us your

15   name, shield and command.

16              THE WITNESS:  Detective James Gaynor.  Shield

17   1000.  Brooklyn South Homicide Squad.

18              THE CLERK: Spell your name.

19              THE WITNESS: G-A-Y-N-O-R.

20              THE COURT:  Counsel.

21   DIRECT EXAMINATION

22   BY MS. CHU:

23   Q    Detective, how long have you been a member of the

24   New York City Police Department?

25   A    Twenty years.

JB

1      Q      I want to direct your attention to February 27th of

2  2005.  Were you working on that day?

3      A      Yes, I was.

4      Q      Did there come a time when you became involved in

5  the investigation into the death of Edgar Ojeda?

6      A      Yes, I did.

7      Q      During the course of your investigation did there

8  come a time when you were looking to speak with someone in

9  particular?

10     A      Yes.

11     Q      Who was that?

12     A      Enrique Rivera.

13     Q      Did you have any information on Enrique Rivera

14  regarding his family members or where they lived?

15     A      Yes.

16     Q      And I want to direct your attention now to February

17  28th of 2005 at about one o'clock in the morning. Did you

18  find yourself at 30 Bush Street here in Brooklyn?

19     A      Yes, I did.

20     Q      What location is 30 Bush Street?

21     A      That was the residence of Enrique Rivera's mother.

22     Q      Did you knock on the door?

23     A      Yes, I did.

24     Q      And did anyone answer the door?

25     A      Yes, she answered the door.

```
 1        Q    His mother?

 2        A    Yes.

 3        Q    What was her name?

 4        A    Anna Casallas.

 5        Q    Were you with anyone when you went to the location?

 6        A    I was with Detective Darino from the 72 Squad.

 7        Q    Once you were there did Miss Casallas, did she

 8   speak English at all?

 9        A    Very little.

10        Q    Did you tell her why you were there?

11        A    I told her I was investigating a crime.  I didn't

12   tell her exactly why I was there, no.

13        Q    Did she seem to be able to understand what you were

14   telling her?

15        A    Not all that.

16             MR. DRANOVE: Objection.

17        A    Not all that well, no.

18             MR. DRANOVE: I withdraw.

19        Q    Could you tell what language she spoke?

20        A    Spanish.

21        Q    What did you do?

22        A    I went to the location in an attempt to locate

23   Enrique Rivera. I was unable to converse with her, speak

24   with her.  I contacted Detective Rivera to translate for me.

25        Q    While you were at the location did you actually go
```

```
 1    inside the apartment?

 2         A    Yes, I did.

 3         Q    Which apartment was that?

 4         A    Can I look at my notes to refresh my memory?

 5              THE COURT:  Go ahead.

 6         A    Apartment 1D.

 7         Q    1D?

 8         A    Yes.

 9         Q    While you were inside apartment 1D did you observe

10    anything?

11         A    Yes, I did.

12         Q    What did you observe?

13         A    In the rear bedroom I observed a camouflage jacket,

14    green like army type hat and a brown sweatshirt on the

15    floor.

16         Q    Did you try and have any conversations with the

17    Defendant's mother with Enrique Rivera's mother regarding

18    the clothing you saw on the floor?

19         A    Yes, I did.

20         Q    Were you able to communicate with her at all?

21         A    Very little.

22         Q    Pursuant to your investigation into the case did

23    you have any information regarding what the perpetrators

24    were wearing who were involved in the crime regarding Edgar

25    Ojeda?
```

1          A    Yes.

2          Q    What information did you have?

3          A    It was similar clothing, camouflage jacket and

4     green army hat.

5          Q    You said you contacted Detective Rivera from the 72

6     precinct?

7          A    Yes.

8          Q    Why?

9          A    So he could translate and tell her mother what we

10    wanted to do with the clothing.

11         Q    Did you use your cell phone?

12         A    No.   I used my cell phone to his cell phone.

13         Q    Did you get in touch with Detective Rivera?

14         A    Yes.

15         Q    Once you spoke with him what did you tell him?

16         A    We had clothes here that fit the description of the

17    clothing worn by the perpetrator in this case, that we

18    wanted to take them, I wanted him to ask the mother if it

19    would be all right to take them.

20         Q    Did you tell him any information about trying to

21    locate Enrique Rivera at that point?

22         A    Yes.   We were also asking her if she knew where her

23    son was through Detective Rivera.

24         Q    Did you then give the phone over to Miss Casallas?

25         A    Yes, I did.

1  Q Did she proceed to have a conversation on your

2 telephone?

3  A Yes, she did.

4  Q What language was she speaking?

5  A Spanish.

6  Q After she had this conversation with Detective

7 Rivera on your telephone was the phone given back to you?

8  A Yes, it was.

9  Q Did you speak to Detective Rivera?

10  A Yes, I did.

11  Q What did he tell you?

12  A She said it would be all right if we took the

13 clothes.

14  Q Did she tell you whose clothing they were?

15  A She said it was her son Enrique's and he more than

16 likely left them there at eight p.m. when he came because

17 when he was there earlier in the day she didn't see the

18 clothing on the floor.

19  Q At that point you then took the clothing?

20  A Yes.

21  Q Did she give you any information about that she

22 will contact you if she saw Enrique?

23  A Yes.  She said she would contact us if she saw him

24 in the future.

25  Q What did you do with the clothing after you left

1    the apartment?

2        A    It was taken back to the precinct and vouchered.

3             MS. CHU: Thank you very much.  I have nothing

4        further.

5             THE COURT:  Counsel.

6        CROSS-EXAMINATION

7        BY MR. DRANOVE:

8        Q    Detective, what type of building is 30 Bush Street?

9        A    It's a project, an apartment building.

10       Q    How did you get from the street into the inside of

11   the building?

12       A    There is a hallway door. I don't even know if it

13   was locked or not.

14       Q    Do you recall if it was locked?

15       A    I don't know if it was locked or if we were allowed

16   in, I'm not sure.

17       Q    Did you have a search warrant with you?

18       A    No, I didn't.

19       Q    Arrest warrant?

20       A    No.

21       Q    At the time you went to the apartment had you

22   already called Officer Rivera?

23       A    I'm sorry, I don't understand the question.

24       Q    This police gentleman named Rivera, what is his

25   rank?

1    A    Detective.

2    Q    Was he a Detective then?

3    A    Yes.

4    Q    When did you call Detective Rivera?

5    A    I called him while I was inside the apartment.

6    Q    Is that the first time you called him on this run?

7    A    I was in contact with him at different times

8    throughout the day regarding the whole case. He was working

9    the case with us.

10    Q    You went to the apartment before you called

11    Detective Rivera?

12    A    Correct.

13                MS. CHU: Objection.

14                THE COURT: Overruled. He just answered the

15          question yes.

16                Did you go to the apartment before you called

17          Officer Rivera?

18                THE WITNESS: Regarding the conversation I had

19          with the mother, but I had spoken with him a few times

20          during the course of the day.

21    Q    What was your purpose in entering the apartment?

22    A    In an attempt to locate Enrique Rivera.

23    Q    Did you see him in the apartment?

24    A    No.

25    Q    You mentioned a brown sweatshirt?

1  A Yes.

2  Q Did you take that with you?

3  A Yes.

4    THE COURT:  Who let you in the apartment?

5    THE WITNESS:  The mother.

6    THE COURT:  What did you say to her when you

7 got there?

8    THE WITNESS: I said we were looking to speak

9 to her son.  She said he wasn't here.

10    THE COURT:  Did she understand you?

11    THE WITNESS:  She understands.  Her husband

12 was also there.  I think he speaks a little better

13 English than she did.

14    THE COURT:  You asked if you could go in the

15 apartment?

16    THE WITNESS: Yes.

17    THE COURT:  Did she understand?

18    THE WITNESS: I believe she did.  She allowed

19 us.

20    THE COURT:  She gave you permission to enter

21 the apartment?

22    THE WITNESS:  Yes.

23  Q Did she say in English you have permission to enter

24 the apartment?

25  A No.

1       Q    Did she say in Spanish anything that you

2    understood?

3       A    Anything in Spanish that I understood?  No.

4       Q    Did you talk to the husband?

5       A    I did, yes.

6       Q    Do you recall his name?

7       A    No, I don't.

8       Q    What does he look like?

9       A    He is five foot four, rather stocky.

10      Q    Did you speak to him?

11      A    Yes, I did.

12      Q    In English?

13      A    Yes.

14      Q    What did you tell him?

15      A    I told him that we were looking to speak to his

16   son.

17      Q    Did he tell you his son wasn't there?

18      A    Yes.

19           THE COURT:  I'm going to stop you.  You

20      indicated the mother gave you permission to enter the

21      apartment.  How was that conveyed to you if not in

22      English?

23           THE WITNESS:  I don't remember if it was

24      conveyed directly through her or the father, but they

25      allowed us to come in.

1          I said would it be all right for us to come

2     in?  I believe the father said you could come in.

3          THE COURT:  You were specifically invited in

4     by one of the parties or both?

5          THE WITNESS:  One of the parties.  I'm not

6     certain which one.

7          THE COURT:  Did the other party indicate to

8     you you shouldn't come in?

9          THE WITNESS:  No.

10         THE COURT:  They didn't want you to come in?

11         THE WITNESS:  No.  She was extremely

12    cooperative.

13    Q    Were you accompanied by anybody in addition to the

14    other Detective, Detective Darino?

15    A    There was another Detective.  I think it may be

16    Detective O'Brien, I'm not certain.  There was another

17    Detective from homicide, maybe O'Brien.

18    Q    Did you knock on the door or ring a bell to the

19    apartment?

20    A    No.  We went inside and knocked.

21    Q    On the door to the apartment?

22    A    Yes.

23    Q    Were all three of the detectives arranged within

24    ten feet of the door when one of you knocked on the door?

25    A    Yeah.  We were right by the front door.  We might

1    have had somebody in the back that also might have been

2    there.

3        Q    There may have been more than three?

4        A    May have been more than three.

5        Q    Back of what?

6        A    Back of the building where the exit would have

7    been, the rear windows may have been in case he was there

8    and somebody came out.

9        Q    Was that done pursuant to an agreement as to how

10   you would look for Mr. Rivera at that location?

11       A    I don't understand the question.

12       Q    You said there may have been someone in the back?

13       A    Yes.

14            THE COURT:  Was that specific employment?

15            THE WITNESS: Yes, we would do that on any

16       case.

17       Q    There were at least four law enforcement officers

18       on this run?

19       A    Yes.

20       Q    Any more?

21       A    I don't believe so.  There were other locations we

22   were looking to find him at.

23       Q    Do you recall who opened the door?

24       A    I'm rather certain it was the mother.

25       Q    Did you then walk in and start talking to her?

1        A    We talked to her in the door for a moment.  After

2    we were invited in we went to -- there is a table, a kitchen

3    area when you first get in.

4        Q    Anybody you were with of the Detectives with you

5    speak and understand Spanish as far as you know?

6        A    I don't believe Detective O'Brien or Darino, no.

7                MR. DRANOVE: No further questions.

8                THE COURT:  Counsel.

9                MS. CHU: No questions.

10               THE COURT:  You're excused.  Thank you.

11               (Witness excused.)

12               THE COURT:  Call your next witness.

13               MS. CHU: We call Detective Hector Rivera.

14               DETECTIVE HECTOR RIVERA, having been first

15        duly sworn, testified as follows:

16               THE COURT:  State your name, spell it, give

17        your shield number and command.

18               THE WITNESS:  Hector Rivera, R-I-V-E-R-A.

19        Shield 4926, 72 squad.

20               THE COURT: Continue counsel.

21               MS. CHU: Thank you.

22        DIRECT EXAMINATION

23        BY MS. CHU:

24        Q    Good afternoon Detective.

25        A    Good afternoon.

1          Q      How long have you been employed by the New York

2     City Police Department?

3          A      Nineteen years.

4          Q      You're currently assigned to the 72 precinct?

5          A      Excuse me.

6          Q      The 72 precinct?

7          A      Yes.

8          Q      I want to direct your attention to February 27th of

9     2005.  Did there come a time when you became involved in the

10    investigation into the death of Edgar Ojeda?

11         A      Yes, I did.

12         Q      Now I want to direct your attention to the

13    following day, February 28th of 2005 at about one o'clock in

14    the morning.  Did there come a time when you were contacted

15    by Detective Gaynor from Brooklyn South Homicide?

16         A      Yes.

17         Q      And can you tell the Court where were you at that

18    time when you got contacted?

19         A      I think I was in another apartment somewhere on

20    12th Street near the barber shop.

21         Q      How did Detective Gaynor get in touch with you?

22         A      By the cell phone.

23         Q      Did Detective Gaynor tell you what he wanted from

24    you?

25         A      Yes.

1    Q    What did he tell you?

2    A    He stated to me he needed me to translate because

3    he was speaking to Enrique Rivera's mother and she couldn't

4    understand too well.

5    Q    Did he tell you what he wanted to inquire of her?

6    A    Yes.

7    Q    What did he tell you?

8    A    He stated to me that he needed -- there was some

9    clothing in there and he needed me to explain to her that

10   the clothing that was in there he wanted permission to take

11   the clothing.

12   Q    Did he also give you any indication to relay to her

13   information regarding Enrique Rivera's whereabouts?

14   A    Yes.

15   Q    Once he told you all this stuff -- you are fluent

16   in Spanish?

17   A    Yes, I am.

18   Q    Did you get on the phone with a woman after you

19   spoke with Detective Gaynor?

20   A    Yes.

21   Q    Did you identify yourself to this person?

22   A    Yes.

23   Q    What did you say?

24   A    I stated to her my name is Detective Rivera and I

25   basically stated we are conducting an investigation in

1    regards to her son and the Detective wanted to know that the

2    clothing that was there that was left by him if she would

3    give permission for him to take the clothing.

4         Q    What did the mother tell you?

5         A    She stated that her son had came earlier and

6    dropped off, I think she mentioned a baby, and he also might

7    have left those clothes.

8         Q    Did she say about what time he had stopped by the

9    apartment?

10        A    I think she said about eight o'clock.

11        Q    Did she give any indication as to whether or not

12   the Defendant lived with her?

13        A    That he comes and goes, he doesn't live there.

14        Q    It was eight o'clock he went there, dropped off the

15   child and left the clothing?

16        A    Yes.

17        Q    Did she identify the clothing as being her son's?

18        A    She stated those clothing weren't there before her

19   son got there and when he left the clothing was there.

20        Q    Did she indicate to you anything regarding whether

21   or not Detective Gaynor could take the clothing?

22        A    Yes.

23        Q    What did she say?

24        A    Yes.

25        Q    That he could take the clothing?

1        A        Yes.

2        Q        How did she sound to you; was she cooperative or

3    uncooperative?

4                 MR. DRANOVE: Objection.

5                 THE COURT: Rephrase the question.

6        Q        Can you describe how she sounded on the phone?

7        A        Okay. She was a little concerned about her son,

8    wanted to know what was going on, but she was very

9    cooperative.

10       Q        Did you ask her any information regarding her son's

11   whereabouts?

12       A        Yes.

13       Q        Did she have any information?

14       A        She said no. She said she didn't know where he was

15   at, but if she had contact with him she would call.

16       Q        Once you got off the phone with her did you speak

17   with Detective Gaynor again?

18       A        Yes.

19       Q        Did you inform him what she had told you?

20       A        Yes.

21       Q        Other than what you just described did you have any

22   further involvement?

23       A        No.

24                MS. CHU: Thank you very much. I have nothing

25           further.

JB

1           THE COURT: Counsel.

2      CROSS-EXAMINATION

3      BY MR. DRANOVE:

4      Q    Detective, did you speak to anyone else who was, as

5      you understood it, inside the apartment and related to

6      the lady you spoke to?

7      A    I don't understand the question.

8           THE COURT:  Did you speak to anybody else in

9      the apartment except for the lady that you spoke to?

10          THE WITNESS: No.

11          MR. DRANOVE: No further questions.

12          THE COURT:  Any redirect?

13          MS. CHU: No.

14          THE COURT:  You're excused.   Thank you

15     Detective.

16          THE WITNESS:  Thank you.

17          (Witness excused.)

18          THE COURT: Miss Chu, call your next witness.

19          MS. CHU: People have no further witnesses.

20     People rest.

21          MR. DRANOVE: I need an interpreter for my

22     witness.

23          THE COURT:  What language?

24          MR. DRANOVE: Spanish.  May I step outside?

25          THE COURT:  Sure.  We will get the interpreter

1    right now.

2              (A recess is taken.)

3              THE CLERK:  Mr. Rivera is present with

4    counsel.  Assistant District Attorney present.

5              THE COURT:  Call your witness please.

6              MR. DRANOVE: I call Anna Casallas.

7              (Whereupon, the Official Spanish Interpreter

8    interpreted from English to Spanish and Spanish to

9    English.)

10             MR. DRANOVE: Can you tell Anna when she walks

11   up there to sit in the chair up there.

12             ANNA CASALLAS, having been first duly sworn,

13   testified as follows:

14             THE CLERK:  If you'll give us your name and

15   county of residence please.

16             THE WITNESS:  Anna Casallas, Brooklyn.

17             THE CLERK:  Spell your last name.

18             THE WITNESS:  C-A-S-A-L-L-A-S.

19             THE COURT: Counsel.

20   DIRECT EXAMINATION

21   BY MR. DRANOVE:

22   Q    Good afternoon Mrs. Casallas.

23   A    Good afternoon.

24   Q    I'm going to ask you some questions and request you

25   answer them.  If you don't understand the question --

```
 1                   THE COURT:  She has to speak.  She can't just
 2    nod her head.
 3                   THE WITNESS:  Okay.
 4          Q    Can you hear me clearly?
 5          A    Yes.
 6          Q    Is Enrique Rivera who is sitting in the courtroom
 7          over there one of your children?
 8          A    Yes.
 9          Q    Do you remember an unusual event at your apartment
10    in late February of 2005?
11          A    Yes.
12          Q    Did there come a time when you heard knocking on
13    the door?
14          A    Yes.
15          Q    Where were you when you heard that?
16          A    In the living room.
17          Q    What did you do when you heard that knocking?
18          A    I went to the door and I saw some tall man standing
19    there and I was kind of afraid.  I went back and told my
20    husband.
21          Q    What language did you speak to your husband?
22          A    Spanish.
23          Q    What happened next?
24          A    I opened the door.
25          Q    What happened when you opened the door?
```

1      A    They came in.

2      Q    Did they speak to you before they came in?

3      A    No.

4      Q    Please describe their actions as they came in.

5      A    When I opened the door they came in.  One stayed in

6 the kitchen, one in the living room and the other went to

7 look around the house.

8      Q    When they came in did they speak to your husband?

9      A    Yes, they spoke to him, but in English and my

10 husband did not understand.  He speak a little English.

11            MR. DRANOVE: No further questions.

12            THE COURT:  Did the People who came into the

13     house identify themselves as police officers?

14            THE WITNESS:  No.

15            THE COURT:  How long have you been in America?

16            THE WITNESS:  About twenty years.

17            THE COURT:  Counsel.

18

19   CROSS-EXAMINATION

20   BY MS. CHU:

21      Q    Good afternoon Miss Casallas.

22      A    Good afternoon.

23      Q    We have never spoken; right?

24      A    No.

25      Q    What do you do for a living?

```
 1        A    I baby-sit children.

 2        Q    You baby-sit children?

 3        A    Yes.

 4        Q    Can you speak any English?

 5        A    A little bit.

 6        Q    Now you're saying when these large men came to the

 7   door you said that they did not identify themselves as

 8   police officers to you?

 9        A    No.

10        Q    Do you remember being on the telephone with

11   anybody?

12        A    No.

13        Q    Nobody gave you a cell phone to talk to anybody in

14   Spanish with?

15        A    One of them, but that was after they look through

16   the house.

17        Q    So you did speak to someone on the telephone?

18             THE COURT:  Did you speak to someone on the

19   telephone or not?

20             THE WITNESS:  They --

21             THE COURT:  The question is did you speak to

22        someone on the telephone or not?

23             THE WITNESS:  Yes.

24             THE COURT:  Si or no?

25             THE WITNESS:  Yes.
```

1    Q    You spoke to this person in Spanish; correct?

2    A    Yes because he was Hispanic.

3    Q    Isn't it a fact that that person identified

4    themselves to you as being a police officer; isn't that

5    correct?

6    A    No.

7    Q    Well, didn't I hear you say policia when you were

8    speaking to the interpreter when you were on the phone?

9              MR. DRANOVE: I object to the prosecutor making

10   herself as a witness or that she be called as a witness.

11             THE COURT: I heard her say policia too.

12             In any event, ask the question again.

13   Q    Miss Casallas, when you were just speaking with the

14   interpreter did you use the word policia?

15             MR. DRANOVE: Your Honor.

16             THE COURT: Counsel, is that an objection?

17             MR. DRANOVE: It's an objection.

18             THE COURT: Overruled.  Did you use that word?

19             THE WITNESS: They told me they was going to

20   put someone in Spanish, but didn't say it was a police

21   officer.

22             THE COURT: Stop.  Who did you say came into

23   the apartment?

24             THE WITNESS: Detectives.

25             THE COURT: Don't you think Detectives work for

1       the police?

2                   THE WITNESS: Yes.

3                   THE COURT: So you knew they were police

4       officers when they came into your apartment?

5                   MR. DRANOVE: Objection.  There is no

6       testimony.

7                   THE COURT: Counsel, I'm asking the question.

8       Stop.

9                   MR. DRANOVE: I object.

10                  THE COURT: Your objection is noted.

11                  Did you think they were police officers when

12      they came into your apartment?

13                  THE WITNESS: I thought something happened to

14      my son, that is why I opened the door.

15                  THE COURT: When the people came into the

16      apartment did you know they were police officers?

17                  THE WITNESS: The one that came in and looked

18      through the apartment, yes.

19                  THE COURT: So you knew they were police

20      officers?

21                  THE WITNESS: Yes.

22                  MR. DRANOVE: Let her finish her answer please.

23                  THE COURT: She said yes.

24                  MR. DRANOVE: You interrupted her answer.  She

25      already said when she was searching the apartment I knew

they were police.

THE COURT:  I'm the trier of facts in this area.  I want to get to the bottom of it.

If you have an objection note your objection. You'll have an opportunity to give me an oral argument at the end.  You'll have an opportunity to redirect this witness.  At this moment I ask you please be seated and allow the Court to inquire with respect to the facts.

MR. DRANOVE: Yes, sir.

THE COURT:  So, these officers you knew they were Detectives when they were in the apartment.  Was that before or after they gave you the telephone?

THE WITNESS:  They went to look around and they talked between each other and they told me they were going to get an interpreter.

THE COURT:  Did you know they were police officers before or after you had the telephone conversation?

THE WITNESS: When they came in I knew they were detectives because my husband was telling me they were detectives.

THE COURT:  So when they made a phone call and gave the phone to you to speak to somebody did you know that the person was a detective on the other end of the phone?

1          THE WITNESS: No.

2          THE COURT: Counsel continue.

3      Q    Miss Casallas, isn't it a fact that the person that

4      spoke to you on the other side of the phone identified

5      themselves as being Detective Rivera?

6      A    No.

7      Q    What did you speak to this person about?

8      A    He asked if Mr. Enrique Rivera was living there and

9      if he was there and I told him no. And he said okay.

10     Q    So, isn't it a fact that the Detective or the other

11     person on the phone asked you about the camouflage jacket

12     that was on the floor in your apartment?

13     A    No.

14     Q    Isn't it a fact that you told Detective Rivera that

15     that camouflage jacket and clothing belonged to your son?

16     A    When he picked it up in the room he told me in

17     English and I could understand a little bit and he asked me

18     who do they belong to? And I told him they belong to my

19     son.

20     Q    So you did tell the Detectives that that clothing

21     belonged to your son Enrique Rivera?

22     A    Yes.

23     Q    Isn't it a fact that you told the Detectives that

24     your son was there at about eight p.m. the night before;

25     isn't that correct?

```
 1        A    Yes, that he had been there, but he left.  They
 2   didn't believe me and they continued to look around the
 3   house.
 4                THE COURT:  I'm going to stop you.
 5                When you said that to the Detectives did you
 6        say that on the phone to Detective Rivera or did you
 7        tell the police officers who were in the apartment?
 8                THE WITNESS:  The ones that were in the house.
 9                THE COURT: Did you say it in English or in
10        Spanish?
11                THE WITNESS:  Spanish.  Some things I tried to
12        say in English and I just try --
13        Q    How do you say your son's name?
14        A    Kekay.
15        Q    Kekay.  That is his nickname; right?
16        A    Uh huh.
17        Q    That is short for Enrique?
18        A    That is his name.  I call him Kekay.
19        Q    You call him Kekay.
20                MS. CHU: If I could have one moment, your
21        Honor.
22        Q    Isn't it true, Miss Casallas, that once the
23        Detectives are inside your apartment and you identified
24        the clothing as being your son's that you allowed them
25        to take it?
```

1       A     No, they just took it without my permission.

2       Q     You tried to stop them?

3       A     No.

4             MS. CHU: I have nothing further, your Honor.

5             THE COURT:  Counsel.

6       REDIRECT EXAMINATION

7       BY MR. DRANOVE:

8       Q     Miss Casallas, did you give the police permission

9       to enter your apartment?

10      A     No.

11      Q     Did you hear your husband in English or Spanish

12      speak to the police as they were entering the apartment?

13      A     In Spanish cause my husband don't speak English,

14      just a little bit.

15            MR. DRANOVE: No further questions.

16            THE COURT:  Counsel.

17      RECROSS EXAMINATION

18      BY MS. CHU:

19      Q     Miss Casallas, but you opened the door for them;

20      correct?

21      A     Yes.

22      Q     When they walked in you didn't try and push them

23      out; did you?

24      A     No.

25            MS. CHU: Nothing further.

1          A     I was afraid.

2                    THE COURT:  Any redirect counsel?

3                    MR. DRANOVE: No.  Miss Casallas, I think the

4          lawyers have no more questions for you.  I don't know if

5          the Judge does, but thank you for coming here.

6                    THE COURT:  You're excused.

7                    MR. DRANOVE: No further questions.

8                    (Witness excused.)

9                    THE COURT:  Call your next witness counsel.

10                   MR. DRANOVE: Judge, I'm not prepared to call

11         another witness now.

12                   THE COURT:  Does that mean the defense rests?

13                   MR. DRANOVE: I would like to see if I could

14         get the stepfather in maybe this afternoon.

15                   THE COURT: We will be back at 2:30.  If you

16         want to have him have him here by 2:30.

17                   MR. DRANOVE: I will do everything I can.

18                   THE COURT:  If there is any rebuttal witnesses

19         for purpose of the hearing you'll have your witnesses

20         ready at 2:30 also.

21

22                   A F T E R N O O N     S E S S I O N

23

24                   THE CLERK:  This is a continuation of the

25         hearing from this morning, People versus Enrique Rivera

```
1                    THE COURT: Call your next witness.

2                    MR. DRANOVE: Mr. Carlos Casallas.

3                    (Whereupon, an Official Spanish Interpreter

4         was present to interpreter English to Spanish and

5         Spanish to English.)

6                    CARLOS CASALLAS, having been first duly sworn,

7         testified as follows:

8                    THE CLERK:  If you'll give us your name and

9         county of residence.

10                   THE WITNESS:  Carlos Casallas.

11                   THE COURT:  Spell it.

12                   THE WITNESS:  C-A-S-A-L-L-A-S.

13                   THE CLERK:  Do you live here in Kings County,

14        Brooklyn?

15                   THE WITNESS:  Red Hook, Brooklyn.

16                   THE CLERK:  Thank you.

17                   THE COURT:  Counsel.

18        DIRECT EXAMINATION

19        BY MR. DRANOVE:

20        Q    Good afternoon Mr. Casallas.  I'm going to ask you

21        questions and your answers have to be spoken.  For

22        example, if the answer is yes you can't shake your head.

23        A    Okay.

24        Q    Thanks.  Are you married?

25        A    Yes.
```

1  Q Who is your wife?

2  A Anna, Anna Casallas.

3  Q She is sitting in the back of the courtroom?

4  A Yes, she is sitting in the back.

5    MR. DRANOVE: Because they are both witnesses I

6  would just like to now ask Miss Casallas to step out

7  because they may both end of testifying at trial.

8    THE COURT: Was she sitting here for the first

9  portion, the People's direct examination of the

10  witnesses this morning?

11    MR. DRANOVE: No.

12    THE COURT: You're sure she wasn't in the

13  courtroom this morning for those witnesses? I do

14  believe I saw her sitting there.

15    MR. DRANOVE: I asked her to step out early on.

16  She went into the witness room.

17    THE COURT: Have her step out. Just proceed.

18  Q Mr. Casallas, in late February of 2005 were you

19  home one evening when something unusual happened? Were

20  you at home when something unusual happened?

21  A Yes.

22  Q Please tell the Judge and everyone else in the

23 courtroom what happened.

24  A They knocked on the door and they knocked very

25 hard. And then my wife went to open the door. When my wife

1  opened the door there was a big group of men.  They were

2  well dressed and they looked very strong.  Then my wife got

3  scared.  Then she turned around to let me know, but then at

4  that time they started to come into the apartment.  And in

5  that group there was a woman.

6      Q    When they started to enter the apartment did any of

7  them speak to you?

8      A    No.

9      Q    Did any of them speak to you in Spanish?

10     A    No.

11     Q    Did any of them speak to you in English?

12     A    Not neither, no.

13     Q    Did anyone of the people who entered the apartment

14  ask you for permission to enter the apartment?

15     A    No, at no time at all.

16          MR. DRANOVE:  Thank you.  I have no further

17      questions.  The prosecutor has the right to ask you

18      questions.

19          THE COURT:  Thank you counsel.  Miss Chu.

20          MS. CHU:  Thank you.

21  CROSS-EXAMINATION

22  BY MS. CHU:

23     Q    You said that there was a number of people that

24      were standing outside the door.

25     A    When they opened the door I saw the group.  When my

1       wife opened the door.

2              Q    But she did open the door; correct?

3              A    Yes.  Sure.

4              Q    Then she stepped away from the door; correct?

5                   THE INTERPRETER: And she stepped away from the

6       door?

7              Q    Then she stepped away from the door?

8              A    Yes, she stepped away to let me know.

9              Q    Well, that's when they walked in; right?

10             A    Yes.  When she stepped away about one or two meters

11      they started to come in.

12             Q    Did you ever try and stop them or tell them to

13      leave the apartment?

14             A    No, no, no.

15             Q    Isn't it correct that you knew that they were

16      police though; right?

17             A    I didn't know they were -- I didn't know that they

18      were police officers or police.  With so many people coming

19      in we were very nervous.  They didn't show any document.

20                  THE COURT:  What did you think was happening

21             when these men in suits came into your apartment?

22                  THE WITNESS: I didn't know what was happening.

23             I asked them and they didn't answer me.

24                  THE COURT:  So a bunch of men in suits just

25             walked into your apartment.  Did you ask them why they

1       are coming in and who they were?

2               THE WITNESS:  With a woman.  Nobody answered.

3       Q     Were you speaking in English or were you speaking in

4       Spanish?

5       A     I was speaking in Spanish because I don't speak

6       English.

7       Q     You don't speak any English?

8       A     Very little.

9       Q     What do you do for a living?

10      A     I work for a company that makes books.

11      Q     That makes books?

12              THE COURT:  Spanish books?

13              THE WITNESS:  No.

14              THE COURT:  English books?

15              THE WITNESS:  Yes, in English.

16      Q     How long have you worked for this company?

17      A     Almost ten years.

18              THE COURT:  Ten years you've been working for

19      a company that makes English books?

20              THE WITNESS:  They distribute the books.

21              THE COURT: All right, Miss Chu, ask some

22      questions.  Just answer the question.

23              MR. DRANOVE: Your Honor, let the witness --

24              THE COURT:  Counsel, I'm the one determining

25      the facts, please.

1    Q    Mr. Casallas, how long have you been in this

2    country?

3    A    Twenty years.

4    Q    Twenty years.  In fact, your wife works too; right?

5    A    My wife is not working.  I work for her.

6    Q    She doesn't work as a baby-sitter?

7    A    Well, she takes care of a child, you know, she

8    takes him to school.

9    Q    How old is this child?

10   A    The child is about three years old.

11   Q    Now, you said that no one asked you for permission

12   to enter into your apartment; is that what you're saying?

13   A    Nobody asked permission to come into my apartment.

14   Q    Do you remember one of the men had white hair that

15   came into your apartment; do you remember that?

16   A    It was a group of men moving inside the apartment.

17   Q    Were they jogging around your apartment?

18        MR. DRANOVE: Objection.  No need to belittle

19        the witness.

20        THE COURT:  Sustained.

21   Q    Were any of the men or did any of the men have white

22   hair?

23   A    I don't remember.

24   Q    Did you stay inside that first area where you walk

25   into your apartment the entire time these men were inside

1    your apartment?

2       A    I stayed near the kitchen near the door.

3       Q    Were you by your wife during the entire time these

4    people were in your house?

5       A    My wife went to one of the bedrooms.

6       Q    Do you recall that your wife actually got on one of

7    the Detective's cell phones while they were in your

8    apartment?

9       A    They allowed her to talk to somebody.

10       Q    And she was speaking in Spanish; isn't that

11    correct?

12       A    Yes, that is correct.

13       Q    Isn't it a fact that she told the person on the

14    telephone that the clothing that was on the floor in your

15    apartment belonged to your son?

16       A    I didn't hear at that moment.

17       Q    Do you recall that there was some clothing on the

18    floor inside your apartment?

19       A    They were my clothes. I have changed my clothing

20    and they wanted to take my clothing.

21       Q    Did they take your clothing?

22       A    No because I told them not to take it, that it was

23    my clothes.

24       Q    So they didn't take your clothes?

25       A    They put it back where it was.

```
 1      Q    They didn't want your clothes; right?

 2               MR. DRANOVE: Objection.

 3      A    I don't know.

 4               MR. DRANOVE: Goes to state of mind.

 5               THE COURT:  Sustained.

 6      Q    There were other clothes on the floor; isn't that

 7      correct?  There was a camouflage jacket on the floor?

 8      A    In one of the bedrooms.

 9      Q    That, in fact, was your son's jacket; is that

10      correct?

11      A    Yes.

12      Q    Your son, Enrique Rivera, who is sitting right over

13      there?

14      A    Yes.

15      Q    And it had a matching hat to it too; right?

16      A    I don't remember the color.  But I remember they

17      took the jacket, they took the hat and I think they took

18      some sneakers and they also took a sweater.

19      Q    A sweatshirt?

20      A    Oh, one that has like a hood.

21      Q    Like a hooded sweatshirt?

22      A    I don't know how they call it.

23      Q    And all those things or all those items of clothing

24      were, in fact, your son's, Enrique Rivera; correct?

25      A    The ones that they took, yes.
```

1        Q     Isn't it also true that Enrique Rivera had come by

2   your house about eight p.m. the night before?

3        A     Yes.  Yes, he was in the house the day before, yes.

4        Q     In fact, that is when he left that clothing there

5   on the floor?

6        A     Yeah, he did change clothes, yes.

7        Q     You said that while your wife was on the telephone,

8   one of the men's cell phone, that you didn't hear the entire

9   conversation she had about the other person on the phone?

10       A     I didn't hear her.

11       Q     Is it fair to say you don't know what she said on

12  that telephone?

13       A     No, I didn't hear.  Yes.

14       Q     You never tried to tell the police that they needed

15  to leave your apartment; did you?

16       A     I was very nervous.  There were many men in there

17  and they were coming in and out, they were coming in and

18  they were leaving.  It was in and out, in and out.

19             THE COURT: You testified earlier you didn't

20  know who the men were.  At any time did you find out who

21  they were?

22             THE WITNESS: No.  They didn't present any

23        credentials for me to find out who they were.

24             THE COURT: At no time while they were in the

25        house did you know they were police officers?

JB

1          THE WITNESS: They didn't present any

2     credentials.

3          THE COURT: Did you think these people came to

4     your apartment to rob your son's clothes?

5          THE WITNESS: No. They were very well dressed

6     to be thieves.

7          THE COURT: Continue counsel.

8     Q    Isn't it a fact, sir, that you told your wife these

9     were police officers?

10    A    No, I didn't know.

11    Q    Well, if your wife said that you told her they were

12    police then she would be incorrect?

13          MR. DRANOVE: Objection.

14          THE COURT: Sustained.

15          MS. CHU: I have nothing further.

16          THE COURT: Counsel.

17    REDIRECT EXAMINATION

18    BY MR. DRANOVE:

19    Q    Mr. Casallas, did you and I first meet this

20    afternoon in this building?

21    A    Yes.

22    Q    Were you at work this morning?

23          MS. CHU: Objection, your Honor. This is

24    beyond the scope of my cross.

25          THE COURT: Overruled.

1      A      Yes.

2      Q      What do you do at the company?

3      A      I gather orders to be sent to the doctors.

4             THE COURT: Are these orders written in

5      Spanish?

6             THE WITNESS:  We go by numbers, your Honor.

7             THE COURT: Are there only numbered orders?

8             THE WITNESS:  Yes.

9             THE COURT:  There is no English words on

10     there?

11            THE WITNESS: The titles of the books, though

12     the numbers are the important ones.

13            THE COURT:  So you never read the titles on

14     the books?

15            THE WITNESS:  I read the titles.  I could try

16     to learn a little bit of English.

17            THE COURT:  When you deliver a book and it

18     goes to the doctor and it's the wrong book and they tell

19     you it was the wrong book how do you know if it was or

20     wasn't the wrong book?

21            MR. DRANOVE: I object.

22            THE COURT:  You brought it up, counsel.  I'm

23     curious as to what the extent of his language skills

24     are.  I think that is relevant to this hearing.  I'm

25     also concerned about the credibility of this witness.

1          MR. DRANOVE: What about the Detectives?

2          THE COURT: I'm concerned about the credibility

3     of this witness.

4          MR. DRANOVE: What about the Detectives?

5          THE COURT:  I'll hear your argument.

6          MR. DRANOVE: I'm not going to make an argument,

7     Judge, I think I understand.

8          THE INTERPRETER: Can you repeat the question?

9          THE COURT:  I don't need to know the answer.

10              You're excused.

11              (Witness excused.)

12         THE COURT:  Call your next witness.

13         MR. DRANOVE: I have no further witnesses,

14    Judge.

15         THE COURT:  Any rebuttal requests?

16         MS. CHU: No.

17         THE COURT:  Ready to proceed to argument

18    counsel?

19         MR. DRANOVE: I'll stand here.

20         THE COURT:  Wherever you want.

21         MR. DRANOVE: Thank you.  With respect to the

22    recorded statement I believe it's clear my client did

23    not affirmatively waive his rights and that the

24    prosecution has the burden of proof that he did and they

25    cannot prove it.

1     With respect to the other two statements the

2   testimony stands.

3     With respect to the lineup the Judge has seen

4   the pictures.  Judge, you've seen the pictures and

5   you'll make up your own mind.

6     With respect to entry into the apartment, what

7   are two humble, simple people supposed to do when a

8   bunch of large white guys start walking in?

9     THE COURT:  We don't know if they were all

10   white people.

11     MR. DRANOVE: We saw two of them.  They come

12   in, we know they are hot on a trail of someone who is an

13   alleged perpetrator.  These are simple people, Judge,

14   they are not going to call a lawyer.  When the lady

15   turned around to tell her husband these people are here

16   they just came in and they are waiting for you to sort

17   it out in a way that favors them.  I think they are salt

18   of the earth people who told the truth.

19     If a man picks a book by number that doesn't

20   make him fluent in English.  That is all he does, he

21   picks it by number and it goes somewhere else.  He is

22   not in the department of speaking to doctors who orders

23   books.

24     A woman who is taking care of a baby is

25   another humble person.  I think the testimony speaks for

1      itself.

2                  The Detectives, didn't have any warrants, who

3      think they are going to find a man there, don't.  They

4      kept looking.  They had no right to take any property.

5      My client didn't give them permission to take the

6      property.  They had no right to be in the apartment in

7      the first place.

8                  Some of these questions, such as did you try

9      to push the detectives out -- I mean, could you imagine

10     if she tried to push the Detectives out?

11                 THE COURT:  Let's not point fingers or address

12     anybody in an unprofessional manner.

13                 MR. DRANOVE:  If anybody tried to push

14     Detectives out of an apartment they would be arrested

15     for obstruction of justice, assault and after they got

16     out of the hospital for the beating for being put in

17     their place.  To ask that of these people I think is

18     insulting to all of us.

19                 The entry was illegal.  Everything that flows

20     from it should be suppressed.

21                 THE COURT:  Meaning the property recovered?

22                 MR. DRANOVE:  The property.

23                 THE COURT:  Thank you very much, counsel.

24                 MR. DRANOVE:  You're welcome, sir.

25                 THE COURT:  Miss Chu.

1        MS. CHU: Yes, your Honor.

2        Going to the Huntley portion of the hearing

3    first, I believe the evidence given at the time of this

4    hearing indicated that each and every statement the

5    Defendant gave to both the police as well as the

6    Assistant District Attorney were a voluntarily, knowing

7    and intelligent waiver of his Miranda rights.

8        The defense counsel made issue with regard to

9    the fact that the Defendant during the videotaped

10    statement said "we here". I think it's quite clear from

11    his actions he was acquiescing in speaking to the

12    Assistant District Attorney after being advised of all

13    of his rights.

14        THE COURT: He had been advised earlier when he

15    was first arrested.

16        MS. CHU: True.

17        THE COURT: I believe that was exhibit --

18        MS. CHU: Exhibit 2.

19        THE COURT: 2 in evidence.

20        MS. CHU: Moving on to the Wade portion of the

21    hearing. Obviously, your Honor, you have the

22    photographic array in evidence as well as the lineup

23    photos.

24        THE COURT: Why don't we address the last

25    issue.

1              MS. CHU: Okay, I'll move on to that.

2              I think Detective Gaynor and Detective

3       Rivera's testimony has not been controverted despite the

4       fact that both Mr. and Mrs. Casallas has testified at

5       this hearing regarding what transpired as being

6       something different than from Detective Gaynor and

7       Detective Rivera testified to.

8              Detective Gaynor and Detective Rivera, I

9       thought, were credible witnesses setting forth exactly

10      how they proceeded.  I think it's clear once Detective

11      Gaynor was speaking with both of them he indicated that

12      he knew that they were having difficulty understanding

13      what they were saying and that is why they reached out

14      to Detective Rivera, which was corroborated by both Mr.

15      and Mrs. Casallas, that she was on the telephone, on one

16      of their cell phones.

17             I think Mr. and Mrs. Casallas actually didn't

18      jive with each other because she said the reason why --

19             THE COURT:  Miss Chu, that aside, what about

20      the fact that they didn't make a phone call until they

21      were already in the apartment?

22             MS. CHU: That is because they didn't know what

23      the language abilities would be.

24             THE COURT:  If they didn't know if he could

25      speak English or not what were they doing in the

JB

1    apartment?

2              MS. CHU: He said they were let in. They had

3    limited amounts of English. Each witness says they

4    speak a little English.

5              In her testimony she says she looked through

6    the peephole, sees the people outside, goes to see her

7    husband and then goes outside.

8              He testified she already opened the door and

9    then goes to get him.

10             There they are not even consistent with what

11   it is they are trying to set forth to this Court as who

12   how the door got opened.

13             THE COURT: I think they were consistent and

14   suggest to the Court they never gave permission of these

15   people to go into the apartment. I think they were

16   called for that purpose and said the same thing.

17             MS. CHU: I thought it was inconsistent in

18   their recollection of how the door opened, why she

19   turned around.

20             THE COURT: That goes to their credibility as

21   to their consistency or purpose for why they testified.

22             Is there anything else?

23             MS. CHU: Yes, your Honor.

24             I believe whatever transpired during her

25   either walking away or letting Detective Gaynor and

1    whoever he was with and Detective Darino come to the

2    apartment it was clear that action alone can give

3    consent for someone coming in.

4              In fact, there is a case People versus Davis

5    120 AD2d at page 604 where it says that stepping aside

6    to allow the police to enter the premises can be

7    considered consent.  You don't actually need words to

8    say yes, you may come into my home.

9              THE COURT:  When was that decided and where?

10   What was the site?

11             MS. CHU: People versus Davis.

12             THE COURT:  It's all right.  Proceed.  It's

13   okay.  Just proceed.

14             MS. CHU: There is also case law in People's

15   versus Schoff 136 AD2d 578 Second Department 1988 case.

16   It says once the police have entered the home, not

17   directing them to leave or in any way indicating that

18   they don't have permission to remain is also considered

19   to be consent.

20             I believe that once the Detectives were inside

21   the apartment, not being asked to leave, I believe that

22   they believed by Miss Casallas opening the door and

23   moving away from the door that she was letting them in.

24   Once they are inside the apartment the clothing on the

25   floor was in plain view.  Knowing that the perpetrators

that were involved in this case were wearing very specific clothing; camouflage coat, camouflage hats, etc., and seeing that type of clothing there, once they spoke to Detective Rivera who translated what Miss Casallas said, she corroborated as well, she indicated that clothing was her son's and that it had been left there when he was there at eight o'clock.  It corroborates the testimony by Detective Rivera and Detective Gaynor about the conversations that they had with her via Detective Rivera translating.

I believe once they were in there the plain view doctrine supersedes that they could have taken those items of clothing, in addition to the fact that Detective Rivera indicated she said it was okay for them to take it.  In fact, she was very cooperative with them.  She said she would let them know if she got in touch with her son, she would contact them.

I believe the evidence before this Court is clear they had consent not only to enter the apartment, but they had consent to take the clothing they saw in plain view in the apartment.

These witnesses say he doesn't even live there.  I don't know whether or not right to privacy issues come into effect.  I think consent and plain view doctrine should come into effect when seizing the

1    Defendant's property from the apartment.

2              MR. DRANOVE: May I?

3              THE COURT:  Briefly.

4              MR. DRANOVE: Interesting the prosecutor asked

5    you to accept the testimony of defense witnesses as a

6    hundred percent true in each and every regard except

7    saying they didn't give permission to enter.

8              The fact she cites a case where perhaps we

9    find someone who says you want to come in, step aside,

10   that is not what happened here.

11             I recall arguing a case in the Appellate

12   Division First Department People versus Glasstone Graham

13   in the Bronx. They got into the building, they went to

14   an apartment, knocked on the door to the apartment he

15   was in.  Someone opened the door and they went in.  In

16   that apartment they found a kilo of cocaine.  It was

17   suppressed.

18             I remember the argument they said what is

19   this, the wild west?  That was spoken by the judge from

20   the Appellate Division.  It's still the wild west in

21   Brooklyn if this is allowed to be continued.  They

22   didn't even wait to get a Spanish speaking Detective

23   with them to tell this family in their apartment we are

24   here, we would like to come in, we would like to see if

25   your son is here.

JB

1          They are in the apartment for an unknown

2     period of time before they could think maybe we should

3     find out if we should be here.  They had opportunities

4     galore.  They had a Detective stationed out back in case

5     someone is going to jump out of a window, I suppose.

6     They could have had a Spanish speaking officer with them

7     or on the phone.  It was their own choosing to rush and

8     do this in haste and they shouldn't be excused.

9          THE COURT:  Thank you counsel.  Let me take a

10    few minutes.

11          (A short recess was taken.)

12          THE CLERK:  Mr. Rivera is again present.

13          THE COURT:  I'm ready to proceed with my

14    decision with respect to the hearing that was just

15    conducted.

16          A Wade, Huntley with the Payton issue hearings

17    were conducted before me.  The Wade hearing dealt with

18    six lineups.  The Huntley hearing dealt with an oral,

19    written and video statement.  And the Payton issue dealt

20    with a baseball hat, camouflage jacket and -- I'm sorry,

21    what was the other piece?

22          MS. CHU: Hooded sweatshirt.

23          THE COURT:  Sweatshirt, jacket and hat that

24    were recovered from the parents' apartment of the

25    Defendant while the Defendant wasn't present.

1       The People called three witnesses.  I want to

2   begin by indicating that I found all three of the

3   People's witnesses to be credible.

4       First witness called was Detective John

5   Darino, an investigating Detective from the 72 Detective

6   Squad.  He testified that on February 27th, 2005 he was

7   in the confines of the 72 precinct.  He received a

8   notification of a homicide at El Borinquen Bar at 314

9   39th Street.  He was assigned as the case Detective at

10  0800 hours.  He spoke with witnesses.  I don't know if

11  it was at the scene or not who indicated to him that

12  Kekay was the person who committed the homicide.

13      Kekay has been identified as the Defendant.

14  He was the person identified as the perpetrator of the

15  crime.

16      At 2050 or 8:50 p.m. a photo array was

17  created.  Confidential witness, identified as

18  confidential witness number six viewed the photo array.

19  It was shown to that person at 9:10 p.m. the witness

20  recognized number 2 as the person who committed the

21  crime.  Number 2 was the photo of the Defendant.

22      The statement made was he was the male

23  punching and swinging hands at the person who was

24  stabbed.

25      The copy of the photo array was introduced as

1        People's 1 in evidence for purpose of the hearing.  The

2        Court viewed the photo array and there was nothing

3        unduly suggestive in the photo array, none of the

4        photographs seemed to suggest that the police had

5        already made a selection of one of the photographs.

6              On 2/28/05 information was received that the

7        Defendant was at 172-18 Effington Avenue in Flushing,

8        New York. This Detective or this witness went to that

9        location with Detective Gaynor at 4:20 a.m. it was a

10       private house, detached. A Patricia Glasgow opened the

11       door.  They had arrived at approximately five a.m. the

12       Defendant was on the couch.  He was arrested, brought to

13       the 72 precinct interview room.

14             At 5:15 a.m. he spoke with -- this witness

15       spoke with the Defendant in the interview room.  He

16       testified that Detective Gaynor was with him.  He read

17       Miranda warnings to the Defendant.  Copy of the warnings

18       that were read were introduced as People's 2 in evidence

19       for purpose of the hearing.

20             The Court had an opportunity to review that

21       Miranda warnings sheet.  Defendant wrote that he

22       understands or marked a yes with his initials next to

23       all of the questions on the Miranda warnings sheet, also

24       signed the bottom of the sheet.  Afterwards, he orally

25       agreed to speak with the officers.

1            He indicated in sum and substance that he went

2       to the bar, there was a small confrontation, there was a

3       guy looking at him in a crowded room, crowd rose, he

4       took out a knife and used it in self-defense.  He swung

5       it at the crowd in self-defense.

6            The Defendant was then asked to write down a

7       statement.  That statement was introduced into evidence

8       as People's 3 for purpose of the hearing.  The Court had

9       an opportunity to review that statement.  It was signed

10      by the Defendant.  Ten a.m. 2/28/05, the Defendant,

11      approximately five hours after he was brought to the

12      precinct spoke with an Assistant District Attorney and

13      made a videotaped recording.  That tape was introduced

14      into evidence as number 4.  The Court viewed the tape.

15      The Defendant was read his rights on the tape and he

16      indicated "we here" as a response to that recitation of

17      rights prior to giving the videotaped statement.

18           This witness testified that lineups were

19      conducted.  The Defendant was the subject of the

20      lineups.  Six people were contacted and brought to the

21      precinct to view the lineups.  Numbers five and six or

22      confidential witnesses five and six were picked up by

23      the Police Department and brought there.  Number one

24      through number four came of their own accord.  They were

25      all placed in different rooms except for five and six

JB

1    who came together who were seated together prior to the

2    viewing.

3             The Defendant was in a room that was separated

4    from those who were brought to view the witnesses.  The

5    Defendant was in the viewing room/interview room the

6    entire time he was in the precinct.  He could not be

7    seen by witnesses prior to the lineup.  Fillers were

8    obtained; two from the neighborhood, three police

9    officers.  Police officers who were used as fillers were

10   not seen by the witnesses.  Photograph of the lineup was

11   introduced as People's number 5 in evidence for purpose

12   of the hearing.  The Court had an opportunity to view

13   the lineup photographs.  The Defendant had chosen

14   position number 4 in the lineup.

15            At 4:18 p.m. witness number one viewed the

16   lineup, picked out number 4, said he's the guy from the

17   bar, the guy who stabbed the victim.

18            Number two viewed the lineup, picked number 4,

19   said he's the guy who punched the kid.

20            Number three picked number 4, the Defendant,

21   of course, being number 4 and said that's the stabber.

22            Number four viewed the lineup and was unable

23   to make an identification.

24            Number five viewed the lineup and picked

25   number 4 also, the Defendant, and said that's Enrique.

JB

1          Number six viewed the lineup, picked number 4,

2     also the Defendant, said that's the guy swinging his

3     arms and punching the victim.

4          Witnesses once again did not meet before the

5     lineup.  They all left through the side door after they

6     had an opportunity to view the lineup.

7          The witness testified that the Defendant had

8     been fed on several occasions, was given drink

9     continuously during the time he was in custody.

10         Between each lineup the Defendant had been

11    asked whether or not he wanted to change seats.  That

12    was the sum and substance of the testimony of the

13    Detective.

14         The second witness called by the People,

15    Detective James Gaynor testified that he works for

16    Brooklyn South Homicide, he has been a New York City

17    police officer for twenty years.  On 2/27/05 he went to

18    speak with the Defendant, at 2/27/05 at one a.m. at 30

19    Bush Street, apartment ten.  He went to the Defendant's

20    mother's residence.  She could not speak English.  He

21    was with Detective Darino.  He testified that the mother

22    let him into the residence.  Upon entering the residence

23    he saw a jacket camouflage, an army hat, brown

24    sweatshirt all on the floor.

25         Detective Rivera was contacted by this

1       Detective, phone was given to the mother of the

2       Defendant.  She spoke with Detective Rivera.  Detective

3       Rivera asked her if she knew where her son was and asked

4       if it would be okay if the police who were in the

5       apartment took the clothing.

6              Then it was indicated by Detective Rivera

7       consent was given to take the clothing.  The witness

8       took the clothing and vouchered it at the precinct.

9              30 Bush Street was a project, an apartment

10      building.  There was no warrant to search these

11      premises.

12             That was the sum and substance of what that

13      Detective testified to.

14             The third witness was Detective Hector Rivera.

15      He testified he has been a New York City Police

16      Department Detective -- that he is a New York City

17      Police Department Detective.  He has been on the Police

18      Department for nineteen years.  He works out of the 72

19      precinct.  On 2/28/05 at one a.m. he spoke with

20      Detective Gaynor.  He had been in another apartment at

21      the time searching for the Defendant.  He spoke on his

22      cell phone. He said he had a conversation with the

23      Defendant's mother in Spanish.  He asked her about where

24      the Defendant was and also about whether or not the

25      police could take the clothing from the apartment.

JB

1          He indicated that the witness said that the

2     police could take the clothing from the apartment.  He

3     testified she gave him permission to take the clothing;

4     that she said Detective Gaynor could take the clothing.

5     She said she didn't know where the Defendant was.

6          That was the People's case with respect to the

7     hearing, direct case, at which time the Defendant called

8     two witnesses for purposes of the hearing; Miss Anna

9     Casallas and Carlos Casallas.

10         Insofar as both witnesses indicated they spoke

11    a little bit of English, I found that to be credible.

12    As far as both witnesses indicated that they were

13    related to the Defendant, I found that to be credible.

14         As far as both witnesses testified that they

15    were frightened at the arrival of their apartment by the

16    police, I find that to be credible.

17         There were other portions of the testimony

18    that I found to be less than forthright.  I'm not

19    totally convinced as to whether or not they gave the

20    police permission to enter the apartment and I'm not

21    totally convinced that they didn't give police

22    permission to take the clothing, although one testified

23    that they didn't give permission to take the clothing.

24         I found the first witness, Miss Casallas, to

25    be evasive with respect to several points that were

1    directly asked to her by the Court, somewhat evasive in

2    any event. The fact that she is the mother of the

3    Defendant is certainly something the Court is going to

4    consider when judging the testimony of the witness as a

5    whole.

6           In any event, regardless of the complete

7    credibility of the witness' testimony, I'm not convinced

8    that she came in here and completely lied about

9    everything that she said. I do think, as I indicated,

10    there were some portions in her testimony where she was

11    either less than candid or somewhat evasive. That being

12    said, at no point during her testimony did she indicate

13    that the police in any way forced themselves into the

14    apartment; that she strenuously or in any way asked them

15    to leave once they were in the apartment and the same is

16    true with respect to Mr. Carlos Casallas, the

17    stepfather.

18           During the course of his testimony he

19    indicated he never gave police permission to enter the

20    apartment or to take the clothing, but at no time did he

21    testify he told them to leave the apartment once they

22    were there. He actually indicated at no point did he

23    even know who they were; that I find to be somewhat

24    incredulous. I can't imagine a group of police officers

25    or people would enter a person's apartment, stay there,

1  take property and the person who owned the apartment

2  would have no idea what they, in fact, were doing in the

3  apartment.

4  Miss Casallas indicated she did have a

5  conversation with Detective Rivera. I can't imagine she

6  had a conversation with Detective Rivera and at that

7  point was unaware that Detective Rivera was a police

8  officer, although she strenuously insisted she didn't

9  know these were police officers. I find that to be

10 incredulous. I can't imagine that either of these

11 witnesses didn't know who the people who came into the

12 apartment were at that time in the morning dressed the

13 way they were. As I indicated, at no point did either

14 witness testify that they asked these people to leave.

15 In any event, that is the findings of fact

16 with respect to this hearing.

17 With respect to my conclusions of law I'm

18 going to begin with the fact that at pretrial hearing to

19 suppress evidence obtained as a result of an alleged

20 illegal arrest it's the People's burden to demonstrate

21 the legality of the police conduct in the first

22 instance. I'm going to cite People's versus Wise at 42

23 NY2d 321 page 329. A lot of other cases support that

24 proposition.

25 The Defendant however does bear the ultimate

1    burden of proving by a preponderance of the evidence the

2    credible evidence that the evidence should not be used

3    against him and that the police lacked probable cause to

4    arrest the Defendant.  I'm going to cite People versus

5    Berrios at 28t NY2d 367, People versus Baldwin 25 NY2d

6    66 page 70 and People versus Milhouse at 246 AD2d 119

7    page 123.  Probable cause to arrest only requires

8    information which would lead a reasonable person who

9    possesses the same expertise as the arresting officer to

10   conclude that under the circumstances that the suspect

11   about to be arrested is about to or has committed a

12   crime.  There's a lot of cases that support that

13   proposition.

14          Before me the first issue I want to deal with

15   is the Wade hearing.  When a Defendant seeks suppression

16   of physical evidence and has put forward sufficient

17   factual allegations to warrant a pretrial hearing, that

18   Defendant bears the ultimate burden of proving that the

19   evidence should not be used against him.  Once again

20   citing Berrios, page 367.  Although a Defendant carries

21   the burden of proof in a suppression hearing the People

22   are nevertheless put to the burden of going forward to

23   show the legality of the conduct of the police in the

24   first instance.

25          Now, with regard to the Wade issues, the

JB

1      purpose of a Wade hearing is to determine whether a

2      police conducted pretrial identification procedure was

3      unduly and impermissibly suggestive so as to deny the

4      Defendant his due process rights.

5      Now the People have the initial burden of

6      going forward to establish the reasonableness of the

7      police conduct and the lack of any undue suggestiveness

8      in a pretrial identification procedure. The Defendant

9      once again bears the ultimate burden of proving that

10      such procedure was unduly suggestive.

11      Now in this case a photographic display was

12      used.  Now, a photographic display is suggestive only

13      where some characteristic of one of the pictures draws

14      the viewer's attention to that picture indicating that

15      the police have made a particular selection.  I'll cite

16      People versus Cherry at 150 AD2d 475 and People versus

17      Dubois at 140 AD2d 619, page 622.

18      I examined the photographic array employed in

19      this case and I found it was not suggestive.  In light

20      of the indication law there was nothing about any of the

21      pictures that drew the viewer's attention indicating the

22      police had made a particular selection.  The Defendant's

23      appearance and clothes did not differ greatly from the

24      men in the other photographs.  They all seemed to this

25      viewer as being close in age, similar hairstyles, skin

1    tones and facial characteristics, meeting the criteria

2    set forth in People versus Robert 184 AD2d 597.  That

3    was repeated in People versus Floyd 173 AD2d 211.

4    Now, with respect to the lineup in this case

5    the Defendant also contends that the evidence of the

6    lineup identification should be suppressed because the

7    difference with respect to facial characteristics, etc.

8    of the participants or that the lineup procedure in

9    general would have rendered that procedure unduly

10   suggestive.  While participants in a lineup should share

11   general physical characteristics, and that is People

12   versus Jackson at 211 AD2d 744, there is no requirement

13   that a Defendant in a lineup be surrounded by people who

14   are nearly identical in appearance.

15   There are a lot of cases, starting with People

16   versus Chip 75 NY2d 327 page 336 and many other cases

17   that support that proposition.

18   Now, this Court examined the photographs of

19   the lineup which were introduced into evidence for

20   purpose of the hearing and I conclude that the lineup

21   was not unduly suggestive. The fillers, although not

22   perfect, were similar in appearance to the Defendant.

23   The lineup constituted a fairly representative panel and

24   any witness viewing it could make a reliable

25   identification.  I also found the procedures utilized by

1      the police in conducting the lineup were not unduly

2      suggestive.  Criteria put forward in People versus Caban

3      181 AD2d page 787.

4          Based on all the facts and circumstances

5      presented in this case the Defendant's motion to

6      suppress lineup identifications are hereby denied.

7          Finally or secondly, a Huntley hearing was

8      conducted at which time the People again would have the

9      burden of establishing that the Defendant voluntarily

10     waived his prejudice against self-incrimination.  To be

11     valid an accused waiver of his or her rights must be

12     knowingly and intelligently made the Court must always

13     ascertain whether the Defendant understood how Miranda

14     rights affected the custodial interrogation.

15         An individual may validly waive Miranda rights

16     so long as the immediate import of those warnings is

17     comprehended, regardless of his or her ignorance of

18     mechanics by which the fruits of that waiver may be used

19     later in the criminal process, as the Court of Appeals

20     stated in People versus Sirno 76 NY2d 967 from page 968.

21         Where a Defendant indicates he understands his

22     Miranda rights and promptly after having been

23     administered those rights willingly proceeds to make a

24     statement or answer questions during interrogation no

25     other indication prior to the commencement of

JB

1          interrogation is necessary to support a conclusion that

2          the Defendant waived those rights. Also, federal case,

3          North Carolina versus Butler at 441 US 369 and New York

4          companion, People versus Davis 55 NY2d 731, a different

5          People versus Davis than was cited by counsel earlier to

6          support a different proposition that I'll be addressing

7          immediately after this.

8                 I found that the Defendant in this case

9          willingly proceeded to make a statement and answer

10         questions during interrogation and no other indication

11         prior to commencement of that interrogation is necessary

12         by this Court to support the conclusion that he waived

13         his rights.

14                That aside, he indicated when he said "we

15         here" after answering yes to all the questions the Court

16         found that was, in fact, a waiver of his rights because

17         he proceeded to answer all the questions asked of him.

18                It should be noted also that two hours

19         earlier, approximately two hours earlier he signed a

20         Miranda warnings sheet and then made an oral and written

21         statement after that. So it's within two hours of being

22         already read his Miranda warnings there was no argument

23         of there not being any form of continuation.

24                Therefore, the application to suppress three

25         statements is hereby denied, although I do want to notes

1    for the record that he did say "we here" as was pointed

2    out by counsel, gratefully pointed out because the Court

3    was under the misimpression that he had said yes so I

4    was glad counsel pointed that out so I could view that

5    again. However, it doesn't change the ultimate ruling

6    that the Defendant knowingly and voluntarily waived his

7    rights and proceeded to give those statements after

8    having been formally read.

9         That brings us to the final issue, I suspect

10   the most complicated which faced us and caused the Court

11   concern because it had to do with several factors, one

12   being a determination of the credibility of the

13   witnesses, which I think I made clear during the course

14   of my recitation. But also it gave the Court some pause

15   because I believe it was necessary to review more

16   importantly the law concerning what was before me.

17        Now, the first question that I have deals with

18   standard. I'm going to address that issue, but I'm

19   going to move ahead once I've addressed that issue. One

20   seeking standing to assert a violation of his fourth

21   amendment rights must demonstrate a legitimate

22   expectation of privacy. One may have an expectation of

23   privacy in premises not one's own or a familial or other

24   socially recognized relationship. However, as the

25   undisturbed findings of the trial court, that's me,

1    demonstrate the Defendant only had a relatively tenuous

2    tie to the apartment where the property, which is the

3    subject of this, what would be considered a Payton

4    hearing was recovered.

5              The Defendant, it was clear was, as is cited

6    in the case I'm going to quote from now, People versus

7    Ortiz 83 NY2d 840, reading from the first page that I

8    have. A Defendant who is a casual visitor to an

9    apartment and would not have any reasonable expectation

10   of privacy within the apartment, especially if they

11   didn't have any expectation of privacy on the date of

12   arrest.

13             The fact that there is only a tenuous

14   relationship with the apartment, as was testified by the

15   mother and the father or the stepfather of the Defendant

16   called by the defense, would indicate to me that he

17   stayed there now and then, once in a while he came and

18   went from the apartment, but there was no indication

19   that he lived there or that he even stayed there for any

20   extended period.  The testimony was that he came in,

21   changed his clothes and left.

22             So with respect to the issue of standing,

23   although not raised tangentially, I suspect raised by

24   the prosecution, the Court addresses that issue now and

25   finds that were that to be the primary concern before me

1     I'd have to find that there was no standing to even

2     contest the taking into custody of the items that were

3     taken into custody.  That aside, the Court will address

4     the Payton issue in any event.

5            There is a case I want to cite dealing with

6     the issue of standing, People versus Manuel Hornedo.  I

7     just have it's a Second Department, November 1, 2000

8     case.  The indictment number is 7943 of 1999.  This case

9     is exactly on point where a Defendant contends that the

10    police unlawfully arrested him in his mother's

11    apartment.  The court held that they agree with the

12    hearing court that the Defendant failed to demonstrate

13    that he had a legitimate expectation of privacy in his

14    mother's apartment.  The Defendant lived at another

15    location at the time of the arrest.  He acknowledged

16    that he stayed at the other location.

17           In this case not only do we have testimony

18    that the Defendant didn't live in the apartment, but he

19    was, in fact, arrested at another address.

20           So once again, that case would support the

21    fact that there was, in fact, no standing to suppress

22    the items.

23           That aside I'm going to now move into the

24    Payton issue that was litigated in any event.

25           I would like to cite the case of People versus

1    Velez.  The best cite I have is 4 Misdemeanor Third at

2    1004(a) in brackets.  It's a May 12th, 2004 Bronx county

3    case.  This case cites People versus Gonzales at 39 NY2d

4    122 dealing with People versus Payton 445 US 573.

5         It indicated in Gonzales that the Court of

6    Appeals examined several factors which may influence

7    one's voluntary consent to a search.  Those factors

8    include whether the subject of the search was in police

9    custody, what the subject's background was, whether the

10   subject was evasive or cooperative with law enforcement

11   authorities, whether the police advised the subject of

12   his right to refuse consent, etc.

13        Accordingly, any determination regarding the

14   Defendant will turns upon the totality of circumstances

15   presented on the record and since Gonzales, Appellate

16   courts have found consent to enter one's home by

17   analyzing the occupant's words and it should be stressed

18   conduct when dealing with the police.

19        I would like to cite People versus Brown 234

20   AD2d 211.  Where consent was found where a Defendant's

21   companion left the front door open and then walked over

22   to the Defendant and then the police then followed that

23   person inside.  Also, People versus Satorino 153 AD2d

24   595.  The Appellate Division found there was no Payton

25   violation where the Defendant's mother told detectives

1    that her son was in his room and then pointed to that

2    direction when not indicating not giving them specific

3    permission to enter.

4         More on point, I want to cite People versus

5    Davis, also cited in this case. This was a case brought

6    to my attention by the prosecutor 120 AD2d 606. I have

7    a copy of that case here too. Basically, it says

8    occupants acts of stepping aside to let officers in is

9    tantamount to consent. Consequently, when the

10   government claims to have been given consent to enter

11   one's home, an occupant's failure then to object to the

12   entry supports the conclusion of implicit permission to

13   enter. It indicates that that stepping aside when

14   people walk in is implicit permission to enter. The

15   Appellate Division upheld the police conduct in that

16   particular instance.

17        Also People versus Schoff 136 AD2d 578.

18   Consent was upheld where after entering premises

19   occupants neither asked the police to leave nor objected

20   to their presence. Also People versus Long 124 AD2d

21   1016. Occupants' cooperation with police was evidence

22   of voluntary consent to enter. While it's unclear why

23   Defendant's encounters with the police progressed into

24   someone's home, a Defendant's failure to object to

25   officers presence supports a court's finding that there

1     was, in fact, no Payton violation. And in this case as

2     opposed to a Defendant we have a witness. So a witness'

3     failure to object, but then going back to the witness,

4     as opposed to Defendant, once again returns us to the

5     issue of standing.

6            Let's just make it clear we are talking about

7     a general Payton issue as opposed to there being

8     standing or not being standing.

9            I would like to cite People versus Davis

10    itself. I would like to quote from People versus Davis

11    itself. Consent can be established by conduct as well

12    as words.

13           Davis cites People versus Abrams 95 AD2d 155

14    from page 175. Also cites United States versus Griffin

15    at 530 Fed2d 739. It also says the Defendants mother's

16    conduct in stepping aside from the door to admit the

17    officers is enough to establish consent. People versus

18    Taylor 111 AD2d 520 489 New York supp. 2d 394.

19           I think that is pretty clear that the mother

20    stepped aside and let the police in. Even the mother's

21    testimony was that she stepped aside or stepped back and

22    let the police enter the apartment. I think it's pretty

23    clear in light of the case law.

24           There are other cases I want to cite, People

25    versus Ayala Second Department 165 AD2d 878. Also

1       citing that stepping aside without saying anything is

2       not a violation. The officers can enter the apartment,

3       make an arrest and advise someone of their Miranda

4       rights without having a Payton violation. Also People

5       versus Washington at 209 AD2d 817, a Third Department

6       case indicating that stepping aside and failing to

7       direct the police to leave was tacit admissions of the

8       police or consent of the police to enter the apartment.

9       In this case testimony alone demonstrated that

10      the person tacitly consented to the officers' entry by

11      conduct, that conduct being stepping aside and failing

12      to direct the people to leave or otherwise indicate

13      after they have already entered that there was no

14      permission to stay.

15      Finally, People versus Schoff once again at

16      136 AD2d 578 and 71 NY2d 1033 also indicating failure to

17      direct police to leave the premises on entry passively

18      grants the police permission.

19      In this case, although there is some question

20      as to whether or not the police officers were actually

21      given permission or not, there is no doubt that there

22      was a phone conversation between Officer Rivera and the

23      mother and the mother didn't tell Officer Rivera in

24      Spanish that she wanted everybody to leave. She simply

25      indicated she had a conversation with the police

1          officer, Detective on the other end of the phone.  There

2          is no testimony, although many opportunities, to request

3          them to leave could have been made; it was never taken.

4                    These people who testified did not indicate

5          that they in any way asked the officers to leave after

6          they entered.  They did say unequivocally that they

7          didn't give them permission to enter.

8                    The facts and circumstances as determined by

9          this Court indicate that there was no, in fact, Payton

10         violation and counsel's application, even if they had

11         standing to suppress these items, is hereby denied.

12                   Your exception is noted counsel, I'm sure.

13                   Tomorrow morning 10:30.

14                   MR. DRANOVE: One last point; I don't know what

15         your take on it would be.  Since no more money is

16         available --

17                   THE COURT:  We will take that up tomorrow.

18                   While waiting for the jury panel to be brought

19         up be prepared to proceed with Sandoval and Antonmarchi.

20                   MR. DRANOVE: Can I get an idea of the

21         prosecution witness list?

22                   THE COURT:  I don't have it now.  We will go

23         over it all together so we can evaluate.

24                   MR. DRANOVE: I still have issues about

25         identity of witnesses.

1             THE COURT:  Tomorrow morning.  Same bail

2    conditions. Was Defendant given Parker warnings?

3             MR. DRANOVE: It's going to be hard for him to

4    run.

5             THE COURT: I want him to know if he does

6    voluntary absent himself by not coming tomorrow we will

7    proceed in his absence.  We have had that issue.

8             MR. DRANOVE: This gentleman looks forward to

9    being here.

10            THE COURT:  Good.

11            (Whereupon, the case was adjourned to June 7,

12    2006.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    THE COURT:   Tomorrow morning.   Same bail

2        conditions. Was Defendant given Parker warnings?

3                    MR. DRANOVE: It's going to be hard for him to

4        run.

5                    THE COURT: I want him to know if he does

6        voluntary absent himself by not coming tomorrow we will

7        proceed in his absence.   We have had that issue.

8                    MR. DRANOVE: This gentleman looks forward to

9        being here.

10                   THE COURT:   Good.

11                   (Whereupon, the case was adjourned to June 7,

12       2006.)

13

14                        *     *     *     *

15

16

17                   It is hereby certified that the

18                   foregoing is a true and accurate

19                   transcript of the proceedings.

20

21

22

23                   JUDITH BRUSCA

24                   OFFICIAL COURT REPORTER

25

1  SUPREME COURT OF THE STATE OF NEW YORK

2  COUNTY OF KINGS:    CRIMINAL  TRIAL  TERM  :   PART   29

3  - - - - - - - - - - - - - - - - - - - - - X

4  THE PEOPLE OF THE STATE OF NEW YORK        :   Indictment
                                                  No. 1453/2005
5            - against -                      :

6  ENRIQUE RIVERA                            :   JURY TRIAL

7  - - - - - - - - - - - - - - - - - - - - - X

8                            June 27, 2006
                             320 Jay Street
9                            Brooklyn, New York

10

11 B E F O R E:

12                    THE HONORABLE ROBERT J. COLLINI,

13                         J U S T I C E.

14

15 A P P E A R A N C E S:

16

17              CHARLES J. HYNES, ESQ.
                    District Attorney, Kings County
18                  BY:  PHYLLIS CHU, ESQ.
                    Assistant District Attorney
19

20              JOEL K. DRANOVE, ESQ.
                    299 Broadway, #706
21                  New York, New York  10007
                    Attorney for Defendant

22

23

24

25                              Maria E. Gordon, R.P.R.
                                Official Court Reporter

PROCEEDINGS                961

1      COURT CLERK:  This is 1453/2005:  It's the other

2   case on trial Enrique Rivera.  Mr. Rivera is present.

3      Could we have counsel give their appearance.

4   The People are present, the jury is not.

5      THE COURT:  I have a document in front of me.

6   It's entitled Jury Note.  The time of the note is

7   2:30 p.m.  It's been shown to both counsel.  The date is

8   6/27/06.  My name is stamped to the note.  It's signed by

9   the foreperson.  It's been marked Court Exhibit Number 13.

10      The body of the note reads as follows "Your

11   Honor, may we have the copy of the definitions for the

12   verdicts and direct and circumstantial evidence."  That

13   was brought into the jury room.  "Pictures inside bar."

14   That was brought into the jury room.  "Testimony of DNA

15   expert."

16      It's my intention to bring the panel in and have

17   the court reporter read the testimony of the DNA expert.

18   It runs approximately 22 pages.  Any objection, counsel?

19      MS. CHU:  No.

20      THE COURT:  Counsel?

21      MR. DRANOVE:  No, sir.

22      COURT OFFICER:  Ready for the jury?

23      THE COURT:  Yes, please.

24      (WHEREUPON, the jury returned to the jury box

25   and the following proceedings takes place before the Court

1    and jury as follows:)

2            COURT OFFICER:  All twelve deliberating jurors

3    are now present.  Both sides waive the reading of roll?

4            MS. CHU:  Yes.

5            MR. DRANOVE:  Yes.

6            THE COURT:  Thank you.  I have a document in

7    front of me.  It's entitled Jury Note.  It's signed by the

8    foreperson.  Again, I'm getting to know this signature

9    very well.  It's Court Exhibit Number 13.  My name is

10   stamped to the note.  The body of the note reads as

11   follows "Your Honor, may we have a copy of the definitions

12   for the verdicts and direct and circumstantial evidence."

13           I know that was brought in to the jury room.

14   Plus "pictures inside the bar."  I know that was brought

15   into the jury room and "the testimony of the DNA expert."

16   Maria is going to read that to you now.

17           (WHEREUPON, the requested portion of the record

18   is read by the court reporter)

19           THE COURT:  You're dismissed to continue

20   deliberation.

21           (WHEREUPON, the jury exits the courtroom and the

22   following proceedings takes place before the Court as

23   follows:)

24           THE COURT:  The jury's out of the room.  The

25   door is closed.  Folks, stick around for a little while.

1       (WHEREUPON, a recess is taken, after which the

2   following proceedings commence before the Court as

3   follows:)

4       COURT CLERK:  This is 14153/2005 Enrique Rivera

5   who is present with counsel, the People are present, the

6   deliberating jury is not.

7       THE COURT:  I have a document that is in front

8   of me.  It's entitled Jury Note.  The time is 4:40 p.m.

9   The date is 6/27/06.  My name is stamped on the note.

10  It's been signed by the foreperson.  It will be marked

11  Court Exhibit Number 14.  I believe it's 14.  The body of

12  the note reads --

13      COURT CLERK:  Yes.

14      THE COURT:  The body of the note reads as

15  follows "Your Honor, after five and a half days of much

16  discussion and review of the court exhibits and reading of

17  the court testimonies, opinions remain unchanged and we

18  cannot come to a unanimous decision."  Counsel?

19      MS. CHU:  Hang them.

20      MR. DRANOVE:  Your Honor, I respectfully request

21  to inquire of the jury as to whether they are able to come

22  to a unanimous decision about any of the counts.

23      They have had an extraordinarily amount of time

24  and perhaps they have, and that, I believe, is, in all

25  fairness, something that is neutral and just that request

PROCEEDINGS

964

1    should be granted.

2         THE COURT:  I'm going to read two sections of

3    the criminal procedure law Section 310.60 "Discharge of

4    Jury before Rendition of a Verdict and Effect Thereof"

5    Section 1A.  In Section 1 "A deliberating jury may be

6    discharged by the Court without having rendered the

7    verdict only when (a) the jury has deliberated for an

8    extensive period of time without agreeing upon a verdict

9    with respect to any of the charges submitted and the Court

10   is satisfied that any such agreement is unlikely within a

11   reasonable time, (b) the Court, the defendant, and the

12   People all consent to such discharge, (c) a mistrial is

13   declared pursuant to Section 280.10."

14        Section 2 "When a jury is so discharged, the

15   defendant or defendants may be retried upon the

16   indictment.  Upon such retrial, the indictment is deemed

17   to contain all counts which it contained, except those

18   which were dismissed or would deemed to have resulted in

19   acquittal pursuant to subdivision one of Section 290.10."

20        Section 310.70 deals with the Rendition of

21   Partial Verdict and Effect Thereof.  "1. If a deliberating

22   jury declares that it has reached a verdict with respect

23   to one or more but not all of the offenses submitted to it

24   or with respect to one or more but not all of the

25   defendants, the Court must proceed as follows (a) if the

1    possibility of ultimate agreement with respect to the

2    other submitted offenses or defendants is so small and the

3    circumstances is such that if they were the only matters

4    under consideration the Court would be authorized to

5    discharge the jury pursuant to Paragraph A of subdivision

6    one, Section 310.60, the Court must terminate the

7    deliberation and order the jury to render a partial

8    verdict with respect to those offenses and defendants upon

9    which or with respect to whom it has reached a verdict,

10   (b) if the Court is satisfied that there is a reasonable

11   possibility of an ultimate agreement upon any of the

12   unresolved offenses with respect to any of the defendant

13   it may either --" I'm not going to read those two

14   sections, but it deals with continuing rendering a verdict

15   and continuing deliberation.

16           Subdivision two of 310.70 indicates as follows

17   "Following the rendition of a partial verdict pursuant to

18   subdivision one, the defendant may be --" and then it sets

19   forth what the defendant may do, the operative section,

20   and there's other sections or one other section dealing

21   with submitted offenses, what submitted offenses means,

22   but that doesn't really have any impact on what we have

23   before us.

24           Now, your request is to take a partial verdict.

25           MR. DRANOVE:  No.  To ask them if they've

1    reached a partial verdict to determine if there have been

2    a compliance with the very first subsection that you read

3    because you haven't asked the jury to report if they

4    reached an agreement upon a verdict upon any charge.

5          THE COURT:  Just to show that I -- not only do I

6    disagree with you but you're wrong.  I'm going to read

7    Section 310.70(1) again.  "If a deliberating jury

8    declares --" and I don't think I could be more emphatic

9    than that.  This jury has not declared --

10          MR. DRANOVE:  Then ask them whether they have.

11          THE COURT:  Counsel, would you please, don't

12    interrupt "--that it has reached a partial verdict with

13    respect to one or more but not all of the offenses, then

14    the Court must proceed in a specific way."

15          This jury has not under any aspect indicated

16    that it has declared that it has reached a verdict with

17    respect to one or any of the counts.

18          MR. DRANOVE:  Your Honor, I submit that the jury

19    doesn't have a copy of the CPL nor anyone guiding them

20    what they are supposed to know -- what they're supposed to

21    do if they've reached a partial verdict.

22          A verdict would be through the end of the

23    verdict sheet, that's all, saying they cannot reach, I

24    believe, and I don't understand your resistance in asking

25    them if they reached a partial verdict.

PROCEEDINGS
967

1        If my client has or has not been acquitted of

2   one or two of the charges, he should know it, Your Honor

3   should know it, the People of the State of New York should

4   know it.

5        I don't understand the hesitation when they were

6   not asked by Your Honor to report as to whether or not

7   they've reached a partial verdict.

8        THE COURT:  Counsel?

9        MS. CHU:  Your Honor, I would agree with the

10  Court.  I believe that the statute is quite clear that

11  it's only when a jury has indicated that they have reached

12  a partial verdict that the Court is to proceed in a

13  certain manner.

14       There have been no indications whatsoever during

15  the five and a half days that we've been with this jury

16  that they've reached a verdict on any of the counts that's

17  before them.

18       Not only that, they asked for all three of the

19  counts to be given to them in writing, which indicates

20  that they have not reached a verdict on anything, so I

21  believe that it would be outside the boundary of what the

22  Court is permitted to do to ask them a question of whether

23  they have reached anything.

24       THE COURT:  Not only do I agree with you but by

25  submitting a question to the jury asking them whether they

1    can or have reached a partial verdict might imply to the

2    jury that the Court is suggesting that they do, and I have

3    no intention of doing that.

4                I don't want this jury to think that it's the

5    Court's impression that they should reach at least a

6    partial verdict, which would certainly be --

7                MR. DRANOVE:  Your Honor --

8                THE COURT:  -- certainly be an avoidance of

9    their duty in whole, and, secondly, it would be a

10   mischaracter of justice to the community in the sense that

11   I would be suggesting they have to reach at least some

12   form of verdict and I don't want to pressure them to think

13   that that would be the case.  That's the fear of the Court

14   and that's why, counsel, your objection is obviously

15   noted.

16               MR. DRANOVE:  Your Honor, do you actually

17   believe that inquiry of the jury as to whether they

18   reached a partial verdict is going to be anything more

19   than an inquiry as to whether they've reached a partial

20   verdict?

21               THE COURT:  Yes.

22               MR. DRANOVE:  I'm surprised you say so, Your

23   Honor.

24               THE COURT:  In any event, I have no obligation

25   to ask that question.  I have no indication from the jury

1    that they have reached a partial verdict in any way and

2    it's my intention to bring in the jury and to declare a

3    mistrial and dismiss this panel.

4                COURT OFFICER:  Are you ready for the jury now?

5                THE COURT:  Yes, please.

6                (WHEREUPON, the jury returned to the jury box

7    and the following proceedings takes place before the Court

8    and jury as follows:)

9                COURT CLERK:  All 12 members of our deliberating

10   jury is now present.  Both sides waive the reading of the

11   roll?

12               MS. CHU:  Yes.

13               THE COURT:  Counsel?

14               MR. DRANOVE:  Yes.

15               THE COURT:  Thank you.  Now, I have a document

16   in front of me entitled Jury Note.  The time is 4:30 p.m.,

17   the date is 6/27/06.  It's been marked Court Exhibit

18   Number 14.  My name is stamped to the document.

19               It's been signed by the foreperson again and the

20   body of the note reads as follows "Your Honor, after five

21   and a half days of much discussion and review of the court

22   exhibits and reading of court testimonies, opinions remain

23   unchanged and we cannot come to a unanimous decision."

24               I'm going to dismiss the panel at this time.

25               MR. DRANOVE:  Would you ask them if they reached

1          a partial verdict, Your Honor?

2                    THE COURT:  Sit down, counsel.  I'm going to

3          dismiss the panel at this time and before I do I'm going

4          to just take a few minutes to thank you for all your time.

5                    I know this is a very, very difficult situation.

6          I know you didn't shirk your responsibility, and I know

7          you worked very, very hard.  Sometimes these things are

8          very, very hard to do.

9                    Thank you in any event for your time.  You're

10         all excused.

11                   (WHEREUPON, the jury exits the courtroom and the

12         following proceedings takes place before the Court as

13         follows:)

14                   THE COURT:  When is the next day --

15                   MS. CHU:  All right.  Your Honor, the defense

16         counsel is asking the family members to go outside and try

17         and speak to the jury about partial verdicts.

18                   THE COURT:  The panel is dismissed.

19                   MS. CHU:  I think that what defense counsel did

20         during --

21                   THE COURT:  Was near contemptuous but the Court

22         is going to excuse his zeal, but if it should happen again

23         at any time in the future, the Court will not be so

24         lenient.  We've --

25                   MR. DRANOVE:  Judge --

1          THE COURT:  Counsel, we've discussed this.  We

2     discussed this outside the earshot of the jury.  The Court

3     made its determination.  It was uncalled for, especially

4     someone with your professional reputation, your quality as

5     an attorney, you know better than to have done that.

6          MR. DRANOVE:  Perhaps the more reason I have

7     that reputation is I take quite seriously, as you did,

8     sir, when you were representing your clients, and as all

9     in this courtroom who at one time did the need to

10    zealously represent their client.

11         THE COURT:  That's why I haven't held you in

12    contempt for that contemptuous behavior.

13         In any event, I do understand your zeal,

14    counsel.  I believe it was misplaced with that particular

15    outburst.

16         In any event, we're going to need a day to retry

17    this.  What would be the most appropriate -- Both parties

18    have received the minutes.  That's not going to be an

19    issue.  We're going to move forward expeditiously.

20         MS. CHU:  I have 2004 matter that's scheduled

21    for trial on July 18th.  I'm going to be away the first

22    week of August.  Sometime towards the end of August would

23    be fine with me.

24         MR. DRANOVE:  Judge, I look forward to August

25    with one caveat.  I have a firm date for federal trial on

PROCEEDINGS

1   September 11th, so -- He picked September 11th.

2           THE COURT:  What about the July 5th?

3           MS. CHU:  I'm going to be away that week.

4           THE COURT:  When are you coming back?

5           MS. CHU:  And I'm also riding the following week

6   after.

7           THE COURT:  Can you change the riding situation?

8           MS. CHU:  Everybody is pretty busy right now.

9           MR. DRANOVE:  Judge, I'm extremely tied up with

10  Appellate Division deadlines.

11          THE COURT:  No, I understand.  The only point --

12  The only reason because you just told me your schedules.

13  I'm not going to be here the last two weeks of August, so

14  that creates a real problem.  You're going to be here the

15  last two weeks of July -- the two weeks in July.  You

16  can't do this and then the first week in August is not

17  good.

18          Mr. Dranove, you're going to be on trial again

19  September 11th, so that's putting us in a bit of a bind.

20  If we can't do it right away then we can't do it for

21  awhile.

22          MS. CHU:  What about towards the middle to end

23  of September after he's finished with his federal trial?

24  I should be able to do another trial in between there and

25  then I should be done by maybe the third week of

1    September.

2             THE COURT:  Counsel, Mr. Dranove?

3             MR. DRANOVE:  Judge, I am consulting with my

4    client.  If you give me a a moment more I'll respond.

5             (WHEREUPON, there is an off-the-record

6    discussion, after which the following proceedings takes

7    place before the Court as follows:)

8             THE COURT:  How about the week of the 18th?

9             MR. DRANOVE:  Of which month?

10            THE COURT:  September.

11            MR. DRANOVE:  Your Honor, I think all I would be

12   able to report then is that I'm in the middle of a trial.

13            THE COURT:  I know that and that may be -- that

14   may be possible but there's always the possibility.

15            MR. DRANOVE:  For control date so we --

16            THE COURT:  What my intention is to have you try

17   this case right after that one.

18            MR. DRANOVE:  Can I at least prepare for this

19   retrial.  The fact that I've tried it once indicates

20   there's a voluminous amount to --

21            THE COURT:  You did such a good job, I must add.

22            MR. DRANOVE:  I beg your pardon?

23            THE COURT:  You did such a good job at the first

24   trial.  You seem to be well prepared already to move

25   ahead.

1          MR. DRANOVE:  Thank you, Judge.  I take that as

2     a compliment.

3          THE COURT:  So why don't we just take the 18th.

4     Use that as the day for trial.  If you're actually

5     engaged, you're engaged.

6          MR. DRANOVE:  We have a two-week trial coming up

7     there --

8          THE COURT:  Then you will be engaged.

9          MR. DRANOVE:  -- in Mangano.  My client has a

10    Somalian interpreter.  The co-defendant's interpreter is

11    French.

12         It's going to be a very interesting trial and

13    supposedly two weeks, so then the 25th would be more

14    realistic.

15         THE COURT:  Why don't we put it on for the 18th.

16    You'll have a good idea on the 18th when you'll be able to

17    try it.  If you need a day or two in between, you will let

18    me know.

19         I'll be very, you know, happy to give you a

20    practice day or two, but we've already done it and we

21    already have the minutes and you have, you know, between

22    now and then it's not like we need any further

23    investigation; although, maybe you do.

24         MR. DRANOVE:  I do, Your Honor, have a request.

25    It's for you to reconsider your prior decision denying my

1  application for the contact information for all of the

2  persons who were in the bar who did not see a knife in my

3  client's hand.  A limited number spoke at this trial.

4  There are others who were in the bar.  There are a

5  bartender and bartendress who was interviewed whose

6  contact information I don't have, particularly, in light

7  of the fact we've all sat through the trial and understand

8  the arguments.

9      I believe they are in deed exculpatory Brady

10 evidence material witnesses and there's been no indication

11 of why I should not be entitled to at least ask them if

12 they'd like to speak to me or my investigator.  I renew my

13 application.

14      THE COURT:  Counsel?

15      MS. CHU:  Your Honor, I don't know which

16 witnesses he's talking about.  The witnesses, as far as I

17 know, as far as the bartender and things alike, they

18 didn't see what happened, so whether or not they saw a

19 knife in his client's hands, I don't see how that would be

20 relevant.

21      MR. DRANOVE:  Well, we've tried the case.  I

22 don't have to reveal more of my trial strategy.

23      THE COURT:  Were more DD-5's handed over to

24 counsel at trial unredacted?

25      MS. CHU:  With the exception of the addresses,

1    yeah.

2            THE COURT:  With the exception of the addresses

3    but all the names of all the witnesses?

4            MS. CHU:  The names are all out there.

5            THE COURT:  We're not talking about confidential

6    witness one, two, three up to six anymore.

7            MR. DRANOVE:  But how do I contact them?

8            MS. CHU:  That is why you have an investigator.

9            THE COURT:  Yeah.  That's why you have an

10   investigator.  I'm not going to order them to turn over

11   the addresses of the witnesses; that is, I'm not going to

12   do it.

13           MR. DRANOVE:  How about phone numbers?  Let me

14   just confirm phone numbers with Ms. Chu because --

15           THE COURT:  Counsel, I'm not going to order them

16   to turn over contact information.

17           Obviously, investigators have a lot of abilities

18   to contact people in this day and age.  People who were in

19   the bar, I guess, or people who worked for the bar, if you

20   have their names, I don't see it should be much of a

21   problem.

22           MR. DRANOVE:  Judge, we have a bouncer named

23   Bebe.  How do I contact Bebe?

24           MS. CHU:  Ask your client.  He's the only one

25   who knows -- Ask Mr. Rivera.  He's the only one who knows

1   about a Bebe.

2           MR. DRANOVE:  Luis Rivera -- May I have Luis

3   Rivera's NYSID number from the prosecution because I'm

4   convinced they're not going to call him for the retrial,

5   and I would like the Court to sign an order to produce him

6   for the retrial.

7           THE COURT:  Counsel, you get me an order to

8   produce and I'l sign it.

9           MR. DRANOVE:  I will ask for the NYSID number

10  and his location to be provided to me by Ms. Chu.

11          MS. CHU:  Your Honor, his client is

12  incarcerated.  I would not want to have any incident occur

13  in jail while he knows the witness' NYSID number and where

14  he's actually held.

15          I refuse to give over that information under the

16  guise of, you know, we heard from that witness himself

17  that there were threats that were being put around that he

18  is a snitch and what have you when he actually testified.

19          MR. DRANOVE:  Where did you hear that?

20          MS. CHU:  From his attorney.

21          THE COURT:  His attorney?

22          MR. DRANOVE:  Oh, well, I'm not privy to any of

23  that.

24          THE COURT:  Yeah, you were.  You were actually

25  standing right here.

1           MR. DRANOVE: I didn't hear it.

2           THE COURT: Then you didn't hear it, but you

3    were standing right here.

4           Let the record reflect that I'm pointing to the

5    bench when he came up and told us.

6           MR. DRANOVE: I have -- I don't have that on the

7    record that I have and if --

8           THE COURT: No, it was not on the record. We

9    didn't put that on the record.

10          MR. DRANOVE: In any event, I want to call that

11   person to the witness stand. He's testified.

12          THE COURT: Counsel, my advice, and I really

13   shouldn't be giving you advice from the bench, but --

14          MR. DRANOVE: You're a learned jurist.

15          THE COURT: My advice to you would be to call

16   his lawyer and ask his lawyer for that information, and

17   I'm sure his lawyer will give it to you if he thinks it's

18   appropriate but he has a lawyer. Call his lawyer.

19          MR. DRANOVE: Is his lawyer's name in the

20   record? I don't --

21          THE COURT: I'm sure it is.

22          MR. DRANOVE: I will look for it. If it's not,

23   I will notify Your Honor. We can take --

24          THE COURT: We'll help you find his name.

25          MR. DRANOVE: Fine. Hold on a minute. Here it

1    is.

2              THE COURT:  Mr. Quinn is the best.  Step up.  It

3    had just been discarded.  I'm handing down Mr. Fredrick's

4    Legal Aid card to counsel.

5              MR. DRANOVE:  Thank you.

6              THE COURT:  And I guess you can contact Mr.

7    Fredrick and he'll help you out.

8              MS. CHU:  Thank you.

9              THE COURT:  Thank you both.

10             (WHEREUPON, proceedings adjourned to

11   September 18, 2006)

12                     *-*-*-*-*-*-*-*-*

13        I hereby certify that the foregoing is a true and

14   accurate copy of the stenographic copy of the hearing held in

15   the above matter.

16                  (Or trial as the case may be)

17

18                                Maria E. Gordon, R.P.R.

19                                Official Court Reporter

20

21

22

23

24

25

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:  CRIMINAL TERM: PT 35
---------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK

          - against -          Ind. #1453/05

ENRIQUE RIVERA,                 Murder 2

               Defendant.   Sandoval Hrg
                         Voir Dire
---------------------------------------x
               320 Jay Street
               Brooklyn, New York

               May 4, 2009 and May 5, 2009

B E F O R E :   HONORABLE ALAN MARRUS, presiding

A P P E A R A N C E S :

FOR THE PEOPLE:     CHARLES HYNES, ESQ.
                    District Attorney - Kings County
                    210 Joralemon Street
                    Brooklyn, New York
                    BY:  PHYLLIS CHU, ESQ.
                    Assistant District Attorney

FOR THE DEFT:      JOEL DRANOVE, ESQ.
                    Brooklyn, New York

                          MICHELE J. WALKER
                  OFFICIAL SENIOR COURT REPORTER

Motions

2

1          COURT CLERK:  Indictment 1453, 2005.

2     Enrique Rivera.

3          THE COURT:  Counsel, your appearances,

4     please?

5          MR. DRANOVE:  Joel Dranove, D-R-A-N-O-V-E,

6     for Mr. Rivera.

7          MS. CHU:  For the office of the District

8     Attorney, Phyllis Chu.

9          Good afternoon, your Honor.

10          THE COURT:  This case was sent to me for

11     trial.

12          Are the People ready?

13          MS. CHU:  Yes, your Honor.  The People are

14     ready.

15          THE COURT:  Is the Defense ready?

16          MR. DRANOVE:  Yes, your Honor.

17          THE COURT:  Then we move the case for

18     trial.

19          Mr. Rivera, I'm Judge Marrus, and I'm the

20     judge that has been assigned to try your case.

21          THE DEFENDANT:  Good afternoon.

22          THE COURT:  Good afternoon.

23          Before we commence jury selection, I want

24     to resolve all matters that need to be

25     resolved.  So let's start with the prosecution.

1          Is there any ruling that you need from me

2     before jury selection commences?

3          MS. CHU:  Your Honor, I would just ask

4     that there is one detective that is no longer

5     available.  He is retired, and we have tried

6     several attempts at trying to locate him

7     through his pension address and he has been

8     unable to be located.  That detective's name is

9     Detective James O'Sullivan.  For that reason,

10    your Honor, this detective testified at the

11    prior trial in 2006, before Judge Collini, and

12    pursuant to CPLR, I believe, Section 670,

13    People would be seeking to introduce his prior

14    testimony in its entirety because of his

15    unavailability.

16         THE COURT:  Is there any objection by the

17    Defense?

18         MR. DRANOVE:  I have a question which --

19    with respect to the efforts to locate the

20    detective.

21         Was anybody sent to his last known address

22    to find out if he actually lives there?

23         THE COURT:  Miss Chu, what efforts were

24    made to locate him?

25         MS. CHU:  I sent two letters to his

Motions

4

1    address, as well as one certified letter to

2    him.

3        The first two letters were sent regular

4    mail because sometimes when you send certified,

5    it delays them actually being able to get it.

6        I also had a detective actually go to the

7    location.  The detective informed me that when

8    he arrived there, there were no cars in the

9    driveway.  And it did not appear as though

10   anyone lived in the house.  All the lights were

11   out.  I don't recall what time of the day it

12   was.  But it did appear -- I'm sorry -- that

13   there were computer checks that were done for

14   this detective, and that is a legitimate

15   address for him.  However, it didn't appear as

16   though anyone was residing in the apartment --

17   I'm sorry -- the address that was listed on his

18   pension information.

19       MR. DRANOVE:  I wonder, have the pension

20   checks been cashed?  Have they been returned to

21   The City?  If they're being negotiated, then

22   that's his address.

23       Might be insufficient showing.

24       THE COURT:  Miss Chu?

25       MS. CHU:  I have no idea.  I believe

Motions

1    there's some sort of privacy issues having to

2    do with his pension checks. I'm not sure we

3    can find out his finances whether or not he's

4    cashing checks.

5        The efforts that I made to try and locate

6    Detective O'Sullivan, I believe, are

7    sufficient. To establish that he has been --

8    that we have been unable to locate him. I

9    don't believe that going into pension checks

10   and finding out that information, I don't know

11   where we have the authority to do that.

12       THE COURT: Now, you said you sent two

13   letters, and one was -- you also sent a

14   certified --

15       MS. CHU: I also did send a certified

16   letter. That has not been picked up. To date.

17       I sent one letter, I believe, beginning of

18   March. The second letter was sent the

19   beginning of April. Then I sent the certified

20   letter, I think, about a week or two ago. And

21   I have not heard anything back. He has not

22   called.

23       I also asked detectives from his original

24   command, Crime Scene Unit, to try and reach out

25   to him, and they also have been unsuccessful in

1     trying to reach him.

2          THE COURT:  Was the certified letter

3     return receipt requested?

4          MS. CHU:  Certified so that he has to sign

5     for it, and we would know, whoever signed for

6     it, that he got it.

7          I have not received anything saying

8     anybody picked up the letter at all.

9          THE COURT:  Well, it seems pretty clear

10    that, you know, the People have made a

11    reasonable effort to locate this detective and

12    to get in touch with him by sending him

13    numerous letters, including one certified and

14    by sending a detective investigator out to his

15    last known address.  It would appear to me that

16    this does satisfy the statutory requirements

17    that the witness is unavailable to testify at

18    this trial.  And given the fact he was fully

19    cross-examined, and the same counsel that was

20    involved in that trial, I don't really see any

21    prejudice to the defense regarding the scope of

22    his testimony.

23          So I'll allow the People to perpetuate his

24    prior testimony from the first trial at this

25    trial.  And that the testimony will be read

Antommarchi                                    7

1      from the transcript that was certified by the

2      court reporter from the first trial.

3           Is there any other matter that the People

4      need a ruling on before jury selection

5      commences?

6           MS. CHU:  Not at this time.

7           THE COURT:  Mr. Dranove, do you need a

8      ruling from me on anything?

9           MR. DRANOVE:  No.

10          But I want the record to reflect that

11     there will come a time when jury questioned and

12     there may be a possibility that a juror may

13     want to speak in confidence to The Court and

14     counsel and my client would have a right, under

15     the People versus Antommarchi case, to be

16     present and I will discuss with him the

17     possible decisions to be made and report back

18     to The Court.

19          THE COURT:  Well, I want to discuss one of

20     those issues right now.

21          When we pick the jury, I expect everything

22     to be on the record, and everything obviously

23     will be in open court.  However, every once a

24     while there is a juror who does not want to

25     answer a question asked by someone publicly.

Antommarchi

8

1    And I want to know if that is going to be okay

2    with your client if the juror wants to speak to

3    me privately, with you and the DA present? But

4    not him.

5         MR. DRANOVE: I will let you know before

6    the questioning starts, your Honor. Whether my

7    client wants to be present.

8         My recollection of the last trial is that

9    we did not include my client, but that is three

10   years ago. I am not certain I am accurate in

11   that regard.

12        THE COURT: Well, it's probably an

13   academic issue. In my part, the last juror

14   that asked to speak to me privately was over a

15   year ago. That is the last I can remember, the

16   way I conduct jury selection.

17        However, there is possibility, if that

18   happens, I need to know whether to tell the

19   jury yes or no that the juror can speak to me

20   privately or not.

21        All right, now there is a Sandoval

22   application that has to be done before trial.

23   I am looking at a criminal history sheet. That

24   indicates the defendant has a youthful offender

25   adjudication in 1992 for Criminal Possession of

Sandoval

9

1      a Weapon in the Third Degree, a felony

2      conviction for Attempted Robbery in the Second

3      Degree in 1993 and a felony conviction for

4      Criminal Sale of a Controlled Substance in the

5      Third Degree in 1998. After that I only see a

6      violation for harassment in 2004, which I won't

7      allow any cross-examination about since it's

8      violation. Are you aware of any other criminal

9      record that your client has, Mr. Dranove, in

10     this or any other jurisdiction?

11            MR. DRANOVE: No, sir.

12            THE COURT: And Miss Chu, are there any

13     other bad acts, outside of this criminal

14     history, that you would propose to

15     cross-examine the defendant about if he takes

16     the stand?

17            MS. CHU: I am not aware of any other

18     prior bad acts other than what is listed on the

19     rap sheet.

20            THE COURT: Mr. Dranove, I will hear you

21     on this why I shouldn't allow the DA to ask

22     your client about these criminal convictions,

23     specifically the two felonies.

24            MR. DRANOVE: I think that the 1993 felony

25     apparently the layperson and others would

Sandoval

10

1    consider a crime of violence.  The indictment
2    charges alternate violence as we know it.  And
3    it's an old, if not very old, conviction.  I
4    think the combination of the age of it and the
5    fact that it's a violent crime, is such that it
6    would prejudice the jury so that it would not
7    be able to compartmentalize that this is just a
8    criminal conviction, not indication of the
9    defendant's nature.

10        And as to the other felony, the sale of
11   drugs.  I think it's not relevant to this crime
12   whatsoever and nonviolent and now 11 years old.

13        My client has been in jail for sometime,
14   of course.  I think that the jury should hear
15   the witness, whether it's my client or another,
16   not have felony conviction in their mind as
17   they wonder what to make of that felony
18   conviction.  He's a felon, why should I believe
19   him?

20        So I am asking not to allow the
21   prosecution to question my client with respect
22   to the '92 youthful offender case or the '93
23   attempted robbery or the '98 sale of a
24   controlled substance.  Third degree.

25        THE COURT:  Miss Chu?

Sandoval

1          MS. CHU:  Yes, your Honor.

2          I believe that the defendant was

3    incarcerated during that time period for four

4    years.  I believe he was committed in 1998, he

5    did not get out until 2002.  So four of those

6    years he had spent incarcerated.  So,

7    therefore, it would toll the time under which,

8    as far as the distance between 1992 or 1993

9    until the present time.

10         Obviously, he has been incarcerated since

11   he was arrested on this case in 2005.  Your

12   Honor, I believe that would obviate the

13   argument, or negate the argument, that it's too

14   remote as far as that's concern.  As far as

15   time wise is concerned.

16         The People would not only like to inquire

17   of the defendant, should he take the stand,

18   regarding those convictions, but of the

19   underlying fact which are on the first case of

20   the attempted robbery in the second degree.  He

21   was arrested on October 7th, 1992, and on

22   October 7th, 1992 the allegations, or the

23   facts, or the underlying facts, of that case

24   were that 5:10 p.m., in front 615 Mill Street,

25   the defendant accosted a delivery person and

Sandoval

12

1    demanded money.  When the victim refused,

2    defendant took out a knife and put it to the

3    victim's throat and goes through his pockets

4    and takes out money.  The defendant was

5    apprehended based upon a point-out to the

6    police, and that resulted in the attempted

7    robbery in the second degree conviction, which

8    resulted in the five year probation as a

9    sentence.

10       In addition to that, your Honor the

11   attempted sale of a controlled substance in the

12   third degree conviction that he received in

13   October of 1998, the underlying facts are that

14   June 9 of 1997, at 1:10 p.m., the defendant,

15   along with an apprehended other person by the

16   name of Edward Irrizary, were approached by an

17   undercover officer, and the undercover who had

18   first approached the apprehended other, was led

19   to the defendant who was inside of 11 Bush

20   Street.  Once the defendant saw the undercover

21   come overhe opened the door to the building and

22   reached over the door and got red glassines and

23   asked the undercover how many he wanted.  When

24   the undercover asked for a dime, the defendant

25   even clarified that they were actually nickel

Sandoval

13

1    bags.  So he handed him one more glassine.  So

2    he got two glassines when the undercover gave

3    him $10 of pre-recorded buy money.  At the time

4    of the defendant's arrest, he was found in

5    possession of buy money, as well as matching

6    stash to the drugs that were sold to the

7    undercover.

8        And while the defendant was out on bail in

9    that case, he actually fled to Puerto Rico.  He

10   had to be extradited back to the United States.

11       The People would seek to inquire of the

12   defendant, not only of the convictions, but of

13   the underlying facts.

14       With regard to the robbery conviction, I

15   understand that in this case he also had a

16   knife.  However, there is case law, I believe

17   it's Rahming, that holds that a defendant

18   should be allowed to use, if he uses the same

19   m.o. on cases to use that as a shield to

20   prevent him from being cross-examined should he

21   take the stand.  And although he did brandish

22   the knife in that case and alleged to have used

23   the knife in this case, he can use that as a

24   shield anymore to prevent himself from being

25   questioned regarding that.

Sandoval

14

1        So, for all those reasons, the People

2    would ask that we be allowed to ask about not

3    only the convictions, but the underlying facts.

4        MR. DRANOVE:  May I respond?

5        THE COURT:  You may.

6        (pause)

7        THE COURT:  Go ahead.

8        MR. DRANOVE:  I am starting to recommend

9    similar arguments last time.  I remind Miss

10    Chu, as I informed her last time, one doesn't

11    get extradited from Puerto Rico, it's actually

12    part of the United States.  I think the last

13    time she called it another country.

14        And this is not a similar m.o. case.  With

15    respect to an attempted robbery.  This is just

16    about a frightful incident, and the decedent,

17    argument apart from that, already has been

18    placed before your Honor.

19        THE COURT:  Balancing the factors which I

20    must, I'll allow the People to ask the

21    defendant two questions if he takes the stand:

22        The first is, on October 7th, 1998, were

23    you convicted of a felony?  On October 7, 1998,

24    were you convicted of a felony?

25        And the second question is, on

Sandoval

15

1    September 3rd, 1993, were you convicted of

2    another felony?  On September 3rd, 1993 were

3    you convicted of another felony?

4        If he truthfully answers those two

5    questions a yes, that will bar any further

6    questioning about the crimes or the underlying

7    facts.

8        If he were to deny that he was convicted,

9    or try to explain or mitigate them in any way

10   beyond a yes answer, that will open the door to

11   cross-examination about what the crimes were

12   and any underlying facts.

13       MS. CHU:  That brings me to my next

14   application.

15       During the last trial, the defense -- I am

16   sorry.  The Court ruled, similarly with your

17   Honor, with respect to the facts that I could

18   question the defendant, should he take the

19   stand, whether he was convicted of a felony.

20   During that time, during Sandoval ruling on the

21   prior case, the court admonished counsel, that

22   means you're not allowed to ask the defendant,

23   you know, you pled guilty on those cases and

24   therefore you're testifying on this, so,

25   therefore, implying to the jury that somehow

1    you pled guilty because you were guilty in

2    those cases and you're only testifying on this

3    case because you're, in fact, innocent on this

4    case.

5         Despite those admonitions to the defense

6    counsel, the defense counsel asked the

7    defendant, and he testified during the prior

8    trial that, yes, he had pled guilty on those

9    prior cases, and he says this is the first time

10   that he was actually testifying on this case.

11   On any case that he had ever had.  So I made an

12   application, and although the court's decision

13   agreed, I felt that that crossed the line and

14   that opened the door for me to be able to ask

15   him about the underlying facts of those

16   felonies.

17        Now I am asking The Court, because of the

18   fact that this has happened before when we

19   tried the case before, that again Defense be

20   admonished or warned that they are not to try

21   and imply to this jury, or suggest to this

22   jury, that the only reason why he is testifying

23   now is because he's, in fact, innocent, when he

24   took those pleas on other cases it was because

25   they guilty on those cases.  I think it's an

Sandoval

17

1    unfair picture to paint to the jury.  It's

2    unfair to the justice system.  I think that

3    that should not be allowed.

4         THE COURT:  Mr. Dranove.  If you're not

5    going to ask that question at this trial, I

6    think it's my application --

7         MR. DRANOVE:  I will not ask that question

8    at this trial.

9         THE COURT:  All right.  So it's clear the

10   question is simply, were you convicted of a

11   felony each time?  If yes is the answer, and

12   that's it.  Nothing else about this.  All

13   right.  We've got to keep it at that level.

14        Any other explanation or comment about it

15   is going to be viewed as a violation of my

16   ruling.

17        MR. DRANOVE:  This raises an issue which

18   I'd like to address.

19        THE COURT:  All right.

20        MR. DRANOVE:  If my client testifies, I

21   imagine he may be cross-examined with respect

22   to prior testimony he's given.  Does The

23   Court -- does The Court yet have any idea what

24   it might instruct the jury with respect to why

25   it is that we're hearing --

Sandoval

18

1          THE COURT:  It's common when there is a

2      retrial, there may be a lot of witnesses who

3      are questioned about their prior testimony.

4      And so counsel are instructed to refer their

5      questions to, "at a prior proceeding."  And not

6      use the word "trial."  "You remember testifying

7      at a prior proceeding" and then going forward

8      and asking the question, and answer now was at

9      that time, keep it at that level.  I don't

10     think there's any prejudice to anyone in saying

11     that there was some sort of prior proceeding at

12     which people gave an account.  I think that is

13     the best way to handle it, and, of course, I

14     would instruct counsel to admonish your

15     witness, prosecution witnesses or defense

16     witnesses, that they are not to mention that

17     there was a prior trial when they testified.

18     It's conceivable that a witness might volunteer

19     that information in response to some question,

20     and they need to be told before they testify,

21     whatever you say, don't refer to the fact that

22     you were previously here at another trial or

23     gave testimony at another trial.  They are not

24     to say that to avoid any possible prejudice.

25          All right, now is there any other matter

Sandoval

19

1    that you need a ruling from me on at this time,

2    Mr. Dranove?

3         MR. DRANOVE:  No.

4         THE COURT:  So before we recess, I just

5    want to make it clear in terms of a plea

6    situation.  That the District Attorney has

7    informed counsel for the defendant, and myself,

8    that the DA is not offering any plea down from

9    the top count, which is murder.  Therefore, the

10   scope of sentence that is available for a plea

11   is 15 to life to a maximum of 25 to life.

12        Based on what I know about this case, if

13   the defendant wanted to take a plea now, I

14   would offer him the minimal sentence, which is

15   15 years to life, and if he doesn't want to

16   take that, and from what I heard I don't expect

17   him to, then he needs to be aware that he faces

18   the risk of a sentence of up to 25 years to

19   life after trial.

20        So I am sure you have explained that to

21   him, Mr. Dranove?

22        MR. DRANOVE:  I have.

23        THE COURT:  Is there any interest in that

24   plea?

25        THE DEFENDANT:  No, sir.

Sandoval

1          THE COURT:  I am just telling you, not

2     because I want you to take a plea, but because

3     it's important that you understand the risk

4     that you take in going to trial.

5          You face an exposure of a sentence of up

6     to 25 years to life.  Noone knows what a jury

7     will do.  So you're taking that risk.  I just

8     want you to understand that.

9          Okay, we will recess until tomorrow for

10     jury selection.  I will ask counsel to be here

11     at ten o'clock.

12          We're going to put 20 jurors in the box,

13     and they are numbered 1 through 10 in the front

14     row.  Eleven through 20 in the back row.

15     You'll have fifteen minutes per round for your

16     questioning.  After we pick a jury tomorrow,

17     and then the People are to be ready to open and

18     proceed with the People's case on Wednesday.

19          Have a good day.

20          *            *            *            *

21          (Adjourned to May 5, 2009)

22

23

24

25

```
 1    SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF KINGS:  CRIMINAL TERM:  PT 35
 2    ---------------------------------------x

 3    THE PEOPLE OF THE STATE OF NEW YORK

 4              - against -                  Ind. #1453/05

 5
      ENRIQUE RIVERA,                         Murder 2
 6
                              Defendant.   Voir Dire
 7
      ---------------------------------------x
 8                           320 Jay Street
                             Brooklyn, New York
 9
                             May 5, 2009
10

11    B E F O R E:  HONORABLE ALAN MARRUS, presiding

12
            (Appearances same as previously noted)
13

14                         MICHELE J. WALKER,
                       OFFICIAL SENIOR COURT REPORTER
15    - - - - - - - - - - - - - - - - - - - - - - - - -

16            THE COURT:  Before we bring the jurors in,

17       is there anything you want to put on the

18       record, Mr. Chu?

19            MS. CHU:  Yes, your Honor, I do have an

20       application for The Court.  Actually, I have

21       two things I want to do.

22            Yesterday he spoke to you about the

23       witnesses we would be calling during trial.

24       This time on the retrial.  I just wanted to set

25       forth there were -- there were six people that
```

Proceedings

1    viewed the line-up in this case.  Four of

2    whom -- one of whom did not make an

3    identification.  Three of whom did.  The two

4    that did are Rudy Cordova and Jahaira Serrano.

5    Third person was a person by the name Julio

6    Rivera.  We do not intend to call Rudy Cordova

7    and Jahaira Serrano.  In light of the fact,

8    based upon the statements given to detective as

9    well as statements given, oral sworn

10   statements, given to the District Attorney's

11   office, they were later interviewed at the

12   prior trial.  Just while we were in the middle

13   of trial.  And based upon their statements,

14   they were, in effect, recanting what they had

15   told us before and they were saying that they

16   didn't see what they said they saw and they

17   were not going to testify the way they had told

18   us things that happened because they say now

19   they couldn't remember.  For those reasons, I

20   am not going -- seeking to put on Cordova or

21   Mr. Serrano in light of the fact I did not

22   believe them, and I do not believe the People

23   have an obligation -- I actually do not have an

24   obligation, but I cannot put on a witness who I

25   think would be perjuring themselves at trial.

Proceedings

23

1       And which I would think they would be doing if

2       they were to tell me something different than

3       what they already told me in a sworn statement.

4           In addition, that there was a Luis Rivera

5       that testified the last trial.  He also gave

6       statements to the detectives, and when they

7       testified at the trial, he did not identify the

8       defendant as touching anybody where he -- as he

9       did give that to his statement to the police.

10          In addition to that, I had an intern in

11      the courtroom who advised me that after the

12      defendant -- I am sorry -- after the witness,

13      Mr. Rivera, had gotten off the stand, he had

14      winked at the defendant because essentially

15      what he had testified was just that the

16      defendant had gotten punched and that was all

17      he had seen, which is contrary to what he had

18      said to the police at the time that he was

19      interviewed.  For that reason, your Honor,

20      again, I would not be seeking to call

21      Mr. Rivera as a witness in this case.

22          The second issue that I'd like to raise

23      before The Court was that on the -- at the

24      trial, the defendant testified on his own

25      behalf, and during the testimony of the

Proceedings

24

1    defendant there was several articles of

2    clothing that were referred to by the

3    detectives at his parent's home.  They were --

4    they fit the description of what the defendant

5    was wearing at the time of the incident and

6    they were vouchered and sent to the DNA lab for

7    testing.  Subsequent to being sent for testing,

8    the hat that was recovered at his mother's

9    house was found to have blood on it that

10   belonged to Mr. Ojeda, the victim in this case.

11   The People seek to introduce a portion of the

12   defendant's prior trial testimony relating to

13   the fact that he admitted on the stand that

14   those items of clothing were what he was

15   wearing that night when he was at the bar on

16   the night in question.  We seek to introduce

17   that through the court reporter as direct

18   evidence on our evidence case.  There is

19   two-prong test to be done in order to elicit

20   only a portion of a trial testimony or prior

21   proceedings testimony.  And while it is true

22   we're not permitted to introduce only the

23   portion of the statement where it would be

24   misleading, the People's position is that it

25   would not be misleading.  That actually

Proceedings

25

admission of the clothing is separate and apart
from what he testified to at the trial, which
is that basically he was just there and he
didn't do anything.  And that would be
exculpatory.  The other is just self-serving
statement.

The second test under the rules is an
issue of completeness.  And the People's
position is that his admission of what he was
wearing is independent of his claims that he
did not actually stab the victim in this case.
The People would direct The Court's attention
to two cases.  People versus Harris, 249 A.D.
2nd, 775.  That is a Third Department case.
And People versus Jones, 203, A.D. 2nd, 183.

In People versus Harris, the court held
that it was proper for the People to introduce
a portion of the grand jury testimony without
the remainder because the omitted points -- I
am sorry -- the omitted parts were not
extricably intertwine nor did they create a
false presentation to the jury.  The court held
that there was no basis to allow the defendant
to bolster his trial testimony by introducing
earlier self-serving denials of culpabilities.

Proceedings

1      In People versus Jones, the court in that

2      case held that the introduction of only the

3      inculpatory portion of the grand jury testimony

4      was proper since the People had no obligation

5      to introduce the defendant's exculpatory

6      statements because they were self-serving and

7      not extricably intertwined with the inculpatory

8      statement.

9      So, in essence, the People are asking that

10     these inculpatory statements made by the

11     defendant at the time of the prior trial

12     relating to the clothing that we will be

13     putting into evidence be allowed to be brought

14     out by the court reporter who is going to be

15     testifying in this case with regard to

16     Detective James O'Sullivan's testimony.

17     THE COURT:  Do you have the portion of the

18     testimony in the transcript for me to review?

19     MS. CHU:  I did not bring that with me,

20     but I can have that for you as soon as I go

21     back to my office or actually call my paralegal

22     and have her bring it over.

23     THE COURT:  We are about to pick jury, I

24     can't review it right now.

25     Obviously you need to show Mr. Dranove the

Proceedings

27

1  actual portion of the transcript that you
2  intend to use.
3       Mr. Dranove?
4       MR. DRANOVE:  I'd like to know if the
5  prosecution can cite any case authority where
6  trial testimony, not grand jury testimony, is
7  the subject?  They've only cited the two cases
8  where grand jury testimony was chosen also with
9  respect to three witnesses.  Prosecution may
10 think they're not speaking of truth.  But that
11 may be because their truth is the truth and it
12 doesn't fit their theory.  I'd like to be able
13 to contact these people.  I don't have any
14 phone numbers for them.  I don't know how to
15 contact them.
16      Thirty-six months after -- 35 months after
17 the last trial, I suddenly hear that there was
18 a wink in the courtroom from an unknown trial
19 assistant.  I think that is a meaningless
20 statement.  I'd like to know how I can contact
21 these people.  I think they're, at minimum,
22 able to present evidence that is favorable to
23 the defense and I'd like an opportunity to
24 reach them.
25      I appreciate the prosecutor honoring her

Proceedings

28

1    commitment and letting the court know, although

2    about two weeks ago I wrote to the prosecution

3    and asked her any favorable evidence, and she

4    wrote back saying, I complied with all rights.

5    I can bring that letter in.

6         I don't know when the prosecutor learned

7    that three witnesses are not favoring the

8    prosecution in this case at this time, and

9    Mr. Rivera -- by the way, Judge, if I remember

10   correctly, was the bouncer on duty that night?

11   And I don't know how to reach these people.

12   The bar is closed.  Because there is another

13   homicide in that bar, my client was on Rikers

14   Island at the time.  So I don't know how to

15   reach Mr. Rivera.  Or the other individuals.

16        MS. CHU:  Well, your Honor --

17        THE COURT:  Wait.  I am a little surprised

18   to hear this being raised and discussed in this

19   case at this time.

20        First of all, one of the witnesses, you

21   just said, testified at the previous trial, and

22   then you said that witness didn't give the

23   testimony that you had expected at the trial.

24   Isn't that what you said?

25        MS. CHU:  Yes.

Proceedings

29

1      THE COURT:  So as far as that witness is

2   concerned, there is nothing new to report.  You

3   already heard that witness' account at the

4   time.  At the trial.  You knew years ago what

5   that witness said.  That is no surprise.  And

6   she now, now in light of this thing with the

7   wink, is totally irrelevant to that issue as

8   far as that witness is concerned.  She doesn't

9   intend to call him based on the testimony he

10   gave at the prior trial.

11      Now, as to the other two witnesses, I

12   believe what she said was that they have

13   recanted their prior testimony, basically,

14   saying they didn't see what they had originally

15   told the police they said they saw.  Which

16   probably makes them useless witnesses for

17   anyone.  But as far as contact information is

18   concerned.

19      MS. CHU:  Jahaira Serrano and his counsel

20   and that their boyfriend, Mr. Cordova --

21      THE COURT:  If you have any contact

22   information regarding a telephone number or

23   whatever, I would ask you to provide that.  To

24   Mr. Dranove.  If he wants to speak to these

25   people.

Proceedings

30

1          MS. CHU:  Just in response to his letter,

2     he was given statements that were made by

3     Mr. Rudy Cordova, Mr. Jahaira Serrano.  He was

4     given all relevant statements.  Audio-taped

5     statements.  DD5.  Grand jury testimony of all

6     these witnesses.  So had all --

7          MR. DRANOVE:  Except --

8          MS. CHU:  Documents that I have.

9          MR. DRANOVE:  Except the statements where

10    they said, I didn't tell the truth earlier.

11    Those statements are apparently not recorded or

12    preserved in any summation at all.  I don't

13    know.  I am not trusting Miss Chu to be able to

14    have a hundred percent recall of what these

15    witnesses stated.

16         THE COURT:  She'll give you the contact

17    information.  But it's my experience that based

18    on what the recommendation is, these witnesses,

19    having given sworn statements and then having

20    inconsistent statements after that, make them

21    problematic as witnesses for either side to

22    call at this trial.  But I should think you

23    should get the contact information so you can

24    speak to them yourself.

25         MR. DRANOVE:  Does that include

Proceedings

31

1     Mr. Rivera?

2          MS. CHU:  I'll give whatever contact

3     information I have for Mr. Rivera as well.

4          MR. DRANOVE:  Right away.

5          MS. CHU:  I'll give it to you as soon as I

6     get back to my office.

7          MR. DRANOVE:  Thank you very much.

8          THE COURT:  Now, as far as the other part

9     of her application, regarding the testimony of

10    the defendant at the prior trial.  Again, to me

11    this sounds like something that may be somewhat

12    of a moot issue since there was apparently a

13    dispute at the last trial that the defendant

14    acknowledged that he was at the bar the night

15    this happened and didn't dispute the fact that

16    the clothing was his.  The only issue is the

17    legal issue as to whether or not you should be

18    allowed to introduce this on your direct case

19    through his transcript.  What you need to do is

20    to provide the exact portion of the trial that

21    you propose to introduce.  Let Mr. Dranove

22    review it, and then I will hear any objection

23    that he may have as to the completeness or

24    incompleteness of that part of the account that

25    you propose to offer at this trial.  Since it's

Proceedings

32

1    very fact specific to your application when it

2    comes to completeness.

3         MR. DRANOVE:  Your Honor, perhaps you

4    could include that portion of the testimony

5    where my client had been told to take the hat

6    off, and he said he did take it off and he put

7    it back on.  He took it off.  And there is no

8    doubt from the trial testimony that at least

9    one or more law enforcement officers went to

10   the client's mom's apartment and took the

11   clothing from there.  I don't know how many

12   nails they have to put in that coffin, but I'll

13   address it when I have the opportunity then.

14        THE COURT:  Right.  I am saying what you

15   need, and I am ordering the DA to supply to

16   you, is their proposed portion of the testimony

17   that they want to introduce on their direct

18   case.  And then if you have an objection to

19   that as being incomplete or misleading, I'll

20   hear your objection, then I'll make my ruling.

21   But I can't do that until I see what they

22   propose to introduce.

23        THE COURT:  Is there anything else before

24   we bring the jurors in?

25        MS. CHU:  No.

Jury Selection

33

1          THE COURT:  Mr. Dranove?

2          MR. DRANOVE:  No, sir.

3          THE COURT:  Okay.  We will wait the

4     arrival of the jurors.

5          (pause)

6          COURT OFFICER:  Your Honor, ready for the

7     panel?

8          THE COURT:  Yes, we are.

9          COURT OFFICER:  Jury panel entering.

10         COURT CLERK:  Will the prospective jurors

11    stand up and raise your right hand, please?

12         (Whereupon, the prospective jury panel was

13    duly sworn at this time.)

14         THE COURT:  Good morning, ladies and

15    gentlemen:  May name is Judge Alan Marrus, and

16    you are here in Part 35 of the Supreme Court

17    for the trial of a criminal case.  I'd like to

18    introduce to the you parties to this trial.

19         Representing the People of the State of

20    New York is Assistant District Attorney Phyllis

21    Chu.

22         Miss Chu.

23         MS. CHU:  Good morning.  Good morning.

24         THE COURT:  The defendant on trial in this

25    case is Mr. Enrique Rivera.

1        Mr. Rivera, be good enough to stand up.

2        THE DEFENDANT:  Good morning.  Good

3   morning.

4        THE COURT:  His attorney, representing him

5   at this trial, Mr. Joel Dranove.

6        MR. DRANOVE:  Good morning.

7        THE COURT:  Anyone knows the defendant,

8   Mr. Rivera, his attorney, Mr. Dranove, the

9   district attorney, Miss Chu or myself?  Just

10   raise your hand to let me know.

11        Now, some other people who may be involved

12   with this case, who are not here today, I will

13   read their names.  If you think you know

14   anyone, just raise your hand to let me know.

15        Edgar Ojeda, Matthew Ojeda, Raymond

16   Classen, Carlos Solomon, Jonathan Dominguez,

17   Marcus Carrasquillo, Rudy Cardova, Luis Rivera,

18   Edwin Carpio, Angel Rodriguez, Kimberly

19   Tapia-Mendez, Enrique Navarette, Gloria Vale,

20   Patricia Glasglow, Jahaira Serrano, William

21   Arrufat, Molly Schloemer, Angel Rivera, Julio

22   Rivera, Anna Cassalas, Jennifer Sipress, Yon

23   Paul Casalouc, Judith Brusca, Justin Harriman,

24   Police Officers Zambrano, Chi Shing Bao,

25   Acosta, Lopicollo, Garda.  Detective John

Jury Selection

35

1    Darino.  Hector Rivera and James Gaynor.
2    Detectives David Cruz and Michael Cunningham,
3    James O'Sullivan.  Detective Deborah Kennedy.
4    Doctor Frede Frederic.  Linda Razzano.  And
5    Tito Rivera.  Do any of those names ring a bell
6    with anyone?
7        I am going to tell you a little something
8    about this case that we are about to try:  The
9    People of the State of New York are alleging
10   that on February 27, 2005, at a bar located at
11   314 39th Street, in the Sunset Park section of
12   Brooklyn, the defendant committed the crime of
13   murder.  Specifically the charges are that on
14   that date, February 27, 2005, at that location,
15   314 39th Street, a bar called El Borinquen Bar,
16   the defendant stabbed to death a man name Edgar
17   Ojeda.
18       Now, those are the charges in this case.
19   That is all they are, charges.  Under the law,
20   the defendant is presumed innocent of these
21   charges, and it will be the burden of the
22   district attorney to prove his guilt by proof
23   beyond a reasonable doubt.
24       Is there anyone who feels you cannot
25   follow the rules that the defendant is presumed

Jury Selection

36

1    innocent and it is the district attorney who

2    has the burden of proof to prove his guilt by

3    proof beyond a reasonable doubt?  Anyone have a

4    problem with those rules?

5         Is there anyone that feels you don't

6    understand English well enough to serve as a

7    juror?  Can you all understand me?

8         THE JURORS:  Yes.

9         THE COURT:  Anyone have a problem with

10   that so far?

11        If you do, just raise your hand to let me

12   know if you don't understand anything.  Don't

13   be ashamed to let me know.

14        Is there anyone that feels you have a

15   health problem that would prevent you from

16   serving?  Such as you cannot hear or some

17   problem like that.

18        Yes, ma'am?  You want to raise your hand?

19        THE JUROR:  Yes.

20        THE COURT:  No reason for you to walk

21   anywhere.  Stay there.

22        THE JUROR:  My mother was murdered in

23   November, 2008?

24        THE COURT:  Go over to the clerk, I can

25   see you're very upset.  Sorry about that.

Jury Selection

1              As far as the health question is

2       concerned.  Does anyone feel you have a health

3       problem, such as you cannot hear, that would

4       prevent you from serving?  You're all the

5       healthy like me?

6              I hope so.

7              Now, this is a criminal trial.  We need

8       jurors who will make a decision.  That decision

9       will either be guilty or not guilty.  Is there

10      anyone who feel you can't make that decision

11      because of religious or personal beliefs?

12             Yes, ma'am?

13             THE JUROR:  I might have a problem with

14      that.

15             THE COURT:  You can't do that?

16             THE JUROR:  Yes.

17             THE COURT:  Go over to the clerk.

18             John, please mark her card, send her for

19      civil.

20             THE COURT:  Yes, ma'am?  We'll send you

21      for a civil case.  Those are the longer trials.

22             (Juror Excused)

23             Let me go over with you the schedule for

24      this trial.  If you are selected to serve.

25             We will work on the trial the rest of this

1    week.  Today is Tuesday.  So you would have to

2    return here the rest of this week, Wednesday,

3    Thursday and Friday for the trial.  And, of

4    course, we will not work on the weekend.  And

5    you have to return next week, and this trial

6    will be completed by the end of next week.  We

7    expect to get the case for it's decision

8    probably by Wednesday of next week.  But you

9    have to be able to serve next week.  And the

10   schedule, in terms of time, would be you would

11   never have to be here before ten o'clock in the

12   morning.  We don't start before ten.  And you

13   would never have to be here pass five o'clock.

14   We never work pass five.  And if I can get you

15   out of her earlier, that may work too some

16   days.  But that is the schedule for the trial.

17   If you have a problem with that, please let me

18   know by raising your hand.

19        On this side, yes, ma'am?  What is your

20   problem?

21        THE JUROR:  I am diabetic, I have to have

22   my meals in between.

23        THE COURT:  You just bring it here with

24   you.  We can use the refrigerator.  If you need

25   it, you can have it at any time.  That would be

1    no problem for us.  We can certainly handle

2    that.

3          Anyone else over here on this side?  Yes,

4    sir?

5          What about as far as schooling?

6          THE JUROR:  I am excused from school or

7    excused from college.

8          THE COURT:  When you're on jury duty,

9    you're excused from any place.  But if you

10   don't want to be here because you want to go to

11   school, then you have to postpone your jury

12   duty to when you're not in school.

13         I understand the students get a lot of

14   time off during the year, you will have plenty

15   of time to serve on a jury when you're off.  If

16   you don't want to be here because of class, I

17   will excuse you, but you wouldn't get credit

18   for your jury service.  You'll be postponed to

19   another time.

20         THE JUROR:  I would like to postpone it.

21         THE COURT:  Go over to clerk, you have to

22   come back again.

23         John, a postponement for college.

24         (Juror Excused)

25         Anyone else on this side?  Nobody here on

1       this side?

2           Let's start, second row, yes, ma'am?

3           THE JUROR:  Surgical procedure I have to

4       go back and have --

5           THE COURT:  I am sorry?

6           THE JUROR:  I have to have stitches

7       removed following surgical procedure.  I am

8       scheduled for that next week.

9           THE COURT:  If you're picked for the jury,

10      let us know.  We will make sure you can get

11      your stitches removed.  That is not going to be

12      a long-term thing.  We will work that out with

13      you.

14          Yes, ma'am.?

15          THE JUROR:  I speak English a little but

16      --

17          THE COURT:  You understand me?

18          THE JUROR:  A little bit, yes.

19          THE COURT:  Have I said anything that you

20      don't understand?

21          THE JUROR:  50/50.

22          THE COURT:  If I tell you, you go over to

23      the clerk, that is a hundred percent.

24          (Juror Excused)

25          If someone is going to tell me they don't

Jury Selection

41

1    understand 50 percent, I can't argue with the

2    person.  It is what it is.

3        Who else in the next row?  Yes, ma'am?

4        THE JUROR:  I have a trip scheduled to

5    leave the country next week.

6        THE COURT:  If you're picked, I get to use

7    your tickets because I need a vacation.

8        Go over to the clerk, give him your name.

9        (Juror Excused)

10       THE COURT:  Who else?  Yes, sir?

11       THE JUROR:  I have a scheduling conflict

12   for tomorrow at 2:30.  I have a job interview.

13       THE COURT:  If you're picked for the case,

14   I'll contact, if necessary, whoever it is you

15   have an interview to make sure you get the

16   interview.  They can't deny you that because

17   jury duty is an important obligation.  You'll

18   get your job interview.  You have to let us

19   know if you're picked.  Make sure you remind me

20   before you leave, if you're selected, about

21   that.  Thank you.

22       Who else?

23       THE JUROR:  I need postponement for

24   school.

25       THE COURT:  Go over, give your name to the

1       clerk.

2             Isn't it final examine time?

3             THE JUROR:  Yes.

4             THE COURT:  In the back row, yes?

5             THE JUROR:  I have to go to school.

6             THE COURT:  You need to postpone and go

7       study.  Go over to the clerk.

8             How people come in during final examine

9       time for jury duty?  I don't know.

10            Anyone else in the row over here?

11            Let's go to the jury box.  Yes, ma'am?

12            THE JUROR:  Only thing -- only problem I

13      need to have access to my cell phone.  You

14      know, in case -- only thing in case a certain

15      number comes up because my mother's in a

16      nursing home.  And she's like this right now.

17            THE COURT:  When we are working on the

18      trial, obviously, we don't have cell phones on

19      in the courtroom.  We give you a phone number

20      where someone can call the courtroom at any

21      time.  If that will work for you.  In case of

22      an emergency.  We'll give you a number, someone

23      can get through at any time.

24            THE JUROR:  No problem then.

25            THE COURT:  You we will still be able to

Jury Selection

43

1      have your telephone.  But right now you can't

2      call on your cell phone.  I hope  it's off.

3           THE JUROR:  Oh, yes, it is.

4           THE COURT:  Someone else?  Who else?  Yes,

5      sir.

6           THE JUROR:  I have a flight scheduled next

7      Wednesday.

8           THE COURT:  We don't want to give -- go

9      over to the clerk and give him your name.

10          (Juror Excused)

11          THE COURT:  Anyone else in the jury box?

12     Yes, sir?

13          THE JUROR:  Your Honor, I got a work

14     problem.  It'll be a little difficult for me.

15          THE COURT:  Tell us who's going to --

16          THE JUROR:  I can't do that, but will be

17     little rough, not impossible, but they are long

18     days.  Two or three long days.

19          THE COURT:  Again, what I suggest you do,

20     postpone your jury duty to when --

21          THE JUROR:  I can do that.

22          THE COURT:  Go over and give him your

23     name.

24          (Jury Excused)

25          THE COURT:  Anyone else in the jury box

1       that I missed?  Noone else?

2              All right, we are ready to move to the

3       next process.  Here's how we are going to work

4       it.  The clerk is going to select your names,

5       randomly picking your cards out of a wheel he

6       has on his desk.  If he selects your name, I

7       ask you to take a seat in the jury box.

8              Once we fill the box with jurors, I am

9       going to ask each of you a few questions about

10      yourselves.  And then the attorneys get a brief

11      opportunity to ask you some questions also.

12             Now, why are we going to ask you

13      questions?  We are looking for people who can

14      be fair and impartial.  To both sides.  So,

15      please, try to answer the questions that you

16      are asked as honestly as you can.  If at any

17      time you feel embarrassed about something or

18      you don't want to answer something in front of

19      the whole group, if that is a problem, just let

20      me know.  We are not looking to embarrass you.

21      We are looking for certain information to pick

22      a jury.

23             When your name is called, take your

24      belongings, come up to the jury box, one of our

25      court officers will tell you where to sit.

1        I am going to ask you to step out of the

2     jury box.  You can fill in the seats in the

3     gallery when they become available.

4        COURT CLERK:  Dorothy Jean Baptiste.

5     J-E-A-N-B-A-P-T-I-S-T-E; Alyson Gill, G-I-L-L;

6     Knita Artis, A-R-T-I-S; Michael Pabon,

7     P-A-B-O-N; Stephen Chance, C-H-A-N-C-E; Carl

8     Beard, B-E-A-R-D;  Crystal Rodriguez,

9     R-O-D-R-I-G-U-E-Z; Glendon Britton,

10    B-R-I-T-T-O-N; Yuwnus Warner, W-A-R-N-E-R;

11    Benjamin Proffer, P-R-O-F-F-E-R; Denise

12    McCarthy, M-C-C-A-R-T-H-Y; Mary Jones,

13    J-O-N-E-S; Cara Howe, H-O-W-E; Marlon Antigua,

14    A-N-T-I-G-U-A; Nigel Jeremiah, J-E-R-E-M-I-A-H;

15    Victor Sutton, S-U-T-T-O-N; Kerrianne McGowan,

16    M-C-G-O-W-A-N; Lisa Constantine,

17    C-O-N-S-T-A-N-T-I-N-E; Lorraine LaPera,

18    L-A-P-E-R-A; Andrew Steininger,

19    S-T-E-I-N-I-N-G-E-R.

20       THE COURT:  Those that weren't selected

21    for this round, please pay attention because

22    probably you'll get your term very shortly.  It

23    will go a lot faster if you follow what we are

24    doing.

25       Those over here in the jury box, I am

Jury Selection

1     going to ask that you tell us one at a time the

2     neighborhood in Brooklyn in which you live,

3     your marital status, or if you're in a

4     committed relationship with someone, what kind

5     of work, if any, you are doing at the present

6     time.

7          We are going to start with you Miss Jean

8     Baptiste.  What part of Brooklyn you live in?

9               THE JUROR:  Canarsie.

10              THE COURT:  Your marital status?

11              THE JUROR:  Single.

12              THE COURT:  Are you working?

13              THE JUROR:  Yes.

14              THE COURT:  What kind of work do you do?

15              THE JUROR:  Sales associate.

16              THE COURT:  What kind of business?

17              THE JUROR:  Abercrombie & Fitch.

18              THE COURT:  Thank you.

19         Next we have Miss Gill, you want to tell

20    us about yourself, please?

21              THE JUROR:  I live in Boreum Hill I am

22    married and I'm an attorney.

23              THE COURT:  I am sure the attorneys would

24    like to know what kind of legal work you

25    specialize in?

1          THE JUROR:  Criminal.

2          THE COURT:  Do you do criminal defense

3    work?

4          THE JUROR:  I work for the Attorney

5    General.  Prosecution.

6          THE COURT:  What unit?

7          THE JUROR:  Federal Habeas Corpes section.

8          THE COURT:  Next we have Miss Artis.  Tell

9    us about yourself?

10         THE JUROR:  I live in Flatbush.  Brooklyn.

11   I'm single, and I work in the Department of

12   Social Services.

13         THE COURT:  What kind of work do you do

14   there?

15         THE JUROR:  I work on Medicaid.

16         THE COURT:  Thank you.

17         Mr. Pabon is next.

18         THE JUROR:  Yes, your Honor.

19         I live in Boreum Hill.  I'm single.  And

20   I'm self-employed.  I'm a carpenter.

21         THE COURT:  Thank you, Mr. Pabon.

22         Next up, Mr. Chance.

23         THE JUROR:  I live in the Midwood section

24   of Brooklyn.  I'm married.  And I'm retired.

25         THE COURT:  In what line of work did you

1          do, Mr. Chance?

2          A     I work for New York City Department of

3     Sanitation.

4               THE COURT:  Are you enjoying your

5          retirement?

6               THE JUROR:  Yes, I am.

7               THE COURT:  Thank you very much.

8               Next up, Mr. Beard?

9               THE JUROR:  I'm single.  I live in Bedford

10         Stuyvesant, and I work for the New York City

11         Police Department.

12              THE COURT:  What kind of work do you do

13         there?

14              THE JUROR:  Police officer.

15              THE COURT:  Where are you assigned?

16              THE JUROR:  The Bronx.

17              THE COURT:  Thank you very much.

18              Next up we have Miss Rodriguez.

19              THE JUROR:  Bushwick, Brooklyn.  Single.

20         I'm a student.  I am not working right now.

21              THE COURT:  What are you studying?

22              THE JUROR:  Criminal Justice.

23              THE COURT:  Thank you very much.

24              You can make it through this trial?

25              THE JUROR:  Sure.

Jury Selection

49

1          THE COURT:  Miss Britton is next.

2          I live in Crown Heights section.  Married.

3     I'm home attendant.

4          THE COURT:  Thank you very much.

5          Next up, Mr. Warner.

6          THE JUROR:  I live in Bedford Stuyvesant,

7     Brooklyn.  I'm telephone technician, and I am

8     single.

9          THE COURT:  Thank, Mr. Warner.

10         Move on next to Mr. Proffer.

11         I live in Crown Heights.  I am single, and

12    I'm freelance writer.

13         THE COURT:  What kind of things do you

14    write about?

15         THE JUROR:  Travel writing.  Mostly.

16         THE COURT:  Thank you very much.

17         Now we move to the back row, Miss

18    McCarthy.

19         THE JUROR:  Sheepshead Bay.  Married.  And

20    semi-retired.  I am a substitute teacher.

21         THE COURT:  Thank you, Miss McCarthy.

22         Next up we have Miss Jones.

23         THE JUROR:  I live in Bay Ridge.  I am

24    single, and I work for the Met Correctional

25    Center, Manhattan.

Jury Selection

1          THE COURT:  Are you a corrections guard

2     there?

3          THE JUROR:  I am certainly investigator.

4          THE COURT:  Thank you, Miss Jones.

5          Next we have Miss Howe.

6          THE JUROR:  I live in Williamsburg.  I am

7     single.  And I am a freelance photographer.

8          THE COURT:  Thank you, Miss Howe.

9          Move over next to Mr. Antigua.

10          THE JUROR:  Bushwick.  Single.  I'm a

11     Principal Administrator Associate for the New

12     York City --

13          MR. DRANOVE:  I am sorry?

14          THE COURT:  Principal Administrator

15     Associate for the New York City Parks

16     Department.

17          Now, move on to Mr. Jeremiah.

18          THE JUROR:  I live in East Flatbush.

19     Married.  Carpenter for construction.

20          MS. CHU:  I didn't hear the last part.

21          THE COURT:  Works for construction company

22     as a carpenter.

23          THE COURT:  Thank you, Mr. Jeremiah.

24          Mr. Sutton?

25          THE JUROR:  Married.  Flatbush Avenue,

Jury Selection

51

1          Brooklyn.  Self-employed real estate investor.

2                  THE COURT:  Next up, Miss McGowan.

3                  THE JUROR:  Hi.  I am single.  I work

4          customer service for University Music.  I live

5          in East New York.

6                  THE COURT:  Move over to Miss Constantine.

7                  THE JUROR:  I live in Flatbush.  I am

8          single, and I work in financial industry.

9                  THE COURT:  Next up, Miss Lapera?

10                 THE JUROR:  I am single.  I work in

11         Department of Education.  I am oral translator,

12         which is I work with the child with Coeklar

13         implant in a high school.  And I have been

14         working with her since third grade.  She reads

15         my lips, and I take her notes for her.

16                 THE COURT:  Thank you, Miss Lapera.

17         Next up, Miss Steininger.

18                 THE JUROR:  I live in Prospects Heights.

19         Single.  Work for the borough president.

20                 THE COURT:  What kind of work do you do

21         for the --

22                 THE JUROR:  I work on his capital budget.

23                 THE COURT:  Can we get some more money for

24         the court system?

25                 THE JUROR:  I'll call him up and ask him.

Jury Selection

1           THE COURT:  Thank you very much, Mr.

2     Steininger.

3           I have a few more questions each.  To save

4     time, I am going to ask you all at once.  If

5     the answer is yes, just let me know.

6           First, I'd like to know if you ever been

7     on a jury in a criminal or federal trial or if

8     you were on a grand jury?  If you were actually

9     own a jury, just let me know.

10           I see five hands for follow-up.

11           Mr. Pabon, about how long ago were you on

12     a jury?

13           THE JUROR:  Approximately eight years ago,

14     I believe, your Honor.

15           THE COURT:  Was it a criminal or civil

16     trial?

17           THE JUROR:  It was a criminal trial.

18           THE COURT:  Did the jury reach a verdict?

19           THE JUROR:  Yes, we did.

20           THE COURT:  You remember the crime that

21     was involved?

22           THE JUROR:  Yes, I do.

23           THE COURT:  Was it murder, drugs, robbery,

24     assault?

25           THE JUROR:  It was murder.

1          THE COURT:  Thank you.

2          Mr. Chance, about how long ago for you?

3          THE JUROR:  Approximately eight years ago,

4     little longer.

5          THE COURT:  You remember what kind of case

6     it was?

7          THE JUROR:  I think it was a civil.

8          THE COURT:  Civil case?

9          THE JUROR:  Yeah.

10          THE COURT:  Did the lawyer settle before

11     you reached a verdict or --

12          THE JUROR:  They settled.

13          THE COURT:  I think I got everyone in the

14     front row.  I'll move back to Mrs. McCarthy.

15          THE JUROR:  I think it was five years ago.

16     Five, six years ago.

17          THE COURT:  What kind of --

18          THE JUROR:  Criminal, and it was assault.

19          THE COURT:  Did the jury reach a verdict?

20          THE JUROR:  Yes.

21          THE COURT:  Thank you.

22          Miss Constantine?

23          THE JUROR:  It was civil, over six years

24     ago.  And they settled.

25          THE COURT:  Miss Lapera?

Jury Selection

1        THE JUROR:  It was civil, and I don't
2   remember how long ago it was.
3        THE COURT:  Did they reach a verdict or
4   did they --
5        THE JUROR:  No, we reached a verdict.
6        THE COURT:  Anyone else that I missed?
7        Next question.
8        I have already heard that there is one
9   member of our group working for the police
10   department.  Anyone ever -- who we haven't
11   heard -- who ever worked for the police
12   department, the DA's office, the court system
13   or someone in your immediate family who ever
14   worked for those agencies?
15        Miss Gill?
16        THE JUROR:  I work for the Brooklyn DA.
17   The Queens DA, and my husband work for the
18   Brooklyn Queens DA.
19        THE COURT:  Anyone else.
20        THE COURT:  Miss Pabon?
21        THE JUROR:  My father served 26 years with
22   the NYPD, and he was retired approximately ten
23   years ago.  And he died of cancer last year.
24        THE COURT:  Thank you.  Sorry about that.
25        Anyone else ever worked for law

Jury Selection

1    enforcement agency or someone in your family?

2         My brother is a detective in Jacksonville,

3    Florida.

4         THE COURT: Anyone else?

5         Because this is a criminal case, the

6    police are involved. The police are involved

7    in every criminal trial. We will hear

8    witnesses from the police department, and when

9    they testify, we treat them the same way we

10   treat all of the other witnesses. Police

11   officers are just like anyone else when it

12   comes to be witnesses. They can tell the

13   truth. They can be mistaken. They can lie.

14   Anyone that has a problem being completely fair

15   and impartial when it comes to police

16   witnesses?

17        Mr. Beard, I guess I have to ask how do

18   you feel about sitting as a juror and having to

19   judge police officer testimony. Do you think

20   you can be completely fair about that?

21        THE JUROR: Yeah.

22        THE COURT: Or you'll have an issue? No

23   problem?

24        THE JUROR: No problem.

25        THE COURT: How about you, Miss Gill?

Jury Selection

56

1           THE JUROR:  No problem.

2           THE COURT:  Next question.  Anyone who's

3      been a victim of a crime or someone in your

4      immediate family who may have been the victim

5      of a crime?

6           Miss Britton?

7           THE JUROR:  My husband was accused of

8      assault on my son.

9           THE COURT:  About how long was that?

10          THE JUROR:  The case finished, it was

11     dismissed March of this year.

12          THE COURT:  Here in Brooklyn?

13          THE JUROR:  Yes.

14          THE COURT:  Did you come down to court on

15     the case?

16          THE JUROR:  No, it was just resolved.

17          THE COURT:  Anything about the experience

18     of your husband and your son that is going to

19     create a problem to be a fair juror?

20          THE JUROR:  Yes because he was arrested

21     unfairly.

22          THE COURT:  You can return to the central

23     jury room, Miss Britton.  Go downstairs.

24          (Juror Excused)

25          THE COURT:  Who else has been the victim

Jury Selection

1       of a crime or someone in your family?

2            Mr. Proffer?  Someone tried to rob you?

3            THE JUROR:  Ah-huh.

4            THE COURT:  Your house or you personally?

5            THE JUROR:  Me personally.

6            THE COURT:  Was anyone ever caught?

7            THE JUROR:  No.

8            THE COURT:  Does that experience create a

9       problem for you to be a fair juror?

10            THE JUROR:  (Indicating)

11            THE COURT:  Anyone else in the front row?

12            Back row, Miss Constantine.

13            THE JUROR:  Robbery.  Apartment.  It was

14       over five years ago.

15            THE COURT:  Here in Brooklyn?

16            THE JUROR:  Yes.

17            THE COURT:  Did you report it?

18            THE JUROR:  Yes.

19            THE COURT:  Anyone ever caught?

20            THE JUROR:  No.

21            THE COURT:  Miss McGowan.

22            THE JUROR:  Yes, my aunt was murdered.

23            THE COURT:  Here in Brooklyn?

24            THE JUROR:  No.

25            THE COURT:  Where?

Jury Selection

58

1          A     This is another state.

2                THE COURT:  About how long ago?

3                THE JUROR:  Over ten years ago.

4                THE COURT:  Police ever caught anyone in

5          this case?

6                THE JUROR:  Not that I know.

7                THE COURT:  Regarding your aunt, would

8          that create a problem for you to be a fair

9          juror?

10               THE JUROR:  I will be all right.

11               THE COURT:  Anyone else?  Victim of a

12         crime?  Noone else?

13               Substitute this seat?

14               COURT CLERK:  Alan Chu.  C-H-U.

15               THE COURT:  Take the empty seat there, Mr.

16         Chu.

17               You want tell us about yourself, please?

18               THE JUROR:  I forgot three questions.

19               THE COURT:  You weren't paying attention

20         out there?

21               THE JUROR:  It was long time ago.

22               THE COURT:  I need to know what part of

23         Brooklyn you live, marital status or

24         relationship, what kind of work you do?

25               THE JUROR:  Live in downtown Brooklyn.  I

1    am married.  And I work as CPA.

2         THE COURT:  I am paying attention, you

3    have a job interview tomorrow?

4         See, I remember what you said.  I am doing

5    better than you.

6         Have you ever been on a jury before?

7         THE JUROR:  No.

8         THE COURT:  Do you have any relationship

9    to anyone that works for the police department,

10   the DA's office or the court system?

11        THE JUROR:  No.

12        THE COURT:  Can you be fair when it comes

13   to police witnesses?

14        THE JUROR:  Yes.

15        THE COURT:  Any experience being a victim

16   of a crime in your family?

17        THE JUROR:  Yes.

18        THE COURT:  Who was that?

19        THE JUROR:  It was me.  It was a burglary,

20   my apartment, over ten years ago.

21        THE COURT:  Did you report it?

22        THE JUROR:  Yes, I did.

23        THE COURT:  Anyone ever caught?

24        THE JUROR:  No.

25        THE COURT:  I am finished with my

Jury Selection

1        questions for you.

2             One more question for anyone else.  Anyone

3        had the experience that the other -- one of the

4        other jurors mentioned about being arrested for

5        something or convicted of something in your

6        family.  An experience we also need to know.

7             Someone on this jury ever been arrested or

8        convicted of anything?  Please raise your hand

9        to let me know.

10            Start in the front row.  Miss Rodriguez?

11       A    My brother and my uncle.  My brother was

12   arrested and convicted with three felonies for armed

13   robbery.  And my uncle served 15 years state prison

14   I don't know what it was for.

15            THE COURT:  Was it here in Brooklyn,

16       relatives or someplace else?

17            THE JUROR:  Yeah, in Brooklyn.

18            THE COURT:  Did you ever go to court on

19       any of their cases?

20            THE JUROR:  No.

21            THE COURT:  Did you ever hear anything

22       about their cases that would create a problem

23       for you to be a fair juror?

24            THE JUROR:  No.

25            THE COURT:  Thank you for letting us know.

1       Yes, ma'am.

2       THE JUROR:  My brother, he was -- he did

3   time.  I am not sure what for, at the time I

4   was young.  It happened in Brooklyn.  He served

5   time upstate.

6       THE COURT:  Nothing you heard about that

7   would create a problem for you to be a juror?

8       THE JUROR:  Uh-uh.

9       THE COURT:  Anyone else?

10      Miss Lapera?

11      THE JUROR:  My nephew was in jail in

12  Riverhead.  For robbing someone's house.

13      THE COURT:  Did you ever go to court on

14  his case.

15      THE JUROR:  No, I never went to the court,

16  but I felt as he should have been in rehab

17  instead --

18      THE COURT:  Anything what you heard about

19  that case create a problem for you to be a fair

20  juror?

21      THE JUROR:  No.

22      THE COURT:  Anyone else?

23      All right, I am finished with my

24  questions, and I am now going to give the

25  attorneys a chance to talk to you.  We start

1      with the DA.

2             Miss Chu, would you like this board?

3             MS. CHU:  No.

4             THE COURT:  Would you like the table

5      opened up?

6             MS. CHU:  I can do it.

7             Good morning, ladies and gentlemen:

8             My name is Phyllis Chu, and I will be the

9      assistant district attorney that handles this

10     case should you be selected as jurors.

11            Now, the first thing I want to talk to you

12     about is what the judge was saying as far as

13     really what we are looking for honest answers.

14     There are no wrong answers when we ask these

15     questions because really now is the only time

16     that we get to exchange with you and ask you

17     for your opinions or your feelings on certain

18     issues that may come up during the course of

19     this trial.  So don't anybody think, oh, she

20     wants us to say certain things.  No attorney

21     wants you to say something that's not the

22     truth.  Whatever the feelings are, that is what

23     we want to hear, okay, and also we are not

24     trying to pry.

25            Judge says if you have feelings that make

Jury Selection

63

1      you uncomfortable at all, anything, just let us

2      know.  We will be able to discuss that in

3      private.

4           First thing I want to talk to you about is

5      the fact that there's a lot of things on TV now

6      a days.  There are a bunch of shows about the

7      criminal justice system, about police officers,

8      about a lot of Law and Orders, CSI.  I am

9      guilty, like everybody else, of watching all

10     those things because there are almost on every

11     channel.

12          You all understand that this is not TV.

13     This is not something where the witnesses are

14     going to come up here, and they are going to

15     testify from a script.  There is no commercials

16     here.  It's not going to be wrapped up in an

17     hour.  Can you all appreciate this live

18     testimony, these people are going to be coming

19     up here and telling you that on a particular

20     day they were at a particular place and they

21     saw something?  They are going to tell you

22     about it.  That is considered to be evidence.

23     Can you all except that?

24          THE JUROR:  Yes.

25          MS. CHU:  The spoken word is considered to

1      be evidence just like if we give you something

2      in your hand to hold, like physical evidence,

3      or photos.  Can you all appreciate that?

4           THE JURORS:  Yes.

5           MS. CHU:  Now what I want to talk to you

6      about next.  Do you think if more than one

7      person views any occurrence at the time,

8      they're going to have the same account of what

9      happened?

10          THE JUROR:  No.

11          MS. CHU:  Why do you think that is?

12          THE JUROR:  Because everybody sees things

13     different certain cases.  Every person don't

14     think alike.

15          MS. CHU:  Do you also think when someone

16     tells somebody what they saw, what they

17     experienced, that they are going to express

18     themselves the same way that the person next to

19     them is going to express themselves?

20          THE JUROR:  No.

21          MS. CHU:  You all are individuals.  When

22     you guys were answering questions the judge

23     just posed to you, you all answered in your own

24     little way.  Would you all agree with that?

25          THE JURORS:  Yes.

Jury Selection

1          MS. CHU:  Do you think that would affect

2     how people describe something?

3          THE JURORS:  Yes.

4          MS. CHU:  Just because people -- there is

5     possible some people seen one thing and maybe

6     see something else but not necessarily going to

7     see exactly the same thing.  Can you all

8     appreciate that that might happen?

9          THE JUROR:  Yes.

10          MS. CHU:  Now along the lines of that.  Do

11     you also think that if someone tells somebody

12     what happened that they are going to say it the

13     same way every time?

14          THE JUROR:  Not at all.

15          MS. CHU:  Have you ever told an occasion

16     what happened to you, later you think, I forgot

17     to tell them about this part, right?

18          And vice versa, you tell them something at

19     the beginning, and when you say it again, you

20     might forget what you mentioned before.  Would

21     you all agree that might happen?  Do you think

22     that necessarily means you are not telling the

23     truth?

24          THE JUROR:  No.

25          MS. CHU:  Do you think you're the kind of

1    person to distinguish what is important and

2    what is not important?  Big inconsistency

3    versus little inconsistency.  Can you do that

4    in this case?

5         THE JUROR:  Yes.

6         The next thing I want to talk to you about

7    is how many people think they know what

8    circumstantial evidence is?  Big word.  You see

9    things on TV.

10        I wanted to give you an example.  You're

11   wearing a white shirt.  Right?  You don't know

12   me.  I come up to you, and I tap you.  And as

13   soon as I do that, you see there is a red

14   marker across your shirt.

15        MR. DRANOVE:  Your Honor, I object to

16   that.

17        THE COURT:  So far it's okay.

18        MR. DRANOVE:  Can we approach?

19        THE COURT:  No reason to approach.  Let me

20   hear the question.

21        What is the question?

22        MS. CHU:  So my question to you.  If you

23   didn't see what was in my hand, would you be

24   able to conclude that I had a marker in my hand

25   because I just made a streak on your shirt?

1          THE JUROR:  Yes.

2          MS. CHU:  Even though you didn't see the

3     marker.

4          You may hear evidence in this case that

5     witnesses did not see a weapon, but there will

6     be other evidence to show that there was a

7     weapon used.  Anyone here have a problem with

8     the fact that these witnesses cannot have seen

9     the weapon?  Anybody here have a problem with

10    that?  No?

11         Can you think of a reason why someone

12    might not see a weapon, like a knife or a sharp

13    object or something like that?

14         MR. DRANOVE:  I object to this.

15         THE COURT:  I will sustain the objection.

16    That gets too fact specific to our case.

17         Let's move on.

18         MS. CHU:  Are you -- does anyone here

19    disagree that if someone didn't see an actual

20    weapon that you would have a problem, you

21    wouldn't be able to --

22         MR. DRANOVE:  Objection.

23         THE COURT:  Again, it's too fact specific.

24    I will sustain the objection.

25         MS. CHU:  In this case, there are

Jury Selection

1        allegations that a knife was used in this case.

2        There was never a knife recovered or a weapon

3        recovered in this case. Anyone here that

4        feels -- I'm sorry, I am going to withdraw

5        that.

6            Will be other evidence to show that there

7        was a weapon, such as a knife, used, but you

8        won't actually get to see that knife. Is there

9        anyone here that thinks I need to see that kind

10       of evidence before I can decide a case like

11       this?

12           MR. DRANOVE: I object to this.

13           THE COURT: That's a hard question for

14       jurors to answer.

15           MS. CHU: I ask do you have the problem

16       that a knife wasn't recovered in this case?

17           MR. DRANOVE: I object again.

18           THE COURT: They don't know enough about

19       the case to know it's a problem.

20           MS. CHU: Your Honor, may we approach?

21           THE COURT: No, there no reason to

22       approach.

23           MS. CHU: If you heard that there wasn't a

24       knife recovered, would you have a problem

25       deciding this case without a --

Jury Selection

1          MR. DRANOVE:  I repeat any objection.

2          THE COURT:  I sustain the objection.

3          MS. CHU:  All right, I will move on to

4     something else.

5          You may hear from witnesses in this case

6     that have criminal histories.  All right.  Now,

7     is there anyone here that feels that if someone

8     has a criminal history that they couldn't -- I

9     am being extreme here -- that they couldn't

10    believe what they have to say?  That they

11    wouldn't even listen to what they had to say to

12    see whether or not he makes sense, what is the

13    other evidence that you're going to hear in

14    this case?  Would anyone have anybody have a

15    problem listen -- at least listening to them?

16          THE JURORS:  No.

17          MS. CHU:  You cannot listen to anybody

18    that is going to testify that has a criminal

19    history?

20          THE JUROR:  No.

21          MS. CHU:  You can't have a open mind?

22    Give them a fair listen?

23          Do you agree, convicted of a crime or not

24    or whether there was police officers, that you

25    have to make your own determination as to

1       whether or not they're telling the truth?

2       Would you agree with that?  And would you be

3       able to do that in this case?

4               THE JURORS:  Yes.

5               MS. CHU:  Now, along the lines of that.

6       There will be police officers that testify in

7       this case.  And we have a number of people

8       here, we heard the gentleman that left, he said

9       he does something with law enforcement.  Lot of

10      different types of jobs we have.  We have a

11      police officer, we have a substitute teacher.

12      You know, can you all appreciate that it's not

13      fair to judge the whole by just one?  So I may

14      have substitute teacher that was all -- I may

15      have a substitute teacher that was terrific,

16      but I can't say all substitute teachers are

17      terrific or awful.  Just based upon one

18      experience.  Can you all do that in this case

19      and give each of the witnesses, whether they're

20      police officers or not, whether they have

21      criminal history or not, a fair listen to just

22      see if what they say makes sense and connect it

23      with other evidence in this case?  Can you all

24      do that?

25              THE JURORS:  Yes.

1        MS. CHU:  Now, next thing I want to talk

2    to you about is the fact that you may hear

3    evidence in this case that the defendant made

4    certain statements.  Is there anyone here that

5    feels that it's possible that a person who is

6    being questioned by the police officer would

7    make statements would even talk to the police?

8    Do you think that is possible?

9        THE JURORS:  Yes, it's possible.

10       MS. CHU:  Do you think someone being

11   spoken to by the police that it's possible that

12   they might say something that would be in the

13   best interest for them?

14       MR. DRANOVE:  Objection.

15       THE COURT:  Overruled.  I'll allow it.

16       THE JUROR:  Yes.

17       MS. CHU:  Put them in the best light?

18       THE JUROR.  Yes.

19       MS. CHU:  I'm not saying that is what

20   happened.  I am just saying, do you think it's

21   possible?

22       THE JURORS:  Yes, it is possible.

23       MS. CHU:  Now, are you the type of people

24   that if you're chosen as jurors in this case

25   that can distinguish between what might be

Jury Selection

1    truthful, what might not be truthful and

2    compare and contrast the other evidence that

3    you're going to get?

4         THE JURORS:  Yes.

5         MS. CHU:  Anyone here that says, you know

6    what, I am not so good at that?  Would it be

7    fair to say that you all make judgments

8    everyday about whether or not someone is

9    telling you the truth?

10        THE JUROR.  Yes.

11        MS. CHU:  You have people that you work

12   with.  Anybody work with someone you don't

13   really like them so much.  They tell you a

14   story, and when they tell you what happened,

15   and this is goes for whether someone's making a

16   statement, goes for witnesses as well.  But

17   what they are telling you, whether you like

18   them or not, if what they're saying makes sense

19   or doesn't make sense.  You make that judgment

20   everyday.  Yes?

21        THE JUROR:  Yes.

22        MS. CHU:  You can do that in this case,

23   yes?

24        THE JURORS:  Yes.

25        MS. CHU:  Now, there is a burden of proof,

1    and I have that burden of proof.  Can everybody

2    here promise me that you're going to hold me to

3    the burden of proof that the judge tells you I

4    have to prove.  All the things that I have to

5    prove, you're going to hold me to that?  Yes?

6          THE JURORS:  Yes.

7          MS. CHU:  On the flip side, there are

8    certain things that I don't have to prove.

9    Like I don't have to prove motive.

10          MR. DRANOVE:  I am going to object this

11    area.

12          THE COURT:  Overruled.  I'll allow it.

13          Ask the question.

14          MS. CHU:  Does anyone here -- I am sorry.

15    Does everyone here promise me that you all also

16    will not hold me to a higher burden to what the

17    judge is going to tell you my burden is?  You

18    will not?

19          Also there's something I want to talk to

20    you about is the judge is going to give you

21    instructions as to the fact that sympathy for

22    the victim, for the defendant has no place in

23    your deliberations in this case.

24          Is there anyone here that thinks, by

25    looking at the defendant, that there is

1    something about him or anything about the way

2    he looks that would prevent you from deciding

3    this case solely on the evidence?  Because now

4    is really the time that you have to tell us.

5    Because obviously if you're selected as jurors,

6    it will be too late.

7         Anybody here feel that, you know, based

8    upon your experiences, what you hear in the

9    criminal justice system, you might have

10   something else to affect your abilities to be

11   fair in this case?  Everybody okay?

12        Anything that I talked about that anybody

13   thinks, you know, I mentioned earlier that you

14   think you might want to know now?  Any

15   questions for me?

16        Thank you very much for your time.

17        THE COURT:  Mr. Dranove.

18        MR. DRANOVE:  Thanks, Judge.

19        Can I have that table?

20        THE COURT:  I will ask one of the court

21   officers to open it up for you.

22        MR. DRANOVE:  Well, my name is Joel

23   Dranove.  I represent Mr. Rivera.

24        Miss Gill, we have had a case or two

25   together; is that right?

```
 1              THE JUROR:  I don't recall.

 2              MR. DRANOVE:  I have been in the Brooklyn

 3         DA's office?

 4              THE JUROR:  Yes.  '92 to '96.

 5              MR. DRANOVE:  Do you remember me?

 6              THE JUROR:  No, I don't.

 7              MR. DRANOVE:  Attorney with the federal

 8         federal lab is the --

 9              MS. CHU:  I am going to object.  She said

10         she didn't --

11              MR. DRANOVE:  -- constitution --

12              THE COURT:  I'll allow it.

13              MR. DRANOVE:  Constitutional law.

14              THE JUROR:  Yes.

15              MR. DRANOVE:  When were you in the Queens

16         DA's office?

17              THE JUROR:  From '97 to 2001.

18              MR. DRANOVE:  Remember me from Queens DA's

19         office?

20              THE JUROR:  No.

21              MR. DRANOVE:  Never seen me before?

22              THE JUROR:  No.  Can't say never seen you,

23         I just don't recall you.

24              MR. DRANOVE:  Do you think that your many

25         years in the prosecutor's office may have
```

Jury Selection

1     caused you to have predisposition to believe

2     they're prosecuting the right guy for the right

3     crime?

4         THE JUROR:  No.  Because there's a lot of

5     people, lots of innocent people, charged with

6     crimes and convicted of crimes.

7         MR. DRANOVE:  Thank you.

8         Mr. Pabon, do you believe that is possible

9     innocent people are convicted of crimes?

10        THE JUROR:  Yes, I do.

11        MR. DRANOVE:  How would you know if

12    innocent persons being prosecuted?

13        THE JUROR:  You don't know.

14        MR. DRANOVE:  You wait to hear the

15    evidence?

16        THE JUROR:  Exactly.

17        MR. DRANOVE:  Officer Beard, have you

18    always been an officer in the Bronx?

19        THE JUROR:  No.

20        MR. DRANOVE:  In Brooklyn at any time?

21        THE JUROR:  No.

22        MR. DRANOVE:  Where else?

23        THE JUROR:  Harlem.  Harlem and the Bronx.

24        MR. DRANOVE:  Just investigated any

25    homicide cases at all or participated in the

1    investigation?

2        THE JUROR:  I did one probably about ten,

3    15 years ago.

4        MR. DRANOVE:  What do you know on the job?

5        THE JUROR:  I work in Transit now.

6        MR. DRANOVE:  Underground or above?

7        THE JUROR:  Both.

8        MR. DRANOVE:  Are you undercover or

9    something I shouldn't be asking?

10       THE JUROR:  Uniform.

11       MR. DRANOVE:  Have you testified in court?

12       THE JUROR:  Yeah.

13       MR. DRANOVE:  Questioned by defense

14   lawyers?

15       THE JUROR:  Not recently.  No.

16       MR. DRANOVE:  Anything about the trial

17   experience that leave us with any propensity

18   towards one side or the other?

19       THE JUROR:  No.

20       MR. DRANOVE:  Miss Jones?

21       THE JUROR:  Yes.

22       MR. DRANOVE:  Work in MCC?

23       THE JUROR:  Yes.

24       MR. DRANOVE:  You're in special

25   investigations?

Jury Selection

1          THE JUROR:  Yes.

2          MR. DRANOVE:  What do you investigate?

3          THE JUROR:  Staff and innocent crimes

4     within -- inside the institution.

5          MR. DRANOVE:  You say innocent crimes,

6     whatever it might be?

7          THE JUROR:  Yes.

8          MR. DRANOVE:  What about staff, what do

9     you investigate about staff?

10         THE JUROR:  We have staff, good staff, we

11    have bad staff.

12         MR. DRANOVE:  Have you -- have you -- we

13    come across each other --

14         THE JUROR:  I don't recall you.

15         MR. DRANOVE:  How long have you been

16    working as a special investigator, whatever

17    your title is?

18         THE JUROR:  Here MCC, New York, I have

19    been here since 2007.

20         MR. DRANOVE:  Before 2007, where were you?

21         THE JUROR:  I was in --

22         MR. DRANOVE:  Federal --

23         THE JUROR:  Yes.

24         MR. DRANOVE:  -- Bureau of Prisons?

25         THE JUROR:  Yes.

1              MR. DRANOVE:  What were you doing out

2        there?

3              THE JUROR:  Same thing.

4              MR. DRANOVE:  How many years --

5              THE JUROR:  From 2003 until I got here.

6              MR. DRANOVE:  Do you have any problem with

7        keeping an open mind?

8              THE JUROR:  No.

9              MR. DRANOVE:  You weren't never a juror;

10       is that correct?

11             THE JUROR:  No.

12             MR. DRANOVE:  Is it correct that you were

13       never a juror?

14             THE JUROR:  Yes.

15             MR. DRANOVE:  I am going to tell all of

16       you that I am not going to give you any, what

17       if you heard questions.  I prefer you hear it

18       and make up your own mind at the end.

19             Now, is there anybody who hasn't heard

20       whatever we discussed, has any problem with the

21       nature of what they have heard may or may not

22       come out on the witness stand?

23             And that being a problem that prevents

24       them from saying, I want to be a juror on this

25       case?

Jury Selection

1              No hands means, I don't have a problem,

2        right?  Okay.  It's 20 people takes two sheets.

3              Okay, Mr. Sutton, did you say you're a

4        real estate investor?

5              THE JUROR:  I did.

6              MR. DRANOVE:  You work out of Brooklyn?

7              THE JUROR:  I work out of Manhattan.

8              MR. DRANOVE:  Have you ever been a juror?

9              THE JUROR:  No.

10             MR. DRANOVE:  You ever been called down to

11       be a juror before this time?

12             THE JUROR:  Yes.

13             MR. DRANOVE:  Were you ever in an panel?

14             THE JUROR:  No, I never got --

15             MR. DRANOVE:  Never got this far?

16             THE JUROR:  No.

17             MR. DRANOVE:  What type of real estates do

18       you deal with?

19             THE JUROR:  Commercial.

20             MR. DRANOVE:  Like I said before.  And the

21       prosecutor said, trial is about to start, and

22       I'm finished, Judge.

23             THE COURT:  All right, so here's how it

24       works.  The parties will decide who they would

25       like to select from this group.  And once we

1        finish with that, then we go forward with the

2        next round.

3            I am going to excuse everybody, go

4        outside, stretch your legs before the next

5        rounds begin.

6            Those in the gallery, step out in the

7        hallway.

8            Those in the jury box, follow the way out.

9        Don't leave the floor.

10           If you want to use the facility, they're

11       down the hall.  We will be a few minutes.

12           (Jury Panel Excused)

13           THE COURT:  A juror asked to speak with me

14       privately.  Counsel want to approach?

15           For the record, is it okay?  It's all

16       right?

17           THE DEFENDANT:  Yes.  Yes.

18           THE COURT:  Come on up.

19           (Whereupon, there was a discussion held

20       off the record with a juror at this time.)

21           THE COURT:  For the record, the juror

22       seated in seat 16, Mr. Sutton, just came up and

23       told us that he can't be fair.  He said he's

24       biased, and when I asked him why, he couldn't

25       give me a reason.  But he just wanted us to

Jury Selection

1  know.  And counsel did not have questions for

2  him.

3  MR. DRANOVE:  Also, with respect to that,

4  my client was advised by me of his right to be

5  present at these sidebars, which right was

6  explained in People versus Antemarche I related

7  to my client.  He informed me to notify The

8  Court, I am putting more expansively on the

9  record because I did notify The Court that he

10  agrees that I should be the only one from the

11  defense table at the sidebars with the jury men

12  and women.

13  THE COURT:  Okay.  Thank you.

14  Miss Chu, let me know when you're ready.

15  (pause)

16  THE COURT:  Let's talk about the first 12

17  jurors.  Everyone in the front row.  And the

18  first two jurors in the back row.  That's up to

19  and includes Miss Jones in seat 12.

20  Any challenge for cause by the People?

21  MS. CHU:  None for cause.

22  THE COURT:  Any challenge for cause, by

23  the Defense, in first group of 12?

24  MR. DRANOVE:  No.

25  THE COURT:  Precinct by the people.

Jury Selection

1      MS. CHU:  Yes.  Juror number 1.

2      THE COURT:  Miss Jean Baptist is excused.

3      MS. CHU:  Juror number 2.

4      THE COURT:  Miss Gill is excused.

5      MS. CHU:  Juror number 3.

6      THE COURT:  Miss Artis is excused.

7      MS. CHU:  And juror number 7.

8      THE COURT:  Miss Rodriguez is excused.

9      MS. CHU:  I have completed my challenges.

10      THE COURT:  I will hear any peremptory

11 challenges by the defense, remaining jurors in

12 that group?

13      MR. DRANOVE:  4.

14      THE COURT:  Mr. Pabon is excused.

15      MR. DRANOVE:  6, Officer Beard.

16      THE COURT:  Mr. Beard is excused.

17      MR. DRANOVE:  11 and 12.

18      THE COURT:  Miss McCarthy and Miss Jones

19 are excused.

20      THE COURT:  Does that complete your

21 peremptory challenge in that group?

22      MR. DRANOVE:  Ah-huh.

23      THE COURT:  Mr. Chance, juror number 1.

24 Mr. Chu, juror number 2.

25      MR. DRANOVE:  Does the prosecutor know

Jury Selection

84

1    whether or not she's related to Mr. Chu?

2        THE COURT:  I asked the audience whether

3    they knew anyone here.  It's a very common

4    name, as you know.

5        MR. DRANOVE:  I had to raise the question.

6    I think it's a fair question.

7        THE COURT:  You want to answer the

8    question?

9        MS. CHU:  I don't know.

10       THE COURT:  It's sort of like Smith.  It's

11   a common name.

12       I asked people out there if there's any

13   relationship or know any of the people.  I

14   guess like Rodriguez.  He didn't -- would be a

15   common Hispanic name or whatever.  There is no

16   reason to believe he has any connection with

17   her because I asked him that.  He would know if

18   he did.  He didn't raise his hand.

19       Number 3 is Miss -- Mr. Warner.  I am

20   sorry.  And number 4 is Mr. Proffer.

21       Let's talk about the eight jurors.  That

22   everyone left in the jury box.

23       Now, I believe we are going to excuse

24   Mr. Sutton in seat 16 for cause on consent.

25   Correct?

Jury Selection

1          MS. CHU:  Yes.

2          MR. DRANOVE:  Yes.

3          THE COURT:  He is excused on consent for

4     cause.

5          Any other challenges for cause in that

6     group by the People?

7          MS. CHU:  No.

8          THE COURT:  For cause by the Defense?

9          MR. DRANOVE:  No.

10         THE COURT:  Peremptory by the People?

11         MS. CHU:  Yes.  Juror number 17.

12         THE COURT:  Miss McGowan.

13         MS. CHU:  Juror number 18.

14         THE COURT:  Miss Constantine.

15         MS. CHU:  And juror number 19.

16         THE COURT:  Miss Lapera.

17         MS. CHU:  And I have no further

18    challenges.

19         THE COURT:  Any peremptory challenge by

20    the Defense two remaining jurors in that group?

21         MR. DRANOVE:  None.

22         THE COURT:  That means Miss Howe becomes

23    juror number 5.  Mr. Antigua, number 6.

24    Mr. Jeremiah number 7.  And number --

25    Steininger, number 8.

Jury Selection

1          THE COURT:  Mr. Chu is the one who had the

2      job interview.  So I am asking your permission

3      for me to speak to him outside of your

4      presence, if necessary, to resolve that issue.

5      I'll only speak to him about his job interview

6      to get the information and possibly have to

7      speak to his employer before he leaves today.

8          Is there any objection by the People to

9      that?

10          MS. CHU:  No.

11          THE COURT:  By the Defense?

12          MR. DRANOVE:  None.

13          (Whereupon, the selected jurors were sworn

14      at this time.)

15          (Remaining jury panel entering)

16          THE COURT:  We're ready to go forward with

17      the next round.  When your name is called,

18      bring your belongings and take a seat in the

19      jury box.  COURT CLERK:  B-I-N-E-M.

20      N-A-I-M-A-N;  Gem Vancooten, V-A-N-C-O-O-T-E-N;

21      David Garcia, G-A-R-C-I-A; Thomas McDonald,

22      M-C-D-O-N-A-L-D; Joseph O'Connell,

23      O-C-O-N-N-E-L-L; Calvin Chandler,

24      C-H-A-N-D-L-E-R; Nicola Telford, T-E-L-F-O-R-D;

25      Catherine P-A-S-Z-K-O-W-S-K-I; Edwin Gonzalez,

Jury Selection

1    G-O-N-Z-A-L-E-Z; Yevgeny Spektor,

2    S-P-E-K-T-O-R; Eutisha Rennix, R-E-N-N-I-X;

3    Reginald Mathis, M-A-T-H-I-S; Marjorie Trafton,

4    T-R-A-F-T-O-N; Lucy Koteen, C-O-T-E-E-N;

5    Marianne Thompson, T-H-O-M-P-S-O-N; Christie

6    Rasado, R-A-S-A-D-O; LaToya Everett,

7    E-V-E-R-E-T-T; Anthony Arnold; A-R-N-O-L-D;

8    Jean Loconde, L-O-C-O-N-D-E; Marianne Tollier,

9    T-O-L-L-I-E-R.

10       THE COURT:  You folks heard my questions

11   before.  I am going to ask you the same things

12   that I asked the first group.

13       Let's start with you.  Naiman.  Tell us

14   about yourself, please?

15       THE JUROR:  I live Boro Park.  Brooklyn.

16   I am married, and I run a restaurant.

17       THE COURT:  Thank you, Mr. Naiman.

18       Next we have Vancooten.

19       THE JUROR:  I live in Flatbush.  I'm

20   retired.  I'm a registered nurse.  I work in

21   the unite advertised unit.

22       THE COURT:  What part of Brooklyn you live

23   in?

24       THE JUROR:  Flatbush.

25       THE COURT:  Next we have Mr. Garcia.

Jury Selection

88

1          THE JUROR:  I am a student.  I live in
2     Park Slope.  And I am engaged.
3          THE COURT:  What are you studying to be?
4          THE JUROR:  A cartoonist.
5          THE COURT:  You're able to get through the
6     trial with your scheduling as a student no
7     problem?
8          THE JUROR:  Next Friday I have final.  I
9     don't know --
10         THE COURT:  If we need you to be prepared
11    to be here next week?
12         THE JUROR:  Possible way -- I can talk to
13    my professor and schedule the test on office
14    hours.
15         Is there a way I can prove I was here?
16         THE COURT:  I give everyone proof they
17    were here.
18         Thank you very much.
19         Mr. McDonald?
20         THE JUROR:  Live in Bay Ridge.  Married,
21    and I'm retired guidance counselor.
22         THE COURT:  Thank you.
23         Mr. O'Connell.
24         THE JUROR:  I live in Sunset Park.  I am
25    single, a copy editor for a magazine.

1      Freelance writer.

2           THE COURT:  What magazines, you cover what

3      subject?

4           THE JUROR:  Forbes.  Financial magazine.

5           THE COURT:  Thank very much.

6           Mr. Chandler?

7           THE JUROR:  I live in Crown Heights.

8      Unemployed and single.

9           THE COURT:  Have you work in the past?

10          THE JUROR:  Yes.

11          THE COURT:  What kind --

12          Media coordinator.

13          THE COURT:  Thank you.

14          Next we have Miss Telford.

15          THE JUROR:  I live in Mill Basin.  I am

16     registered CN.  Nursing assistant, and I am

17     married.

18          THE COURT:  Thank you.

19          Next up is Miss Paszkowski.

20          THE JUROR:  I live in Park Slope.  I am in

21     a relationship, and I'm an attorney.

22          THE COURT:  Again, what kind of legal work

23     do you do?

24          I am court attorney for a Civil Court

25     judge.  In New York county.

Jury Selection

1          THE COURT:  Did you ever do any criminal

2     work before you did that?

3          I interned one semester in the New York

4     County District Attorney's office.

5          THE COURT:  Move over to Mr. Gonzalez.

6          THE JUROR:  I live in Canarsie.  I am

7     single.  And I do building maintenance.

8          THE COURT:  Thank you.

9          Next up is Mr. Spektor.

10          THE JUROR:  I live in Bensonhurst.  I am a

11     designer.  I'm married.

12          THE COURT:  Thank you.

13          Let's go to the back row.  Miss Rennix.

14          THE JUROR:  I live in East Flatbush.  I am

15     in a relationship, and I'm a cashier.

16          THE COURT:  What kind of business?

17          THE JUROR:  Cafe.

18          THE COURT:  We move over to Mr. Mathis.

19          THE JUROR:  I live in Flatbush.  I am

20     married.  And I am computer tech.

21          THE COURT:  Thank you, Mr. Mathis.

22          Next, Miss Trafton.

23          THE JUROR:  I am single.  Live in Crown

24     Heights, and I do event marketing.

25          THE COURT:  Event marketing.

1          THE JUROR:  For a furniture magazine.

2          THE COURT:  Forbes?

3          THE JUROR:  No.

4          THE COURT:  Next, Miss Koteen?

5          THE JUROR:  I am married.  I live in Fort

6    Greene.  I have been a teacher.  I currently

7    work in --

8          THE COURT:  What subject do you teach?

9          THE JUROR:  I worked with younger children

10   and then afterschool.  After school program.

11   Director for after school program two years.

12         THE COURT:  What do you do now?

13         THE JUROR:  I work in lactation breast

14   feeding help.

15         THE COURT:  Miss Thompson.

16         THE JUROR:  I live in Williamsburg.  I am

17   single, and I am a student.

18         THE COURT:  What are you studying to be?

19         THE JUROR:  A psychiatrist.

20         THE COURT:  Your studies permit you to be

21   here now?

22         THE JUROR:  Yeah.  I am taking sometime

23   off right now.

24         THE COURT:  Thank you, Thompson.

25         Next we have Miss Rasado.

Jury Selection

92

1            THE JUROR:  I live in Bay Ridge.  I am in

2       a relationship.  I am freelance graphic

3       designer.

4            THE COURT:  We move next to Miss Everett.

5            THE JUROR:  I live in Flatbush.  And edit

6       magazine.  What was the other question?

7            THE COURT:  Are you married or in --

8            THE JUROR:  In a relationship.

9            THE COURT:  Thank you.

10           Next up is Mr. Arnold.

11           THE JUROR:  In relationship and

12      Williamsburg, Brooklyn.  I'm real estate

13      developer.

14           THE COURT:  What kind of developer?

15           THE JUROR:  Real estate.

16           THE COURT:  Thank you.

17           Next up is Mr. Loconde.

18           THE JUROR:  East Flatbush.  I am engaged.

19      And I do marketing promotion.

20           THE COURT:  Thank you.

21           Next is Miss Koteen.

22           THE JUROR:  I am single.  I live in

23      Flatbush, and I am retired.

24           THE COURT:  What kind of work do you do?

25           THE JUROR:  Clerical.

1          THE COURT:  What kind of business?

2          THE JUROR:  Social services.

3          THE COURT:  Thank you.

4          Is there anyone in this group who has been

5     selected to be on a jury before?  Any kind of

6     case, just raise your hand if you've actually

7     been on a jury.

8          Let me just start over here.  Mr.

9     Gonzalez, how long for you?

10         THE JUROR:  Nine years ago.

11         THE COURT:  What kind of case was it?

12         THE JUROR:  It was murder.

13         THE COURT:  Did the jury reach a verdict?

14         THE JUROR:  Yes.

15         THE COURT:  Miss Paszkowski?

16         THE JUROR:  It was 12 years ago.  It was a

17    prosecution sting case.  And we did reach a

18    verdict.

19         THE COURT:  Who else in the front row, I

20    see hands?  Mr. McDonald?

21         THE JUROR:  About 20 years ago.  It was a

22    civil case.

23         THE COURT:  Was there a verdict or did

24    they settle it?

25         THE JUROR:  It turned into a mess because

Jury Selection

94

1    we went to trial and the first witness for the
2    plaintiff screwed up his story and the lawyers
3    was trying to get him to change his story and
4    then --
5            THE COURT:  The trial ended?
6            THE JUROR:  Yes.
7            THE COURT:  Hopefully that is not going to
8    happen here.
9            Who else in the front row?  Mrs. Koteen?
10           THE JUROR:  Yes, an accident case.
11           THE COURT:  Did the jury reach a verdict?
12           THE JUROR:  Yes.
13           THE COURT:  In the back row, let me see
14   those hands again.
15           Mr. Mathis?
16           THE JUROR:  It was a civil case.  It did
17   go to a verdict.
18           THE COURT:  Anyone else in the back row?
19           Anyone else, I haven't heard from, ever
20   work for the DA's office, police department,
21   court system, someone in your immediate family
22   who had worked for those agencies?
23           Mr. Mathis?
24           THE JUROR:  I have two brothers.  One
25   retired police.  One is now working for the

1       police.

2            THE COURT:  Do you know where your brother

3       is assigned right now?

4            THE JUROR:  Downtown Brooklyn.

5            THE COURT:  Anything about your

6       relationship with them that creates a problem

7       for you to be a fair juror?

8            THE JUROR:  I think I can.

9            THE COURT:  You can fair?

10           THE JUROR:  I can be fair.

11           THE COURT:  Mr. McDonald, is your hand up?

12           THE JUROR:  Yes.

13           My father was a New York City detective.

14      He's deceased.

15           THE COURT:  Anyone else?

16           Miss Paszkowski?

17           THE JUROR:  I just forgot to say something

18      about myself.

19           My job is in civil, but we were in

20      criminal assigned for a year.  New York City.

21           THE COURT:  Who was the judge you work

22      for?

23           THE JUROR:  Barbara Jaffe.

24           THE COURT:  Anyone else?

25           Anyone have a problem as far as being fair

Jury Selection

1     when it comes to police testimony?

2          We are going to have police officer

3     witnesses.  Anybody couldn't treat them the

4     same way as anyone else?  No better, no worse.

5     Anyone has a problem with that?

6          Anyone had the experience of being the

7     victim of a crime or someone in your family?

8          Mr. O'Connell?

9          THE JUROR:  I was a victim of armed

10    robbery, a store hold up about a year and a

11    half ago.

12         THE COURT:  Was that here in Brooklyn?

13         THE JUROR:  Yes, it was in Bushwick.

14         THE COURT:  Did you report it?

15         THE JUROR:  Yes.

16         THE COURT:  Was anyone ever caught?

17         THE JUROR:  No, not to my knowledge.

18         THE COURT:  Is that going to create a

19    problem to be a fair juror?

20         THE JUROR:  I don't think so.

21         THE COURT:  Anyone else in the front row?

22    Miss Paszkowski?

23         My grandparents were murdered 27 years

24    ago.

25         THE COURT:  In Brooklyn?

```
 1              THE JUROR:  No, Poland.
 2              THE COURT:  Anyone caught?
 3              THE JUROR:  Yes.
 4              THE COURT:  Does that impact your ability
 5         to be a fair juror in a murder case?
 6              THE JUROR:  No, not at all.
 7              THE COURT:  Mr. Gonzalez?
 8              THE JUROR:  I was robbed last August at
 9         gunpoint.
10              THE COURT:  Here in Brooklyn?
11              THE JUROR:  Yes.
12              THE COURT:  Did you report it?
13              THE JUROR:  Yes.
14              THE COURT:  Anyone ever caught?
15              THE JUROR:  Yes.
16              THE COURT:  Did you have to testify or
17         have you --
18              THE JUROR:  No.  I had to come over to
19         testify in front of the grand jury.
20              THE COURT:  That is what I meant.
21              What happened with the case?  Is it
22         finished?
23              THE JUROR:  The detective never called me
24         back.  They just called to testify in the grand
25         jury what happened to me.
```

Jury Selection

```
 1              THE COURT:  You don't know what happened
 2       with the case.
 3              THE JUROR:  I don't know what happened to
 4       the case.
 5              THE COURT:  Anything about that experience
 6       that would create a problem for you to be a
 7       fair juror?
 8              THE JUROR:  No.  Not at all.
 9              THE COURT:  Who else in the front row?
10       Mr. Garcia?
11              THE JUROR:  I was stabbed.  About eight
12       years ago.
13              THE COURT:  Here in Brooklyn?
14              THE JUROR:  (Indicating)
15              THE COURT:  Did you report it?
16              THE JUROR:  (Indicating)
17              THE COURT:  Do you know who did it?
18              THE JUROR:  No.
19              THE COURT:  Did the police ever catch
20       anyone?
21              THE JUROR:  No.
22              THE COURT:  Now, this case involved a
23       stabbing that ultimately led to a death.
24              Do you think, because of your experience
25       as a victim of a stabbing, that would create a
```

Jury Selection

1      problem for you to be completely fair and

2      impartial?

3            THE JUROR:  Yes, I do.

4            THE COURT:  Then return to Central Jury,

5      Mr. Garcia, on the second floor.

6            Anyone else who has been a victim of a

7      crime that I missed?

8            Mr. Loconde?

9            THE JUROR:  I was robbed at gunpoint ten

10     years ago.  In Brooklyn.

11           THE COURT:  He was rob at gunpoint about

12     ten years ago in Brooklyn.

13           Did you report it to the police.

14           THE JUROR:  Yes.

15           THE COURT:  Anyone ever caught?

16           THE JUROR:  No.

17           THE COURT:  Anything about that experience

18     create a problem for you to be fair?

19           THE JUROR:  No.

20           THE COURT:  Mr. Spektor?

21           THE JUROR:  That was long ago, about 19

22     years ago, I was assaulted with a knife.  My

23     bike got taken away.  But I never reported it

24     because it was -- it wasn't local gang.

25           THE COURT:  Anyone else?

Jury Selection

100

1          Let's fill in seat 3.

2          COURT CLERK:  Jean Bruce B-R-U-C-E.

3          THE COURT:  Mr. Bruce, how are you?

4          THE JUROR:  Fine.

5          THE COURT:  Would you be good enough to

6     tell us about yourself, please?

7          THE JUROR:  I am married.  I live in East

8     Flatbush.  I work in a hospital for special

9     surgery as a PCA.

10          THE COURT:  What exactly do you do there?

11          THE JUROR:  Like a nurse technician.

12          THE COURT:  Have you ever been on a jury?

13          THE JUROR:  Yes.

14          THE COURT:  About how long ago?

15          THE JUROR:  Eight years.

16          THE COURT:  Do you know what kind of case

17     it was?

18          THE JUROR:  Civil.

19          THE COURT:  Did the jury reach a verdict?

20          THE JUROR:  Yes.

21          THE COURT:  Anyone in your family ever

22     worked for those agencies I keep mentioning?

23     Police, DA's office, court system?

24          THE JUROR:  Yes.  My son-in-law.

25          THE COURT:  Who does he work for?

 1            THE JUROR:  Federal government.

 2            THE COURT:  Is there anything about his

 3      work or anything else that would create a

 4      problem to be fair when it comes to police

 5      testimony?

 6            THE JUROR:  No.

 7            THE COURT:  Anyone been the victim of a

 8      crime in your family?

 9            THE JUROR:  I did.  I was stabbed eight

10      years ago.

11            THE COURT:  Here in Brooklyn?

12            THE JUROR:  Yes.

13            THE COURT:  Did I report it to the police?

14            THE JUROR:  Yes.

15            THE COURT:  Did they ever catch anyone?

16            THE JUROR:  Yes.

17            THE COURT:  Was it someone you knew or a

18      stranger?

19            THE JUROR:  Stranger.

20            THE COURT:  Did you have to testify?

21            THE JUROR:  Yes.

22            THE COURT:  Was there a trial?

23            THE JUROR:  Yes.

24            THE COURT:  Anything about your experience

25      that would create a problem for you to be a

Jury Selection

1      fair juror in this kind of case?

2          THE JUROR:  No.

3          THE COURT:  Were you seriously injured in

4      that matter?

5          THE JUROR:  Yes.  I was out of work for

6      six weeks.

7          THE COURT:  You heard the charge in this

8      case.  I just want to make sure, because they

9      involve a stabbing in this case too, if you

10     would feel sensitive about the fact that you

11     were the victim of a stabbing that would impact

12     your ability to be fair?

13         THE JUROR:  No.

14         THE COURT:  Thank you very much.

15         Last question for everyone:  Has anyone

16     been arrested, convicted of a crime?  Someone

17     in your family may have had that experience, we

18     need to know that also.

19         Mr. Loconde?

20         THE JUROR:  Refusal to take a

21     breathilizer.

22         THE COURT:  This was driving while

23     intoxicated or impairment?

24         THE JUROR:  Allegedly, yeah.

25         THE COURT:  Were you arrested for that?

Jury Selection

```
 1              THE JUROR:  I didn't take the
 2      breathalizer.
 3              THE COURT:  That was here in Brooklyn?
 4              THE JUROR:  Yes.
 5              THE COURT:  What ultimately happened with
 6      the case?
 7              THE JUROR:  It's still open.
 8              THE COURT:  Is there something about that
 9      experience with the police -- obviously you're
10      not happy about it.  We understand that.
11              THE JUROR:  Right.
12              THE COURT:  -- spill over where you think
13      it will impact your ability to be a fair juror?
14              THE JUROR:  No.
15              THE COURT:  Who else?  Mr. Arnold?
16              THE JUROR:  Trespassing.
17              THE COURT:  Here in Brooklyn?
18              THE JUROR:  No.
19              THE COURT:  Where was that?
20              THE JUROR:  In Connecticut.
21              THE COURT:  What ultimately happened with
22      that?
23              THE JUROR:  It was dismissed.  It was
24      skateboarding in a drained pool.
25              THE COURT:  Skateboarding in a drained
```

 1      pool?

 2              THE JUROR:  Yes.

 3              THE COURT:  In someone's back --

 4              THE JUROR:  In someone's backyard.

 5              THE COURT:  Anything about your experience

 6      that would create a problem to be a fair juror?

 7              THE JUROR:  No.

 8              THE COURT:  You still skateboard?

 9              THE JUROR:  Of course.

10              THE COURT:  Who else had that experience

11      of being arrested, convicted or your family?

12          Mr. Naiman?

13              THE JUROR:  Somebody in my family arrested

14      for robbery or something like that.  Money.

15              THE COURT:  Anything about that create a

16      problem for you?

17              THE JUROR:  No.

18              THE COURT:  Anyone else?

19          All right, I am finished with my

20      questions.  And I am going to turn the floor

21      over to Miss Chu.

22          MS. CHU:  Good afternoon, ladies and

23      gentlemen.

24          We talked about the fact that there is a

25      lot of things on TV now about this whole

1       scenario.  Courtrooms shows, police shows,

2       things like that.  Is there anyone here that

3       feels as though you expect people to come up

4       here and look like actors that you see on the

5       TV, this case is going to get wrapped up in an

6       hour, commercials?  You understand that's not

7       real?  Can you all accept that people that

8       testify or who come are witnesses in this case

9       are just real live people just like you and I?

10      Yes?

11          THE JURORS:  Yes.

12          MS. CHU:  What I wanted to ask you about

13      is that the fact when the clerk was calling

14      your name out, how many got a little nervous?

15      When you came up here.  The judge asked you

16      questions.  A little nervous.

17          Only two people.  Yes, a little bit.

18          Do you think that that might happen,

19      someone might get up here and testify as a

20      witness?  Yes?

21          Would you all agree that everybody shows

22      their nervousness or stress, they deal with

23      stress differently?  Would you all agree with

24      that?  Can you all take that into consideration

25      when you're deciding or you're listening to

1      what someone has to say?  Yes, you can do that?

2           Now, we talked a little bit earlier about

3      the fact that if more than one person view

4      something occurring, that not everybody is

5      going to have the same account of what

6      occurred.  Anyone here that would disagree with

7      that?  That thinks everybody should have the

8      same account?

9           Noone disagrees?  No?

10          I also talked about the fact that if

11     someone told somebody what happened, every time

12     they said it, won't -- it won't be something

13     that would be unusual.  Would you all agree

14     with that as well?  Can you accept that people

15     are human just like you and I?  Yes?

16          THE JURORS:  Yes.

17          MS. CHU:  Now, we also talked about the

18     fact that if you were wearing a white shirt and

19     I came up to you --

20          MR. DRANOVE:  Objection.

21          THE COURT:  Let me hear the question

22     again?

23          MS. CHU:  And I touched you, and you had a

24     red mark on your shirt, that even though you

25     might have seen a marker in my hand, I clearly

Jury Selection

107

1          must have had one.

2                  THE COURT:  I'll allow it.

3                  MS. CHU:  Would you agree with that?  Yes?

4          Would you be able to come to that conclusion?

5          Yes?  Anyone here that would not be able to do

6          that?

7                  MR. DRANOVE:  I object to.

8                  THE JUROR:  If it was unless it was marked

9          before.  Obviously --

10                 MS. CHU:  Right.  Let's say a clean white

11         shirt you just bought and put it on that day.

12                 THE JUROR:  Maybe I haven't noticed the

13         mark.  Clean white shirt with a mark.

14                 MS. CHU:  True.  If you hear -- is it

15         possible --

16                 MR. DRANOVE:  I withdraw my objection.

17                 THE JUROR:  It's possible.

18                 MS. CHU:  I looked at your shirt, you

19         know, it's got nothing on it.  Right?  Would

20         everybody be able to draw that conclusion?

21         Yes?

22                 Now, we also talked about the fact that

23         you may hear from witnesses in this case that

24         have criminal histories.  Is anyone here -- I

25         am not saying you can take into consideration

1     if someone's been accused or convicted of a

2     crime, you can take that into consideration

3     when you're deciding whether or not to believe

4     them.  But I just want to know whether or not,

5     you know what, no matter what, whatever they

6     say, I can believe them.  Because of the fact

7     that they've been convicted of a crime or maybe

8     they even have a lifestyle that you don't

9     approve of or you don't care for.  Anyone here

10     that thinks right off the bat, I could not give

11     that person a listen?  Everybody okay with

12     that?  Can you decide on your own whether or

13     not that person, what they tell you, makes

14     sense when you compare, contrast to the other

15     evidence you're going to hear in the case?  Can

16     you do that in this case?  Yes?

17          THE JURORS:  Yes.

18          MS. CHU:  I talked also about police

19     officer witnesses and the fact that you'll be

20     hearing from some.  How many of you ever gotten

21     a ticket from a police officer?  Running a red

22     light?  Whatever it is.  We have all had bad

23     experiences, good experiences and we talked

24     about the fact that everybody, no matter what

25     you do, there are some people that are very

1    good at what they do and some people are very

2    bad.  You have to decide whether these

3    witnesses, whoever they are, whether civilian

4    or they are police officers, if they are

5    telling you the truth based upon the other

6    evidence that you're going to hear in this

7    case.  Can you do that?

8        MR. DRANOVE:  Objection to that

9    characterization.

10        THE COURT:  I'll allow it.

11        You will have to decide whether you

12    believe they are telling the truth or not.

13    That is up to you.

14        MS. CHU:  Can you do that in this case?

15    Yes?

16        Now, we also talked about the fact that

17    you may be hearing evidence or you might hear

18    evidence in this case the defendant made

19    certain statements.  Now, we talked about the

20    fact that -- let me ask you.  Do you think it

21    would be unusual for someone who is questioned

22    by the police to ever talk to them?

23        Does anybody think that is something you

24    can fathom?  You're okay with that?

25        Do you think if someone speaks to the

Jury Selection

1    police they would try to say something in the

2    best light to them?  Is there a possibility?

3         MR. DRANOVE:  I object, again, to this

4    area.

5         THE COURT:  I'll allow it.

6         MS. CHU:  Do you think that's a

7    possibility?

8         Yes.

9         Now, are you the type of person that can

10   decide whether or not someone is being truthful

11   or not truthful based upon other evidence you

12   may hear in this case?

13        Some people think they are not good at

14   that.  Do you think you are?  Yes?  Okay.

15        Now, the last thing I want to talk about

16   is the fact that we talked a little bit about

17   sympathy.

18        I want you guys to all take a look at the

19   defendant.  Is there anything about the way he

20   looks that you think would prevent you from

21   deciding this case only on the facts?  Only on

22   what you hear in here, the evidence that's

23   before you?

24        Because you understand that once you're

25   selected as jurors and you're back there

Jury Selection

1    deliberating, you can't say, you know what, I

2    feel sorry for someone.  Whatever it is.

3    Sympathy should play no part in your decision

4    in this case.

5         Can you all separate that and be able to

6    decide this case only on the evidence?  Can you

7    do that?

8         THE JURORS:  Yes.

9         MS. CHU:  Anything that we mentioned,

10   either on the other round or during my talk

11   with you or with the judge's, that you think

12   you might want to draw your attention or you

13   have a question?  Everybody okay?

14        Thank you very much for your time.

15        THE COURT:  Mr. Dranove, last but not

16   least.

17        MR. DRANOVE:  This is a test.  Raise your

18   hand if you think my client's guilty?  Anybody

19   think he's guilty?  Raise your hand, this is

20   your chance.

21        I see no hands up.  That is good.  You

22   have been paying attention to the judge.

23        I have a few questions.  Too many --

24   Mr. O'Connell, you were a victim of a violent

25   crime here in Brooklyn.  How long ago was it?

1        THE JUROR:  It was September of 2007.

2        MR. DRANOVE:  Were there -- was it day or

3    night?

4        THE JUROR:  Night.

5        MR. DRANOVE:  Were you alone at the time?

6        THE JUROR:  I was -- there was in a -- I

7    was in a bodega, there was a cashier, I was the

8    only customer in the store.

9        MR. DRANOVE:  You still get nervous about

10   it when you think about it?

11       THE JUROR:  Sometimes.

12       MR. DRANOVE:  I say sort of -- well, if

13   you're here, you're going to be sitting through

14   days of testimony concerning a homicide early

15   Sunday morning in a bar.

16       Now, just thinking a little more, do you

17   feel your personal emotions may get in the way

18   of sitting through this?

19       THE JUROR:  No, I think I could be fair.

20       MR. DRANOVE:  Then Mr. Gonzalez, as far as

21   you know, your case is still -- the case where

22   you're the victim is still open; is that right?

23       THE JUROR:  I really don't know.

24       MR. DRANOVE:  Don't you care?

25       THE JUROR:  Yes, I care.

Jury Selection

1            MR. DRANOVE:  You want to make sure the

2       right guy is convicted?

3            THE JUROR:  Yeah.

4            MR. DRANOVE:  If it's right --

5            THE JUROR:  If it's the right guy.

6            MR. DRANOVE:  Just identify --

7            THE JUROR:  Yes, I went to a line-up.

8            MR. DRANOVE:  And since then, have you

9       taken any steps, like a phone call, to like

10      step up to make -- and say what's happening?

11           THE JUROR:  Well, I spoke to the detective

12      and detective said, you know, to come in

13      because I was so traumatized, you know.  I came

14      in, and I testified in front of a grand jury.

15      And, you know, the attorney told me, you know,

16      you did what you had to do.  And that was it.

17      Because I was very traumatized.  I was like I

18      wasn't myself.

19           MR. DRANOVE:  I just want to ask you

20      something personal, but I think it's the right

21      question.  Since this happened to you in

22      Brooklyn.

23           THE JUROR:  Yes.

24           MR. DRANOVE:  You've got to rely on if you

25      think you identified the right person.

1    Brooklyn prosecutor's office want to see that

2    justice is done.  Can you give all of us your

3    word, or can you not give us your word that you

4    could put your own personal nightmare aside and

5    just sit there really close to the witnesses,

6    and to Mr. Rivera, this judge, this case, as

7    this case should be judged?

8          THE JUROR:  Yes.  Yes.

9          MR. DRANOVE:  Great.

10         Now, the prosecutor talked to you about

11   putting something on someone's white shirt.  In

12   that area, listen to the testimony, direct

13   examination, cross-examination, there are no

14   white shirts, there were no red markers in this

15   case.  And there are bad and good guys, but I

16   am not going to attempt an analogy.

17         Raise your hand, please, if you believe it

18   possible that the police can put pressure on

19   somebody so that the person can make a

20   statement?  Do you think police can pressure

21   someone into making a statement?  Raise your

22   hand.

23         Mr. Naiman, you don't know the police can

24   pressure anybody into making a statement?

25         THE JUROR:  I am not sure of the question.

1       I don't understand.  I don't understand how you

2       pressure.

3              MR. DRANOVE:  Well, if you don't

4       understand the question, I'll move on.

5              With respect to your relative, was your

6       relative, or someone you know --

7              THE JUROR:  Relative.

8              MR. DRANOVE:  State or federal?

9              THE JUROR:  I have no idea.

10             MR. DRANOVE:  Is he in jail now?

11             THE JUROR:  Yes.

12             MR. DRANOVE:  Was he convicted?

13             THE JUROR:  Yes.

14             MR. DRANOVE:  How many years ago?  Were

15      you a witness?

16             THE JUROR:  No.

17             MR. DRANOVE:  Now, Mr. Bruce, you were

18      stabbed?

19             THE JUROR:  Yeah.

20             MR. DRANOVE:  Can you put that out of your

21      mine and sit through the testimony in another

22      case where a knife -- a knife was used?

23             THE JUROR:  Yes.

24             MR. DRANOVE:  Can you tell us how you can

25      put it out of your mind and judge neutrally

1        this case?
2            THE JUROR:  It's a long time, and I have
3        to move on.  I cannot always look back.
4            MR. DRANOVE:  Miss Vancooten, did you work
5        in any hospital?
6            THE JUROR:  Yes.
7            MR. DRANOVE:  In Brooklyn?
8            THE JUROR:  Yes.  Maimonides Medical
9        Center.
10           MR. DRANOVE:  Did can you ever work in the
11       emergency room?
12           THE JUROR:  No, I work in neonatal ICU.
13           MR. DRANOVE:  That's serious.
14           Well -- how do you pronounce, Paszkowski.
15       What types of criminal cases were before the
16       judge when you sat in the criminal term?
17           THE JUROR:  Just misdemeanors.
18           MR. DRANOVE:  Any trials.
19           THE JUROR:  I think we did -- while I was
20       with her, maybe three trials.
21           MR. DRANOVE:  You heard all the legal
22       charges and instructions to the jury?
23           THE JUROR:  Yes.
24           MR. DRANOVE:  I think the judge will tell
25       you the law here, you have to accept that.

1              THE JUROR:  Yes.

2              MR. DRANOVE:  Now, did you ever learn why

3        your grandparents were murdered?

4              THE JUROR:  You mean -- do you mean the

5        motive?

6              MR. DRANOVE:  Yes.

7              THE JUROR:  I think so.

8              MR. DRANOVE:  What did you understand

9        happened?

10             THE JUROR:  My grandfather was a political

11       figure, and it was some kind of politically

12       motivate.  The robbery that went bad.

13             MR. DRANOVE:  Sorry to have to raise that

14       with you.

15             THE JUROR:  No.

16             MR. DRANOVE:  Mr. Loconde, how long ago

17       were you a victim of a robbery?

18             THE JUROR:  Over ten years.

19             MR. DRANOVE:  Still on your mind as you

20       sit here in this courtroom thinking about it

21       again, bothered by it?

22             THE JUROR:  No.

23             MR. DRANOVE:  Mr. Arnold, what type of

24       real estate developer are you?

25             THE JUROR:  Residential or commerical.

1          MR. DRANOVE:  Brooklyn?

2          THE JUROR:  Brooklyn, Bronx.

3          MR. DRANOVE:  How's it going?

4          THE JUROR:  We have had better days.

5          MR. DRANOVE:  Who hasn't.

6          Mr. Mathis, two brothers in law

7      enforcement?

8          THE JUROR:  Right.

9          MR. DRANOVE:  You always get along 24

10     hours a day, everyday, live with your brothers,

11     never have any arguments?

12         THE JUROR:  Of course, I have arguments

13     with them.

14         MR. DRANOVE:  Thank you very much.

15         I have no further questions.

16         THE COURT:  Okay.  Now, there is a group

17     of you that have not been in the jury box, very

18     patiently sitting here, listening to everyone,

19     I am going to excuse you folks for your lunch

20     right now.

21         You can go out to lunch.  I am going to

22     ask you to return to the Central Jury room,

23     second floor, at 2:15.  Thank you for your

24     patience.  Have a nice lunch.

25         Those selected to be on the trial, I am

1    going to ask you folks to wait out in the

2    hallway for just a few more moments.  Step

3    outside, just wait for us.

4         And those already in the jury box, we will

5    let you know before you go to lunch if you've

6    been picked.  Wait out in the hall for a few

7    more moments.  Thank you very much for your

8    patience.

9         (Prospective Jurors Excused)

10        (pause)

11        MR. DRANOVE:  With respect to juror 1, may

12   very well have a case -- may have a case -- I

13   am talking about the gentleman, number 9, who

14   said he was robbed at gunpoint, testified in

15   the grand jury in Brooklyn.  He doesn't know if

16   the case is over or not.

17        I think that perhaps we should find out,

18   if we can, if there is a data base the

19   prosecutor can quickly find out if there is a

20   case pending where he's the complaining witness

21   and if prosecutor is prosecuting someone, for

22   example, in this courthouse.

23        I think -- I don't remember the case law,

24   but there's been some case law about this.

25        THE COURT:  Let's go to this juror when we

Jury Selection

1    go through the jury selection then.

2        I don't think we are going to get much

3    information unless we have a name of a

4    defendant to check it out.

5        MR. DRANOVE:  I don't know, data base is

6    sophisticated in the DA's office in Brooklyn.

7    I don't know.

8        THE COURT:  The important thing is

9    information he had, and what he told us.  What

10   he told is the most important thing that we

11   have to rely on.

12       We have eight jurors picked, so we are

13   going to talk about the first four jurors in

14   the box.  Everyone up to and including

15   Mr. McDonald in seat 4.

16       Any challenge for cause by the People?

17       MS. CHU:  No.

18       THE COURT:  For cause by the Defense?

19       MR. DRANOVE:  No.

20       THE COURT:  Peremptory by the People?

21       MS. CHU:  No.

22       THE COURT:  Peremptory by the Defense?

23       MR. DRANOVE:  Yes.  Seats 1, 3 and 4.

24       THE COURT:  Mr. Naiman, Miss Bruce and

25   Mr. McDonald.  Are all excused.

1    That means Miss Vancooten becomes juror

2    number 9.

3         Go to the next three jurors, Mr.

4    O'Connell.  Up to and including Miss Telford in

5    seat 7.  Any challenge for cause by the People?

6         MS. CHU:  No.

7         THE COURT:  For cause by the Defense?

8         MR. DRANOVE:  None.

9         THE COURT:  Peremptory by the People?

10        MS. CHU:  Yes.  Juror number 6.

11        THE COURT:  Mr. Chandler is excused.

12        MS. CHU:  That's it.

13        THE COURT:  We have two jurors left in

14   this group.  Number 5, Mr. O'Connell and juror

15   number 7, Miss Telford.  Only two in play.

16        MR. DRANOVE:  Number 5.

17        THE COURT:  You're challenging

18   Mr. O'Connell?

19        MR. DRANOVE:  Yes.

20        THE COURT:  Excused.

21        Mrs. Telford is acceptable?

22        MR. DRANOVE:  Yes.

23        THE COURT:  She becomes juror number 10.

24        Go to the next two jurors in the box.

25   Paszkowski and Gonzalez, for cause by the

Jury Selection

1    People?

2         MS. CHU:  No.

3         THE COURT:  Cause by the Defense?  Any for

4    cause by the Defense?  For cause.

5         MR. DRANOVE:  No, sir.

6         THE COURT:  Peremptory by the People?

7         MS. CHU:  No.

8         THE COURT:  Peremptory by the Defense?

9         MR. DRANOVE:  Judge, could we address

10   Mr. Gonzalez?  I think that unless he can tell

11   us, or the prosecution can tell us, whether the

12   case is resolved, I would ask that he be

13   challenged for cause?

14        THE COURT:  Procedurally we just went to

15   you for challenge for cause.  I think you can

16   just ask for peremptory.  Maybe there was a mix

17   up in communication.  I am sorry if there was a

18   mix up in communication.

19        MR. DRANOVE:  It's probably my fault, I

20   apologize.  I don't understand how it is when

21   we may very well be a prepped by someone in

22   Miss Chu's office.

23        THE COURT:  Again, procedurally we are at

24   the point where it's a bit of a problem.  Why

25   don't you exercise a peremptory challenge?  You

Jury Selection

123

1     have 20 peremptory challenges.  I really don't

2     think you're even going to come close to using

3     them all.  If you have any objection, that is

4     simply --

5          MR. DRANOVE:  I will challenge him.

6          THE COURT:  I don't want to jeopardize --

7          MR. DRANOVE:  19 or 20.  May I reassess

8     it?

9          THE COURT:  Yes.

10          I think the best way, at this point, to

11     expedite it, because she did already exercise

12     no peremptory for him.

13          He is excused.

14          What about Paszkowski, is she acceptable?

15          MR. DRANOVE:  Yes.

16          THE COURT:  She becomes juror number 11.

17          Let's go to the next juror in the box.

18     Mr. Spektor.

19          Challenge for cause by the People?

20          MS. CHU:  No.

21          THE COURT:  Challenge for cause by the

22     Defense?

23          MR. DRANOVE:  No.

24          THE COURT:  Peremptory by People.

25          MS. CHU:  No.

Jury Selection

124

1          THE COURT:  Peremptory by Defense?

2          MR. DRANOVE:  No.

3          THE COURT:  Mr. Spektor is number 12.

4          Let's go to alternate jurors for the first

5     seat, Miss Rennix.

6          Challenge cause by the People?

7          MS. CHU:  No.

8          THE COURT:  Cause by the Defense?

9          MR. DRANOVE:  No.

10         THE COURT:  Peremptory by the People?

11         MS. CHU:  Yes.

12         THE COURT:  Miss Rennix is excused.

13         Mr. Mathis, challenge for cause by the

14    People?

15         MS. CHU:  No.

16         THE COURT:  Cause by the Defense?

17         MR. DRANOVE:  No.

18         THE COURT:  Peremptory by the People?

19         MS. CHU:  No.

20         THE COURT:  Peremptory by the Defense?

21         MR. DRANOVE:  Yes.

22         THE COURT:  Mr. Mathis is excused.

23         THE COURT:  Two per seat.  You have each

24    used one.

25         THE COURT:  Miss Trafton, challenge for

Jury Selection

1        cause by the people?

2              MS. CHU:  No.

3              THE COURT:  Cause by the Defense?

4              MR. DRANOVE:  No.

5              THE COURT:  Peremptory by the People?

6              MS. CHU:  No.

7              THE COURT:  Peremptory by the Defense?

8              MR. DRANOVE:  Yes.

9              THE COURT:  Miss Trafton is excused.

10             That completes your peremptory for that

11       seat.

12             Miss Koteen, challenge for cause by the

13       People?

14             MS. CHU:  No.

15             THE COURT:  Cause by the Defense?

16             MR. DRANOVE:  No.

17             THE COURT:  Peremptory by the People?

18             MS. CHU:  No.

19             THE COURT:  Miss Koteen becomes alternate

20       number 1.

21             We are looking for alternate number 2.

22             Challenge for cause as to Miss Thompson by

23       the People?

24             MS. CHU:  No.

25             THE COURT:  By the Defense, for cause.

Jury Selection

126

1          MR. DRANOVE: No.

2          THE COURT: Peremptory by the People?

3          MS. CHU: Yes.

4          THE COURT: Miss Thompson is excused.

5          Miss Rasado, challenge for cause by the

6     People?

7          MS. CHU: No.

8          THE COURT: Cause by the Defense?

9          MR. DRANOVE: No.

10         THE COURT: Peremptory by the People?

11         MS. CHU: No.

12         THE COURT: Peremptory by the Defense?

13         MR. DRANOVE: No.

14         THE COURT: Miss Rasado becomes alternate

15    number 2.

16         Since we have several jurors, let's go for

17    a third alternate.

18         Miss Everett, in seat 17, challenge for

19    cause by the People?

20         MS. CHU: No.

21         THE COURT: Cause by the Defense?

22         MR. DRANOVE: No.

23         THE COURT: Peremptory by the People?

24         MS. CHU: Yes.

25         THE COURT: Miss Everett is excused.

Jury Selection

1              Mr. Arnold, challenge for cause by the

2       People?

3              MS. CHU:  No.

4              THE COURT:  Cause by the Defense?

5              MR. DRANOVE:  No.

6              THE COURT:  Peremptory by the People?

7              MS. CHU:  No.

8              THE COURT:  Peremptory by the Defense?

9              MR. DRANOVE:  Third alternate seat, Judge?

10             THE COURT:  Yes.

11             MR. DRANOVE:  No.

12             THE COURT:  He will be our third

13      alternate.

14             We have our jurors.  We will swear them

15      in.  And then recess until tomorrow morning.

16             (Jurors entering)

17             (Whereupon, the remaining selected jurors

18      were duly sworn at this time.)

19             THE COURT:  I want to thank each and every

20      one of you for being so patient and answering

21      everyone's questions.  I hope you didn't find

22      the process too bad.  It could be a lot worse,

23      let me assure you.

24             Now, you have any objection, I am going to

25      let you folks have the rest of the day off.  If

1    that's okay with you.  Is that all right?  You

2    have only been here a minute and already you

3    have agreed on something.  Isn't that amazing.

4         Here's the plan.  We are going to resume

5    the trial tomorrow morning.  We are going to

6    start tomorrow at 10:30 in the morning.  I'd

7    like to start on time.  Very promptly.  So

8    please make a special effort to be here ready

9    to go.  It can take a while to get into the

10   building.  We have a line of people in the

11   morning, and the elevator can get crowded.  So

12   think in terms of getting here by ten o'clock

13   so that you can all be here ready to start at

14   10:30 in the morning.

15        You report to a room that is on this

16   floor.  The court officer is going to show you

17   where that room is, and that will be your room

18   for your use for the rest of the trial.

19        It's a very nice room.  You're going to

20   have a beautiful view of Manhattan so you can

21   enjoy it.

22        Now, if you should run into any of the

23   parties to this trialfrom now on, if you see

24   them out of the courtroom, they may be in lobby

25   getting into an elevator, you might see them in

1        the hallway coming into the building, they're

2        not allowed to speak to you.  I'm sure you

3        could understand why.  So if you happen to see

4        any of them outside, please do not go over to

5        them and start talking to them or asking them

6        anything.  They're not allowed to speak to you.

7            Now you have a very important job, so

8        please dress appropriately.  I ask the men to

9        wear a tie, if you have one, and I ask the

10       women to dress as you would for an important

11       job.

12           Now, we are going to recess the trial

13       until tomorrow morning.  The court officer is

14       going to take you to the jury room to show you

15       where it is you report.  And make sure we have

16       reliable contact information for you.  So make

17       sure you give her an accurate phone number for

18       where you could be reached in case there's any

19       problem.

20           Please make special effort to be here on

21       time.  The earlier we get started tomorrow, the

22       earlier we finish.  Okay.  Have a very nice

23       afternoon.  I just ask the court officer to

24       take the jury to the jury room.

25           Ms. Chu, you'll give her the information

1      about your interview tomorrow, and you want to

2      try to call them from here or you want --

3            THE JUROR:  I'm going to call them from

4      the break -- I will be here.

5            THE COURT:  See if you can push it back

6      later in the afternoon.  Where is it?

7            THE JUROR:  51 and Park.

8            THE COURT:  If they could do that, we'll

9      break a little earlier for to you get there.

10     If they could do it at five o'clock.

11           THE JUROR:  Let me speak to them.

12           THE COURT:  I am going to be here.  I will

13     speak to them on the phone for you.  If you

14     want to do it another day.  Same day at the end

15     of day.

16           THE JUROR:  I am trying to find out when

17     next week I would probably be available or

18     later in the day for tomorrow.

19           THE COURT:  You want to push it over for a

20     week, if that would be more of a problem for

21     you.  At the end of day.

22           (The jury panel was excused.)

23           MR. DRANOVE:  I will provide declaration

24     of my client's indigency, if I could, may I

25     just copy the one committed to the U.S. Supreme

1       Court?

2            THE COURT:  The answer, even though

3       Mr. Dranove is retained, I feel it's very

4       important that the defense get daily copy in

5       this case.  So I am authorizing daily copy on

6       the condition that I get an affirmation from

7       the defense attorney before the trial is over

8       establishing the indigency of the defendant and

9       his inability to pay for daily copy.

10           MR. DRANOVE:  Yes, sir.

11           THE COURT:  The form of that will work out

12      between us.

13           MR. DRANOVE:  With respect to tomorrow,

14      how many witnesses and which witnesses should I

15      hopefully know in advance so I can prepare.

16           THE COURT:  I ask Miss Chu to provide, off

17      the record, who anticipate who she will call

18      and try to do that on a daily basis so you can

19      be prepared.

20           We are in recess until tomorrow morning.

21      Be here very punctually tomorrow morning.

22      10:30.

23           MR. DRANOVE:  With respect to the matter,

24      if I submit a proposed order for a particular

25      private investigator, reasonable hourly rate,

1        would your Honor consider signing that?

2             THE COURT:  I'll consider it.  Sure.

3             MR. DRANOVE:  Thank you.

4             *           *           *

5             (Adjourned to May 6, 2009)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                    2

1        THE COURT:  For the record, I want to put

2   two things on the record before the jurors come

3   out.

4        The first is that there was a scheduling

5   issue regarding one of the jurors yesterday who

6   was picked, who informed everyone he had a job

7   interview scheduled for this afternoon at 2:30.

8   I had asked him to try to make an arrangement

9   to switch the job interview to a later time or

10  to another day.  And I got permission of

11  counsel to work with the juror regarding this

12  issue.

13       He called me in the afternoon and informed

14  me that he had rescheduled the interview until

15  four o'clock this afternoon today.  I indicated

16  it might work out since the parties didn't know

17  about it, we might have a lot of witnesses

18  scheduled for today.  And I asked for

19  permission to try to reschedule for later in

20  the week, which he gave me.  So I called his

21  potential employer, and they were kind enough

22  to reschedule the interview without any

23  prejudice to him until Friday afternoon at four

24  o'clock.  And I called him back to tell him

25  that, and he said that was fine with him too.

Proceedings

3

1        I want to alert everyone that we are going

2    to need to break the trial earlier on Friday in

3    order that he can accommodate that job

4    interview.  Hopefully that will work out for

5    everyone.

6        Now, the second thing I want to put on the

7    record is that yesterday the DA made an

8    application to read part of the transcript of

9    the defendant's testimony from the prior trial,

10   and I asked defense counsel to let me know if

11   he has any objection to that.

12       I received a fax this morning indicating

13   that the Defense was requesting a larger

14   portion of the transcript be read back.  Since

15   I just got it, I want a chance just to review

16   it.  I'll have my decision tomorrow morning.  I

17   don't think this has to be resolved right now.

18   So I will take a look at it, read it carefully

19   and have a decision by tomorrow morning as to

20   the extent of the transcript that needs to be

21   read back.

22       Are the People ready to proceed?

23       MS. CHU:  Yes, your Honor.

24       THE COURT:  Are you ready to proceed, Mr.

25   Dranove.

Proceedings

4

1      MR. DRANOVE:  I am.

2      I have inquiry of The Court, if I may?

3      THE COURT:  Yes.

4      MR. DRANOVE:  I have a new fax machine I

5   am using, started using it yesterday.  I faxed

6   over a letter this morning addressing the

7   request for assignment of an investigator.  I

8   don't know whether your office received --

9      THE COURT:  Yes, I did.  I am sorry, I

10   should have mentioned I received that also.

11      MR. DRANOVE:  You will have a decision

12   sometime as soon as possible.

13      One pick person I could not track down so

14   far from the phone number information --

15      THE COURT:  I will have an answer.  I will

16   grant the application, but it's conditional,

17   again, by me receiving an appropriate

18   affirmation as to the indigency and the

19   inability to afford hiring such an

20   investigator.

21      MR. DRANOVE:  Judge, may I present that to

22   you Monday?

23      THE COURT:  Yes.

24      MR. DRANOVE:  Thank you, sir.

25      We are ready to proceed.

Proceedings

5

1       THE COURT:  Give me an order.

2       MR. DRANOVE:  I understand.  I appreciate

3   your accepting this in letter application.

4       THE COURT:  Right.  I'm granting the

5   application.

6       THE COURT:  Tell James to bring out the

7   jury that is present.

8       MS. CHU:  As well as defendant's

9   testimony.  If we could resolve the issue

10  having to do with what exactly you're going to

11  allow in.  She won't be testifying in the

12  afternoon, so if you wanted to address that

13  when we break for the lunch, we can do that at

14  that time.

15      THE COURT:  You're talking about the

16  defendant's prior testimony?

17      MR. DRANOVE:  That could be read in by the

18  court, any court reporter or the prosecution.

19  Once we reach a decision.

20      MS. CHU:  You have to decide what parts

21  are going --

22      THE COURT:  I don't think a witness is

23  going to testify about that.

24      MS. CHU:  She is actually the reporter

25  that took --

Proceedings

6

1          THE COURT:  Is there objection on the
2      accuracy of what is read back?
3          MR. DRANOVE:  Correct.
4          MS. CHU:  When she testifies, I will do it
5      while she is up there.
6          THE COURT:  You don't need --
7          MS. CHU:  I don't need -- while she was --
8          THE COURT:  If I can.
9          MS. CHU:  She is not going to testify this
10     morning.  At some time before she testifies, if
11     she itemize exactly what it is that we are
12     going to read from his testimony --
13         THE COURT:  I am going to make it clear.
14     She don't have to read it back.  It doesn't
15     have to be read back this afternoon.
16         MR. DRANOVE:  One more thing.
17         THE COURT:  I'm finished.
18         MR. DRANOVE:  I had 9:45 a.m. settlement
19     conference in a federal action in Manhattan.
20     It concerns a gentleman who is 23, locked up,
21     seeking to get documents.  Started as a civil
22     litigant.  Ultimately this federal litigation,
23     the litigation to force documents to be
24     produced.  I think it's resolved.  I won't know
25     for sure until the Attorney General's office

Proceedings

7

1     and I meet with the judge.  I'm scheduled for

2     9:45 in the morning.

3          I could call and explain I'm engaged in

4     trial.  I can't get an adjourn -- I can't

5     guarantee I will get an adjournment, so -- I

6     think I'll call later today.  From what I

7     understand, I believe today's testimony won't

8     last until five o'clock.  I think I can reach

9     Judge McMann's chambers at a reasonable hour.

10          THE COURT:  See what you can do.  The ADA

11     has a lot of witnesses she has lined up for

12     tomorrow.  See what you can do.  If you need my

13     help, let me know.

14          COURT OFFICER:  Ready for the jury?

15          THE COURT:  Yes.

16          COURT OFFICER:  Jury entering.

17          COURT CLERK:  Jurors are present with the

18     exception of juror number 6, Marlon Antigua.

19          THE COURT:  Good morning, ladies and

20     gentlemen.  I want to thank you for being so

21     punctual.  I want to commend you for being the

22     best looking jury in Brooklyn today.

23          Now, we are missing one juror, and so we

24     can't really start until that juror arrives.

25     We haven't heard anything from this juror, so I

Proceedings

8

1   am hoping the juror will arrive shortly.  Let's

2   just wait a few minutes.

3        You can talk, if you want, in the jury box

4   while we are waiting.  We are ready to proceed

5   and hopefully the juror will arrive shortly.

6        (pause)

7        COURT CLERK:  Jurors are now present and

8   seated.

9        THE COURT:  Again, I wish everyone a good

10  morning.  Good morning, Mr. Antigua.

11       Now, when we left off yesterday, you were

12  selected, you, the jury, in this case, and what

13  I want to do right now is to go over with you

14  the procedures that we will follow for the rest

15  of this trial so that you can understand

16  exactly what will happen, and also I want to go

17  over with you exactly what your

18  responsibilities will be.  Now that you're the

19  jurors in this case.

20       So let's start with the procedure for the

21  trial.  The next step in this trial will be an

22  opening statement by the District Attorney,

23  Miss Chu.

24       The law requires that the district

25  attorney make an opening statement, telling you

Opening - Court

1      what she intends to prove by way of evidence in

2      this case.

3           After you hear her opening statements, Mr.

4      Dranove, the Defense attorney gets a chance to

5      make an opening statement.  But he is under no

6      obligation to make an opening statement.  It's

7      entirely optional for the defense attorney.

8           After you've heard the opening statement

9      or statements, the district attorney will then

10     begin presenting her case to you.  She is going

11     to call witnesses to the witness stand, and she

12     will get a chance to question each of her

13     witnesses first.  We call the district

14     attorney's questioning of each prosecution

15     witness direct examination.

16          After the direct examination is completed,

17     defense counsel gets a chance to question each

18     witness, and, of course, we call that

19     cross-examination.

20          Once the district attorney has finished

21     presenting her witnesses and her evidence to

22     you, the defendant gets a chance to call

23     witnesses and present evidence also.  But is

24     under no obligation to call anyone as a witness

25     or present any evidence.  It is entirely

1      optional for the defense.

2          After you've heard all of the evidence,

3      the attorneys get one more chance to stand

4      before you to make a closing argument, which we

5      call a summation.

6          And then after you've heard each of their

7      summations, I have to give you specific

8      instructions on the law that you must apply to

9      decide the case.

10          I will then give you the case for your

11     deliberations, and a verdict of either guilty

12     or not guilty for each charge I will list for

13     you on a verdict sheet.  It's a piece of paper,

14     it will have the charges on it.

15          Once you have all agreed as to what the

16     right verdict should be for each charge on that

17     verdict sheet, you will check it off under

18     guilty or not guilty.  Once you completed

19     filling out the verdict sheet, I'll ask you to

20     send me a note and tell me that you have

21     arrived at a unanimous verdict.

22          I will then ask you to come in the

23     courtroom and announce that verdict through

24     your foreperson, through our foreman, who will

25     be juror number 1.  That is the outline for the

1    trial.

2         For the most part, evidence comes through

3    the witnesses who testify at trial.  There may

4    also be physical exhibits, which I'll allow you

5    to see, and if these attorneys agree on any

6    facts about which there is no dispute, they

7    will stipulate that they agree on those facts

8    and you may consider them evidence also.

9         Please remember that the questions the

10   attorneys ask during the questioning are not

11   evidence.  It is the answers the witnesses give

12   to the attorney's questions that will be

13   evidence.

14        For example, if an attorney asks a

15   witness, do you own an automobile, and the

16   witness answers, no.  You must not assume the

17   witness owns an automobile because the attorney

18   asked a question about one.  You have to listen

19   to the answer, because together with the

20   question, that is what the evidence will be.

21        You may hear the attorneys make objections

22   during the trial.  The law allows an attorney

23   to object to a question asked by the other side

24   or to an answer given by a witness.  And you'll

25   hear the attorneys say objection.  They may

Opening - Court

1    even give a reason for the objection.  It's my

2    job to rule on each objection, and I will.  If

3    I agree with the attorney, I will say

4    sustained.  That means I believe the question

5    or the answer is not legally proper, and you

6    must disregard it.  If I disagree with the

7    attorney, I am going to say overruled.  That

8    means I believe the question and the answer is

9    legally proper, and you may consider it.

10        Please don't hold it against these

11   attorneys if they make objections that I rule

12   against.  They're just doing their job.

13        Now, let's go over your responsibilities.

14   You've been selected to decide what happened in

15   this case.  You will decide whether you believe

16   a witness or you don't, what weight you will

17   give any of the witness' testimony, you will

18   decide what the verdict should be in this case.

19   So we call you the judges of the facts.

20        My job is to be judge of the law.  The

21   attorneys have to follow the law whether they

22   agree with it or not as I give it to them and

23   so must you.

24        I don't have any power to interfere with

25   your power.  As the judge of the facts.  And I

Opening - Court

1    am very happy to have you here to decide this

2    case.  But, please, don't interfere with my

3    power when I tell you something isn't the law,

4    that's it, you have to follow it whether you

5    agree with it or not.

6         Now, because you will decide this case, it

7    is extremely important that you keep an open

8    mind, not form or express any opinion about

9    this case to anyone.  When we take a break in

10   the trial, when you go home in the evening,

11   when you're with the other jurors in the jury

12   room during a break, you are not allowed to

13   decide the facts of the case or express any

14   opinion about the case.

15        Now, I encourage you to make this as

16   pleasant a social experience as possible, so

17   when you are together in the jury room, if you

18   want to talk to each other, please feel free to

19   do so.  If you want to talk about the beautiful

20   view from the jury room, if you want to talk

21   about the weather, what is on sale at Macy's,

22   whatever interest you have, by all means, talk

23   to each other.  But not about the case.  You

24   have to wait until the end of the trial when

25   your deliberations begin to talk about the

Opening - Court

14

1    case.

2         Now, we have specific rules you must

3    follow:

4         You're not allowed to go out to the scene

5    where this crime is alleged to have occurred to

6    look at it.  You have to decide the case solely

7    on the evidence.  Should this case be reported

8    in the media, you are not allowed to read or

9    listen to any accounts of it, and if you become

10   aware of an attempt by anyone to improperly

11   influence you or any other members of the jury,

12   you must promptly report that to one of our

13   court officers and we will take immediate

14   corrective action.

15        Now, let me go over with you a couple of

16   other things that are very important for you to

17   know.  You may have seen trials on television

18   or in the movies, and they show jurors sitting

19   in a jury box with pads and pencils and the

20   jurors are taking notes while the witnesses are

21   testifying.  Here in New York, we do not

22   believe that in most cases jurors should try to

23   take notes.  Why?  Well, first of all, this is

24   not going to be that long of a trial.

25   Secondly, you are not chosen for your

Opening - Court

1    note-taking abilities. It's very hard to try
2    to write down accurately what witnesses are
3    saying and hear everything. And, third, and
4    most importantly, we have a court reporter who
5    will be taking down everything as accurately as
6    possible during this trial. So if during your
7    deliberations you do have some question amongst
8    yourselves about what a witness said, you can
9    simply ask to have the testimony read back to
10   you with complete assurance that that is what
11   the witness said. So I don't want you to try
12   to take notes. I want you to sit back and
13   listen.
14        If at any time you don't hear something,
15   don't be ashame to let me know. All you have
16   to do is raise your hand in the jury box,
17   that's a signal to me to have the witness
18   repeat the answer for you or I'll have the
19   court reporter read back what the witness just
20   said.
21        Now, another thing that is very important
22   for you to understand is that this is not the
23   only case I have to handle. Sometimes I have
24   other matters that they assign me. I wish I
25   only had one case at a time, my life would be a

Opening - Court

16

1    lot easier.  It doesn't work that way.  I will

2    always excuse you when I do other business.

3    I think it is very inconsiderate for a judge to

4    keep jurors waiting around while a judge does

5    other business.

6        Try to be very punctual.  If you didn't

7    figure it out already, I am going to tell you

8    right now, when I give you a time that we are

9    going to work on the trial, that is the time I

10   would like everyone to be here.  Sometimes we

11   do have to wait for a witness, that is beyond

12   anyone's control.  But other than that, we

13   should proceed as punctually as possible, and I

14   do appreciate your cooperation.

15       The other thing I want to mention to you

16   is that we are now living in the world of the

17   internet.  Use of the computer has become very

18   common.  I want to instruct you right now that

19   you must resist any temptation to try to go on

20   the internet to try to find out any information

21   about the case or any of the people involved in

22   this case.  You can't do that.  I am sure you

23   could understand that there is a lot of

24   miscellaneous information and inaccurate

25   information out there, and you have to decide

1    this case solely on the evidence in this

2    courtroom.  So, please, if you have a computer,

3    you use the internet, do not try to find out

4    any information about this case during this

5    trial on-line.  I appreciate your cooperation.

6    That completes what I have to tell you.

7        We are now ready to move into the next

8    step in this trial, which will be the opening

9    statement by Miss Chu.

10        You may proceed when you're ready.

11        MS. CHU:  Thank you.

12        Good morning, ladies and gentlemen:

13        It was just suppose to be another Saturday

14    night hanging out with his friends.  That is

15    what Edgar Ojeda had planned for that Saturday

16    night, February 26, 2005.

17        They began their day earlier that Saturday

18    morning going shopping right here in downtown

19    Brooklyn.  And they spent the day together, and

20    after going home until around the evening time,

21    they arranged to meet up again so they can go

22    hang out that night.

23        Now, they ended up at a bar called El

24    Borinquen Bar.  It was located at 314 39

25    Street, here in the Sunset Park section of

1      Brooklyn, and they ended up there after trying

2      to go to a party out in Fort Greene.  They

3      couldn't find parking, then they stopped by a

4      strip club over on Third Avenue.  Then they

5      ended up at this bar.

6           What you will learn about El Borinquen

7      Bar, it's a local bar.  A local bar on 39 and

8      Third.  It's been owned by a lot of people,

9      Amnesta Bar, and now known as El Borinquen Bar.

10     A bar that is not too big.  It's right there on

11     the corner, right on 39 and Third.  If you know

12     the overpass of the BQE, it's right under there

13     diagonally across is the Costco.

14          What you will learn, it's a narrow bar.

15     It's an entrance on 39 Street.  There is also a

16     side entrance on Third Avenue.  As you walk

17     into the bar, it's narrow and it has a bar that

18     runs the length of the bar, about halfway down

19     on the left-hand side.  There are some tables

20     and chairs set up on the right-hand side, right

21     by where this side entrance is.  Side exit is.

22     There's also a jukebox over there.  About

23     halfway into the bar towards the back, there is

24     a dance floor on the right-hand side, then

25     there are rest rooms in the back, far back left

19

1      corner.

2          Now, when Edgar and his friends, it's

3      Carlos Solomon, Marcus Carrasquillo and

4      Jonathan Dominguez, when they arrived at this

5      bar, it's now after midnight.  So, technically,

6      it's the next day, February 27, 2005, little

7      bit after one o'clock.  And they get some

8      beers, and Edgar and Carlos kind of set up near

9      where the jukebox is.  Standing where that side

10     entrance is.

11         What you'll all learn, the two guys, they

12     were with Marcus and Jonathan, they know some

13     people at the bar.  So they're kind of hanging

14     out by the bar area conversing with them.  And

15     about half hour into them being at this bar,

16     the defendant, that man there, Enrique Rivera,

17     walks up to Edgar Ojeda, while standing by this

18     door, and says something, kind of leans in and

19     says something to him.  And Carlos, who's

20     standing next to him, can't hear, but he sees

21     Edgar responds and says something.  Next thing

22     that happens, they see that the defendant

23     either push or punch Edgar somewhere in this

24     area (indicating).  The body area.  Then Carlos

25     goes to try to protect Edgar, but Carlos is a

20a

1     lot taller than Edgar.  Edgar is fairly -- is

2     five foot six, and Carlos is six foot two.  He

3     goes to try to protect Edgar, tries to go after

4     the defendant and some of the people that he's

5     with.  In the process of doing that, they run

6     out, he gets alerted, and at that point Edgar

7     realizes that the defendant didn't punch or

8     push him.  What he did, he had stabbed him.

9     And Edgar takes off his scarf and blood begins

10    to pour out of him.  He says, "I think I got

11    stabbed.  He's alerting his friend, Carlos and

12    Jonathan and Marcus.  What they do when they

13    realize, indeed, their friend, Edgar, is

14    stabbed, they turn -- their attentions are now

15    on him and they try to get him out of the bar.

16         What you'll learn, they try and control

17    the bleeding, they try to take him out of bar.

18    Their car is right on Third Avenue, right

19    underneath the underpass on the other side of

20    Third Avenue facing towards the higher numbers.

21    So they try to walk him out there, take him

22    over there to the car and they tried to rush

23    him over to Lutheran Medical Center, which is

24    about 20 blocks away on 58 Street.

25         And you'll learn while they're there,

1        they're trying to tell Edgar to hold on, they

2        are trying to prevent the bleeding from

3        happening or keep going.  When they arrived at

4        the hospital, they bring him right in.  Carlos

5        picked him up, they arrived at the hospital

6        about two o'clock, that is the time they admit

7        him into the hospital.  And unfortunately the

8        personnel at Lutheran Medical Center are unable

9        to do anything for Edgar and he's pronounced

10       dead at 2:22 in the morning on February 27,

11       2005.  At the hands of that man, (indicating)

12       Enrique Rivera.

13             Now, you will learn, based upon the fact

14       that Edgar had come to the hospital and expired

15       their, the police get notified.  Because Carlos

16       and the -- frantic Carlos, Marcus and Jonathan,

17       they're frantic -- I am sorry -- attempts to

18       bring Edgar to the hospital, they are not

19       thinking about calling 911.  They just take him

20       to the hospital.  So the hospital personnel

21       actually called.  And they confirmed that

22       someone was injured there, and Carlos, Marcus

23       and Jonathan, they remain at the hospital.

24             And what you will learn, there was an

25       officer from the 72 Precinct, person by the

Opening - Chu

22α

1      name of Justin Harriman, he's assigned to

2      respond to the hospital, and he sees Marcus,

3      Jonathan and Carlos there and he talks to them

4      and he confirmed that, yes, indeed, there was

5      someone that was injured and killed.

6           They find out where the location is.  They

7      have an officer arrive at the bar, but by the

8      time the officer gets there, the bar's been

9      closed.  You see fresh water in front of it

10     cleaned up.  So they have someone sit there at

11     the location, the El Borinquen Bar and preserve

12     it as best they can.  They set up a crime scene

13     tape.

14          You will learn there was police officers

15     that was assigned to sit on the location to

16     make sure that no one comes in and out or goes

17     inside.  In the meantime, they are trying to

18     get a hold of the bar owner so that they can

19     get inside.

20          But in the meantime, one of the police

21     officers that gets assigned from the Crime

22     Scene Unit is the Detective Michael Cunningham,

23     and he gets assigned to process the scene and

24     when he gets to the bar, the bar is still

25     closed.  It's about 4:40 in the morning.  When

1    he gets there, when he does, he tries to

2    process as best he can.  He can't get inside.

3         What he does, he takes photographs of the

4    outside of the location on 39 and Third.  He

5    takes the Third Avenue view, he takes from the

6    39th view.  He takes it from across street.  He

7    takes measurements from inside.  While he's

8    there, he notices that sidewalk looks like it's

9    been washed.  It's actually fresh blood at the

10   corner of 39th and Third.  Drops of blood on

11   the corner.  He takes photographs of that.  He

12   takes samples.  How he takes samples, he'll

13   explain to you.  You get a Q-tip, he swabs the

14   area, he puts it all in a package, he wrapped

15   it up and he then sends that off for testing in

16   the DNA lab.

17        Now, in the meantime, Detective John

18   Darino from the 72 Precinct, he is assigned

19   this case.  And he too speaks with Marcus,

20   Jonathan and Carlos about what had transpired.

21   And in the course of speaking to them, they

22   learn about some other people and they want to

23   talk to people that were at the bar.  And in

24   the course of their investigation, they learn

25   that the defendant, his brother and two other

Opening - Chu

1    of his friends were at this location, and they

2    begin to look for the defendant.

3        What you will learn is that on

4    February 28, the next day, about one in the

5    morning, Detective James Gaynor, who's working

6    with the Detective Darino, goes to the

7    defendant's parents' house at 30 Bush Street

8    and he goes there.  When Detective Gaynor goes

9    there, he actually knows he has some

10   information regarding whatever the defendant's

11   clothing was at the time of this incident.

12   Camouflage jacket.  Hoodie sweatshirt.  He

13   knows what the description is.  So he gets into

14   the location because the defendant's mother

15   opens the door for him.  While he's inside, he

16   observed a pile of clothes, camouflage jacket,

17   in a pile inside the location.  And true, the

18   use of an interpreter, a detective, a Spanish

19   speaking detective, from the precinct, he is

20   able to communicate with the defendant's

21   mother.  And he recovers and vouchers that

22   clothing that he finds at 30 Bush Street.

23       Now, at about 4:20 that same morning,

24   February 28, 2005, Detective Darino, and his

25   team of investigators, find the defendant in

1     Queens.  And they bring him back to the 72

2     Precinct, and he put him in an interview room.

3         Now, once the defendant arrived back at

4     the precinct, you will learn he was brought

5     into the interview room and he was spoken to by

6     Detective Darino and Detective Gaynor, but

7     before they speak to him, they read what you

8     all know as Miranda rights.

9         After the defendant hears his Miranda

10    rights, he agrees to speak with them.  And what

11    he tells the detective is that he was at that

12    bar that night, and sometime while he was there

13    he and the victim kept staring at each other.

14    And sometime by the end of the night, he ends

15    up by the bar and Mr. Ojeda was still giving

16    him looks.  And asked the defendant what's up.

17    And the defendant says -- at that point he

18    says, what seems to be your problem, to the

19    victim.  And he said at that point, he terms

20    the phrase, he says, "the crowd rose."  And he

21    felt punches and grabbing, so he took out a

22    knife and he used it in self-defense.  And

23    after he made his statement, the detectives go,

24    all right, well, would you like to put that

25    down on paper?  So they give him a pen and

1    paper, and he writes down pretty much the same

2    thing that he had just told them orally.

3         Once he's done writing out this statement,

4    you'll learn that he was asked whether he

5    wanted to speak with the District Attorney's

6    office.  And he says, yes.  And so what happens

7    after that is around 10:30 in the morning that

8    same day.  February 28, 2005, an assistant

9    district attorney by the name of Jennifer

10   Sipress comes into the precinct and speaks to

11   the defendant.

12        It's common procedure in the District

13   Attorney's office that when you speak to a

14   defendant that it is recorded.  It is recorded,

15   video taped.  It's video taped.  And that is

16   what's done with the defendant.  And you'll

17   actually get to see that video tape of the

18   defendant.  And, again, he is read his rights

19   by ADA Jennifer Sipress, and what he says this

20   time is that while he's inside the bar now the

21   victim bumps him.  And when the victim bumps

22   him, they keep giving each other eyes, and when

23   the defendant goes up to the bar, he asks the

24   victim what is his problem and then he feels

25   someone hit him from his side.  And the victim

1        was still in front of him, so he says he then

2        takes his pocket knife out and he swings it

3        around and then he ran immediately out of the

4        location.  And he ditches the knife somewhere,

5        got into his car and he drove off.

6            Now, after this statement is done and

7        you'll get to see that statement, you'll learn

8        that the defendant was put in a line-up.  He

9        was put in line-ups.  And when he was put

10       line-ups, he was identified by Carlos Solomon,

11       as well as a bouncer at the bar that was there

12       as a patron that night.  As being the person

13       that they saw punching or pushing Edgar Ojeda

14       just prior to him realizing that he had been

15       stabbed.

16           Now, after Lutheran Medical Center was

17       unable to save Mr. Ojeda's life, his body was

18       then taken to the Medical Examiner's office

19       here in Kings County.  And there was an autopsy

20       that was conducted by a Dr. Frederic.  You're

21       going to hear from her as well.  What she found

22       upon her autopsy of Mr. Ojeda's body is that he

23       sustained three stab wounds to his body.  He

24       received one in the left, upper chest.  This

25       stab wound cut through the skin, goes between

1    the area of the ribs, cuts through a rib and

2    punctures his left lung.  The knife wound is

3    actually five inches deep, that means the knife

4    went in five inches.  In the process of going

5    in five inches into his body, it goes and

6    punctures his lung about one and a quarter

7    inch.  So that causes his lung to bleed.  There

8    were two other stab wounds to him.  On his

9    back, left.  Those two stab wounds, two and

10   three quarter inches low, and the other one is

11   two inches deep on the back.  And what she is

12   going to tell you is that all of those stab

13   wounds have what she called acute angle on

14   either side, which means that the object, or

15   the knife, was sharp on both ends.  They all

16   match having the same pattern.  And it's

17   clearly created by some sort of weapon.  It

18   could be a puncture by someone using that hand

19   to poke a hole into someone's body like that

20   (indicating).

21       Now, with those wounds, basically Ojeda

22   bled to death.  His lungs made out of blood,

23   and it just bleeds out and that is why they

24   were unable to save his life when he gets to

25   the hospital.

Opening - Chu

29a

1          Now, in the meantime, the clothing that

2     was found at 30 Bush Street, which the

3     defendant at a later proceeding admits that he

4     was wearing that night, gets sent to the

5     medical examiner's office, forensic biology

6     department, which is the DNA lab.

7          What happens is, there is a person by the

8     name of Linda Razzano, she is a criminis there,

9     she looks at this bleeding.  There is a jacket,

10    there is a hoodie, there are pants and there is

11    also a hat.  And what she finds that's on this

12    hat that was worn by the defendant that night,

13    there are two stains of blood.  Two stains of

14    blood on the front and on the back.  And she

15    tests that hat, and not only do they show blood

16    stains from the front and back of the

17    defendant's hat belong to Edgar Ojeda, but all

18    of the samples that were taken by Detective

19    Sullivan -- Detective Cunningham -- I am

20    sorry -- there was another detective that gets

21    there and gets to go inside, and he finds three

22    other samples of blood from that side exit

23    where Mr. Ojeda and his friend Carlos were

24    standing.  Three blood samples that gets there.

25    So that three blood samples, in addition to the

1   one Cunningham found outside on the street

2   corner, in addition to the two stains that are

3   on the defendant's hat belonged to Edgar Ojeda.

4        Now, you're going to hear from Mr. Ojeda's

5   friends.  You're going to hear from Marcus.

6   You're going to hear from Carlos.  You're going

7   to hear from Jonathan.  You're going hear from

8   the bouncer, whose name is Enrique Navarette,

9   who was present at the bar that night and saw

10  what happened.  You're going hear from the

11  police officers that responds.  You're going to

12  hear from Detective Darino, who takes

13  statements from the defendant, and you're going

14  to hear from the ADA, as well as the DNA

15  expert, and Dr. Frederic.

16       And after you hear all of the evidence in

17  this case, I am going to come back, and I am

18  going to speak with you like I am speaking with

19  you now.  I am going to show you how the

20  evidence in this case will have proven that the

21  defendant, Enrigue Rivera, is guilty of causing

22  the death of Edgar Ojeda on February 27, 2005.

23       Thank you.

24       THE COURT:  Dr. Dranove, do you wish to

25  make an opening statement?

1    MR. DRANOVE: I do, your Honor.

2    THE COURT: Then you may proceed when

3    you're ready.

4    MR. DRANOVE: Thank you.

5    MR. DRANOVE: Good morning: I am Joel

6    Dranove, I represent Mr. Rivera.

7    I listened, as did you, very carefully to

8    the opening statement, and I wish to give you

9    my opening statement telling you what else you

10   will hear that is critical. That you need to

11   understand that there was a rush, by Detective

12   Darino on his first homicide case, to arrest

13   someone real fast and he did. And the fact

14   that you will hear my client's statement is

15   totally inconsistent with the injuries. The

16   eyewitness observations are totally

17   inconsistent with the injury.

18   Those facts known to Detective Darino has

19   nothing to do with what he did. It was his

20   first case several years ago as a homicide

21   investigator. He was able to question my

22   client when he awoke from sleeping in the

23   middle of the night in a precinct at five in

24   the morning. In that precinct was my client's

25   brother, my client was -- well, a victim of --

1      you will find psychological manipulation by the

2      detective.  Whatever the detective said to my

3      client and my client said to the detective

4      before the video tape was never recorded.

5          And you'll hear there was a recording

6      device in the precinct.  It was not used.  They

7      chose not to record what they said to my

8      client.

9          You will hear that after my client made

10     his statement, his brother was released.  They

11     got -- do they get the right person?  Didn't

12     matter, Detective Darino wrote, "case closed"

13     that morning on his folder.  "Case closed."

14         You will hear that the detective was so

15     convincing that he convinced himself of certain

16     things that he knew were false and yet he put

17     them into police reports knowing they were

18     false.  And they're very important.  Because he

19     put them into the document that brought my

20     client into court.  The complaint.  He said he

21     was --

22         MS. CHU:  Objection.

23         THE COURT:  Overruled.

24         MR. DRANOVE:  That witnesses saw my client

25     strike Edgar Ojeda repeatedly about the chest

1   and the back with a closed fist.  That is not

2   true.  Noone saw my client strike Mr. Ojeda,

3   the victim, on this tragic incident on the

4   back.  Noone.  In fact, Mr. Solomon will say

5   this case is a few years old, we have some idea

6   people will say --

7        MS. CHU:  Objection, your Honor.

8        THE COURT:  Overruled.

9        MR. DRANOVE:  Punch with a closed fist one

10   time, his friend Mr. Ojeda and run away.

11   That's what Mr. Solomon will say.  And he will

12   say he ran after my client, and he got to the

13   door of the door, my client left and bouncer

14   prevented him from going after my client.  And

15   when he was there, the bouncer was preventing

16   him from going after my client, whatever was

17   going on behind him was going on.  There was

18   screaming, a commotion and it continued for a

19   long time.  Mr. Solomon never saw my client

20   with a knife in his hand.  He said what he saw.

21   Closed fist.

22        Now, this is an interesting bar because it

23   actually takes security seriously.  Whoever

24   went as a patron is searched.  You'll hear

25   testimony about that.  Careful search.  They

Opening - Dranove/Defense

340

1    don't have weapons.  But it's a bar.  This is a

2    bar.  Bar employees and knives.  You won't hear

3    from the bartenders.  I don't think the

4    prosecution is going to call any on-duty

5    bouncer.  I think Mr. Navarette was off duty

6    and just there that night.

7         Now, Mr. Solomon came back to his friend,

8    and at some time observed blood coming from

9    Mr. Ojeda.  There was a commotion, there was a

10   tremendous amount of commotion going on and my

11   client wasn't there.  Something was going on

12   between people, not including my client, and it

13   included stabbing the victim and his death.

14        Detective Darino also said that the

15   witness, the friends of Mr. Ojeda, saw him

16   bleeding from his chest and neck and back, not

17   true.  It's under oath.  That was true

18   according to the detective.  The detective also

19   said that --

20        MS. CHU:  Objection, your Honor.  This

21   is --

22        THE COURT:  Overruled.  That is what he

23   says the evidence will show.

24        MS. CHU:  That is not what he said.

25        THE COURT:  That is what he is saying the

1   evidence will show.

2       MR. DRANOVE:  Deponent states he further

3   informed by the defendant's own word that the

4   defendant pulled out a knife and swung the

5   knife at the victim.  My client never said he

6   swung a knife at the victim.  He never said

7   that.  He never said, I swung the knife at the

8   victim.  That is in the complaint signed by

9   Detective Darino immediately beneath the words

10  false statements made in this document are

11  punishable as a Class A misdemeanor, pursuant

12  to Section 210.45 of the Penal Law.  I believe

13  you'll find he made false statements.  I

14  believe you'll find they are punishable under

15  Penal Law.  I believe you'll find he wasn't

16  punished.  And then he was convinced this case

17  is closed and never went further.  And the

18  report he submitted and he signed, known as a

19  complaint follow-up.

20      He wrote on February 28, 2005, at

21  approximately 5:15, Enrigue Rivera, after being

22  advised of his rights, made an admission to

23  stabbing the victim in this case.  Mr. Rivera

24  never made an admission to stabbing anybody in

25  this case.  Now, that is a series of false

Opening - Dranove/Defense

360

1    statements by the detective in his zeal to

2    close the case.  He closed it.

3         You'll find also from the witnesses, the

4    prosecution mentioned Miss Razzano -- I mean

5    Mrs. Razzano in particular something very

6    interesting.  The DNA expert in an official

7    report requested permission to compare the DNA

8    found in the hat of somebody they will say is

9    my client, with the DNA of the second person

10   whose blood was found in and on the hat.  There

11   was DNA from two people in the blood spot on

12   the hat that's going to show up in the charts

13   that the witness will show you.  A second

14   person's blood is in the blood spot where

15   Mr. Ojeda's blood.  It's going to come out

16   during the trial.  It's going to come out

17   during the trial my client had no injuries.

18   This is an open question, four years old now,

19   whose blood is it?  The DNA expert said, get me

20   a sample.  Either the prosecution did or did

21   not.  We don't know.  And why not, I don't

22   know.  But the question is, who else was

23   bleeding there and why?  Was it someone with a

24   knife, his hand slid on the blade?  We'll never

25   know.  Was that somebody injured whoever blood

1   was injured in addition to Mr. Ojeda who passed

2   away.

3        The detective has, and you will see, had

4   an opportunity to talk to my client.  He sees

5   him.  My client's supposedly has made a

6   confession or a statement whatever enough for

7   the detective to close the case, and he asked

8   my client where is the knife?  Rather important

9   question.  My client says, I threw it away.

10  What did you do?  Where'd you throw it?  Nope.

11  Even the detective doesn't believe that's so.

12  He don't even ask him where is the knife.  But

13  the case was closed.  It's unfortunate it was

14  closed before the investigation was completed.

15  But by stating, case close, the investigation

16  was brought to a close.

17       Why was the bar cleaned up?  I don't think

18  anyone's going to testify to that.

19       In the bar there was a long period of a

20  five between persons unknown except but for

21  Carlos Solomon, one or two of his friends and

22  the at some time at the end of this, Mr. Ojeda

23  says, I am bleeding, get me to the hospital.

24  Mr. Ojeda doesn't say any one in particular,

25  guy in the camouflage, or the guy with the cap,

1    or the guy with the hoodie, nothing like that

2    is said by him. He just said, I'm bleeding.

3        My client also, on that Saturday night,

4    thought it was just another Saturday night.  He

5    went with one brother and some friends.  To a

6    local bar.  And his life was changed forever.

7    Many years ago, he plead not guilty.  I believe

8    you'll find that so.

9        Thank you very much.

10       *        *        *        *.

11       (The rest of this page is blank, followed

12   by the first witness' testimony, P.O.

13   Lopiccolo.)

14

15

16

17

18

19

20

21

22

23

24

25