SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:  CRIMINAL TERM: PT 35
----------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK

            IND.#1453/05

   - against -

ENRIQUE RIVERA,        Murder 2

        Defendant.  Trial

----------------------------------------x
      360 Adams Street
      Brooklyn, New York


      May 6, 2009


B E F O R E :  HONORABLE ALAN MARRUS, presiding


A P P E A R A N C E S :

FOR THE PEOPLE:  CHARLES HYNES, ESQ.
        District Attorney - Kings County
        210 Joralemon Street
        Brooklyn, New York
        BY:  PHYLLIS CHU, ESQ.
        Assistant District Attorney


FOR THE DEFT:   JOEL DRANOVE, ESQ.
        Brooklyn, New York


      MICHELE J. WALKER,
      SANDRA WILKES,
   OFFICIAL SENIOR COURT REPORTERS

Lopicollo - Direct

20

1              THE COURT:  Miss Chu, are you ready to

2        proceed with your case?

3              MS. CHU:  Yes, your Honor.

4              THE COURT:  You may call your first

5        witness.

6              MS. CHU:  People call Police Officer

7        Salvatore Lopicollo.

8        P. O.  S A L V A T O R E   L O P I C O L L O,

9   shield #1555, having been called as a witness,

10  having been duly sworn, testified as follows:

11             COURT CLERK:  State your name, please?

12             THE WITNESS:  Officer Salvatore Lopicollo.

13        Shield 1555, 72 Precinct.

14             COURT CLERK:  Shield number?

15             THE WITNESS:  15555, four fives.

16             THE COURT:  You may examine the witness,

17        Miss Chu.

18             MS. CHU:  Thank you.

19  DIRECT EXAMINATION

20  BY MS. CHU:

21        Q    Good morning, officer.

22        A    Good morning.

23        Q    How long have you been a member of the New

24  York City Police Department?

25        A    July 1st will be seven years.

Lopicollo - Direct                                    21

1       Q    How long you have been assigned to the 72
2    Precinct?
3       A    For the whole time that I've been out of
4    the academy.
5       Q    What capacity do you work for the 72
6    Precinct?
7       A    I am currently assigned to the Community
8    Policing Unit in the 72 Precinct.
9       Q    I want to direct your attention to
10   February 27, 2005.  Were you working on that date?
11      A    Yes, I was.
12      Q    Can you tell the members of the jury what
13   were the hours that you worked?
14      A    I started my tour about 11:15 in the
15   morning, which was -- it's midnight tour.  Little
16   bit before midnight, finish 7:50 a.m.
17      Q    On the 27?
18      A    On the 27.  Correct.
19      Q    Did you have a partner that day?
20      A    Yes, I did.
21      Q    Who was that?
22      A    Officer Woo.
23      Q    Were you assigned to a car, or were you on
24   foot?
25      A    I was assigned to a car.

Lopicollo - Direct

22

1      Q     Was the car marked or unmarked?

2      A     It was a marked car.

3      Q     And how about uniform, did you have

4    uniform --

5      A     Yes, had a uniform, yes.

6      Q     Now, I want to just ask you, were you

7    assigned to the Community Policing Unit at that

8    time?

9      A     At that time, I was assigned to patrol.

10     Q     Patrol.

11           What are your duties and responsibilities

12   as a patrol officer?

13     A     As patrol officer, we responded to various

14   jobs that would come over on video from

15   communication section.  A job would come over, we

16   respond to a scene and handle the job.  Throughout

17   the course of the tour.

18     Q     Now, I want to direct your attention

19   during the course of your tour of February 27, 2005;

20   did there come a time when you became involved in

21   the investigation into the death of a person by the

22   name of Edgar Ojeda?

23     A     Yes, there was.

24     Q     Can you tell us about what time you were

25   notified?

Lopicollo - Direct

23

1      A    I would say approximately 3:45 in the
2   morning.
3      Q    And where were you when you were actually
4   notified?
5      A    At the time notification, I was in the 72
6   Precinct stationhouse processing arrest.
7      Q    And did you have to go to a location?
8      A    I did.
9      Q    And where did you go?
10      A    39 Street and Third Avenue.
11      Q    And what is the location that's there?
12      A    The El Borinquen Bar.
13      Q    El Borinquen?
14      A    Yes.
15      Q    Was the establishment open or closed when
16   you arrived?
17      A    The establishment was closed when I
18   arrived.
19      Q    And was police personnel present when you
20   arrived at the location?
21      A    There was police personnel when I arrived,
22   yes.
23      Q    Do you recall who was there when you
24   arrived?
25      A    I believe it was Officer Garda.

Lopicollo - Direct

24

1    Q    Now, was a crime scene already
2  established?
3    A    Crime scenes were established, yes.
4    Q    What does it mean to have a crime scene
5  established?
6    A    That means the area of the incident was
7  roped off with crime scene tape.  There was set up
8  so no outside people would be able to contaminate
9  the scene.  It was blocked off.  There were police
10  personnel there.  Making sure nobody went in and out
11  the bar area or around the area that was under
12  investigation.
13    Q    When you said you arrived there, about
14  what time?
15    A    I would say approximately 3:50 in the
16  morning.
17    Q    And when you were there, how long did you
18  stay there?
19    A    I stayed there until approximately six
20  o'clock a.m.
21    Q    Now, during the course of your being at
22  the scene, did there come a time when crime scene
23  detective arrived?
24    A    Crime scene were when I got there, yes.
25    Q    Could you tell us what you observed them

Lopicollo - Direct

25

1    doing?

2        A    They were conducting their investigation.

3    They were observing the area.  They were looking for

4    evidence related to the incident.  They were taking

5    photographs.  They were locating samples,

6    fingerprints.  Blood samples.

7        Q    And can you tell me what -- you said you

8    left about six o'clock in the morning?

9        A    Correct.

10       Q    Did you -- was the crime scene detective

11   still there when you arrived when you left?

12       A    I don't recall if they were still there at

13   that time.  I don't believe so.

14       Q    And who was it that relieved you?

15       A    Officer Bao.

16       Q    Could you just tell us, did you go back to

17   the precinct?

18       A    I went to the precinct.

19       Q    Did there come a time when you received

20   any evidence from officer by the name of Acosta?

21       A    Yes, at approximately six o'clock a.m.

22   Officer Acosta handed me a bag of evidence.

23       Q    Where did he do that?

24       A    At the stationhouse.

25       Q    What did you do with it?

Lopicollo - Direct

26

1     A     I vouchered it.

2     Q     Ask you explain to the members of the jury

3     what does it mean to voucher evidence?

4     A     Vouchering property is systematic way that

5     the police do to safeguard and mark property,

6     whether safekeeping, whether it's for something that

7     will hold and we give back to you at another time

8     or, in this case, evidence that will be

9     systematically safeguarded and sent to the lab for

10    testing in the future whenever the evidence is

11    needed again.

12    Q     Now, is there an actual number that is

13    assigned to property when you voucher it?

14    A     Yes, there is.

15    Q     Is that number unique to that property?

16    A     It is unique to that person's property.

17    Q     Did you see Officer Acosta when you left

18    at six o'clock?

19    Q     Did I see Officer Acosta at the scene?  I

20    did.  Yes.

21    Q     Was he -- he did also relieve you when you

22    were there?

23    A     He did.

24    Q     Now, did it -- I am sorry.  Just tell us

25    what voucher number you assigned to what you were

Lopicollo - Direct                                      27

1   given by Officer Acosta?

2              THE WITNESS:  May I refer to my papers?

3              THE COURT:  You may.

4        A    M621112.

5        Q    And what were the items that were given to

6   you?

7        A    I vouchered one yellow packet with blood

8   specimen and additional yellow packet with blood

9   specimen.  Two blood specimens were vouchered.

10       Q    What did you do with those items?

11       A    I vouchered them, and they were sent to

12  the laboratory for further testing.

13       Q    Now, did you ever -- you said while you

14  were there, they established remained closed during

15  the time --

16       A    Yes.  Closed to the public, correct.

17             MS. CHU:  At this time, if I could have

18        this deemed marked People's number 1?

19             THE COURT:  Do you have any objection to

20        this exhibit?

21             MR. DRANOVE:  When it's offered in

22        evidence, I don't think I will.  I don't know

23        what it's been offered for.

24             THE COURT:  You may proceed.

25             MR. DRANOVE:  There was several pictures

1    on it.

2        Q    Officer Lopicollo, if you could just take

3    a look at what's been pre-marked in evidence.  I am

4    sorry, been marked in evidence for identification --

5        THE COURT:  I ask my court officer to

6        lower that because the jurors cannot see the

7        witness when you do that.

8        Thank you.

9        Go ahead.

10       Q    Officer, on the left-hand side of the

11   exhibit, do you recoginize that diagram?

12       A    I do.

13       Q    And what is that a diagram of?

14       A    That a diagram of the area where the

15   incident took place.  The El Borinquen Bar.  And

16   looks likes the street, 39 Street and Third Avenue.

17       Q    Does that diagram fairly and accurately

18   depict the layout of that intersection of 39th and

19   Third where you responded to on February 27th,

20   2005?

21       A    Yes, it does.

22       THE COURT:  You can put the board down.

23       Q    Officer, if you just look at the

24   photographs that are running along the right side of

25   the exhibit.  Do you recognize what those are

Lopicollo - Direct

29

1   photographs of?

2       A   I do.

3       Q   And what are they photographs of?

4       A   That is the bar where the incident took

5   place.  That is the corner -- that is the corner

6   where I was in the car securing the crime scene.

7   The blood stain that was being secured at the crime

8   scene, and the third picture is the bar facing Third

9   Avenue going towards Manhattan.  From the Third

10  Avenue side.

11      Q   On the bottom?

12      A   That is third picture here.

13      Q   Now, do all those photographs that are in

14  People's number 1 fairly and accurately represent

15  how that area of El Borinquen appeared when you were

16  there on February 27?

17      A   That is how it appeared that night, yes.

18          MS. CHU:  At this time, I would offer into

19      evidence as People's 1.  If we can have the

20      pictures A, B, C, D, E.

21          THE COURT:  Any objection?

22          MR. DRANOVE:  May I just ask some

23      questions so I get oriented as to what is

24      north, what is south, east, west?  That is all.

25      Unless it's on there.  I didn't see it.

1              I can ask that later, no objection.

2              THE COURT:  Okay.  People's 1 will be

3          received in evidence.

4              Please post it.

5              There is a north arrow on the diagram.

6                              (Whereupon, the above-mentioned

7                              item was received and marked as

8                              People's 1, 1A, 1B, 1C, 1D, 1E,

9                              in evidence.)

10         Q    Officer --

11             MS. CHU:  May he approach the exhibits?

12             THE COURT:  Certainly.

13         Q    Step down and just state to the -- right

14     there.  If you could just show us on the diagram

15     where El Borinquen Bar is on the diagram?

16         A    On the diagram?

17         Q    Yes.

18         A    This would be (indicating) --

19         Q    Is it marked El Borinquen Bar?

20         A    It is.

21         Q    If you can show us where -- what the cross

22     streets are that are depicted in that diagram?

23         A    Third Avenue.  Run north and south.  And

24     39 Street, running east and west (indicating).

25         Q    I am going to direct your attention to the

Lopicollo - Direct

31

1  top photograph. What is that a picture of?

2      A     That is a picture of the bar if you're

3  standing on 39 Street. This is 39 Street going east

4  and west (indicating).

5      Q     Going across the picture?

6      A     Going across the picture.

7      Q     What about the second picture, B?

8      A     This is 39 Street. This is 39 Street as

9  well. (Indicating) This is -- you're talking about

10 this picture?

11     Q     Yes.

12     A     This is 39 Street. This is the front.

13 This is the front of the El Borinquen. If you're

14 parked in this car, you're facing eastward, going

15 east on 39 Street. (Indicating)

16         MS. CHU: Let the record reflect that when

17     he pointed to the bar, he was referring to the

18     left-hand portion of the B picture. In

19     People's number 1.

20     Q     If you were taking that photograph in

21 People's B, would you be on 39 Street?

22     A     If I was taking this photograph here

23 (indicating)?

24     Q     Yes. Would you be standing on --

25     A     I would be standing on 39 Street.

Lopicollo - Direct

32

1    Q    That would be Third Avenue?

2    A    That would be Third Avenue in the

3    background, yes.

4    Q    Taking a look at the next photograph,

5    photograph C; what is that a picture of?

6    A    That is the corner of 39 Street and Third

7    Avenue.  This would be the intersection of 39 Street

8    and Third Avenue where I had my vehicle on this

9    corner.  Facing Manhattan northbound.  Going north.

10   (Indicating)

11   Q    That structure that's in the picture, see

12   that maroon -- is that El Borinquen?

13   A    That is El Borinquen Bar, yes.

14   Q    Taking a look at the next photograph.

15   Photograph D, what is that a picture of?

16   A    That looks like blood samples on the

17   concrete, on the cement.

18   Q    Is that a closeup of anything on any of

19   the other photographs?

20   A    I'm sorry, excuse me?

21        MS. CHU:  Your Honor, may I approach the

22        exhibit?

23   A    You're talking about this (indicating) --

24   Q    Yes.

25        THE COURT:  You can approach.

Lopicollo - Direct

33

1      Q      I just want to direct your attention to

2    photograph C.  On the bottom portion there.

3    (Indicating)

4      A      Yes, it appears to be the same blood that

5    you see.

6      Q      So that is just a closeup version of what

7    is in C?

8      A      That is.

9      Q      Picture number E, if you could just let us

10   know what is that a picture of?

11     A      Picture number E appears to be Third

12   Avenue going northbound, and that is the side of the

13   El Borinquen bar.

14     Q      So, if you could use your finger and point

15   where the bar is?

16     A      The bar is here (indicating).

17            MS. CHU:  Let the record reflect he is

18         pointing to the right-hand side of the

19         photograph of E.  In People's 1.

20            MS. CHU:  Thank you very much, Officer.

21         You can have a seat.

22            (pause)

23            MS. CHU:  I have nothing further.

24            THE COURT:  Cross-examination, Mr.

25         Dranove?

Bao - Direct

1          MR. DRANOVE:  No questions, your Honor.

2          THE COURT:  Thank you very much, Officer.

3      You may step down.

4          (WITNESS EXCUSED)

5          MR. DRANOVE:  May we approach sidebar for

6      application?

7          THE COURT:  Okay.

8          Call your next witness.

9          MS. CHU:  People call Police Officer Chi

10     Shing Bao.

11         THE COURT:  Okay, you can approach.

12     P. O.  C H I  S H I N G  B A O, shield #14592,

13     having been called as a witness, having been duly

14     sworn, testified as follows:

15         COURT CLERK:  State your name, please?

16         THE WITNESS:  Officer Bao, for the 72.

17         COURT CLERK:  First name?

18         THE WITNESS:  Chi Shing.

19         COURT CLERK:  Shield number?

20         THE WITNESS:  14592.

21         COURT CLERK:  What is your precinct?

22         THE WITNESS:  72.

23         THE COURT:  You are may examine the

24     witness, Miss Chu.

25         MS. CHU:  Thank you.

1    DIRECT EXAMINATION

2    BY MS. CHU:

3        Q    Officer, by whom are you employed?

4        A    NYPD.

5        Q    Is that New York City Police Department?

6        A    Yes, ma'am.

7        Q    How long have you worked for them?

8        A    Seven years.

9        Q    And you said you're currently assigned to

10   the 72 Precinct?

11       A    Yes, ma'am.

12       Q    Are you a patrol officer there?

13       A    Yes.

14       Q    I want to direct your attention to

15   February 27th, 2005.  Were you working as a police

16   officer for the 72 Precinct on that date?

17       A    Yes, ma'am.

18       Q    And were you -- I am sorry.  What were

19   your hours that day?

20       A    7:05 in the morning.  And 3:40 in the

21   afternoon.

22       Q    So seven in the morning to 3:40 in the

23   afternoon?

24       A    Yes.

25       Q    And were you assigned to a partner that

Bao - Direct

1  day?

2        A    No.

3        Q    Were you assigned to a car?

4        A    No.

5        Q    You were on foot?

6        A    Yes, ma'am.

7        Q    Did you have a uniform on?

8        A    Yes.

9        Q    I want to ask you, did there come a time

10  at about 7:35 that morning on February 27, 2005 that

11  you became involved in an investigation of the --

12  into the death of Edgar Ojeda at 39 and Third?

13        A    Yes, ma'am.

14        Q    And how is it that you became involved in

15  the investigation?

16        A    Cause they sent me out to the crime scene

17  to secure the crime scene.

18        Q    To secure the scene?

19        A    Yes.

20        Q    When you arrived at the scene, was there

21  other police officers there?

22        A    Yes, ma'am.

23        Q    And who was that you relieved?

24        A    Officer Acosta.

25        Q    Officer Acosta?

1      A    Yes.

2      Q    Now, was there crime scene tape up at the

3   location?

4      A    Yes, ma'am.

5      Q    And can you tell me what was located right

6   there at that corner?

7      A    39 Street and Third avenue.

8      Q    Is there -- that's -- that was the

9   establishment that's there.  Is it a bar?

10     A    A bar -- bar restaurant.

11     Q    Bar restaurant.

12         And was this bar restaurant open when you

13   arrived there?

14     A    Yes, ma'am.

15     Q    You know whether or not crime scene

16   detectives were there when you arrived at 7:35 in

17   the morning?

18     A    Yes, ma'am.  They were there.

19     Q    They were already there?

20     A    Yes.

21     Q    Were they inside the location?

22     A    There were inside the location.

23     Q    Did you ever go inside the location?

24     A    No.

25     Q    You remained outside?

Bao - Direct

38

1     A     I remained outside, yes.

2     Q     Did there come a time when the detective

3   from crime scene that were inside the location came

4   out and gave you anything?

5     A     Yes.

6     Q     And what did they give you?

7     A     They give me two items.

8     Q     What did they give you?

9     A     Can I look at my memo book?

10         THE COURT:   You may.

11    A     Blood samples and empty bottles.

12    Q     An empty bottle?

13         MR. DRANOVE:   Bottle or bottles?

14         THE COURT:   He said "bottles", plural.

15         One bottle or more?

16         THE WITNESS:   One.

17    Q     How was that item package; do you

18   remember?

19    A     Inside a brown bag.

20    Q     Brown bag?

21    A     Yes.

22    Q     Did you give -- I am sorry.   What were you

23   suppose to do with these items?

24    A     To voucher it?

25    Q     Did you voucher those items?

Bao - Direct

39

1      A    Yes, ma'am.

2      Q    Do you recall what voucher number that you

3   assigned to the blood samples that you received from

4   the detective?

5      A    Yes, ma'am.

6      Q    What were the -- what was the voucher

7   number?

8      A    M -- like Mary -- 621117.

9      Q    And what about the empty bottle that you

10  received?

11     A    It's M -- like Mary -- 621116.

12     Q    After you vouchered these items, what did

13  you do with them?

14     A    I send to the lab.  For the examination.

15     Q    Other than the duties and responsibilities

16  that you just described, did you have any further

17  involvment in this case?

18     A    No.

19          MS. CHU:  Thank you very much.  I have

20      nothing further.

21          MR. DRANOVE:  No questions.

22          THE COURT:  Thank you, Officer Bao.

23      You're excused.  You may step down from the

24      witness stand.

25          THE WITNESS:  Thank you.

Bao - Direct

40

1           (WITNESS EXCUSED)

2               THE COURT: We will take a short recess,

3           and then we will resume with testimony.

4               Please take charge of the jurors.

5               Don't discuss the case during the break.

6               THE COURT: Mr. Dranove has an application

7           that he wished to make. He originally asked to

8           approach and make it at sidebar. I indicated

9           that he could make it at the first available

10          recess.

11              You may make your application.

12              MR. DRANOVE: If your Honor, factual

13          basis, is that approximately 11:30 in the

14          morning I turned around and noticed a court --

15          whatever the title is -- an attorney for a

16          judge, in fact, the attorney for the judge at

17          the first trial -- the lawyer being Mr. Quinn,

18          I believe, Kevin Quinn, in the audience sitting

19          with the victim's mother. I just think it's

20          absolutely improper. It's the equivalent, in

21          my opinion, of an advocate. I am talking as a

22          human being. It's equivalent to the judge

23          sitting there, and it just sends a message of

24          support for a certain side in the case. I

25          believe -- it's incumbent upon me to ask for a

Application/Dranove

1    mistrial under these circumstances.

2         I would note, the gentleman left at 11:42

3    in the morning at the 1 of Officer Bao's

4    testimony, and I noticed him 11:30 in the

5    morning.  I do not know who was testifying at

6    that time.

7         I have no idea what his intention was.  He

8    certainly could have spoken outside of this

9    courtroom with the victim's mother.  But he

10   chose to sit next to her for a period of time

11   unavoidable to your Honor that he was sitting

12   with the victim's mother.

13        THE COURT:  Well, I am going to deny the

14   motion for a mistrial.

15        First of all, it's a public courtroom,

16   anyone can come in.  Anyone can sit next to

17   anybody else that they want to.  I have no

18   control over the seating arrangements.  Only

19   rules we have is the first row of the courtroom

20   is reserved for police officer and whatever.  I

21   don't know why I declare a mistrial for that.

22   He's a court attorney.  The jurors certainly

23   wouldn't know who he was.  I didn't even

24   realize that he had any connection to this case

25   when you talked about it.  It certainly doesn't

Application/Dranove

1     have an impact on me.  So I am denying the

2     motion for a mistrial.

3          MS. CHU:  I just wanted to put something

4     else on the record.

5          During defense counsel's opening statement

6     to the jury, he made reference, several times,

7     to the fact that this is now 2009 and obviously

8     this happened in 2005.  I merely just stated

9     the date.  I didn't make a discrepancy or

10    highlight at all the difference in time between

11    when the incident occurred and when we are

12    actually trying it now.

13         I believe that in light of statements that

14    were made by defense counsel during his opening

15    that it would be appropriate for your Honor to

16    perhaps give an instruction to the jury that

17    they are not speculate as to why there is a

18    difference.  Because, I mean, I certainly

19    didn't highlight, he definitely did, in his

20    opening, many times to the jury, and I think it

21    kind of leaves a question in their mind as to

22    why it is that we are now in 2009 when this

23    incident occurred in 2005.

24         THE COURT:  In any case, quite often in

25    homicide cases, there's a lengthy period of

Application/Dranove

43

1      time between when the crime occurs or someone's

2      arrested and when the trial occurs.

3      But in this case, I will consider giving

4      such an instruction in my final instructions.

5      If you want me to make that application at

6      this time, I don't think now is the time to

7      give any instructions regarding that issue.

8      MS. CHU: I will be out --

9      MR. DRANOVE: Miss Chu's request raises,

10     in my mind, a question to your Honor. How will

11     the read back of testimony be introduced with

12     respect to when the testimony is given?

13     It does happen at a certain period of time

14     in a prior proceeding. Maybe just refer to a

15     prior proceeding, answer Miss Chu's concern.

16     THE COURT: There will be no reference

17     what happened at the first trial, as a prior

18     proceeding. That is the way we are going to

19     leave it.

20     MS. CHU: I will -- if The Court wishes, I

21     won't refer to a date at all. I was going to

22     refer to date.

23     THE COURT: I think you need to refer to a

24     date when the statement is made. So the jury

25     will know when these statements were made.

Cunningham - Direct

44

1          MS. CHU:   That is what I originally

2     planned.

3          THE COURT:   At a prior proceeding on that

4     date.

5          Keep this as short as possible.

6                    (Whereupon, there was a short

7                    recess at this time.)

8          THE COURT:   Ready for the jury?

9          COURT OFFICER:   Jury entering.

10         COURT CLERK:   Both says waive role call?

11         MS. CHU:   So waived.

12         MR. DRANOVE:   So waived.

13         THE COURT:   Call your next witness.

14         MS. CHU:   People call Detective Michael

15    Cunningham.

16    D E T E C T I V E   M I C H A E L   C U N N I N G

17    H A M, shield #5035 having been called as a witness,

18    having been duly sworn, testified as follows:

19         COURT CLERK:   State your name, please?

20         THE WITNESS:   Detective Michael

21    Cunningham.

22         COURT CLERK:   Shield number?

23         THE WITNESS:   5035.

24         COURT CLERK:   And your command?

25         THE WITNESS:   Crime Scene Unit.

Cunningham - Direct

45

1   DIRECT EXAMINATION

2   BY MS. CHU:

3       Q    Good afternoon, Detective.

4            How long have you been a member of the New

5   York City Police Department?

6       A    About 23 years.

7       Q    And where are you currently assigned?

8       A    To the Crime Scene Unit.

9       Q    How long have you been assigned to the

10  Crime Scene Unit?

11      A    About nine years.

12      Q    Can you tell us about your career with the

13  NYPD beginning when you were in the Academy?

14      A    Graduated from the Academy in 1986.  I was

15  assigned to a foot patrol unit in midtown Manhattan.

16  Times square area.

17           About a year later, I was assigned to the

18  84 Precinct in Brooklyn.  Which is this area.  And

19  later on in the 84 Precinct, I was assigned to the

20  latent fingerprint office.  And I was responsible

21  for responding to burglary and robbery scenes to

22  process latent prints.

23           And about 12 or 13 years ago, I was

24  reassigned to the Brooklyn North Evidence Collection

25  Team, Controlled Base Unit that responds to crime

Cunningham - Direct

46

1    scenes to collect evidence.

2         And then about nine years ago I was

3    assigned to the Crime Scene Unit.

4    Q    Did you receive any special training to

5    become a member of the Crime Scene Unit or that

6    Evidence Collection Team that you belonged to?

7    A    Yes, I did.

8    Q    And what was that?

9    A    I attended training offered by the police

10   department fingerprints recovery, photography crime

11   scene documentation. Recognition and collection of

12   evidence. Recognition and collection of DNA. Crime

13   scene investigation course.

14   Q    Now, what are your duties and

15   responsibilities as a member of the Crime Scene

16   Unit?

17   A    Responsible to respond to scenes. Or

18   incidents that occurred to process scene or

19   evidence. Search for evidence. Document the scene.

20   Typically use photographs, notes and sketches.

21   Collect evidence. Forward the evidence to the

22   proper laboratories for analysis.

23   Q    Now, I went to direct your attention to

24   February 27th of 2005. Were you working as a

25   detective at the Crime Scene Unit on that date?

Cunningham - Direct

47

1      A    Yes, I was.

2      Q    And were you assigned to a partner that
3   day?

4      A    Yes.

5      Q    And who was that?

6      A    Detective Joseph Bello.  B-E-L-L-O.

7      Q    What were the hours that you worked that
8   day?

9      A    I worked from 10:00 p.m. in the evening
10   before until eight o'clock in the morning.

11      Q    And did there come a time during that time
12   that you were working when you became involved in
13   the investigation into the death of a person by the
14   name Edgar Ojeda?

15      A    Yes.

16      Q    And can you tell us where you responded
17   to?

18      A    I responded to a scene on Third Avenue in
19   the confines of the 72 Precinct in Brooklyn.

20      Q    And can you tell me about what time did
21   you arrive at that location?

22      A    I arrived at the scene, I believe it was a
23   little before 5 a.m.

24      Q    And what time were you guys notified to go
25   to the scene?

48

1       A    I received a notification from the Crime

2   Scene Unit dispatcher, who takes some requests by

3   telephone, probably somewhere around four o'clock in

4   the morning.

5       Q    Now, when you arrived at the location, was

6   police -- was a crime scene established?

7       A    Yes, there was.

8       Q    And was police officer personnel present

9   when you arrived?

10      A    Yes.

11      Q    Can you describe that area 39 and Third

12  for us?

13      A    Third Avenue is a major thoroughfare.  The

14  Gowanus Expressway elevated and runs north and south

15  over Third Avenue.  It's commercial area.  It's

16  storefronts and businesses.  And on the corner where

17  the crime scene was established was a sports bar.

18      Q    Was the sports bar opened when you arrived

19  there?

20      A    No.  It wasn't.  It was locked up.

21      Q    And what did you do, and what did you

22  observe when you were there?

23      A    It was one police officer there.  He was

24  in a marked car.  And there was yellow crime scene

25  tape right there on the outside of the sports bar.

Cunningham - Direct                                    49

1    So I spoke to the police officer and collected some

2    information.  Name.  Some basic information about

3    what had occurred there.  And I did a walk through

4    of the seen.  Then I observed there some blood on

5    the sidewalk that appeared to have originated near

6    the front entranceway to the sports lounge.  And

7    travel across the sidewalk towards Third Avenue.  I

8    also saw some water -- very cold morning -- look

9    like somebody tried to wash the sidewalk near the

10   fronts entranceway, but the water froze on to the

11   sidewalk.

12        Q    Can you tell me where was the front

13   entrance to this location, the sports bar?

14        A    It was on the side street from Third

15   Avenue.

16        Q    39th Street side?

17        A    Yes.

18        Q    And can you tell me, you said you observed

19   some blood trail coming from the front entrance,

20   going towards the corner?

21        A    Yes.

22        Q    Did you photograph the scene?

23        A    Yes, I did.

24        Q    And can you also do a sketch of what you

25   observed while you were there at that corner?

1       A    Yes, I did.

2       Q    What did you do with the blood that you

3   seen at the corner of 39 and Third?

4       A    I collected sample of blood using a

5   sterile swob.  I packaged it and sealed it, I gave

6   it to the police officer that was there so he could

7   invoiced and forwarded to the lab for DNA testing.

8       Q    Do you remember which officer it was that

9   you gave it --

10      A    I don't recall his name offhand, but I

11  have it in my notes.

12           MS. CHU:  Your Honor, may the witness

13      refer to his notes?

14           THE COURT:  Certainly.

15      A    I gave the blood sample to Police Officer

16  Acosta from the 72 Precinct.

17      Q    What was your purpose for giving it to

18  Police Officer Acosta?

19      A    I gave it to him with some worksheets that

20  I prepared so he can invoice it at the precinct and

21  prepare laboratory requests to be forwarded to the

22  medical examiner's DNA lab for testing.

23      Q    When you say invoices, that another word

24  for vouchering it?

25      A    Yes.

Cunningham - Direct

51

1      Q    How long were you at the location of 39
2   and Third?

3      A    Probably less than two hours.

4      Q    Was the establishment still closed when
5   you left that location?

6      A    Yes.  We waited for a period of time to
7   try to wait for somebody to come with a key to give
8   us access.  When that didn't happen, after a while
9   while, we went back to the office and left
10   instructions.

11      Q    I am sorry.

12      A    Left instructions to call the Crime Scene
13   Unit when we could have access to the sports bar.

14      Q    When you left the location, was -- were
15   police still safeguarding it?

16      A    Yes.

17      Q    Now, can you tell me, were you aware
18   whether anybody else in your unit was dispatched to
19   process the inside of that location?

20      A    Yes.

21      Q    And who was it that was assigned?

22      A    Detective James O'Sullivan.

23      Q    And where is Detective James O'Sullivan
24   now?

25      A    He's retired.

1     Q    In the last few weeks, did you make

2  attempts to reach out to Detective O'Sullivan?

3     A    Yes, I did.

4     Q    What were the results of your attempts?

5     A    I wasn't able to contact him.  He was not

6  residing at his residence anymore.

7          MS. CHU:  Now, at this time, your Honor,

8      if I can have People's 1 posted for the

9      witness?

10         THE COURT:  Certainly.

11    Q    Detective O'Sullivan -- Detective

12 Cunningham, referring to the left side of People's

13 1, the diagram there; who created that diagram?

14    A    I did.

15    Q    And when did you create it?

16    A    In the days following the incident at the

17 crime scene office.

18    Q    Does that diagram fairly and accurately

19 depict the scene as you processed it and as you

20 prepared it on February 27th, 2005?

21    A    Yes, it does.

22    Q    What about -- I am sorry.  Just with

23 regard to the diagram itself.  Are you familiar with

24 the term to be to scale?

25    A    Yes.

Cunningham - Direct

53

1    Q    Is this diagram to scale?

2    A    No.  This diagram was prepared for

3    illustration, not to draw the scale up.

4    Q    What does it mean to be to scale?

5    A    If drawn to scale, everything depicted in

6    the diagram would be relative to it's true size.  So

7    the measurements would all have to coincide, would

8    be the true measurements at the scene.  There would

9    be some scale, one inch may equal 25 feet in real

10   life.

11   Q    And this diagram is not to scale?

12   A    No.

13   Q    Now, the photograph that run along the

14   right-hand side of People's number 1, that's labeled

15   A, B, C, D, E.  Who took those photographs?

16   A    I took those photographs.

17   Q    When did you take them?

18   A    I took them when I was at the scene that

19   day.

20   Q    If you would, taking this red marker,

21   would you please indicate each -- what each of the

22   photographs, where you were standing when you took

23   those photographs and what your view was?

24           THE WITNESS:  Approach the sketch, please?

25           THE COURT:  Certainly.

Cunningham - Direct

54

1          A     Photograph A, want me to draw on the
2     sketch where I was standing?
3          Q     Yes, please.
4          A     Photograph A, I was standing at this
5     location, facing this way.  Photograph B, I was
6     standing right here, facing this way.  Photograph C,
7     I was standing in this area, facing this way.
8     Photograph D, I was facing the samples on the
9     sidewalk.  And photograph E, I was standing down
10    here, sidewalk, facing that way. (Indicating)
11         Q     Now, on your diagram, you actually have a
12    directional north, facing north going towards the
13    top of the diagram?
14         A     Yes.
15         Q     That would be going towards like downtown
16    Brooklyn, into the Manhattan?
17         A     Yes.
18              MS. CHU:  Your Honor, if I can have one
19         moment?
20              You can have a seat, Detective.
21              THE COURT:  Yes.
22              MS. CHU:  Thank you very much.  I have
23         nothing further.
24              THE COURT:  Cross-examination?
25              MR. DRANOVE:  No, sir.

1          THE COURT:  Thank you.

2          Detective Cunningham, you're excused.  You

3     may step down from the witness stand.

4          THE WITNESS:  Thank you.

5          (WITNESS EXCUSED)

6          THE COURT:  I am going to recess the trial

7     for lunch.  We are going to resume at 2:15.

8          Have a nice lunch break.

9          Don't discuss the case.

10          I want to see you back here at that time.

11          Take charge of the jury, please?

12          (Jury Excused)

13          THE COURT:  I ask those here at the trial

14     to remain in the courtroom until the jurors are

15     in the elevator and out.  That's the procedure

16     I'd like to follow for the rest of the trial so

17     you don't get mixed up with the jurors.

18          The court officer will tell you when it's

19     okay to leave.  Thanks for your patience.

20          2:15.  Have a nice lunch.

21                    (Whereupon, there was a luncheon

22                    recess at this time.)

23          (Whereupon, Michele Walker was relieved by

24     Sandy Wilkes as Official Senior Court Reporter

25     for the afternoon session.)

56

COLLOQUY

1        A F T E R N O O N   S E S S I O N

2            THE COURT:  Before we bring the jury out, I

3    just want to resolve a couple of things on the record.

4            The first is the district attorney made a

5    application to read back some prior testimony that the

6    defendant gave at the first trial, and I asked the

7    defense if there was any objection to it and the

8    defense furnished me with a letter outlining a request

9    that some additional portion of the testimony be read

10   back and also objecting to the last two lines of the

11   read back.  I took a look at the transcript and I'm

12   going to grant the defense's application to read back

13   the additional lines that were requested by the defense

14   from the proposed testimony by the DA, but I'm denying

15   the application to redact the last two lines of the

16   defendant's account.  So that's my ruling.

17           This can be read back by the district

18   attorney at the point in time that the People wish to

19   during the trial.

20           MR. DRANOVE:  Well, may I elaborate on this

21   record why I asked for the redaction of lines you're

22   not ordering to be redacted?

23           THE COURT:  You could put your reason on the

24   record.  I mean, you sent me a letter about it.

25           MR. DRANOVE:  Right.  Basically my client

SW

COLLOQUY

1      testified after there was courtroom testimony from an

2      expert witness that the victim's blood was on the cap.

3      My client is not an expert.  My client had already

4      testified at the trial he left and he didn't stab the

5      fellow.  So I think this is taking my client's adoption

6      of the prosecution witness's conclusion and making it

7      seem as if my client affirmatively knew it and was

8      present when the fellow was stabbed which he's denying.

9      I think it opens up a pandora's box and I'm going to

10     designate that my client's testimony that he didn't

11     stab him, in order to undo, you know, an inference, the

12     jury would improperly draw from those records.  My

13     client said in response to Ms. Chu, in response to the

14     words that were testified that the blood belonged to

15     the victim.

16              THE COURT:  I don't know what your client's

17     thought process was when he answered that question.

18     You're apparently inferring that's the reason why he

19     gave that answer.

20              MR. DRANOVE:  Yeah, that's right.

21              THE COURT:  There's going to be testimony at

22     this trial regarding that DNA analysis, so it's going

23     to come out at this trial the same thing as the last

24     trial.  The jury wasn't told at that trial that was the

25     reason why he gave that answer, so his testimony would

SW

COLLOQUY

58

1    be the same.

2        MR. DRANOVE: Judge, the jury at the other

3    trial had already heard that the victim's blood was on

4    the cap. Here they have not heard that yet. With this

5    being read in at this time could be led to infer

6    directly that my client was present when blood got onto

7    that cap.

8        THE COURT: A simple answer. Then I'll

9    direct the district attorney not to read back this

10   exhibit until after the DNA evidence has been brought

11   to the attention of the jury. That will eliminate the

12   sequential issue you're concerned about.

13       MR. DRANOVE: And it also somehow formulates

14   some notice at a prior proceeding this DNA testimony

15   had already been presented in that case before my

16   client uttered those words.

17       MS. CHU: I'm going to object to that, your

18   Honor.

19       THE COURT: I don't know how I can tell the

20   jury that, to explain that. That's something that I

21   really can't explain.

22       MR. DRANOVE: Judge, I think the purpose of

23   this testimony having been read in was for my client to

24   identify the clothing. That was done before his saying

25   that blood on there belonged to the victim. We're

SW

1    taking it to a different evidentiary point on the sly,

2    but very directly.

3            THE COURT: He's accepted the fact it's the

4    blood of the victim. He's accepted.

5            MR. DRANOVE: He heard the testimony. This

6    jury is going to think otherwise unless he testifies.

7    You're putting an impermissible burden on us to explain

8    why in that proceeding he would say the victim's blood

9    is on that cap unless the jury here knows there has

10   been testimony about that before hand.

11           THE COURT: I'm not putting any burden on

12   anyone to do anything.

13           MR. DRANOVE: I disagree.

14           THE COURT: It wasn't objected to at the time

15   he gave that answer. And in terms of the sequence,

16   you're saying that's the reason why he gave it. I

17   don't know what the reason is why he gave that answer.

18   All I know, that was the question, that was the answer.

19   And I believe the People should be allowed to read the

20   transcript. When the summations are given, whatever

21   argument you want to make about this, you're free to

22   make. I'm not inferring any rationale as to why he

23   gave that answer, and I'm eliminating the sequential

24   issue that you're talking about which will be that this

25   testimony would be read back after the DNA evidence has

SW

COLLOQUY

60

1    been read back.

2              MR. DRANOVE:  But they would have no, no --

3    in order to do that, this testimony that's read back

4    was given in another proceeding, the DNA testimony

5    reading --

6              THE COURT:  I don't agree.  He may have known

7    before the trial, before the DNA report was given to

8    him.

9              MR. DRANOVE:  Let the jury know that in the

10   prior proceeding the testimony in front of my client

11   was the victim's blood on that cap, and that's the

12   testimony in open court that took place before my

13   client testified.  Otherwise, the jury is going to

14   speculate.

15             THE COURT:  I'm not going to inject that into

16   the trial as to that issue.  You have your exception.

17             MR. DRANOVE:  All right.

18             MS. CHU:  Just to clarify, your Honor, the

19   Court, you're saying what you're granting to him is

20   page 524, lines --

21             THE COURT:  Nine through 24.

22             MS. CHU:  Just wanted to put it on.

23             THE COURT:  You have an application regarding

24   the medical examiner's testimony?

25             MS. CHU:  Yes, your Honor.  I intend to put

SW

1    into evidence the autopsy report that was done for

2    Mr. Ojeda. And contained within the autopsy report is

3    a page, supplemental case information page that was

4    prepared by MLI Jude Anglade. In that report there's

5    reference in that the MLI says as per Dr. Prokura(ph)

6    the decedent was brought to the emergency room and I

7    seek to redact that as hearsay. It's double hearsay.

8    The MLI testified he learned it from the doctor who

9    learned it from friends.

10          In addition to that, there were questions

11   that were proceeded by defense counsel I believe during

12   the last trial having to do with information that was

13   contained in there. I guess I could address that at

14   the time, but I would like to redact that from the

15   autopsy report before my next witness.

16          MR. DRANOVE: Judge, this doctor had a duty

17   to report this. Dr. Prokura and another doctor signed

18   off on the report. And what Ms. Chu is trying to do --

19   you didn't preside at the last trial so let me help.

20   At the last trial I asked the medical examiner

21   referencing this report some questions, and her answers

22   were --

23          MS. CHU: What page are you on?

24          MR. DRANOVE: I'm on page 468.

25          "Do you agree that the result in your files

SW

62

COLLOQUY

1  says the decedent was taken to the hospital after he

2  had been on the ground for more than 20 minutes?

3          "ANSWER:  It is correct, yes.

4          "QUESTION:  Now, based upon your experience,

5  if this report is true, would this gentleman have been

6  lying on the ground long enough to have bled to death?

7          "ANSWER:  He was bleeding profusely.  I don't

8  have any way of saying if they did bring him to the

9  hospital earlier that they should have saved his life.

10 I don't know.  But obviously for 20 minutes he was

11 bleeding."

12         Now, it was noted a fatal wound that killed

13 this man.  So he was bleeding for a substantial period

14 of time.  The doctor concluded obviously he was

15 bleeding, obviously for 20 minutes he was bleeding.

16         Based upon her professional experience and

17 the records before her, the records of people that have

18 a duty to report, I think this is permissible and I

19 think to take out of this report a very significant

20 medical examiner report upon which a medical examiner

21 did in fact base an opinion, and upon which I wish to

22 question the medical examiner is again taking away the

23 chance to confront the witness and let the jury hear

24 the evidence that they're entitled to hear from the

25 medical examiner.

SW

63

COLLOQUY

1      THE COURT: As far as I can tell, the cause

2   of death is not an issue at this trial --

3      MR. DRANOVE: You know, judge --

4      THE COURT: -- even if medical treatment

5   could have saved the life of the victim.

6      MR. DRANOVE: You're right.

7      THE COURT: It wouldn't matter.

8      MR. DRANOVE: What matters is how long he was

9   bleeding. Since there will be clear testimony that my

10   client was out of there moments after he struck, this

11   gentleman, the victim, and then different words used by

12   friends of the victim, basically a big fight broke out

13   and went on and it was obviously was broken up.

14      THE COURT: Well, the medical examiner

15   certainly can offer no testimony as to how long he  was

16   bleeding on the ground.

17      MR. DRANOVE: That's correct. But the

18   medical examiner can offer testimony that he was

19   bleeding, and for how long would be based upon medical

20   information presented. When someone presents to the

21   hospital injured, the description of what happened is

22   admissible if it's for treatment purposes. This is the

23   same, he was bleeding for 20 minutes, can you save him?

24   They couldn't save him.

25      THE COURT: Well, you're free to ask the

SW

64
COLLOQUY

1    medical examiner that. But the question as to what the

2    doctor told some medical investigator for the

3    preparation of the report, that would be hearsay. I

4    don't see -- there's no treatment in this case by the

5    medical examiner.

6              MR. DRANOVE: There was treatment by the

7    medical staff.

8              THE COURT: Not by the medical examiner.

9              MR. DRANOVE: No, but there was treatment by

10   the medical staff in the hospital based on what they

11   learned.

12             THE COURT: My ruling is that part of it

13   would be hearsay. It could not come in what any doctor

14   told the medical investigator for the medical

15   examiner's office. The medical examiner is free to be

16   questioned about what her opinion is as to the cause of

17   death, how long the victim may have bled before he

18   died, and anything that she has either first hand

19   knowledge of or an opinion based on the information

20   that she obtained by doing the autopsy.

21             MR. DRANOVE: Could I just have that read

22   back, sir. I just want to have that read back so I'm

23   clear.

24             THE COURT: All right, let's bring the jury

25   in okay.

SW

COLLOQUY

1        You can read that back.

2            (At this time, the record was read back.)

3            THE COURT:  Okay, let's proceed with the

4        trial.

5            MS. CHU:  So, your Honor the autopsy that I'm

6        going to be putting into evidence, I'm going to mention

7        it might be subject to redaction?  So I didn't redact

8        it obviously until your Honor gave the ruling.

9            THE COURT:  You'll offer that exhibit and

10       then you'll redact.  You don't have to say it's subject

11       to redaction.

12           MS. CHU:  Okay.

13           MR. DRANOVE:  Thanks, judge.

14           COURT OFFICER:  Ready?

15           THE COURT:  Yes.

16           COURT OFFICER:  Jury entering.

17           COURT CLERK:  Both sides waive the roll call?

18           MS. CHU:  So waived.

19           MR. DRANOVE:  Yes.

20           THE COURT:  Good afternoon ladies and

21       gentlemen of the jury.  Hope you had a pleasant lunch

22       and recess.  When we left off, the prosecution was

23       calling a witness.  We'll continue with that now.

24           MS. CHU:  The People call Dr. Frede Frederic.

25           (At this time, the witness entered the

SW

66

COLLOQUY

1    courtroom.)

2              THE COURT:  Good afternoon.

3              DR. FREDERIC:  Good afternoon.

4              COURT CLERK:  Solemnly swear the testimony

5    you are about to give will be the truth, the whole

6    truth, and nothing but the truth?

7              DR. FREDERIC:  Yes, I do.

8              COURT CLERK:  Be seated, please.  State your

9    name.

10             DR. FREDERIC:  Frede, F-R-E-D-E, Frederic,

11   F-R-E-D-E-R-I-C.

12             COURT CLERK:  What county do you live in?

13             DR. FREDERIC:  Kings.

14             COURT CLERK:  Thank you.

15             THE COURT:  You may inquire of the witness.

16             MS. CHU:  Thank you.

17   D R.  F R E D E  F R E D E R I C, having been duly sworn,

18   testified as follows:

19   DIRECT EXAMINATION

20   BY MS. CHU:

21   Q    Good afternoon, Doctor.

22   A    Good afternoon.

23   Q    Are you licensed to practice medicine in the state

24   of New York?

25   A    Yes, I am.

SW

DR. FREDERIC - DIRECT/CHU

1    Q    And what is your field or specialty?

2    A    Forensic pathology.

3    Q    What is the field of forensic pathology?

4    A    Pathology is the study of disease, and forensic

5  pathology is a special field of death investigation.  That

6  involve anytime somebody kill someone, anytime somebody kill

7  himself or anytime somebody is dead and they cannot explain

8  why the person is dead.

9    Q    Now, Doctor, did you receive any specific training

10  to become specialized in the area of forensic pathology?

11    A    Yes, I did.

12    Q    And what did that entail?  What is your

13  educational background?  I'm sorry.

14    A    I study medicine in Haiti and I came to the United

15  States.  I did four years of pathology at Maimonides Medical

16  Center in Brooklyn, New York.  Then I did two years of

17  forensic pathology in Pittsburgh, Pennsylvania.

18    Q    Now, are you currently employed as a forensic

19  pathologist?

20    A    Yes.  Since 1988 I am working in the office of the

21  chief medical examiner for the City of New York.

22    Q    And what is the position that you hold there?

23    A    City medical examiner.

24    Q    Now, in your position in the M.E.s office, have

25  you had occasions to perform autopsies?

SW

DR. FREDERIC - DIRECT/CHU

1    A    Yes, I do.

2    Q    Can you explain to the members of the jury what is

3    an autopsy?

4    A    An autopsy consist of an external and an internal

5    examination to determine the cause of death.

6    Q    How many autopsies have you performed in your

7    career?

8    A    More than five thousand autopsy.

9    Q    In your position as a medical examiner, have you

10   had occasion to testify in courts of law?

11   A    Yes, in all the five borough, in all the court, in

12   Pittsburgh, Pennsylvania and in Israel.

13   Q    And how many times have you done so?

14   A    More than two hundred times.

15   Q    Each time have you been qualified as an expert?

16   A    Yes.

17   Q    In what field?

18   A    Forensic pathology.

19        MS. CHU:   At this time, your Honor, I would

20        offer Dr. Frederic as a expert in the field of forensic

21        pathology.

22        THE COURT:   Any objection?

23        MR. DRANOVE:   No.

24        THE COURT:   There's no dispute ladies and

25        gentlemen Dr. Frederic is a expert in forensic

SW

Case 1:15-cv-02657-EK Document 9-1 Filed 12/08/15 Page 51 of 811 PageID #: 468

1    pathology, and therefore she will be permitted to

2    testify before you as a expert in this field.

3         You may proceed.

4         MS. CHU:  At this time, your Honor, pursuant

5    to CPL 45.18, I am offering into evidence a certified

6    copy of the autopsy report.

7         THE COURT:  Any objection by the defense?

8         MR. DRANOVE:  May I examine it first?  I

9    don't anticipate any, but I'd like to examine it.

10        THE COURT:  Please, show it to Mr. Dranove.

11        (Handing.)

12        MR. DRANOVE:  No objection.

13        THE COURT:  Okay, People's 2 will be received

14   in evidence.

15        Show it to the witness.

16        COURT OFFICER:  So marked, your Honor.

17   Q    Doctor, on February 28, 2005, did you perform an

18   autopsy on a body that was identified to your office as

19   Edgar Ojeda?

20   A    It's February 27.

21   Q    I'm sorry, February 27th?

22   A    Yes, I did.

23   Q    And can you tell me what is the case number

24   assigned to this case?

25   A    KO51155.

SW

1    Q    What was the height and weight and approximate age

2  of Mr. Ojeda?

3    A    Mr. Ojeda weigh 118 pounds, his height was 65

4  inches, and he appears to be the set age of 29 years old.

5    Q    Were there any recent injuries that were found on

6  Mr. Ojeda's body during the autopsy?

7    A    Yes.  At the time of the external examination,

8  Mr. Ojeda sustained three stab wound to the body.

9    Q    Can you randomly select one of stab wounds and

10  describe that wound for us?

11    A    The stab wound, they are labeled one, two, and

12  three.  But I don't know which one is the first.  The one

13  that I label first is locate on the left side of the chest

14  about eleven and a half inch below the top of the head and

15  three and one quarter of an inch to the left of the anterior

16  neck.  This -- the length of the stab wound is about one and

17  one quarter of an inch.  This stab wound goes inside, inside

18  the left chest cavity, cut the second rib deep, that

19  perforates the upper lobe of the left lung.  The entire

20  depth of the stab wound is about five inch.  This stab wound

21  was from the front of the body to the back from the left to

22  the right and downward.

23    Q    Now, you mentioned something about once the stab

24  wound goes in, you said something about a rib?

25    A    Yes.  The stab wound cut the second rib.

DR. FREDERIC - DIRECT/CHU

1    Q    It cut through the second rib?

2    A    Yes, correct.

3    Q    And you said that it actually -- could you tell

4  how far it went into the lung?

5    A    About one, one inch.

6    Q    About one inch?

7    A    In the lung, but the entire depth of the stab

8  wound is about five inch like from start to finish.  It's

9  about five inch.

10    Q    Okay, and can you tell me, would you please

11  describe the second wound for us, the one that you randomly

12  labeled number two?

13    A    The second stab wound is located on the left side

14  of the back.  It's about 16 and one quarter of an inch to

15  the top of the head and six and one quarter of an inch to

16  the left of the posterior midline.  The stab wound, the

17  length of the stab wound is about one and one quarter of an

18  inch.  This stab wound is only to the skin, to the

19  subcutaneous tissue, and the muscle of the left side of the

20  back and the entire depth of the stab wound is about two and

21  a quarter inch.  This stab wound is from the back to the

22  front, left to right and downward.

23    Q    Okay, and you said that that didn't hit any

24  organs, that the stab wounds did not have any organs that

25  were injured as result?

DR. FREDERIC - DIRECT/CHU

1    A    It is correct.

2    Q    Now, if you would please move on to the third stab
3 wound.

4    A    The third stab wound is locate in the posterior
5 aspect of the left shoulder. It's about 12 and one quarter
6 of an inch below the top of the head and eight and one
7 quarter of a inch to the left of the posterior midline, and
8 the length of the stab wound is about one inch. This stab
9 wound goes only to the skin and the subcutaneous tissue of
10 the left shoulder and the muscle of the left shoulder and
11 the left side of the back. The entire depth of the stab
12 wound about two inch. This stab wound goes from the back to
13 the front, left to right and downward. So we have two stab
14 wound in the back and one stab wound in the front.

15    Q    Okay. Now, can you tell me, you mentioned that
16 each of those stab wounds was about one and a quarter inches
17 in width?

18    A    The length. The length.

19    Q    The length, I'm sorry.

20    Now, when you say "length," that means that the
21 actual cut in the skin was about one and a quarter inch in
22 length?

23    A    That is correct.

24    Q    And did you notice anything about the wounds
25 themselves?

SW

DR. FREDERIC - DIRECT/CHU

1    A    Those stab wound, each of them like depending on

2  the way the knife entered the body, the wound will be

3  gapping, like you have a space between the two edges of the

4  wound. So you have to put the two wound together. And when

5  you put them together, it's like a particular shape wound

6  and they have an acute angle.

7    Q    You're saying that when you have a stab wound that

8  there is basically a gapping wound that occurs to the skin?

9    A    Depending on how the person was stabbed.

10    Q    Okay, these stab wounds you said something about

11  having to put the edges together?

12    A    That is correct.

13    Q    Did you do that with these three stab wounds?

14    A    I did, yes.

15    Q    And when you did that, did you make a

16  determination as to the edges of those stab wounds?

17    A    The edge of the stab wound, they exhibit the shape

18  of a acute angle. And because they were stab wounds, the

19  edge were very sharp because they were done by a sharp

20  instrument.

21    Q    So what you're saying when you put the two edges

22  together, that on either side of the edges there was an

23  acute angle?

24    A    That is correct.

25    Q    And that gives you an indication that the weapon

SW

1  that was used had to have been sharp on both sides?

2      A    Not necessarily.  That could be that you have

3  weapon that is sharpen on both sides.  But if you have a

4  knife that has a very thin back, a thin back, that will give

5  you also an acute angle.

6      Q    It wouldn't have to necessarily be as sharp on the

7  sides, but narrow enough?

8              MR. DRANOVE:  Judge, I'd like the witness to

9          answer, not be led.

10             THE COURT:  I'll sustain the objection to the

11         form of the question.

12     Q    Can you explain to us what you just meant by that?

13     A    I said both of them, they will give you an acute

14  angle.  That's all I could say, that either, if you have

15  both, put each of the two knife, if they are sharp, you will

16  get an acute angle.  If you have a knife that have a thin

17  back, that will also give you acute angle.

18     Q    A very thin edge is what you're talking about?

19     A    A thin edge, yes.

20     Q    Okay, thank you very much.

21             Now, have you completed your remarks regarding all

22  of those stab wounds?

23     A    Yes, I did.

24     Q    Based upon your autopsy that you performed, what

25  was the cause of death to Mr. Ojeda to a reasonable degree

                          SW

DR. FREDERIC - DIRECT/CHU

1  of medical certainty?

2      A    That is stab wound to the chest and upper

3  extremity with lung and muscular skeletal injuries.

4      Q    Now, can you tell me with the injury that

5  Mr. Ojeda received to his, the chest, the left chest area,

6  what would happen to the body as a result of that stab

7  wound, one that went in five inches?

8      A    This is in reality, this is the only stab wound

9  that kill Mr. Ojeda because that went through the lung and

10 the person bled to death.  You had some blood inside the

11 left chest cavity.

12     Q    Blood was inside the left chest cavity?

13     A    Blood.

14     Q    Okay, and can you tell me, I'm just going to ask

15 you, if you received an injury such as that, would you still

16 have the ability to move and to walk around?

17     A    Of course you could still move because it's not

18 like the movie, like they stab you and you are dead right

19 there.  You have to lose a certain amount of blood.  Like

20 you have to lose one third of your blood.  You lose

21 consciousness and then the person continue to breathe and

22 will lose blood for the person to be dead.

23     Q    And how long would you -- I'm sorry, in your

24 opinion how long would this type of injury take before

25 Mr. Ojeda would lose consciousness?

DR. FREDERIC - DIRECT/CHU

1    A    Maybe minutes.

2    Q    Minutes?

3    A    Few minutes.

4    Q    And what about resulting in death?

5    A    Few minutes.

6    Q    Few minutes.  Okay.

7         Now, I want to give you a hypothetical.

8         Would the injuries that you found on Mr. Ojeda

9    upon his autopsy be consistent with someone waving a knife

10   around like this?

11   A    No.  If you are -- you have to stab the person.

12   The knife has to go through.

13             MR. DRANOVE:  Your Honor, I would like the

14        record to reflect the witness gestured with her right

15        hand from up and around the shoulder area downwards

16        toward the table top in front of her.

17             THE COURT:  So indicated.  And the record

18        should reflect when the DA asked the question, she made

19        a waving motion with her hand as if she was holding the

20        knife in her hand waving it.

21   A    Because the knife cut.  If you are just waving a

22   knife, that cannot go through somebody.

23   Q    It wouldn't have been able to penetrate five

24   inches into the body?

25   A    That is correct.

SW

1    Q    Now, would the injuries that you found on

2  Mr. Ojeda upon his autopsy be consistent with someone

3  punching him in the area with a knife?

4    A    That could be.

5    Q    Now, could the injuries that were received by

6  Mr. Ojeda be caused by a mere fist and not a weapon?

7    A    Fist?

8    Q    A fist, like a --

9    A    What are you talking about?  This is a sharp

10  injury.  This is not a blunt trauma.  This is a sharp injury

11  that is caused by a knife or a sharp instrument.

12    Q    And are all the three injuries that you found to

13  Mr. Ojeda where you matched the edges, do they all, were

14  they consistent with having used one weapon?

15    A    It is consistent that one knife was used to put

16  the stab wound.

17    Q    Was a toxicology examination requested on the

18  fluids from Mr. Ojeda?

19    A    Yes, they were.

20    Q    And could you explain to the members of the jury

21  what toxicology is?

22    A    Why don't you call somebody from the toxicology

23  lab?  I am a doctor.  I'm a forensic.  I know about the

24  toxicology, but I am not a expert in toxicology.

25    Q    But do you know what they are?

SW

DR. FREDERIC - DIRECT/CHU

1    A    I could tell you the finding.

2         Toxicology is the study of person, like whatever

3    medication that you take or if you drink alcohol, if you

4    smoke cocaine, marijuana, always will show in your

5    toxicology.  In his blood it has small amount of alcohol and

6    he did smoke marijuana because cannabis was detected.

7    Q    Were there any other injuries to Mr. Ojeda's body

8    upon his autopsy other than the ones you just described?

9    A    No.

10   Q    Now, I just want to ask you one other question.

11        Now, with respect to the stab wound to the front,

12   the one that went in five inches, would you expect the

13   person or whoever was doing the stabbing to get blood on

14   him?  Would it result in blood coming out of that wound?

15              MR. DRANOVE:  Objection.

16              THE COURT:  It's two separate questions, so

17        rephrase your question.

18   Q    The injuries that Mr. Ojeda had to the chest

19   injury, okay, the one that went in five inches, would you

20   expect that wound to have bled immediately upon his being

21   stabbed?

22   A    For him to bleed, yes.

23   Q    If someone were the one that put the knife into

24   Mr. Ojeda, would you expect blood, to perhaps get the blood

25   on the person who actually stabbed him?

SW

DR. FREDERIC - DIRECT/CHU

1          MR. DRANOVE:  Objection.  No foundation and

2     speculative.

3          THE COURT:  I'm going to sustain to the form

4     of the question.

5          Could you describe how the blood might come

6     out?  Would it come out slowly, quickly or spurt out?

7     Can you describe, if you have an opinion, as to how the

8     blood would come out of a wound like that?

9          THE WITNESS:  No, the blood would not come

10    out gushing unless that is moving.  It's not like the

11    person is stabbed in the ventricular vein in the neck,

12    with the jugular vein or the artery, the carotid

13    artery.  Next, when you stab the person, when the blood

14    were come out, no, it's not like that.

15    Q    Well, let me ask you this:  If you were to take

16    the knife and insert it into Mr. Ojeda, stab it into him and

17    then take it out, would that motion cause blood to come out?

18         MR. DRANOVE:  Objection, your Honor.

19         THE COURT:  Overruled.

20         You may answer that question.  Would it cause

21    blood to come out?

22    A    The knife will have blood in it.  But the blood

23    gushing, coming out of the wound that goes to the, goes to

24    the person that did it, I doubt it.

25    Q    But the act of the actual knifing in and out of

SW

1   Mr. Ojeda's body the way it did, would that have caused

2   blood to be on the knife, and perhaps after the --

3           MR. DRANOVE:  Objection to the form of the

4       question.

5           THE COURT:  Yes, sustained as to perhaps.

6           MR. DRANOVE:  And it's a compound question.

7           THE COURT:  I'm sustaining the objection to

8       the question.

9   Q    Would the knife going into Mr. Ojeda's body as

10  deep as it did and coming out, would that cause there to be

11  blood on the knife?

12  A    Yes, will have blood on the knife.

13  Q    Thank you very much.

14          MS. CHU:  May I have, if I can have this

15      deemed People's number 3.

16          Mr. Dranove?

17          MR. DRANOVE:  Yes.

18          THE COURT:  Any objection?

19          MR. DRANOVE:  No.

20          THE COURT:  Okay, People's 3 will be received

21      in evidence and posted.

22  Q    Doctor, if you could just take a look at that

23  diagram.

24          Do you recognize it?

25  A    Yes, I do.

SW

1    Q    Who prepared that?

2    A    I did.

3    Q    And did you prepare that in connection with the

4    autopsy you did on Mr. Ojeda?

5    A    Yes.

6    Q    Can you just tell us what it is a diagram of

7    essentially?

8    A    The body diagram.  This is for somebody to

9    understand what happened.  Instead of showing a picture,

10   they show the body diagram to show where the stab wound

11   were.  Like I describe the first one in the front in the

12   left upper chest, and we have the two other stab wound in

13   the left side of the back.

14   Q    Doctor, would you please approach the exhibit and

15   just use this red marker and just mark for us the wounds as

16   you have labeled them, number one, two, and three?

17   A    This one is number one stab wound.  This is the

18   one that went inside the chest cavity that went to the lung

19   and that killed Mr. Ojeda.

20        And this is number three and the number two.

21   Those went only to skin, to subcutaneous tissue.  That will

22   not kill somebody.

23   Q    Thank you very much, Doctor.  You can have a seat.

24        MS. CHU:  Your Honor, may I have one moment?

25        THE COURT:  Certainly.

SW

DR. FREDERIC - DIRECT/CHU

1      MS. CHU: Thank you very much. I have

2   nothing further.

3      THE COURT: Cross examination Mr. Dranove?

4      MR. DRANOVE: Thank you.

5   CROSS EXAMINATION

6   BY MR. DRANOVE:

7   Q   Doctor, you discussed the testimony you gave here

8   before you came here today with Ms. Chu, is that correct?

9   A   Yes. But if you did ask me, yes, I would have

10   discuss it with you also.

11   Q   Fine.

12      Well, let me ask you something here.

13      Did you discuss with Ms. Chu your opinion of how

14   long Mr. Ojeda was bleeding before he lost consciousness?

15      MS. CHU: Objection.

16      THE COURT: Overruled. You may answer.

17   A   Yes, I did.

18   Q   Did she ask you if it could have been up to 20

19   minutes?

20   A   That cannot be 20 minutes.

21   Q   Did she ask you if it could be up to ten minutes?

22   A   No. I just tell her that should be minutes, and

23   that's what I said.

24   Q   How many minutes could it have been?

25   A   Few minutes. Maybe less than five minutes.

DR. FREDERIC - CROSS/DRANOVE

1    Q    Maybe five minutes?

2    A    Maybe.

3    Q    Maybe six minutes?

4    A    That could be.

5    Q    Do you agree that no artery was severed by that

6    fatal wound?

7    A    No artery was sever, but the lung, this is one of

8    the organ where the blood goes.

9    Q    Of course.

10    A    For the content of oxygen.  The lung is full of

11    blood.  So when that stab wound went one half inch into the

12    lung, the person would start to bleed and bleed profusely.

13    Q    Now, do you have any opinion as to how long it

14    would take for that man in that physical condition to have

15    bled to death once the fatal wound was inflicted?

16    A    About maybe five, six minutes.  Maybe less than

17    ten minutes you can say.

18    Q    Five or six minutes to lose consciousness,

19    correct?

20    A    The person lose consciousness first, maybe

21    minutes, and then maybe less than ten minutes the person

22    will die.

23    Q    Okay.

24        Now, the prosecutor asked you if somebody punched

25    a man with a knife, could it inflict that wound, correct?

SW

DR. FREDERIC - CROSS/DRANOVE

1  You heard some questions and answered about that?

2       A    She ask if this was punch.  I said this is

3  nonsense.  This was stab.

4       Q    Stabbed by someone holding a knife, correct?

5       A    Of course.

6       Q    Thrusting it from an upward position downwards,

7  correct?

8       A    The stab wound went downward, that is correct.

9       Q    And it went from, when you look at the victim,

10  from his left side downwards and inwards into the lung?  The

11  left or right lung, I don't know which one?

12       A    Into the left lung.

13       Q    The wounds in the back, they also were downwards

14  from left to right?

15       A    That is correct.

16       Q    Now, would the injury to the lung prevent the

17  person from speaking?

18       A    Like I said, it's not like in movie like as soon

19  as the person receive the stab wound the person just drop

20  dead.  The person could speak.  You have to start losing

21  blood and you have to lose a certain amount of blood to lose

22  consciousness.  So when the person first received the stab

23  wound, he would be --

24       Q    The person would know the person was stabbed?

25            MS. CHU:  Objection.

SW

DR. FREDERIC - CROSS/DRANOVE

1    THE COURT:  Sustained.

2    Q    Do you remember being asked about the injury in

3    the chest possibility being caused by someone punching the

4    person with a knife?

5    MS. CHU:  Objection.

6    Q    Do you recall being asked something about that?

7    THE COURT:  Overruled.

8    Do you remember the DA asked you a question

9    could this have been caused by someone punching the

10   victim with a knife in his hand?  Do you recall that

11   question?

12   THE WITNESS:  The question is, the person is

13   stab, not punch.  That is not what it's from.

14   Q    I beg your pardon?

15   A    I can't answer that.  The person isn't punch, the

16   person is stab with the knife.

17   Q    The knife being thrust downwards into the chest?

18   A    That is correct.

19   Q    Thank you.  I have no further questions.

20   THE COURT:  Any redirect?

21   MS. CHU:  No.

22   THE COURT:  Thank you Dr. Frederic.  You are

23   excused.  You may return to your normal medical duties.

24   THE WITNESS:  Thank you, your Honor.

25   THE COURT:  Okay, ladies and gentlemen, there

SW

DR. FREDERIC - CROSS/DRANOVE

1    is a witness who is not available to testify, a retired

2    detective, and so it's been agreed that you will hear

3    prior testimony that this witness gave in another

4    proceeding.  So we're going to have that witness's

5    testimony read back.

6            MR. DRANOVE:  Can we approach for a moment?

7            THE COURT:  Certainly.

8            (At this time, a bench conference was held

9    off the record.)

10           THE COURT:  All right, counsel have requested

11   permission just to go outside in the hallway for one

12   moment, so.

13           (At this time, there was a break in the

14   proceeding and the matter subsequently resumed.)

15           THE COURT:  Are you ready to proceed?

16           MR. DRANOVE:  Next witness.

17           THE COURT:  All right.

18           Okay, as I was saying, the witness Detective

19   James O'Sullivan is a retired detective and he's not

20   available to testify.  And since he has given testimony

21   at a prior proceeding, the parties have agreed to save

22   time and trouble to simply read to you the testimony

23   that he gave before as the evidence that he would have

24   to offer at this trial.  So I'm going to allow the

25   district attorney to read the transcript of his

SW

PROCEEDINGS

1    testimony to you, and you may accept it as evidence as

2    if he were here personally giving us his testimony.

3                 Would you like to read it from the witness

4    box?

5                 MS. CHU:   Sure.

6                 James O'Sullivan, shield 6592, assigned to

7    the Crime Scene Unit.

8                 "QUESTION:   Good afternoon, Detective."

9                 THE COURT:   This is direct examination.

10                MS. CHU:   I'm sorry, this is direct

11   examination of Detective O'Sullivan.

12                "QUESTION:   Good afternoon, Detective.

13                "ANSWER:   Good afternoon.

14                "QUESTION:   How long have you been with the

15   New York City Police Department?

16                "ANSWER:   Eighteen years, eleven months.

17                "QUESTION:   Can you tell me, you said you're

18   assigned to the Crime Scene Unit.   How long have you

19   been there?

20                "ANSWER:   A little over five years.

21                "QUESTION:   Just tell us about your career

22   with the NYPD.

23                "ANSWER:   I entered the Police Academy in

24   July of 1987.   Upon graduation of the Academy, I was

25   transferred to NSU-3 out of Midtown South, a training

SW

PROCEEDINGS

1    unit.  I stayed in Midtown South until December of '96

2    where I was transferred to Manhattan South Evidence

3    Collection team.  I was there until my transfer in May

4    of 2001 to the Crime Scene Unit.

5         "QUESTION:  Did you receive any specialized

6    training to become a member of the Evidence Collection

7    Unit as well as the Crime Scene Unit?

8         "ANSWER:  Yes.  My training started back in

9    1988.  I was trained as a latent prints officer while

10   assigned to Midtown South Precinct.  Upon assignment to

11   Manhattan South Evidence Collection team, I was trained

12   by the Crime Scene Unit in the areas of forensic, the

13   forensic areas of processing the crime scene as well as

14   transferred to the Crime Scene I was trained again by

15   Crime Scene in the crime scene processing procedures.

16        "QUESTION:  You were trained by someone who

17   was more senior to you?

18        "ANSWER:  Yes.

19        "QUESTION:  Now, can you tell me what are

20   your duties and responsibilities as a member of the

21   unit?

22        "ANSWER:  My job, my responsibilities is to

23   respond to a crime scene and process that scene for

24   physical evidence, the documentation of the crime

25   scene, the recovery of evidence, documentation of that

SW

89
PROCEEDINGS

1    evidence, packaging of that evidence, proper packaging

2    for it to be forwarded to the specific labs for

3    analysis.

4         "QUESTION:  On February 27th of 2005 were you

5    working?

6         "ANSWER:  Yes, I was.

7         "QUESTION:  Can you tell the members of the

8    jury what your hours were?

9         "ANSWER:  I was actually working from the

10   26th eleven p.m. until eight o'clock in the morning of

11   the 27th.

12        "QUESTION:  Were you assigned a partner that

13   day?

14        "ANSWER:  Yes, I was.

15        "QUESTION:  Who was that?

16        "ANSWER:  Police Officer Hulick.

17        "QUESTION:  Did there come a time when you

18   became involved in the investigation into the stabbing

19   death that occurred at 314 39th Street here in

20   Brooklyn?

21        "ANSWER:  Yes.

22        "QUESTION:  About what time was it that you

23   were notified to go to the scene?

24        "ANSWER:  Approximately 6:30.

25        "QUESTION:  6:30 in the morning?

SW

PROCEEDINGS

1          "ANSWER:  Yes, ma'am.

2          "QUESTION:  To your knowledge had anybody

3     from your unit already responded to the scene?

4          "ANSWER:  Yes.

5          "QUESTION:  Who was that?

6          "ANSWER:  Detective Michael Cunningham.

7          "QUESTION:  What time did you arrive at the

8     scene?

9          "ANSWER:  Approximately 7:15 in the morning

10    on the 27th.

11         "QUESTION:  When you arrived at the location,

12    can you tell me was the location open?  Was the

13    establishment open?

14         "ANSWER:  Yes.  The corner bar, it was open

15    with a member Police Officer Bao safeguarding the

16    location.

17         "QUESTION:  The scene was already established

18    by the time you arrived there?

19         "ANSWER:  Yes.

20         "QUESTION:  Was crime scene tape already up?

21         "ANSWER:  Yes.

22         "QUESTION:  Any civilians inside or allowed

23    to roam within the confines of the actual establishment

24    when you arrived there?

25         "ANSWER:  No.

PROCEEDINGS

1     "QUESTION:  What did you do when you got

2     there?

3     "ANSWER:  Upon arrival I did an initial

4     walk-through of the location.  I tried to make note of

5     items that are of particular interest to myself.  I

6     then proceeded to do a rough sketch or hand-drawn

7     sketch of the location.  When my sketch is done with

8     measurements, I will photograph the entire scene.  Any

9     items that I discover or I find during my crime scene

10    search of importance I will label, will put a

11    photograph, ruler and rephotograph those items in place

12    as I found them.  Then I will recover those items,

13    document what those items were and then process the

14    scene for latent fingerprints.

15    "QUESTION:  Was your job on that morning just

16    to process the inside of 314 39th Street?

17    "ANSWER:  Yes, it was.

18    "QUESTION:  Do you know what Detective

19    Cunningham had done prior to you getting there?

20    "ANSWER:  I was just aware that he processed

21    the exterior.  My job was to process the interior of

22    the location.

23    "QUESTION:  Did you observe anything or

24    recover anything from inside of 314 39th Street?

25    "ANSWER:  Yes, I did.

SW

PROCEEDINGS

92

1         "QUESTION: Explain to the members of the

2   jury what that was.

3         "ANSWER: Upon my investigation I discovered

4   three samples of blood, which I did photograph and

5   recover by recovering blood swabs from the areas, the

6   interior. Front door, there was a blood sample on the

7   interior side of the glass. There was a side exit door

8   across from the bar. There were two blood samples on

9   the floor, which I did recover.

10         There was an empty bottle of Clorox,

11   twenty-four ounce Clorox bottle in the garbage pail on

12   the south end of the bar. That was processed for

13   latent fingerprints with one lift recovered as well as

14   the jar itself. The Clorox bottle itself was

15   recovered.

16         The both door areas, the front door and side

17   door area and the tables that were adjacent to the side

18   door were processed for latent fingerprints. I

19   obtained four latent prints from the interior glass of

20   the front door.

21         "QUESTION: Front door on 39th Street?

22         "ANSWER: Yes.

23         "QUESTION: What did you do with the blood

24   samples that you recovered from the door as well as the

25   floor of the exit by Third Avenue?

PROCEEDINGS

1           "ANSWER:  The samples were packaged and

2    turned over to Police Officer Bao for vouchering and

3    they were to be forwarded to the office of the Medical

4    Examiner, Medical Examiner's office for DNA analysis.

5           "QUESTION:  What were done with the lifts

6    that you said you recovered, the one from the Clorox

7    bottle as well as the four inside the location?

8           "ANSWER:  Lifts were processed by myself and

9    forwarded to the Major Case Section of the Latent

10   Prints Unit at One Police Plaza for analysis."

11          MS. CHU:  At this time these photographs were

12   shown.  You want to just show that to --

13          THE COURT:  Any objection?

14          MR. DRANOVE:  No.

15          THE COURT:  Okay, then we can mark that as

16   People's 4.

17          COURT OFFICER:  Display it on the board?

18          THE COURT:  You might as well.  Four in

19   evidence.

20          COURT OFFICER:  So marked, your Honor.

21          THE COURT:  You may proceed.

22          "QUESTION:  Detective, if you could just take

23   a look at those four photographs.  Do you recognize

24   them?

25          "ANSWER:  Yes.

SW

PROCEEDINGS

1     "QUESTION:  What do you recognize them to be

2     photographs of?

3          "ANSWER:  Photographs I had taken at the

4     scene that morning.  They have my label on -- my crime

5     scene label with my initials on the rear of the photos.

6          "QUESTION:  You took them on February 27,

7     2005?

8          "ANSWER:  Yes.

9          "QUESTION:  Do those photographs fairly and

10    accurately depict how those portions of the bar inside

11    of 314 39th Street appeared when you were there to

12    process them?

13         "ANSWER:  Yes."

14         MS. CHU:  They're just going into evidence.

15         THE COURT:  Okay.  Show those to Mr. Dranove.

16         MR. DRANOVE:  No objection.

17         THE COURT:  Okay, People's 5 in evidence.

18         Why don't you walk in front of the jury box

19    with those because they're not going to see them from

20    the board.

21         You can continue to read.

22         MS. CHU:  Thank you.

23         "QUESTION:  If you could just look at what

24    has been marked People's 5A through E.  See if you

25    recognize them.

PROCEEDINGS

1          "QUESTION:  Do you recognize those

2     photographs?

3               "ANSWER:  Yes.

4          "QUESTION:  What do you recognize them to be

5     of?

6          "ANSWER:  Photographs I took inside that

7     location on the 27th.

8          "QUESTION:  What were they pictures of?

9          "ANSWER:  Photographs of the evidence that I

10    recovered from the interior of the location.

11         "QUESTION:  Meaning blood sample, Clorox

12    bottle?

13              "ANSWER:  Yes.

14         "QUESTION:  Do those photographs fairly and

15    accurately depict those items as they appeared when you

16    were processing the scene on February 27, 2005?

17              "ANSWER:  Yes."

18         MS. CHU:  Then they were offered into

19    evidence.

20         "QUESTION:  If you could just point to the

21    top photograph, left photograph, I believe that is 5A

22    in evidence.  Can you tell us what that is a picture

23    of?

24         "ANSWER:  It's an overall view looking down

25    on to two garbage pails that were at the south end of

SW

PROCEEDINGS

1    the bar. In one photograph -- in one garbage pail you

2    could see an empty Clorox bottle.

3        "QUESTION: Moving on to the top right

4    photograph, I believe 5B in evidence. What is that a

5    picture of?

6        "ANSWER: Overall photograph of a blood stain

7    on the interior side of the glass of the front door

8    leading out to 39th Street.

9        "QUESTION: There is also a blue marker

10   underneath that?

11       "ANSWER: This is a blue scale marker we use

12   to give scale or standardized measurement to our

13   photographs and also identifies the evidence.

14       In this photograph item was S1 for serology

15   1. The crime scene run number on the bottom 05/207A

16   depicts my run number for the job.

17       "QUESTION: Moving on to the second row on

18   the left-hand side, that photograph, I believe 5C in

19   evidence. What is that a picture of?

20       "ANSWER: Overall view west of the floor.

21   This is the side entrance door or exit door. This is

22   the jukebox off to the left edge as you face it.

23   There's two blue scale rulers also in that photograph,

24   S2 and S3 depicting blood sample locations. That just

25   gave the overall view of the actual locations where

SW

1    they are.

2              "QUESTION:  Moving on to People's 5D, the

3    next photograph to the right of that.

4              "ANSWER:  Close-up view of blood sample S2.

5    Again, blue scale ruler is included.  Blood sample is

6    just to the top of the black triangle or black arrow.

7    This was on the door, saddle of the door.

8              "QUESTION:  That is depicted in 5C?

9              "ANSWER:  Yes.

10             "QUESTION:  Moving on to the last photograph,

11   People's 5E at the bottom.

12             "ANSWER:  Again, close up photograph of a

13   blood sample.  Not this item off to the side here.

14   It's to the top of the black arrow there's a couple of

15   droplets of blood.  The scale ruler identifying as S3,

16   serology 3.

17             "QUESTION:  Is that also depicted in People's

18   5C, the photograph above that?

19             "ANSWER:  Yes, to the right of the jukebox

20   and just east of the door saddle of the side entrance

21   door.

22             "QUESTION:  Thank you very much.  You could

23   have a seat.

24             In fact, after you took the samples of blood,

25   did you give them to anybody?

98
PROCEEDINGS

1     "ANSWER:  Yes.

2     "QUESTION:  Who did you give them to?

3     "ANSWER:  Upon packaging I turned them over

4     to Police Officer Bao of the 72nd precinct for

5     vouchering.

6     "QUESTION:  Were there any instructions as to

7     what you were supposed to do after you voucher them?

8     "ANSWER:  I fix a request for laboratory

9     analysis to the items detailing where they were to go,

10    to the medical examiner office for serology and DNA

11    analysis."

12    MS. CHU:  At this time -- I'm going to refer

13    to this as People's 6.

14    MR. DRANOVE:  Judge, I have no objection.

15    THE COURT:  All right, then People's 6 can be

16    marked in evidence.

17    COURT OFFICER:  So marked, your Honor.

18    "QUESTION:  Detective, if you could take a

19    look at what is being shown to you.  Do you recognize

20    it?

21    "ANSWER:  Yes.

22    "QUESTION:  What is it?

23    "ANSWER:  Computer version or finalized

24    version of my rough sketch for the interior of the

25    location.

SW

99
PROCEEDINGS

1        "QUESTION:  314 39th Street?

2        "ANSWER:  Yes.

3        "QUESTION:  You actually prepared that

4    sketch?  It's a blown-up version of it?

5        "ANSWER:  Yes.

6        "QUESTION:  Does that diagram fairly and

7    accurate depict the layout inside 314 39th Street as it

8    appeared when you were there on February 27, 2005?

9        "ANSWER:  Yes.

10       "QUESTION:  Is it to scale?

11       "ANSWER:  No, it is not.

12       "QUESTION:  What does that mean to be to

13   scale?

14       "ANSWER:  To scale -- basically architects

15   draw everything to scale.  Everything is sketched to an

16   exact precise measurement.

17       In the crime scene, we will measure out the

18   width and length of the location of items, but it is

19   not to a true fracture of an inch.  It's a rough

20   distance with a common wheel measuring line or a tape

21   measuring, whether it's a measuring stick or regular

22   twenty-five or thirty foot Stanley, if you will, ruler.

23       "QUESTION:  What appears either closer or far

24   away from each other in the diagram is not necessarily

25   how it would appear in real life?

SW

PROCEEDINGS

1        "ANSWER: Correct."

2        It was then offered into evidence.

3        This is voir dire by the defense counsel.

4        "QUESTION: Detective, are there distances

5    marked off on that item?

6        "ANSWER: Yes, there are.

7        "QUESTION: Are they accurate?

8        "ANSWER: I'm sorry, I couldn't hear you.

9        "QUESTION: Are they accurate?

10       "ANSWER: To the measurements that I took,

11   yes.

12       "QUESTION: Did you mark off which side is

13   Third Avenue and which side is 39th Street?

14       "ANSWER: Apparently, I did not, no."

15       And this is continued direct examination.

16       "QUESTION: Detective, just an aside, do any

17   of the crime scene detectives draw their diagrams to

18   scale?

19       "ANSWER: No, it's not a practice of the

20   Crime Scene Unit.

21       "QUESTION: Just because it's not to scale

22   does that mean the measurements that are within that

23   diagram are not accurate? Does that mean that?

24       "ANSWER: No, it doesn't.

25       "QUESTION: If you could just tell us, if you

SW

101
PROCEEDINGS

1     could walk us through the diagram."

2                And at this time the witness is approaching

3     the exhibit.

4                "QUESTION:  If you could indicate what the

5     cross streets are on this diagram.

6                "ANSWER:  North side would be 39th Street.

7     Out past the sidewalk, if there were one drawn, 39th

8     Street would be there and Third Avenue would be along

9     the left side of the drawing.

10               "QUESTION:  Can you please mark that?"

11               And the witness marked.

12               "QUESTION:  If you could just tell us which

13    is facing north.

14               "ANSWER:  North is facing up, top of the

15    sketch.

16               "QUESTION:  If you could just walk us through

17    the diagram.

18               "ANSWER:  Front entrance door comes off 39th

19    Street indicated by the door swinging symbol showing

20    door swings out from left to right or right in.  Facing

21    the door it would be a left hinge.

22               As you walk into the bar, there were tables

23    off to the right-hand side, a video game in front or

24    northwest corner as well as joker poker machine in the

25    northeast corner.  Bar was kind of a wavy pattern to

SW

1    the bar, which went pretty much down whatever, the

2    whole interior of the location.

3            Side entrance door that leads out to Third

4    Avenue also indicated by the swing of the door right

5    over here."

6            I believe that's to the left hand portion of

7    the diagram.

8            "The jukebox, as in the photos, is right

9    adjacent to the door or south of the door next to a

10   building.

11           Toward the bottom of the bar there is an

12   opening for, I guess, the bar employees to get access

13   to the rear of the bar.

14           There were two garbage pails located just

15   south of the bar as indicated by these round symbols.

16           Dance floor toward the end, southern end of

17   the location and a rear exit door into the back of the

18   location, outdoor location.

19           "QUESTION:  In the photograph, I believe

20   People's 5A in evidence, there was a picture of the

21   Clorox bottle you found inside the garbage cans?

22           "ANSWER:  Yes.

23           "QUESTION:  Tell us where the garbage cans

24   are located?

25           "ANSWER:  South end of the bar.  The bar is

SW

103
PROCEEDINGS

1  the dashed line. There is an arrow with J1, Clorox

2  bottle, pointing to the -- of the two garbage pails.

3          "QUESTION:  You mentioned there were serology

4  or blood sample recovered from the interior door of the

5  39th Street entrance?

6          "ANSWER:  Yes.

7          "QUESTION:  If you could just show us on the

8  diagram where that is.

9          "ANSWER:  That would be the front door.

10  Arrow is pointing to the door as it shows it open.

11  Said by S1 with blood swab pointing to the door.

12          "QUESTION:  What about the other two Third

13  Avenue exit door?

14          "ANSWER:  S2, the blood sample that was

15  recovered on the saddle of the door, doorway.  S3 was

16  the one adjacent to jukebox as indicated by S3, blood

17  spot with the arrest and jukebox.

18          "QUESTION:  You said you took some

19  measurements?

20          "ANSWER:  Yes.

21          "QUESTION:  Are they indicated on this

22  diagram?

23          "ANSWER:  Yes.

24          "QUESTION:  What measurements did you take?

25          "ANSWER:  Measurements on this diagram.

SW

PROCEEDINGS

104

1    Also, the items that I recovered the evidence from is

2    not on the diagram.  They are in the typed report and

3    notes.

4              On this diagram it was roughly five feet,

5    eight inches from the interior or the northern phase of

6    the wall to the front end of the bar.  Approximately

7    fifteen feet, six inches across, and the overall length

8    was approximately fifty-seven feet, six inches from the

9    north end to the south end of the location.  There was

10   a fixed item, a column.  From the column to the north

11   wall or 39th Street wall was approximately twenty-five

12   feet, three inches.

13             "QUESTION:  You said there are also other

14   measurements noted in your other report?

15             "ANSWER:  Yes.

16             "QUESTION:  Have a seat and let us know what

17   else you measured, please?

18             "ANSWER:  I'm refreshing from my handwritten

19   notes the serology measurements.  The item S1, the

20   blood stain, that was on the front interior of the door

21   was approximately four feet from the bottom edge up, on

22   the interior side of the glass and seven inches right

23   of the left edge.

24              Item S2 was blood swab or blood sample on

25   that -- was on the saddle of the door frame below the

SW

1    door.  That was approximately seven feet, eleven inches

2    north of the north side of the column on the saddle

3    itself.  I do not have a measurement going east to

4    west.  It was affixed on the saddle.

5          S3 was the third blood sample that was

6    approximately six feet north of the column and seven

7    inches east of the west side or west edge of the

8    column.  I also --

9          "QUESTION:  Repeat that last one.

10          "ANSWER:  Seven inches east of the west wall

11    coming out from the column from the wall.

12          "QUESTION:  Not measuring from where the

13    column comes out, but from the wall?

14          "ANSWER:  Correct.  Seven inches from the

15    wall east of the west wall.  I also measured out

16    location of the Clorox bottle, which was in that

17    garbage pail.  It was approximately three feet, five

18    inches west of the east wall, thirty-two feet, six

19    inches south of the north wall or the 39th Street wall.

20          "QUESTION:  How long were you there,

21    Detective?

22          "ANSWER:  From 7:15 I finished the job.  My

23    run time ends when I get back to my office.  I got back

24    to my office at 1:30 in the afternoon.

25          "QUESTION:  Do you know how long you were

SW

PROCEEDINGS

1    actually at the scene?

2            "ANSWER:  I would have to say I left the

3    scene approximately 12, 12:30."

4            MS. CHU:  And that ends the direct

5    examination.  And now the cross examination.

6            "QUESTION:  Detective, why did you focus at

7    all on the Clorox bottle?

8            "ANSWER:  I do not believe everything is

9    focused on the Clorox bottle.  It's just one item that

10   was photographed and recovered.

11           "QUESTION:  Did you lift any prints from the

12   Clorox bottle?

13           "ANSWER:  Yes, I did.

14           "QUESTION:  Why did you seek to lift prints

15   from the Clorox bottle?

16           "ANSWER:  In my experience, if a location had

17   been cleaned or an attempt had been cleaned, Clorox

18   bleach is one of the items used to clean the location.

19           In my experience I processed that bottle for

20   fingerprints as well as recovering it.

21           "QUESTION:  Did you lift any prints from the

22   bottle?

23           "ANSWER:  Yes, I did one lift.

24           "QUESTION:  Do you know what you did with

25   that print you lifted from the Clorox bottle?

SW

PROCEEDINGS

1         "ANSWER:  Yes.

2         "QUESTION:  What did you do?

3         "ANSWER:  Completed the card and forwarded it

4    to the Latent Prints Section of the Major Case Unit at

5    One Police Plaza.

6         "QUESTION:  Do you know if the Major Case did

7    any studies upon that print?

8         "ANSWER:  I do not know.

9         "QUESTION:  Did you take any blood from

10   outside the --

11        "ANSWER:  No, I did not.

12        "QUESTION:  I'm over here.

13        "ANSWER:  I know.

14        "QUESTION:  Do you know if there was any

15   investigation taken into whether blood was cleaned up

16   inside the premises, Detective?

17        "ANSWER:  Considering I recovered or I

18   located numerous items of blood within that location, I

19   recovered those items.  I cannot determine whether

20   blood was cleaned up or not cleaned.

21        "QUESTION:  Did you lift any prints from the

22   Third Avenue door?

23        "ANSWER:  Four prints were lifted.  Third

24   Avenue door, no, sir, there were none lifted.

25        "QUESTION:  How many prints in total did you

SW

PROCEEDINGS

1          lift?

2                    "ANSWER: Five fingerprints.

3                    "QUESTION: One from the Clorox and four from

4          the 39th Street door; is that correct?

5                    "ANSWER: Yes.

6                    "QUESTION: Do you know if there is a Police

7          Department policy you should not draw crime scenes to

8          scale?

9                    "ANSWER: There is no policy, sir.

10                   "QUESTION: Did you chose not to draw it to

11         scale?

12                   "ANSWER: We do not draw it to scale, sir."

13                   MS. CHU: That's the end.

14                   THE COURT: That completes the testimony that

15         we have available today. So if you have no objection,

16         I'm going to excuse you and let you go home. Is that

17         all right with you.

18                   THE JURY: Yes.

19                   THE COURT: Thank you for your patience

20         today. We're going to resume the trial today, we're

21         going to resume tomorrow morning at 10:30. Please make

22         an effort to be on time.

23                   Don't discuss the case.

24                   (At this time, the jury exited the

25         courtroom.)

SW

109
PROCEEDINGS

1          THE COURT:   The trial is in recess until

2     tomorrow morning at 10:30.   Have a nice evening.   I'll

3     ask counsel to wait, any family member to wait until

4     the jury leaves.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SW

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF KINGS: CRIMINAL TERM: PART 35
 2   ----------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK   :
 3
                - against -            : INDICTMENT#
 4                                       1453/2005
     ENRIQUE RIVERA,                   :
 5
                              Defendant.:
 6   ----------------------------------------X
     TRIAL                    320 Jay Street
 7                            Brooklyn, New York
                              May 7, 2009
 8

 9   B E F O R E :

10              HONORABLE ALAN MARRUS, J.S.C.

11                                 Justice and Jury

12   A P P E A R A N C E S :

13
                    OFFICE OF CHARLES J. HYNES, ESQ.
14                       District Attorney, Kings County
                         For the People
15                  BY:  PHYLLIS CHU, ESQ.
                         Assistant District Attorney
16

17                  18-B ASSIGNED COUNSEL:
                         CRIMINAL DEFENSE DIVISION
18                  BY:  JOEL DRANOVE, ESQ.
                         Attorney for Defendant
19   -------------------------------------------
                    MICHELLE WALKER
20                  SANDRA WILKES, R.P.R.
                    Senior Court Reporters
21

22

23

24

25

                         SW
```

PROCEEDINGS

1          THE COURT:  For the record, before we start,

2     my court officer informed me that alternate number

3     three just told her he has a problem listening to this

4     gruesome testimony.  He didn't expect it would be so

5     gruesome and he's worried he might pass out because

6     it's so gruesome.  I think we'll talk to him later at

7     the first available break.

8          Obviously he heard the medical examiner

9     testify yesterday.  I don't think there will be any

10    more gruesome testimony than we heard yesterday.  So

11    we'll bring him out and talk to him later.

12          MS. CHU:  I just let Mr. Dranove know, since

13    the last trial Mr. Dominguez has two additional arrests

14    that resulted in a conviction.  One was on May 8, 2008

15    he was arrested for criminal possession of a controlled

16    substance, and that resulted in a disorderly conduct on

17    October 30th of 2008.  I gave him the docket number for

18    that.

19          There was also an arrest on September 7,

20    2007.  He was arrested for possession with intent to

21    sell, possession seven and aggravated unlicensed

22    operation of a motor vehicle.  That resulted in a

23    conviction on September 25, 2008 to criminal possession

24    of a controlled substance in the seventh degree.  I

25    think I did not put in the indictment number on that.

SW

PROCEEDINGS

1     That's 8783 of 2007.  On that last case, the indictment

2     number is 8783 of 2007.

3              MR. DRANOVE:  Judge, Ms. Chu handed me this

4     morning what's basically a follow up to her telling me

5     earlier that Mr. Dominguez has had some further

6     interaction with the criminal justice system.  She

7     handed me a sheet, handed me a sheet with the

8     information she already put on the record.

9              THE COURT:  Okay.

10             MS. CHU:  The second thing I want to address

11    with the Court, one of my first couple of witnesses is

12    retired detectives, Detective Darino -- I'm sorry,

13    Gaynor and retired Detective Rivera.

14             During the last trial the defense counsel

15    asked many questions on cross examination I believe of

16    Detective Rivera concerning interviews he had conducted

17    with witnesses in the case and elicited information

18    regarding what they had actually said.  I would ask

19    that the Court preclude him from asking those questions

20    as they would be hearsay.  And if he wants to address

21    that issue as to a prior inconsistent statement, those

22    witnesses would actually have to testify first and he

23    has to actually confront them with the inconsistencies

24    and perhaps call the detective back to show that they

25    had made a prior statement that was different.  I'm

1    going to ask that the Court preclude the defense

2    counsel from asking him concerning any witnesses he may

3    have interviewed, witnesses in this case who may or may

4    not be testifying so we don't have to run into a case

5    of having to ring a bell once he asks the questions,

6    once he does which may be in the heads of the jury.

7              THE COURT:  Are these interviews of any of

8    the witnesses you're going to call?

9              MS. CHU:  No.  Actually he asks about Luis

10   Rivera, he asks about Jahaira Serrano, and he also asks

11   about the defendant's brother, Mr. Rivera.

12             THE COURT:  It's an important fact.  Are you

13   going to call any of the witnesses that he interviewed?

14             MS. CHU:  I was not going to call.

15             THE COURT:  I'm just asking you, are you

16   going to call any of the witnesses that he interviewed?

17             MS. CHU:  That Detective Rivera interviewed?

18             THE COURT:  Right.

19             MS. CHU:  I just want to double check to make

20   sure I have all the witnesses that he looked up.

21             No.

22             THE COURT:  Okay.  Then there's no issue.  If

23   you were going to call someone who he interviewed, then

24   you should call him after that witness testifies.

25             MS. CHU:  No, he didn't interview any of the

SW

114

PROCEEDINGS

1    witnesses that would be testifying.

2            THE COURT:  All right, let's bring the jury

3    in.

4            COURT OFFICER:  Okay.

5            Your Honor, you're ready for the jury?

6            THE COURT:  Yes.

7            COURT OFFICER:  Jury entering.

8            COURT CLERK:  Both sides waive the roll call?

9            MS. CHU:  Yes.

10           MR. DRANOVE:  Yes.

11           THE COURT:  Good morning ladies and

12   gentlemen.  How is my favorite jury today?

13           THE JURY:  Fine.

14           THE COURT:  We left off yesterday, the

15   prosecutor had begun its case.  We'll continue with

16   that.

17           You may call your next witness.

18           MS. CHU:  The People call retired Detective

19   James Gaynor.

20           (At this time, the witness enters the

21   courtroom.)

22           COURT SERGEANT:  Step right up to the witness

23   stand, please, and face the clerk.

24           COURT CLERK:  Raise your right hand.

25           Do you solemnly swear the testimony you are

SW

GAYNOR - DIRECT/CHU

1       about to give will be the truth, the whole truth, and

2       nothing but the truth?

3                   RETIRED OFFICER GAYNOR:  Yes, I do.

4                   COURT CLERK:  Be seated.

5                   State your name.

6                   RETIRED OFFICER GAYNOR:  James Gaynor.

7                   COURT CLERK:  What county do you live in?

8                   RETIRED OFFICER GAYNOR:  Richmond.

9                   THE COURT:  You may inquire of the witness.

10                  MS. CHU:  Thank you.

11  J A M E S   G A Y N O R, having been duly sworn, testified

12  as follows:

13  DIRECT EXAMINATION

14  BY MS. CHU:

15      Q    Good morning retired Detective Gaynor?

16      A    Good morning.

17      Q    Are you a former member of the New York City

18  Police Department?

19      A    Yes, I am.

20      Q    Could you please tell the jury the circumstances

21  under which you left the NYPD?

22      A    I retired in April of 2006.

23      Q    And how long have you worked for the New York City

24  Police Department?

25      A    Twenty years.

SW

116
GAYNOR - DIRECT/CHU

1    Q    And where was your last assignment?

2    A    I was assigned to the Brooklyn South Homicide

3    Squad.

4    Q    How long were you there?

5    A    About four, four and a half years.

6    Q    I want to direct your attention to February of

7    2005.  Did there come a time when you became involved in the

8    investigation into the death of a person by the name of

9    Edgar Ojeda?

10   A    Yes.

11   Q    And can you tell me how was it that you became

12   involved in the case?

13   A    The precinct detective squad notified us of a male

14   that was killed and we responded to the scene.

15   Q    Was there a case detective in the 72nd precinct

16   that was assigned to the case?

17   A    Yes, Detective John Darino.

18   Q    During the course of the investigation did there

19   come a time that you began to look for anyone in particular?

20   A    Yes.

21   Q    Who were you looking for?

22   A    Enrique Rivera.

23   Q    Did you learn any information about where he lived

24   or his family might reside in Brooklyn?

25   A    Yes, I did.

SW

117

GAYNOR - DIRECT/CHU

1    Q    I want to direct your attention to February 28,
2    2005 at 1:20 in the morning.  Were you at 30 Bush Street?
3    A    Yes, I was.
4    Q    Can you tell me what is that location?
5    A    That was the residence we believed Enrique Rivera
6    may have lived in.  It's an apartment within the Red Hook
7    projects.
8    Q    Was there a particular apartment number you were
9    looking for?
10   A    Yes, apartment 1D.
11   Q    Were you with anybody at that time?
12   A    I was with Detective O'Brian and Detective Dunn.
13   I don't remember -- I believe there was a fourth detective.
14   I'm not certain who it was.
15   Q    What floor is apartment 1D on?
16   A    It's on the first floor.
17   Q    And do you remember entering into the building?
18   A    Yes.
19   Q    Do you know how you got in?  Is there a locked
20   door in the front?
21   A    I don't know if the door had been opened or if
22   someone else had buzzed us in or somebody may have been
23   walking in.  I don't recall exactly how we got in.
24   Q    You stated there was a fourth detective with you
25   but you don't recall the name?

SW

118
GAYNOR - DIRECT/CHU

1   A    Correct.

2   Q    Did you have anybody stand outside where the

3   window would be for that apartment?

4   A    Yes, we did.

5   Q    What was the purpose for that?

6        MR. DRANOVE:  Objection.

7        THE COURT:  Overruled.  You may answer.

8   A    Just in case, you know, Enrique Rivera was there,

9   we wanted to prevent him from fleeing out the window or

10  anything like that.

11       MR. DRANOVE:  Objection.

12       THE COURT:  Overruled.

13  Q    Did there come a time when you knocked on the door

14  of apartment 1D?

15  A    Yes.

16  Q    And did anyone answer the door?

17  A    Yes.

18  Q    Did you learn the name of that person that

19  answered the door?

20  A    Yes.  Her name was Anna Cassalas.

21  Q    And did you establish whether or not there was any

22  relationship between Ms. Cassalas and Enrique Rivera?

23  A    Yes.  It was his mother.

24       MR. DRANOVE:  Objection, unless he speaks

25       Spanish.

SW

1                    THE COURT:  Overruled.  I'll allow the next

2        question.

3        Q    Did Ms. Cassalas speak any English?

4        A    Very little.

5        Q    Did you identify yourself as a detective?

6        A    Yes, I did.

7        Q    How did you do that?

8        A    I showed my shield.

9        Q    Did there come a time when you were led into the

10       apartment?

11       A    Yes.

12       Q    Were you having trouble communicating with her

13       because of her language?

14       A    Yes.

15       Q    What did you do?

16       A    I contacted Detective Rivera from the 7-2 to have

17       him translate for me.

18       Q    How did you contact Detective Rivera?

19       A    By cell phone.

20       Q    You called his cell phone?

21       A    Correct.

22       Q    With your cell phone?

23       A    Correct.

24       Q    Did you explain to him that you --

25                   MR. DRANOVE:  Objection to leading.

                            SW

GAYNOR - DIRECT/CHU

1          THE COURT:  I'll sustain as to form.  I

2      already hear the question is not going to be good.

3      Q    What did you say to him?

4          MR. DRANOVE:  Objection.

5          THE COURT:  Sustained.

6      Q    Did you have a conversation with him?

7      A    Yes, I did.

8      Q    Did you then hand your phone to Ms. Cassalas?

9      A    Yes, I did.

10     Q    Did she engage in a conversation on your

11  telephone?

12     A    Yes, she did.

13     Q    Was this conversation in Spanish or English?

14     A    Spanish.

15     Q    Did there come a time when she was on the phone

16  that you observed anything in the apartment?

17     A    I observed a couple of items of clothing on the

18  floor in the bedroom.

19     Q    Now, prior to your actually arriving at 30 Bush

20  Street pursuant to your investigation, were you aware of any

21  clothing descriptions that were given in this case?

22     A    Yes, I was.

23     Q    And the clothing that you saw on the floor -- I'm

24  sorry, what was it?

25     A    It was a green camouflage jacket, brown sweat

121
GAYNOR - DIRECT/CHU

1  jacket and a green hat, army hat.

2      Q    And did you then talk on the phone with Detective

3  Rivera after Ms. Cassalas spoke to Detective Rivera?

4      A    Yes.

5      Q    Did you tell him additional information?

6      A    Yes.

7      Q    And did you then hand the phone back to

8  Ms. Cassalas?

9      A    Yes, I did.

10     Q    Did she then have a continued conversation with

11 Detective Rivera on your phone?

12     A    Yes, she did.

13     Q    At that time did you ever talk on the phone with

14 Detective Rivera again?

15     A    Yes.

16     Q    Once you had a conversation with him, what did you

17 do with the clothing that you saw on the floor?

18     A    The clothing was taken and brought to the precinct

19 and vouchered.

20     Q    Now, can you tell me what voucher number you

21 assigned to the clothing that you had recovered from 30 Bush

22 Street?

23            THE WITNESS:  I'd have to look at my notes.

24            THE COURT:  You may.

25            THE WITNESS:  Thanks.

SW

122
GAYNOR - DIRECT/CHU

1    A    The voucher number was Michael 621135.

2    Q    And after you vouchered those items of clothing,

3   what did you do with them?

4    A    They were sent to the lab for analysis.

5         MS. CHU:  At this time, your Honor, if I can

6    have this marked as People's 7.

7         THE COURT:  We'll mark it People's 7.

8         COURT OFFICER:  The whole bag?

9         MS. CHU:  Yes.

10   Q    Retired Detective Gaynor, would you please take a

11  look inside People's, what's been marked for identification

12  as People's number 7?

13   A    Okay.

14   Q    Do you recognize the contents?

15   A    Yes, I do.

16   Q    And what do you recognize the contents to be?

17   A    The articles of clothing.

18   Q    That you found at 30 Bush Street on February 28,

19  2005?

20   A    Correct.

21   Q    Did you make any markings on those articles of

22  clothing?

23   A    Yes, I believe I did.

24   Q    What markings did you make on them?

25   A    I'd have to look at them to see exactly where I

SW

GAYNOR - DIRECT/CHU

1   have them marked.

2                THE COURT:  You may.

3       Q    I just want to know what you put on it.

4                THE COURT:  She wants to know what mark.

5       A    I'm sorry.  I put my initials.

6       Q    And your initials being J.G.?

7       A    Correct.

8       Q    Did you put it on each of the articles of

9   clothing?

10      A    I believe so, yes.

11      Q    And what is contained within there?

12      A    We have a green army hat, a camouflage army

13  jacket, and a brown sweat jacket.

14      Q    A brown sweat jacket?

15      A    Sweat shirt.

16      Q    Like a hoody?

17      A    Correct.

18      Q    You said those were the actual articles of

19  clothing that you recovered from 30 Bush Street?

20      A    Yes, they are.

21               MS. CHU:  At this time, your Honor, I would

22           offer them in evidence as People's 7.

23               MR. DRANOVE:  May I?

24               THE COURT:  Any objection?

25      Q    Do you mind if I just address you as detective

                             SW

GAYNOR - DIRECT/CHU

1  instead of retired.

2      A    No.

3      Q    Did you make markings on all those items you're

4  identifying?

5              THE WITNESS:  I believe I did.

6              MR. DRANOVE:  I have no objection.

7              THE COURT:  People's 7 will be received in

8      evidence.

9              COURT OFFICER:  So marked, your Honor.

10             THE COURT:  Thank you.

11     Q    Thank you very much.

12             MS. CHU:  I have nothing further.

13             THE COURT:  Cross examination?

14             MR. DRANOVE:  Yes.

15 CROSS EXAMINATION

16 BY MR. DRANOVE:

17     Q    What was the weather like at that time?

18     A    At what time?

19     Q    The time you went to 30 Bush Street?

20     A    It was dark.  I don't believe it was raining.

21     Q    Do you remember if it was warm, cold for that time

22 of year?  Snow?  Anything?

23     A    Definitely not snow.  But I don't remember how

24 cold it was.

25     Q    And at this time do you remember the name of the

125
GAYNOR - CROSS/DRANOVE

1   other law enforcement person who accompanied you apart from

2   Dunn and O'Brian?

3       A    No, I don't.

4       Q    No further questions.

5                THE COURT:  Anything else Ms. Chu?

6                MS. CHU:  No.

7                THE COURT:  Thank you very much.  You're

8       excused.  You may step down from the witness stand.

9                (At this time, the witness exited the

10      courtroom.)

11               THE COURT:  People may proceed.

12               MS. CHU:  People call retired Detective

13      Hector Rivera.

14               (At this time, the witness entered the

15      courtroom.)

16               COURT OFFICER:  Stand in front of the chair,

17      raise your right hand.

18               THE COURT:  Swear to tell the truth, the

19      whole truth, and nothing but the truth?

20               RETIRED DETECTIVE RIVERA:  Yes, I do.

21               THE COURT:  You may be seated.

22               COURT SERGEANT:  State your name for the

23      record, please.

24               RETIRED DETECTIVE RIVERA:  Hector Rivera.

25               THE COURT:  What county do you live in?

SW

RIVERA - DIRECT/CHU

1          RETIRED DETECTIVE RIVERA:  Queens.

2          THE COURT:  You may examine the witness Ms.

3     Chu.

4          MS. CHU:  Thank you.

5     H E C T O R   R I V E R A, having been duly sworn, testified

6     as follows:

7     DIRECT EXAMINATION

8     BY MS. CHU:

9          Q    Good morning.

10         A    Good morning.

11         Q    Are you a former member of the New York City

12    Police Department?

13         A    Yes, I am.

14         Q    What was the circumstances of your departure from

15    the police department?

16         A    I retired.

17         Q    When did you retire?

18         A    August 2007.

19         Q    And can you tell us where were you last assigned

20    before you retired?

21         A    72nd squad.

22         Q    And how long were you there?

23         A    I was there about 12 years.

24         Q    Were you working as a detective in their squad?

25         A    Yes.

RIVERA - DIRECT/CHU

1    Q    I want to direct your attention now to February

2    the 28th of 2005.  Were you working as a detective for the

3    72nd precinct on that date?

4    A    Yes, I was.

5    Q    And can you tell me at about 1:30 in the morning

6    on February the 28th of 2005 did there come a time when you

7    were contacted by Detective Gaynor from Brooklyn South

8    Homicide?

9    A    Yes.

10   Q    And can you tell me how was it that you were

11   contacted?

12   A    He called me on my cell phone.

13   Q    Did you have a conversation with him over the cell

14   phone?

15   A    Yes.

16   Q    And after you spoke with him on the cell phone,

17   did there come a time when you spoke with the female on the

18   phone?

19   A    Yes.

20   Q    Can you tell me are you fluent in Spanish?

21   A    Yes, I am.

22   Q    Did you have this conversation with the female in

23   English or in Spanish?

24   A    In Spanish.

25   Q    After you spoke with this woman, did you ever

SW

1   learn her name?

2        A    Yes.

3        Q    What was her name?

4        A    Her name was Anna Cassalas.

5        Q    And after you had this conversation with her, did

6   you speak with Detective Gaynor again?

7        A    Yes.

8        Q    And then after you spoke with Detective Gaynor,

9   did you tell him what you had talked about --

10            MR. DRANOVE:  Objection.

11       Q    -- with Ms. Cassalas?

12            THE COURT:  Overruled.  You may answer.

13       A    Can you repeat?

14       Q    Did you tell Detective Gaynor what she had told

15  you?

16       A    Yes, I did.

17       Q    Did you then have a further conversation with

18  Detective Gaynor?

19       A    Yes.

20       Q    Did you then again talk with Ms. Cassalas on the

21  telephone?

22       A    Yes.

23       Q    Was this conversation in Spanish?

24       A    Yes.

25       Q    After you had the conversation with her, did you

SW

129

1   then get back on the phone with Detective Gaynor?

2       A    Yes, I did.

3       Q    And did you explain to him what you had spoken

4   about with Ms. Cassalas a second time on the telephone?

5       A    Yes.

6       Q    Now, after you spoke with Detective Gaynor, did

7   you end your conversation with him?

8       A    Yes.

9       Q    Thank you very much.

10              MS. CHU:  I have nothing further.

11              THE COURT:  Any cross examination?

12              MR. DRANOVE:  No.

13              THE COURT:  Thank you very much.  You're

14      excused.  You may step down from the witness stand.

15              (At this time, the witness exited the

16      courtroom.)

17              THE COURT:  You may proceed Ms. Chu.

18              MS. CHU:  The People call Matthew Ojeda.

19              (At this time, the witness entered the

20      courtroom.)

21              COURT SERGEANT:  Stand in front of the chair,

22      raise your right hand, please, face the clerk.

23              COURT CLERK:  Solemnly swear the testimony

24      you are about to give will be the truth, the whole

25      truth, and nothing but the truth?

SW

1          MR. OJEDA:  Yes, sir.

2          COURT CLERK:  Be seated.  State your name,

3     please.

4          MR. OJEDA:  Matthew Ojeda.

5          COURT CLERK:  What county do you live in?

6          MR. OJEDA:  Kings.

7          COURT CLERK:  Thank you.

8          THE COURT:  You may examine the witness Ms.

9     Chu.

10         MS. CHU:  Thank you.

11    M A T T H E W   O J E D A, having been duly sworn, testified

12    as follows:

13    DIRECT EXAMINATION

14    BY MS. CHU:

15    Q    Good morning.

16    A    Good morning.

17    Q    How old are you?

18    A    Twenty-three.

19    Q    I'm sorry?

20    A    Twenty-three.

21    Q    Do you work?

22    A    Yes, ma'am.

23    Q    What do you do for a living?

24    A    I'm a patient access rep for Beth Israel Medical

25    Center.

1    Q    Do you know someone by the name of Edgar Ojeda?

2    A    Yes, I do.

3    Q    Who is he?

4    A    He was my older brother.

5    Q    How old was he back in 2005?

6    A    He was 29.

7    Q    I want to direct your attention now to February 27

8    of 2005.  Did there come a time when you learned any

9    information regarding your brother Edgar?

10   A    Yes.  I came back from a night of partying.  It

11   was about 3 o'clock in the morning.  My phone was off to

12   conserve energy.  And when I turned it on, I got a phone

13   call from my mother.  She told me my brother had been

14   killed.

15   Q    Do you know if he had been brought to a hospital.

16   A    It was to my understanding that from where the

17   incident occurred they took him to the hospital that was

18   closest.

19   Q    Which was?

20   A    Lutheran Medical Center.

21   Q    Did you ever go to Lutheran Medical Center?

22   A    No.

23   Q    I want to direct your attention now to the

24   following day, February 28th of 2005.  Did there come a time

25   when you went to the office of the chief medical examiner to

SW

1    identify a body?

2        A    Yes.

3        Q    Whose body did you identify?

4        A    My brother's.

5        Q    Did you actually see his body or did you look at a

6    photograph of him?

7        A    I looked at a photograph.

8        Q    Was that indeed your brother Edgar Ojeda?

9        A    Yes, it was.

10       Q    I have nothing further.  Thank you.

11            THE COURT:  Any cross examination?

12            MR. DRANOVE:  No, sir.

13            THE COURT:  Thank you, Mr. Ojeda.  You're

14   excused.  You may step down from the witness stand.

15            (At this time, the witness exited the

16   courtroom.)

17            THE COURT:  You may proceed Ms. Chu.

18            MS. CHU:  People call Enrique Navarette.

19            (At this time, the witness entered the

20   courtroom.)

21            COURT SERGEANT:  Raise your right hand, face

22   the clerk, please.

23            COURT CLERK:  Solemnly swear the testimony

24   you are about to give will be the truth, the whole

25   truth, and nothing but the truth?

SW

Case 1:15-cv-02657-EK Document 9-1 Filed 12/08/15 Page 115 of 811 PageID #: 532

1          MR. NAVARETTE:  I do.

2          COURT CLERK:  Be seated, please.

3          State your name.

4          MR. NAVARETTE:  Enrique Navarette.

5          COURT CLERK:  What county do you live in?

6          MR. NAVARETTE:  Kings.

7          COURT CLERK:  Thank you.

8          THE COURT:  I'm going to ask you to slide up

9      and speak closer to the mike.

10         MR. NAVARETTE:  Sure.

11         THE COURT:  You may proceed.

12         MS. CHU: Thank you.

13  E N R I Q U E   N A V A R E T T E, having been duly sworn,

14  testified as follows:

15  DIRECT EXAMINATION

16  BY MS. CHU:

17     Q    Good morning Mr. Navarette.

18     A    Good morning.

19     Q    How old are you?

20     A    Thirty-four.

21     Q    Do you work?

22     A    Yes, I do.

23     Q    What do you do?

24     A    I'm a warehouse supervisor.

25     Q    I want to direct your attention now to February

SW

NAVARETTE - DIRECT/CHU

1  27th of 2005. Were you working or did you know about a bar

2  called El Borinquen Bar on 39th and Third in Brooklyn?

3      A    Yes, I know of it.

4      Q    And how did you know of this bar?

5      A    Well, I worked there on occasion before the night

6  in question. The night in question I was just there hanging

7  out with friends having a couple of drinks.

8      Q    What was the capacity under which you worked for

9  that bar?

10     A    I was a bouncer.

11     Q    Do you go by any other names?

12     A    Just Rick.

13     Q    Now, do you know if there were any other bouncers

14  that were working that night?

15     A    There was one bouncer. We called him Lion. I

16  believe his name was Luis Rivera.

17     Q    He was there that night?

18     A    Yes, he was.

19     Q    Now, can you tell me was the name of the bar El

20  Borinquen at the time or --

21     A    At the time I was there, yeah.

22     Q    Do you recall what the name of it was may be

23  before it was El Borinquen?

24     A    I believe it was Amanacer, A-M-A-N-A-C-E-R.

25     Q    Now, about how many -- I'm sorry. Withdrawn.

SW

135

NAVARETTE - DIRECT/CHU

1      About what time did you arrive at the location?

2    A    Probably got there about 11:30, quarter to 12.

3    Q    And can you just describe the bar for us?

4    A    As far as the size, or what do you mean?

5    Q    Just like when you walk in, what are you looking

6    at?

7    A    When you walk into the bar, the bar was located on

8    the left-hand side, probably came out about six feet.  There

9    was a path.  As soon as you walked in the door, there were

10   three tables, a side exit, the jukebox.  And then when you

11   went to the end of the bar, there was a dance floor.  And

12   where the DJ set up was all the way in the back corner, and

13   the bathrooms were on the left.

14   Q    The bathrooms were on the left in the back?

15   A    Yes.

16        MS. CHU:  Let the record reflect when he was

17        describing the three tables and jukebox, he was

18        pointing to his right side.

19   Q    Now, about how many people were there when you got

20   there?

21   A    Off the top of my head I can't tell you.  It

22   wasn't a lot, maybe ten, fifteen, the most.

23   Q    Okay.  And where did you set up?

24        You said you were there as a patron?

25   A    Yes.

SW

NAVARETTE - DIRECT/CHU

1    Q    Where did you set up?

2    A    I was right by the front door, right in the front

3    corner of the bar.

4    Q    Sitting at the bar?

5    A    Sitting at the bar.

6    Q    Did you know anybody else besides Lion, the other

7    bouncer that was there?

8    A    I knew the two bartenders that were there, Will

9    and Gloria, and Fugi, the manager at the time.

10   Q    He was present at the bar as well?

11   A    Yes, he was.

12   Q    Did you also know any other females that were at

13   the bar that were patrons?

14   A    I knew a couple of them that were there as

15   regulars, came in on a normal basis when I was working.

16   Q    Now, were you with anybody when you actually set

17   up?

18   A    I had a friend that was there, she came.  She met

19   me.  She actually got there a few minutes after I did.

20   Q    Now, did you notice when a group of about four

21   males entered into the location?

22   A    Yes, I did.

23   Q    And can you tell me, do you remember what they

24   were wearing?

25   A    I remember one, two of the gentlemen were wearing

SW

137

NAVARETTE - DIRECT/CHU

1  camouflage hoodies, and one gentleman was wearing a gray

2  sweat shirt.  I couldn't tell you what the other gentleman

3  was wearing.

4      Q    And the two that were wearing the camouflage

5  jackets --

6              MR. DRANOVE:  Objection.  The testimony was

7          hoodies.

8              THE COURT:  Were they wearing hoodies or

9          jackets?

10             MR. DRANOVE:  The testimony was hoodies.

11             THE COURT:  I'm going to ask.

12             THE WITNESS:  One gentleman had on a

13         camouflage jacket with a hoody, and the other

14         gentleman, if I'm not mistaken, was a camouflage hoody.

15     Q    And can you tell me, the one that had the jacket

16  on with the hoody underneath -- I'm sorry.  I'm going to

17  withdrawn that question.

18             Was there any difference in the build of the one,

19  the two that had the camouflage patterns on?

20     A    One gentleman was taller and thinner.  The other

21  one was a little shorter and stockier.

22     Q    Which one was the one that had the camouflage

23  jacket with the hoody?

24     A    That would have been the gentleman that was taller

25  and thinner.

SW

1    Q    I'm going to ask you, that you take a look around

2    the courtroom today and see if you see the person who was

3    wearing the camouflage jacket with the hoody underneath here

4    in the courtroom?

5    A    Yes, I do.

6    Q    Could you please point to him and tell me

7    something that he's wearing?

8    A    The gentleman in the pink top?

9         THE COURT:   He's indicating Mr. Rivera, the

10        defendant.

11        MS. CHU:   Thank you.

12   Q    Now, did you see where they went once they came

13   inside the location?

14   A    I saw them stand by the bar for a minute, and then

15   I guess they were buying a beer.  And then after that they

16   just went on in the back.  And I stood up front with my

17   friend drinking.  I didn't really notice anybody or anything

18   after that.

19   Q    Now, you had mentioned that there were some girls

20   that are regulars to the bar that you know?

21   A    Uh huh.

22   Q    Did you know a woman by the name of Jahaira?

23   A    Yes.

24   Q    Was she at the bar that night?

25   A    Yes, she was.

SW

1    Q    You said when the defendant entered with his

2  people that he went towards the back after going to the bar?

3    A    Yes.

4    Q    Do you remember where Jahaira was that night?

5    A    From my recollection, she was in the back of the

6  bar.

7    Q    Is that where the dance floors are?

8    A    Yes.

9    Q    Now, you had mentioned something about that

10  there's a jukebox and the exit door on the right-hand side?

11    A    Uh huh.

12    Q    Now, does that exit door, is it actually opened or

13  was it open that night?

14    A    It's not supposed to be open.  Normally it's kept

15  locked.  I never tested it.  But I can't say if it was open

16  or not.

17    Q    Normally it's locked?

18    A    Normally it's locked.

19    Q    You said you were not working that day?

20    A    No, I wasn't.

21    Q    Do you know if there were any other bouncers there

22  that night besides Luis?

23    A    No.  As far as I know, he was the only one.

24    Q    Is there any type of security or cover you have to

25  do when you get into the bar?

1      A    When you come in you're supposed to, your ID is
2   checked.  And at that particular bar we pat down the
3   gentlemen and any of the females we open their bag, take a
4   look through it to make sure there weren't any weapons in
5   the bag.  The females were not patted down, but they did
6   have a wand that was used on occasion.

7      Q    And do you remember him searching the defendant
8   and the people that he came in with?

9      A    Yes.

10     Q    Now, when you say "search," what do you mean when
11  you say pat down?

12     A    They're patted down.  Check their legs, belt
13  buckle, under the belt buckle, collars, hoods to make sure
14  there's nothing in the hood, pat the shoulders, chest and
15  back to make sure they're not concealing anything when they
16  come in.

17     Q    Can you tell me, it's not like you have to walk
18  through the metal detector or anything like that?

19     A    No.

20     Q    Do you remember using the wand on anyone?

21     A    No.  I did not have the wand at that time.

22     Q    The jukebox you mentioned that's by that door, did
23  you happen to notice that there were any people by the
24  jukebox later in the night?

25     A    Later in the night there was a group of, I don't

SW

1    remember, three or four.  But there were a couple of guys
2    standing there and a couple of other guys came on over and
3    that's about it.  About five or six people in total.

4        Q    And when you're talking about this five or six
5    people, you're talking about -- well, let me ask you, what
6    do you mean by some people came over?

7        A    There was one group already standing there.  There
8    was another group that came by and stood in the same area.
9    Two different groups, I'm assuming, you know.

10       Q    Can you describe the individuals that were
11   standing by the jukebox before the group came over to them?

12       A    I know there was a taller gentleman.  I forget
13   what he was wearing.  And then there was another gentleman,
14   if I'm not mistaken, he was wearing a white Met jersey.  I
15   remember telling him "nice jersey" when he came in because
16   I'm a Met fan.  But that's about it.

17       Q    Can you tell me, do you remember what they looked
18   like as far as skin tone or height?

19       A    Taller gentleman was darker complexion and the
20   shorter gentleman was light skin.

21       Q    Now, that's the one that had the Met jersey on?

22       A    Yes.

23       Q    Okay.

24            Now, you said that there was a group that walked
25   over to them?

SW

142
NAVARETTE - DIRECT/CHU

1      A      Uh huh.

2      Q      Now, and you said there was about five people in

3   total?

4      A      Well, when both groups were together there was

5   about five, six people in total, yes.

6      Q      Now, the three that came over, did you recognize

7   them from earlier in the night at all?

8      A      Yeah.

9      Q      And who were they?

10     A      The gentleman in the camouflage and the gray hoody

11  sweater.

12     Q      The defendant being one of them?

13     A      Yes.

14     Q      Do you remember who was standing in front of the

15  one that had a Met jersey on?

16     A      Well, I know when I looked over I saw, if this is

17  the jukebox, the gentleman, the shorter gentleman, this was

18  the guy with the Met jersey, the shorter gentleman was kind

19  of standing here, and the other gentleman was standing here.

20  I mean they were both standing in front of him.  But who was

21  closer to him?  I would say would probably be -- it's kind

22  of hard to say readily.  If this is the gentleman with the

23  Met jersey, this is the gentleman, the shorter gentleman and

24  this is the gentleman, the taller gentleman.

25     Q      The taller, meaning the defendant.

SW

1      A    The taller, yes.

2      Q    So the defendant, then the guy with the other

3    camouflage pattern was to his right?

4      A    Yes, and the other gentleman was standing right

5    here by the door.

6      Q    Meaning that's the guy with the Met jersey?

7      A    With the Met jersey, yes.

8      Q    So that would mean -- where is the exit in

9    relation to the guy with the Met jersey?

10      A    The exit in relation to the guy with the Met

11    jersey (indicating.)

12      Q    So his back was on the door?

13      A    He was standing right by the door.

14      Q    Now, did you watch continuously as you saw the

15    defendant when you were --

16      A    No, I wasn't watching.  I just happened to glance.

17    I just took a look around, you know.  Force of habit.  I saw

18    them come over and then I went back to my conversation.

19      Q    With your female friend?

20      A    Yes.

21      Q    Did there come a time when you looked over towards

22    where the jukebox was again?

23      A    Yes.

24      Q    Can you tell us what you saw?

25      A    I saw the two groups talking.  And then all of a

SW

1   sudden there was a couple of, you know, there was a push.

2   And then I saw Lion the bouncer come over.  So soon as I saw

3   him make his way towards the groups, I got up to help him,

4   to back him up, and, you know.

5       Q    Let me just stop you right there.  When you said

6   you saw someone push, who was it that you saw push?

7       A    I saw the defendant give a push to the gentleman

8   in the Met jersey.

9       Q    Do you recall how many times you saw him touch

10  him?

11      A    Maybe twice, you know.

12      Q    Maybe twice?

13      A    But I can't say for -- you know, I can't tell you

14  exactly, but I would say twice, maybe.

15      Q    Did you see anything in the defendant's hands when

16  you saw him touch the person in the Met jersey?

17      A    No.

18      Q    Were you looking for anything in his hand?

19      A    I wasn't looking for anything, no.

20      Q    Can you tell me where was it that you saw the

21  defendant touch the guy with the Met jersey on?

22      A    I would say sort of the shoulder, chest area.

23               MS. CHU:  Let the record reflect he's

24      referring to the area on the left side shoulder.

25               MR. DRANOVE:  No, the shoulder -- judge,

SW

1    would you take a look?

2              THE COURT:  The witness is indicating on the

3    upper left hand corner of his chest right where it's

4    adjacent to his shoulder, in that area.

5              MS. CHU:  Thank you.

6    Q    Now, once you saw the defendant touching the guy

7    with the Met jersey on, what did you see the defendant do?

8    A    Oh, at that point when Lion came over and we split

9    everybody, you know, he split them up, and I went and backed

10   him up, then the defendant and the other gentleman just

11   left.  You know, they left the bar and then we helped -- I

12   stood in front of the other two guys so they didn't go

13   outside and it didn't escalate further outside.

14   Q    Now, the third guy that you saw with the defendant

15   and the other person in the camouflage jacket, you said he

16   had gray on?

17   A    A grayish sweatshirt.

18   Q    Did he leave with the defendant?

19   A    He left I'd say maybe 20, 30 seconds afterwards.

20   Q    After defendant left?

21   A    Uh huh.

22   Q    When you said you walked over to where Lion was to

23   kind of separate the two groups, were you standing closer to

24   where the defendant had gone or were you closer to where the

25   person who got touched was?

SW

1      A    I was standing closer to the gentleman in the Met
2    jersey.

3      Q    The person that was standing with him, the taller
4    guy, the dark skin guy, was he still there with the person
5    who just got touched.

6      A    When we initially split them up, I was actually in
7    front of them, he actually swung over me to take a swing at
8    the gentleman in the gray sweatshirt.  And then after that,
9    that's when the gentleman in the gray sweatshirt left.  And
10   I just kind of stood in front of them, you know, looking out
11   towards the door to make sure Lion didn't need any help
12   outside.

13     Q    Did you ever turn around to where the person with
14   the Met jersey and his friends were?

15     A    I took a quick glance behind me, yeah.

16     Q    Was anybody behind other than them two?

17     A    I didn't see anybody in the vicinity, no.

18     Q    Let me just ask you this:  That would be in
19   between where the tables are right by the door and where the
20   jukebox is?

21     A    Yeah.  Well, yeah.  They were standing -- when I
22   was standing in front of them, they were basically standing
23   in front of the door by the jukebox.  This is the jukebox,
24   this is the door.  I had them, like they were right in that
25   corner.  I was standing in front of them so they didn't go

1    by.

2        Q    Okay.  Now, after the defendant left with the

3    other guys with the camouflage sweatshirt or whatever it

4    was, and you said about thirty seconds later the guy with

5    the gray sweatshirt goes?

6        A    Uh huh, yeah.

7        Q    Was the person with the Met jersey and his friend

8    still in the bar?

9        A    Yeah.

10       Q    Did there come a time when someone turned on any

11   lights?

12       A    Yes, the lights were turned on and Fugi wanted the

13   bar cleared out so everybody could go home.

14       Q    When the lights were turned on, did you happen to

15   look over to where the guy with the Met jersey was?

16       A    Well, actually when the lights were turned on, I

17   took a walk to the front to take a peek out to see if Lion

18   was okay.  By the time I got there, he was already coming

19   back.  He said "Everything is good.  Don't worry about it."

20   We came back in and that's when I heard the gentleman with

21   the Met jersey say "Oh, I think I'm bleeding."

22       Q    Did you see blood?

23       A    Yes.

24       Q    Where did you see the blood coming from?

25       A    The blood was coming from his upper area.

SW

148

NAVARETTE - DIRECT/CHU

1      Q      Upper chest area?

2      A      Yeah.

3      Q      Did you see any blood in the actual bar itself?

4      A      I didn't see any blood in the bar.  I saw some

5   blood on the concrete outside when he went out, because he

6   went outside and he was with his friends, and one of his

7   friends said "Let's call the ambulance."  And the other

8   gentleman said "My car is right there parked under the

9   Gowanus on Third Avenue.  Let's just drive to the hospital."

10   So they walked out.  I walked out behind them because I was

11   on my way out as well, and I saw some blood on the concrete.

12      Q      Did you ever go back into the bar after you exited

13   from the bar when you saw the victim and his friends

14   leaving?

15      A      I stepped back in the bar for a minute just to let

16   Fugi know that I was leaving.

17      Q      And then you left?

18      A      Then I left and I went home.

19      Q      Now, did you ever call the police at all?

20      A      Did I call the police?  No.

21      Q      I want to direct your attention to the following

22   day, February 28, 2005.  Did anyone contact you to go to the

23   72nd precinct to look at a line-up?

24      A      Yeah.  I was called by a detective that morning to

25   come down to see if I could view a line-up.  So I said fine.

SW

1    I went down.

2        Q    Can you tell me how did you get to the precinct?

3        A    I drove.

4        Q    Do you remember who it was that contacted you?

5        A    No, I don't.

6        Q    Did you go there with anyone?

7        A    No, I went by myself.

8        Q    Once you were there at the precinct, did the

9    detective put you anywhere?

10       A    I was put in a waiting area.  We waited there for

11   a while and then I was taken into a interview room.

12       Q    Were you with anybody?

13       A    Yeah.  There were, I believe there was the friends

14   of the gentleman in the Met jersey.  They were there as

15   well.  And I'm sorry, and Lion was there also.

16       Q    Now, when you went upstairs to look at the

17   line-up, did you, did the detective explain to you what was

18   going to happen?

19       A    Yeah.  He told me the line-up was going to be

20   coming through and he just said to look and see if I saw

21   anybody that I saw from the bar last night.  I said okay.

22       Q    And did you do that?

23       A    Yes, I did.

24       Q    Did you recognize anyone in the line-up?

25       A    Yes, I did.

SW

1        Q     Who did you recognize?

2        A     The defendant.

3        Q     And do you remember what position he was in?

4        A     No, I couldn't tell you.

5        Q     Did you tell the detective where you recognized

6    him from?

7        A     Yes.

8        Q     And did you tell him, did you tell the detective

9    what you saw the defendant doing?

10        A     At that point I don't believe we really got into a

11    conversation, no.

12        Q     You didn't?

13        A     No.  I didn't really get into that conversation

14    there during the line-up. He just said look at the line-up

15    and see if you see anybody from the bar last night. So when

16    I did, I told him, yeah, I recognized someone from the bar

17    last night.

18        Q     When you spoke to the detective, did you indicate

19    to the detective what you had seen the defendant doing?

20               MR. DRANOVE: Objection.

21               THE COURT: Overruled. You may answer.

22        A     I'm sorry, could you repeat the question?

23        Q     When you spoke to the detective, did you indicate

24    to him what you saw the defendant doing?

25        A     Yes, that he was part of the altercation.

SW

NAVARETTE - DIRECT/CHU

1    Q    Did you tell him about -- I'm sorry.  Did you tell

2    him whatever you had told us?

3                MR. DRANOVE:  Objection.

4                THE COURT:  Sustained as to the form of the

5         question so far.

6    Q    Did you tell the detective what you saw the

7    defendant doing?

8                MR. DRANOVE:  Objection.

9                THE COURT:  When are we talking about now?

10               MS. CHU:  At the time of the altercation at

11        the bar.

12               THE COURT:  No, at what time?

13               THE WITNESS:  At the line-up.

14   Q    When you're speaking to the detective?

15               THE COURT:  When he spoke to the detective

16        when?

17   Q    When you spoke to the detective at the precinct?

18   A    For the line-up?

19   Q    Yes.

20   A    No.  The only thing he asked me to do was look and

21   see if I saw anybody from the bar the previous night.  So I

22   told him I saw someone from the bar.  There was no

23   conversation about what happened at the bar, not during the

24   line-up.

25   Q    Did you have a conversation with the detective at

1    another time regarding what actually you saw?

2             MR. DRANOVE:  Objection.

3             THE COURT:  Overruled.  You may answer yes or

4        no.

5        A    Yes.

6        Q    And did you give him information regarding what

7    you had seen the defendant doing?

8        A    Yes, I did.

9        Q    Did you tell him about the fact that you had seen

10   the defendant --

11            MR. DRANOVE:  Objection.  Leading.

12            THE COURT:  I'm going to sustain the

13       objection to that question.

14       Q    Did you tell the detective what you saw the

15   defendant doing?

16            MR. DRANOVE:  Objection, asked and answered

17       already.

18            THE COURT:  Again, when are we talking about,

19       before or after the line-up?

20       Q    When you spoke to the detective, was this before

21   or after the line-up?

22       A    When I spoke --

23            MR. DRANOVE:  Objection to the form of the

24       question.

25            THE COURT:  Overruled.

SW

1            When did you tell the detective about what

2       you had seen, before or after the line-up?

3            THE WITNESS:  Before the line-up.

4       Q    You had already told him what you had seen?

5       A    Uh huh.

6            THE COURT:  Yes or no?

7            THE WITNESS:  Yes.  I'm sorry.

8       Q    So when you looked at the line-up, did you tell

9  the detective -- I'm sorry.  What did you tell the

10 detective?

11           MR. DRANOVE:  Objection, asked and answered.

12           THE COURT:  Sustained.  Asked and answered.

13      Q    During your interview with the detective before

14 the line-up actually occurred, did you tell them what you

15 had seen the defendant doing?

16      A    Yeah, I told them.

17           MR. DRANOVE:  Objection.  Asked and answered.

18           THE COURT:  Sustained.

19      Q    Was anyone else injured that you saw at the bar

20 that night?

21      A    Was anyone that I saw -- no.

22      Q    Did you see any altercations other than the one

23 that you saw between the defendant and the victim in this

24 case?

25      A    No.

SW

1    Q    Did you see the victim or his friends, anybody

2  getting into any arguments with anybody else during the

3  course of the night that you were there?

4    A    No.

5          MS. CHU:  At this time, your Honor, if I

6       could have People's number 4.

7          (Handing.)

8    Q    Mr. Navarette, do you recognize the photographs

9  that we have here?

10   A    Yes, I do.

11   Q    What are those pictures of?

12   A    These are pictures of the El Borinquen Bar.

13   Q    Is that the bar that you were out to on February

14  27, 2005?

15   A    Yes, it is.

16   Q    If you could just tell us -- I'm sorry, do you

17  have a marker up there?

18          COURT OFFICER:  Yes.  Which color?

19          MS. CHU:  I'm sorry, officer, if you could do

20       it, going from left to right, top to bottom, A, B, C,

21       D.

22          COURT OFFICER:  (Complying.)

23          MS. CHU:  Thank you.

24          COURT OFFICER:  Uh huh.

25   Q    Mr. Navarette, look at People's 4A.  What is that?

                        SW

155
NAVARETTE - DIRECT/CHU

1    A    It's a picture of the front of the bar.

2    Q    What street would you be on when you entered the

3 front entrance to the bar?

4    A    39th Street.

5    Q    Looking at the picture labeled B, what is that a

6 picture of?

7    A    That's a picture of the front of the bar.

8    Q    Looking towards which direction?

9    A    Looking towards the back of the bar.

10    Q    Now, you had mentioned the jukebox in your

11 testimony.  Do you see that jukebox in this photograph?

12    A    Yes, I do.

13    Q    Would you please point to it?

14    A    On B or C?

15    Q    On B.

16          MS. CHU:  He's indicating the lower right

17    hand corner of the photo.

18    Q    Taking a look at People's 4C, the bottom left

19 photograph, what is that a picture of?

20    A    That's a picture of the jukebox and the other --

21 exit door.

22    Q    And that's the exit door that you said normally is

23 kept locked?

24    A    Yes.

25    Q    The jukebox that's in People's picture 4C, is that

SW

1    the same jukebox that's in the earlier picture, People's 4B?

2        A    Yes, that is.

3        Q    And taking a look at People's 4D, could you tell

4    us what that's a picture of?

5        A    That's a picture toward the back of the bar.

6        Q    In which direction would you be looking in if you

7    were looking in that photograph, People's 4D?

8        A    You're looking towards the front of the bar, the

9    front entrance on 39th Street.

10       Q    Do you see the actual bar in that photograph?

11       A    Yes, I do.

12       Q    And where is it in the photograph?

13       A    In the photograph it's located on the right-hand

14   side.

15       Q    Thank you.

16            MS. CHU:   Now, if I can have the diagram put

17       up, please.   That's People's 6.

18       Q    Mr. Navarette, do you recognize the diagram that

19   we have here in front of you?

20       A    Yes, I do.

21       Q    What's that a diagram of?

22       A    The EL Borinquen Bar.

23       Q    If you can just tell us, you said that when you

24   initially came into the bar that you had sat down with your

25   lady friend at the bar like when you first walk in?

SW

1        A    Yes.

2        Q    Do you see the approximate area where you and your

3    lady friend were when you were at the bar?

4        A    Yes, I do.

5        Q    If you can take that marker -- is there a marker

6    there -- and just put your initials in the area that you

7    were at.

8        A    (Witness complying.)

9        Q    If you could remain standing.

10            When you saw the victim that was standing there

11   with his friends, do you see the area in the diagram where

12   they were at?

13       A    Yes, I do.

14       Q    Where was it?

15       A    Over here.

16            You want me to put a X?

17       Q    If you could just put CW there.

18            And that's where the both of them were standing?

19       A    Yes.

20       Q    You could have a seat now.  Thank you.

21            Now, Mr. Navarette, when you initially saw the

22   defendant walk over to where the victim was and had the

23   conversation, were you still in the same area that you

24   marked on the diagram?

25       A    Yes, I was.  Uh huh, yes.

SW

NAVARETTE - DIRECT/CHU

1    Q    When you saw the defendant touching the victim,

2  were you still in the same area?

3    A    Yes.

4    Q    Did you ever move from that -- I'm sorry.

5  Withdrawn.

6         When did you actually move over closer to where

7  the victim was?

8    A    I didn't get up until the pushing started, and I

9  saw Lion go over.

10   Q    Can you tell us where was it that you went after

11  you saw Lion go over?

12   A    When I saw Lion go over, I went towards the

13  jukebox here.

14   Q    So you were standing right where you had marked

15  CW?

16   A    Yes.

17   Q    Now, you had mentioned that the defendant along

18  with his friends and the other guy with the gray jacket were

19  standing in front of where the CW was marked?

20   A    That's where the gentleman in the Met jersey was

21  standing.  The defendant and his friends were standing more

22  in front of the jukebox.

23   Q    And --

24        I'm going to withdraw that.

25        MS. CHU:  Hold on one second, your Honor.

SW

1      Q    Do you remember whether or not the defendant had

2   anything on --

3                MR. DRANOVE:  Objection to leading.

4                THE COURT:  I have to hear the question.  Let

5        me hear the whole question.

6                MR. DRANOVE:  Whether or not?

7                THE COURT:  Well, let me hear the question.

8      Q    Do you remember if the defendant or any of the

9   people that he came in with were wearing anything on their

10  heads?

11               THE COURT:  Overruled.  You may answer.

12     A    I believe one gentleman had a hat on.

13     Q    Do you remember which one of them had the hat?

14     A    No, I don't.

15     Q    Do you remember what kind of hat it was?

16     A    Like a army hat but not a fatigue color, just a

17  solid green.

18     Q    Thank you very much.

19               MS. CHU:  I have nothing further.

20               THE COURT:  Cross examination.

21               MR. DRANOVE:  Thank you, judge.

22               I just want to get a close up of that.

23               THE COURT:  Be my guest.  You may approach

24       the exhibit.

25               MR. DRANOVE:  Could I stand here just to make

SW

1      it easier for me to see what I'm referring to because I

2      don't have a copy of that.

3              THE COURT:  For this part of the cross

4      examination.  Don't block the jury.  They need to see

5      the witness.

6   CROSS EXAMINATION

7   BY MR. DRANOVE:

8      Q    Is that the entrance the public uses to get into

9   the place on that night, or was the entrance at the top of

10  that diagram on 39th Street?

11     A    Yes, it was.

12     Q    Where you wrote EN is at the bar, correct?

13     A    Yes.

14     Q    Where you wrote CW is where the victim Mr. Ojeda

15  was standing, correct?

16     A    Yes.

17     Q    How far away were you from there?

18     A    I never actually judged the distance, but I say

19  maybe ten feet, between ten and fifteen feet.

20     Q    On that night was the lighting the usual lighting?

21     A    Yes.

22     Q    Did any of those photographs that you saw --

23              MR. DRANOVE:  And I'd like to ask the officer

24      to hold them up.

25              THE COURT:  That's People's 4.

SW

1          MR. DRANOVE:  The one with the pictures of

2     the inside.

3     Q     Do any of those pictures, best of the three

4     pictures of the inside best show what the lighting was like

5     when you observed what you observed and did what you did

6     that you testified to?

7          MS. CHU:  Objection.

8          THE COURT:  What's the -- sustained as to the

9     form.

10          Did the photo show the lighting as it looked

11     that night?

12          THE WITNESS:  Actually, it was probably

13     darker.  Normally when it's dark out, they always lower

14     the light, you know, you want to get a club atmosphere,

15     it's kind of dark.

16     Q     Would it be lower than the light in this picture

17     B?

18     A     Yeah, a little lower than that.

19     Q     And in picture D there's a globe, you know, like a

20     reflecting globe at the top?

21     A     Yeah.

22     Q     Does that have light within it?

23     A     No.  That just normally reflects the light that

24     was on at the bar.

25     Q     Thank you for that.

SW

1           I'm not done.

2           You have spoken to Ms. Chu about what you

3    observed, correct?

4      A    Yes.

5      Q    And you've spoken over the phone with me, correct?

6      A    Yes.

7      Q    I think you did come once to my office?

8      A    I don't believe so.  I think we've only spoken on

9    the phone.

10     Q    But you've gone to Ms. Chu's office?

11     A    Yes.

12     Q    Approximately how many times did Ms. Chu ask you

13   in her office if you saw a knife in Mr. Rivera's hand?

14     A    In the two times that I've spoken to her, been in

15   her office, I'd say twice, three times.

16     Q    Would you always say no?

17     A    Yes.

18     Q    Each and every time?

19     A    Yes.

20     Q    During the time it took for Lion to remove whoever

21   he removed, from then through the time Fugi had the lights

22   turned on, as you remember, did you hear any yelling or any

23   screaming?

24     A    There was some loud talking, but I really didn't

25   pay attention to it.  I was focused on what was going on in

SW

1    front of me.

2        Q    Do you recall if there was a real tall Latino guy

3    there, six, three, six, four, maybe as tall as you or

4    taller?

5        A    Yes.

6        Q    Did he strike anybody?

7        A    He took a swing.  That's the gentleman that took a

8    swing over me at the gentleman in the gray sweatshirt.

9        Q    Can you tell me what the gentleman in the gray

10   sweatshirt looks like?

11       A    He was a little shorter than me, maybe six foot,

12   dark skin as well.  I believe he had a bald head.

13       Q    Was it my client?

14       A    No.

15       Q    Was he about the same complexion as my client?

16       A    Yes.

17       Q    Same facial structure as my client?

18       A    Yes.

19            MS. CHU:  Objection.

20            THE COURT:  Overruled.  You may answer.

21       A    Yes.

22       Q    Same height as my client?

23       A    About.

24       Q    And this tall fellow swung at that person, not my

25   client, is that correct?

SW

164
NAVARETTE - CROSS/DRANOVE

1    A    Yes.

2    Q    Did you see that person do anything at all before

3 the tall person swung at him?

4              MS. CHU:  Objection --

5    A    No.

6              MS. CHU:  -- as to who we're talking about

7 here.

8              THE COURT:  Overruled.  You may answer.

9    A    No, I didn't.

10   Q    Was there -- well, I think -- did you use the word

11 altercation to describe what you and Lion were separating

12 and splitting up?

13   A    Yeah.  I call altercations anything that happens

14 in between two groups that might escalate.

15   Q    How many people were in the altercation at the

16 time that you were there?

17   A    At the time that we split, there was five.

18   Q    And did Lion remove my client?

19   A    No, he left.

20   Q    How did my client leave?

21   A    He just walked out the door.

22   Q    Did you see him walk out the door?

23   A    I saw him walk to the door.

24   Q    You didn't see him walk out the door?

25   A    No.

SW

NAVARETTE - CROSS/DRANOVE

1    Q    You don't know how he got out?

2    A    No.

3    Q    How far did he have to walk to get to the door

4    from where you saw him?

5    A    From the jukebox to the front door, again never

6    estimated it, maybe between ten and fifteen, closer to

7    fifteen.

8    Q    Did you see the tall fellow who swung at a person

9    go towards the front door?

10   A    At the time that we split the people up, no.

11   Q    Did you see him have any kind of interaction with

12   Lion?

13   A    No, because when we split the two groups up, the

14   defendant and his friend went towards the front door, Lion

15   went after them.  The gentleman in the Met jersey and his

16   friend, I kind of stood in front of them to keep them

17   behind.  We didn't want to let everybody leave at the same

18   time so there wasn't another thing going on outside the bar.

19   Q    So you were in front of the gentleman with the

20   jersey and his friends?

21   A    Yes.

22   Q    What went on behind you you couldn't see, correct?

23   A    No.

24   Q    Did you see that tall fellow who struck somebody

25   follow anyone in the bar?

SW

NAVARETTE - CROSS/DRANOVE

1     A    No.

2     Q    Or confront anyone in the bar besides the person

3   he struck?

4     A    No.

5     Q    Did you see him attempt to leave the bar and be

6   stopped by Lion?

7     A    I can't say that I saw that, no.

8     Q    The bar served alcoholic beverages, correct?

9     A    Yes.

10    Q    Some with lime, some with lemon?

11    A    Yes.

12    Q    And you used knives to cut the limes, knives to

13  cut the lemons?

14    A    Yes, they did.

15    Q    Can you describe the knives?

16    A    Small knives.  I didn't work behind the bar.

17    Q    How many people do you recall being in the bar,

18  that you recall being in the bar that night?

19    A    Honestly, the bartender, the female I was with and

20  Jahaira.  I think there were maybe two more.

21    Q    As far as you understood it, the females were not

22  searched when they entered the bar?

23    A    They were not patted down, no.

24    Q    The men were?

25    A    Yes.

1        Q    Can you describe again the pat down?

2        A    Pat down is, we check, we pat the legs both sides,

3   front and back, you check under the belt, you pat down the

4   shoulders, the chest, the back.  If they have a hood on, we

5   check the hood.  If they have a hat, we pull off the hat, we

6   check the inside lining of the hat, make sure there's

7   nothing in there.  You know, pat anywhere you feel like they

8   could conceal something that they could use as a weapon

9   inside.

10       Q    Did you consider that procedure to be a thorough

11  pat down?

12       A    A thorough pat down, yes.

13       Q    When -- strike that.

14            Did Lion move a group to get them out the door?

15       A    I believe there was some people standing by the

16  door.  I know when I heard, I did move, you know, get out of

17  the way.  But I don't know if he actually physically had to

18  move anybody.

19       Q    Did you see anybody punching anyone else besides

20  the one you talked about?

21       A    No, I didn't.

22       Q    When Mr. Rivera pushed the fellow, did he use an

23  open hand?  If you remember.

24       A    I honestly couldn't tell you.  I don't know if it

25  was open or closed.  I just saw his arm go in that

                            SW

1  direction.

2      Q    You had your hand open when you just gestured.

3      A    I'm sorry.  That's a force of habit.  I couldn't

4  tell you if his hand was opened or closed.

5      Q    But you can tell us he did not have a knife in his

6  hands?

7      A    I can tell you I didn't see one, yes.

8      Q    And you saw his hand, correct?

9      A    Yes.

10     Q    Thank you.

11              MR. DRANOVE:  No further question.

12              THE COURT:  Redirect?

13              MS. CHU:  Yes, your Honor.  Just a few

14     questions.

15              MR. DRANOVE:  Judge, may I continue before

16     she starts?

17              THE COURT:  If you have a good question.

18              MR. DRANOVE:  I think I do.

19              THE COURT:  All right.

20     Q    Is it true that Mr. Rivera never touched the guy

21  in the back, the man who was pushed?

22     A    I did not see him.

23     Q    You did not see him?

24     A    I did not see him touch the gentleman in the back.

25     Q    And your attention was drawn to that?

SW

1    A    Once I saw the pushing going on, yes.

2    Q    So you saw the push in the front, not in the back?

3    A    Yes.

4         MR. DRANOVE:  Thank you.

5         THE COURT:  Is that your final question?

6         MR. DRANOVE:  Yes.

7         THE COURT:  Okay.  Redirect?

8         MS. CHU:  Yes.

9    REDIRECT EXAMINATION

10   BY MS. CHU:

11   Q    Mr. Navarette, prior to seeing the defendant push

12   the victim in the chest, was your attention directed towards

13   him at that point?

14   A    No.

15   Q    So you don't know what he did before you saw him

16   actually push?

17   A    No, I don't.

18   Q    Now, you also said that you didn't know if his

19   hand was open or closed?

20   A    Uh huh.

21   Q    So although you didn't see something, you don't

22   know if he had anything in his hands?

23   A    I don't know, no.

24   Q    Now, there's a jukebox over there, right?

25   A    Yes.

1    Q    In fact in People's C, on 4C up there, that

2   jukebox is right there?

3        A    Yes.

4        Q    Was it working that night?

5        A    No, there was a DJ.

6        Q    There was a DJ?

7        A    Yes.

8        Q    But it's used?

9        A    Well, it can be used.  It's played during the

10  week, but on the weekends it's not used.

11       Q    It's not used?

12       A    No, the DJ plays all the way through the night.

13       Q    I just wanted to ask you, in People's 4C, is that

14  the area that you're talking about that the victim was

15  standing with his tall friend, the dark skin guy with the

16  bald head?

17       A    Yes.

18       Q    Is that the same area that they were in when you

19  walked over after Lion came to kind of separate the two

20  groups?

21       A    Yes.

22       Q    So if --

23            MS. CHU:  If I can approach the exhibit, your

24       Honor?

25            THE COURT:  You may.

SW

171
NAVARETTE - REDIRECT/CHU

1    Q    When you said you were trying to separate the two
2   groups, you had mentioned a corner between the jukebox and
3   where the door is?

4    A    Yes.

5    Q    Would that be the corner that you're talking about
6   right here?

7    A    Yes.

8    Q    So when you came over, were you standing closer to
9   this side or closer to where the jukebox is?

10                THE WITNESS:  May I go over --

11                THE COURT:  Certainly.

12    A    We're in this area, and I was standing right over
13   there just trying to keep them blocked over there so they
14   didn't go outside after the other guys.

15                THE COURT:  The witness indicated he was on
16        the right side of People's 4C as you look at it.

17    Q    Okay, thank you.

18          And you said that when you turned around it was
19   just the victim and his friend, the tall guy?

20    A    Yes.  When I turned to check who was behind me, it
21   was only them two.

22    Q    You had mentioned that the way you pat down that
23   that's what you consider to be a thorough pat down?

24    A    As far as a pat down goes, yes.

25    Q    You didn't use a wand on the defendant?

SW

172

NAVARETTE - REDIRECT/CHU

1      A    No, I didn't.

2      Q    So it's not like someone walked through a metal
3  detector?

4      A    No.

5      Q    And you said that pat downs are not done on the
6  women that come into the bar?

7      A    No, they're not.

8      Q    Now, the women that you said were in the bar were
9  Jahaira was one of them, right?

10     A    Yes.

11     Q    And you said she was in the back, right?

12     A    Yes.

13     Q    Towards where the dance floor is?

14     A    Yes.

15     Q    Now, is the dance floor like lighter or darker
16  than where the bar is?

17     A    It's probably darker.

18     Q    Darker back there?

19     A    Yes.

20     Q    And you said that light, the disco ball that's in
21  People's 4D, that's actually there to reflect the lights
22  that comes from the bar itself?

23     A    That normally reflects the lights when the lights
24  are on, but normally during the night it doesn't do
25  anything.  It's just there.

SW

1    Q    Only the bartenders need lights to serve their

2    drinks to know what they're doing?

3    A    They have lights behind the bar.  It's a little

4    more lit behind the bar.  Normally the back drop where they

5    keep the liquor has lights as well.

6            MS. CHU:  I'm sorry.  Just one second, your

7        Honor.

8            THE COURT:  Certainly.

9            MS. CHU:  I have nothing further.  Thank you.

10           THE COURT:  Any recross?

11           MR. DRANOVE:  I don't know if this was

12       covered on --

13   RECROSS EXAMINATION

14   BY MR. DRANOVE:

15   Q    Did you have anything to drink at the bar before

16   you made your observations?

17           MS. CHU:  Objection.

18           THE COURT:  Overruled.  You may answer.

19   A    Yes, I did.

20   Q    What did you have?

21   A    I had a beer.  And I think I was on my third

22   drink, which is Bacardi Rum and cranberry.

23   Q    But only one beer?

24   A    Yes.

25   Q    When did you start drinking there?

SW

1      A     Probably about five minutes after I got there.

2      Q     When did you arrive there?

3      A     I got there between 11:30 and 11:45.

4      Q     Do you have any recollection of when this incident

5  you described took place?

6      A     No, I don't.

7            MS. CHU:  Objection, your Honor.  It's beyond

8        the scope.

9            THE COURT:  Overruled.

10     A     No, I don't.

11     Q     Earlier on that Saturday night had you had

12 anything to drink any place else?

13     A     Yeah, I had a couple of beers with some friends

14 before I got to the bar.

15     Q     When you say "couple," two or could it have been

16 more than two?

17     A     Probably about three or four beers.

18     Q     When did you start drinking those three or four

19 beers?

20     A     We had went out to dinner.  I think we got to

21 dinner about 8:30.

22     Q     So between 8:30 and when this incident took place,

23 you had about four to six beers and you were on your third

24 Bacardi drink?

25     A     Yes.

SW

175
NAVARETTE - RE-REDIRECT/CHU

1    Q    Thank you.

2              MR. DRANOVE:  I have no further questions.

3              THE COURT:  You want to ask him about that

4    Ms. Chu?

5              MS. CHU:  Yes, your Honor.

6    RE-REDIRECT EXAMINATION

7    BY MS. CHU:

8    Q    I'm sorry, what did you eat at dinner?

9    A    I honestly don't remember.  I think we went to a

10   Mexican restaurant so I probably had a quesadilla and rice.

11   That's normally what I get.  I can't remember one hundred

12   percent.

13   Q    So you were eating while you were drinking?

14   A    Yes.

15   Q    And when you got to -- well, during the

16   altercation or when this actually occurred, would you say

17   that you were impaired at all?  Were you falling down drunk?

18   A    No, I wasn't.

19   Q    And you actually got there by driving, right?

20   A    Yes, I did.

21   Q    And you felt that you were fine enough to drive?

22   A    Yes.

23   Q    When you got there you were able to know that Lion

24   needed help, to come over, right?

25   A    Yes.

SW

1   Q    It's not like you were falling asleep in the

2   chair, anything like that?

3        A    No.

4             MS. CHU:  I have nothing further.

5   RE-RECROSS EXAMINATION

6   BY MR. DRANOVE:

7        Q    So you drove after how many drinks?

8        A    After the beers, and yeah, what, three, four, five

9   beers and three drinks.

10       Q    Nobody tested your blood alcohol before you drove,

11  correct?

12       A    No, they didn't.

13       Q    Of course not.

14            And it was dark in there, wasn't it?

15       A    Yes, it was.

16            MR. DRANOVE:  No further questions.

17            THE COURT:  Thank you Mr. Navarette.  You're

18  excused.  You may step down from the witness stand.

19            (At this time, the witness exited the

20  courtroom.)

21            THE COURT:  You may proceed, Ms. Chu.

22            MS. CHU:  People call Justin Harriman.

23            (At this time, the witness entered the

24  courtroom.)

25            COURT SERGEANT:  Stand in front of the chair,

SW

177
HARRIMAN - DIRECT/CHU

1    raise your right hand, face the clerk.

2              COURT CLERK:  Raise your right hand.

3              Solemnly swear the testimony you are about to

4    give will be the truth, the whole truth, and nothing

5    but the truth?

6              RETIRED OFFICER HARRIMAN:  Yes, I do.

7              COURT CLERK:  Be seated.

8              State your name, please.

9              RETIRED OFFICER HARRIMAN:  Justin Harriman.

10             COURT CLERK:  What county do you live in?

11             RETIRED OFFICER HARRIMAN:  I now live in

12   Belmont, Massachusetts.

13             THE COURT:  You may examine the witness

14   Ms. Chu.

15             MS. CHU:  Thank you.

16   J U S T I N   H A R R I M A N, having been duly sworn,

17   testified as follows:

18   DIRECT EXAMINATION

19   BY MS. CHU:

20        Q    Good morning Mr. Harrison.

21             MR. DRANOVE:  Harrison or Harriman?

22        Q    Harriman, I'm sorry.

23             Good morning Mr. Harriman.

24        A    Good morning.

25        Q    Are you a former member of the New York City

SW

HARRIMAN - DIRECT/CHU

1    Police Department?

2        A    Yes, I am.

3        Q    Can you tell me what was the circumstances under

4    which you left the New York City Police Department's

5    employee?

6        A    I retired after serving five years.

7        Q    And you said you're currently in Massachusetts?

8        A    Yes, I am.

9        Q    Now, can you just tell us where were you assigned

10   before you retired?

11       A    The precinct I was at before I retired was Highway

12   Two, and before that the 72nd precinct.

13       Q    And when was it that you actually retired?

14       A    I believe it was July 18, 2008.

15       Q    I want to direct your attention to February 27,

16   2005.  Were you working as an officer at the 72nd precinct

17   on that date?

18       A    Yes, I was.

19       Q    And can you tell the members of the jury what

20   hours you worked?

21       A    I worked the midnight shift which started at 11:15

22   p.m. until 7:50 a.m.

23       Q    You actually started the day before on the 26th?

24       A    Yes.

25       Q    Did you have a partner that day?

SW

 1      A    Yes, I did.

 2      Q    And who was that?

 3      A    Her name was Officer Zambrano.

 4      Q    Were you guys assigned to a car or on foot?

 5      A    We were in a car.

 6      Q    Was that car marked or unmarked?

 7      A    Marked.

 8      Q    Were you in uniform or plain clothes?

 9      A    In uniform.

10      Q    I want to direct your attention to sometime during

11  the night about, actually sometime during your shift on

12  February 27, 2005.  Did there come a time when you were

13  directed to go anywhere?

14      A    Yes.

15      Q    Where were you directed to go?

16      A    To Lutheran Medical Center.

17      Q    How was it that you got the assignment?

18      A    We were radioed via the dispatcher to call the

19  command, and we called the command and they informed us to

20  respond over to Lutheran Medical Center.

21      Q    What was your reason for responding over to

22  Lutheran Medical Center?

23      A    There was a need for a police officer to be there.

24      Q    When you arrived at the location -- I'm sorry, did

25  you arrive at Lutheran Medical Center?

1      A      Yes, we did.

2      Q      Was there anybody particular that you were

3   supposed to go to speak to or what was your purpose for

4   being there?

5      A      There was a injured party and we were to go there

6   to see what happened.

7      Q      And when you arrived at the hospital, can you tell

8   me did you learn the name of the individual that had been

9   injured?

10     A      Yes.

11     Q      And what did you learn his name to be?

12     A      Edgar Ojeda.

13     Q      Can you tell me when you arrived at the hospital

14   what was his condition at that point?

15     A      He was being treated by the doctors in the trauma

16   center.

17     Q      Did there come a time when they stopped treating

18   him?

19     A      Yes.

20     Q      Now, did you actually see Mr. Ojeda's body while

21   you were at the hospital?

22     A      Yes.

23     Q      Can you tell me did you observe any injuries to

24   his body?

25     A      Yes, I did.

SW

181

HARRIMAN - DIRECT/CHU

1   Q   And where did you see those injuries?

2   A   He was apparently stabbed three times.  Once in

3   the left side of his neck, and twice in the left side of his

4   rib cage.

5   Q   Can you tell me what was his condition when you

6   actually saw those injuries?

7   A   He was deceased at that time.

8   Q   Now, did you speak with any individuals that were

9   at the hospital with regard to Mr. Ojeda?

10  A   Yes, I did.

11  Q   And did you get any contact information from them?

12  A   I got their names.

13  Q   Did you provide those names to detectives from

14  your precinct?

15  A   Yes.

16  Q   Now, I want to direct your attention to February

17  28, 2005 about 9:30 in the morning.  Were you present at the

18  office of the chief medical examiner here in Kings County?

19  A   Yes.

20  Q   What was your purpose for being there?

21  A   To identify Mr.  Ojeda's body again.

22  Q   Did you identify his body?

23  A   Yes, I did.

24  Q   Was that the same person that you had seen at

25  Lutheran Medical Center the day before?

1        A    Yes.

2        Q    At this time, other than the duties and

3    responsibilities that you just described, did you have any

4    further involvement in this case?

5        A    I vouchered the clothes that were taken off of him

6    at the hospital for safekeeping.

7        Q    Other than that, did you have any further

8    involvement?

9        A    No.

10       Q    Thank you very much.

11              MS. CHU:  I have nothing further.

12              THE COURT:  Any cross examination

13   Mr. Dranove?

14              MR. DRANOVE:  Yes.

15   CROSS EXAMINATION

16   BY MR. DRANOVE:

17       Q    Sir, are you still involved in law enforcement?

18       A    I am not.

19       Q    Are you employed?

20       A    I am employed.

21       Q    What type of work are you working right now?

22       A    I am a waiter.

23       Q    Did you on that February morning when you went to

24   the hospital, were you in the presence of a medical

25   examiner?

SW

183
HARRIMAN - CROSS/DRANOVE

1    A    At the hospital?

2    Q    At the hospital.

3    A    I'm sorry, I don't understand the question.

4    Q    Let me ask it again.

5         Were you present when the autopsy of Mr. Ojeda was

6    performed?

7    A    No, I was not.

8    Q    Has Ms. Chu or anybody else shown you any diagrams

9    drawn by the medical examiner as to where the injuries were

10   on the body of Mr. Ojeda?

11   A    No.  I witnessed those myself.

12   Q    And you say one was on the neck and two were in

13   the rib cage?

14   A    Yes.

15              MR. DRANOVE:  No further questions.

16              THE COURT:  Any redirect?

17              MS. CHU:  No, your Honor.

18              THE COURT:  Thank you Mr. Harriman.  You're

19        excused.  You may step down from the witness stand.

20              MR. DRANOVE:  Well --

21              THE COURT:  We got to be a little more on the

22        ball.

23   Q    Do you remember the name of the people you spoke

24   to at the hospital?

25   A    Yes, I do.

SW

184

COLLOQUY

1     Q     What are they?

2     A     Carlos Solomon, Jonathan Dominguez, and Marcus

3     Carrasquillo.  I have trouble pronouncing the last name.

4               THE COURT:  That's it.  You're sure?

5               MR. DRANOVE:  Yeah.

6     Q     Did you discuss --

7               THE COURT:  You're not sure.

8     Q     Did you discuss with them the location of the

9     wounds on the body?

10    A     I don't recall.

11              MR. DRANOVE:  No further questions.

12              THE COURT:  Did you want to ask him anything

13    about that Ms. Chu?

14              MS. CHU:  No.

15              THE COURT:  Thank you Mr. Harriman.  You're

16    now excused for sure.

17              (At this time, the witness exited the

18    courtroom.)

19              THE COURT:  You may proceed Ms. Chu.

20              MS. CHU:  People call Jonathan Dominguez.

21              (At this time, the witness entered the

22    courtroom.)

23              COURT SERGEANT:  Take the witness stand,

24    please.

25              COURT CLERK:  Step up and raise your right

SW

1    hand, please.

2              Solemnly swear the testimony you are about to

3    give will be the truth, the whole truth, and nothing

4    but the truth?

5              MR. DOMINGUEZ:  Yes.

6              COURT CLERK:  Be seated.

7              State your name.

8              MR. DOMINGUEZ:  Jonathan Dominguez.

9              COURT CLERK:  What county do you live in?

10             MR. DOMINGUEZ:  Kings County.

11             THE COURT:  You may inquire Ms. Chu.

12             MS. CHU:  Thank you.

13   J O N A T H A N   D O M I N G U E Z, having been duly sworn,

14   testified as follows:

15   DIRECT EXAMINATION

16   BY MS. CHU:

17        Q    Good morning Mr. Dominguez.

18        A    Good morning.

19        Q    How old are you, sir?

20        A    31.

21        Q    And can you tell me, are you employed?

22        A    No.

23        Q    Do you know someone named Edgar Ojeda?

24        A    Yes.

25        Q    How do you know him?

186
DOMINGUEZ - DIRECT/CHU

1    A    He's a friend of mine.

2    Q    And how long have you known him?

3    A    Probably for like four years before he passed

4  away, four years.

5    Q    How did you meet him?

6    A    I met him through my friend Carlos.

7    Q    Now, just before we get into that, I just want to

8  ask, do you have a criminal history?

9    A    Yes.

10    Q    Can you tell me on May 30 of 2000, did you plead

11  guilty to attempted criminal sale of a controlled substance

12  in the third degree?

13    A    Yes.

14    Q    And in that case, sir, you received a sentence of

15  six months in jail and five years probation?

16    A    Yes.

17    Q    And in that case you were selling cocaine?

18    A    Yes.

19    Q    Were you also convicted on June 12th of 2003 of

20  aggravated unlicensed operation of a motor vehicle in the

21  third degree?

22    A    Yes.

23    Q    And in that case did you pay a fine of $500?

24    A    Yes.

25    Q    And on March 24th of 2006, did you also plead

SW

DOMINGUEZ - DIRECT/CHU

1  guilty to driving while intoxicated, a misdemeanor?

2      A    Yes.

3      Q    And in that case did you also, did you get

4  sentenced to a conditional discharge and have to go to an

5  alcohol abuse program?

6      A    Yes.

7      Q    Yes?

8      A    Uh huh.

9      Q    And September 25, 2008 were you convicted of

10 criminal possession of a controlled substance in the seventh

11 degree?

12     A    Yes.

13     Q    And in that case you were in possession of

14 cocaine?

15     A    Yes.

16     Q    And in that case you received, I believe it was

17 thirty days in jail?

18     A    Yes.

19     Q    Is that true?

20     A    Uh huh.

21          THE COURT:  You need to say yes or no.

22     A    Yes.  Sorry.

23     Q    What about October of 2008, October 30th

24 specifically of 2008, did you plead guilty to a violation of

25 disorderly conduct in which you were sentenced to a

SW

1 conditional discharge?

2    A    Yes.

3    Q    Now, that we got that out of the way.

4         I want to direct your attention to February 26th

5 of 2005 into the early morning of February 27, 2005.  Did

6 you have any plans with Edgar?

7    A    Yes.

8    Q    Now, you said that you knew Edgar through your

9 friend Carlos?

10   A    Yes.

11   Q    What's Carlos's last name?

12   A    Solomon.

13   Q    Do you also know someone by the name of Marcus?

14   A    Yes.  That's my cousin.

15   Q    What's Marcus's last name?

16   A    Carrasquillo.

17   Q    Did you have any plans with Edgar that day?

18   A    Yes.

19   Q    What were the plans?

20   A    We were planning to go out to a bar.

21   Q    Earlier in the day did you spend any time with

22 Edgar, Carlos or Marcus?

23   A    Yes.

24   Q    Where?

25   A    We want to Fulton to buy some clothes.  Edgar

SW

DOMINGUEZ - DIRECT/CHU

1   bought some sneakers.

2       Q    Edgar bought sneakers.  So you guys went shopping?

3       A    Yeah, shopping.

4       Q    After you guys went shopping, where did you go

5   next?

6       A    We want back to Carlos house.

7       Q    Did you have any plans for later that evening?

8       A    Yes.

9       Q    What were the plans?

10      A    We were going to a bar that my cousin Marcus knew.

11      Q    Do you know where that bar was located?

12      A    It was downtown Brooklyn.  I really don't know.

13      Q    Do you remember the name of it?

14      A    No.

15      Q    After you guys went shopping and then you went

16  back to Carlos's house, did you stay at Carlos's house

17  before you went back out again or did you go anywhere?

18      A    No, we stood there.

19      Q    Did you ever go and get anything to eat at your

20  house?

21      A    Not that I recall.

22      Q    Do you remember eating anything?

23      A    No.

24      Q    Now, did there come a time when you guys started

25  to go out?

SW

1      A    Yes.

2      Q    Later that night?

3      A    Yes.

4      Q    Do you remember about what time it was you guys

5  went out?

6      A    Maybe like 12 o'clock, 11:30, 12.

7      Q    You said that it was supposed to be a bar

8  somewhere downtown?

9      A    Yes.

10     Q    Did you ever get to that bar that Marcus knew?

11     A    No, couldn't find it.

12     Q    Where did you guys end up?

13     A    We wound up in a strip club.

14     Q    Where is that strip club located?

15     A    On 37th and Third Avenue.

16     Q    How did you guys get there?

17     A    Carlos was driving.

18     Q    Could you just wait for me to finish the question

19  so she can get everything we're saying.

20          You said you had ended up at 37th and Third at a

21  strip club?

22     A    Yes.

23     Q    Do you remember what the name of that strip club

24  was?

25     A    Cocktails.

1    Q    Once you were at Cocktails, did you guys have any
2  cocktails?

3    A    Yes.

4    Q    What were you drinking there?

5    A    Beer.

6    Q    What kind of beer?

7    A    Heineken.

8    Q    Do you remember about how many Heinekens you guys
9  had when you were there?

10    A    Two, three.

11    Q    Once you were there, did there come a time when
12  you left Cocktails?

13    A    Yes.

14    Q    Where did you go?

15    A    We went to Amanacers.

16    Q    Where is that located?

17    A    On 39th and Third Avenue.

18    Q    Did Carlos drive from the Cocktails place to
19  Amanacer or did you guys walk the two blocks?

20    A    I'm not sure.  Maybe we drove.  I don't recall.

21    Q    But you had eventually ended up at Amanacers?

22    A    Yes.

23    Q    Do you remember if that was the actual name at the
24  time or that's what you know it as?

25    A    That's what I know it as.

1    Q    Had you ever been to that bar before?

2    A    Yes.

3    Q    It was still the four of you?

4    A    Yes.

5    Q    Did you change at all from what you wore from when

6    you went shopping during the day, or you --

7    A    No.

8    Q    If you recall?

9    A    We didn't change at all.

10   Q    Can you tell me once you arrived at Amanacers did

11   you drink anything there?

12   A    Yes.

13   Q    What did you get to drink?

14   A    One beer.  We didn't even drink a beer.  We just

15   got there like five, ten minutes.

16   Q    Can you tell me when you first got to the bar

17   where did you go?

18   A    Straight to the bar to get a drink.

19   Q    Did you see where Edgar went?

20   A    He was right with me, right behind me.

21   Q    Did you stay by the bar?

22   A    Yeah, stood by the bar.

23   Q    Do you know whether there's a jukebox in that bar?

24   A    Yes.

25   Q    Did you go anywhere near the jukebox?

SW

1      A      That's where we were standing, right next to the

2   jukebox.

3      Q      Well, the bar is across the way from there, right?

4      A      Yeah, but it's right there, like three feet.

5      Q      Three feet away?

6      A      Yeah.

7      Q      Were you standing closest to the jukebox or are

8   you standing closer to the bar?

9      A      I was by the bar.  They were closer to the

10  jukebox.

11     Q      When you say "they," who are you talking about?

12     A      Marcus, Edgar and Carlos.

13     Q      Did you know anyone there?

14     A      Some kid Rudy.  I don't know his last name.

15     Q      How do you know Rudy?

16     A      He lives in the neighborhood.

17     Q      Did you guys have a conversation, you and Rudy?

18     A      Yeah, I was talking to him.

19     Q      And when you were talking to him -- I'm sorry,

20  does Marcus know him as well?

21     A      Yes.

22     Q      Do you know whether or not Carlos or Edgar knows

23  him?

24     A      Carlos might know him because of his friends, but

25  Edgar didn't know him.

SW

1    Q    Edgar didn't know him?

2    A    No.

3    Q    When you were standing there talking with Rudy,

4  can you tell me where was Edgar, Carlos and Edgar, Carlos

5  and Marcus to your body, front of you, side of you?

6    A    They were behind me.

7    Q    Was Rudy facing you when you were talking to him?

8    A    Yes.

9    Q    Can you tell me what happened while you were

10  talking with Rudy?

11    A    I heard like a scuffle behind me.

12    Q    When you say "scuffle," what do you mean?

13    A    Voices, people arguing.

14    Q    So did you turn around?

15    A    Yeah, turned around immediately.

16    Q    When you turned around, can you tell us did you

17  see anybody involved in the scuffle?

18    A    No.

19    Q    What did you see?

20    A    I seen two guys right there.  But the bouncer was

21  like kicking them out.  So I ran to Edgar and Carlos like,

22  what's going on, what's going on.  And that's when Edgar was

23  like "Yo, I'm stabbed."

24    Q    Did you see what happened before you turned around

25  from the commotion?

SW

195

DOMINGUEZ - DIRECT/CHU

1    A    No.

2    Q    When you walked up to Edgar -- I'm sorry, you

3  walked up to Carlos and Edgar, did you see any injuries on

4  him?

5    A    Yeah.  The blood was pouring out -- not pouring

6  out, but like leaking down.

7    Q    And can you tell me where was it that you saw the

8  blood coming from?

9    A    Right here, like on his neck by the shoulder

10  blade.

11        MR. DRANOVE:  Indicating the right side.

12        THE COURT:  The left side of his body.

13        Which side are you indicating?

14        MR. DRANOVE:  Right side.

15        THE COURT:  I'm sorry, you're right, the

16    right side of his neck where it meets the shoulder.

17    Q    Now, you said you saw two guys.  What did you see

18  them doing?

19    A    Just like, I did not really see them doing

20  nothing.  When I got there the bouncers was breaking them up

21  and they were just leaving.

22    Q    They were leaving?

23    A    They kicked them out.

24    Q    Do you remember what those two were wearing?

25    A    I just remember one had a hoody on with a army

1  jacket.

2      Q    A hoody with a army jacket?

3      A    Yes.

4      Q    Did you see the two guys that were leaving, the

5  one with the hoody and army jacket, did you see them earlier

6  when you got to the bar?

7      A    No.

8      Q    Do you know if they were there with anybody else?

9      A    I think they were there with one of the other

10  kids.

11      Q    After they left, did you see the other kid they

12  were there with around the bar still?

13      A    Yes.

14      Q    Did you see anybody try and hit that person?

15      A    I think me and Carlos tried honestly.

16      Q    Why was that that you tried to hit him?

17              MR. DRANOVE:  Objection.

18              THE COURT:  Overruled.  You may answer.

19      A    Because my friend just got stabbed.  I mean it was

20  just a reaction.

21              MR. DRANOVE:  Judge, I ask that in light of

22          his not observing any stabbing, that it be stricken

23          from the record.

24              THE COURT:  Overruled.  I'm going to allow

25          the answer as to why he was swung at.

SW

DOMINGUEZ - DIRECT/CHU

1    Q    Once you realized Edgar was stabbed, what did you

2    do?

3    A    What do you mean?  We left, went straight to the

4    car.

5    Q    Initially you said there were bouncers there by

6    the door.  Was -- I'm sorry.  Withdrawn.

7         Were you allowed to immediately leave or were the

8    doors locked?

9    A    The doors were locked at first.

10   Q    And how did you get them to open the door?

11   A    They seen him bleeding.

12   Q    And they let you guys out?

13   A    Yeah, they let us out.

14   Q    Did you ever call for an ambulance or anything?

15   A    No, because we had a car.

16   Q    Was Edgar able to walk?

17   A    Yeah, he walked to the car.

18   Q    Did you guys help him at all?

19   A    No, he walked to the car by himself.

20   Q    Did you see -- was he bleeding as he was walking?

21   A    Yeah.  He was choking.

22   Q    Did there come a time when you actually got him to

23   the car?

24   A    Yes.

25   Q    Whose car was that?

SW

198
DOMINGUEZ - DIRECT/CHU

1      A      Carlos car.

2      Q      And where was it parked, if you remember?

3      A      Right across the street under the highway.

4      Q      Under where, the BQE?

5      A      Yes.

6      Q      Once you guys got in the car, do you remember

7   where Edgar was sitting?

8      A      Sitting in the front seat.

9      Q      What about Carlos, he was driving?

10     A      Yeah.

11     Q      Where were you?

12     A      I was in the back.

13     Q      What about Marcus?

14     A      He was in the back.

15     Q      So all four of you left together?

16     A      Yes.

17     Q      What did you do once you guys got in the car?

18     A      We started eating all the lights and went straight

19   to the hospital.

20     Q      When you say "eating," what do you mean?

21     A      Running them.

22     Q      Running red lights?

23     A      Yes.

24     Q      About how long did it take for you guys to get to

25   the hospital?

SW

1    A    Not even a couple of minutes.

2    Q    Can you tell me which hospital did you take him

3    to?

4    A    Lutheran.

5    Q    Lutheran Medical Center?

6    A    Yes.

7    Q    Was Edgar able to talk at all while he was in the

8    car?

9    A    No.  He was choking.

10   Q    And can you tell me --

11   A    He was trying to talk, but he was choking.

12   Q    Was he still conscious while he was in the car?

13   A    For a little while, not the whole ride.  Maybe for

14   about half the ride.

15   Q    Maybe for half the ride he was conscious?

16   A    (Head gesture.)

17   Q    You have to answer out loud.

18   A    Yes.

19   Q    Now, once you got to the hospital, what did you

20   do?

21   A    We picked him up and brought him into the

22   emergency room.

23   Q    Once you brought him to the emergency room, that's

24   when you gave him over to the personnel there?

25   A    Yes.

SW

DOMINGUEZ - DIRECT/CHU

1  Q  Now, did you stay at the hospital?

2  A  Yes.

3  Q  And did there come a time when the police arrived

4  there?

5  A  Yes.

6  Q  Did you talk to them?

7  A  Yes.

8  Q  Told them what your name was?

9  A  Yes.

10  Q  Did you -- where did you go after you were at the

11  hospital?

12  A  To the precinct.

13  Q  Did you talk to them again there?

14  A  Yes.

15  Q  I want to direct your attention now to February

16  28, 2005, the next day.  Did there come a time when the

17  police contacted you to come look at a line-up at the

18  precinct?

19  A  Yes.

20  Q  And when you looked at the line-up -- do you

21  recall who it was that contacted you?

22  A  No.

23  Q  Do you remember how you got to the precinct?

24  A  Most likely it was with Carlos and everybody.

25  Q  So you went there with Carlos and Marcus?

SW

1        A    Most likely, but. Most likely we were all

2    together.

3        Q    Once you were at the precinct, do you remember if

4    you were kept together or did you get separated at some

5    time?

6        A    No, we got separated at some time.

7        Q    Initially you were together but eventually you got

8    separated?

9        A    Yes.

10       Q    When you got separated, was there any instruction

11   to you about wandering around the precinct?

12       A    I don't recall, but I'm sure we wouldn't wander no

13   where.  Nobody was wandering.

14       Q    And once you were at the precinct, did there come

15   a time when you actually looked at the line-up?

16       A    Yes.

17       Q    When you looked at the line-up, were you able to

18   recognize anyone?

19       A    No.

20       Q    And you said that the two that you saw running

21   out, did you actually get to see their faces at all?

22       A    No.

23       Q    What about the third person you said you thought

24   might have been with them?

25       A    Yes.

1    Q    Do you remember what he looks like?

2    A    Yeah.

3    Q    What did he look like?

4    A    He was tall, dark skin and bald.  He had like a

5    white jacket.

6    Q    He's the one that was still inside after the two

7    left?

8    A    Yes.

9    Q    Now, other than this commotion that happened while

10   you were talking to Rudy, was there any beef that Edgar had

11   with anyone in the bar while you were there?

12   A    No.  We just got there.

13   Q    Did you have any problems with anybody at the bar?

14   A    No.

15   Q    How about Marcus?

16   A    No.

17   Q    What about Carlos?

18   A    No.

19   Q    Anybody in the bar have any altercations other

20   than what occurred while you were talking with Rudy?

21   A    No.

22   Q    Did you guys have any altercation while you were

23   at the other place, at Cocktails?

24   A    No.

25              MS. CHU:  If I could have the exhibits 4 and

SW

1    6 put up, please.

2        Q    Taking a look at the bottom picture, People's 4D,

3    the one on the bottom right, you see that Mr. Dominguez?

4        A    Yes.

5        Q    You said that you were standing like closer to the

6    bar.  Do you see the area in that photograph where you were

7    standing with Rudy when you were talking?

8        A    Yes.

9        Q    Could you just point to it with your finger?

10       A    I was probably like right here, (indicating).

11            MS. CHU:  Let the record reflect that he's

12       pointing to the right side of the photograph just to

13       the left of the bar depicted in the photograph.

14       Q    And you said that Edgar, Carlos and Marcus were

15   closer to where the jukebox is?

16       A    Yeah.  Yes.

17       Q    Do you see the area where they were standing in

18   any of those photographs?

19       A    Yes.

20       Q    Can you just tell us which photograph?

21       A    This one (indicating).

22       Q    In photograph C?

23       A    Yes.

24       Q    And were they standing -- you see the door that's

25   there?

204
DOMINGUEZ - DIRECT/CHU

1      A    Yes.

2      Q    Were they closer to the door or closer to the

3   jukebox, if you remember?

4      A    Like right in the middle, maybe like closest to

5   the door a little bit.

6            MS. CHU:  Your Honor, may I approach the

7        exhibit?

8            THE COURT:  Sure.

9            MS. CHU:  Thank you.

10     Q    You see this table that's in People's 5 -- I'm

11  sorry, 4C?

12     A    Yes.

13     Q    Was the table in that same area, approximately,

14  when you were there?

15     A    I can't recall.  I don't even know if there was a

16  table there because we were standing there.  If we were

17  standing there, there wouldn't be a table there.

18     Q    I'm just saying, was it in that approximate area?

19  Was it further out?

20     A    No, no, no, against the wall right there.

21     Q    You said they were standing within this area here

22  (indicating)?

23     A    Yes.

24            MS. CHU:  Let the record reflect I'm circling

25        where the jukebox is.

SW

1      Q    Basically right in front of the door?

2      A    Yes.

3           MS. CHU:  Your Honor, may I have one moment?

4           THE COURT:  Yes.

5           MS. CHU:  I have nothing further.

6           THE COURT:  Cross examination Mr. Dranove?

7           MR. DRANOVE:  Thanks, your Honor.

8   CROSS EXAMINATION

9   BY MR. DRANOVE:

10     Q    Mr. Dominguez, what time did you get to Amanacer

11  that night?

12     A    Like 1 o'clock, 12:30, 1 o'clock.

13     Q    And did you hear any commotion before you turned

14  and saw Edgar and some -- or people at the jukebox?

15     A    Yes.

16     Q    Was the music playing?

17     A    Yes.

18     Q    Was the music loud?

19     A    Not that loud.  Pretty loud though.

20     Q    Did you hear the commotion over the music?

21     A    Yes.

22     Q    Did there come a time when one or more bouncers

23  got involved in stopping the commotion?

24     A    Excuse me?

25     Q    Did one or more bouncers get involved with

SW

DOMINIGUEZ - CROSS/DRANOVE

1  stopping the commotion?

2        A    One or more?

3        Q    Yes.

4        A    One.

5        Q    Just one?

6        A    One.

7        Q    Do you remember the name of that bouncer?

8        A    Yes.

9        Q    What did he do that you saw?

10       A    He just had them leave.

11       Q    Who leave?

12       A    The other two kids that were there.

13       Q    You're calling them "kids?"

14       A    Men.

15       Q    Did you see anyone leave before the bouncer had

16  the other two leave?

17       A    I had my back turned.  I don't know.

18       Q    Did you see any bouncer lock a door or anybody

19  lock a door?

20       A    Yes, after they left.

21       Q    How many had gone before the door was locked?

22       A    Two.

23       Q    And they were half the group, two left inside?

24       A    One left inside.

25       Q    And did Carlos swing at him?

1    A    Yes.

2    Q    Did you swing at him?

3    A    Yes.

4    Q    Had you seen him do anything to Edgar?

5    A    Who, the guy?

6    Q    The one left inside that you swang at, swung at,

7  did you see him touch Edgar?

8    A    No.

9    Q    Could he be the one who stabbed Edgar?

10   A    No.

11           MS. CHU:  Objection.

12           THE COURT:  Sustained.

13   Q    Did Carlos try to leave the bar before he left

14  with Edgar?  Did he make an earlier attempt to leave the

15  bar?

16   A    No.

17   Q    Was he stopped by a bouncer from leaving the bar?

18   A    We was all stopped, yes.

19   Q    You were stopped by a bouncer from leaving the

20  bar?

21   A    Yes.

22   Q    Before you as a group were stopped by a bouncer

23  from leaving the bar, was Carlos alone stopped by a bouncer

24  from leaving the bar?

25           MS. CHU:  Objection.

1          THE COURT:  Overruled.  You may answer.

2     A    No.

3     Q    Could you describe the bouncer?

4     A    It was -- I know it was a Spanish kid.

5     Q    Tall?  Short?

6     A    Short.

7     Q    I don't know how tall you are, but compared to

8  you?

9     A    About the same as I am.

10    Q    About how tall are you?

11    A    Five, eight.

12    Q    Did you see a hat on either of the persons who you

13 said were the two who left first or just the hoody?

14    A    Just a hoody.  He could have had a hat on.  I

15 wouldn't know.

16    Q    He could have had a hat on and you would not have

17 seen it?

18    A    He had a hoody on.

19    Q    You don't know if he had a hat on?

20    A    No.

21    Q    And can you tell us if at the time you were there

22 the lighting in the bar was in any way related to, in

23 comparison to the lighting in the picture B there?

24    A    Picture D?

25    Q    B, the upper right one.

SW

1    A    Yeah, like that.

2    Q    It was like that?

3    A    Yes.

4    Q    You had how many drinks before you got to that

5  bar?

6    A    Two, three.

7    Q    And there was -- were they all at Cocktails?

8    A    Yes.

9    Q    Were they cocktails or beers?

10    A    Beers.

11    Q    All three?

12    A    Yes.

13    Q    Heineken?

14    A    Yes.

15    Q    About what time did you get to Cocktails?

16    A    Like 12, 12:15, around there.

17    Q    When you left, what time was it?

18    A    Like one.

19    Q    So, after the three beers and the 45 minutes to

20  one hour at Cocktails, you went over to Amanacer's, correct?

21    A    Yes.

22    Q    How long were you there before the commotion took

23  place?  I'm going to withdraw that question, rephrase it,

24  ask it differently.

25         How long were you in Amanacer's before you became

SW

1    aware that there was a commotion?

2        A    Ten minutes, five minutes.  Just got there.

3        Q    Were you searched when you went into the place?

4        A    Yes.

5        Q    What were you wearing that night?

6        A    I don't recall.

7        Q    At all?

8        A    Not really.

9        Q    Do you recall what Carlos was wearing that night?

10       A    No.

11       Q    Was he wearing camouflage clothing?

12       A    I don't recall.

13       Q    Describe how you were searched before you entered

14   the bar?

15       A    Patted down.

16       Q    From where to where?

17       A    From shoulder to ankles.

18       Q    Were you wearing a cap or a hoody?

19       A    I wasn't -- I wasn't wearing no hoody.  I don't

20   think so, no.

21       Q    And were you searched inside your legs?

22       A    Yes.

23       Q    Inside of your legs?  Outside of your legs?

24       A    No, just like patted down.

25       Q    Thoroughly patted down?

SW

1    A    No.

2    Q    Not you?

3    A    No.

4    Q    Had you been to the bar before?

5    A    No.

6    Q    Did you bring a knife into that bar?

7              MS. CHU:  Objection.

8              THE COURT:  When are we talking about?

9              MR. DRANOVE:  That night.

10             THE COURT:  Overruled.  You may answer.

11   A    No.

12   Q    How many people did you and Carlos strike at?

13   A    One.

14   Q    Was the group -- that was the group -- the two

15   people who left were from a group of three or four people,

16   as far as you understand?

17   A    Three.

18   Q    Do you have any memory of what time it was that

19   you left the bar on the way to the hospital?

20   A    It had to be like ten, fifteen minutes after we

21   got there.

22   Q    You got there about 1 o'clock?

23   A    Probably about 1 o'clock.

24   Q    Now, when you observed the bouncers breaking up

25   something, you referred to it as "breaking it up," remember,

SW

1  "Breaking it up?"  You said the bouncers were "breaking it

2  up" here in this courtroom.

3      A    I don't understand what you're saying.

4      Q    You don't know what the bouncers did, do you?

5            MS. CHU:  Objection.

6      Q    You weren't facing the group near the jukebox,

7  right?

8            THE COURT:  Sustained as to the form of the

9      question.

10     Q    You weren't facing the group near the jukebox when

11 whatever happened, happened, right?

12     A    Yes.

13     Q    You don't know how long the episode took before

14 you turned around and looked, right?

15     A    It took like a minute; it was quick.

16     Q    Were you at the jukebox before you went to the

17 bar?

18     A    No, I was like five feet from it.

19     Q    Paying attention to whatever you were doing at the

20 bar, right?

21     A    I was talking to my friend.

22     Q    For how long?

23     A    Two minutes.

24     Q    What were you doing before that?

25     A    I just got the drink from the bar.

SW

1    Q    So, you were at the bar when you got the drink,

2   right?

3    A    Yes.

4    Q    Did you go to the bar and get a drink when you

5   went in?

6    A    Yes.

7    Q    You stayed at the bar drinking that Heineken?

8    A    No.

9    Q    Different beer?

10   A    I went to talk to my friend Rudy.  I had to stay

11  at the bar.

12   Q    And there was nothing going on, correct?

13             MS. CHU:  Objection.

14             THE COURT:  Sustained as to the form of the

15       question.

16   Q    When you talked to Rudy, was there anything going

17  on?

18   A    When I was talking to him, that's when it

19  happened, the little scuffle.

20   Q    Where was Rudy?

21   A    In front of me.

22   Q    At the bar?

23   A    Yes.

24   Q    Do you know his last name?

25   A    No.

SW

214

COLLOQUY

1    Q    Do you know the name -- does the name Jahaira ring
2    a bell?
3    A    I think that's his girl, his wife, whatever.
4    Q    When you entered the bar, how many bouncers
5    searched the four of you when you went into the bar?
6    A    One.
7    Q    Did he search you one at a time?
8    A    Yes.
9         MR. DRANOVE:  No further questions.
10        THE COURT:  Any redirect?
11        MS. CHU:  No.
12        THE COURT:  Thank you, Mr. Dominguez.  You're
13   excused.  You may step down from the witness stand.
14        (At this time, the witness exited the
15   courtroom.)
16        THE COURT:  We've had a long run here.  I
17   appreciate your patience.  We'll recess until 2:15.
18   Don't discuss the case and enjoy your lunch.
19        Please take charge of the jurors.
20        Why don't you wait here Mr. Larson (ph).
21   Everyone else can leave.
22        (At this time, the jury exited the courtroom
23   except Alternate Number 3.)
24        THE COURT:  Okay.  The officer mentioned to
25   me this morning that you told her that you were

SW

1    concerned about the graphic nature of the testimony.

2            ALTERNATE NO. 3:  Yeah.  I was basically

3    feeling ill yesterday to the point I felt I was going

4    to pass out.  I really was not paying attention.  I

5    couldn't.  I had to think about other things and not

6    pay attention to the testimony.

7            THE COURT:  What about what you're hearing

8    today?

9            ALTERNATE NO 3:  When the conversation comes

10   up again about what happened, that kind of stuff, I get

11   very lightheaded.  I pass out at those things.

12           THE COURT:  I certainly don't want you to

13   pass out.  I think we've gotten through the medical

14   examiner.  Yesterday was the graphic part.

15           ALTERNATE NO. 3:  I didn't really get much of

16   what she was saying.  I was trying not to listen.

17           THE COURT:  You want to ask him anything,

18   Ms. Chu?

19           MS. CHU:  Would that affect your ability to

20   concentrate on what the evidence is in this case?

21           ALTERNATE NO. 3:  I think most definitely.

22           THE COURT:  Do you want to ask him anything?

23           MR. DRANOVE:  You want to leave the panel now

24   because you think it's right to have the people who

25   have heard all the testimony?

                        SW

216

COLLOQUY

1      ALTERNATE NO. 3:  I'll say so.

2      THE COURT:  Thank you.  Just step outside.

3   I'll confer with all the attorneys, okay.

4      (At this time, the juror exited the

5   courtroom.)

6      THE COURT:  I think that he has to be

7   discharged based on what he just told us.  Any

8   objection by the People?

9      MS. CHU:  No.

10     THE COURT:  By the defense?

11     MR. DRANOVE:  No.

12     THE COURT:  You can tell the juror he's

13   discharged.  All right.

14     All right.  We're in recession until 2:15.

15   Have a nice lunch.

16     (At this time, there was a luncheon break and

17   the matter subsequently resumed.)

18     (At this time, Michelle Walker relieved

19   Sandra Wilkes as official court reporter.)

20

21

22

23

24

25

SW

Solomon - Direct

217

1           A F T E R N O O N   S E S S I O N

2           COURT OFFICER:  Jurors are entering.

3           COURT CLERK:  Both sides waive roll call?

4           MS. CHU:  So waived.

5           MR. DRANOVE:  Yes.

6           THE COURT:  Good afternoon, ladies and

7       gentlemen.  I hope you liked that weather that

8       I arranged for you on the lunch break.

9           We are going to continue with the

10      prosecution's case this afternoon.

11          You may call your next witness, Miss Chu.

12          MS. CHU:  People call Carlos Solomon.

13      C A R L O S   S O L O M O N, having been called

14  as a witness, having been duly sworn, testified as

15  follows:

16          COURT CLERK:  State your name?

17          THE WITNESS:  Carlos Solomon.

18          COURT CLERK:  What county do you live in?

19          THE WITNESS:  Kings.

20          THE COURT:  Mr. Solomon, I am going to ask

21      you to slide up, get a little closer to

22      microphone so we can hear what you have to say.

23          You may examine the witness, Miss Chu.

24          MS. CHU:  Thank you.

25  DIRECT EXAMINATION

Solomon - Direct

218

1    BY MS. CHU:

2        Q    Good afternoon, Mr. Solomon.

3        A    Good afternoon.

4        Q    How old are you, sir?

5        A    Thirty-two.

6        Q    Do you work for a living?

7        A    Yes.

8        Q    What did you do?

9        A    I work for tow truck company.

10       Q    You work --

11       A    Tow truck company.

12       Q    How long have you been working for them?

13       A    Fifteen years.

14       Q    What did you do for this tow truck

15   company?

16       A    We work in conjunction with the marshal's

17   office, everything for cars that owe money to The

18   City.  Parking tickets.

19       Q    So what actually do you have to do in your

20   job with the tow truck company?

21       A    I -- actually I drive around in my own

22   personal car looking for license plates that owes

23   The City.  Tickets to The City.

24       Q    Could you just take your gum out?

25            You said -- I am sorry.

Solomon - Direct

219

1          MS. CHU:  Can you just read back that last
2      answer for me?
3                     (Whereupon, the question was
4                     read as requested.)
5      Q    Do you actually have a list that is
6  provided to you by the marshal's office?
7      A    Yes.  Actually, I'm provided by my tow
8  truck company.
9      Q    And if you find a vehicle that is a
10  license plate that matches your list, what are you
11  suppose to do then?
12      A    I have a radio in my car, so I just -- if
13  I find a vehicle, I called the marshal on my radio
14  and they come pick up the car whenever they get a
15  chance.
16      Q    Do you take any part at all in when they
17  come get the car at all?
18      A    No.
19      Q    Now, did you know someone by the name
20  every Edgar Ojeda?
21      A    Yes.
22      Q    And how did you know Edgar?
23      A    We grew up together.
24      Q    What was your relationship with him?
25      A    He was one of my best friends.

Solomon - Direct

220

1      Q    How often would you see Edgar back in
2    2005?
3      A    Everyday.
4      Q    I want to direct your attention to
5    Saturday, February 26, 2005, into the early morning
6    of Sunday, February 27th, 2005.  Did you spend any
7    time with Edgar that day?
8      A    Yes.
9      Q    What plans did you guys have that
10   Saturday?
11     A    Saturday morning we was hanging out, we
12   went shopping.
13     Q    Where did you guys go shopping?
14     A    Downtown Brooklyn.
15     Q    Do you remember was just you and Edgar,
16   did you have somebody else with you?
17     A    It was couple more friends with me.
18     Q    And who was that?
19     A    Marcus was with me also.
20     Q    Anybody else?
21     A    And Jonathan.
22     Q    Do you go by a nickname?
23     A    Yes.
24     Q    What is your nickname?
25     A    Buster.

Solomon - Direct

221

1      Q    What about Jonathan, does he have a
2  nickname?
3      A    Yes.
4      Q    What is his nickname?
5      A    GoGo.
6      Q    GoGo?
7      A    Yes.
8      Q    And what about Marcus, does he have a
9  nickname?
10     A    Ely.
11     Q    Now, after you guys went downtown, did
12 you -- what you do downtown?
13     A    We was just killing time shopping.
14 Nothing much really.
15     Q    Where did you go after you were downtown?
16     A    After we went down there, we went back to
17 my house.
18     Q    And when you say, we went back to my
19 house, are you -- all four of you went back to your
20 house?
21     A    Yes.  Correct.  All four of us.
22     Q    How did you get downtown?
23     A    In my car.
24     Q    And then you went back to our house also
25 via car?

Solomon - Direct

1      A   Yes.

2      Q   Do you remember what time it was that you

3  got back to your house around?

4      A   I am not exactly sure, but it was in the

5  evening time.

6      Q   Did you guys have plans for later that

7  night?

8      A   Yes.

9      Q   And what were you guys going to --

10     A   We're going to go to a bar of one of our

11  friends, guy name Ely, he knew somebody was throwing

12  a party in a bar downtown.

13     Q   Do you know where this bar was located?

14     A   If -- it was on Ashland and Dekalb.

15     Q   Did you know the name of the bar?

16     A   Yes.

17     Q   What was it?

18     A   Buttacup.

19     Q   Did you guys actually -- I am sorry.

20          How long are you actually at your house

21  before you guys go back out again?

22     A   We was there about three or four hours.

23     Q   Did Marcus and Jonathan remain at your

24  house the whole time, or did they leave at all?

25     A   No, they left.

Solomon - Direct

1          Q     Where did they go?

2          A     They went back home to change and shower

3     up because we're going to go out in the nighttime.

4          Q     How did you meet up with them again?

5          A     I picked them up from their house.

6          Q     How did you get to their house?

7          A     In my car.

8          Q     About what time was it that you left?

9          A     Exactly, I am not sure, but it was close

10    to around ten, 11.

11         Q     At night?

12         A     Yes.

13         Q     And where did you guys go first?

14         A     First we went downstairs looking for the

15    bar, Buttacups.

16         Q     And did you find the bar?

17         A     At first we didn't find it, but when we

18    finally did find it, we couldn't -- we had no

19    parking, so we decided to leave.

20         Q     Where did you go next?

21         A     From there, we went to strip club on Third

22    Avenue.

23         Q     Do you remember cross street of Third

24    Avenue that you went to for the strip club?

25         A     Between 36, 37.

Solomon - Direct

224

1    Q    Do you remember the name of the place?

2    A    No, I don't remember the name.

3    Q    About how long -- I am sorry.  Withdrawn.

4         Do you remember about what time it was

5    that you arrived at this place on the strip club?

6    A    We arrived between 12 and one, I think.

7    Q    How long did you stay there?

8    A    Not long.  We had two beers, and we left.

9    Q    It's still the four of you?

10   A    Yes.

11   Q    Where did you go next?

12   A    Once we left the strip club, we went to

13   another bar that is on 39 Street about two blocks

14   from the strip club.

15   Q    Did you actually leave your car from where

16   you were at the strip club to where the place on

17   39th, or did you just leave the car there?

18   A    Actually, I don't remember if I moved it

19   or not.

20   Q    And actually you end up at a bar on 39 and

21   Third?

22   A    Yes.

23   Q    Do you recall about what time it was that

24   you arrived there at the bar on 39 and Third?

25   A    We got there, I say, between one and 1:30.

Solomon - Direct

225

1      Q    Now, you said you had about two beers at
2    the strip club?
3      A    Yes.
4      Q    Once you got to this place on 39 and
5    Third, do you remember the name of that place?
6      A    About -- it was Spanish sword.  I think it
7    was Amanacer, something like that.
8      Q    Did you have anything to drink when you
9    were there?
10     A    I had one beer.
11     Q    Now, when you first walked in Amanacer on
12    39 and Third, can you describe for us where you went
13    to?
14     A    Soon as we walked into the bar, on the
15    right-hand side it was a jukebox.  I was by the
16    jukebox.
17     Q    Did you ever leave that area by the
18    jukebox?
19     A    Only one time to go to the bathroom.
20     Q    How soon after you got to the bar did you
21    go to the bathroom?
22     A    As I say, almost immediately.
23     Q    Where was the bathroom located inside the
24    bar?
25     A    Towards the back.

Solomon - Direct

226

1      Q    Now, are you familiar with where the dance

2   floor is in back of bar?

3      A    Yes.

4      Q    Did you have to pass by that area in order

5   to get to the bathroom?

6      A    Yes.

7      Q    And when you were in the process of

8   passing by the dance floor area to go to the

9   bathroom, did you notice anything?

10     A    Yes.

11     Q    What did you notice?

12     A    I notice somebody dancing with a girl.

13     Q    What made you notice them?

14     A    Cause the person dancing with the girl had

15  her leg in the air.

16     Q    Who had leg up in the air?

17     A    The guy had the girl's leg in the air.

18     Q    That was what made you look over?

19     A    Yes.

20     Q    Had you ever seen this person before?

21     A    No.

22     Q    Can you describe what the person was

23  wearing, the male?

24     A    He was wearing camouflage jacket.

25     Q    Did you have any words with the person in

Solomon - Direct

227

1    the camouflage jacket at all at this point?

2        A    No.

3        Q    Now, you went to the bathroom?

4        A    Yes.

5        Q    And then when you came out of the

6    bathroom, where did you go next?

7        A    I went straight back to the jukebox where

8    I was standing originally.

9        Q    And who was at the jukebox?

10       A    Edgar.

11       Q    Now, was Edgar there when you left to go

12   to the bathroom?

13       A    Yes.

14       Q    And he was in the same spot when you got

15   back?

16       A    Yes.

17       Q    You said you had a beer?

18       A    Yes.

19       Q    Do you remember who got the beer for you?

20       A    Ely got me the beer.

21       Q    Do you remember where Ely or Jonathan was

22   at the time that you were by the jukebox with Edgar?

23       A    They was by the bar.

24       Q    Did you know anybody when you first got to

25   the bar?

Solomon - Direct

228

1        A     No.

2        Q     Did you Jonathan or -- Jonathan or Marcus,

3   know nobody when they got there?

4        A     Yes.

5        Q     And did they talk to this person?

6        A     Yes.

7        Q     Did you know the person?

8        A     No.

9        Q     Now, did Edgar ever go anywhere else other

10  than in that area by the jukebox and where that door

11  is?

12       A     No.

13       Q     I am sorry.  I am going to ask you, is

14  there -- is there anything else by that jukebox?

15       A     Anything else by the jukebox?

16       Q     Yeah.  Is there like a side entrance

17  there?

18       A     Yes there's exit door.

19       Q     And where were you guys standing in

20  relation to that door?

21       A     Directly in front of it.

22       Q     Who was closest to the jukebox, if you

23  remember?

24       A     I was.

25       Q     You were closest to the jukebox?

Solomon - Direct

1    A    Yeah.

2    Q    Now, did there come a time when you saw

3    the individual that you had seen in the back dancing

4    with that girl again?

5    A    Yeah.

6    Q    And where did you see him?

7    A    Next time I seen him, he was walking,

8    walking out the club.

9    Q    He was walking out --

10    A    Out, crossing me by, getting ready to

11    leave.

12    Q    So coming in front of you?

13    A    Yeah.

14    Q    I am going to ask that you look around the

15    courtroom today and see if you see the person that

16    you saw both in the back and walking in front of

17    you?

18    A    Yes.

19    Q    Would you please point him out, tell us

20    something that he's wearing?

21    A    Defendant wearing what looks -- seem like

22    a pink shirt.

23         MS. CHU:  Your Honor, indicate defendant

24         --

25         THE COURT:  Indicating Mr. Rivera, the

Solomon - Direct

230

1      defendant.

2           MS. CHU:  Thank you.

3      Q    Now, you said he crossed in front of you?

4      A    Yes.

5      Q    And where did he go?

6      A    He kept walking, it seem like he was going

7 to leave.

8      Q    Did there come a time when you saw him

9 stopping anywhere?

10     A    Yes.

11     Q    Where did he stop?

12     A    He stopped by my friend, Edgar.

13     Q    Now, Edgar was standing right next to you?

14     A    Yeah.

15     Q    So he walks in front of you, then stops

16 like basically to your left?

17     A    Yes.

18     Q    And what did you see the defendant do?

19     A    He whispered something to him in his ear.

20     Q    He whispered something into whose ear?

21     A    Edgar's ear.

22     Q    Did you hear what he was saying?

23     A    No.

24     Q    Now, was there any music playing at this

25 bar that night?

Solomon - Direct

1     A   Yes.

2     Q   Do you remember where -- there was a DJ

3  there, right?

4     A   I am not sure if there was a DJ.

5     Q   You're not, but there are --

6     A   There was music being played.

7     Q   You couldn't hear what was being said?

8     A   No.

9     Q   Did you see Edgar respond at all to what

10  the defendant had said to him?

11     A   Yes?

12     A   What -- did you hear what he said?

13     A   No.

14     Q   Did you Edgar respond?

15     A   Yes, he responded.

16     Q   How did you respond?

17     A   I -- he was talking to him.  What they was

18  saying exactly, I couldn't hear.  But there was

19  conversation going on.

20     Q   He responded with words?

21     A   Yes.

22     Q   Now, at that point, can you tell me, did

23  anyone else come in your area where the defendant

24  and Edgar was standing?

25     A   Yes.

Solomon - Direct

1      Q    Who came there?

2      A    Two of the defendant's friends.

3      Q    Can you describe those people for us?

4      A    One was taller guy.  Dark skin, short hair

5    cut.

6           The other gentleman was shorter than him,

7    light skin, chubby.

8      Q    Light skin and chubby?

9      A    Yeah.

10     Q    Do you remember what those two other

11   people that were with the defendant was wearing that

12   night?

13     A    Yes.

14     Q    What were they wearing?

15     A    Camouflage jackets.

16     Q    Now, which one was wearing the camouflage

17   jackets?

18     A    Both of them was wearing camouflage

19   jackets.

20     Q    Both of what?

21     A    Both of the defendant's friends.

22          No, I am sorry.  I am sorry.  The

23   defendant and his friend was wearing a camouflage

24   jacket.  The third person was wearing a white

25   jacket.

Solomon - Direct

233

1      Q    The third one was wearing a white jacket?

2      A    Yeah.

3      Q    Third person, is that the short chubby one

4   or is that the taller dark one?

5      A    Taller, dark skin.

6      Q    Now, when they -- the two friends in

7   the -- came over to where the defendant was, what

8   did you do?

9      A    I turned to the  gentleman that was

10  wearing the white jacket, and I asked him if there

11  was a problem.

12     Q    And what did he say to you?

13     A    He said to mind my fucking business.

14     Q    So now while you were having this

15  conversation with the guy with the white jacket, do

16  you know what the defendant was doing?

17     A    No.

18     Q    Was he still in front of where Edgar was?

19     A    Yes.

20     Q    And can you tell me what happens next?

21     A    I am talking to the guy with the white

22  jacket, the taller gentleman.  And all of a sudden I

23  seen the defendant strike my friend.

24     Q    And where did you see the defendant strike

25  Edgar?

Solomon - Direct

234

```
 1        A    Around the top of his shoulder.  Chest
 2   area.  Top of shoulder. (Indicating)
 3             THE COURT:  Indicating the left lower
 4        shoulder area where the shoulder meets the
 5        neck.
 6        Q    And after you saw the defendant do that,
 7   can you tell me, did you see if there was any --
 8             MR. DRANOVE:  Objection.
 9             MS. CHU:  I am sorry.  Withdrawn.
10             THE COURT:  She withdrew the question.  So
11        I don't have rule on the objection.
12        Q    Did you look to see if anything was in the
13   defendant's hand when he struck the defendant?
14             MR. DRANOVE:  Objection.
15             THE COURT:  Overruled.
16             You may answer.
17        A    Excuse me?
18             THE COURT:  You may answer the question.
19             THE WITNESS:  Can you repeat the question,
20        please?
21        Q    Did you look to see if anything was in the
22   defendant's hand when he struck your friend?
23        A    No.
24        Q    Did you see anything in his hand?
25        A    No, I wasn't looking for anything.
```

Solomon - Direct

235

1      Q    You wasn't --

2      A    I wasn't looking for anything.

3      Q    After you saw the defendant strike Edgar

4    over here, what did you see the defendant do?

5      A    He ran out the door with the other

6    gentleman wearing the camouflage jacket.

7      Q    And can you tell me what happened to the

8    guy with the white or the gray jacket?

9      A    When the two -- when the two ran out the

10   door, the third one tried -- person tried to run out

11   and was stopped by the bouncer.

12     Q    Do you know did you try and go after the

13   defendant and the other guy in the camouflage jacket

14   when he ran out?

15     A    Yes.

16     Q    Did you get stopped?

17     A    Yes.

18     Q    By whom?

19     A    By the bouncer.

20     Q    Did you try and do anything to the guy

21   with the light colored jacket?

22     A    Yes.

23     Q    Why?

24          MR. DRANOVE:  Objection to why.

25          THE COURT:  Sustained as to why.

1         What is it that you tried to do?

2              THE WITNESS:  I am answering your

3         question?

4              THE COURT:  Yes.  When I ask a question,

5         you can answer it.

6              THE WITNESS:  I got lost with the

7         question.

8              THE COURT:  What is it that you tried to

9         do with the fellow in the white jacket?

10             THE WITNESS:  I went after him.

11             THE COURT:  Next question.

12        Q    What do you mean went --

13        A    I tried -- I threw a punch at him.

14        Q    Did you connect with him?

15        A    I went over the bouncer, so I don't know

16   what happened.  I could've hit him, I could have hit

17   the bouncer.

18        Q    And can you tell why was it that you tried

19   to hit him?

20             MR. DRANOVE:  Objection.

21             THE COURT:  Overruled.

22             You may answer.

23        A    Because he was with the guys who just

24   finished trying to attack my friend.

25        Q    After you did that, did there come a time

Solomon - Direct                          237

1   when Edgar got your attention?

2        A    Yes.

3        Q    And can you tell me where were you -- I am

4   sorry.  Withdrawn.

5             Were you still in that area where the

6   jukebox was?

7        A    Yes.

8        Q    And when Edgar got your attention, what

9   did you do?

10       A    I was -- he pulled -- he pulled -- I had a

11  jacket on, he pulled it, like tugged on it from

12  behind and I turned around.  When I turned around,

13  he told me, "I think I got stabbed."

14       Q    And did you see -- did you look to see if

15  he had gotten stabbed?

16       A    Yes.

17       Q    And where did you see him stabbed?

18       A    He was -- blood -- he had a scarf on, I

19  removed the scarf, when I took off the scarf, blood

20  start shooting from his neck in the air.

21       Q    Can you tell what you did the scarf?

22       A    I don't remember what happened with the

23  scarf.

24       Q    Did you try to cover up the wound at all?

25       A    Yeah.

Solomon - Direct

1    Q    When you saw your friend Edgar was
2    bleeding, what did you do?
3    A    I grabbed him immediately, and we started
4    going to my car.
5    Q    Do you remember where your car was parked?
6    A    Yes.
7    Q    And where was it parked?
8    A    On Third Avenue.
9    Q    Do you remember was it on the side closer
10   to where the bar was or was it on the opposite side?
11   A    It was on the opposite side.
12   Q    Do you know what Costco is?
13   A    Yes.
14   Q    Is the same --
15   A    Yeah, same side as Costco.
16   Q    Do you -- did you -- I am sorry.
17        What did you do with Edgar, did you have
18   to hold him up?  How did you --
19        THE COURT:   You have to let her finish the
20        question because she can't take it down if
21        you're both talking at the same time.
22        Start again.
23   Q    How did you get Edgar to your car?
24   A    He walked over with me to the car.
25   Q    I am sorry.

1        A    He walked over on his own with me to the
2    car.
3        Q    Did anybody have to help when he was
4    walking?
5        A    No.
6        Q    Do you know -- I am sorry, withdrawn.
7             Once you got him to the car, did you have
8    to wait for the light in order to cross the street,
9    or did you just --
10       A    I just started eating all the lights --
11       Q    I am actually -- when you were walking to
12   your car.
13       A    When I am walking to the car, I just
14   walked directly from the club across the street into
15   my car.
16       Q    Were you running, were you walking, how
17   were you going?
18       A    Walking rapidly.
19       Q    Once you got to the car, you were driving?
20       A    Yes.
21       Q    And what about Edgar, where did he go?
22       A    Edgar was in the passenger seat.   Front
23   passenger.
24       Q    Where was Marcus and Jonathan at this
25   point?

Solomon - Direct

240

1          A     Sitting in the back seat.

2          Q     You said, once you got back in the car,

3    you started to drive?

4          A     Yes.

5          Q     Said something about eating the lights?

6          A     Yes.  Started running through all the --

7    running through all the red lights.

8          Q     How far away was the hospital that you

9    took him to?

10         A     Twenty blocks.

11         Q     Which hospital did you take him to?

12         A     Lutheran.

13         Q     Now, were you doing anything with Edgar

14   while you were in the car driving?

15         A     Yes.

16         Q     What were you doing?

17         A     I was talking to him and my hand over his

18   wounds on his neck.

19         Q     And why were you doing that?

20         A     Because I was trying to stop the blood

21   from coming out.

22         Q     I am sorry.  Was Edgar able to talk to you

23   at all while you were in route to the hospital?

24         A     Yes.

25         Q     And do you recall what it was he was

Solomon - Direct

241

1  saying?

2      A    He kept saying, "I can't breathe.  I can't

3  breathe."

4      Q    Now, did there come a time when you guys

5  actually got there?

6      A    Yes.

7      Q    What?

8      A    Yeah.

9      Q    When you got to the hospital, and can you

10  tell me what did you do with Edgar?

11      A    When I got to the hospital, I pulled up, I

12  ran around the front of the car, opened the

13  passenger door and I picked him up like a baby and

14  ran into the emergency room with him.

15      Q    Once you were in the emergency room, you

16  gave him over to the personnel that was there?

17      A    Yes.

18      Q    Did you see what they did with him?

19      A    Yeah.  They immediately stripped all his

20  clothes from him, and they was just pushing his

21  stomach down, stuff like that.  Then told me to

22  leave the room.

23      Q    Now, did you remain at the hospital?

24      A    Yes.

25      Q    Did there come a time when police arrived

Solomon - Direct

242

1    there?

2         A    Yes.

3         Q    Did they speak with you?

4         A    Yes.

5         Q    Did you give them your name?

6         A    Yes.

7         Q    Did you then go to the precinct?

8         A    Yes.

9         Q    Did you there speak with them at the

10   precinct?

11        A    Yes.

12        Q    Now, did you tell them what you had seen?

13        A    Yeah.

14        Q    And what happened at that bar?

15        A    Yes.

16        Q    I went to draw your attention now to

17   February 28th of 2005, at about 4:00 p.m.  Did

18   there come a time a time when you went to the 72

19   Precinct to look at a line-up?

20        A    Yes.

21        Q    Can you tell me who contacted you to come,

22   or how did you know to go there?

23        A    One of officers from the precinct called

24   me.

25        Q    Did they tell you about what you were

Solomon - Direct

243

1    going to do once you got there?

2        A    Yeah, they said they needed me for a

3    line-up.

4        Q    Once you arrived at the precinct, where

5    did you get put?

6        A    I don't understand.

7        Q    Did they -- when you arrived at the

8    precinct, you let them know you were there?

9        A    Yes.

10       Q    Did you stay at the front door, do you go

11   upstairs to --

12       A    No, they took me to a room that was

13   closed.

14       Q    And once you were in that room, did there

15   come a time when they got you to come look at the

16   line-up?

17       A    Yes.

18       Q    When you looked at the line-up, did they

19   ask you a series of questions?

20       A    Yes.

21       Q    And were you able to recognize anyone in

22   that line-up?

23       A    Yes.

24       Q    Who did you recognize?

25       A    The defendant.

Solomon - Direct

244

1    Q    And do you recall what position he was in

2  when you looked at the line-up?

3    A    Yes.

4    Q    What position?

5    A    4

6    Q    Did you tell the detective you recognized

7  him?

8    A    Yes.

9    Q    Did you tell the detective where you

10  recognize him from?

11    A    Yes.

12    Q    Did you also tell the detective what

13  you -- I am sorry -- what you remember the defendant

14  doing?

15    A    Yes.

16        MS. CHU:  Your Honor, if I can have

17    People's 4 and People's 6 posted, please?

18    Q    Mr. Solomon, if you can just take a look

19  at the photos that's up.  You see labels above

20  all -- each of the photos.  A, B, C, D.  Do you see

21  that?

22    A    Yes.

23    Q    Do any of photos -- do you see the

24  approximate area where you and Edgar was standing

25  when this incident took place?

Solomon - Direct

245

1      A    Yes.

2      Q    Can you tell me what letter is above that
3   photograph?

4      A    Letter C.

5      Q    Letter C?

6      A    Yes.

7      Q    If you can just let us know, you see the
8   jukebox in that photograph?

9      A    Yes.

10     Q    You said that is the jukebox that you were
11  standing closest to?  You were closest to that than
12  Edgar was?

13     A    Yes.

14     Q    Can you tell us in that photograph
15  approximately where Edgar was standing when this all
16  happened?  Was he closer to the door or closer to
17  where that table is in People's 4?

18     A    I say closer to the table (indicating).

19     Q    Closer to the table?

20     A    Yes.

21          MS. CHU:  If I can have the diagram,

22     please?

23          Actually, just leave that up one second.

24     Q    You said that the bathrooms are in the
25  back?

Solomon - Direct

246

1    A    Yes.

2    Q    So you see in picture B, right?  That

3    would be looking towards the back?

4    A    Yes.  Yes.

5    Q    So you would have to walk through all that

6    and then goes to the left, that is where the

7    bathrooms would be?

8    A    Yeah.

9         MS. CHU:  Number 6.

10   Q    Mr. Solomon, taking a look at that diagram

11   that is in evidence as People's number 6.  You

12   recognize the layout there?

13   A    Yes.

14   Q    And what is that a layout of?

15   A    Seems to be the layout of the bar.

16   Q    Now, just for clarification purposes.  We

17   were talking about the bathrooms and stuff like

18   that.

19        MS. CHU:  If I can approach, your Honor?

20        THE COURT:  You may.

21   Q    You entered the bar from this door up here

22   (indicating)?

23   A    Yes.

24   Q    And then if you come in and go there, this

25   would be the dance floor where it's marked

Solomon - Direct

247

1    (indicating)?

2         A    Yes.

3         Q    And where would the bathrooms be?

4         A    The bathroom would be to the left.

5         Q    So this corner right here (indicating)?

6         A    Yes.

7              MR. DRANOVE:  Indicating the lower --

8              THE COURT:  -- right-hand corner of the

9         diagram.

10        Q    If you could just put bathroom in the

11   corner where you just indicated for us, please?

12        A    (Indicating)

13             THE COURT:  You wrote BR?

14             THE WITNESS:  BR.

15             THE COURT:  Fine.

16             THE WITNESS:  BR.

17             MS. CHU:  I have nothing further.

18             THE COURT:  Cross-examination.

19             MR. DRANOVE:  Thanks, Judge.

20   CROSS-EXAMINATION

21   BY MR. DRANOVE:

22        Q    Were there any bouncers at the club that

23   night?

24        A    Yes.

25        Q    Were you searched or frisked before you

Solomon - Cross

1    entered the club?

2        A    Yes.

3        Q    How was that accomplished?

4        A    I was patted down.

5        Q    From where to where?

6        A    My waist to my legs.

7        Q    Were you wearing a jacket?

8        A    No.

9        Q    Were you wearing a shirt of some type?

10       A    Yes.

11       Q    Camouflage shirt?

12       A    Yes.

13       Q    Any pockets in it?

14       A    No.

15       Q    Did you have a knife on you when you

16   entered the place?

17            MS. CHU:  Objection.

18            THE COURT:  Overruled.

19            MS. CHU:  What is the basis?

20            THE COURT:  Overruled.

21            You may answer.

22       A    No.

23       Q    Back to what you're doing for a living, if

24   you don't mind.

25            Do you have any particular -- well.  You

Solomon - Cross

249

1    just punch license plate numbers into the computer

2    or what you do?

3         A    Put license plates into the computer.

4         Q    Randomly?

5         A    Yes.

6         Q    Sort of like the lottery if you lose.

7              MS. CHU:  Objection, your Honor.

8              THE COURT:  Sustained.

9         Q    Now, you were at a strip club for half

10   hour or so?

11        A    Yeah.

12        Q    At any time earlier that day, did you

13   smoke any marijuana?

14        A    In the morning maybe.

15        Q    About what time in the morning would you

16   smoke marijuana?

17        A    In the morning, was like ten o'clock.

18   Twelve, 11 o'clock.

19        Q    Were any of your friends over by that

20   time?

21        A    I think Edgar might have been there by

22   then.

23        Q    Did he smoke with you?

24        A    Yes.

25        Q    Did you smoke marijuana in the afternoon?

Solomon - Cross

250

1       A    No.

2       Q    How much did you smoke in the morning?

3       A    Smoked one.  One joint.

4       Q    Big, small, strong, not strong?

5            MS. CHU:  Objection.

6       Q    Describe it in more detail?

7            THE COURT:  Overruled.  I'll allow the

8       question.

9            Can you describe it in more detail?  What

10      you smoked?

11      A    I smoked a joint.

12      Q    Smoke them everyday?

13           MS. CHU:  Objection.

14           THE COURT:  Overruled.

15           You may answer.

16      A    No.

17      Q    How often in the week?  At that time were

18      you smoking marijuana?

19      A    I don't know.  I can't give you an exact

20      number.

21      Q    Approximately?

22      A    Two.

23      Q    How many times a week did you drink beer

24      at that time?

25      A    Not often.

Solomon - Cross

251

1      Q    So on Saturday, did you drink anything in

2  the afternoon?

3      A    No.

4      Q    In the evening, what hour was it when you

5  started to drink?

6      A    When I got to the strip club.

7      Q    About midnight or after?

8      A    About 12, one o'clock.

9      Q    How many beers did you have?

10     A    Two.

11     Q    Were they Heinkens?

12     A    Yes.

13     Q    Then you went over to the other club where

14  the homicide occurred.  That was where you had

15  another beer; is that right?

16     A    Yes.

17     Q    When you went to that club, you noticed

18  the man dancing with the woman in the back.  From

19  that moment to the moment the man you say is my

20  client struck Edgar, did my client have any loud

21  words with Edgar?

22         MS. CHU:  Objection.

23         THE COURT:  Overruled.

24         You may answer.

25     A    Can you repeat the question?

Solomon - Cross

252

1           MR. DRANOVE:  Can you read it back,

2      please?

3                       (Whereupon, the question was

4                       read as requested.)

5      A    No.

6      Q    Did Edgar say anything loudly to my

7      client?

8      A    No.

9      Q    Did either one of them gesture towards the

10     other?

11     A    I'm not -- I don't know.

12     Q    How close were you to them when the

13     conversation took place?

14          MS. CHU:  Objection.  At what point are we

15     talking about?

16          THE COURT:  Overruled.

17          You may answer.

18     A    Can you repeat the question?

19          THE COURT:  How close were you to them

20     when there conversation took place?

21          THE WITNESS:  Maybe a foot or two.

22     Q    The gentleman that was talking to Edgar

23     was a stranger to you, right?

24     A    Excuse me?

25     Q    The gentleman talking to Edgar at that

Solomon - Cross

253

1    time was a stranger to you?

2         A    Yes.

3         Q    Am I correct?

4         A    Yes.

5         Q    Edgar slighter build than you are,

6    correct?

7         A    Yes.

8         Q    You were keeping an eye on that guy,

9    correct?

10        A    Yes.

11        Q    You didn't want to see anything happen to

12   Edgar?

13        A    Yes.

14        Q    Nothing happened to Edgar, correct?  At

15   that time, nothing happened to him?

16        A    At that time, no.

17        Q    Now, two other people came over to where

18   you were standing with Edgar and the gentleman that

19   you say is my client was talking to Edgar?  Right?

20        A    Yes.

21        Q    One was wearing camouflage jacket?

22        A    Yes.

23        Q    Other one camouflage jacket, but you said

24   white in color; is that right?

25        A    Yes.

Solomon - Cross

254

1      Q    Did any of these three people -- let me

2  withdraw that question.

3         Were all three of them strangers to you?

4      A    Strangers?

5      Q    Yes.

6      A    Yes.

7      Q    Which one of those three said, "mind your

8  fucking business"?

9      A    The one with the white jacket.

10     Q    He said that to you?

11     A    Yes.

12     Q    Was it a response to a question?

13     A    Yes.

14     Q    What was your question?

15     A    "Is there a problem"?

16     Q    How did you say it to him?

17     A    Say "is there a problem."

18     Q    Would you say that to him?

19     A    Cause he just -- he was standing on the

20  right, now he's standing in front of me surrounding

21  my friend.

22     Q    Surrounding your friend, you said to him,

23  "is there a problem"?

24     A    Yes.

25     Q    Did you have two other friends in the bar

Solomon - Cross

255

1    at that time?

2       A    Excuse me?

3       Q    Did you have two other friends with you in

4    the bar?

5       A    Yes.

6       Q    Did they come over to this seen?

7       A    Not -- not immediately.

8       Q    Did they come over?

9       A    Yes.

10      Q    Did they come over before or after you

11   said "is there a problem"?

12      A    After.

13      Q    Did they come over before or after the

14   gentleman in the white jacket said "mind your

15   fucking business"?

16      A    They came over after he said that.

17      Q    How much time passed before they came over

18   after the gentleman said "mind your fucking

19   business"?

20           MS. CHU:  Objection.

21           THE COURT:  Overruled.

22           If you know.

23      A    I am not exactly sure.

24      Q    Was second or longer?

25      A    Not exactly sure.

Solomon - Cross

256

1      Q    Do you remember it happening?

2      A    I remember my friends coming over.

3      Q    This is before Edgar was struck, isn't it?

4      A    Yes.

5      Q    Your friends came over, Edgar yet to be

6  struck, did either of your friends say anything?

7      A    Yes.

8      Q    Which of your friends said something?

9      A    GoGo.

10     Q    Both of them?

11     A    GoGo.

12     Q    Which -- what's his real name?

13     A    Jonathan.

14     Q    Did you hear what he said?

15     A    Yes.

16     Q    What did he say?

17     A    "Is there a problem"?

18     Q    Did anyone tell him to mind his fucking

19  business?

20     A    No.

21     Q    There are four of you at this seen -- you

22  and your three friends are there, correct?

23     A    Yes.

24     Q    And the gentleman you say is my client and

25  two other people are at the same spot, correct?

Solomon - Cross

257

1  A  Yes.

2  Q  Can you describe the height of the man in

3 the white jacket?

4  A  The height?

5  Q  Yeah.

6  A  Taller than the other two.

7  Q  Facial complexion?

8  A  Dark skin.

9  Q  With respect to the face of my client,

10 similar or --

11  A  Dark skin and short hair.

12  Q  Well, my client pretty short now.  Short

13 like that or different?

14  A  He had short hair, and he was dark skin.

15  Q  Facial structure?

16  A  I am not sure.

17  Q  Take a look at my client, tell me if he

18 helps you remember --

19  A  I don't have to look.

20    MS. CHU:  Objection.  He is asking about

21  somebody totally different.

22    THE COURT:  Overruled.

23    You may answer.

24  A  Repeat the question?

25    MR. DRANOVE:  I don't recall the exact

Solomon - Cross

258

1          words.  I want you to answer the exact words.

2                THE COURT:  Please read back the exact

3          words.  I remember generally, but not exact

4          words.

5                          (Whereupon, the question was

6                          read as requested.)

7          Q    You don't have to look?

8          A    He's dark skin and had short hair.  He was

9     taller than the rest.

10         Q    Only one of the three people that were of

11    the seven at the spot there, not you and your

12    friends, only one who said anything to you was the

13    guy in the white jacket?

14         A    Yes.

15         Q    So, the first gentleman -- we use that

16    word -- who you saw talk to Edgar was my client, the

17    one that was dancing on the dance floor?

18         A    The defendant was talking to Edgar.

19         Q    And then two other gentlemen came over,

20    correct?

21         A    Yes.

22         Q    Second gentleman and a third gentleman,

23    right?

24         A    Yes.

25         Q    Was it the third gentleman was the taller

Solomon - Cross

259

1    one, right?

2         A    Yes.

3         Q    And the third gentleman is the one that

4    struck Edgar; isn't it true?

5         A    The person I was talking to?

6         Q    If you call that talking, yes.

7         A    No, he didn't strike Edgar.

8         Q    You ran after that person, correct?

9         A    Yes.

10        Q    You were blocked by a bouncer from going

11   after him, correct?

12        A    Yes.

13        Q    You'd gotten to the exit door before you

14   were blocked, correct?

15        A    No.

16        Q    Where were you when a bouncer blocked you

17   from going after the man with the white jacket?

18        A    I was by the jukebox.

19        Q    Where was the bouncer?

20        A    In front of me.  Not too far off.

21        Q    Sitting in front of you?

22        A    No.  I am not -- no.

23        Q    You don't recall exactly?

24        A    Exact spot at the time, no.

25        Q    Do you recall what he looks like?

1        A    No.

2        Q    Height?

3        A    No.

4        Q    Race?

5        A    Nope.

6        Q    Did you watch Edgar the entire time at

7    that location after Mr. Rivera came up before Edgar

8    was punched?

9        A    Was I watching him the whole time?

10       Q    Yeah.

11       A    No.

12       Q    And you saw him punched in the chest?

13       A    Saw who punched in the chest.

14       Q    You tell me, did you see anybody punched

15   in the chest?

16       A    Yes.

17       Q    Edgar?

18       A    Yes.

19       Q    Anyone else?

20       A    No.

21       Q    How many feet were you from Edgar when he

22   was punched?

23       A    Few feet.

24       Q    How many?

25       A    A few.

Solomon - Cross

261

1      Q    Three, four, five, two, one?

2      A    A few.  A few feet.  Exactly, I can't tell

3   you exactly.

4      Q    Close, roughly?  Do you know how far --

5   strike that.

6           Did you leave the area of the side of the

7   bar there where my client was talking to Edgar

8   before Edgar was struck?

9      A    No.

10     Q    You stayed right there, correct?

11     A    Yes.

12     Q    You were one foot from Edgar when my

13  client approached, correct?

14     A    I am not exactly sure.

15     Q    When this man in the white jacket told you

16  to mind your fucking business, did you get angry at

17  him?

18     A    No.

19     Q    Did you tell him to mind his fucking

20  business?

21     A    My reply was, that's my friend.  His

22  business is my business.

23     Q    What did the guy in the white jacket say?

24     A    Nothing.

25     Q    You're keeping an eye on your friend,

1   Edgar?

2       A    I was talking to the guy in the white

3   jacket.

4       Q    Where was he?

5       A    Excuse me?

6       Q    How far was he from Edgar?

7       A    I'm not sure.

8       Q    Was --

9       A    Excuse me?

10      Q    Was your back to Edgar?

11      A    I was talking to the gentleman in the

12  white jacket.

13      Q    What -- about the other gentleman who

14  walked over with the gentleman with the white

15  jacket, where was he?

16      A    I don't know who you talking about?

17      Q    The shorter man wearing camouflage jacket

18  at the time you were talking to the man with the

19  white jacket was where was he?

20      A    He was next to the guy I was talking to.

21      Q    How far was the man who was shorter from

22  at that time from Edgar?

23      A    From Edgar?

24           MS. CHU:  Objection.  Who are we talking

25      about now?

Solomon - Cross

263

1          THE COURT:  You know who he's talking

2      about, the man who was shorter?

3          THE WITNESS:  I assume he is talking about

4      the defendant's friend.

5          THE COURT:  Okay.

6      Q     The one with the camouflage jacket, how

7  close was he to Edgar when you were talking to the

8  guy in the white jack?

9      A     I am talking to the guy in the white

10  jacket.

11     Q     How far was the short guy?

12     A     Exactly, I don't know.  Because I am

13  talking to the guy in the white jacket.

14     Q     Was it more than an arm's length away from

15  you?

16     A     I couldn't give you exact --

17     Q     Two arm's lengths away?

18     A     Can't give exact distance.

19     Q     Three arm's lengths away?

20         THE COURT:  I think he already answer that

21      question.  Next question.

22     Q     After you told the guy, my friend's

23  business is my business, the guy with the white

24  jacket, what did he tell you?

25     A     Nothing.

1      Q    Were you looking at him?

2      A    Yes.

3      Q    Did you look at him, what drew your

4   attention to Edgar?

5      A    I asked him -- said to him, he is my

6   friend, his problem is my problem, that is it and no

7   more.

8      Q    And sometime after that, Edgar was pushed

9   or punched in the chest?

10     A    Yes.

11     Q    Once?

12     A    I'm not sure.

13     Q    Did you see it at all?

14     A    Excuse me?

15     Q    Did you see Edgar punched or pushed in the

16  chest?

17     A    Yes.

18     Q    Once?

19     A    Once, you are saying?  I can't hear what

20  you're saying.

21          THE WITNESS:  I can't understand what he's

22     saying.  Once?

23          THE COURT:  At any time if you don't

24     understand, just simply tell me.

25          Once, he wants to know, how many times you

Solomon - Cross

265

1       saw Edgar punched.

2       A     In chest area, it was two times.

3       Q     Two times.  Not once?

4       A     Two.

5       Q     And did you see the defendant punch Edgar

6    any place else?

7       A     Not that I'm aware of.

8       Q     Isn't the answer no?

9       A     Not that I'm aware of.

10      Q     Do you recall testifying in a prior

11   proceeding in this case?

12      A     Excuse me?

13      Q     You remember testifying in a prior

14   proceedings in this case, three years ago?

15      A     Yep.

16      Q     Remember being asked this question and

17   giving this answer?  Page 69, lines 1 through 3.

18           "Direct examination:  Question:"  From

19      this lady (indicating).  "Did you see the

20      defendant punch Edgar any place else?

21           "Answer:  No."

22      A     Is that a question?  Or a statement?

23           THE COURT:  Do you remember saying that?

24           THE WITNESS:  No, I don't remember saying

25      that.

Solomon - Cross

1      MR. DRANOVE:  Can I get stipulation that

2   it's fair and accurate rereading of the sworn

3   statement asked.

4      MS. CHU:  Yes.

5      THE COURT:  There is no dispute that is

6   what the witness said.

7      MR. DRANOVE:  May I have a moment, Judge.

8      THE COURT:  Certainly.

9      (pause)

10  Q    Did you see the gentleman you say is my

11  client touch Edgar at all before you saw him

12  punching him up towards his shoulder?

13  A    If I seen him touch him before?

14  Q    Yes.

15  A    No.

16  Q    At any time, was there a commotion going

17  on in the bar?

18      MS. CHU:  Objection.

19      THE COURT:  Sustained as to the form of

20   the question.

21  Q    You said when -- are you certain you saw

22  Edgar punched?

23  A    I'm sure I see defendant put his hand on

24  my friend in the chest area.

25  Q    You don't know if he punched him, correct?

Solomon - Cross

267

1      A    No.

2      Q    And you didn't see a knife in his hands,

3  did you?

4      A    I wasn't looking for one.

5      Q    You saw him put his hand on your friend's

6  chest, correct?

7      A    Yes.

8      Q    If you saw a knife, if there was a knife

9  in the hand, you'd see it, correct?

10      A    No.

11      Q    After you saw him put his hand on your

12  friend's chest, what did you see him doing -- what

13  did you see my client do with his hand or hands?

14      A    After put his hand on the chest, he ran

15  straight out the door.

16      Q    So put his hand on the chest once, in your

17  vision, correct?

18      A    I seen two -- I seen his hand touch him on

19  the chest twice, and then he ran out the door.

20      Q    Chest twice, correct?  Correct?

21           You have to answer.

22      A    Correct.

23      Q    You didn't see a knife either time?

24      A    I wasn't looking for one.

25      Q    Did you see one?

Solomon - Cross

268

1      A    No.

2      Q    Now, didn't you understand that your

3   friend had been stabbed in the neck?

4      A    Excuse me?

5           MS. CHU:  Objection.

6           THE COURT:  You have to rephrase that

7      question.

8      Q    Did you ever say to anyone, all I know is

9   my friend is dead and he was stabbed in the neck?

10          MS. CHU:  Objection.

11          THE COURT:  Sustained whether he ever said

12     that to anyone.  You can't ask that.

13     Q    Did you see anybody hit or punch Edgar in

14  the back?

15     A    Not that I'm aware.

16     Q    Was there anything going on at the time --

17  strike that.

18          Is anybody swinging at anybody during this

19  little period of time when Edgar was pushed in the

20  chest twice?

21     A    Before or after?

22     Q    Before or after one.

23     A    Swinging.  Edgar --

24     Q    After the swinging, did anyone swing at

25  anybody?

Solomon - Cross

269

 1      A    Yes.

 2      Q    Who was swinging?

 3      A    I was.

 4      Q    Anyone else?

 5      A    Not that I am aware of.

 6      Q    Mr. Dominguez?

 7      A    Not that I am aware of.

 8      Q    Who were you swinging at?

 9      A    I was swinging at the gentleman in the

10   white jacket.

11      Q    Was he swinging at you?

12      A    No.

13      Q    At anybody?

14      A    Not that I am aware.

15      Q    What about your friends, Mr. Dominguez and

16   Mr. Carrasquillo; what were they doing?

17      A    Ah, I don't know.

18      Q    Was there anything happening when you went

19   after the -- strike that.

20           Did the person in the white jacket try to

21   leave the bar?

22      A    Yes.

23      Q    How did he go about trying to leave the

24   bar?

25      A    Tried to run out.

Solomon - Cross

270

1      Q      He tried to run out?

2      A      Yes.

3      Q      And did he succeed?

4      A      No.

5      Q      What happened to him?

6      A      The bouncer stopped him.

7      Q      Where?

8      A      Where he stopped him?

9      Q      Yes.

10     A      Somewhere in his tracks from trying to get

11     out of the bar.

12     Q      How did he stop him?

13     A      With his body.

14     Q      What did he do?

15     A      Stopped him.  Put his body in the way.

16     Q      Did you try to go out of the bar?

17     A      Yes.

18     Q      Were you stopped from leaving the bar?

19     A      Yes.

20     Q      Did you then turn around after you were

21     stopped from leaving the bar turn around to see

22     where Edgar was?

23     A      Edgar was behind me the whole time.

24     Q      Starting from when through when was Edgar

25     behind you?

Solomon - Cross

 1       A    Starting from when the kid ran out to try

 2    to run, he was behind me the whole time.

 3       Q    About how many people were in the bar at

 4    that time?

 5       A    At least ten people.

 6       Q    When you say behind you, could you, for

 7    the help of us all understanding where were you,

 8    point on that exhibit -- whatever name it is -- to

 9    where you were when they were all behind you?

10            THE COURT:  You're talking about diagram

11       number 6?

12            MR. DRANOVE:  I assume it's number 6.

13            One that is facing the jury.

14            THE COURT:  You want him to mark where?

15       Q    Where he was when they were all behind

16    him?

17            MS. CHU:  Objection.

18            THE COURT:  It's not specific enough.  You

19       have to be more specific in time.

20       Q    All right, Mr. Solomon, you were stopped

21    by a bouncer from leaving the bar; is that correct?

22       A    Yeah.

23       Q    Point to where you were at that time?

24    Show us where you were?

25       A    If this is the jukebox, right here

Solomon - Cross

272

1    (indicating).

2        Q    Right?

3        A    I was maybe a step in front of it

4    (indicating).

5        Q    Near the --

6             THE COURT:  Where the jukebox is.  He is

7        indicating he was by the jukebox.

8        Q    Where was the fellow in the white jacket,

9    where he was stopped?

10       A    When he was stopped from leaving, if I was

11   right here, he was maybe a few feet in front of him

12   (indicating).

13       Q    Pointed to --

14       A    This table right here (indicating).

15       Q    Was he stopped by a bouncer?

16       A    Yes.

17       Q    And Edgar was behind you, correct?

18       A    Yes.

19       Q    Your friends were behind you?

20       A    I don't know where the other two was at.

21   I know Edgar was behind me.

22       Q    And who else what -- how many other people

23   in the bar were behind you?

24       A    When I was standing in that position,

25   right there (indicating)?

Solomon - Cross

1      Q     Yeah.

2      A     Nobody.

3      Q     Did the bouncer physically stop you and

4    restrain you?

5            MS. CHU:  Objection.

6            THE COURT:  Overruled.

7            You may answer.

8      A     No.

9      Q     Did the bouncer and you talk?

10      A     Just two words.  He said, you not going

11    out, and I said why not?

12      Q     Did you have the intention of striking the

13    man in white jacket at that time?

14            MS. CHU:  Objection.

15            THE COURT:  Overruled.

16            You may answer.

17      A     Yes.

18      Q     Had you seen him strike anybody before

19    that moment in that bar?

20            MS. CHU:  Objection, asked and answered.

21            THE COURT:  Overruled.

22            You may answer.

23      A     Who you talking about?

24            THE COURT:  The guy in white.

25      Q     The man in white you wanted to strike.

Solomon - Cross

274

1 A No.

2 Q When you're watching Edgar the entire time

3 before anything happened?

4 A Excuse me?

5  MS. CHU:  Objection.  Asked and answered.

6 Q Were you watching Edgar the entire time

7 before anything happened?

8  THE COURT:  I am going to sustain the

9  objection.  He's already answered that.

10  THE WITNESS:  I was talking --

11  THE COURT:  No, you don't have to answer

12  that.

13 Q Were there any people running back and

14 forth in the bar at any time when you were there

15 that night?

16 A I wasn't paying attention to everybody

17 else.

18 Q Were any people screaming in the bar when

19 you were there?

20 A I couldn't tell you that.

21 Q Were people yelling in the bar when you

22 were there?

23 A I couldn't tell you that.

24 Q Do you remember that prior proceeding

25 giving some statements under oath and saying people

Solomon - Cross

275

1    running back and forth?

2            MS. CHU:  Objection.

3            THE COURT:  Question and answer.

4    Q    Question --

5            MS. CHU:  What page are you on?

6            MR. DRANOVE:  106.

7            MS. CHU:  What line?

8            MR. DRANOVE:  6.

9    Q    "Tell me more about what was going on.

10           "Answer:  Too much.  I can't tell you what

11   was going on.  There was stuff going on

12   everywhere.  I don't know.

13           "Question:  What kind of stuff going on

14   ever where?

15           "Answer:  People running back and forth.

16   People screaming.  People yelling.

17           Do you remember you were asked those

18   questions and giving --

19   A    Yes.

20   Q    -- and giving those answers?

21   A    Yes.

22   Q    Was that true?

23   A    No.

24   Q    That was under oath?

25   A    I might've gotten confused and made it

1    seem like more than it was.  But after I sat and

2    thought about it, it was --

3         Q    You may have gotten confused?

4         A    Yeah.

5         Q    Did you hear people screaming?

6         A    Not --

7         Q    What?

8         A    I am trying to think.

9              No.  I don't think so.  No.

10        Q    Do you recall if you were clear-headed

11   when you testified under oath that people were

12   screaming?

13             MS. CHU:  Objection.

14             THE COURT:  Sustained.

15        Q    Was there a commotion in the bar at about

16   the time you were trying to hit the guy in the white

17   jacket?

18             MS. CHU:  Objection.

19             THE COURT:  Overruled.

20             You may answer.

21        A    Commotion as far as what?  Somebody else?

22        Q    Any kind of disturbance in the bar.

23        A    No.

24        Q    Nothing?

25        A    Nothing.

Solomon - Cross

277

1       Q    Do you know what a commotion is?

2       A    I believe so.

3       Q    What do you think it is?

4       A    A lot of melee stuff what was happening,

5   out of control.

6       Q    Remember being asked this question and

7   giving this answer?  Page 106, line 20.  Line 18.

8            "Did you hear people screaming?

9            "The Court:  When?

10           "Question:  During the commotion?

11           "Answer:  What commotion?

12           "When was there commotion that started in

13       the beginning where my friend -- where he was

14       punched in the chest or shoulder.  Then there

15       was a commotion when I went after the kid when

16       he couldn't get out, and there was a commotion

17       when everybody was out."

18           Remember that question?

19       A    Yeah.

20       Q    So there was a lot going on in the bar at

21   this time, right?

22       A    No.  I just misworded it.  It wasn't no

23   commotion.  Commotion that was referring to was me.

24   There was no other fights, nothing else going on.

25       Q    The commotion was in your head?

Solomon - Cross

278

1      A    No.  I am only the one who was causing the

2   commotion.

3      Q    How much of a commotion were you causing?

4      A    Not much.

5      Q    Enough for people to be screaming?

6      A    I am not sure.

7      Q    Enough for people to be yelling?

8      A    Not sure.

9      Q    When the bouncer wouldn't let you out of

10   the bar, did you turn around and specifically go for

11   the guy in the white jacket?

12      A    Yes.

13      Q    You didn't see anybody else, correct?

14      A    I wasn't looking for nobody else.

15      Q    Everybody else in your vision was a clear,

16   correct?

17      A    I wasn't looking for nobody else.

18      Q    You were focused on the man in the white

19   jacket; is that correct?

20      A    Yes.

21      Q    And anybody else who could have been

22   around you, whether it was your friend, mother or

23   father, you wouldn't have seen them at that moment

24   because you were so focused on that man in the white

25   jacket; isn't that correct?

Solomon - Redirect

1          A     Yes.

2                MR. DRANOVE:  No further questions.

3                THE COURT:  Any redirect, Miss Chu?

4                MS. CHU:  Yes, just a couple of questions.

5                THE COURT:  I have heard that before.

6    REDIRECT EXAMINATION

7    BY MS. CHU:

8          Q     Just want to clarify something.  Because

9    got little confused during your cross-examination.

10               MR. DRANOVE:  Objection to her testimony.

11               THE COURT:  Just ask a question.

12         Q     Were you and Edgar was standing by the

13   jukebox before anything happened?

14         A     Yes.

15         Q     Who was the first person that walked up to

16   you guys?

17         A     The first person was the kid with the

18   white jacket.

19         Q     I am sorry.  You said initially the

20   defendant walked up to Edgar and said -- whispered

21   something in his ear?

22         A     Yes.

23         Q     So was he the first of the three that came

24   over to where you and Edgar was standing before

25   anything happened?

1     A   Yes.

2     Q   After he came over and said something to

3 Edgar, you said someone else came over and that was

4 the guy in the jacket?

5     A   Yes.

6     Q   And where was he standing in relation to

7 where the defendant was?

8     A   He was standing to the left of the

9 defendant.

10    Q   So I am the defendant, he would have been

11 standing to my left (indicating)?

12    A   Yes.

13    Q   Now, at some point, guy with the

14 camouflage jacket, defendant's friend, he comes over

15 too, correct?

16    A   Yes.

17    Q   And where is he standing in relation to

18 where the defendant was standing?

19    A   Between -- he splits them two.

20    Q   He splits them two.

21       It's defendant, his camouflage jacket, and

22 his camouflage jacket friend?

23    A   Yes.

24    Q   His white jacket friend would then be

25 closest to you?

Solomon - Redirect

1       A      Yes.

2       Q      And who would be closest to Edgar?

3       A      The defendant.

4       Q      Once you asked what the problem was, and

5   the guy with the white jacket started talking back

6   to you, where was your focus?

7       A      My focus was on the guy who was talking to

8   --

9       Q      The one in the white jacket?

10      A      Yes.

11      Q      Now, who was closest to Edgar's left side?

12      A      The defendant.

13      Q      The defendant was the closest?

14      A      Yes.

15      Q      Now, you had mentioned something about you

16  wearing a camouflage -- something camouflage?

17      A      Yes.

18      Q      -- of article of clothing was that?

19      A      I was wearing a thermal shirt like a

20  long-John.

21      Q      You know how their different patterns of

22  the camouflage?

23      A      Yes.

24      Q      Do you recall what pattern was on the

25  defendant's camouflage jacket?

Solomon - Redirect

1      A     Yes.

2      Q     What was pattern?

3      A     The pattern he had was standard military

4    camouflage jacket.  Black, green and lighter green.

5      Q     And what about the guy that he was with,

6    did he also --

7      A     Same.  Same type of pattern.

8      Q     Was your pattern the same as both of

9    their's?

10     A     No.

11     Q     What was your pattern in?

12     A     Mine was -- was more of a dessert

13   camouflage.  Green, black and beige.

14     Q     The lighter colors?

15     A     Yes.

16     Q     Besides you said yours was actually a

17   thermal shirt though?

18     A     Yes.

19     Q     Now, you said at some point Jonathan and

20   Marcus come over?

21     A     Yes.

22     Q     Do you remember the precise moment that

23   they came over?  If you remember.

24     A     Exactly, I know I said -- I said to the

25   guy in the white jacket, mind your business.  I mean

Solomon - Redirect

283

1    he said to me, "mind your fucking business."   And

2    when he said that to me, Jonathan came up, maybe 20,

3    30 seconds later.

4              MR. DRANOVE:   What?

5         Q    Twenty, 30 seconds later?

6         A    Maybe a little longer.

7              MS. CHU:   I am going to withdraw that.

8         One second.

9              May I have more moment, your Honor?

10             (pause)

11        Q    Other than the defendant, did you see

12   anyone else touch Edgar?

13        A    No.

14             MS. CHU:   I have nothing further.

15             Thank you.

16             THE COURT:   Any recross?

17             MR. DRANOVE:   Yes.

18   RECROSS-EXAMINATION

19   BY MR. DRANOVE:

20        Q    When Marcus and Jonathan came over, one or

21   both of them said -- correct me if I'm wrong -- some

22   words to the effect, "is there a problem"; is that

23   right?

24        A    Yes.

25        Q    And then my client said, "there is no

1  problem"; is that right?

2      A    No.

3      Q    Who said, "there is no problem"?

4      A    Gentleman in the white jacket.

5      Q    Did anyone else say "there's no problem"?

6      A    Not that I'm aware.

7      Q    Are you sure?

8      A    Not that I am aware.

9      Q    Well, did one or two gentleman say there

10  was no problem?

11      A    The gentleman in the white jacket.

12      Q    Do you recall testifying in the grand

13  jury, page 11, line 5?  Being asked this question

14  and giving this answer?

15          "Question:  Okay.  What do you remember

16      seeing next?

17          "Answer:  Then he said, the first

18      gentleman said, there was no problem.  The

19      second gentleman said, there was no problem.

20      Then the third gentleman, what seem like to me,

21      pushed, pushed my -- Edgar towards the wall and

22      then he ran."

23          Do you remember that question?

24      A    Yes.

25      Q    Does that refresh your memory about what

Solomon - Recross

285

1    one or two of these people said, "there's no

2    problem"?

3         A    Gentleman in the white jacket.

4              MR. DRANOVE:  Can I get a concession that

5         that was the testimony.

6              THE COURT:  Did you read the testimony

7         correctly in the grand jury.

8              MS. CHU:  Yes.  He did.

9         Q    Now, the time that the man in the white

10   jacket told you to mind your f'g business and you

11   told him your friend's business is your business;

12   was the music playing?

13        A    Yes.

14        Q    Were you yelling or shouting?

15        A    Yes.

16        Q    Was the other gentleman yelling or

17   shouting?

18        A    No.

19        Q    But your friends came over; is that right?

20        A    Yes.

21             MR. DRANOVE:  No further questions.

22             MS. CHU:  Your Honor, if I could just be

23        complete.

24             THE COURT:  You have another question?

25             MS. CHU:  Yes, based upon what he just

Solomon - Redirect/Recross

286

1      asked him on the grand jury.

2              THE COURT:  Go ahead.

3      REDIRECT EXAMINATION

4      BY MR. CHU:

5          Q    Mr. Solomon, were you just asked some

6      questions what you had just said in the question.

7              Do you recall also being asked this

8      question and giving the following answer?  This is

9      the follow-up question to what you were just asked

10     by the defense counsel.

11              "So now the third person that you had seen

12         at this point pushed Edgar, was that the same

13         person that you had seen in the back dancing

14         with that girl when you went to the bathroom?

15              "Answer:  Yes."

16              Do you recall giving that answer to that

17         question in the grand jury?

18         A    Yes.

19              MS. CHU:  Thank you very much.

20              I have nothing further.

21              THE COURT:  Anything else on that, Mr.

22         Dranove?

23     RECROSS-EXAMINATION

24     BY MR. DRANOVE:

25         Q    What was lighting like in the bar at that

1    time?

2            MS. CHU:  Objection, your Honor.

3            THE COURT:  Sustained.  We have been over

4        that.

5            MR. DRANOVE:  With this witness?

6            THE COURT:  Yes.

7            MR. DRANOVE:  I apologize for not

8        recalling it.

9            MR. DRANOVE:  No further questions.

10           THE COURT:  Thank you, sir.

11           You're excused.  You may step down from

12       the witness stand.

13           (WITNESS EXCUSED)

14           THE COURT:  You may proceed, Miss Chu.

15           MS. CHU:  The People call Marcus.

16       Carrasquillo.

17       M A R C U S   C A R R A S Q U I L L O, having

18   been called as a witness, having been duly sworn,

19   testified as follows:

20           COURT CLERK:  State your name?

21           THE WITNESS:  Marcus Carrasquillo.  Marcus

22       Carrasquillo.

23           COURT CLERK:  What county do you live in?

24           THE WITNESS:  Kings.

25           THE COURT:  You may examine the witness,

Carrasquillo - Direct

288

1          Miss Chu.

2                MS. CHU:   Thank you.

3     DIRECT EXAMINATION

4     BY MS. CHU:

5          Q     Good afternoon, Mr.  Carrasquillo?

6          A     Good afternoon.

7          Q     How old are you, sir?

8          A     Thirty-seven.

9          Q     Do you work?

10         A     Yes.

11         Q     What do you do for a living?

12         A     Work for Fed Ex.

13         Q     At what?

14         A     Federal Express.

15         Q     How long have you been working for Federal

16    Express?

17         A     Sixteen years.

18         Q     And what do you do for them?

19         A     Foot courier.

20         Q     You deliver packages on foot?

21         A     Right.

22         Q     Do you have a criminal history?

23         A     Yes.

24         Q     On February 5th of 2000, were you

25    convicted of criminal possession of a controlled

Carrasquillo - Direct

289

1    substance in the seventh complete?

2         A    Yes.

3         Q    Did you pay a fine of a thousand dollars

4    on that case?

5         A    Yes.

6         Q    Did that case happen upstate?

7         A    Yes.

8         Q    And what was -- because you were in

9    possession of some drugs?

10        A    Yes.

11        Q    Now, I want to ask you, do you know

12   someone name Edgar Ojeda?

13        A    Yes.

14        Q    How do you know Edgar?

15        A    Best friends.

16        Q    And how long had you known him?

17        A    Six, seven years.

18        Q    How did you meet him?

19        A    I met him through Carlos Solomon.

20        Q    How did you know Carlos?

21        A    Grew up with Carlos.

22        Q    Now, are you also related to Jonathan

23   Dominguez?

24        A    Yes.

25        Q    What is your relationship with him?

Carrasquillo - Direct

290

1      A     My cousin.

2      Q     I want to direct your attention to the

3   weekend of February 26, into early morning of

4   February 27th, 2005.  Did you spend the date at

5   all with Edgar, Carlos or Marcus?

6      A     Yes.

7      Q     And can you tell me what was it that you

8   did?

9      A     They picked me up from downtown Brooklyn.

10  They shopped.  Went to Carlos' house.  After Carlos'

11  house, my cousin and I went to my house.  We got

12  dress.  And then we went out.

13     Q     What were your plans for later that night?

14     A     After -- first we were suppose to go to

15  the Buttacup, downtown Brooklyn.  But we didn't find

16  parking, there was mutual friend's from my job

17  birthday.  We changed our minds, and then we ended

18  up staying local.

19     Q     When you say local, where did you end up?

20     A     On 39 Street, The Amanacer.

21     Q     Did you stop any place before you actually

22  made it to Amanacer's?

23     A     I can't remember.

24     Q     Do you remember about what time it was you

25  got to that place on 39 Street and third?

Carrasquillo - Direct

291

1     A     I can't remember the exact time.

2     Q     Do you remember what time it was that you

3   guys actually left out to try and go out?

4     A     About ten.  I say between ten, 11,

5   something like that.

6     Q     And -- I am sorry.

7           Did you drink at all that night?

8     A     Yes.

9     Q     And what did you drink?

10    A     Heinkens.

11    Q     Did you drink when you got to Amanacer's?

12    A     Yes.

13    Q     What were you drinking there?

14    A     Heinkens.

15    Q     Did you drink before you got to

16  Amanacer's?

17    A     Yes.  I remember now we were at the --

18  we -- we went to a strip spot around the corner.  Up

19  the block on Third Avenue, somewhere on Fourth

20  Avenue.  I can't remember exactly where it was.  We

21  had -- had a Heinken there also.

22    Q     And how was it that you were getting

23  around that night?

24    A     Carlos was driving.

25    Q     Now, it was -- who was with you guys --

Carrasquillo - Direct

292

1    when you guys got to the bar on 39 and Third?

2         A    Carlos and Jonathan.

3         Q    Was the bar crowded when you got there?

4         A    No.

5         Q    When you say, no, what do you mean?  It

6    was completely empty, or was there some people --

7         A    No, there were people there.  It wasn't --

8         Q    Had you ever been to that place before?

9         A    Yes.

10        Q    Now, once you got to the location, can you

11   tell me where did you go once you got in?

12        A    Jonathan had got us some beer.  So by

13   where the jukebox was at, I was towards the right of

14   the jukebox.

15        Q    To the right of the jukebox?

16        A    Right.

17        Q    As you're facing --

18        A    If you're going towards the back, the side

19   box is here, I'm just on the other side

20   (indicating).

21        Q    On the other side?

22        A    Right.

23        Q    Further in?

24        A    Further inside, yeah.

25        Q    Can you tell me, did you know anybody that

Carrasquillo - Direct

293

1   was already at the bar when guys got there?

2       A    Yes.

3       Q    And who was it that you recoginizeed?

4       A    Rudy.

5       Q    Did you talk to Rudy?

6       A    Yes.

7       Q    Does your cousin, Jonathan, also know him?

8       A    Yes.

9       Q    Did you remain at the jukebox, or did you

10  go any place else withinAmanacer's?

11      A    I finished the Heinken, went to the

12  bathroom.  Came out the bathroom, and I went to get

13  myself another Heinken.

14      Q    Where did you go when you went to get

15  another Heinken?

16      A    To the bar.

17      Q    So, which part of the bar were you

18  standing while you were in the side closer to the

19  entrance, or were you on the end that was further

20  into the bar?

21      A    Closer to the end.  Going towards the

22  back.

23      Q    So closer to the dance floor?

24      A    Right.

25      Q    And can you tell me, do you remember where

Carrasquillo - Direct

294

1    Edgar was at that point?

2        A    By the jukebox.

3        Q    Was he with anybody?

4        A    He was next to Carlos.

5        Q    Now, did there come a time when anything

6    happened while you were out at the bar?

7        A    I just remember a commotion.  While I was

8    at the bar.

9        Q    You remember where the commotion was

10   taking place?

11       A    All I knew it was behind me.  My back --

12   my -- I was towards the bar.  Like facing the bar.

13   All I knew the commotion was behind me.

14       Q    Did you turn around?

15       A    Yes.

16       Q    And when you turned around, could you tell

17   who was in this commotion when you turned around?

18       A    No.

19       Q    Did you do anything as far as moving?

20       A    I moved towards where the commotion was

21   going on.

22       Q    Did there come a time when you got to

23   where the commotion was or the area where that

24   jukebox is?

25       A    Right.

Carrasquillo - Direct

295

1    Q    Got there?

2    A    Yeah, I did.

3    Q    Who was first person that you noticed?

4    A    Carlos.

5    Q    And did you have a conversation with

6    Carlos?

7    A    I asked him what happened.

8    Q    And did he talk to you and tell you?

9    A    He said --

10        MR. DRANOVE:  Objection.

11        THE COURT:  Sustained.  The objection as

12        to what he was told by Carlos.

13    Q    You had a conversation with Carlos?

14    A    Right.

15    Q    Based upon your conversation with Carlos,

16    what did you do?

17    A    When he said somebody hit Edgar.

18        THE COURT:  Don't tell us what Carlos

19        said.  I am striking that.

20        What did you do after you were told

21        something?

22    A    I seen two people run towards the door,

23    and I ran towards the door.

24    Q    Were you able to get out -- I am sorry.

25    Withdrawn.

1             Were the two people that ran towards the

2       draw, were they able to get out?

3             A      Right.  Yes.

4             Q      Were you able to get out?

5             A      At first, no.

6             Q      And how -- why was it that you were not

7       able to get out?

8             A      The bouncer closed the door.

9             Q      Did there come a time when you actually

10      were let out?

11            A      I told him open the door.

12            Q      Did he open the door?

13            A      And he opened the door.

14            Q      Did you go outside?

15            A      Yes.

16            Q      And did you see where those two

17      individuals that you saw run out went to?

18            A      They was running towards -- towards the

19      highway.

20            Q      Towards the BQE overpass?

21            A      Yes.

22            Q      On Third Avenue?

23            A      Third Avenue.

24            Q      Did you try pursue them at all?

25            A      No.

1      Q    At this point, did you even know -- well,
2    withdrawn.
3           Once you saw them going, did there come a
4    time when you came back into the location?
5      A    Right.  Yes.
6      Q    When you went back to the location, did
7    there come a time when you actually saw or spoke to
8    Edgar?
9      A    Asked him if he was all right.
10     Q    And can you tell me, did he have any
11   injuries when you came back in?
12     A    He said, I got stabbed and opened his --
13   showed the wounds.
14     Q    Did you see where he had been stabbed?
15     A    Right -- yeah, I did.
16     Q    Did you see any blood?
17     A    Yes.
18     Q    What did you do when you saw that?
19     A    I went into shock.  I was just looking at
20   him.
21     Q    You just stared?
22     A    Yeah.
23     Q    Did there come a time when anybody tried
24   to get you guys to go someplace?
25     A    Carlos grabbed him.

Carrasquillo - Direct

298

1   Q   And what did you guys do?

2   A   Went to Carlos' car.

3   Q   Did you go with him?

4   A   Yes.

5   Q   What about Jonathan?

6   A   Yes.

7   Q   How did you get to Carlos' car?

8   A   Walked.

9   Q   Was anybody assisting Edgar at all?

10  A   Carlos.

11  Q   Where was Carlos' car, if you remember?

12  A   I can't remember where the car was parked.

13  Q   Once you got to the car, where were you

14  sitting?

15  A   Behind the passenger seat.

16  Q   Where was everybody else?

17  A   Edgar was in front of me in the passenger

18  seat.  Carlos was driving.  And Jonathan was next to

19  me.

20  Q   What happened next?

21  A   Carlos kept telling Edgar to breathe.  And

22  he said, "I can't breathe."  And then he coughed up

23  a chunk of blood.  And little bit after, he coughed

24  up another chunk and then he stopped moving.

25  Q   This was while you were in route to the

Carrasquillo - Direct

299

1    hospital?

2        A    Yes.

3        Q    Which direction were you going?   Which

4    hospital were you --

5        A    West, going to Lutheran.

6        Q    Did you there come a time when you guys

7    actually arrived at Lutheran's?

8        A    Yes.

9        Q    When arrived there, what was done with

10   Edgar?

11       A    Carlos ran out the driver's seat, opened

12   side where Edgar was, picked him up and ran him into

13   the emergency room.

14       Q    Did you go into the hospital with Carlos?

15       A    Yes.

16       Q    What about Jonathan, did he come in as

17   well?

18       A    Yes.

19       Q    Did you guys remain there until the police

20   arrived?

21       A    Yes.

22       Q    And after that, did there come a time when

23   you got the precinct to speak to detectives?

24       A    Yes.

25       Q    Now, did you tell the detectives what you

Carrasquillo - Direct

300

1 had seen or what you did when you were at the

2 Amanacer's at the time of the incident?

3   A Yes.

4    THE WITNESS:  At this time, if I could

5   have People's number 4 put up.

6   Q Mr. Carrasquillo, if you could just take a

7 look at the photos that are there.  Just tell me if

8 you can see the approximate area that you were

9 standing in when the commotion occurred on the night

10 of February 27th, or the early morning

11 February 27, 2005, and just tell me what letter is

12 above the photograph?

13   A In B, I was in this area here

14 (indicating).  When -- you know I was at the bar --

15 I was there (indicating).

16    MS. CHU:  Let the record reflect he is

17   pointing just in front of bar on the right-hand

18   side of the picture.

19   Q And can you tell me, do you see the

20 approximate area where you saw Edgar and Carlos

21 while you were there at the bar before anything

22 happened?

23   A On this picture, on B over here.  On this

24 side. (Indicating)

25    THE WITNESS:  Let the record reflect he is

Carrasquillo - Direct

301

1          pointing to People's 4B on the bottom -- bottom

2          right-hand corner.  Just right by where the

3          jukebox is it.

4          Q    Do you also see in People's 4C, you see

5     the jukebox there?

6          A    Yeah.  Right there (indicating).  Right by

7     the door.

8          Q    Right by the door where Edgar and Carlos

9     were?

10          A    Right.

11          Q    Did you see the clothing of the two guys

12     that ran out of the bar just after the commotion had

13     stopped?

14          A    No.

15               MS. CHU:  I have nothing further.

16               Thank you.

17               THE COURT:  Cross-examination, Mr.

18          Dranove?

19     CROSS-EXAMINATION

20     BY MR. DRANOVE:

21          Q    That night in the bar where Edgar was

22     stabbed, did you see anybody dancing?

23          A    I seen people dancing.

24          Q    About how many people did you see dancing?

25          A    I can't remember.

Carrasquillo - Cross

302

1      Q      Remember any of them wearing any
2   particular clothing?
3      A      No.
4      Q      Do you remember if my client was dancing?
5   Did you see him dancing?
6      A      Not that I remember.
7      Q      When you were at the bar, your attention
8   was drawn to where Edgar was by what?  What caused
9   you to pay attention what was going on near the
10  jukebox?
11     A      A commotion.
12     Q      Noise?
13     A      Yes.
14     Q      Yelling?
15     A      More movement.
16     Q      What type of movement?
17     A      Feet moving.  Back and forth movement.
18     Q      Any sounds?
19     A      Not that I can remember.
20     Q      Was there some people fighting?
21     A      When I got there, I didn't see anybody
22  fighting.
23     Q      When you got there, did you have to move
24  people out of the way to get there?
25     A      There was couple of people that were

1   behind me when I was at the bar.  Couple people

2   behind me, and I got -- he got them out of my way.

3        Q    Do you get them out of your way?

4        A    Pushed my way, moved them.

5        Q    Pushed your way through?

6        A    It was short -- spot wasn't that big.

7        Q    How many feet did you have to travel

8   before you saw Carlos?

9        A    Two feet.  Three feet.

10        Q    When you saw Carlos, did you see him

11   fighting?

12        A    No.  I just seen him standing there.

13        Q    Did you see Jonathan?

14        A    I don't remember seeing Jonathan.

15        Q    Did you see Carlos and Jonathan -- Carlos,

16   some guys?

17        A    Nah, I don't remember seeing them

18   fighting.

19        Q    Think back.  Give yourself some time to

20   think about it.

21             MS. CHU:  Objection.

22             THE COURT:  Sustained as to "think back."

23        Q    Did you see Carlos and Jonathan fighting

24   some guys after you pushed through the two people?

25             MS. CHU:  Objection, asked and answered.

1          THE COURT:  Sustained.

2     Q    Do you recall testifying in a prior

3    proceeding.  Being asked a series -- a question and

4    giving the following answer?  Page 132.  Line 5.

5    Question --

6          MR. DRANOVE:  Start line 1, your Honor.

7          THE COURT:  Okay.

8     Q    "Question:  While you were at the bar

9          Area, did you see Carlos come out of the

10         bathroom?

11              "Answer:  No.

12              "Question:  What did you notice then?

13              "Answer:  From when I was waiting for my

14         Heinkens there was a big ruckus.  I turned

15         around, I seen everybody.  There was a lot of

16         just a ruckus.  So I didn't know who was

17         involved in the ruckus.  I was moving people

18         out of my way to make sure the people I was

19         with were not involved.  I saw they were

20         involved."

21              (pause)

22    Q    Just repeating.  "I saw they were

23         involved.  I saw Carlos and Jonathan

24         fighting some guys."

25              Do you recall being asked the questions

Carrasquillo - Cross

305

1    and giving that answer, a while ago, in prior
2    proceedings in this case?
3         A    Nah.  Nah, not like that.  I don't
4    remember if that's what I said, but I remember
5    seeing -- only person I remember seeing -- nah, I
6    saw was Carlos.
7         Q    What did you see Carlos doing?
8         A    He was in the middle.  I just seen him, I
9    said, what happened?
10        Q    What did you see him doing?
11        A    I just seen him in the middle.  I seen him
12   right there on the floor.
13        Q    On the floor.
14        A    Not lying out on the floor.  You know,
15   standing there.
16             MR. DRANOVE:  No further questions.
17             Thank you.
18             THE COURT:  Any redirect?
19             MS. CHU:  No.
20             THE COURT:  Thank you, Mr. Carrasquillo.
21        You're excused.  You may step down from the
22        witness stand.
23             (WITNESS EXCUSED)
24             THE COURT:  Okay, ladies and gentlemen,
25        that completes the testimony.  We have

Proceedings

1    completed our schedule for today.

2         I thank you for being so patient.  We had

3    a very long run today.  I worked you hard.

4    I'll make it up to you tomorrow.  One of jurors

5    has to leave early tomorrow, so you're not

6    going to be here for the whole day.

7         So we are going to start at 11 o'clock.

8    Because I have some other business.  And you'll

9    be out of here by two o'clock latest, maybe

10   earlier if we get started on time.

11        So don't discuss the case.

12        Return tomorrow promptly at 11:00 a.m. and

13   have a very nice evening.

14        Please take charge of the jury.

15        (Jury Excused)

16        THE COURT:  Trial in recess until tomorrow

17   morning at 11 a.m.

18        Have a good evening.

19        *         *         *         *

20        (Adjourned to May 8, 2009)

21

22

23

24

25

307

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF KINGS: CRIMINAL TERM: PART 35
 2   ---------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK    :
 3
                - against -                 : INDICTMENT#
 4                                            1453/2005
     ENRIQUE RIVERA,                        :
 5
                              Defendant.:
 6   ---------------------------------------X
     TRIAL                    320 Jay Street
 7                            Brooklyn, New York
                              May 8, 2009
 8

 9   B E F O R E :

10             HONORABLE ALAN D. MARRUS, J.S.C.

11                                    Justice and Jury

12   A P P E A R A N C E S :

13
                   OFFICE OF CHARLES J. HYNES, ESQ.
14                     District Attorney, Kings County
                       For the People
15                 BY:  PHYLLIS CHU, ESQ.
                       Assistant District Attorney
16

17                 18-B ASSIGNED COUNSEL:
                       CRIMINAL DEFENSE DIVISION
18                 BY:  JOEL DRANOVE, ESQ.
                       Attorney for Defendant
19
                   -------------------------------------------
20                     SANDRA WILKES, R.P.R.
                       Senior Court Reporter
21

22

23

24

25
```

SW

308
PROCEEDINGS

1        THE COURT:  Okay, let's bring the jury out.

2        COURT OFFICER:  Your Honor, ready for the

3    jury?

4        THE COURT:  Yes.

5        COURT OFFICER:  Jury entering.

6        COURT CLERK:  Both sides waive the roll call?

7        MS. CHU:  So waived.

8        MR. DRANOVE:  Yes.

9        THE COURT:  Good morning ladies and

10   gentlemen.

11       THE JURY:  Good morning.

12       THE COURT:  I hope I don't hear any

13   complaints about the weather today.

14       When we left off, the prosecution was

15   presenting its case, and we'll continue with that now.

16       You may call your next witness Ms. Chu.

17       MS. CHU:  The People call Linda Razzano.

18       (At this time, the witness entered the

19   courtroom.)

20       COURT SERGEANT:  Stand in front of the chair,

21   raise your right hand, face the clerk.

22       COURT CLERK:  You solemnly swear that the

23   testimony you are about to give will be the truth, the

24   whole truth, and nothing but the truth?

25       MS. RAZZANO:  I do.

SW

1          COURT CLERK:  Be seated, please.

2          MS. RAZZANO:  Thank you.

3          COURT CLERK:  State your name.

4          MS. RAZZANO:  Linda Razzano, R-A-Z-Z-A-N-O.

5          COURT CLERK:  What county do you live in?

6          MS. RAZZANO:  New York.

7          COURT CLERK:  Thank you.

8          THE COURT:  You may examine the witness

9      Ms. Chu.

10          MS. CHU:  Thank you.

11  L I N D A   R A Z Z A N O, having been duly sworn, testified

12  as follows:

13  DIRECT EXAMINATION

14  BY MS. CHU:

15      Q    Good morning Ms. Razzano.

16      A    Good morning.

17      Q    By whom are you employed?

18      A    I'm employed by the Office of the Chief Medical

19  Examiner for the City of New York, but more specifically for

20  the Department of Forensic Biology.

21      Q    What is your title or position with the Office of

22  the Chief Medical Examiner?

23      A    I'm a criminalist, level four.

24      Q    Now, can you describe your duties and

25  responsibilities as a criminalist, level four?

RAZZANO - DIRECT/CHU

1      A    I am a supervisor in the laboratory.  I am

2   responsible for determining which cases will be accepted

3   within the laboratory and more specifically which items of

4   evidence will be examined.  I am responsible for supervising

5   the daily rotations.  I review case files of DNA reports

6   that are generated by my analysts, and I am also responsible

7   for maintaining my own case load which involves the

8   interpretation of DNA results, generating reports, and when

9   necessary, testifying in court.

10     Q    What is your educational background?

11     A    I have a bachelors degree of science in biology

12  and chemistry from Stonehill College, and I have a masters

13  degree of biology in Houston University.

14     Q    How many years have you been working for the

15  medical examiner's office?

16     A    Almost eight years.

17     Q    Now, while you were with the medical examiner's

18  office, did you receive any additional training beyond

19  college and graduate school?

20     A    Yes.  Upon being hired, I went through an intense

21  six months training period.  But first you are lectured on

22  all the procedures that are performed in the lab.  You will

23  then observe and experience analysts performing those tests.

24  They in turn will observe you to make sure that you're

25  performing those tests properly.  You're also given

SW

RAZZANO - DIRECT/CHU

1    competency tests in order to test your ability to perform

2    those tests properly.  And then at the end of six months

3    you're given an oral examination to test your ability to

4    understand the science behind those procedures and the

5    procedures themselves.

6        Q    Now, what is forensic science?

7        A    Forensic science deals with any realm of science

8    such as biology, chemistry, or physics, and how it can be

9    applied to matters of the law.  An example of this would be

10   utilizing a breathalyzer test in order to determine if

11   somebody has been driving under the influence of alcohol.

12       Q    What is forensic biology?

13       A    Forensic biology is a subspecialty of forensic

14   science which deals with the identification of biological

15   materials such as blood, semen, saliva or skin cells in our

16   attempt to identify from whom those samples come from.

17       Q    Are you familiar with the term what it means to be

18   accredited?

19       A    Yes.

20       Q    What does accredited mean?

21       A    Accredited means that we have met and exceeded all

22   the standards that are set forth by an accreditation agency

23   and it insures that we are doing quality work.

24       Q    Is your lab accredited?

25       A    Yes, we are.

SW

1     Q     Now, are you a member of any professional

2  organizations?

3     A     I am a member of the American Academy of Forensic

4  Science.

5     Q     Now, how many tests have you conducted using DNA?

6     A     Thousands.

7     Q     How many cases have you worked on?

8     A     Over a thousand.

9     Q     Have you ever testified in courts of law?

10     A     Yes.

11     Q     Have you ever been qualified as a expert in the

12  field of forensic biology?

13     A     Yes.

14     Q     How many times have you done so and where?

15     A     Approximately fifty times, and I've testified in

16  the Supreme Courts of Manhattan, Bronx, Brooklyn, Queens,

17  Staten Island, United States Federal Court in Brooklyn,

18  United States Federal Court in Manhattan.

19     Q     Have you ever been denied qualification as a

20  expert?

21     A     No, I have not.

22          MS. CHU:  At this time, your Honor, I would

23        offer Ms. Razzano as a expert in the field of forensic

24        biology.

25          THE COURT:  Any objection?

SW

313

RAZZANO - DIRECT/CHU

1          MR. DRANOVE:  No.

2          THE COURT:  There's no dispute Ms. Razzano is

3     an expert in the field of forensic biology, and

4     therefore I will permit her to testify before you as a

5     expert in this field.

6          You may proceed Ms. Chu.

7          MS. CHU:  Thank you.

8     Q    Ms. Razzano, will you briefly explain to us what

9     is DNA?

10    A    DNA is a genetic make up of an individual.  It

11    carries the information that makes us human along with the

12    information that makes us different from one another.  You

13    inherit half of your DNA from you mother and the other half

14    from your father.

15    Q    Can DNA testing be used in non-forensic testing?

16    A    Yes.  DNA testing can be used in paternity cases,

17    missing person cases, and also in genetic counseling for

18    diseases.

19    Q    Can you explain to the members of the jury what

20    does the term "allele" mean?

21    A    Allele is a alternate form of a gene which means

22    if you have brown hair, you will have alleles for brown

23    hair.  If you have blue eyes, you will have the alleles for

24    blue eyes.

25          In our laboratory the alleles that we have are

SW

1   represented by numbers.

2       Q    Now, are you also familiar with the term loci or

3   locus?

4       A    A locus is a specific part or place in the DNA

5   that we test.  In our laboratory currently we test fifteen

6   different locations along with one that is a sex determining

7   location which will tell you the sex of the individual from

8   which the sample comes.

9       Q    What is a profile?

10      A    Once we are able to determine all the alleles at

11  all the different locations that we test, the combination of

12  those results is what's considered a DNA profile.

13      Q    How do you go about getting or obtaining a

14  profile?

15      A    We will -- the process is, first we will do

16  something called extraction, which is we'll have a sample of

17  that, for example, it's being confirmed to be blood, and

18  we'll first take the DNA out of the cell, and once we are

19  able to get the DNA out of the cell, we need to determine

20  how much is present.  And once we determine how much is

21  present, if we have enough to proceed through DNA testing,

22  we will then amplify it, which means we make multiple,

23  multiple copies because what we're looking at is a very

24  small amount of DNA, so we need to make multiple copies in

25  order for us to visualize, and from the culmination of that

SW

RAZZANO - DIRECT/CHU

1  is where we will be able to obtain a DNA profile.

2      Q    Now, directing your attention to this case, as

3  part of your duties and responsibilities at the medical

4  examiner's office, forensic biology department, did you

5  receive evidence in connection with an investigation of a

6  deceased person by the name of Edgar Ojeda?

7      A    Yes, we did.

8      Q    What was it that you received?

9            THE WITNESS:  May I consult my notes?

10           THE COURT:  At any time.

11           THE WITNESS:  Thank you.

12     A    We received a green, brown, and black camouflage

13  jacket, a green combat hat, and a brown Champion sweatshirt

14  under voucher M621135.  We received a orange and blue

15  baseball cap under voucher M621136.  We obtained crime scene

16  samples under voucher M621112, and additional crime scene

17  samples under M621117.

18           MS. CHU:  At this time, your Honor, if I

19        could have the witness shown People's Number 7 in

20        evidence?

21           THE COURT:  Okay.

22           COURT OFFICER:  You want this taken out of

23        the bag?

24           MS. CHU:  Yes, please.

25           COURT OFFICER:  Which item first?

SW

316

RAZZANO - DIRECT/CHU

1        MS. CHU:  If you could take out all the

2    items, but specifically I want the hat to remain out.

3        COURT OFFICER:  Okay.

4    Q    Ms. Razzano, are those three articles of clothing

5    what you received under voucher M6211135?

6    A    Yes, they are.

7    Q    Now, what did you do with the evidence that you

8    received in connection with this case?

9        You can put that down for now.

10   A    I examined the items for the presence of blood.

11   Q    And what were your conclusions?

12   A    That we were able to find blood on this cap.

13   Those two items did not.

14   Q    Those two items did not have any?

15   A    Correct.

16   Q    Now, could you just tell us were you able to find

17   blood on any of the other samples that were sent to you?

18   A    Yes.

19   Q    Where else did you find blood?

20   A    We also found blood on the baseball cap and the

21   crime scene samples that was found on voucher M621112 and

22   voucher M621117.

23   Q    Now, initially when you first receive the items,

24   what do you do with the items prior to even looking at them?

25   A    The first thing we'll do is we will document the

SW

1  packaging in regards to what the packaging is; is it a bag?

2  Is it a envelope?  Is it a box?  We'll make notations on the

3  size of the packaging, the color of the packaging, is the

4  packaging sealed, and any notations that are made on the

5  outside of the packaging, all of this will be documented in

6  the notes.

7     Q    Were all the items you received in connection with

8  this case sealed when you received them?

9     A    Yes, they were.

10    Q    Did you also compare the contents of those

11 packages to make sure that they matched to what they were

12 labeled to be?

13    A    Yes.

14    Q    Did they match?

15    A    Yes, they did.

16    Q    You said you had found blood on this cap, the

17 baseball cap, and then the samples that were sent to you

18 from crime scene?

19    A    Correct.

20    Q    Can you tell us on this hat that was vouchered

21 understand 621135, where did you find the blood?

22    A    I found a stain right here on the brim of the cap

23 and I found one along the back.

24         MR. DRANOVE:  Could you, your Honor, identify

25    where the witness is pointing with respect to each of

SW

1     those locations?

2              THE COURT:   One is on the brim and the other

3        is on the back of the cap.

4              MR. DRANOVE:   The back?

5              THE WITNESS:   Right here on the back along

6        the back seam.

7              MR. DRANOVE:   The back seam, thanks.

8        Q    Did you label those stains that you found on this

9     hat?

10       A    Yes.   The one on the brim of the cap was labeled

11    as stain 2A, and the one found on the back along the seam

12    was labeled as stain 2B.

13       Q    Now, were you able to take any other samples from

14    any of the items that you received that did not appear to be

15    blood?

16       A    Yes.   Two stains were taken from the inside front

17    brim of the cap.

18       Q    And what did those stains appear to be?

19       A    The time of the examination they appeared to be

20    sweat stains.

21       Q    And why do you take those?

22       A    We would take a sample from the inside of the cap

23    to see if we're able to generate a DNA profile from the

24    individual that was wearing this cap.

25       Q    Now, can you tell us were you able to obtain --

SW

1  just speaking specifically about the blood stains that you

2  found on the items that you received, were you able to

3  obtain a profile from those stains?

4       A     Yes.

5       Q     And can you tell us did you also receive any

6  samples of blood from a person identified as Edgar Ojeda?

7       A     Yes, we did.

8       Q     Were you able to compare the profile from the

9  combat hat that you have in your hands with the profile that

10  you received from Mr. Ojeda?

11      A     Yes.

12      Q     And were you able to make a determination as to

13  the source of the blood on the hat that you have in your

14  hand?

15      A     Yes.

16      Q     And what was that?

17      A     That the DNA profile that I obtained from this

18  stain 2A and stain 2B on the cap was the same DNA profile

19  obtained from Edgar Ojeda.

20      Q     Now, can you tell me are you familiar with the

21  term "mixture"?

22      A     Yes.

23      Q     And can you tell me what does that mean when you

24  have a mixture in a sample?

25      A     A mixture indicates that you have DNA from more

SW

Case 1:15-cv-02657-EK Document 9-1 Filed 12/08/15 Page 302 of 811 PageID #: 719

1  than one individual.

2      Q    And in stain 2A or 2B, was there a mixture in

3  either one of those stains?

4      A    In stain 2B there was a indication of a possible

5  mixture, yes.

6      Q    What gave you that indication?

7      A    When you inherit your DNA, as I said, you have

8  alleles.  Now you inherit one allele from your mother and

9  one allele from your father.  So if you go through your DNA

10 testing and you find locations that has more than two

11 alleles, for example, three alleles or four alleles, this is

12 an indication of a mixture.

13     Q    And how many extra alleles did you find at any

14 particular location?

15     A    One allele.

16     Q    At one location?

17     A    At one location.

18     Q    Now, because of the fact that it's only one allele

19 at one location, are you able to make a determination as to

20 the source of that DNA; for example, whether it's blood,

21 semen, skin or sweat?

22     A    No, no conclusions can be drawn.

23     Q    Why is that?

24     A    For this it was only one single allele.  We're not

25 able to determine from what sample or what individual it

SW

1  came from.

2      Q    Now, when you do your testing, is there another

3  level of testing you do once you establish that there was an

4  extra allele at that one location?

5      A    When the testing was done, at the time we had two

6  different what we call typing systems.  As I said, we would

7  at this point test thirteen different locations in the lab

8  since we've increased the number, the first set would test

9  six different locations and then the next set of testing

10  would be the additional locations.  So we do two rounds.

11  And when the testing was done on this one stain, that 18

12  allele was found in the first round of testing, but not in

13  the second.

14      Q    Meaning you couldn't detect it at all in the

15  second testing?

16      A    Correct, it was not detected.

17      Q    Did you find that single allele in any of the

18  other stains that you found on that hat?

19      A    Yes, I did.  That allele was also found when I did

20  DNA testing on the two stains on the inside.  That allele

21  was consistent with from being -- the results from these

22  samples.

23      Q    Because it was one allele you can't do any further

24  testing on it?

25      A    That is correct.

SW

RAZZANO - DIRECT/CHU

1    Q    What does it mean to be a major contributor?

2    A    The major contributor means that that individual
3    donated the most amount to that sample.

4    Q    Now, in stain 2B, the one that had a mixture, were
5    you able to determine if it was a major contributor?

6    A    Yes.

7    Q    Who was the major contributor?

8    A    Edgar Ojeda.

9    Q    Now, what about the baseball hat, moving to that,
10   you said there were some stains on that?

11   A    That is correct.

12   Q    How many stains were found on that hat?

13   A    May I give this hat back?

14   Q    Yes.   Thank you.

15   A    I found a stain on the front part.   The item that
16   was examined was a Mets baseball cap.   So there was a stain
17   that was located above the Mets emblem.   There were smaller
18   stains noted, three of them on the back, almost in the same
19   location as the one where it was found on the combat hat,
20   and there was additional stains on the top of the back part
21   of the hat and one on the inside top of the hat.

22   Q    Did you test any of those stains?

23   A    Yes.

24   Q    Which stains did you test?

25   A    I tested two stains for DNA under stains 1A and

SW

1  1B.

2      Q    And where were those stains located?

3      A    Stain 1A was found on the front above the Met

4  emblem, and stain 1B was found on the inside interior part

5  of the hat on the top, almost where it would come in contact

6  with the top of the head.

7      Q    And why was it that you only tested two of the

8  stains that were on that hat?

9      A    Based on the information that we provided, was

10  provided in the case file, it was believed that the cap was

11  worn by Edgar Ojeda.  So we only tested two areas of the

12  hat.

13      Q    Now, were you able to obtain a profile from the

14  stains that were taken from the Mets hat with the profiles

15  that were taken from Edgar Ojeda?

16      A    Yes.

17      Q    And did those profiles match?

18      A    Yes, they did.

19      Q    Now, let's move to the crime scene samples that

20  you received under voucher ending in 1, 2.  Were you able to

21  obtain a profile from the samples that were given to you

22  under that voucher?

23      A    Yes.

24      Q    How many samples were given to you?

25      A    On that voucher we received two samples.

SW

324

RAZZANO - DIRECT/CHU

1    Q    And -- I'm sorry, how many?  I thought there might
2    have been three samples.

3    A    Under the voucher ending in 1, 2?

4    Q    Yes.

5    A    There was a crime scene sample that was labeled as
6    S1, and a crime scene control that was labeled as S1A, two
7    samples.

8    Q    Okay, you did one at a time in total under that
9    voucher?

10   A    Two.

11   Q    Two samples were sent to you?

12   A    Two samples were tested for the presence of blood,
13   but only one was sent off for DNA testing.

14   Q    Okay.  Can you tell me were you able to obtain a
15   DNA profile from that sample?

16   A    Yes.

17   Q    And can you tell us were you able to compare that
18   with the profile from Mr. Ojeda?

19   A    Yes.

20   Q    What was your conclusion?

21   A    That the DNA that was found on crime scene sample
22   S1 is the same as the DNA profile for Edgar Ojeda.

23   Q    Did you receive any other crime scene samples?

24   A    Yes.  They were under voucher M621117.  It was
25   three crime scene samples and three crime scene controls.

SW

1    Q    And under that voucher number, were you able to
2    obtain a profile from each of those samples that were sent
3    to you?

4    A    We did DNA testing on the crime scene samples that
5    were labeled as S1, S2 and S3, and we were able to obtain a
6    male DNA profile from those three samples.

7    Q    I'm sorry, was that profile compared to the
8    profile that you had from Mr. Ojeda?

9    A    Yes.

10   Q    What was your conclusion?

11   A    That the DNA profile obtained from those three
12   samples is the same as the DNA profile for Edgar Ojeda.

13   Q    Now, did you prepare a report in connection with
14   your testing in this case?

15   A    Yes, I did.

16   Q    Did that report contain a table regarding your
17   findings?

18   A    Yes, it did.

19          MS. CHU:  At this time, your Honor, if I can
20      have this marked People's number, I believe we're up to
21      8.

22          THE COURT:  Yes.

23          (At this time, the document was marked
24      People's 8, for identification.)

25   Q    Ms. Razzano, do you recognize the chart that's

SW

1  being held up for you?

2      A    Yes, I do.

3      Q    Who prepared that?

4      A    I prepared that table.

5      Q    Did you prepare it in connection with the testing

6  that you did in this case?

7      A    Yes, I did.

8              MS. CHU:  At this time, your Honor, I would

9          offer it into evidence as People's Number 8.

10             THE COURT:  Any objection?

11             MR. DRANOVE:  No.  Your Honor, I have no

12         objection, but is there a chance a copy could be made

13         for me so I can have the one that's being referred to.

14         I have many pages but I can't locate this one.

15             THE COURT:  Yes, we'll make a copy for you.

16             MR. DRANOVE:  Please.

17     Q    Now, Ms. Razzano, before we actually talk about

18  the chart here --

19             THE COURT:  You have to mark this in

20         evidence, I'm sorry.

21             COURT OFFICER:  So marked, your Honor.

22             THE COURT:  Thank you.  The item in evidence

23         is People's 8.

24             COURT OFFICER:  So marked, your Honor.

25             You want it posted?

SW

1        THE COURT:  Post it, please.

2        Since there are numbers on this, I'm going to

3   ask you to put this in front of the jury box, otherwise

4   they won't be able to see the numbers.

5        MS. CHU:  Actually, on my copy, if you want,

6   we can put it up.

7        THE COURT:  All right.  You can use a laser

8   pointer for the exhibit.

9        Okay, defense counsel has his copy.  We're

10  ready to turn the lights down to see the chart.

11       THE WITNESS:  I think I prefer to use that

12  (indicating.)

13       THE COURT:  This is better for the jury.

14       THE WITNESS:  You want me to use that, okay.

15       THE COURT:  I think the laser pointer would

16  be better.

17       (At this time, the document is being

18  displayed to the jury.)

19  Q    Now, Ms. Razzano?

20  A    Is there any column you would like me to do it on?

21  Q    Is that good?

22  A    That's fine.  Thank you.

23  Q    Can you tell us what you're looking at here?

24  A    This is a blown up representation of the table

25  that is found in my case file.

RAZZANO - DIRECT/CHU

1  Q    And can you tell us when you said that, if you can
2  just walk us through.  I see Edgar Ojeda's name is up there
3  on the top?

4  A    That is correct.

5  Q    There's a series of, you know, letters and numbers
6  on the top running across, as well as numbers that are just
7  directly underneath that have either one or two -- one or
8  two numbers.  See there's a first line going across, this
9  here 1617?

10  A    If you were to look here, this line here this bold
11  text that's found up here, these are a different location
12  although the DNA that we test in our laboratory.  And then
13  here you'll see the name Edgar Ojeda, and next to that
14  you'll see the DNA profile that we obtained from Edgar
15  Ojeda.

16       Now, as I stated, you will get a maximum of two
17  alleles at each location, again, depending upon what you
18  inherit from your mother and what you inherit from your
19  father.  There are several locations.  For example, the one
20  right here where you see only one number, this indicates
21  that he inherited the same allele from each parent.  So in
22  essence it can be written as a 20 comma 20.  But in our
23  reports, we just report it as one single number.  So once we
24  get all the alleles at each of the locations that we test,
25  this is what is considered a DNA profile.

SW

329
RAZZANO - DIRECT/CHU

1    Q    Now, moving on to the next entry there, you have a
2    combat hat and you have stain 2A and stain 2B.  Can you show
3    us how this was that you came to your conclusion that you
4    testified to earlier?

5    A    So these two lines here, along with all the other
6    lines that you have seen in this table represent the DNA
7    result that we got from each of those samples tested.  So
8    you'll see here it says "Combat cap, stain 2A and 2B," and
9    next to it is the DNA profile that we obtained from those
10   two samples.

11        Now, if you were to look at each location and
12   compare it to the profile of Edgar Ojeda, you could see that
13   the same numbers or the same alleles are found at each of
14   the locations that was tested.  This indicates that the DNA
15   profile that we obtained from these two samples is the stain
16   as the DNA profile that we obtained for Edgar Ojeda.

17   Q    And just moving on down the chart going to the
18   baseball cap and different crime scene samples that are
19   underneath, they all have the same numbers that match with
20   the alleles that you found at the different locations in
21   Mr. Ojeda's profile?

22   A    That is correct.

23   Q    Now, you had mentioned earlier during your
24   testimony about the fact that there was a extra allele some
25   place?

SW

1      A      Yes.

2      Q      Is it located on this chart?

3      A      If you look here at the combat cap stain 2B, at

4  this one location you see three numbers, three alleles,

5  which means that this sample was a mixture.  If you were to

6  move across and look at every other location that was tested

7  there, you only see two alleles.  This is the only

8  indication from the sample that we have this mixture.

9      Q      Is the reason why there is the same alleles at

10  each of the locations in stain 2B matching to Mr. Ojeda is

11  that he is named to be the major contributor of that stain?

12      A      That is correct.

13      Q      This is the only place that the 18 came up in that

14  stain of 2B?

15      A      That is correct.

16      Q      Now, as a criminalist, are you able to determine

17  when a stain was actually left on an item?

18      A      No, we cannot.

19      Q      Is there any testing or information that you have

20  that's able to say how long something has been there?

21      A      No, there is not.

22              MS. CHU:  I can turn this off now.  Thank

23      you.

24              THE COURT:  Let's put the lights back on.

25      Leave it on right now just in case we need it on cross

SW

331

RAZZANO - DIRECT/CHU

1    examination.

2        Q    Now, I want to talk about statistics.

3            Ms. Razzano, did you conduct statistical analysis

4    on the profile that you obtained from Mr. Ojeda which

5    matched the samples that you received in this case?

6        A    We did a statistical analysis on the DNA profile

7    obtained from the evidence in this case.

8        Q    And what were the results of your statistical

9    analysis?

10       A    That this combination of DNA alleles would be

11   expected to be found in approximately one in greater than

12   one trillion blacks; one in greater than one trillion

13   Caucasians; one in greater than one trillion Hispanics; and

14   one in greater than one trillion Asians.

15       Q    Now, trillion is a big number.  The only time I've

16   heard about it is when we're talking about out deficit.

17   What significance does that number have in your statistical

18   analysis when you make your determination and your findings?

19       A    There are approximately 6.7 billion people on

20   planet earth.  Therefore, in order to see this DNA profile

21   in a random male population other than Edgar Ojeda, we would

22   have to test approximately 149 planet earth populations in

23   order to see this DNA profile again, which in essence is

24   greater than the population that every lived on this planet.

25       Q    So, in your expert opinion, is the blood that was

1 found on the hat that's right behind you, that combat hat,

2 that of Edgar Ojeda?

3      A    Yes, it is.

4      Q    Thank you very much.

5            MS. CHU: I have nothing further.

6            THE COURT: Cross examination.

7            MR. DRANOVE: Thank you.

8 CROSS EXAMINATION

9 BY MR. DRANOVE:

10      Q    Ms. Razzano --

11            THE COURT: I don't want to cut you off, do

12    you want this exhibit to show for your cross?

13            MR. DRANOVE: At this time, I would prefer to

14    proceed, if possible, with that in the background

15    rather than have to warm up the machine again. But I'd

16    rather refer to a different page and some other

17    materials.

18            THE COURT: I'm not sure I understand your

19    answer. You want us to turn this off or off?

20            MR. DRANOVE: Leave it on, but take the

21    exhibit off the plate.

22            All right, turn it off, sir, please.

23            THE COURT: Thank you. It will shut itself

24    off eventually, you know.

25      Q    Ms. Razzano, good morning.

1       A     Good morning.

2       Q     Are you aware of any studies of prisoner

3    populations which show matching DNA profiles among

4    prisoners?

5       A     No.

6       Q     Have you brought with you a page referred to as --

7    strike that.

8             That chart up there is exhibit 11?  Eight?  I

9    don't know what the number is.  The one that's up there.

10            COURT OFFICER:  It's eight.

11      Q     Eight, behind you, does that have a page number on

12   it?

13      A     Yes, it does.

14      Q     What number is that?

15      A     In my report that is page number four.

16      Q     Okay, could we turn to page number five of that

17   report, please.

18            We're not going to forget about page number four.

19            You have page five?

20      A     Yes, I do.

21      Q     Is that a page of this report which you prepared?

22      A     Yes.  Page five in my report also has DNA testing

23   on the two stains that are found on the inside of that

24   combat hat.

25      Q     Now, in a handwritten note also identified as page

SW

1    five, there's some writing.  I just want to show you a

2    document and ask you to see if you have this original with

3    you?

4        A    Yes.

5        Q    Okay, is that your handwriting?

6        A    Yes, it is.

7        Q    Okay, may I have that back.  I may refer to that.

8    I just want you to know what I would be referring to.

9        A    May I explain?

10            This is a page that is found not as part of my

11   report.  This is a page that is found as my examination

12   notes on the right hand side of my file.

13       Q    That's all it is?

14       A    Yes.

15       Q    Your notes of your observation?

16       A    Yes.

17       Q    Okay, thank you.

18            The stain on the back of the cap, the stain 2B,

19   the back of the green cap, correct?

20       A    Yes.

21       Q    You found indications of DNA from two people

22   there, is that right or wrong?

23       A    The stain showed the mixture in which we had that

24   one additional allele at that one location.

25       Q    One allele or -- in the chart --

SW

335

RAZZANO - CROSS/DRANOVE

1        MR. DRANOVE:  May I approach?

2        THE COURT:  Yes.

3    Q    I just want to make sure I'm understanding you

4    correctly and the chart correctly.

5        You said if there's only one number, that means

6    that there's two alleles of the same number, is that right?

7    A    Yes.

8    Q    So over for 2B, you have an 18.  Does that mean

9    there were two 18s?  It's only one number?

10   A    That is correct.

11   Q    Okay, thank you.

12       Now, those two 18s, those numbers mean in affect

13   evidence, is that correct?

14   A    To clarify --

15   Q    Is that correct?

16       MS. CHU:  Objection, your Honor.

17       THE COURT:  I'm going to sustain the

18       objection to the form of the question, "in affect

19       evidence."

20   Q    All right.

21       What do those two 18s represent with respect to

22   being at that location under D3, S1 358 in blood?

23   A    I cannot make that conclusion that that 18 is a

24   single 18, meaning that there's another allele that goes

25   with that 18 or if that single 18 is actually two alleles

SW

1    from the same person.

2        Q    Well, the allele was detected, correct?

3        A    That is correct.

4        Q    You wrote down the number 18, correct?

5        A    Yes.

6        Q    Okay.  What does the word "typing" mean to you, in

7    the phase "typing not attempted?"

8        A    When I explained how we did our DNA testing at the

9    time, I said we had two different systems.  So the first

10   system --

11                   THE WITNESS:  May I approach, Your Honor?

12                   THE COURT:  Okay.

13       A    When I said that we did two different rounds of

14   testing, the first rounds of testing would test these

15   locations that are listed here.  The second round of testing

16   did these remaining locations along with this additional

17   location a second time, this D3 location a second time, and

18   this location here AMEL which shows you the sex of the

19   individual from whom the sample comes from (indication).

20       Q    Could you elaborate upon what you just said?

21       A    So when we did the DNA testing, we did the testing

22   in two different rounds, meaning we tested different

23   locations each time in order to generate a DNA profile.  At

24   the time the DNA testing was done, in order to obtain this

25   profile it was done in two separate experiments for example.

                              SW

RAZZANO - CROSS/DRANOVE

1    Now, in the testing we do in the laboratory, we
2    are able to test all those locations in one experiment. But
3    at the time this was done it was done in two different
4    rounds of testing. So these are the locations that are
5    tested in the first round. These are the locations that are
6    tested in the second round (indicating).

7    Q    May I -- I just want to make sure I follow.

8    When you say these and swing your hand around, are
9    you saying like one set of things are being tested in the
10   first round and different things are being tested in the
11   second round?

12   A    Different locations.

13   Q    So the first round tested certain locations, the
14   second round other locations?

15   A    That is correct. So the first round we tested the
16   D3 location, D16, the sex determining locations which is
17   listed as TLO1, TPOX, CFX1BO, D7S820. These locations were
18   tested first. After we got these results, we interpreted
19   them and I determined which stains would go on to get the
20   remaining locations for a complete DNA profile.

21   Q    Okay, thank you. Thank you.

22   Now, with respect to stain 2A and 2B, you applied
23   something called KM reagent?

24   A    KM reagent or Kastle-Meyer reagent is a reagent
25   that we use to test presumptively for the presence of blood.

SW

1   So when we do the examination of the evidence, the first

2   thing we use is our visual examination.  So if I'm looking

3   for something that looks like blood, I would be looking for

4   something that would be red-ish brown in nature.  Once these

5   areas are located, we'll then use the Kastle-Meyer test or

6   KM test to test those things presumptively for the presence

7   of blood, which means it's positive that we believe blood

8   may be present.  But we need to do DNA testing to confirm

9   the presence of blood.

10      Q    In this stain 2B, with respect to that first

11  column, that number 18 is a number of somebody other than

12  Mr. Ojeda, is that correct?

13      A    That is correct.

14      Q    Thank you.

15           Now, did you test -- I mean did you examine stains

16  2C and 2D from the combat cap, what you call the combat cap?

17      A    They were not tested for blood.  The areas were

18  not red-ish brown in nature.

19      Q    I asked you if you examined them?

20      A    I examined them, yes.

21      Q    What did you examine them for?

22      A    When we examine evidence, we do a complete visual

23  examination --

24      Q    Did you do any further --

25           MS. CHU:  Objection.  He's interrupting the

SW

1  witness.

2              THE COURT:  Let her finish her answer.

3              MR. DRANOVE:  I will.  I apologize.

4      A    When I examined the hat, I did find those

5  locations that were red-ish brown in nature.  Those were

6  tested for the presence of blood.  On the inside of the cap,

7  according to my notes on page five, the inside of the hat

8  was submitted in order to see if we can determine the DNA

9  profile of the individual that was wearing the hat.  And in

10 my notes it states that on the inside of the hat they had

11 stains that looked sweat-like in nature.

12     Q    Which page is that?  I have five here.

13     A    That is on page five, the third line.  It states

14 "Cap has sweat-like grains on inside and outside of cap

15 brim."

16     Q    Go further down five lines from the bottom, it's

17 your handwriting, correct?

18     A    That is correct.

19     Q    You also asked for a MSR.  Can you tell me what

20 MSR is?

21     A    MSR is Meredith Rosenberg.  She's a supervisor in

22 the laboratory.  She was the supervisor in charge of that

23 rotation when I was examining this.

24     Q    So you were instructed then by Ms. Rosenberg or

25 Dr. Rosenberg to obtain what you could in the nature of DNA

SW

1  from those spots 2C and 2D, is that correct?

2      A    Yes.  Ms. Rosenberg.  She's not a doctor.

3      Q    Did you do that?

4      A    Yes.

5      Q    Did you go through the same testing of that DNA as

6  you did for the testing of the DNA in stains 2A and 2B?

7      A    Yes, I did.

8      Q    Have you seen a blowup -- or is the result of that

9  testing on that chart?

10     A    No, it is not.

11     Q    Is it on any chart?

12     A     It is found on page five within the report.

13              MR. DRANOVE:  Well, may I just ask the

14         witness to confirm that I will be referring to the page

15         five she's referring to judge?

16              THE COURT:  Okay.

17              MR. DRANOVE:  I'm offering up a page to the

18         officer.

19     A    Yes.

20     Q    Okay, thank you.

21              MR. DRANOVE:  May I have that back and ask if

22         that page could be shown to the jury?

23              All right, let's -- I don't know if it would

24         work.

25              THE COURT:  It will work, the same way as it

SW

1      worked for the other one.

2              MR. DRANOVE:  Judge, mine has some markings

3      on it.  I'm trying to get a clean copy.

4              I've never used one of these, before judge.

5      I'll try.

6              I'm not ready for prime time.

7      Q    Ms. Razzano, you see stain 2C and stain 2C

8      there -- 2C and 2D right up on the upper left?

9      A    Right here, 2C, 2D (indicating.)

10     Q    Okay.  I'm going to attempt something.

11             Mr. Ojeda in 2C and 2D, stain 2C was found on the

12     cap, correct, the inside of the cap?

13     A    Yes.

14     Q    And the same thing with stain 2D?

15     A    Yes.

16     Q    Now, stain 2C is that of somebody other than

17     Mr. Ojeda's DNA, is that right?

18     A    If you were to look at the results here, you'll

19     see there's a 15, 18.  When you compare that to Edgar Ojeda,

20     the two DNA profiles are different which indicates it's from

21     a different individual (indicating).

22     Q    All right.  Now, as part of your work, did you as

23     part of your responsibilities determine if you were able to

24     do a complete profile on stain 2D?

25     A    Yes, we did DNA testing and got a full profile

SW

1   from stain 2D.

2       Q    Can you determine if stain 2D was from a

3   individual who was not the same individual as the one who

4   led to stain 2D?

5       A    We only got results from one location which is

6   that 15, 18.

7       Q    Yes.

8       A    When we have results that only shows one location,

9   we really cannot use that as a form of comparison.

10      Q    But the results at one location for stain 2C, is

11  different than the results of the stain location for stain

12  2D, is that right?

13      A    What you see here on the top line is the results

14  that we obtained.

15      Q    Which top line?  Could you point to it?

16      A    The line for 2D.

17      Q    I'm talking about 2C right now.  And it's not as

18  clear as I'd like, but it says underneath the DJ in bold

19  letters for stain 2C, it says 15 comma 18, correct?

20      A    Correct.

21      Q    And then for stain 2D it's 15 comma 17?

22      A    Fifteen comma 17 comma 18.

23      Q    Comma 18?

24      A    With two stars.

25      Q    Okay.  So does stain 2D then have DNA from two or

SW

1   more people then?

2       A    Yes, at least two people.

3       Q    And these two people, at least one of them for

4   sure, is not Mr. Ojeda, is that correct?

5       A    That is correct.

6       Q    Is it your opinion as to whether you can reach an

7   opinion with respect to whether both of the people who,

8   whose DNA is in stain 2D are not Mr. Ojeda?

9       A    I cannot say that with certainty whether Mr. Ojeda

10  is related to that history or not.

11      Q    With respect to stain 2C, can you reach an opinion

12  as to whether there are any differences in the I guess

13  allele information between whoever put stain -- whoever's

14  DNA is in stain 2C and Mr. Ojeda?

15      A    If you were to see this line down here, based on

16  the results that we got here, we were able to determine a

17  DNA profile from the major contributor, the one who had the

18  most amount of DNA present.

19      Q    Okay.

20      A    When you look at the sample here, this represents

21  the DNA profile that was obtained.  And when you look at

22  this first location, it's a 15, 18, which is the same as

23  what we see up here on the 15, 18.

24      Q    Right.

25           Now, with respect to 2C, can you reach an opinion

344

RAZZANO - CROSS/DRANOVE

1   as to whether whoever's DNA is in stain 2C is somebody other

2   than the person who's DNA you were able to find from stain

3   2D?

4        A    No, you cannot determine that.

5        Q    Okay.  Now, so there's somebody in stain 2D who is

6   not Mr. Ojeda, correct?

7        A    Correct.

8        Q    And there may be more than one person in stain 2D?

9        A    There are one more than person.  There is more

10  than one person in stain 2D.

11       Q    And you don't know who the other one is, is that

12  right?

13       A    That is correct.

14       Q    And it's not blood, is that correct?

15       A    That is correct.

16       Q    And stain 2C is not blood, correct?

17       A    That is correct.

18       Q    You were able to do -- you concluded that with

19  respect to 2D, the DNA is not the DNA of Mr. Ojeda, correct?

20       A    That is correct.

21       Q    This DNA must have come from a second male

22  individual, correct?

23       A    That is correct.

24       Q    Were you keeping notes as to what date you made

25  this report?

SW

1      A     This report was generated on May 16, 2005.

2      Q     Who is male donor A?

3      A     I do not know the identity of male donor A.

4      Q     Your last line on the bottom says "The DNA alleles

5   seen in stain 2C are consistent with the DNA alleles of male

6   donor A."  Who is male donor A?

7      A     I do not know the identity of male donor A.

8      Q     Is male donor A somebody other than the donor to

9   stain 2D who you were able to type or don't you know?

10     A     The DNA profile for male donor A was the DNA donor

11  profile that we deduced or determined from that mixture of

12  stain 2D.

13     Q     So you're saying that male donor A has DNA

14  consistent with stain 2C?

15     A     When we look at the results from 2C, we see that

16  15, 18 which we also see as the DNA profile at the first

17  location for stain 2D.  Therefore, the DNA may have come

18  from the same individual.

19     Q     You said consistent with the DNA?  Your word is

20  "consistent," right?

21     A     Yes.

22     Q     One number makes it consistent, but not

23  conclusive?

24     A     We cannot make any conclusions.

25     Q     Have you since that 2005 examination ever been

SW

COLLOQUY

1   asked to compare the DNA of Mr. Rivera to anything?

2       A    No.

3       Q    Thank you.

4               MR. DRANOVE:  No further questions.

5               THE COURT:  Lights on.

6               Redirect?

7               MS. CHU:  I have no redirect.

8               THE COURT:  Okay, thank you, Ms. Razzano.

9       You're excused.  You may step down from the witness

10      stand.

11              THE WITNESS:  Thank you.

12              (At this time, the witness exited the

13      courtroom.)

14              THE COURT:  People may proceed.

15              MS. CHU:  At this time, your Honor, the

16      People call Detective Deborah Kennedy.

17              (At this time, the witness entered the

18      courtroom.)

19              COURT SERGEANT:  Stand in front of the chair,

20      face the clerk.

21              COURT CLERK:  Raise your right hand.

22              Solemnly swear the testimony you are about to

23      give will be the truth, the whole truth, and nothing

24      but the truth?

25              DET. KENNEDY:  I do.

DET. KENNEDY - DIRECT/CHU

1          COURT CLERK:  Be seated, please.

2          State your name.

3          DET. KENNEDY:  Deborah Kennedy.

4          COURT CLERK:  Shield number.

5          DET. KENNEDY:  3501.

6          COURT CLERK:  And your command?

7          DET. KENNEDY:  Latent Print Section.

8          THE COURT:  You may examine the witness.

9          MS. CHU:  Thank you.

10  D E T E C T I V E   D E B O R A H   K E N N E D Y, having

11  been duly sworn, testified as follows:

12  DIRECT EXAMINATION

13  BY MS. CHU:

14      Q    Good afternoon Ms. Kennedy.

15      A    Good afternoon.

16      Q    How long have you been a member of the New York

17  City Police Department?

18      A    Nineteen years.

19      Q    And where are you currently assigned?

20      A    Latent Print Section.

21      Q    How long have you been there?

22      A    Almost nine years.

23      Q    Did you receive any type of training to become a

24  member of the latent print unit?

25      A    Yes, I did.

SW

1      Q     What was it?

2      A     I successfully completed the science of a

3  fingerprint course, a latent print course and palm print

4  course.  I worked --

5      Q     Go ahead.

6      A     I worked for seven years in the identification

7  section, classified fingerprints, and I've worked for almost

8  nine years in the latent print section comparing latent

9  prints.

10     Q     Now, once you arrived -- I'm sorry, when you first

11  arrived at the latent print unit, did you have to undergo

12  training with a more senior person when you arrived?

13     A     Yes, I did.

14     Q     How long did that occur for?

15     A     That lasted for several months.

16     Q     And what was it that you actually did with them?

17     A     It was on the job training where you actually did

18  latent cases, but you worked with a senior latent officer.

19     Q     Now, can you tell us what is -- what are your

20  duties and responsibilities as a detective in the

21  fingerprint unit?

22     A     I analyze and evaluate latent prints sent to me

23  from crime scenes to determine if they're of value or no

24  value.  The of value latent prints are compared in -- are

25  compared against the prints of known persons who have

SW

349

DET. KENNEDY - DIRECT/CHU

1   legitimate access to the crime scene or ink print of persons

2   who is suspected of committing a crime.

3       Q    You had mentioned something about ink prints and

4   latent prints.  Can you tell us what's the difference

5   between the two?

6       A    A ink print is a permanent image of someone's

7   fingers taken of the first index finger that's, it's usually

8   done in black printer's ink and it's rolled onto a white

9   paper or onto a fingerprint card.  A latent print is a

10  chance image.  On your palms, fingers and soles of your feet

11  you have a raised skin which is called ridge.  It's called

12  friction ridges.  When you touch it -- and on those friction

13  ridges you have pores.  When you perspire and you touch a

14  object, you may leave behind a copy of a image of those

15  ridge characteristics.  They are chance images because there

16  are various reasons why you may not leave behind a copy of

17  your print.

18      Q    Now, how many comparisons have you made during

19  your years with the Latent Print Unit?

20      A    I've made thousands of comparisons.

21      Q    Have you ever testified in court?

22      A    Yes, I have.

23      Q    How many times have you done so and which courts?

24      A    Twenty-seven times, in Brooklyn Supreme, Manhattan

25  Supreme, Queens Supreme and Staten Island Supreme Court.

SW

1    Also Brooklyn Criminal Court and Manhattan Grand Jury.

2        Q    Have you been qualified as a expert on each of

3    those occasions?

4        A    Yes, I have.

5                MS. CHU:  At this time, your Honor, I would

6        offer Detective Kennedy as a expert in the field of

7        fingerprint analysis.

8                THE COURT:  Any objection?

9                MR. DRANOVE:  No.

10                THE COURT:  There's no dispute ladies and

11        gentlemen Detective Kennedy is a expert in fingerprint

12        analysis, and therefore she would be permitted to

13        testify before you in this field.  You may proceed.

14                MS. CHU:  Thank you.

15        Q    Detective Kennedy, how are fingerprints compared

16    in an identification?

17        A    There's one where the latent print is compared

18    against the ink print by examining it under a microscope and

19    looking from latent prints to ink prints to determine if the

20    ridge characteristics are present in the latent prints are

21    also present in the ink prints.

22        Q    Now, did you or a member of your unit receive

23    latent prints that were covered from a scene in a case

24    involving the death of Edgar Ojeda?

25        A    Yes, I did.

SW

1    Q    What was the case number assigned?

2    A    Two, two, two of 2005.

3    Q    Now, how did you become involved in the case?

4    A    The latent case was assigned to me.

5    Q    Can you describe what you received in connection

6    with this case?

7    A    Yes, I can.  I received five latent prints from

8    the crime scene.  One was from a Clorox bottle and four from

9    the door.

10    Q    And did you receive any other latent prints from

11    any other unit in NYPD?

12    A    Yes, I did.  I received two latent prints from the

13    lab which were from beer bottles.

14    Q    Now, you had mentioned earlier being of value or

15    no value.  Could you just tell us what that is?

16    A    An of value latent is a latent with enough ridge

17    characteristics to make a comparison on an identification,

18    and a no value print would be a latent print that hasn't

19    enough ridge characteristics to make a determination.

20    Q    Now, of the items you received the five latent

21    prints you got from the crime scene as well as the two

22    latents that were sent to you from your latent print

23    development unit, how many were of value?

24    A    There were two latent prints of value from the

25    original crime scene; one from a Clorox bottle and one from

SW

1  the door.

2      Q   And can you tell me where were they gotten from

3  the door, the one from the door specifically?

4      A   I'd have to look at my notes.

5              THE COURT:  You may.

6              THE WITNESS:  Thank you.

7      A   Interior side of front door glass.

8      Q   So there were only two of value that were

9  submitted to you?

10     A   That is correct.

11     Q   Now, can you tell me, are you familiar with the

12 system under which you can import or to upload a copy of a

13 latent print onto the computer so you could have it compared

14 with others?

15     A   Yes.

16     Q   What system that?

17     A   It's called AFIS System, Automated Fingerprint

18 Identification System.

19     Q   Were you able to upload the prints that you

20 received that were of value into the system?

21     A   Yes, I did.

22     Q   Were there any results that came from that?

23     A   There were no match.

24     Q   Now, did you also compare the latent prints that

25 were of value in this case with the inked fingerprints of

SW

1  Edgar Ojeda?

2      A    Yes, I did.

3      Q    What were the results of your comparison?

4      A    There were no match.

5      Q    Did you also compare the latent prints that were

6  found in this case to be of value to the inked fingerprints

7  of Enrique Rivera?

8      A    Yes.

9      Q    What were the results of that comparison?

10     A    They were also of no match.

11     Q    I'm sorry, I'm just going to go back a little bit.

12          You mentioned when you leave latent fingerprints,

13  it's a chance image?

14     A    Yes.

15     Q    What are some things that effect whether or not

16  you are able to leave a latent fingerprint on an object when

17  you touch it?

18     A    There are several things.  The weather or

19  temperature.  If it's too hot, it might cause it to

20  evaporate.  If it's too cold, you might not be perspiring

21  when you touch the item.  Also there are barriers such as

22  gloves, bandaids, your sleeves that would obstruct you from

23  leaving a fingerprint.  Also if a person is excited or

24  emotional, they're perspiring a lot, that may cause them not

25  to leave a fingerprint.

SW

1    Q    So basically if there's too much water, that would

2    effect it?

3    A    That is correct.

4    Q    How long can a print actually remain on a surface?

5    A    I don't know.  There is no time, but as long as

6    the surface remains undisturbed, the print should remain

7    there?

8                    MS. CHU:  Thank you very much.  I have

9          nothing further.

10                   THE COURT:  Cross examination.

11                   MR. DRANOVE:  Nothing.

12                   THE COURT:  Thank you Detective Kennedy.

13          You're excused.  You may step down.

14                   THE WITNESS:  Thank you.

15                   (At this time, the witness exited the

16          courtroom.)

17                   THE COURT:  People may proceed.

18                   MS. CHU:  The People call Detective John

19          Darino.

20                   (At this time, the witness entered the

21          courtroom.)

22                   COURT SERGEANT:  Stand in front of the chair,

23          raise your right hand, face the clerk.

24                   COURT CLERK:  Solemnly swear the testimony

25          you are about to give will be the truth, the whole

SW

DET. DARINO - DIRECT/CHU

1     truth, and nothing but the truth?

2               DET. DARINO:  Yes, I do.

3               THE COURT:  Good morning and good afternoon.

4               DET. DARINO:  Good morning.

5               COURT CLERK:  State your name.

6               DET. DARINO:  Detective Darino, John Darino.

7               COURT CLERK:  Shield number?

8               DET. DARINO:  Shield number 186.

9               COURT CLERK:  Your command?

10              DET. DARINO:  Joint Terrorism Task Force.

11              COURT CLERK:  Thank you.

12              THE COURT:  You may examine the witness,

13    Ms. Chu.

14              MS. CHU:  Thank you.

15  D E T E C T I V E   J O H N   D A R I N O, having been duly

16  sworn, testified as follows:

17  DIRECT EXAMINATION

18  BY MS. CHU:

19      Q    Good afternoon, Detective?

20      A    Good afternoon.

21      Q    How long have you been a member of the New York

22  City Police Department?

23      A    Approximately 13 years.

24      Q    And where are you currently assigned?

25      A    The Joint Terrorism Task Force.

SW

356

DET. DARINO - DIRECT/CHU

1    Q    How long have you been there?

2    A    About two and a half years.

3    Q    Where were you assigned before that?

4    A    The 72 detective squad.

5    Q    How long were you assigned to the 72 detective

6    squad?

7    A    Approximately four years.

8    Q    I want to direct your attention to February the

9    27th of 2005.  Were you working as a detective with the 72nd

10   precinct?

11   A    Yes, I was.

12   Q    Can you tell us what was your tour that day or

13   what hours you worked?

14   A    I was working 8 a.m. to 4 p.m.

15   Q    Did there come a time that day that you became

16   involved in the investigation and death of a person by the

17   name of Edgar Ojeda?

18   A    Yes, I did.

19   Q    And how was it that you became involved in this

20   case?

21   A    I was assigned the case detective.

22   Q    You were the case detective?

23   A    I was the case detective.

24   Q    Now, about what time was it that you were

25   notified?

SW

357
DET. DARINO - DIRECT/CHU

1    A    Approximately 0800, 8 a.m.

2    Q    Eight in the morning?

3    A    That is correct.

4    Q    So basically when you walked in you were given the
5    assignment?

6    A    Yes, I was.

7    Q    Did you learn where Mr. Ojeda had been injured,
8    the location of where he had been injured?

9    A    Yes, I did.

10   Q    And where was that?

11   A    Three one four 39th Street.  That's 314 39th
12   Street at the El Borinquen Bar.

13   Q    Now, during the course of your investigation, did
14   there come a time when you or your colleague spoke with
15   witnesses to this case?

16   A    Yes, there was.

17   Q    And during the course of that investigation, did
18   there come a time when you began to look for anyone in
19   particular?

20   A    Yes, there was.

21   Q    And who was that?

22   A    Enrique Rivera.

23   Q    Did you find out information regarding him or any
24   of his family members?

25   A    Yes, I did.

SW

358

DET. DARINO - DIRECT/CHU

1    Q    Did you learn where he resided?

2    A    Yes, I did.

3    Q    I want to direct your attention now to February

4  the 28th of 2005.  Did there come a time when you received

5  information regarding the whereabouts of Mr. Rivera?

6    A    Yes, I did.

7    Q    And about what time was it that you received this

8  information?

9    A    Approximately 3 a.m.

10   Q    On February 28th?

11   A    On February 28th.

12   Q    Where did you go?

13   A    I went to 117 dash --

14        THE WITNESS:  Let me just refresh my memory,

15        if you don't mind.

16        THE COURT:  You may.

17   A    I believe it was 172 dash 18 Everington Avenue in

18  Flushing, Queens.

19   Q    Did you go there with anyone?

20   A    Yes, I did.

21   Q    Who did you go with?

22   A    Detective Gaynor from Brooklyn South.

23   Q    Can you describe for us the location of 172-18

24  Everington Avenue in Flushing, New York?

25   A    It was a private house.

SW

359

DET. DARINO - DIRECT/CHU

1    Q    About what time did you arrive at that location?

2    A    Approximately 4:20.

3    Q    A.m. or p.m.?

4    A    That's a.m.

5    Q    Did you knock on the door?

6    A    Yes, we did.  Yes, I did.

7    Q    Did anyone open the door?

8    A    Patricia Glasglow.

9    Q    Did you have a conversation with Ms. Glasglow?

10   A    Yes, we did.

11   Q    What did you ask?  What did you say?

12   A    I identified myself as a New York City detective,

13   showed them my identification, and asked her if she knew

14   where Enrique Rivera was.

15   Q    And what happened next?

16   A    She opened the door, she said "He's right there on

17   the couch."  I approached Enrique, asked him to step

18   outside.

19   Q    And did he do that?

20   A    Yes, he did.

21   Q    And did you place him in handcuffs at that point?

22   A    Yes, I did.

23   Q    Did you tell him why it was that you were -- I'm

24   sorry.  What -- did you say anything to him?

25   A    Yes, I did.

SW

360
DET. DARINO - DIRECT/CHU

1      Q    And what did you tell him?

2      A    I told him I was investigating a incident that

3  occurred in a bar in Sunset Park, Brooklyn.

4      Q    Did you ask him to come with you?

5      A    Yes, I did.

6      Q    And did he come with you?

7      A    Yes, he did.

8      Q    I'm going to ask that you take a look around the

9  courtroom today and see if you see the person that you took

10  out of 172-18 Everington Avenue on February 28, 2005?

11     A    Beige suit, blue tie (indicating).

12          THE COURT:   Indicating Mr. Rivera, the

13     defendant.

14          MS. CHU:   Thank you.

15     Q    Now, how did you transport the defendant back to

16  your precinct?

17     A    In a patrol car.

18     Q    And once he was brought back to your precinct,

19  where did you put him?

20     A    In the 72 detective squad interview room.

21     Q    Can you just describe for us the layout of the

22  72nd precinct, like where everything is?

23     A    The precinct is located on Fourth Avenue and 30th

24  Street in Brooklyn.  The squad is located on the second

25  floor and the interview room is closely located near the

SW

DET. DARINO - DIRECT/CHU

1   entrance of the door, maybe about thirty feet.

2       Q    So when you go up to the second floor, once you

3   get into the detective squad, that's where the interview

4   room would be?

5       A    That's correct.

6       Q    Yes?

7       A    Yes.

8       Q    Once you brought him into the interview room, what

9   did you do with him?

10      A    I uncuffed him and placed him in the interview

11  room.

12      Q    Did you leave him in there or did you stay in

13  there with him?

14      A    I left him in there.

15      Q    And can you tell me about what time was it you

16  guys arrived back at the precinct?

17      A    About 5 a.m.

18      Q    Now, did there come a time when you went back into

19  the room with Mr. Rivera?

20      A    Yes, there was.

21      Q    And did there come a time when you actually had a

22  conversation with Mr. Rivera?

23      A    Yes, there was.

24      Q    And were you alone or were you with anyone else?

25      A    I was with Detective Gaynor.

SW

362
DET. DARINO - DIRECT/CHU

1    Q    Now, before you spoke with the defendant, did you
2    read him what are commonly known as Miranda Rights?

3    A    Yes, I did.

4    Q    Can you tell us how was it you were able to read
5    him the Miranda Rights?

6    A    I read it off a preprinted Miranda Rights form.

7              MS. CHU:  At this time, your Honor, if I can
8         have this marked People's Number 9 for identification.

9              THE COURT:  Okay.

10             (At this time, the document was marked
11        People's 9, for identification.)

12   Q    Detective Darino, do you recognize what's being
13   shown to you as People's Number 9 for identification?

14   A    Yes, I do.

15   Q    What do you recognize that to be?

16   A    The Miranda Warnings.

17   Q    Are those the actual Miranda Warnings that were
18   read to the defendant or is that the paper that you read
19   from when you gave the defendant his Miranda Rights on
20   February 28, 2005?

21   A    Yes, it is.

22   Q    Did you make any markings on the actual sheet at
23   the time you read it to the defendant?

24   A    Yes, I did.

25   Q    What markings did you make on there?

SW

DET. DARINO - DIRECT/CHU

1      A     I placed my name, my shield number, location of

2   the interview, the date, the time, and my signature.

3      Q     Okay, and are those -- is that the actual paper

4   that you read to the defendant when you read him his Miranda

5   Rights?

6      A     Yes, it is.

7              MS. CHU:  At this time, your Honor, I would

8         offer that into evidence as People's Number 9.

9              THE COURT:  Any objection?

10             MR. DRANOVE:  No.

11             THE COURT:  All right, then People's 9 would

12        be received in evidence.

13             COURT OFFICER:  So marked, your Honor.

14     Q     Detective Darino, would you please demonstrate the

15  matter in which you read the plaintiff his Miranda Rights

16  and include any responses that he gave to the questions that

17  you asked him?

18     A     Sure.

19             "You have the right to remain silent."

20             MR. DRANOVE:  I want the record to reflect

21        the detective is reading from the form.  I would like

22        to see if he could do it without reading from it.

23             THE COURT:  No, he's testifying that he's

24        duplicating what he did before, which is that he read

25        it from the form originally, isn't it?

SW

DET. DARINO - DIRECT/CHU

1          THE WITNESS:  That is correct.

2          MR. DRANOVE:  My misunderstanding.

3          THE COURT:  He's duplicating the way he did

4      it before.  So, you may continue reading.

5          THE WITNESS:  Thank you.

6      A     "You have the right to remain silent and refuse to

7  answer any questions.  Do you understand?"  Enrique answered

8  "Yes" and he wrote "Yes" on the form after the question and

9  initialed E.R.

10     Q     Did you ask him to do that?

11     A     Yes, I did.

12     Q     Did you ask him to do it after you read him the

13  first question?

14     A     Yes, I did.

15     Q     Did you then go on to the second question?

16     A     Yes, I did.

17     Q     You can continue.

18     A     "Anything you do say may be used against you in a

19  court of law.  Do you understand?"  He responded "Yes,"

20  wrote "Yes" on the form and initialed E.R.

21          Then I went to the next question:  "You have the

22  right to consult an attorney before speaking to the police

23  and to have an attorney present during any questioning now

24  or in the future, do you understand?"  He answered "Yes,"

25  and wrote the initials E.R.

365

DET. DARINO - DIRECT/CHU

1    "If you cannot afford an attorney, one will be
2 provided for you without cost.  Do you understand?"  He
3 answered "Yes," and wrote E.R.

4    "If you do not have an attorney available, you
5 have the right to remain silent until you have an
6 opportunity to consult with one.  Do you understand?"  He
7 wrote "Yes," and wrote E.R.

8    "Now that I've advised you of your rights, are you
9 willing to answer any questions?  He responded "Yes," and
10 wrote E.R.

11    Then he wrote underneath that, "I understand my
12 rights," and initialed E.R.

13   Q After you had him enter in all his answers and put
14 his initials as to each question, did you then have him sign
15 the form itself?

16   A Yes, I did.

17   Q Did he do that in front of you?

18   A Yes, he did.

19   Q After he signed it, did you then sign it?

20   A Yes, I did.

21   Q You had mentioned -- did he answer yes to each of
22 the questions and then write yes?

23   A He answered, he responded "Yes" orally and then
24 wrote it down his answer "Yes."

25   Q And then he was asked to initial that yes as well,

SW

DET. DARINO - DIRECT/CHU

1   is that correct?

2       A    That is correct.

3       Q    Now, after you read the defendant his Miranda

4   Rights, did he agree to speak with you?

5       A    Yes, sir, he did.

6       Q    Can you tell us how the conversation started?

7       A    I explained to him that a incident occurred at the

8   El Borinquen Bar at 39th and Third Avenue and people had

9   placed him in the bar, and I wanted to know what happened,

10  his version of what happened.

11      Q    And how did he begin to talk?  Was it more of a

12  narrative or did you have to keep asking him questions?

13      A    It was more of a narrative.

14      Q    What did he tell you?

15      A    He said he went to the bar with his brother and a

16  couple of his friends, and he said he went to get a few

17  drinks.  While he was at the bar, he was getting looks from

18  a individual who was in the bar, and that individual said to

19  him "What's up," and he responded "What's your problem?"

20  And Enrique said that he felt grabbing and punching and he

21  took out a knife.

22      Q    I'm sorry, did he tell you where -- did he tell

23  you who was grabbing or punching on him?

24      A    He didn't know.  And he took out his knife and he

25  said he started swinging at the crowd, and he didn't know

367
DET. DARINO - DIRECT/CHU

1    that he actually hit anybody or hurt anyone.  So he left the

2    location, jumped in his car and left.

3        Q    Now, after the defendant made the statement to

4    you, what did you do?

5        A    I asked him if he would be willing to write it

6    down.

7        Q    And what did he say?

8        A    He said yes.

9        Q    Did you provide him with paper and pen to do that?

10       A    Yes, I did.

11       Q    Did you have to exit the room in order to get him

12   paper and pen at all?

13       A    No, I did not.

14       Q    You actually had it with you?

15       A    Yes, I did.

16       Q    Did you remain in the room while the defendant

17   wrote out a statement for you?

18       A    Yes, I did.

19       Q    Now, when the defendant was giving you his oral

20   statement, did you take any notes at all?

21       A    No, I did not.

22       Q    And how soon after he gave the oral statement did

23   he then begin to write for you a written statement?

24       A    Right after that.

25       Q    Now, what time was it about that you read him his

SW

1    Miranda Rights?

2        A    Approximately 5:15 a.m.

3        Q    Now, once he began to write out his statement, did

4    you have any conversations with him while he was actually

5    writing it out?

6        A    No, I did not.

7        Q    Did there come a time when he actually finished or

8    completed his written statement?

9        A    Yes, there was.

10       Q    And did you review it at all?

11       A    Yes, I did.

12       Q    And when you reviewed it, did you ask him to do

13   anything once you reviewed it?

14       A    Yes.  I told him that I would like him to initial

15   where he lined out on the form, put his initials next to it.

16       Q    Meaning any where he crossed out something?

17       A    Yes.

18       Q    He was to initial it?

19       A    That's correct.

20       Q    And you said that there were no conversations that

21   were had between you and him when he was actually writing

22   that out for you?

23       A    That is correct.

24       Q    Did you have a chance to review it while you were

25   talking to him -- I'm sorry, after he wrote it out for you?

                            SW

369

DET. DARINO - DIRECT/CHU

1    A    Yes, I did.

2        Q    After he wrote it out for you, did you ask him to

3    do anything else with the actual statement itself?

4        A    I asked him to sign his name and I signed my name

5    on it on the bottom.

6        Q    And did he initial where -- the areas where he had

7    crossed out things?

8        A    Yes, he did.

9            MS. CHU:  At this time, your Honor, if I

10           could have this marked People's Number 10 for

11           identification.

12           (At this time, the document was marked

13           People's 10, for identification.)

14       Q    Detective Darino, looking at People's Number 10

15   for identification, do you recognize what's in front of you?

16       A    Yes, I do.

17       Q    And what do you recognize that to be?

18       A    It's Enrique's written statement.

19       Q    Is that what he wrote out for you on February 28,

20   2005 while you were in the interview room with him?

21       A    Yes, it is.

22           MS. CHU:  At this time, your Honor, I would

23           offer it into evidence as People's Number 10.

24           THE COURT:  Any objection?

25           MR. DRANOVE:  May I have a voir dire?

SW

DET. DARINO - VOIR DIRE/DRANOVE

1    THE COURT: Yeah.

2  VOIR DIRE EXAMINATION

3  BY MR. DRANOVE:

4    Q    Detective, on exhibit 9 the Miranda Warnings

5  exhibit in evidence, this handwriting including 0515 hours,

6  you see that on exhibit 9?

7    A    Yes, I do.

8    Q    Is there any indication on what's offered as

9  exhibit 10 of when the writing was made?

10    A    May I refresh my memory?

11    THE COURT: Take a look at the document.

12    Q    Of course.

13    A    No.

14    MR. DRANOVE: No further questions at this

15    time.

16    THE COURT: Any objection to the exhibit

17    coming into evidence?

18    MR. DRANOVE: No.

19    THE COURT: Then People's 10 would be

20    received in evidence.

21    COURT OFFICER: So marked, your Honor.

22  CONTINUED DIRECT EXAMINATION

23  BY MS. CHU:

24    Q    Detective Darino, would you please read for us

25  what the defendant wrote when he was in the interview room

SW

DET. DARINO - DIRECT/CHU

1   on February 28, 2005.

2       A   Sure.

3        "On the night of February 27, 2005, I, Enrique

4   Rivera, went out for a few drinks. The bar was located at

5   39th Street and Third Avenue. While I was there having a

6   few drinks I had a small confrontation with a guy. It was

7   just words, but as the night goes on, I'm getting these eyes

8   contacting," looks like that's what it says, "eyes contacted

9   but nothing to it. Now, as I go to the bar to get my second

10   round, the guy is still looking at me and I happen to look

11   back at him. So he said "What's up?" and I asked him what

12   seems to be the problem. And right away the crowd rose.

13   Then I felt punches and grabbing. So I take out a knife,

14   used it in self defense, swinging it at the crowd not

15   knowing that I really hurt anyone. I got out of there, got

16   in my car and went home. I didn't know someone was hurt.

17   It was self defense. I didn't mean it. I was just scared.

18   I know by saying sorry is not going to bring that person

19   back, but I really didn't mean this to go down this way.

20   I'm very sorry."

21       Q   And then he signed it?

22       A   And then he signed it.

23       Q   Now, Detective, did you ask the defendant anything

24   else with regard to his written statement?

25       A   No.

SW

DET. DARINO - DIRECT/CHU

1  Q    Did you ask him whether that was all that he
2  wanted to say?

3  A    That is correct.  I asked him if he had anything
4  else he wanted to add that was different from what he told
5  me orally and than what he wrote down on the statement.  He
6  said "No."

7  Q    Did you ask him anything else about making any
8  other statements?

9  A    Yes, I did.

10  Q    What did you ask him?

11  A    I asked him if he was willing to speak to the
12  District Attorney's office.

13  Q    What was his response to that?

14  A    He said "Yes."

15  Q    Now, about what time was it that he finished
16  writing this written statement for you, if you can recall?

17  A    Approximately, based on the time of the Miranda
18  Warnings and the oral statement, the written statement and
19  our conversation, approximately an hour after that time.  So
20  around 6, 6:15, around there, approximately.

21  Q    And after he told you that he wished to speak to
22  the District Attorney's office, did you then -- did you
23  remain in the room or the interview room with him or did you
24  leave?

25  A    I left.

SW

DET. DARINO - DIRECT/CHU

1   Q    Where did you go?

2   A    I went into my squad area where I prepared my

3   paperwork, my DD5s.

4   Q    Now, what is a DD5?

5   A    A DD5 is a New York City Police Department form

6   where we document interviews and any investigatory steps

7   that we take.

8   Q    Okay.  And did you prepare a DD5 in connection

9   with what the defendant had told you initially before he

10  actually wrote out a statement?

11  A    Yes, I did.

12  Q    And you said initially you had not taken any notes

13  while he was giving you this oral statement?

14  A    No, I did not take notes.

15  Q    Did you use anything to help you remember what he

16  had said to you when you were actually typing out the form?

17  A    Yes, I did.

18  Q    What did you use?

19  A    Enrique's statement.

20  Q    What he wrote out for you?

21  A    That is correct, his written statement.

22  Q    I'm sorry?

23  A    His written statement.

24  Q    Why did you use his written statement when you

25  were preparing the DD5 regarding his oral statement?

374

DET. DARINO - DIRECT/CHU

1        MR. DRANOVE:  Objection.

2        THE COURT:  Overruled.  You may answer.

3    A    Because I didn't take notes.

4    Q    Was the oral statement consistent with what he had

5    written for you earlier on?

6    A    Yes, it is.

7    Q    Now, did there come a time when you contacted the

8    District Attorney's office to have them arrange for someone

9    to come speak with him?

10   A    Yes, I did.

11   Q    Do you recall about what time it was that you

12   called to have someone come?

13   A    It was after the completion of the interview,

14   somewhere between 8 and 9 a.m., because that's when all the

15   district attorneys usually come in the office that I would

16   be able to contact anybody.

17   Q    And did there come a time when an assistant

18   district attorney actually came and spoke with the

19   defendant?

20   A    Yes, there was.

21   Q    About what time did the assistant district

22   attorney arrive at your precinct?

23   A    Approximately 10 a.m., I believe.

24   Q    And who was it that arrived?

25   A    A.D.A. Cyprus.

SW

DET. DARINO - DIRECT/CHU

1    Q    Were you present when she spoke with the
2    defendant?

3    A    Yes, I was.

4    Q    And was this conversation recorded in any way?

5    A    Yes, it was videotaped.

6    Q    Now, before you actually -- I'm sorry, before the
7    assistant district attorney arrived at your precinct, did
8    you make arrangements to have a line-up conducted in this
9    case?

10   A    Yes, I did.

11   Q    Did you contact witnesses in order to get them to
12   come to look at the line-up?

13   A    Yes, I did.

14   Q    Did you make arrangements with them with regard
15   to -- about the time the line-up would take place?

16   A    Yes, I did.

17   Q    And what arrangements did you make?

18   A    Based on interviewing, as well as speaking to the
19   people on the phone, we determined the best time would be in
20   the afternoon.

21   Q    And what time was it that you actually contacted
22   them?

23   A    It was in the morning.  I do not recall the time.

24   Q    Now, can you just tell us who it was that you
25   contacted?

DET. DARINO - DIRECT/CHU

1    A    It was -- the individuals' names?

2    Q    Yes, please.

3    A    It was Jonathan Dominguez, Mr. Solomon, Carlos

4    Solomon, and Enrique Navarette.

5    Q    Now, can you describe for the members of the jury

6    what is a line-up?

7    A    A line-up consists of six individuals, it's the

8    subject and five other individuals that fit similar

9    characteristics as the subject, and they're placed in the

10   same room together where we -- they hold up placards with

11   numbers on it.

12   Q    Now, who was the subject of this line-up?

13   A    It was Enrique Rivera.

14   Q    And are the other persons that in on the line-up

15   known as fillers?

16   A    That is correct.

17   Q    Where did you arrange to get the fillers for this

18   line-up from?

19   A    Two individuals were from the neighborhood and the

20   other three individuals were police officers from the

21   precinct.

22   Q    And did you make any arrangements with the police

23   officers with regard to where they were to stay so that they

24   weren't roaming around the precinct before the line-up

25   actually took place?

SW

DET. DARINO - DIRECT/CHU

1    A    Yes, I did.

2    Q    And where did you have them stay?

3    A    In the police officers' locker room, and it was

4  located in the basement of the precinct.

5    Q    Now, did there come a time when the witnesses

6  arrived at the precinct?

7    A    Yes, there was.

8    Q    And once they arrived at the precinct, did you

9  then bring them up to the second floor where your detective

10  squad is?

11    A    Yes, I did.

12    Q    And did you bring -- I'm sorry, where did you put

13  them once you were upstairs on the second floor?

14    A    They were placed in separate offices on the second

15  floor.

16    Q    Did any of the witnesses have to pass by where the

17  defendant was being held in that interview room?

18    A    No.

19    Q    Did the defendant remain in the interview room

20  from the time he was brought into the precinct until the

21  time the line-up actually occurred?

22    A    Yes, he did.

23    Q    When did you actually get the two individuals, the

24  two fillers that were not police officers?  Did you get them

25  before or after the witnesses arrived at the precinct?

SW

DET. DARINO - DIRECT/CHU

1    A    It was prior to the witnesses arriving.

2    Q    And where did you put them?

3    A    They were placed in the interview room.

4    Q    Now, they didn't -- I'm sorry.  Withdrawn.

5         The witnesses did not have to go by the interview

6    room at all when they were secluded in their rooms?

7    A    That's correct.

8    Q    Did you give the instruction to the witnesses as

9    to not wandering in the precinct?

10   A    I explained to them that they had to stay in the

11   room that they were in.

12   Q    Now, did there come a time when you assembled the

13   line-up to begin?

14   A    Yes, I did.

15   Q    What position was the defendant in in this

16   line-up?

17   A    Position number four.

18   Q    And how was it that the defendant came to be in

19   position number four?

20   A    He was given the opportunity to choose a number

21   and Enrique chose number four.

22   Q    Once he chose number four, what did you do with

23   the other fillers?

24   A    I had them sit accordingly and handed out the

25   numbers randomly to the people.

SW

379
DET. DARINO - DIRECT/CHU

1    Q    According to where they were sitting?

2    A    Where they were sitting, right.

3    Q    Did you take any photographs of this line-up?

4    A    Yes, I did.

5    Q    And how was it -- I'm sorry, what kind of camera

6    did you use?

7    A    It was a Polaroid camera.

8         MS. CHU:  At this time, your Honor, if I can

9         have this marked as People's 11 for identification.

10        THE COURT:  Exhibit 11.

11   Q    Can you -- I'm sorry, Detective Darino, do you

12   recognize the photos that's in front of you?

13   A    Yes, I do.

14   Q    What do you recognize that to be?

15   A    That's the Polaroid photographs that were taken at

16   the time of the line-up.

17   Q    Do those photographs fairly and accurately depict

18   how the line-up appeared when the lineups were done on

19   February 28, 2005?

20   A    Yes, it does.

21        MS. CHU:  At this time, your Honor, I would

22        offer them into evidence as People's Number 11.

23        THE COURT:  Any objection?

24        MR. DRANOVE:  No.

25        THE COURT:  All right, then People's 11 will

SW

380

DET. DARINO - DIRECT/CHU

1      be received in evidence and shown to the jury.

2                  COURT OFFICER:  So marked, your Honor.

3                  (At this time, the photograph is being

4      displayed to the jury.)

5                  THE COURT:  You want to ask him anything

6      about this while it's on the screen or not?

7      Q      You said the defendant was in position number

8  four?

9      A      That's correct.

10     Q      Why was it that you took two photographs?

11     A      The Polaroid camera I was using, I couldn't get

12  the whole line-up in one photo.

13     Q      All six?

14     A      Yes.

15     Q      So you took three and three?

16     A      That is correct.

17                 MS. CHU:  Thank you very much.

18                 THE COURT:  We can take down the exhibit.

19     Q      Who viewed the line-up first?

20     A      It was Enrique Navarette.

21     Q      And what time did Mr. Navarette view the line-up?

22     A      4:20 p.m.

23     Q      And can you tell me what did you tell

24  Mr. Navarette, without telling us what he said back to you?

25     A      I told him that he was going to view a line-up,

SW

381

DET. DARINO - DIRECT/CHU

1    that he was to look at the line-up, see if he recognized

2    anyone.  If he did recognize anyone, where did he recognize

3    that person from and what did they do.

4        Q    You asked him to tell you what number it was?

5        A    That is correct.

6        Q    Did Mr. Navarette view the line-up?

7        A    Yes, he did.

8        Q    After he viewed the line-up, where did he go?

9        A    He exited the side exit door.

10       Q    And was he allowed to speak at all with

11   Mr. Solomon or Mr. Dominguez?

12       A    No, he was not.

13       Q    Who viewed the line-up next?

14       A    Carlos Solomon.

15       Q    And what time did he view the line-up?

16       A    4:21 p.m.

17       Q    Now, let me ask you this:  Before Mr. Solomon

18   actually viewed the line-up, did you give the defendant an

19   opportunity to change his position?

20       A    Yes, I did.

21       Q    And did he do it?

22       A    No.  He chose to stay in position number four.

23       Q    Now, you said Mr. Solomon was next?

24       A    That's correct.

25       Q    Did you give him the same instruction that you had

SW

382

DET. DARINO - DIRECT/CHU

1   given to Mr. Navarette?

2       A    Yes, I did.

3       Q    And did Mr. Solomon view the line-up?

4       A    Yes, he did.

5       Q    After he viewed the line-up, what did you do with

6   him?

7       A    He exited the side exit door.

8       Q    And was he allowed to speak to Mr. Dominguez

9   before Mr. Dominguez viewed the line-up?

10      A    No.

11      Q    Did you then afford the defendant a opportunity to

12  change his position at this point?

13      A    Yes, I did.

14      Q    And did he choose to do so?

15      A    No, he chose to stay in position number four.

16      Q    Now, who looked at the line-up next after

17  Mr. Solomon?

18      A    It was 4:23 p.m.  It was Jonathan Dominguez.

19      Q    After Mr. Dominguez looked at the line-up, did you

20  give him the same instruction you had given to Mr. Solomon

21  and Mr. Navarette?

22      A    Yes, I did.

23      Q    After he was done with the line-up, what did

24  you -- withdrawn.

25           What did you do with him next?

SW

DET. DARINO - DIRECT/CHU

1    A    I asked him to exit the side door.

2    Q    Now, was the defendant afforded any opportunity to

3  eat or drink anything while he was at the precinct?

4    A    Yes, he was.

5    Q    And what and when did you give him something to

6  eat?

7    A    He ate at 9 a.m., and I believe --

8         THE WITNESS:  If you don't mind, just to

9  refresh my memory?

10         THE COURT:  You may.

11    A    At 9 a.m. he had a egg and cheese on a roll and a

12  coffee, and at 3 p.m. he had three slices of pizza and a

13  bottle of Sprite.  And throughout the time of his stay, he

14  had water and coffee throughout the day, and use of the

15  restroom.

16    Q    Now, did you ever threaten the defendant before he

17  made his oral or written statements to you?

18    A    No, I did not.

19    Q    Now, during the course of your investigation, did

20  you learn whether or not his brother Julio Rivera was at the

21  bar, the El Borinquen Bar on the night of February 27, 2005?

22    A    Yes, I did.

23    Q    Did you ever speak with his brother?

24    A    Yes, I did.

25    Q    And what time was it that his brother was spoken

384

DET. DARINO - DIRECT/CHU

1    to?

2         A     It was approximately 1:20 a.m. on the 27th.

3         Q     And how was it that he came to be at the precinct?

4         A     He voluntarily came back to the 72 precinct with

5    Detectives Heyward and Hopkins, I believe.

6         Q     Why were Detectives Heyward and Hopkins at

7    Mr. Rivera's residence?

8                   MR. DRANOVE:  Objection.

9                   THE COURT:  Overruled.  If you know.

10        A     It was because we believed Enrique may be in the

11   house with --

12                  MR. DRANOVE:  I renew my objection.

13                  THE COURT:  I'll allow it.  You may finish

14        your answer.

15        Q     You were looking for the defendant?

16        A     That is correct.

17        Q     Now, while Mr. Rivera was at the precinct, is that

18   when you actually got the information about Enrique Rivera's

19   whereabouts about 3 a.m.?  That's what you told us before?

20        A     Yes.

21        Q     Did you tell Mr. Rivera, Julio Rivera, anything

22   about being audio-taped by the District Attorney's office?

23        A     No.

24        Q     I'm sorry, Julio Rivera?

25        A     I'm sorry, I thought you said Enrique.  Julio,

                              SW

DET. DARINO - DIRECT/CHU

1    yes, I did.

2         Q    What arrangements did you make with regard to the

3    audio-taping?

4         A    I told him it was going to be a while that we were

5    going to audiotape, and if he wanted to, if he was willing

6    to do that, and I asked him what he wanted to do and he said

7    he was willing to stay in the precinct.

8         Q    Where did he stay in the precinct?

9         A    He stayed in the squad, detective squad's kitchen.

10        Q    In the kitchen?

11        A    Yes.

12        Q    Is there a door on this room?

13        A    There's no door on that room.

14        Q    Is there a lounge or couch in that room?

15        A    There's two leather recliners and a television,

16   typical kitchen stuff, refrigerator, toaster.

17        Q    Did you check on him throughout the course of the

18   morning?

19        A    He was resting, and in passing I saw him resting.

20        Q    When you passed the room?

21        A    That's correct.

22        Q    Now, at the time that you spoke with the

23   defendant, did you ever give him any indication that his

24   brother Julio was at the precinct?

25        A    No.

SW

386
DET. DARINO - DIRECT/CHU

1    Q    Did you ever give any indication to the defendant

2    anything that the witnesses had told you with regard to what

3    they had seen at the time of the incident?

4    A    No.

5    Q    Other than Edgar Ojeda, was anyone else injured

6    during this altercation at the bar?

7    A    No.

8    Q    Did the defendant have any injuries on him when he

9    was apprehended on February 28, 2005?

10   A    No.

11   Q    Do you know what pedigree information is?

12   A    Yes, I do.

13   Q    What is it?

14   A    It is a person's name, date of birth, address, and

15   basic description of the individual, height, weight.

16   Q    And how is it that you obtained that information?

17   A    By asking the defendant and placing it on the

18   online booking sheet.

19   Q    So basically whatever they tell you is what you

20   write?

21   A    That's correct.

22   Q    What was the height and weight that the defendant

23   gave for you?

24   A    Five, eleven, 160 I believe.

25   Q    Did he tell you where he lived?

SW

1       A     Yes, he did.

2       Q     Where was that?

3       A     30 Bush Street.

4       Q     Now, were you familiar with your investigation of

5   a name that came up of Jahaira?

6       A     Yes.

7       Q     Did you learn if she had any relationship with any

8   people in this case?

9       A     Yes, I did.

10      Q     What was that?

11                  MR. DRANOVE:  Objection.  It's all hearsay.

12                  THE COURT:  Sustained.

13                  MS. CHU:  I have nothing further.  Thank you.

14                  THE COURT:  Okay, Detective, I'm going to ask

15          you to step down.  We're going to have a recess.  Don't

16          discuss the case.

17                  Counsel, you want to approach, please?

18                  Excuse me for a moment, ladies and gentlemen.

19                  (At this time, there was a sidebar held off

20          the record.)

21                  THE COURT:  Okay, after conferring with

22          counsel, we've decided to recess the trial for the

23          cross examination of the witness until Monday, if you

24          have no objection.  I just want to make sure it's okay

25          with you, of course.  You okay with that?

SW

388

COLLOQUY

1      THE JURY:  Uh huh.

2      THE COURT:  That means you have the rest of

3 the day off, and we'll give you off Saturday and Sunday

4 as well since you're such a nice group.  That's the

5 least I can do.  The very least.

6      All right, we're going to resume the trial on

7 Monday morning at 10 o'clock.  And the schedule is that

8 we expect to complete testimony by Tuesday and you'll

9 get the case as I promised on Wednesday for your

10 decision.  That's the schedule barring any unforeseen

11 problems.  So don't discuss the case.  Enjoy the rest

12 of your day, have a very nice weekend, and return on

13 Monday at 10 a.m., okay.

14      Have a nice weekend.

15      (At this time, the jury exited the

16 courtroom.)

17      THE COURT:  The trial is in recess until

18 Monday morning at 10 a.m.

19      MR. DRANOVE:  Your Honor, two points.

20      First, I failed to offer in evidence the

21 exhibit that I questioned the witness from, the witness

22 Razzano which was page five.  I would like to know if

23 there was any objection to that going in?

24      THE COURT:  Ms. Chu.

25      MS. CHU:  I have no objection.

SW

389

COLLOQUY

1      MR. DRANOVE:  I may have it enlarged as well.

2   And if I do, I'll bring it.

3      THE COURT:  That would be marked as Defense

4   Exhibit A.  That's the first defense exhibit at the

5   trial.

6      MR. DRANOVE:  Can I have it back for the

7   weekend?

8      THE COURT:  What we can do is make a

9   photocopy and we keep the original and give you a

10  photocopy.

11     MR. DRANOVE:  Yes.  And I don't know if the

12  Corrections Department would oblige, but I'd like to be

13  able to speak to my client.  Now downstairs on the

14  third floor there is no privacy there.  He's sitting

15  next to the next person being interviewed.  Because

16  there's a solid lucite or plexiglass window, you have

17  to talk loudly.  I would just like to be able to have,

18  maybe have 5 to 10 minutes of my client before he's

19  brought downstairs here in private.

20     THE COURT:  I think we can accommodate that.

21  I don't think there's any problem.

22     MR. DRANOVE:  That is great news.

23     THE COURT:  We have a very accommodating

24  crew.

25     MR. DRANOVE:  Very professional.  Thank you

SW

390

COLLOQUY

1   very much.

2              THE COURT:  Okay.  All right, they'll take

3   care of that right now.

4              (At this time, the proceedings were adjourned

5   to May 11, 2009, Part 35, 10 o'clock.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SW

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF KINGS: CRIMINAL TERM: PART 25
 2   ---------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK   :
 3
              - against -                   : INDICTMENT#
 4                                            1453/2005
     ENRIQUE RIVERA,                        :
 5
                              Defendant.:
 6   ---------------------------------------X
     TRIAL                    320 Jay Street
 7                            Brooklyn, New York
                              May 11, 2009
 8
 9   B E F O R E :
10              HONORABLE ALAN MARRUS, J.S.C.
11                                   Justice and Jury
12   A P P E A R A N C E S :
13              OFFICE OF CHARLES J. HYNES, ESQ.
                   District Attorney, Kings County
14                 For the People
                BY: PHYLLIS CHU, ESQ.
15                 Assistant District Attorney
16
17              18-B ASSIGNED COUNSEL:
                   CRIMINAL DEFENSE DIVISION
                BY: JOEL DRANOVE, ESQ.
18                 Attorney for Defendant
19              -----------------------------------------
                   SANDRA WILKES, R.P.R.
20                 Senior Court Reporter
21
22
23
24
25
```

PROCEEDINGS

1      THE DEFENDANT:  Good morning, your Honor.

2      THE COURT:  Good morning.

3      COURT OFFICER:  Your Honor, you're ready for

4   the jury?

5      THE COURT:  Yes, we are.

6      COURT OFFICER:  Jury entering.

7      COURT CLERK:  Both sides waive the roll call?

8      MS. CHU:  Yes.

9      MR. DRANOVE:  Yes.

10     COURT CLERK:  Detective, you're reminded

11  you're still under oath from Friday.

12     THE WITNESS:  Yes, I do.

13     THE COURT:  Good morning.

14     I want to apologize for the lengthy delay.

15  It was beyond anyone's control.  I'm going to have to

16  make it up for you.

17     When we left off last week, Detective Darino

18  was on the stand.  We had just finished his direct by

19  Ms. Chu and I put over the cross examination until this

20  morning.  So I'm going to turn the floor over to

21  defense counsel for cross examination.

22     MR. DRANOVE:  Thank you.

23     THE COURT:  You may proceed when you're ready

24  with the cross examination.

25     MR. DRANOVE:  Thank you.

SW

DET. DARINO - CROSS/DRANOVE

1   CROSS EXAMINATION

2   BY MR. DRANOVE:

3       Q    Good morning, Detective.

4       A    Good morning.

5       Q    Just on a preliminary matter, on the night, I

6   guess it was Sunday night of the 27th, going into Monday the

7   28th of February, 2005, did you meet a gentleman named Julio

8   Rivera?

9       A    Yes, I did.

10      Q    During the course of your investigation?

11      A    Yes, I did.

12      Q    In the precinct?

13      A    That is correct.

14      Q    The gentleman who you met whose name is Julio

15  Rivera, do you see him in this courtroom?

16      A    Yes, I do.

17              MS. CHU:  Your Honor, may we approach?

18              THE COURT:  He's asking if he sees him in the

19      courtroom.

20      Q    Where do you see him?

21              THE COURT:  You may answer.

22      A    In the rear of the courtroom.

23      Q    What's he wearing?

24      A    Black leather jacket, brown shirt.

25      Q    All right.  Thank you.

SW

1          THE COURT:  You want to excuse him?

2          MR. DRANOVE:  You may step out.

3          (At this time, Mr. Julio Rivera exited the

4      courtroom.)

5      Q    On that night, your partner was Detective Gaynor,

6  is that correct?

7          MS. CHU:  Objection.  What night are we

8      talking about?

9          THE COURT:  The same night he asked about.

10          MR. DRANOVE:  The only night I've asked about

11      so far.

12          THE COURT:  I understood that.

13          You may answer.  Was your partner Detective

14      Gaynor?

15      A    Detective Gaynor was one of my partners.

16      Q    You were in the homicide unit or detective's unit

17  or which unit?

18      A    I was assigned to the 7-2 detective squad at the

19  time, and Detective Gaynor was assigned to the Brooklyn

20  South Homicide Squad.

21      Q    So in your parlance, who was assigned the

22  investigation into the homicide involving Mr. Ojeda?

23      A    I was the assigned detective.

24      Q    Was this the first homicide investigation you were

25  assigned?

SW

DET. DARINO - CROSS/DRANOVE

1      A     As a detective, yes.

2      Q     Now, who was working with you on that

3    investigation on Sunday the 27th from the detective squad?

4      A     Detective Rivera.

5      Q     Did there come a time when you were with Detective

6    Rivera and the gentleman from the audience who you

7    identified as Julio Rivera in the precinct that night?

8      A     Yes.

9      Q     Were you present when that individual was

10   questioned?

11     A     Yes.

12     Q     Did there come a time during that questioning when

13   you showed him a photo identification of the victim?

14     A     No.

15     Q     Did Mr. Rivera, Detective Rivera show him a photo

16   identification of the victim?

17     A     Not that I'm aware of, no.

18     Q     Do you have any notes about -- did you make any

19   notes, written, typed or otherwise about what transpired in

20   your presence with respect to Mr. Julio Rivera?

21     A     No, I did not.

22     Q     Were you present at any time when that gentleman,

23   Mr. Julio Rivera, was questioned by the assistant district

24   attorney named Sipress?

25     A     Yes, I was.

SW

DET. DARINO - CROSS/DRANOVE

1    Q    Approximately what time did that take place?

2         THE WITNESS:  Can I refresh my memory?

3         THE COURT:  You may.

4    A    1149 hours.  That's 11:49 a.m.

5    Q    On Monday the 28th?

6    A    February 28th.

7    Q    2005?

8    A    That's correct.

9    Q    At what time was that gentleman, Julio Rivera,

10   first questioned in your presence in the precinct?

11   A    It was approximately 1:25 a.m.

12   Q    That would be Sunday morning, the 27th, is that

13   correct?

14   A    That's correct.

15        It would be the 28th actually, February 28th at

16   1:25 a.m.

17   Q    Forgetting the number of the day, whether it's a

18   Sunday or a Monday, if you remember?

19   A    I don't recall the date.

20   Q    Monday morning would be the 28th.  So if it's the

21   28th, it would be 1:25 a.m. did you say?

22   A    That's correct.

23   Q    Did you participate in any manner in causing

24   Mr. Julio Rivera to present himself in the precinct?

25        MS. CHU:  Objection.

SW

397

DET. DARINO - CROSS/DRANOVE

1              THE COURT:  Sustained as to the form of the

2       question.

3              MR. DRANOVE:  I'll try to rephrase it.

4       Q    Did you bring Julio Rivera to the precinct?

5       A    No.

6       Q    Who brought him to the precinct?

7       A    Two detectives from Brooklyn South Homicide,

8    Detective Hopkins and Heywood.

9       Q    Was Mr. Julio Rivera to your knowledge brought to

10   the precinct in handcuffs?

11      A    Not to my knowledge.

12      Q    When did you first see him at the precinct?

13      A    He was in the 7-2 detective squad.

14      Q    At what time?

15      A    Approximately 1:25, 1:20.

16      Q    And did you participate in any questioning of

17   Mr. Julio Rivera?

18              MS. CHU:  Objection.  Asked and answered.

19              THE COURT:  Overruled.  You may answer.

20      A    Yes.

21      Q    Did Detective Rivera participate in any

22   questioning in your presence of Julio Rivera?

23      A    Yes, he did.

24      Q    At approximately what time did that questioning by

25   Detective Rivera conclude?

SW

1    A    It was approximately -- I don't know what time it

2  concluded.  I don't recall.

3    Q    Do you have any recollection of whether you were

4  in the room when Detective Rivera finished questioning Julio

5  Rivera?

6    A    I don't recall.

7    Q    Do you recall being present at any time when

8  Mr. Julio Rivera was told he can go home?

9    A    He left on his own.

10    Q    At 1:30 in the morning or 1:40 in the morning

11  after you finished questioning him?

12    A    It was upon completion of his audio-tape.

13    Q    Which was at 11, between 11:30 and 12 noon the

14  next day, is that correct?

15    A    That's correct.

16    Q    He was questioned at about 1:30 and couldn't leave

17  or didn't leave for at least another ten hours, is that

18  right?

19    A    He decided he wanted to stay in the precinct,

20  that's correct, voluntarily.

21    Q    That's your testimony, right?

22    A    That is a fact.

23    Q    Did you -- were you present in the precinct when

24  Detective Rivera and Mr. Julio Rivera discussed the homicide

25  of Mr. Ojeda?

SW

399

DET. DARINO - CROSS/DRANOVE

1    A    No, I wasn't.

2    Q    Not at all?

3    A    Can you rephrase that question?

4    Q    Yeah.  I will.

5         Were you present -- I'll withdraw that.

6         Did you hear Detective Rivera discuss, for lack of

7    a better phrase, the homicide in the bar on 39th Street?

8    A    It was a conversation with Julio where he was told

9    he was --

10   Q    Are you reading from something?

11   A    No, I'm not.  Just looking down.  If you like, I

12   can close the folder.

13   Q    Whatever makes you more comfortable.

14   A    He was -- we spoke to Julio and we told him there

15   was an incident that occurred at the bar and that someone

16   had been killed.

17   Q    And did you tell him that -- well, did you say

18   that or Detective Rivera or don't you recall?

19   A    I don't recall who said that.

20   Q    This was at about 1:30 in the morning?

21   A    That's correct.

22   Q    And did he tell you "I had nothing to do with any

23   killing in the bar" or words of that effect?

24                  MS. CHU:  Objection.

25                  THE COURT:  Overruled.  You may answer it.

SW

DET. DARINO - CROSS/DRANOVE

1      A      Not that I recall, no.

2      Q      Did he say he did kill somebody?

3      A      Excuse me?

4      Q      Did he say "I did kill somebody?"

5      A      No, he did not.

6      Q      Was Detective Rivera assigned to the precinct

7   detective squad or some other squad?

8      A      The precinct detective squad.

9      Q      Do you know if he made any notes of the interview

10   with Julio Rivera?

11      A      Not to my knowledge.

12      Q      Do you have the case folder of the investigation

13   into the killing of Mr. Ojeda with you?

14      A      Yes, I do.

15      Q      Would you just take a look in there and see if

16   Detective Rivera made any -- if what you look at in there

17   refreshes your recollection, I mean as to whether Detective

18   Rivera made any notes of his interview with Julio Rivera?

19      A      To my knowledge there is no notes from Detective

20   Rivera in the case folder.

21      Q      Were you present beyond the two occasions you

22   discussed plainly, the first about 1:30 in the morning with

23   Detective Rivera and Julio Rivera, and the second some time

24   between 11:30 and noon of that Monday, assuming it's Monday,

25   when Ms. Sipress took a statement from Mr. Julio Rivera when

SW

DET. DARINO - CROSS/DRANOVE

1    Mr. Julio Rivera was again questioned?

2        A    Yes, I was.

3        Q    About what time did that take place?

4        A    I --

5             THE WITNESS:  Can I look at my notes?

6        Q    Sure.

7             THE COURT:  Yes.

8             While you're doing that, there's a class that

9    they want to bring in here, so let them come in now.

10            MR. DRANOVE:  On a murder case?

11            THE COURT:  Yes.  They know.

12            MR. DRANOVE:  I object.  I want to go on the

13   record about this.

14            THE COURT:  You can do it at the next break.

15            MR. DRANOVE:  I'm --

16            THE COURT:  This is a common practice in our

17   courts.  We have classes coming in here every week and

18   they observe what goes on in our courts.  It's a part

19   of our educational program.

20            MR. DRANOVE:  Oh, they're getting an

21   education?

22            THE COURT:  Did you refresh your memory?

23            MR. DRANOVE:  Could you read back the

24   question please, and then we'll proceed, so everyone is

25   familiar with what the question was.

SW

402

DET. DARINO - CROSS/DRANOVE

1           (At this time, the record was read.)

2     Q     About what time does that take place, referring to

3     a third questioning of Mr. Julio Rivera?

4     A     I don't recall three questionees.

5     Q     So you recall two different times?

6     A     That's correct.

7     Q     Do you know where Mr. Julio Rivera was when

8     Detective Rivera invited him, for lack of a more precise

9     phrase, to accompany him to the precinct?

10    A     30 Bush Street, I believe.

11    Q     At home?

12    A     That's correct.

13    Q     And two detectives removed him to the precinct,

14    correct?

15    A     That's what I was told, yes.

16    Q     And about the time you spoke to Mr. Julio Rivera

17    for the first time, about 1:30 in the morning, did you

18    understand there were three suspects in this case?

19    A     No, I did not.

20    Q     Never?

21    A     There was three witnesses that I wanted to speak

22    to.  There was one suspect, and that was Enrique.

23    Q     Really?

24    A     That's correct.

25    Q     Three witnesses.  Was Enrique one of the

SW

403
DET. DARINO - CROSS/DRANOVE

1   witnesses?

2        A    No, he was the suspect, the perpetrator.

3        Q    Were you in the bar?

4        A    No, I was not.

5        Q    Did you see what happened?

6        A    Based on my interview --

7        Q    Did you see what happened, sir?

8             MS. CHU:  Objection, your Honor.

9             THE COURT:  It calls for a yes or no answer.

10   Did you see what happened?

11            THE WITNESS:  No, I did not.

12       Q    Based upon your interview, isn't it a fact you

13   interviewed every witness you could and not a single one of

14   them saw a knife in my client's hand?

15            MS. CHU:  Objection.

16            THE COURT:  Overruled.  You may answer.

17       Q    Yes or no?

18       A    Can you repeat the question?

19            MR. DRANOVE:  Please read back the question,

20       Ms. Reporter.

21            THE COURT:  The question was based on your

22       interviews, isn't it a fact that no one saw a knife in

23       Mr. Rivera's hand?

24       A    That is correct.

25       Q    Based upon your interviews, isn't it also a fact

SW

1    that nobody saw my client strike the victim in the back?

2        A    That's correct.

3        Q    And isn't it a fact that nobody, based upon your

4    interviews, nobody saw my client stab the victim at all?

5        A    That is correct.

6        Q    And in your report did there come a time when --

7    strike that, for now.

8            Did you participate in a search of sewers?

9        A    No, I did not.

10       Q    Did anybody participate in a search of sewers?

11       A    Yes.

12       Q    Who was that?

13       A    Detective --

14            THE WITNESS:  Can I refresh my memory with my

15       notes?

16       Q    Of course.

17            THE COURT:  Yes.

18       A    Detective McCafferty and Detective O'Brian along

19   with Detective Dunn.

20       Q    Were you there at the scene when the sewer was

21   searched?

22       A    No.

23       Q    Did Police Officers Hersh and Lindsey conduct a

24   sewer search of two sewers?

25       A    I have to look at my notes.

SW

DET. DARINO - CROSS/DRANOVE

1    Q    Please do.

2         Perhaps number 23?

3    A    That's correct.

4    Q    Were you present when the sewers were searched?

5              MS. CHU:  Objection, asked and answered.

6              THE COURT:  Sustained.

7    Q    Do you have any police reports that indicates the

8    source of information that led to the search of two sewers?

9    A    No.

10   Q    Did Mr. Enrique Rivera ever tell you to search in

11   a sewer?

12   A    No.

13   Q    Did he ever tell you he threw a knife in a sewer?

14   A    No.

15   Q    Did you have a confidential informant who was

16   working with you or did work with you on this case?

17   A    Yes.

18   Q    Do you have any police reports that indicate that?

19   A    There's a DD5 saying that we received information

20   from a confidential informant.

21   Q    May I see that?

22             COURT OFFICER:  (Handing.)

23   Q    Is it one page only?  I don't want to --

24   A    That's correct, one page.

25   Q    Is this one pink sheet which has a number 44 as a

SW

 1  follow up number the only sheet in which this reference to a

 2  person known to the department is?

 3      A    That is correct.

 4      Q    And is that the person you identify as the

 5  confidential informant?

 6      A    That's correct.

 7      Q    Does that sheet --

 8      A    Can you rephrase that question one more time when

 9  you say "identifies?"

10      Q    Well, you've shown me a form that talks about a

11  person known to the department.

12      A    That's correct.

13      Q    Is that a confidential informant?

14      A    Yes, it is.

15      Q    Are there any reports that you have that indicates

16  anything about what the confidential informant saw?

17              MS. CHU:  Objection.

18              THE COURT:  Sustained.

19      Q    The confidential informant supposedly pointed out

20  two sewers, is that correct?

21              MS. CHU:  Objection.

22              THE COURT:  Sustained.

23      Q    What was found in the sewers of relevance to this

24  case?

25      A    There was nothing recovered.

SW

407
DET. DARINO - CROSS/DRANOVE

1    Q    What was the purpose of searching the sewers?

2    A    A knife, weapon was used in the commission of this

3    crime and we weren't able to locate the knife.  So the

4    logical steps would be to look in the vicinity of the bar

5    which would be the sewer, the area of the bar, the vicinity

6    of the bar.

7    Q    The description of the sewer search was that there

8    were two sewers on the southeast corner of Third Avenue and

9    39th Street, correct?

10   A    Yes.

11   Q    Did anyone point out these sewers as a place to

12   look?

13   A    No.

14   Q    Did you ever ask Mr. Rivera if he threw out the

15   knife?

16             MS. CHU:  Objection.

17             THE COURT:  Sustained.

18             MS. CHU:  Asked and answered.

19   Q    Did he ever tell you he threw out a knife?

20   A    Yes, he did.

21   Q    Did you believe he threw out a knife?

22             MS. CHU:  Objection.

23             THE COURT:  Sustained.

24   Q    Did you ask him where he threw it?

25   A    Yes, I did.

SW

DET. DARINO - CROSS/DRANOVE

1    Q    Is that on videotape?

2    A    No.

3    Q    Audio-tape?

4    A    No.

5    Q    In your notes?

6    A    No.

7    Q    Don't you think in the investigation of a murder

8    as the assigned detective keeping track of a description of

9    where the alleged murder weapon is is something you would

10   reduce to writing?

11            MS. CHU:  Objection.

12            THE COURT:  Sustained.

13   Q    When my client made this, allegedly made this

14   statement telling you where he threw the knife, where was

15   he, my client?

16   A    Can you rephrase that question?

17   Q    Where was my client at the time he supposedly told

18   you where he threw the knife?

19   A    In the 7-2 interview room.

20   Q    Was he being interviewed?

21   A    Yes.

22   Q    Were you present?

23   A    Yes, I was.

24   Q    And did you take any written notes about what he

25   was telling you?

DET. DARINO - CROSS/DRANOVE

1      A     No, I did not.

2      Q     Were you aware of whether any other law

3   enforcement personnel were in the room my client was in when

4   you were interviewing him and you were not personally taking

5   notes?

6                  MS. CHU:  Objection.

7                  THE COURT:  Sustained as to the form of the

8          question.

9      Q     Who else was in the room with you when you were

10  interviewing my client and you were not taking notes?

11                 MS. CHU:  Objection.

12                 THE COURT:  Overruled.  Was anyone else in

13         the room?

14     A     Detective Gaynor.

15     Q     Do you have his -- strike that.

16                 In your file which you brought with you, in there

17  are there Detective Gaynor's notes?

18     A     No.

19     Q     Well, where are they?

20     A     He did not take notes.

21                 MS. CHU:  Objection.  Assumes a fact not in

22         evidence.

23                 THE COURT:  Sustained.

24     Q     The two detectives did not take notes.  About what

25  time was this event where you did not take notes?

SW

410

DET. DARINO - CROSS/DRANOVE

1          MS. CHU:  Objection.

2          THE COURT:  Rephrase.  You said two things

3     there.

4     Q    When did you first start questioning my client?

5     A    Approximately 5:15 a.m.

6     Q    When -- and when did you stop questioning him with

7     respect to the questions that started at 5:15?

8          MS. CHU:  Objection.

9          THE COURT:  Sustained as to form.

10          MR. DRANOVE:  I'll try again.

11     Q    How long were you questioning him when you started

12     at 5:15?

13     A    He was read his Miranda Rights at approximately

14     5:15.

15     Q    Did you question him after that?

16     A    Yes, I did.

17     Q    For how long did that process of questioning him

18     after you read him his Miranda Rights continue?

19     A    He was questioned and then he made a statement

20     orally and then written, and it took approximately an hour.

21     Q    Now, there came a time -- strike that.

22          During that one hour period of time, did you

23     record using a tape recording device the interactions

24     between you and my client?

25     A    No, I did not.

SW

411
DET. DARINO - CROSS/DRANOVE

1    Q    Was there a recording device in the precinct?

2    A    Not to my knowledge.  I didn't check.

3    Q    Were you present when my client was videotaped?

4    A    Yes, I was.

5    Q    Where did that videotape equipment come from?

6    A    The district attorney's office.

7    Q    Now, is it your recollection that when you were in

8  the 7-2 precinct on February 28, 2005, there were no

9  recording devices?

10                MS. CHU:  Objection.

11                THE COURT:  Overruled.  You may answer.

12   A    Not to my knowledge.

13                MR. DRANOVE:  May I have a moment, judge?

14                THE COURT:  Yes.

15                MR. DRANOVE:  It may take a while.  I don't

16       want to interrupt now.

17                THE COURT:  Whatever you want.

18                MR. DRANOVE:  All right.

19   Q    Did the source that you mentioned was the

20  confidential source view the line-up?

21   A    No.

22   Q    Was this person who's the confidential source

23  someone who was supposedly present during the incident

24  involving Mr. Ojeda?

25                MS. CHU:  Objection.

                          SW

Case 1:15-cv-02657-EK   Document 9-1   Filed 12/08/15   Page 394 of 811 PageID #: 811

1          THE COURT:  Sustained.

2     Q    Who, to your knowledge, spoke to the confidential

3     source during the course of this investigation?

4               MS. CHU:  Objection.

5               THE COURT:  Sustained.

6     Q    Did you speak to the confidential source during

7     the course of the investigation?

8               MS. CHU:  Objection.

9               THE COURT:  Sustained.

10    Q    In your police training and your training through

11    the years, were you taught about the importance of taking

12    notes of interviews with suspects?

13    A    Can you rephrase that question?

14    Q    Well, when you went to the police academy, you

15    learned how to be a police officer, correct?

16    A    That's correct.

17    Q    You learned the importance of recordkeeping,

18    right?

19    A    That's correct.

20    Q    Not only what time you checked in, what time you

21    had lunch, but keeping notes of what you did, is that right?

22    A    That is correct.

23    Q    And in fact there's something called a memo book,

24    is that right?

25    A    That is correct.

SW

Case 1:15-cv-02657-EK   Document 9-1   Filed 12/08/15   Page 395 of 811 PageID #: 812

1      Q    What's a memo book?

2      A    It's a book that we maintain to show what jobs we

3  respond to.

4      Q    And that's to keep track of your schedule, right?

5      A    That is correct.

6      Q    Now, did you learn at any time at any classes that

7  when you're interviewing a subject of an investigation you

8  should take notes of the interview?

9      A    Based on my experience, I felt it was better to

10  listen to what Enrique had to say to me instead of being

11  distracted takings notes.

12      Q    But you were not alone with Enrique, there was

13  another detective with you, Detective Gaynor, isn't that

14  correct?

15      A    That is correct.

16      Q    Haven't you learned in your experiences one

17  detective takes the notes while the other does the

18  questioning?

19             MS. CHU:  Objection.

20      Q    When two detectives are present and another takes

21  the interview --

22             THE COURT:  Sustained.  Argumentative.

23      Q    Have you been present when in the presence of

24  another detective you interview a subject and the other

25  detective writes down the substance of the questions and

414
DET. DARINO - CROSS/DRANOVE

1   answers?

2               MS. CHU:  Objection.

3               THE COURT:  Sustained.

4               MR. DRANOVE:  Judge, I don't -- may we have a

5       sidebar?

6               THE COURT:  No.

7       Q    Have you ever written down what a subject has told

8   you when being interviewed?

9       A    Yes.

10              MS. CHU:  Objection.

11              THE COURT:  Sustained.

12      Q    Did you do that in this case?

13      A    No, I did not.

14      Q    Is there a gentleman by the name of Angel Rivera

15  whose identity came to your attention between Sunday the

16  27th of February 2005 and Monday the 28th of February 2005?

17              MS. CHU:  Objection.

18              THE COURT:  Overruled.  You may answer.

19      A    Yes.

20      Q    Do you understand him to be a brother of Julio

21  Rivera and Enrique Rivera?

22      A    Yes.

23      Q    Was he someone you saw at the precinct as well?

24      A    No.

25      Q    Now, at about 5:15 in the morning your questioning

SW

1  of my client began, is that correct?

2      A    That's correct.

3      Q    You told him you were investigating a incident in

4  the bar at 39th Street and Third Avenue?

5      A    That's correct.

6      Q    You told him there was a homicide there?

7      A    No.

8      Q    Murder?

9      A    No.

10     Q    Not at all?

11     A    No.

12     Q    Just an incident?

13     A    That is correct.

14     Q    And did you ask him if he knew why he was there?

15     A    Yes, I did.

16     Q    Did he tell you he wasn't sure?

17     A    No.

18     Q    Did he tell you that he was involved in a fight?

19     A    Yes.

20     Q    Did he tell you he didn't hurt anybody?

21     A    He didn't know if he did.

22     Q    What did he say, he didn't know if he did?

23     A    That's correct.

24     Q    Did he tell you he didn't shoot anybody?

25              MS. CHU:  Objection.

SW

DET. DARINO - CROSS/DRANOVE

1           THE COURT:  Overruled.  You may answer.

2     A     Can you repeat that?

3           THE COURT:  Did he tell you he didn't shoot

4     anybody?

5     Q     Are you having troubling understanding?  Did he

6     tell you he didn't shoot anybody?

7     A     I don't recall him saying that, no.

8     Q     Did you tell him nobody was shot, it was a

9     stabbing?

10    A     No.

11    Q     Did you tell him his brother Julio was in the

12    precinct?

13    A     No.

14    Q     Did you tell him his brother Julio was going to be

15    charged with the murder and he was, Enrique was also going

16    to be charged with the murder?

17    A     No.

18    Q     Did you tell Enrique that both of you were going

19    to be charged with the murder unless one of you says you did

20    it?

21    A     No.

22    Q     Did you tell Enrique "Your brother's never done

23    time before, you have to say it's self defense, you'll only

24    get eight to ten years and we'll let your brother go?"

25    A     No.

SW

1       Q    Did you tell my client that you knew that his

2   brother was in the bar fighting?

3       A    No.

4       Q    Did you tell my client that you knew that his

5   brother was in the bar after Mr. Enrique Rivera had left the

6   bar?

7       A    No.

8       Q    How long did it take Mr. Enrique -- strike that.

9   Strike that.

10          When you went to the house in Queens of

11  Ms. Glasgow, it was 4 in the morning or so, is that correct?

12      A    That's correct.

13      Q    And you handcuffed Mr. Rivera outside the house,

14  am I right?

15      A    That's correct.

16      Q    Was he under arrest at that time?

17      A    Yes, he was.

18      Q    Did you tell him he was under arrest?

19      A    No.

20      Q    Once he's under arrest -- strike that.

21          No one had identified him in the line-up, am I

22  right, at that time, correct?

23      A    Yes.

24      Q    He'd given you no statement at all, whatsoever, at

25  4 in the morning, am I also correct?

SW

418

DET. DARINO - CROSS/DRANOVE

1    A    That's correct.

2    Q    And he's under arrest?

3    A    Yes, he is.

4    Q    Did you bring him to central booking after you

5    arrested him?

6    A    Later in the evening after all the identifications

7    were made, yes.

8    Q    Well, he had already been arrested, am I right?

9    A    He was placed in handcuffs, that's correct.

10   Q    You said he was arrested?

11   A    He was arrested, yes.

12   Q    Now, did you have a warrant for his arrest?

13          MS. CHU:   Objection.

14          THE COURT:   Sustained.

15   Q    Once he was arrested, when is the first time --

16   strike once he was arrested.

17          When was it that you first told Mr. Rivera he was

18   under arrest?

19   A    When he was being transported.  I'm sorry, when he

20   was being transported to central booking.

21   Q    That's about how many hours after you arrested

22   him?

23   A    Late in the evening, approximately 5, 1700.

24   That's 5 p.m.

25   Q    So approximately eleven or twelve hours after

SW

DET. DARINO - CROSS/DRANOVE

1    arresting him you told him he was under arrest?

2        A    That's correct.

3        Q    Did he appear tired to you when you brought him

4    into the precinct?

5        A    Yes.

6        Q    And you brought him into what you call the

7    interview room or interrogation room?

8        A    Interview room, that's correct.

9        Q    The interview room has bare walls, correct?

10       A    Yes.

11       Q    Cinder block walls?

12       A    Yes.

13       Q    Any couches in the room?

14       A    No.

15       Q    Any chairs with cushions in the room?

16       A    No.

17       Q    Any windows to the outside world in that room?

18       A    No.

19       Q    Did you leave him alone in that room for any

20   period of time before you started questioning him?

21       A    A short time.

22       Q    When did you first -- when did you take the

23   handcuffs off?

24       A    When he was brought into the precinct.

25       Q    When you put him in the interview room, was he

SW

420

DET. DARINO - CROSS/DRANOVE

1   free to go?

2       A   No, he was not.

3       Q   Was Julio Rivera free to go at 1:30 in the

4   morning?

5       A   Yes, he was.

6       Q   Did you tell him?

7       A   Yes, he was.

8       Q   Did you tell him he was free to go?

9       A   Yes, I did.

10      Q   At what time?

11      A   It was upon the completion of speaking to him.

12      Q   At 11:40 in the morning?

13      A   No, the initial time upon completion of speaking

14  to him.

15      Q   You're aware he was taken from his home from his

16  bed with his wife to the precinct, correct?

17              MS. CHU:  Objection.

18              THE COURT:  Overruled.  If you know.

19      A   I wasn't there.

20      Q   You don't -- you do understand he's married, am I

21  right?

22              MS. CHU:  Objection.

23              THE COURT:  Sustained.

24      Q   Did you hear Mr. Julio Rivera say "I want to stay

25  here?"

SW

421

DET. DARINO - CROSS/DRANOVE

1     A    Yes, he did.

2     Q    And to whom did he say that?

3     A    Me.

4     Q    Do you have any notes about that?

5     A    No, I do not.

6     Q    Do you have any handwritten notes about any aspect

7  of this investigation?

8     A    Yes, I do.

9     Q    Where are they?

10    A    In the folder.

11    Q    Would you show them, with the Court's permission

12 to the prosecution, and then let me take a look?

13         THE COURT:  He can show them to you right

14    now.

15         COURT OFFICER:  Which one?

16         THE WITNESS:  It's the whole book?

17         COURT OFFICER:  The whole book?

18         THE WITNESS:  Yeah.

19         COURT OFFICER:  (Handing.)

20         MR. DRANOVE:  Judge, may we approach?

21         THE COURT:  Okay.  Excuse us for a moment.

22         MR. DRANOVE:  Thank you.

23         (At this time, a sidebar was held off the

24    record.)

25    Q    You were present when Mr. Rivera wrote out a

SW

DET. DARINO - CROSS/DRANOVE

1   statement, correct?

2       A    Yes, I was.

3       Q    He was clearly tired, am I right?

4       A    He look tired.

5       Q    He was tired when you put him in this cinder block

6   room, am I right?

7       A    Yes.

8               MR. DRANOVE:  I just want to get an exhibit,

9       number 10.  Where is exhibit number 10?

10              THE COURT:  Talking about the written

11      statement?

12              MR. DRANOVE:  Yes.

13              COURT OFFICER:  Do you want it, counsel?

14              THE COURT:  Just show it to the witness.

15      Q    Please, take a look at 10.  You testified about

16  that on Friday.

17              That's the written statement Mr. Rivera made,

18  correct?

19      A    Yes.

20      Q    That was made at about what time?

21      A    After the Miranda Warnings were read.

22      Q    About 5:15 in the morning?

23      A    After the completion of the Miranda Warnings,

24  sometime after that.

25      Q    Between 5:15 and 6 in the morning?

423

DET. DARINO - CROSS/DRANOVE

1     A    5:15, whatever it took to read the Miranda

2    Warnings.

3     Q    He just immediately wrote out this statement?

4     A    He gave a oral statement and then wrote it out.

5     Q    No prompting from you?

6     A    No.

7     Q    No suggestions from you to say self defense?

8     A    No.

9     Q    Now, he misspelled the word Enrique on this

10   Exhibit 10, his own name, is that correct?

11    A    It looks like he spelled it correctly.  It looks

12   like the Q, he flipped it the other way.

13    Q    He wrote a G instead of a Q?

14    A    That's how he wrote it.

15    Q    Did you see him write E-N-R-I-G-U-E?

16              MS. CHU:  Objection, your Honor.

17              THE COURT:  Sustained as to form of the

18        question.

19    Q    Were you present throughout the time Mr. Rivera

20   was writing this statement?

21    A    Yes, I was.

22    Q    Did you see him cross out his own first name and

23   then rewrite it?

24    A    I didn't know what he was crossing out.  He did it

25   on his own.  I wasn't reading while he was writing.

SW

DET. DARINO - CROSS/DRANOVE

1    Q    Did you ask him to write on this Exhibit 10 the
2    time he made his statement?

3    A    No, I did not.

4    Q    Is it your common practice to not note on the
5    statement the time it is written?

6              MS. CHU:   Objection.

7              THE COURT:   Overruled.   You may answer.

8    A    At the time, I asked him to write his written
9    statement and it wasn't written down, so common practice or
10   not, I don't have a common practice.

11   Q    When you were in the process of your interviewing
12   of Mr. Rivera after 5 in the morning, had you already
13   received any information about the nature of the wounds to
14   the victim, information from for example Officer Harriman or
15   the hospital?

16   A    Yes.

17   Q    Do you have any notes about what information you
18   had in your possession at the time you started questioning
19   Mr. Rivera?

20             THE WITNESS:   May I look at my DD5?

21             THE COURT:   Yes.

22   Q    Do you have any?

23   A    I have a DD5 from Detective Seroute (ph) stating
24   the interview with the doctor at Lutheran Medical Center,
25   Dr. Moon (ph).

SW

1    Q    So, did you understand the victim had more than

2  one stab wound in him?

3    A    Yes.

4    Q    Did you at any time, did you at any time ask my

5  client if he stabbed anyone?

6    A    Yes, I did.

7    Q    Is that recorded on a videotape, for example?

8    A    Yes, it was a interview with Enrique on a

9  videotape.

10   Q    And you were present?

11   A    For the interview?

12   Q    Yes.

13   A    That's correct.

14   Q    And you asked him if he stabbed somebody?

15   A    No, I didn't.

16   Q    Did the prosecutor in your presence ask him if he

17  stabbed anyone?

18   A    I don't recall.

19            MR. DRANOVE:  Judge, can I have about -- I

20       could finish before lunch if you give me a brief break.

21       I'm just going to look for something.  I don't want to

22       burden everybody, but if you want me to look right

23       here, I --

24            THE COURT:  Whatever you want.  If you want

25       me to excuse the jury --

SW

426
DET. DARINO - CROSS/DRANOVE

1    MR. DRANOVE: Yes.

2    THE COURT: Counsel has asked me to excuse

3    you for a moment while he looks through his papers. As

4    soon as he's finished, we'll resume. Thank you.

5    (At this time, the jury exited the

6    courtroom.)

7    (At this time, there was a short break in the

8    proceedings and the matter subsequently resumed.)

9    THE COURT: You all set?

10    MR. DRANOVE: Yes.

11    THE COURT: Okay, we're ready to bring the

12    jury in. Thank you.

13    COURT OFFICER: Your Honor, you're ready for

14    the jury?

15    THE COURT: Yes.

16    COURT OFFICER: Jury entering.

17    THE COURT: Okay.

18    COURT CLERK: Both sides waive the roll call?

19    MS. CHU: So waived.

20    MR. DRANOVE: Yes.

21    THE COURT: You may proceed Mr. Dranove.

22    CONTINUED CROSS EXAMINATION

23    BY MR. DRANOVE:

24    Q    Did there come a time when you told Enrique Rivera

25    you were investigating a murder?

SW

427

DET. DARINO - CROSS/DRANOVE

1    A    No.

2    Q    Do you recall testifying in a prior proceeding,

3  yes or no?

4    A    Yes.

5    Q    Do you recall, page 283, 284, line 2 being asked

6  the following questions and giving the following answers:

7    "QUESTION:  Did you at any time tell my client he

8  was facing serious charges?

9    "ANSWER:  Yes, I did."

10    Do you remember that?

11    A    That is correct.

12    Q    "QUESTION:  What charges did you tell him he was

13  facing?

14    "ANSWER:  Murder."

15    "QUESTION:  That was after he was arrested,

16  identified, and paper was submitted and he was

17  fingerprinted?

18    "ANSWER:  Yes, he was, not during the time of the

19  interview."

20    Let me put this into a context.

21    Do you recall being questioned in another

22  proceeding about the transactions, the words spoken between

23  you and my client when he made his oral statement?

24    A    Yes, I do.

25    MR. DRANOVE:  Judge, I'll move on.

SW

428

DET. DARINO - CROSS/DRANOVE

1    Q   Now, Detective, did my client ever admit he

2  stabbed anyone?

3    A   He said he didn't know if he did or didn't.

4    Q   Did my client ever admit stabbing anyone?

5         MS. CHU:  Objection, asked and answered.

6         THE COURT:  Overruled.  You may answer it.

7    A   No.

8    Q   Did you put into an official report that at 5:15

9  in the morning, Enrique Rivera, after being advised of his

10  rights made an admission to stabbing the victim in this

11  case?

12    A   Based --

13    Q   Did you put that in a report?

14    A   Yes, I did.

15    Q   That was your conclusion, not what my client said,

16  is that right?

17    A   It wasn't a conclusion.  It was based on the fact.

18    Q   But the fact is, correct me if I'm wrong, the fact

19  is you wrote, "Enrique Rivera, after being advised of his

20  rights made an admission to stabbing the victim in this

21  case?"  And I'm going to repeat it with the quotes in place.

22  Open quote, On February 28th 2005 at approximate 0515 hours

23  Enrique Rivera after being advised of his rights made an

24  admission to stabbing the victim in this case, period,

25  close quotes.

SW

429

DET. DARINO - CROSS/DRANOVE

1              MS. CHU:  Objection, asked and answered.

2      Q    It's a fact that you wrote that?

3              MS. CHU:  Objection, asked and answered.

4              THE COURT:  I'll allow it.  Overruled.

5      Q    Is it a fact, yes or no, that you put in an

6   official report, that you put in an official report the

7   quoted words I just read to you?

8      A    Yes, I did.

9      Q    And clearly that's your conclusion, not

10  Mr. Rivera's words, is that correct?

11     A    Based on the fact --

12              MS. CHU:  Objection.

13              THE COURT:  Overruled.  You may answer.

14              MR. DRANOVE:  I'm going to withdraw that,

15         judge.  Let me --

16              THE COURT:  So you don't have to answer it.

17              MR. DRANOVE:  Thank you.

18              THE COURT:  Question withdrawn.  Next

19         question.

20     Q    My client never admitted stabbing the victim in

21  this case, correct?

22              MS. CHU:  Objection, asked and answered.

23              THE COURT:  Sustained.  It's already been

24         asked and answered.

25              MR. DRANOVE:  All right.

SW

1    Q    Now, isn't it true that my client in his words did

2    not say he pulled out a knife and swung the knife at the

3    victim?

4                    MS. CHU:   Objection.

5                    THE COURT:   Sustained.

6    Q    Before my client was interviewed by Ms. Sipress,

7    did you speak with Ms. Sipress?

8    A    Yes, I did.

9    Q    And Ms. Sipress is an assistant district attorney,

10   correct?

11   A    Yes, she is.

12   Q    Did you show her the reports you prepared prior to

13   that time?

14   A    Yes, I did.

15   Q    Did you show her my client's written statement?

16   A    Yes, I did.

17   Q    Did you show her the hospital reports showing the

18   victim's wounds and the words of the doctor who reported

19   them?

20   A    She saw the photographs.

21   Q    Did she at any time ask my client any questions in

22   your presence before or after the videotape was on?

23   A    No.

24   Q    Were you present when my client was read his

25   Miranda Warnings and the videotape was running?

SW

DET. DARINO - CROSS/DRANOVE

1    A    Yes, I was.

2    Q    Did you hear my client say "What's going on?"

3    A    Yes.

4    Q    Was there a videotape operator in the room at the

5    time?

6    A    Yes, there was.

7    Q    Ms. Sipress, the prosecutor, and yourself as well,

8    correct?

9    A    That is correct.

10   Q    And he said "What's going on?"

11   A    Yes, that's correct.

12   Q    How did he appear to you at that time with respect

13   to his energy level?

14              MS. CHU:   Objection.

15              THE COURT:   Sustained.

16   Q    Did he appear even more tired at that hour than he

17   had at 5:15?

18              MS. CHU:   Objection.

19              THE COURT:   Overruled.   You may answer.

20   A    I don't recall.   It was a while ago looking at the

21   video.

22   Q    Was he kept in that cinder block wall

23   interrogation room after you questioned him through the time

24   he was videotaped?

25   A    Yes.

1      Q    Do you recall that when the warnings were -- the
2   Miranda Rights were read to him and the prosecutor asked him
3   if he wants to make a statement, do you recall what his
4   answer was?
5              MS. CHU:  Objection.
6              THE COURT:  Overruled.  You may answer.
7      A    I don't know exactly.  It's like "I'm here, we're
8   here," something along in that effect.
9      Q    And do you recall whether the prosecutor repeated
10  the question, "Do you want to make a statement?"
11     A    I don't recall the context of the conversation.
12     Q    Do you recall if Mr. Rivera had any wounds on his
13  hands or recent injuries on his hand visible to you?
14     A    Not that I recall.
15     Q    Do you recall -- well, have you seen the video
16  tape in the last 48 hours?
17     A    Yes, I did.
18     Q    You seen my client put his hands on his head in
19  the videotape?
20     A    I didn't study the tape.  I don't remember.
21     Q    You agree his hands are visible on the tape,
22  right?
23     A    Yes.
24     Q    And you didn't notice any injuries on him that you
25  put in any of your reports, am I right?

                              SW

433
DET. DARINO - CROSS/DRANOVE

1      A     That's correct.

2      Q     Are you aware he said on the tape he had a pocket

3    knife, correct?

4      A     That's correct.

5      Q     And that he opened the pocket knife, correct?

6      A     That's correct.

7      Q     Are you familiar with the medical examiner's

8    testimony describing the blade that entered the body of

9    Mr. Ojeda?

10                 MS. CHU:  Objection.

11                 THE COURT:  Sustained.

12                 MR. DRANOVE:  No further questions.

13                 THE COURT:  Any redirect?

14                 MS. CHU:  No.

15                 THE COURT:  Thank you very much, Detective

16          Darino.  You are excused.  You may step down from the

17          witness stand.

18                 (At this time, the witness exited the

19          courtroom.)

20                 THE COURT:  You may call your next witness

21          Ms. Chu.

22                 MS. CHU:  People call Jennifer Sipress.

23                 (At this time, the witness entered the

24          courtroom.)

25                 COURT SERGEANT:  Step up and raise your right

SW

434

COLLOQUY

1    hand.

2              COURT CLERK:  Solemnly swear the testimony

3    you are about to give will be the truth, the whole

4    truth, and nothing but the truth?

5              MS. SIPRESS:  I do.

6              COURT CLERK:  Be seated, please.

7              State your name.

8              MS. SIPRESS:  Jennifer Sipress,

9    S-I-P-R-E-S-S.

10             COURT CLERK:  And your employer and your

11   title.

12             MS. SIPRESS:  I work for the Kings County

13   District Attorney's office.  I'm an assistant district

14   attorney.

15             COURT CLERK:  Thank you.

16             THE COURT:  You may examine the witness

17   Ms. Chu.

18             MS. CHU:  Thank you.

19   J E N N I F E R   S I P R E S S, having been duly sworn,

20   testified as follows:

21   DIRECT EXAMINATION

22   BY MS. CHU:

23        Q    Good afternoon Ms. Sipress.

24        A    Good afternoon.

25        Q    How long have you been working for the Kings

SW

1    County District Attorney's Office?

2         A    Almost ten years.

3         Q    Where are you currently assigned?

4         A    The investigation bureau.

5         Q    How long have you been in that unit, the

6    investigation bureau?

7         A    About eight, eight years.

8         Q    Can you just explain to the members of the jury

9    what are your duties and responsibilities as a member of the

10   investigation unit?

11        A    I travel to precincts to audiotape witnesses and

12   take videotaped statements of defendants.

13        Q    And I want to direct your attention to February

14   the 28th of 2005.  Did there come a time when you traveled

15   to the 7-2 precinct for the purpose of speaking to someone

16   by the name of Enrique Rivera?

17        A    Yes.

18        Q    And how was it that you were notified to go to the

19   precinct?

20        A    Well, either of two ways.  A boss from our office

21   would have notified me or the case detective would have

22   called the office.

23        Q    And did there come a time when you actually --

24             THE COURT:  Excuse me Mr. Dranove.

25             MR. DRANOVE:  I apologize to everybody.  My

SW

1    fault.

2              THE COURT:   You may proceed.

3        Q    Did there come a time when you actually arrived at

4    the 7-2 precinct?

5        A    Yes.

6        Q    Do you remember about what time it was that you

7    got there.

8        A    Approximately 10 o'clock in the morning.

9        Q    In the morning.   And were you with anyone when you

10   arrived there?

11       A    Yes, with the videotape technician.

12       Q    Now, can you tell me, when you speak with -- I'm

13   sorry, when you with speak defendants, is there an office

14   policy with regard to whether or not those conversations are

15   recorded in anyway?

16       A    Yes.

17       Q    And what is the policy?

18       A    That I do not have a conversation with a defendant

19   only if the tape recorder is on, the videotape is on.

20       Q    So the only time you can engage in any kind of

21   conversation with the defendant is when it's being

22   videotaped?

23       A    Absolutely.

24       Q    When you arrived at the precinct you said there

25   was a video technician with you?

437

SIPRESS - DIRECT/CHU

1       A     Yes.

2       Q     Did you speak with the case detective in the case?

3       A     Yes.

4       Q     Were you aware of any statements that Enrique

5    Rivera may have made prior to your being there?

6       A     Yes.  I believe he made a written statement.

7       Q     Did you review that written statement before you

8    actually spoke with him?

9       A     Yes, I did.

10       Q     I'm just going to ask you to take a look around

11    the courtroom and see if you see Enrique Rivera here in the

12    courtroom today?

13       A     Yes, I do.

14       Q     Would you please point to him and indicate

15    something he's wearing?

16       A     The striped tie.

17              THE COURT:  She's indicating Mr. Rivera, the

18         defendant.

19              MS. CHU:  Thank you.

20       Q     Once you got to the precinct, what did the video

21    technician do when you arrived there?

22       A     It usually takes them a few minutes to set up and

23    I would have probably had a conversation with the detective

24    about the case and we would start right away.

25       Q     Did there come a time you actually spoke with

SW

SIPRESS - DIRECT/CHU

1   Enrique Rivera?

2        A    Yes.

3        Q    About what time did the conversation begin?

4        A    I believe about 10:30.

5        Q    Now, was that conversation recorded as is the

6   office policy on videotape?

7        A    Yes, it was.

8        Q    Was it given a number?

9        A    Yes, it was.

10       Q    And what was the number that was assigned?

11       A    R050027.

12       Q    And I'm sorry, when is that number actually

13   assigned to the videotape?

14       A    At that time, right before the video starts.

15       Q    So as it's being created?

16       A    Yes.

17            MS. CHU:  At this time, your Honor, I would

18       ask that this be marked People's number 13.

19            THE COURT:  12.

20            MS. CHU:  I'm sorry, 12.

21            COURT OFFICER:  12.

22            (At this time, the videotape was marked as

23       Exhibit 12, for identification.)

24            MS. CHU:  And I'm going to play it.

25            THE COURT:  Show it to the witness.

SW

439
SIPRESS - DIRECT/CHU

1    Q    Ms. Sipress, just take a look if you can at the

2    outside jacket of that videotape.  Do you recognize what's

3    written on the envelope that contains that videotape?

4    A    Yes, I do.

5    Q    What is that?

6    A    It reflects the tape number, the date and the

7    defendant's name and my name.

8    Q    And is that a customary packaging that the video

9    tape is actually placed in once it's created by the

10   technician?

11   A    Yes.

12   Q    Who's -- I'm sorry.  Was anyone else present for

13   the conversation you had with the defendant?

14   A    Yes, two other people were present, the case

15   detective and video technician.

16            MS. CHU:  At this time, your Honor, I ask

17        that it be played for the witness.

18            THE COURT:  Are you moving it into evidence?

19            MS. CHU:  After she views it, she can

20        authenticate it.

21            THE COURT:  I think it has to be

22        authenticated first.

23   Q    Is that the videotape that was assigned for this

24   defendant on February 28, 2005?

25   A    Yes.

SW

SIPRESS - DIRECT/CHU

1          MS. CHU:  At this time, your Honor, I would

2     offer it as People's Number 12.

3          THE COURT:  Any objection?

4          MR. DRANOVE:  Can I just see it for a moment?

5          THE COURT:  Certainly.

6          COURT OFFICER:  The packaging or the tape?

7          MR. DRANOVE:  I'm going to leave that in

8     there.  I can't get it out.

9          Thank you.

10         THE COURT:  Any objection?

11         MR. DRANOVE:  No.

12         THE COURT:  Then People's 12 would be

13    received in evidence and we'll play it for the jury.

14         COURT OFFICER:  So marked, your Honor.

15         MR. DRANOVE:  Judge, I think I'll move over

16    here.

17         THE COURT:  Okay.

18         (At this time, the videotape is being played

19    for the jury.)

20         MR. DRANOVE:  Judge, I just want the record

21    to reflect the tape is running and people are talking

22    in the courtroom.

23         (At this time, the videotape ended.)

24    Q    Ms. Sipress, other than the conversation you just

25    saw on this videotape, did you have any other discussion

SIPRESS - DIRECT/CHU

1    with the defendant at all on February 28, 2005?

2         A    No.

3         Q    Now, I heard a male voice during the course of the

4    interview asking the defendant, saying that he had to answer

5    out loud.  Whose voice was that?

6         A    The videotape technician's.

7         Q    And I think there was one time during the Miranda

8    Warnings where he just said "uh huh" and nodded his head and

9    someone said he had to answer out loud?

10        A    He listened to make sure he could hear everything

11   the defendant says, so he told him to speak up.

12        Q    Does the videotape technician also indicate to you

13   when the sound is on?

14        A    Yes, he does.

15        Q    Did you listen to it on the videotape?

16        A    Yes.

17        Q    And at the end when you showed the defendant his

18   written statement, there was a male voice there.  Whose male

19   voice was that?

20        A    The technician's.

21        Q    Were there any additions or deletions to the tape

22   of your conversation that you had with Enrique Rivera on

23   February 28, 2005?

24        A    No.

25        Q    I have nothing further.  Thank you.

SW

442

SIPRESS - CROSS/DRANOVE

1          THE COURT:  Cross examination Mr. Dranove?

2          MR. DRANOVE:   Thanks.

3    CROSS EXAMINATION

4    BY MR. DRANOVE:

5          Q     Good afternoon Ms. Sipress.

6          A     Good afternoon.

7          Q     What technical equipment did you bring to the

8    precinct in order to proceed?

9          A     I don't bring the equipment.  The technical -- the

10   videotape technician comes with whatever he needs.

11         Q     Do you recall what the video -- well, was this a

12   video technician you worked with before that night?

13         A     Yes.

14         Q     Did you recognize the equipment the video

15   technician brought?

16         A     Usually it's a tripod and camera with the

17   microphone.

18         Q     And the microphone is connected to the camera?

19         A     Correct.

20         Q     Any other recording devices?

21         A     No, that's it.

22         Q     Later that morning did you record an interview

23   with Julio Rivera?

24         A     Yes.

25         Q     Was it video recorded?

SW

SIPRESS - CROSS/DRANOVE

1    A    No, it was not.

2    Q    Who provided the recording device?

3    A    I did.

4    Q    Where did you bring it from?

5    A    I take it from the office.

6    Q    Did you inquire as to whether the precinct had any

7    recording devices?

8    A    I did not.

9    Q    During the questioning of my client, did you

10   observe his physical appearance at all?

11   A    Yes.  I was sitting right next to him.

12   Q    And that's what it looked like on the video?

13   A    Correct.

14   Q    Yes, and did he appear tired.

15   A    No.

16   Q    Not at all?

17   A    I mean he responded to my questions.  He seemed to

18   be in fine physical condition.

19   Q    Did he appear tired?

20        MS. CHU:  Objection.

21        THE COURT:  Overruled.  If you know.

22   A    He didn't appear tired to me.

23   Q    And that Julio Rivera you interviewed, do you see

24   him in the courtroom?

25   A    You know, I don't remember what Julio was like.  I

444

SIPRESS - CROSS/DRANOVE

1   audiotape many witnesses.  I don't recall.

2       Q    Before you spoke to Mr. Enrique Rivera --

3            THE COURT:  If you could have Mr. Rivera to

4       step out of the courtroom, please.

5            MR. DRANOVE:  Yes, if there's a concession

6       that's Mr. Rivera, because I'll ask that gentleman to

7       step out.  That is Mr. Julio Rivera.

8       Q    Before you started the interview of Enrique

9   Rivera, did you review any materials provided to you by

10  Detective Darino?

11      A    Yeah, the written statement that he gave.

12      Q    Okay.

13           MR. DRANOVE:  May I see Exhibit 10?

14           THE COURT:  You may.

15           MR. DRANOVE:  Could you show this to the

16      witness, please?

17           COURT OFFICER:  Sure.

18      Q    Counsel, would you take a look at Exhibit 10 and

19  tell me if that's an item that you recognize?

20      A    Yes.

21      Q    What is it?

22      A    It's the written statement from Mr. Rivera.

23      Q    Is that the only report, writing or written item

24  you reviewed before questioning Mr. Rivera?

25      A    I couldn't say.  If the detective had some DD5s

445

SIPRESS - CROSS/DRANOVE

1  already prepared, I could have reviewed them.  I don't

2  recall.

3      Q    Now, when you questioned my client, it was after

4  he spoke some words, and the response I heard, I don't know

5  what you heard, it was something like you're going to give a

6  statement or this is a video or words to that effect.  Do

7  you recall when that was said?

8      A    On the beginning of the tape?

9      Q    Yes.

10     A    It seems like he turned to the detective and asked

11 "What is this," and the detective responded, "It's an

12 interview."

13     Q    When you entered that room, was my client already

14 in the room?

15     A    Yes.

16     Q    And did you enter the room separately from your

17 technician?

18     A    I would assume that I did.

19     Q    Do you remember?

20     A    I don't recall.

21     Q    Do you recall how long you were in that room with

22 my client before you questioned my client?

23     A    Maybe thirty seconds before the video started.

24     Q    Now, during the reading of the rights for my

25 client, there came a time when you asked him if he wanted to

SW

SIPRESS - CROSS/DRANOVE

1    make a statement.  Do you recall that?

2    A    Yes, I do.

3    Q    You saw his response on the tape, correct?

4    A    Correct.

5    Q    You saw him pause, put his head in his hand, nod

6    left and right and say "we're here?"

7    A    He says, "Well, we're here."

8    Q    What does nodding left and right mean to you?

9         MS. CHU:  Objection.

10        THE COURT:  Sustained.

11   Q    Do you have an office, a written office policy in

12   the Brooklyn DA's office with respect to how the procedures

13   involved in -- I'll ask this again.

14        Are you aware of any written policy in your office

15   which was in effect in February of 2005 with respect to the

16   steps to take to assure that an accused understands his

17   rights when he's read his Miranda Warnings?

18        MS. CHU:  Objection.

19        THE COURT:  Overruled.  You may answer.

20   A    I don't know of any written policy.  I know I

21   underwent some training when I first was assigned to the

22   investigation bureau.

23   Q    Did that training include informing you that it

24   was important to confirm the accused understood his Fifth

25   Amendment privilege against self incrimination?

SW

SIPRESS - CROSS/DRANOVE

1          MS. CHU:  Objection.

2          THE COURT:  Overruled.  You may answer.

3     A    Yes.  I read him Miranda.

4     Q    I beg your pardon?

5     A    I read him his Miranda Rights.

6     Q    And one of those sentences you read him was "Now

7  that I read you your rights do you want to make a

8  statement?"

9     A    "Do you wish to speak with me?"

10    Q    Right.

11    A    Yes.

12    Q    And in order for you to determine if he wishes to

13 speak to you, correct?

14    A    Yes.

15    Q    Or wants to speak to you?

16    A    Correct.

17    Q    How do you determine from an answer given by

18 Mr. Rivera whether he wants to speak to you?

19    A    Well, he did not ask for a lawyer and he did not

20 say no.  And the response he gave was "Well, we're here.

21 Let's get on with it."

22    Q    He didn't say "Let's get on with it," did he?

23    A    But he could have said no.

24    Q    He could have said yes?

25    A    He could have said no, I would have stopped the

SIPRESS - CROSS/DRANOVE

1    interview.

2        Q    Were you waiting for a yes before questioning him

3    any further?

4        A    No, I took his response --

5                MR. DRANOVE:  No further questions.

6                THE COURT:  Did you finish your answer?

7                THE WITNESS:  I took his response as a yes.

8                MR. DRANOVE:  Well, then may I continue?

9                THE COURT:  Well, it's always a good idea to

10           let the witness finish an answer before you say no

11           further questions.  You started walking away while she

12           was talking.

13       Q    You took his response to be a yes?

14       A    Yes, as a confirmative.

15       Q    Did you speak to confirm he understood you

16    correctly?

17       A    Well, I started to ask him questions and he

18    responded.

19       Q    Did you see him pause before speaking to you in

20    response to your question about what happened and not

21    respond directly?

22                MS. CHU:  Objection.

23                THE COURT:  Sustained as to the form of the

24           question.

25       Q    Do you recall he was told to answer out loud?

1      A     Yes.

2      Q     Was he speaking very softly in your opinion?

3      A     No, but I'm sitting right next to him, and it's

4   the job of the technician to be able to make sure that his

5   equipment is working properly.

6      Q     Ms. Sipress, when you asked my client did you,

7   open quotes, did you see the person you cut with the knife

8   close quotes, at that moment had you seen any police reports

9   which said Mr. Rivera said he stabbed somebody or cut

10  somebody?

11     A     Can I have a moment to read this?

12     Q     Sure.

13     A     I would have to say yes.

14     Q     And it's in Exhibit 10?

15     A     His written statement.

16     Q     The handwritten report?

17           THE COURT:   That's been marked as Exhibit 10.

18           THE WITNESS:   Yes.

19     Q     Somewhere in there it says he cut somebody, is

20  that your conclusion?

21     A     Well, he said he had a knife and used it in self

22  defense swinging it at the crowd.

23     Q     Right.   That's it?

24     A     Pretty much.

25     Q     There came a time when you asked him what he did

SW

SIPRESS - CROSS/DRANOVE

1   with the knife, am I right?

2       A     Yes.

3       Q     Now, the time that you questioned my client you

4   knew that Mr. Ojeda was dead, clearly?

5       A     Yes, I did.

6       Q     And you do basically what they call assigning

7   homicides?

8       A     My job description.

9       Q     How many years experience do you have as an

10  assistant district attorney in February of 2005?

11      A     About six.

12      Q     When you questioned my client, you understood the

13  victim had been stabbed, am I right?

14      A     Yes.

15      Q     Did you have any interest in this investigation in

16  pursuing the location of the knife --

17            MS. CHU:  Objection.

18      Q     -- that was allegedly swung by my client?

19            THE COURT:  Sustained.

20      Q     Were you prevented from asking my client where he

21  threw the knife?

22      A     No, I was not.

23      Q     Did you have any interest professionally at that

24  time in asking my client where he threw the knife?

25            MS. CHU:  Objection.

451

COLLOQUY

1        THE COURT:  Sustained.

2    Q    At what time did you interview Julio Rivera?

3    A    I'm -- I don't recall, but I know it was sometime

4 after the videotaped statements.

5    Q    Where did you find Mr. Julio Rivera when you

6 interviewed him?

7    A    At the precinct.

8        MR. DRANOVE:  No further questions.

9        THE COURT:  Any redirect Ms. Chu?

10        MS. CHU:  No, your Honor.

11        THE COURT:  Thank you Ms. Sipress.  You're

12    excused.  You may step down from the witness stand.

13        (At this time, the witness exited the

14    courtroom.)

15        THE COURT:  You may proceed, Ms. Chu.

16        MS. CHU:  At this time, your Honor, I would

17    offer into evidence a certified copy of the Lutheran

18    Medical Center records of Mr. Ojeda as People's Number

19    13, and then may I approach?

20        THE COURT:  Any objection to the exhibit?

21        MR. DRANOVE:  No.

22        THE COURT:  It will be received in evidence

23    as People's 13.

24        Excuse us for one moment.

25        (At this time, there was a sidebar held off

SW

COLLOQUY

1  the record.)

2          THE COURT:  Okay, you may proceed Ms. Chu.

3          MS. CHU:  At this time, I'm going to read a

4  sworn statement of the defendant at a prior proceeding

5  from June of 2006.

6          "QUESTION:  What were you wearing?

7          "ANSWER:  Camouflage jacket, jeans, boots,

8  hoodie, hat.

9          "QUESTION:  Were you asked to remove your hat

10  at some time?

11          "ANSWER:  Yes, a few times, a couple of

12  times.

13          "QUESTION:  Had you removed it?

14          "ANSWER:  Yes.

15          "QUESTION:  As the witness testified,

16  correct?

17          "ANSWER:  Yes.

18          "QUESTION:  Did you remove the hat?

19          "ANSWER:  Yes.

20          "QUESTION:  Do you recall if you were wearing

21  it at the time the bouncers got into the brawl?

22          "ANSWER:  I don't remember.  I kept putting

23  it back on.  I didn't want to hold it in my hands.  I

24  kept forgetting.  I put it back on.  That is why he

25  keeps telling me a few times.  Last time I said don't

SW

453

COLLOQUY

1    worry about it.  I'm leaving anyway.

2           "Direct examination you said that night you

3    were wearing a army jacket, army hat, and hoodie?

4           "ANSWER:  Yes, ma'am.

5           "QUESTION:  With some jeans?

6           "ANSWER:  Yes, ma'am.

7           "QUESTION:  These clothes that are in

8    evidence, this is a hooded sweatshirt.  Is this yours?

9           "ANSWER: Yes, ma'am.

10           "QUESTION:  This is what the detective had

11    testified what was found at your mom's house, right?

12           "ANSWER:  Yes, ma'am.

13           "QUESTION:  This is the jacket that you were

14    wearing that night?

15           "ANSWER:  Yes, ma'am.

16           "QUESTION:  Isn't that correct?

17           "ANSWER:  Yes, ma'am.

18           "And this also was found in your home --

19    well, at your mom's house as you said?

20           "ANSWER:  Yes, ma'am.

21           "QUESTION:  And this hat here was the hat you

22    were wearing that night, isn't that correct?

23           "ANSWER: Yes, ma'am.

24           "QUESTION:  But yet and still, the hat that

25    is in evidence under People's Number 12, is the hat

COLLOQUY

1    that belongs to you, right?

2            "ANSWER:  Yes.

3            "QUESTION:  That hat has Mr. Ojeda's blood on

4    it, doesn't it?

5            "ANSWER:  Yes."

6            At this time, your Honor, the People rest.

7            THE COURT:  Okay, ladies and gentlemen, the

8    prosecution has rested its case.  I'm going to give the

9    defense a chance to decide now if they wish to present

10   a case.  I'm going to give them until tomorrow morning

11   to do that and make up to you the delay this morning by

12   giving you the afternoon off, if that's okay with you.

13   We're going to resume tomorrow.  I'm going to do some

14   business, we'll start at 10:30.  Hopefully we can get

15   started on time.  Hopefully I hope to wrap up.  You're

16   going to get the case on Wednesday for your

17   determination.

18           Don't discuss the case, have a nice

19   afternoon.  Thank you again for your patience today.

20   10:30 tomorrow.

21           (At this time, the jury exited the

22   courtroom.)

23           THE COURT:  Do you wish to make a motion at

24   the close of the People's case Mr. Dranove?

25           MR. DRANOVE:  Yes, to dismiss on the grounds

SW

COLLOQUY

1      they failed to make out a prima facie case.

2              THE COURT:  Motion is denied.  We'll put the

3      case over until tomorrow morning for any defense case,

4      and I've asked Mr. Dranove to contact Ms. Chu as a

5      courtesy by the end of the day to let her know what the

6      prognosis is for a defense case.

7              MR. DRANOVE:  Judge, as a request, a personal

8      favor, could we say anything but prognosis?

9              THE COURT:  I'm sorry.  I'm sorry.

10             MR. DRANOVE:  Predict.

11             THE COURT:  Okay, what the intention of the

12     defense is for tomorrow morning so that -- she needs to

13     know whether to prepare a summation or not.

14             MR. DRANOVE:  Sure.  Well, I think she will

15     be preparing a summation.

16             THE COURT:  All right, we're in recess, and I

17     apologize.

18             MS. CHU:  I just -- I did when we were

19     putting the video, when we were actually playing it for

20     the jurors, I did notice that Mr. Julio was in the

21     courtroom.  I don't know how long he had been in here,

22     and then I saw him leave.  I guess like towards the --

23     I don't know, sometime after the video started and when

24     the defendant started talking on the video, and then he

25     left and then I did not see him come back in I guess

SW

456

COLLOQUY

1  until right before Ms. Sipress was asked questions.

2  And I know he's a witness. I just want to note that

3  for the Court. He's not really supposed to be in here

4  when other people are testifying, so.

5  MR. DRANOVE: I did not know he had returned.

6  And when the witness finished, I didn't see -- when Ms.

7  Sipress finished, I did not see him.

8  THE COURT: I cannot say anything other than

9  if he's called as a witness, you're free to question

10  him as to when he may have been in the courtroom. It's

11  a fair question to ask. Even if he saw part of the

12  defendant's statement, I don't think that would

13  prejudice his ability to testify about things that

14  occurred that affected him in this case. So I do not

15  see it as a real problem right now.

16  All right, we're in recess until tomorrow

17  morning, 10:30.

18  (At this time, the matter was adjourned to

19  May 12, Part 35, 10:30 a.m.)

20

21

22

23

24

25

SW

457

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF KINGS:  CRIMINAL TERM: PT 35
 2   -------------------------------------x

 3   THE PEOPLE OF THE STATE OF NEW YORK
                                        IND.#1453/05
 4
               - against -                Murder 2
 5
     ENRIQUE RIVERA,
 6                                        Trial
                             Defendant.
 7
     -------------------------------------x
 8                   320 Jay Street
                     Brooklyn, New York
 9

10                   May 12, 2009

11

12   B E F O R E :  HONORABLE ALAN MARRUS, presiding

13

14   A P P E A R A N C E S :  (Same as previously noted)

15                        MICHELE J. WALKER,
                           SANDRA WILKES,
16                   OFFICIAL SENIOR COURT REPORTERS

17   - - - - - - - - - - - - - - - - - - - - - - - - -

18          COURT OFFICER:  Your Honor, ready for the

19      jurors?

20          THE COURT:  Yes, we are.

21          COURT OFFICER:  Jury entering.

22          COURT CLERK:  Both sides waive the roll

23      call?

24          MS. CHU:  So waived.

25          MR. DRANOVE:  Yes.
```

J. Rivera - Direct/Dranove

458

1          THE COURT:  Good morning, ladies and

2     gentlemen.  Did you have pleasant afternoon

3     yesterday?

4          Now, as we left off, as you recall, the

5     prosecution rested its case yesterday.  And I

6     put the case over today for any defense case.

7          You may proceed, Mr. Dranove.

8          MR. DRANOVE:  Thank you, Judge.

9          I'd like to call Mr. Julio Rivera to the

10     witness stand.  Should be out in the hall.

11          J U L I O   R I V E R A, having been called as a

12     witness, having been duly sworn, testified as

13     follows:

14          COURT CLERK:  State your name?

15          THE WITNESS:  Julio Rivera.

16          COURT CLERK:  What county do you live?

17          THE WITNESS:  Bronx.

18          THE COURT:  You may examine the witness,

19     Mr. Dranove.

20     DIRECT EXAMINATION

21     BY MR. DRANOVE:

22          Q    Good morning.

23          A    Good morning.

24          Q    Do you know Enrique Rivera?

25          A    Yes.

J. Rivera - Direct/Dranove

459

| 1 | Q | Is he your brother? |
| 2 | A | Yes. |
| 3 | Q | Do you have any other brothers? |
| 4 | A | Yes. |
| 5 | Q | How many? |
| 6 | A | Three more. |
| 7 | Q | One of them Angel Rivera? |
| 8 | A | Yeah. |
| 9 | Q | How old are you? |
| 10 | A | I'm 37. |
| 11 | Q | Have you ever been convicted of a crime? |
| 12 | A | No. |
| 13 | Q | Are you currently employed? |
| 14 | A | No. |
| 15 | Q | When were you last employed? |
| 16 | A | January, 2008. |
| 17 | Q | For how many years were you hired by that |
| 18 | | employer? |
| 19 | A | Seventeen. |
| 20 | Q | Were you laid off? |
| 21 | A | Yes. |
| 22 | Q | I want to direct your attention back to |

23    Saturday night, February 26, I believe.  2005.  Was
24    there sometime when you met your brother, Enrique,
25    that evening or night?

J. Rivera - Direct/Dranove

460

1      A      Yes.

2      Q      Where did you meet him?

3      A      I met him at the barbershop.

4      Q      What barbershop are you talking about?

5      A      Thirteen -- 13 Street and Fifth Avenue.

6      Q      What is the name of it?

7      A      Diamond Cuts.

8      Q      What is Mr. Enrique Rivera's relationship

9  to the --

10      A      He's co-owner with my brother, Angel.

11      Q      What time did you meet Mr. Rivera at the

12  barbershop?

13      A      About ten o'clock.

14      Q      Was there a purpose to going to the

15  barbershop that evening?

16      A      Yes.

17      Q      What was it?

18      A      Watch a fight.  A recording fight.

19  Boxing.

20      Q      On TV?

21      A      Yes.

22      Q      Did there come a time when you watched

23  that fight?

24      A      Yes.

25      Q      Was Mr. Enrique Rivera with you at the

J. Rivera - Direct/Dranove                    461

1    time?

2         A    He was there.

3         Q    Did it come sometime when you left the

4    barbershop that night?

5         A    Yes.  Yes.

6         Q    Was that by agreement with Mr. Enrique

7    Rivera?

8              MS. CHU:  Objection.

9              THE COURT:  Overruled.

10             You may answer.

11        A    No.

12        Q    Tell me what happened?

13        A    I had got phone call from my cousin,

14   Jahaira.  She wanted to be -- she was going to be at

15   a bar at Third Avenue, and she wanted to speak to

16   Enrique.

17        Q    Did you hand the phone to Enrique?

18        A    Yes.

19        Q    Did he talk?

20        A    Yeah.

21        Q    Did he hand the phone back to you?

22        A    Ah huh.

23             THE COURT:  Please, yes or no.

24             THE WITNESS:  Yes.

25        Q    Sometime did you leave Diamond Cuts?

J. Rivera - Direct/Dranove

462

1          A     Yes, we did.

2          Q     Did you leave at about the time as Mr.

3     Enrique Rivera?

4          A     About the sometime.

5          Q     Where did you go?

6          A     I went to 39 Street and Third Avenue.

7          Q     How did you get there?

8          A     I drove my own car.

9          Q     Did you see your brother, Enrique -- I am

10    going to withdraw that question.

11               Did Enrique Rivera enter your car?

12         A     No.

13         Q     Did you see how he arrived at Third Avenue

14    and --

15         A     No.

16         Q     Did you meet him at Third Avenue?

17         A     Yes.

18         Q     Where did you meet him?

19         A     I met him 39 and Third Avenue in front of

20    the bar.

21         Q     You met him, you remember the name of the

22    bar?

23         A     No.

24         Q     Do you recall what happened when you met

25    him at the bar?

J. Rivera - Direct/Dranove                463

1       A    In front of bar, yes.

2       Q    What happened?

3       A    I met him, Little Julio and JP.

4       Q    Little Julio and JP?

5       A    Correct.

6       Q    Then what happened?

7       A    So we proceded to go inside the bar.  I

8    was the last one in line.  There was searching us --

9       Q    Did you see anybody searched?

10      A    Yes.  Security guard.

11      Q    Did you see your brother searched?

12      A    Yes.

13      Q    What did you -- tell the jury what the

14   search consisted of?

15      A    Okay.  We had put our hands out --

16      Q    Your brother Julio -- your brother,

17   Enrique.  Did you see him searched?

18      A    Yes.

19      Q    Why is that?

20           MS. CHU:  Objection.

21      A    I was last one on the line.

22           THE COURT:  Overruled.

23      Q    What did you see done to your brother,

24   Enrique, during the search?

25      A    He put his hands out.  Straight out.

J. Rivera - Direct/Dranove

464

1    (Indicating)

2        Q    In front of him?

3        A    In front of him.  Excuse me.  Checked his

4    arms.  Open up his jacket.  Checked inside his

5    waistband.  Put around waistband -- (Indicating)

6        Q    Stand up, please, start again?

7        A    They checked -- they checked down his

8    waistband.  Checked his pants, all the way down.

9    Down to his ankles.  Checked inside jacket.  Wrist,

10   and patted the back. (Indicating)

11       Q    What about his pants?

12       A    Checked inside the back pocket, he had to

13   go underneath, inside and just check.  They were

14   actually just holding on to see what -- any

15   materials, whatever.  That's it. (Indicating)

16       Q    Now, were you searched?

17       A    Yes.

18       Q    Describe the search that was conducted on

19   you?

20       A    Same thing.

21       Q    Describe it again?  Stand up and show us

22   the search?

23       A    Put his hands out.  They checked.  My

24   jacket.  Went inside my jacket.  They -- waistband.

25   They patted me down.  All the way down to my ankles.

1    Came back up and checked my pockets.  My back

2    pockets, then we went in. (Indicating)

3        Q    What about your front pockets?

4        A    Yeah, front pockets, back pockets.

5        Q    What about jacket?

6        A    Jacket -- my jacket.  They checked my

7    jacket.  Patted me down.  My wrist.  Everything.

8    All way down to my ankles. (Indicating)

9        Q    Do you recall what you were wearing?

10       A    Yes.  I had a gray jacket.  A football

11   jacket.  Like championship jacket.

12       Q    What else?  Were you wearing anything

13   under the jacket?

14       A    Red shirt and jeans.

15       Q    Dress shirt?

16       A    Red shirt.  A red shirt.

17       Q    What JP, do you recall what he was

18   wearing?

19       A    No.

20       Q    Do you recall what Little Julio was

21   wearing?

22       A    He had jeans.  He had camouflage jacket

23   and a solid hat camouflage.

24       Q    Solid camouflage hat?

25       A    Yes.

J. Rivera - Direct/Dranove

466

1    Q    Do you recall what your brother was

2  wearing?

3    A    Yes.

4    Q    What was he wearing?

5    A    He had a camouflage jacket and a hat.

6    Q    Do you remember if he was wearing a

7  sweatshirt?

8    A    Could have been a hoodie.

9    Q    Could have been or certain or not certain?

10    A    Not certain.

11    Q    Do you recall if Little Julio was wearing

12  an hoodie?

13    A    Yes.

14    Q    Was he wearing a --

15    A    Yes, a black hoodie.

16    Q    When you entered the bar, what took place?

17  Just tell us what happened?

18    A    Okay, we walked in.  We met Jahaira and

19  her boyfriend in front of the bar.  We walked in.

20  She had ordered her drinks.  So we proceeded inside.

21  We ordered our drinks.  As we got our glass, we went

22  towards the back -- of the bar.

23    Q    Who is the we?

24    A    Me, JP, Little Julio and Enrique.

25    Q    Then what happened?

J. Rivera - Direct/Dranove

467

1    A    We went to the back and started drinking.

2    And dancing.  And, you know, listening to music.

3        Q    Was there music playing?

4        A    Yes.

5        Q    Can you describe how loud the music was?

6        A    Loud.  We had talk to each other, you had

7    to yell a little bit.

8        Q    Please, continue telling us what happened?

9        A    Okay.  After we had the first drink,

10   Little Julio had to go and get another drink.  Next

11   round it was his round to pay.  So I went with him.

12   We brought the round.  We continued dancing.  Just

13   drinking.  Then I went and bought the -- the next

14   round.  Did the same.  Then Enrique had went, bought

15   the next round and Little Julio went with him.  He

16   was at the bar when I last looked, and I was talking

17   to JP.  Pointing out Jahaira because she was making

18   fun of her boyfriend.  We just started, you know,

19   having a good time.  The second, I just looked back,

20   I was looking for my drink pause I was done with

21   mines.  So I look to see where Enrique was at.  So

22   when I look, he was being surrounded, there is three

23   guys in front of him, and there are two guys.  I

24   don't know if they were part of the group, they

25   standing in front of the bar, I don't know.

J. Rivera - Direct/Dranove

468

1    Q    What about those two guys?

2    A    I don't know if they was standing either

3    behind him.  I know they were behind him, just don't

4    know if they were at the bar or with the guys.

5    Q    Where was Little Julio?

6    A    Right next to Enrique.

7    Q    What did you observe?

8    A    All right.  So I see -- when I -- I

9    looked, and he was surrounded by -- there was -- I

10   didn't think nothing of it, but then when I seen the

11   hand gestures just pointing fingers and I tapped JP

12   and I told -- I pointed out over there towards them.

13   I proceeded towards them, and I just got in the

14   middle.  I pushed Enrique back.  All right.  Then I

15   gave -- push around towards the guys, and I told

16   them what the F wrong with you guys?  Then I turned

17   back, and I told Enrique the same.  And as soon as I

18   turned back, I got punched in the face.

19   Q    Did you see who punched you?

20   A    Yes.

21   Q    Can you describe him?

22   A    He was dark and skinny and tall.

23   Q    Had you seen him before that night?

24   A    No.  As soon as he punched me, that is

25   when all the punches started going off.  I punched

J. Rivera - Direct/Dranove

469

1    back.  There was punches thrown over my back.  Then

2    it just kept -- everybody just punching and somebody

3    grabbed me hard.  I was ready to swing back, I look

4    back, it was JP.  JP grabbed me, trying to get my

5    out bar.

6        Q    When you look back, where was your

7    brother?

8        A    When I look when JP grabbed me, then I

9    said, I'm not leaving my brother.  When I look, my

10    brother was almost out of the door.

11        Q    Excuse me?

12        A    He was almost out of the door with one of

13    the bouncers.

14        Q    Please continue?

15        A    Then I just proceeded out the door with

16    JP.  Then I said I have to go back in.

17        MS. CHU:  Objection, your Honor.  He is --

18        THE COURT:  Let him finish.

19        Your answer?

20        MR. DRANOVE:  I apologize.

21        THE COURT:  Finish your answer.

22        A    I told JP I had to go back in, I had my

23    jacket, my car keys, my car in front of the shop --

24    the bar.  And then they closed the door.  So I got

25    in JP car, went around the corner.  The cops stopped

J. Rivera - Direct/Dranove

470

1      us, and he asked us some questions, then he let us

2      go.  I said --

3                  MR. DRANOVE:  I'd like to interrupt, with

4            The Court's permission?

5                  THE COURT:  Go ahead.

6      Q      You said someone swung over your shoulder?

7      A      Yes.

8      Q      How many times did that happen?

9      A      One time.

10     Q      Did you recall what that clothing on that

11     arm --

12     A      Yes.

13     Q      Color of it?

14     A      It was dark.  Dark jacket.

15     Q      Or just dark?

16     A      It was a dark jacket.

17     Q      Was a camouflage jacket?

18     A      Could have been.  I am not sure.

19     Q      How many times did that --

20     A      One time.

21     Q      Only once?

22     A      One time.

23     Q      Did you see a knife?

24     A      No.

25     Q      Were you at all, or your clothing, cut at

J. Rivera - Direct/Dranove

471

1    all?

2       A    No.

3       Q    Now, in -- before we continue through the

4    night, was there anybody in that bar who you

5    observed who was wearing white?

6       A    The guy on the left-hand side.

7       Q    Guy left-hand side of --

8       A    Of me.

9       Q    On your left side?

10      A    There's three guys.  The dark skin, tall

11   dude was in the middle.  There is a guy next to him.

12      Q    Was wearing white?

13      A    Wearing white.

14      Q    Beg your pardon?

15      A    Huh?

16      Q    Wearing white?

17      A    Yes.

18      Q    Can you tell us if it was -- what item of

19   clothing he was wearing that was white?

20      A    Looked like a sweatshirt or something.

21      Q    Had you ever seen him before that night?

22      A    No.

23      Q    When you left the bar, did you hear any

24   sounds coming from inside the bar?

25      A    As I am leaving the bar, there was a chair

J. Rivera - Direct/Dranove

472

1    thrown, almost hit me.

2        Q    Were you still in the bar at that time?

3        A    Yeah.  Heading out the door.  There is a

4    chair.  There was bottles rolling towards the bar.

5    Didn't break, I didn't see it.  You know, I seen it

6    rolling.  I just went out.

7        Q    Did you hear any sounds --

8        A    There was still music playing.

9        Q    Did you hear any words spoken?

10       A    They were cursing.

11       Q    What did you hear?  What words did you

12   hear?

13       A    "Motherfucker."  Those words.

14       Q    Now, music was still playing?

15       A    Yes.

16       Q    When you got outside the bar, did you see

17   your brother Enrique?

18       A    No.

19       Q    Did you see him at all that -- withdrawn.

20            About what time is it that you recall you

21   got to the bar?

22       A    It was about 11:30.  Twelve o'clock, I

23   believe.

24       Q    And do you have -- if you're not certain,

25   tell us you're not certain.

J. Rivera - Direct/Dranove

473

1          A    No, it was about after the boxing.

2     Usually like about 11:30.  We got there about that

3     time.  Quarter to, twelve o'clock.

4          Q    And about what time did you recall it was

5     that you left the bar?

6          A    He was there for about an hour.  Maybe one

7     o'clock.

8          Q    Did you see your brother that Sunday?

9          A    Yes, I did.

10         Q    Where did you see him?

11         A    I met him on Nelson Street.

12         Q    That's in Brooklyn?

13         A    Yes.

14         Q    Why Nelson Street?

15         A    Because I called him, and I asked him

16    where he was.  And I was headed that way.

17         Q    Do he have a residence in Brooklyn?

18         A    Hum, my mom, I believe.

19         Q    What about Nelson Street?

20         A    Nelson, that is where my other brother

21    lives.

22         Q    Which brother?

23         A    At that time.  Angel.

24         Q    You had a conversation at that time?

25         A    Yes, we did.

J. Rivera - Direct/Dranove

474

1    Q    How did he appear to you at that time?

2    A    He was fine.

3    Q    What did you talk about?

4    A    We talked about what happened in the bar.

5    I asked him what caused the fight?  What happened?

6    And he was just telling me.

7    Q    What did he tell you?

8    A    Just telling me these guys just kept on --

9         MS. CHU:  Objection.

10        THE COURT:  Sustained.

11   Q    What was he --  strike that.

12        How long were you talking with your

13   brother?

14   A    Just five minutes.

15   Q    Then what did you do?

16        MS. CHU:  I am sorry, didn't hear that

17   last --

18        THE COURT:  Then what did you do.

19        MR. DRANOVE:  "Just five minutes."

20   Q    Then what did you do?

21   A    I went home.

22   Q    Did your brother, Enrique, go to your

23   home?

24   A    No.

25   Q    When's the next time -- did you meet all

J. Rivera - Direct/Dranove 475

1    again on that Sunday?

2         A    No.

3         Q    That night, Sunday night into Monday

4    morning, did there come a time when you had some

5    encounter with law enforcement?

6         A    Yes.

7         Q    Where were you when that started?

8         A    I was home sleeping.

9         Q    And what happened?

10        A    They knocked on the door.  Detectives.  I

11   let them in.

12        Q    Did you see any of those detectives who

13   came to your door that night here in court

14   yesterday?

15        A    Yes.

16        Q    A Detective Darino?

17        A    Yes.

18        Q    Did you learn the identity of the other

19   detectives who came to your apartment?

20        A    Yes.

21        Q    What's the name?

22        A    Rivera.

23        Q    Did you see them do anything in your

24   apartment?

25        A    Yes, they asked me what I was wearing, and

J. Rivera - Direct/Dranove

476

1    I described what I was wearing.  I told them it was

2    in the hamper.  And I said I'll go get it if you

3    want.  They said, no, we'll go.  They went to the

4    hamper, searched my clothes, what he had.

5         Q    Then what happened?

6         A    They put on the table, they checked the

7    clothes that I had on.  The jacket.

8         Q    Go ahead.

9         A    The jacket, and they left it on the table.

10        Q    How did you get your jacket back from

11   inside the bar?

12        A    Jahaira -- I had called Jahaira, she was

13   still at the bar.  And I called her cause my key was

14   there, my truck was still in front of the place.

15        Q    About how many minutes had passed since

16   you left the bar before you called Jahaira?

17        A    Right after I got into the JP's car, I

18   started calling Jahaira.  Maybe few minutes -- three

19   or four minutes.

20        Q    Did you talk to Jahaira?

21        A    Yes.

22        Q    Did you hear any sounds in the background.

23        A    Yes.  Music.

24        Q    Did there come a time when Jahaira brought

25   your jacket to you?

477

1     A   Yes.

2     Q   Now, back in your apartment, did there

3  come a time when you left the apartment with the

4  detectives?

5     A   Yes.

6     Q   Did they handcuff you?

7     A   Yes.

8     Q   Did they tell you you were under arrest?

9     A   No.

10    Q   Did they tell you why they were

11 handcuffing you?

12    A   No.

13    Q   Where did they take you?

14    A   They took me to the precinct.

15    Q   Approximately what time, do you remember,

16 it was when you were taken to the precinct?

17    A   About 11:30.

18    Q   On Saturday night?

19    A   Sunday.  It was Sunday night.

20    Q   Sunday night.  Okay.

21         Did they do anything to the clothing you

22 were --

23    A   No, they just left it there.

24    Q   Beg your pardon?

25    A   They just left it there.

1    Q    Did they take clothing from your

2    apartment?

3         A    No.

4              MS. CHU:  Objection.

5              THE COURT:  Overruled.

6         Q    When you say they just left it there, what

7    do you mean by that?

8         A    They just left -- spread it on the table.

9    They looked at it and just left it where it was.

10        Q    In the precinct?

11        A    No.  In my house.

12        Q    Let's move forward to the precinct.

13        A    Ah-huh.

14        Q    When you were in the precinct.  Did they

15   take any clothing from you?

16        A    No.

17             Oh, yes, they took off my shoe laces.

18   Just my shoe laces and my phone.

19        Q    What about your belt?

20        A    Yeah, the belt.

21        Q    They took your belt and shoe laces and

22   your phone?

23        A    Ah-huh.

24        Q    Were you in a room at the time they did

25   this?

J. Rivera - Direct/Dranove

479

1    A    Yes.

2    Q    Approximately, what time did that take

3    place?

4    A    About part -- after midnight, probably.

5    Q    After -- had you been in the precinct for

6    how long before they took your shoe laces and belt?

7    A    As soon as I got there.

8    Q    Now, did there come a time when any law

9    enforcement people interviewed you?

10   A    Yes.

11   Q    Approximately, what time did -- well, how

12   many times were you --

13   A    Twice.

14   Q    With respect to the first interview, about

15   what time did that take place?

16   A    12:30.  One o'clock in the morning.

17   Q    Was it in a room?

18   A    Yes.

19   Q    Can you describe the room?

20   A    Yes.  I had -- I believe -- it was a glass

21   window there.  Large table.  Small.

22   Q    Small room?

23   A    Ah-huh.

24   Q    Who was in the room with you when you were

25   interviewed?

J. Rivera - Direct/Dranove

480

1      A    Two detectives.

2      Q    Do you remember their names?

3      A    Darino and Rivera.

4      Q    Did they discuss with you what you would

5    be charged with the murder?

6           MS. CHU:  Objection.

7           THE COURT:  Overruled.

8           You may answer.

9      A    Yes.

10     Q    Who told you you could be charged with the

11   murder?

12     A    Rivera.

13     Q    What did he tell you?

14     A    He told me he's looking for my brother,

15   Enrique.  I told him, I don't know where he's at.

16   And he told me that if I don't find him -- help them

17   find him, I could be charged with the murder.

18     Q    Was Detective Darino in the room at the

19   time?

20     A    Yes.

21     Q    Were you asked by Detective Rivera or

22   Detective Darino what you saw take place in the bar?

23     A    Yes.

24     Q    Did you tell them?

25     A    Yes.

481

1    Q    Did they have a recording machine in the

2    room with you?

3    A    That was the second time they asked --

4    they took me back to the other room and they brought

5    me back.

6    Q    In first interview, just with two

7    detectives?

8    A    Yes.

9    Q    At one, 1:30, whatever hour, did a tape

10   recorded --

11   A    No.

12   Q    That you were aware?

13   A    No.

14   Q    Did they ask you anything about whether

15   there was a weapon that you observed during this

16   incident?

17   A    No.

18        MS. CHU:  Objection, leading.

19        THE COURT:  Sustained.  Answer stricken.

20        You have to ask him a more general

21   question.

22   Q    What did they ask you about?

23   A    They asked me about the -- what happened?

24   First they asked me do I know -- showed me I.D.,

25   asked me do you know this person?

J. Rivera - Direct/Dranove

482

1    Q    What type of I.D. were you shown?

2    A    A driver's license.

3    Q    Did it have a photo on it?

4    A    Yes.

5    Q    Do you recall any name on that driver's

6    license?

7    A    No.

8    Q    Did you respond to the questions as to

9    whether you recognize the person?

10   A    Yes.

11   Q    What did you say?

12   A    I said, I don't know him.

13   Q    What else were you asked?

14   A    Excuse me?

15   Q    What else were you asked?

16   A    They asked me what happened, and I told

17   them what happened.  And they stopped and they just

18   said they asked me, can we locate your brother?  And

19   I told him, I don't know where he's at.  I need my

20   phone, I can try -- call him on his phone.

21   Q    What happened then?

22   A    They told me no.  I couldn't use my phone.

23   Q    How long was it that they interviewed you

24   at that time?

25   A    About how long?

483

1    Q    Yes.

2    A    Maybe ten, 15 minutes.

3    Q    When the interview was finished, what did

4    they tell you?

5    A    They didn't say anything.  They just put

6    me in another room.

7         MS. CHU:  I am sorry, didn't hear --

8         THE COURT:  "They didn't say anything,

9         they just put me in another room."

10   Q    For how long were you in that room before

11   you had another encounter with the police?

12   A    I was there for a while.

13   Q    Do you recall -- is there anything that

14   happened that you can recall that would help you

15   identify what time it was you had your next dealings

16   with the police?

17   A    That was when I had looked at the clock,

18   there was a clock there.  Outside the office.  I had

19   to go to work at seven, so I asked him could I use

20   the phone to call my job and let them know that I am

21   not coming in since I am stuck here.

22   Q    What time was?

23   A    That was about six o'clock in the morning.

24   Q    And what was the response when you asked

25   six in the morning?

1        A     They said, yes.

2        Q     What did --

3        A     I called -- instead of calling my job, I

4    called my wife.

5        Q     Did you ask them if you could leave the

6    precinct?

7        A     No.

8        Q     Why not?

9        A     They told me I ain't leaving until they

10   catch Enrique.

11            MS. CHU:  I am sorry --

12            THE WITNESS:  They said they -- they are

13        not going to release me until they catch

14        Enrique.

15       Q     How many times did Detective Rivera tell

16   you they're going to charge you with the murder if

17   you don't give up your brother?

18       A     About three times.

19       Q     Was Detective Darino present for more than

20   one of those times?

21       A     Every time.

22       Q     Now, did there come another time when you

23   were interviewed in the precinct?

24       A     Yes.

25       Q     Was there a lady present?

J. Rivera - Direct/Dranove

485

1        A     Yes.

2        Q     Did she have a tape recording device with

3   her?

4        A     Yes.

5        Q     Was Detective Darino with Detective

6   Rivera?

7        A     Yes.

8        Q     Was anyone else in that room beside those

9   three and you?

10       A     That's it.

11       Q     Did you observe anybody operate that tape

12   recorder?

13       A     Yes.

14       Q     Who operated it?

15       A     There was a lady there.

16       Q     Did you observe her push a button and

17   start it?

18       A     Yes.

19       Q     And she asked you --

20       A     Yes.

21       Q     Did there come a time when she pushed the

22   button and stopped it?

23       A     Yes.

24       Q     Were you questioned at all after she

25   pushed the button to stop the recorder?

J. Rivera - Direct/Dranove

486

1  A Yes.

2  Q Who questioned you after the recorder was

3 turned off?

4  A It was Rivera.  Detective Rivera.  And

5 herself.

6  Q When they finished questioning you, was

7 the recorder turned back on?

8  A Yes.

9  Q By whom?

10  A By the lady.

11  Q What did Detective Rivera asked you after

12 the lady turned off the recorder?

13  A Was it a camouflage jacket?  That punched

14 me when letting them know someone threw a punch over

15 my shoulders.

16  Q And what was your response?

17  A I said, it could have been.  It was dark.

18 It was dark jacket.  He kept on asking me could have

19 been.

20  Q Who was asking you could have?

21  A Rivera.

22  Q How many times did you say, could have

23 been?

24  A About four or five times.

25  Q And what was your response?

J. Rivera - Direct/Dranove

487

1     A     I said, could have been, could have been.

2     Q     Did you describe the color besides saying

3  it was a dark --

4     A     Yeah.  Then I just said jacket could have

5  been camouflage.  Green.  Black.

6     Q     His response consistently could have

7  been --

8           MS. CHU:  Objection.

9           THE COURT:  Sustained.

10    Q     What time were you released?

11    A     About 11:30.  Twelve o'clock.  Noon.

12    Q     Was your belt returned to you at that

13 time?

14    A     Yes.

15    Q     Shoe laces?

16    A     Yes.

17    Q     And your phone?

18    A     Yes.

19          MR. DRANOVE:  Thank you.  I have no

20       further questions.

21          THE COURT:  Cross-examination, Miss Chu?

22          MS. CHU:  Thank you.

23 CROSS-EXAMINATION

24 BY MS. CHU:

25    Q     Mr. Rivera, you said you had a cousin name

1    Jahaira, right?

2        A    Yes.

3        Q    In fact, she is the one that called you to

4    get you guys to come over to the bar, 39th and

5    Third, right?

6        A    Correct.

7        Q    While you guys were at the bar, you,

8    Jahaira and I think it was her boyfriend, Rudy was

9    there too, right?

10       A    Yes.

11       Q    You guys were in the back?

12       A    Ah-huh.

13       Q    According to your testimony, you said you

14   guys got around four rounds of drinks, at least your

15   brother was getting the fourth round?

16       A    Correct.

17       Q    I believe you guys got a round together?

18       A    Ah-huh.

19       Q    And then who was it that got it next?

20       A    It was JP.

21       Q    JP got it next?

22       A    Little Julio, JP, me.

23       Q    Little Julio, me --

24       A    JP.

25       Q    Then the defendant was the last to get a

J. Rivera - Cross/Chu                                489

1    rounds?

2         A    Yeah.

3         Q    You said you got to your brother's

4    barbershop about ten o'clock that evening, right?

5         A    Yes.

6         Q    How did you get there?

7         A    I drove over there.

8         Q    Were you by yourself or were you with

9    anybody else?

10        A    By myself.

11        Q    Was Little Julio there?

12        A    Yes.

13        Q    What about JP, was he there too?

14        A    Yes.

15        Q    Now, both Little Juilio and JP are shorter

16   than you and your brother; isn't that correct?

17        A    JP about my size.  Little Julio, shorter.

18        Q    JP, about your size?

19        A    Yes.

20        Q    Only one that was wearing a camouflage

21   jacket, in addition to your brother, in your group

22   was Little Julio, correct?

23        A    Yes.

24        Q    Reason why Little Julio -- because, in

25   fact, Little --

J. Rivera - Cross/Chu

490

1     A     Correct.

2     Q     He is littlier than you?  Yes?

3     A     Not too little.

4     Q     He is five-foot five; isn't that correct?

5     A     I'm 5'7".

6     Q     Well, how tall are you?

7     A     5'7"

8     Q     You're 5'7?

9     A     Ah-huh.

10    Q     What about your brother?

11    A     He's about six.

12    Q     He's about six feet?

13    A     Ah-huh.

14          THE COURT:  Please, yes or no?

15          THE WITNESS:  Yes.

16    Q     You wouldn't mistake Little Julio with

17    your brother, he's considerably shorter than him;

18    isn't that correct?

19          He is shorter and wider than your brother;

20    wouldn't that be fair to say?

21    A     Yes.

22    Q     Now, you said when you got to the bar that

23    you were last on line to get searched?

24    A     Yes.

25    Q     Anyone else on line besides the four of

J. Rivera - Cross/Chu

491

1    you?

2        A    Just us four.

3        Q    Wouldn't it be fair to say that the bar

4    wasn't that crowded that night?

5        A    It was already crowded inside.

6        Q    But inside the bar, there weren't that

7    many people; isn't that correct?

8        A    You talking -- 25 people, maybe.  The bar

9    wasn't that big.

10       Q    But it wasn't that crowded; isn't that

11   true?

12       A    There was people there.

13       Q    There was people there, yeah.  But I am

14   asking you.  It wasn't that crowded; isn't that

15   true?

16       A    No.

17       Q    It wasn't that crowded?

18       A    No.

19       Q    Now, when you go inside, say you're last

20   in line to get searched.  And who was that doing the

21   search of the bouncers that were there?

22       A    One of bouncers had braids.  Like two

23   braids.

24       Q    Two braids?

25       A    Yeah.

J. Rivera - Cross/Chu

492

1        Q      How tall was he?

2        A      Maybe -- he was about my size, little

3    thicker.

4        Q      Little thicker than you?

5        A      Yeah.

6        Q      You're saying about your size, you say

7    you're 5'7"?

8        A      Yeah.

9        Q      What about the other one, taller or

10   shorter?

11       A      He was taller.  Bigger.

12       Q      Which one was searching the four of you?

13       A      The bigger guy.

14       Q      The bigger one was searching.

15              Now, there is no metal detectors in front

16   of this bar, right?

17       A      No.

18       Q      Just basically a pat down?

19       A      Yeah.

20       Q      So it's not making you take your pockets

21   inside --

22       A      Yes.

23       Q      They didn't cut open your jacket to see if

24   there was --

25       A      No.

J. Rivera - Cross/Chu

493

1  Q They do a pat down?

2  A They touch, go around like this, he touch

3 bottom, go around waist, go each leg, down to your

4 ankles?

5  A Correct.

6  Q You're not taking an hour on each person,

7 correct?

8  A No.

9  Q They didn't hold you guys up side down see

10 if anything falls out of your pocket, nothing like

11 that?

12  A No.

13  Q You get inside, you guys at the bar,

14 right?

15  A Yes.

16  Q You talked about the fact that when your

17 brother was getting his rounds, this is first round

18 of drinks.  Now what were you guys drinking that

19 night?

20  A Heinkens.

21  Q Heinkens.  You mentioned, I think, getting

22 glasses.  Did they give you glasses to pour Heinkens

23 in?

24  A No.

25  Q They did not?

J. Rivera - Cross/Chu

494

```
 1        A     No.
 2        Q     So what were you talking about when --
 3        A     JP had bought drink for himself.
 4        Q     You got a drink for himself?
 5        A     JP -- for JP and Jahaira.
 6        Q     Bought drinks for themselves?
 7        A     Yes.
 8        Q     Those are the glasses that you were
 9   talking about?
10        A     Yes.
11        Q     Or otherwise --
12        A     Just Heinken.
13        Q     Drinking Heinken -- wait for me to finish
14   so she can take down everything you're saying, all
15   right?
16              You had a Heinken?
17        A     Yes.
18        Q     Did you need glass to pour it --
19        A     No.
20        Q     Drink right out bottle?
21        A     Yes.
22        Q     What was your brother drinking?
23        A     Heinkens.
24        Q     What about Little Julio?
25        A     Heinken.
```

1    Q    He was drinking Heinkens.

2         Only person of the four of you that wasn't

3    drinking Heinken was JP?

4    A    JP had Heinkens as well.

5    Q    Little -- I thought you said JP had a

6    drink?

7    A    He had a drink and Heinken.

8    Q    He had two drinks?

9    A    Ah-huh.

10   Q    You have to answer yes or no.

11   A    Yes.

12   Q    You said that Jahaira got a drink?

13   A    Yes.

14   Q    After you guys all got your first drink, I

15   you guys went to the back?

16   A    Ah-huh.

17   Q    A DJ there?

18   A    Yes.

19   Q    You guys fooling around, drinking, trying

20   to have a good time, would that be fair to say?

21   A    Yes.

22   Q    And you guys were dancing, yes?

23   A    Yes.

24   Q    Was your brother dancing?

25   A    Yes.

1        Q      You were dancing?

2        A      Yes.

3        Q      JP?

4        A      Yes.

5        Q      Little Julio?

6        A      Yes.

7        Q      Jahaira?

8        A      Yes.

9        Q      Now, did Jahaira tell you who she was

10   coming with when she got on the phone with you?

11       A      Yes.

12       Q      Who was suppose to come?

13       A      Well, Rudy, which is her boyfriend.  Her

14   brother might show up and his wife.  And that's it.

15       Q      Weren't there suppose to be other girls

16   coming to the party or coming to the bar?

17       A      No.  I didn't know.

18       Q      There was nothing going on in the bar,

19   wasn't like someone's  birthday, or they wasn't

20   throwing a party at that bar?

21       A      No.

22       Q      So, now, when you get into the bar, how

23   many other people were there when you got there?

24              I'm sorry.  It's four of you.  Gentleman

25   name Rudy, who, Jahaira and Rudy?

J. Rivera - Cross/Chu

497

1      A    There's little brother.  His wife.  And
2   that's it, that I know of.
3      Q    So, it's eight of you?
4      A    Yes.
5      Q    Yes?
6      A    Yes.
7      Q    Anybody else at the bar when you got
8   there?  At the bar area?
9      A    Yeah, there were few people there.  There
10   is only two chairs open.  That's when we went and
11   got the drink.
12      Q    Would it be fair to say, the bigger
13   bouncer was kind of by the bar mostly?
14      A    Yes.
15      Q    Yes?
16      A    Yes.
17      Q    He was there with a woman, right?
18      A    I did not see.
19      Q    Did you see a woman at the bar?
20      A    Yes.
21      Q    In fact, there was a woman bartender as
22   well; isn't that correct?
23      A    Yes.
24      Q    There was a male bartender, right?
25      A    Yes.

J. Rivera - Cross/Chu                          498

1      Q    When you guys went towards the back where
2   the dance floor was, anybody back there?
3      A    Just the DJ and us.
4      Q    Just the DJ and you guys?
5      A    Yes.
6      Q    Did you see anybody -- I am sorry.
7   Withdrawn.
8           You said that when the defendant was
9   getting his round, the fourth round, that you guys
10  were there you saw him surrounded by some people?
11     A    Yes.
12     Q    Had you seen those people when you first
13  got to the bar?
14     A    When we first got to the bar, there was
15  people there.  I didn't look at them.
16     Q    While you were at the inside of this 39
17  Street and Third Avenue bar until the time you got
18  there, until the time you saw your brother getting
19  surrounded, had you ever seen those other people
20  before?
21     A    Yeah, they were inside.
22     Q    They were inside.  Were already inside
23  when guys got there.  Did you see them?  What made
24  you notice them before your brother was surrounded?
25     A    I don't know.  They were there.  I don't

J. Rivera - Cross/Chu

499

1    know when they came in, before or after.  I know

2    there was people there when we came in.

3         Q    And where were you there standing, do you

4    remember --

5         A    They -- few people, the right-hand side by

6    the door.  There was few by the bar, and there is

7    around the bar towards the left by the bathroom.

8         Q    Okay.  How many people were by the

9    right-hand side?

10        A    I couldn't tell you.

11        Q    How -- had you mentioned something about a

12   tall guy, tall, dark skin guy?

13        A    Yes.

14        Q    Do you recall what he was wearing?

15        A    No.

16        Q    Now, had you ever been to this bar before?

17        A    No.

18        Q    You never been there before?

19        A    No.

20        Q    Do you remember what -- you said you

21   didn't remember what the tall, dark skin guy was

22   wearing?

23        A    No.  He had dark clothes, dark colors.

24        Q    He had dark colors on?

25        A    Yeah.

1  Q There was a shorter guy with him, right?

2  A Yes.

3  Q And he was wearing -- he was wearing

4 baseball Jersey, wasn't he?

5  A Don't recall.

6  Q You don't recall.

7   Now, Little Julio, is he Puerto Rican?

8  A Yes.

9  Q He's Puerto Rican, he is fair skin, isn't

10 he?

11  A He's what?

12  Q He's fair skin?

13  A Yes.

14  Q Lighter than you?

15  A Yes.

16  Q He's lighter than your brother?

17  A He is my complexion.

18  Q He is your complexion, or he is lighter

19 than --

20  A He's not lighter than me.  He's my

21 complexion.

22  Q Well, when you saw -- when you saw your

23 brother getting surrounded, you said something that

24 drew your attention to look over there?

25  A Yes.

J. Rivera - Cross/Chu                          501

1      Q    What was that?

2      A    When he went to the bar to get the beers,

3    that drew my attention was my bottle was empty.  So

4    I looked to see where Enrique, and he was grabbing

5    the beers.

6      Q    So he was at the bar?

7      A    Yes.

8           MS. CHU:  If I could just have People's

9      number 6.

10          (pause)

11          MS. CHU:  May I approach the exhibit?

12          THE COURT:  Yes.

13     Q    Mr. Rivera, you see this diagram here?

14     A    Yes.

15     Q    That's the way the bar is kind of set up

16   inside, right?

17     A    Yes.

18     Q    Would the name Amanacer or El Borinquen

19   Bar ring a bell, as far as name?

20     A    The Borinquen Bar.

21     Q    Now, curvy line on the right-hand side of

22   People's number 6; that is where the bar was

23   (indicating)?

24     A    Yes.

25     Q    Where you get the drinks?

J. Rivera - Cross/Chu                    502

1        A    Yes.

2        Q    Dance floor would be back here

3   (indicating)?

4        A    Ah-huh.

5        Q    That is where the bathrooms are

6   (indicating)?

7        A    Right.

8        Q    And then you remember there was a side

9   door when you walk in?

10       A    Yes.

11       Q    Where were those people that you saw

12  surrounding your brother, in relation to where that

13  side door was?

14       A    Right by the sidebar.

15       Q    Right?

16       A    Right in front of side door.

17       Q    Could you just tell us how they were

18  surrounding your brother?  Who was closest to the

19  door, who was closest to the bar?

20            You see door left-hand side, the bar on

21  right-hand side (indicating)?  Who was closer to

22  where?

23       A    He was closer.  See where right in front

24  of door, right in the middle of the -- right here in

25  the middle (indicating).

J. Rivera - Cross/Chu

503

1      THE COURT:  Jurors can't see if you're

2   turning like that.

3   Q    You said right where --

4   A    Right in the middle (indicating).

5   Q    Right here (indicating)?

6   A    Yeah.

7      MR. DRANOVE:  The record doesn't reflect

8   what he is pointing to.

9   Q    I am just --

10   A    Right in the middle of the door

11  (indicting).

12   Q    Right in the middle of the door.  Between

13  jukebox and where that table is?

14   A    Yeah.

15   Q    In that area on the diagram was who?

16   A    That was where my brother was surrounded.

17   Q    That was where your brother was

18  surrounded?

19   A    Right.

20   Q    Who was closest to the door and closest to

21  the other side where the bar is?

22   A    Enrique was close to the door, and the

23  other guys were like close towards the door.

24   Q    So they're closer to the door?

25   A    Correct.  Yes.

J. Rivera - Cross/Chu                    504

1        Q    So, would it be fair to say, that the
2    guy -- the two guys -- I am sorry -- you said how
3    many guys surrounding your brother?
4        A    There was about three in front of him.
5        Q    Three in front of him?
6        A    Correct.
7        Q    In that little area between the chair and
8    the --
9        A    They wasn't in between the chair.  It was
10   middle of the door.  Right in the middle.  They were
11   towards the door.  My brother was towards the bar.
12   But it was right in the middle.
13       Q    Okay.  And how far away were the other
14   people from this door?  Were right up on the door?
15       A    Not upon the door.  Maybe three feet.
16   About three feet, maybe.
17       Q    Three feet away from the door?
18       A    Yeah.
19       Q    And your brother, when say surrounded, I
20   mean one was in front of him, one was on the side
21   and one towards the back?  How was it?
22       A    All three in front.  Just spreaded all
23   three.
24            There was another two that I said they
25   were behind him.  Little Julio and him.  But I don't

 1   know if they were with the group or not.  But they

 2   were facing towards Rique, which was behind him.

 3        Q    So everybody was looking at your brother

 4   in the middle?

 5        A    Yeah.  They were all cursing and

 6   everything.

 7             I am just saying two guys behind, they

 8   were turned around towards the crowd

 9        Q    Isn't it fact that one of the guys that

10   were behind him was Rudy, Jahaira's boyfriend?

11        A    I didn't notice.

12        Q    You didn't notice?

13        A    No.

14        Q    So Rudy was cursing at him?

15        A    It wasn't Rudy.  Cause Rudy was on the

16   dance floor.

17        Q    What they look like then?

18        A    They just -- they were tall.  Dark --

19   everything wearing dark clothes.

20        Q    Everything was tall, wearing dark clothes?

21        A    Tall, wearing dark clothes.

22        Q    What about the guy that was standing next

23   to the tall, dark skin guy near the jukebox or

24   closer to --

25        A    They were two.  One shorter.

J. Rivera - Cross/Chu

506

1    Q    One of them was quite short; isn't that
2  true?
3    A    Yes.
4    Q    Five foot five?
5    A    Yes.
6    Q    Skinny guy?
7    A    Yeah.
8    Q    And I mean there was big difference
9  between him and the taller guy?
10   A    Yes.
11   Q    As far as height is concerned?
12   A    Yes.
13   Q    And those two were the ones standing in
14  front of your brother?
15   A    Yeah.
16        THE COURT:  Let him finish, then ask your
17       question.
18   A    There was another person there.
19   Q    There was another person there?
20   A    Yes.
21   Q    So, basically, like face off, that is what
22  you're describing?
23   A    Yes.
24   Q    Where was Little Julio with respect to
25  your brother?

J. Rivera - Cross/Chu

507

1      A    He was towards Rique's right-hand side.

2      Q    Was Rique's right-hand side?

3      A    Yeah.

4      Q    Him and Rique standing side by side?

5      A    Yeah.  Right next to each other.

6      Q    So then the three guys in front of them

7   would be standing side by side as well?

8      A    Not side by side.  Just like a circle.

9   Three guys in front.  Little Julio here, Enrique

10  here.  (Indicating)

11     Q    So if you were looking at that and not

12  knowing who anybody else, you could think that your

13  brother and Little Julio were surrounding the guys

14  in front of them?  Right?

15     A    No.

16     Q    The way it looked to you was that your

17  brother was being surrounded, that is what you're

18  trying to tell us?

19     A    Yes.

20     Q    So you immediately went over?

21     A    Yes.

22     Q    In fact, you were wearing a gray jacket

23  that night?

24     A    Yes.

25     Q    And you weren't wearing a camouflage

J. Rivera - Cross/Chu

508

1    jacket, were you?

2        A    No.

3            MS. CHU:  If I can have People's number 7

4        in evidence.  The clothing.

5            I will move on to something else until

6        they get it.

7        Q    When you first looked over and you saw

8    them having words, was anybody touching yet?

9        A    No.

10       Q    How long did it take you to get from where

11   you were to over where they were?

12       A    Few seconds.

13       Q    It's not very big bar?

14       A    No.

15       Q    You didn't have to plow through people,

16   anything, just walked right over; isn't that

17   correct?

18       A    Right.

19       Q    When you walked over, you were the only

20   one that was walking over; isn't that fair?

21       A    There was already people there.

22       Q    That's not what I asked you.

23           The only one going over to assist your

24   brother; isn't that true?

25       A    Yes and JP.  I tapped him.

J. Rivera - Cross/Chu

509

1    Q    You tapped JP?

2    A    Yes.

3    Q    Do you remember what JP was wearing that

4    night?

5    A    No.

6    Q    He wasn't wearing camouflage though,

7    right?

8    A    No.

9    Q    In fact, Little Julio was the only one in

10   your group that was wearing the exact same jacket as

11   your brother; isn't that true?

12   A    Yes.

13   Q    Now, you said your brother had a hat on

14   too, correct?

15   A    Yes.

16   Q    In fact, he kept having to take it on and

17   off while he was at the bar?

18   A    Yes.

19   Q    Yes.  Now, tell me what happens when you

20   walk over to where you said three guys are

21   surrounding your brother?

22   A    Yes.

23   Q    What happens?

24   A    I walked towards them when they was

25   showing hand gesturing, pointing out, they getting

J. Rivera - Cross/Chu

510

1    closer to their face.

2        Q    When you say they making --

3        A    Hand gestures.  You know, like pointing

4    fingers and putting hands like in people's face.

5        Q    What were they saying?

6        A    Just cursing.

7        Q    About what?

8        A    I couldn't hear it.

9        Q    You said they're cursing, you need --

10       A    Yes.

11       Q    Did they say what they were cursing about?

12       A    No.

13       Q    Did they say, you stepped on my f'g toe,

14   what?

15       A    When I there, you hear the word "fuck.

16   "Fuck off" and stuff like that.  I walked in, then I

17   asked.  I said, what the fuck is your brother -- I

18   came in the middle.  Pushed them back.

19       Q    In fact, you were the one that said

20   something to the tall, dark skin guy, correct?

21       A    Yes.

22       Q    You initiated conversation with him, not

23   the shorter guy?

24       A    No.

25       Q    You were talking to him?

J. Rivera - Cross/Chu

511

1      A     Yes.

2      Q     And you used the F word when you spoke to

3  him?

4      A     Yes.

5      Q     Yes?

6      A     Yes.

7      Q     And then after -- the first time someone

8  made contact, who was it -- I'm sorry.  Withdrawn.

9            Who was it that you saw had physical

10 contact first?

11     A     Well, the tall guy had hit me first.

12     Q     He hit you?

13     A     Yes.as soon as I turned around, curse at

14 my brother, I turned back, when I turned back,

15 that's when he threw the first punch.

16     Q     You cursed your brother?

17     A     Yes.

18     Q     When you did that, you turned -- you

19 turned your head to the side?

20     A     Yes.  I just turned this way (indicating).

21 I pushed -- curse my brother out, when I turned

22 around, when I went to turn back towards the tall

23 dude --

24     Q     The tall guy hit you?

25     A     Yes.

J. Rivera - Cross/Chu                    512

1        Q    In fact, you said that the bouncer were
2   involved somehow?  Did the bouncer come over?
3        A    They came over when he took Rique.  When
4   JP grabbed me --
5        Q    They took him out, right?
6        A    Ah-huh.
7        Q    In fact --
8             MR. DRANOVE:  Objection to "him".
9             THE COURT:  What do you mean when you say
10       "him"?
11            THE WITNESS:  Enrique.
12       Q    They took your brother out, right?
13       A    They took -- they took my brother out,
14   yes.
15       Q    He is only one they took out from this
16   whole -- they took only your brother; isn't that
17   correct?
18       A    No.  They --
19       Q    You just said --
20            THE COURT:  Let him finish his answer.
21       A    After the fight.  When everything was
22   throwing punching, they tried to break up, JP tried
23   to grab me.  All seen -- I told JP, look, where's my
24   brother?  When I looked, the bouncer had my brother.
25   I did not see Little Julio.  And I just started

J. Rivera - Cross/Chu

513

1    going out the bar.

2        Q    So, my question to you is, isn't it true

3    that the bouncer only got your brother to remove --

4            MR. DRANOVE:  To his own -- objection to

5        the form of the question.

6            THE COURT:  Overruled.

7            You may answer.  Is it true the bouncer

8        only had your brother?

9            THE WITNESS:  Yes.

10       Q    Now, you described someone throwing a

11   punch over you?

12       A    Ah-huh.

13       Q    And you described it, as you said, it was

14   a dark colored jacket?

15       A    Ah-huh.

16       Q    Probably camouflage?

17       A    Ah-huh.

18            THE COURT:  Yes or no?

19            THE WITNESS:  Yes.

20       Q    Now, you were asked, you said that when

21   you -- that when you were at the precinct that the

22   detectives kept telling you about this -- kept

23   asking you --

24       A    Jacket, yes.

25       Q    In fact, when you say the detectives were

J. Rivera - Cross/Chu                    514

1    at your house, they actually looked at your clothes
2    that you were wearing that night?
3         A    Yes.
4         Q    And you weren't wearing camouflage
5    clothes, were you?
6         A    No.
7         Q    You weren't wearing a green camouflage
8    type of a hat, were you?
9         A    No.
10        Q    And you didn't have on a brown hoodie, did
11   you?
12        A    No.
13        Q    Your brother was the first of your group
14   to leave the bar, true or not true?
15             MR. DRANOVE:  Objection to his own
16        personal knowledge only.
17             THE COURT:  Sustained as to the form.
18             Restate your question.
19        Q    Your brother, from -- I am sorry.
20   Withdrawn.
21             The group of your four.  You, Little
22   Julio, JP and your brother.  Your brother was the
23   first one you saw leave the bar; isn't that correct?
24        A    He was at the door.
25        Q    Being led out; isn't that true?

J. Rivera - Cross/Chu                              515

 1        A    Yes.

 2        Q    And, in fact, you didn't leave right when

 3   he left; isn't that true?

 4        A    No.

 5        Q    In fact, you remained in the bar and you

 6   were however -- I am sorry.

 7             You didn't leave until a little while

 8   after your brother; isn't that true?

 9        A    Just seconds.

10        Q    You left after your brother; isn't that

11   true?

12        A    Yes.

13        Q    Now, when you spoke with the detectives at

14   the precinct, in fact, you told us during direct

15   examination that you spoke with detective, I believe

16   it was Darino and -- I am sorry -- Detective Rivera

17   at the precinct; isn't that correct?

18        A    Yes.

19        Q    And when they spoke to you, it was

20   sometime early, I believe it's Monday morning, on

21   February 28, 2005, right?

22        A    Yes.

23        Q    And when he spoke to you, they spoke with

24   you at the precinct, correct?

25        A    Yes.

1      Q    In fact, when they -- when detectives came
2    to your house, they asked you to come to the
3    precinct and you said, yeah, I'll come to the
4    precinct, I got nothing to hide; isn't that true?
5      A    Yes.
6      Q    Now, isn't it true that when you spoke
7    with the detectives at the precinct that you said
8    that when you went to break up dispute, as you were
9    breaking the dispute up, someone started to punch
10   the bald headed male?  Do you remember telling them
11   --
12     A    Punching the bald headed male?
13     Q    Yeah.
14     A    No.
15     Q    You don't remember telling them that.
16          Well, did you also tell the detective --
17          MR. DRANOVE:  Objection to "also".
18          THE COURT:  Sustained.
19     Q    Did you tell the detectives that you saw
20   the jacket of the puncher and that jacket was
21   camouflage jacket?
22     A    No.  Told them dark, yes.
23     Q    Dark?
24     A    It could have camouflage.  It was dark
25   jacket.

J. Rivera - Cross/Chu

517

1      Q    But you did mention --

2      A    He mentioned it, I continue --

3      Q    You agree it could have been?

4      A    Could have been.

5      Q    Yes?

6      A    Yes.

7      Q    You also state -- I am sorry.

8           Isn't it true that you told the detective

9      the only people at the bar that had camouflage on

10     were your brother, Kique and his little -- and his

11     friend, Little Julio?

12     A    Yes.

13     Q    That's true, right?  Did you ever tell --

14     I'm sorry.  Withdrawn.

15          You said that you recall being interviewed

16     a second time with the assistant district attorney.

17     The female lady, you said was in the room with the

18     detective?

19     A    Yes.

20     Q    You recall that, right?

21     A    Yes.

22     Q    And you recall being audio taped by her?

23     A    Yes.

24     Q    Where she put tape recorder in front of

25     you?

1       A     Yes.

2       Q     She pressed it down?

3       A     Yes.

4       Q     You remember that?

5       A     Yes.

6       Q     And you, when she put the tape recorder

7   on, do you remember her also having to swear you in?

8       A     Yes.

9       Q     She asked, right -- she told you she was a

10  notary public?

11      A     Don't recall.

12      Q     She said, do you swear to tell truth,

13  whole truth, nothing but the truth, right?

14      A     Yes.

15      Q     She asked you that?

16      A     Yes.

17      Q     And you said, yes?

18      A     Yes.

19      Q     You swore?

20      A     Yes.

21      Q     Now, do you recall telling her that the

22  camouflage jacket was swinging towards the dark skin

23  guy and the short guy in between both of them, and

24  JP just grabbed me and I mean the bouncer, I just

25  left?  Do you remember telling her that on audio

J. Rivera - Cross/Chu

519

1    tape?

2         A    No.

3         Q    You don't remember?

4         A    No.  Just telling her that the punch came

5    over my shoulders.

6         Q    Well, would anything refresh your

7    recollection if in fact you told the assistant

8    district attorney that the camouflage jacket was

9    swinging towards the dark skin guy and the shorter

10   guy?

11        A    It went over my shoulders.

12        Q    It went over your shoulders?

13        A    Yes.

14        Q    Towards the short guy and the tall dark

15   skin guy, correct?

16        A    Yeah.  Towards them, yeah.

17        Q    That was person that was wearing that

18   camouflage jacket?

19        A    Dark jacket.  I don't know camouflage or

20   not.

21        Q    Would anything --

22             MR. DRANOVE:  Would you allow him to

23        answer the question.

24             THE COURT:  Yes.  Let him finish the

25        answer.

J. Rivera - Cross/Chu

520

1    A    Like I said, it could have been dark
2    jacket, camouflage.  I didn't see it.
3    Q    Now, you're saying -- I am sorry.
4         Now, you're saying you didn't see it?
5    A    No.  I said, it was a dark jacket.  It was
6    dark in that area.
7         MS. CHU:  People's number 8, I believe it
8    is.
9         THE COURT:  7.
10        COURT OFFICER:  Which item?
11        MS. CHU:  The jacket, please.
12   Q    Do you recognize that jacket, Mr. Rivera?
13   A    Yes.
14   Q    In fact, that is your brother's jacket;
15   isn't that true?
16   A    Yes.
17   Q    Yes?
18   A    Yes.
19   Q    In fact, that is the jacket he was wearing
20   that night on February 27, 2005?
21   A    Yes.
22   Q    Isn't that correct?
23   A    Yes.
24   Q    Now, in that jacket there are a number of
25   colors?

J. Rivera - Cross/Chu

521

1        A    Yes.

2        Q    Would it be fair to say that those colors

3    are dark colors?

4        A    Yes.

5        Q    And included in those dark colors is

6    black; isn't that true?

7        A    Yes.

8        Q    Isn't that the same -- I am sorry.

9    Withdrawn.

10            You said Little Julio was wearing the

11   jacket pattern of camouflage?

12       A    Yes.

13       Q    Same type jacket?

14       A    Yes.

15       Q    But the exact same pattern?

16       A    Yes.

17       Q    Now --

18            THE COURT:  Can she put it back now?

19            MS. CHU:  Yes, she can put it back.

20            Thank you very much, Officer.

21       Q    Now, let me ask you this, Mr. Rivera.  At

22   the time you were interviewed by the police at the

23   precinct on February 28, 2005, had you already

24   spoken with your brother, the defendant, Enrique;

25   isn't that true?

J. Rivera - Cross/Chu

522

1      A    Yes.

2      Q    In fact, you spoke to him that very night

3  that everything happened at the bar; isn't that

4  true?

5      A    Yes.

6      Q    Yes?

7      A    Yes.

8      Q    In fact, you met up with him on Nelson

9  Avenue, is what you testified to earlier; is that

10 true?

11     A    Yes.

12     Q    Yes.

13          when you met up with him, in fact, you

14 were pretty angry, weren't you?

15     A    Yes.

16     Q    In fact, the first words to him you spoke

17 were yelled at him; isn't that true?

18     A    Yes.

19     Q    In fact, you cursed at your brother when

20 you saw him after you left the bar; isn't that true?

21     A    Yes.

22     Q    Now, you also said that you had called

23 Jahaira because you had left your car keys and your

24 jacket inside the bar?

25     A    Yes.

1      Q    Isn't that correct?

2      A    Yes.

3      Q    In fact, when you met with them, you met

4   them on Ninth Street and Fifth Avenue?  That is

5   where you met them?

6      A    Yes.

7      Q    In fact, she had to drive your car to you

8   so you can get it; isn't that true?

9      A    Yes.

10      Q    Yes?

11      A    Yes.

12      Q    Isn't it also true that you told her --

13           MR. DRANOVE:  Objection.

14      Q    Kique had stabbed --

15           MR. DRANOVE:  Objection.  Objection.

16           May we approach?

17           THE COURT:  Excuse me a moment, ladies and

18        gentlemen.

19           (Whereupon, there was a discussion off the

20        record, at sidebar at this time.)

21           THE COURT:  Start the question again,

22        please?

23      Q    And isn't it true, Mr. Rivera, that when

24   you saw Jahaira on Ninth Street and Fifth Avenue

25   that you told her that Kique had stabbed the guy

1       several times; isn't that true?

2            A    No.

3            Q    You never told her that?

4            A    No.

5            Q    You did meet her on Ninth and Fifth

6       Avenue, didn't you?

7            A    Yes.

8            Q    Kique is your brother, that is his

9       nickname; isn't that true?

10           A    Yes.

11                Not Kique, Rique.

12           Q    Not Kique, Rique?

13           A    Not Kique.

14           Q    When you met with Jahaira, when you were

15      getting your car from her, didn't you tell her that

16      Rique had went up to him and got him jigged in the

17      arm -- which is stabbed -- and in the neck; that is

18      what you told her jigged him in the neck and the

19      arm?

20           A    No.

21           Q    You never told her that?

22           A    No.  She was the one that told me what

23      happened.

24           Q    That Rique had jigged --

25           A    She is one that told me what.  I told --

J. Rivera - Cross/Chu

525

1   she asked -- I knew about the fight.  She told me

2   that somebody got stabbed.

3        Q    But you didn't tell her Rique was the one

4   that stabbed the guy several times?

5        A    No.

6        Q    You didn't tell her that Rique was --

7   jigged him in the arm --

8        A    No.

9        Q    -- and the neck?  You didn't tell her

10  that?

11       A    No.

12       Q    And Rudy was there when you met Jahaira?

13       A    Rudy was and his brother.

14       Q    Isn't it a fact when you met with them,

15  you told, Kique went crazy and start stabbing the

16  guy?

17       A    I didn't say nothing like that.

18       Q    You didn't tell them that when you were on

19  9th and Fifth?

20       A    No.

21       Q    You didn't tell Rudy, I don't know why he

22  did it?

23       A    No.

24       Q    You didn't tell Rudy that Kique was crazy,

25  he stabbed the guy few times, he was bugging out?

J. Rivera - Cross/Chu

526

1    You didn't say that to him?

2          A    No.  No.

3          Q    Now, Mr. Rivera, Enrique is your brother

4    right?

5          A    Yes.

6          Q    In fact, he's your little brother, right?

7          A    Yes.

8          Q    And you don't want to see anything bad

9    happen to him, right?

10         A    No.

11         Q    You don't want to see him go to jail,

12   right?

13         A    No.

14         Q    And you'd do anything to make sure that

15   didn't happen; isn't that true?

16         A    Not anything.

17         Q    Not anything?

18         A    Not anything.

19         Q    Now, you testified earlier that you were

20   at the precinct, right?

21         A    Yes.

22         Q    And isn't it true that you were given the

23   option to leave and come back because there was

24   going to be a while between the interview that the

25   detective had with you and the audio tape by the

1    assistant district attorney; isn't that true?

2         A    No.

3         Q    That is not true?

4         A    No.

5         Q    Well, you said you never asked to leave;

6    isn't that true?

7         A    They never -- told me I couldn't leave.

8         Q    Well, I actually on -- you didn't tell us

9    just earlier that you didn't ask --

10        A    I didn't ask because they already had told

11   me that I cannot leave until they catch my brother.

12        Q    But they already had you in custody,

13   right?

14        A    They had me in custody.

15        Q    That is what you're saying, they had you

16   custody?

17        A    Ah-huh.

18        Q    You were handcuffed while you were at the

19   precinct?

20        A    No.

21        Q    Were you in a room?

22        A    Yes.

23        Q    The room didn't have a door, did it?

24        A    It had a door.

25        Q    It had a door?

J. Rivera - Cross/Chu

528

1      A    Yes.

2      Q    Was the door open or closed?

3      A    Closed.

4      Q    And there was microwave in there?

5      A    Don't recall.

6      Q    TV in there?

7      A    No.

8      Q    Was there a couch in there?

9      A    No.

10     Q    No couch in there?

11     A    No couch.

12     Q    You said you were placed in several rooms

13  though, you said?

14     A    Yes.

15     Q    You weren't just in one room?

16     A    Yes.

17     Q    Were you ever in a room that had a couch?

18     A    No.

19     Q    What about a TV?

20     A    No.

21     Q    What about a refrigerator?

22     A    No.

23     Q    You weren't in a kitchen?

24     A    No.

25     Q    Now, when the detectives came to our

J. Rivera - Cross/Chu                529

1    house, they were there to look for your brother;
2    isn't that true?
3         A    No.
4         Q    They were there to look for your brother?
5              MR. DRANOVE:  Objection, asked and
6         answered.
7              THE COURT:  Sustained.
8         Q    Well, you told us that the detective said
9    they wanted you to help them find Enrique, right?
10        A    They asked me when they were in the
11   precinct.  They said we were looking for  Rique.
12        Q    The were looking for Enrique?
13        A    Correct.
14        Q    And you said it was Darino and Rivera was
15   the one that came to your house?
16        A    Yes.
17        Q    There weren't --
18        A    There is other detectives, about five
19   detectives.
20        Q    About five detectives?
21        A    About five.
22        Q    But Darino and Rivera were the ones first
23   came --
24        A    No.  They were there.  They all came in.
25        Q    But you let them in, right?

J. Rivera - Cross/Chu                                    530

1          A    Yes.

2          Q    In fact, you were willing to talk to them,

3     right?

4          A    Yes.

5          Q    And the first time the detectives spoke to

6     you at the -- the first interview you said that you

7     had, you only spoke about ten, 15 minutes; isn't

8     that true?

9          A    Yes.

10         Q    They didn't have you in there for hours

11    just grilling you, grilling you, they asked you what

12    happened; isn't that true?

13         A    Yes.

14         Q    And isn't it true also that while you were

15    at the precinct, you never tried to leave at all?

16    You never asked them, can I leave?  I'm leaving?

17    You never said anything like that, did you?

18         A    Yes.  When I heard them, they are not

19    going to let me go, I told them I had to go to work.

20         Q    They let you make a phone call?

21         A    I told them I have to go to work.  They

22    said, you are not leaving until we catch Rique.  I

23    said, I have to call my job.

24         Q    And they let you call?

25         A    Yes.

J. Rivera - Redirect/Dranove

531

1          MS. CHU:  If I can have one more moment,

2     your Honor.

3          THE COURT:  Yes.

4          MS. CHU:  I have nothing further.  Thank

5     you.

6          THE COURT:  Any redirect?

7          MR. DRANOVE:  Yes, sir.

8     REDIRECT EXAMINATION

9     BY MR. DRANOVE:

10         Q    Mr. Rivera, can we return to the bar.

11              When you turned and noticed that your

12    brother was with a bouncer, how far was your brother

13    from you at that time?

14         A    Maybe five feet.

15         Q    How close was he to the door?

16         A    Was heading towards the door.

17         Q    How fast?

18         A    Like maybe another three feet, four feet.

19         Q    Where was Little Julio at that time?

20         A    I did not see Little Julio.

21         MR. DRANOVE:  One moment please, sir.

22         MR. DRANOVE:  I have no further questions.

23         Thank you.

24         THE COURT:  Anything else on that, Miss

25    Chu?

J. Rivera - Redirect/Dranove

532

1        MS. CHU:  No.

2        THE COURT:  Thank you, Mr. Rivera.

3        You're excused.  You may step down from

4    the witness stand.

5        You may proceed, Mr. Dranove.

6        (WITNESS EXCUSED)

7        MR. DRANOVE:  May I have a five minute

8    recess?

9        THE COURT:  Okay.  Please return to the

10   jury room.  We will resume shortly.

11       Don't discuss the case.

12       (Jury Excused)

13                   (Whereupon, there was a short

14                   recess at this time.)

15       *         *         *         *.

16       (Whereupon, the official Senior Court

17   Reporter, Michele Walker, was relieved by

18   official Senior Court Reporter, Sandra Wilkes

19   after the recess.)

20

21

22

23

24

25

533
COLLOQUY

1    MR. DRANOVE:  Judge, I would like to recall

2    Mr. Julio Rivera.

3    THE COURT:  First of all, he's sitting here.

4    If you're going to ask him to do anything, he shouldn't

5    be in here.

6    MR. DRANOVE:  With respect to the

7    conversation with Jahaira and my client and the

8    sequence who was spoken to first, I think it's actually

9    critical to presenting the facts, the testimony, and

10   the correct framework and chronology so that this

11   Jahaira who the prosecutor has already said has

12   recanted, and that's why she's not being called at

13   least be identified in a manner based on the direct

14   testimony under oath to evaluate the now words of

15   Jahaira in effect.

16   THE COURT:  I'm not sure what it is you want

17   to recall him on.

18   MR. DRANOVE:  Did you speak to Jahaira before

19   you spoke to your brother or your brother before you

20   spoke to Jahaira.

21   THE COURT:  That's what you want to ask him?

22   MR. DRANOVE:  Yes.

23   THE COURT:  Ms. Chu, what's your position on

24   that?

25   MS. CHU:  My position is that he had his

SW

1      opportunity after I did my cross examination.

2               THE COURT: That is correct. The question is

3      whether or not I'll allow him that one question.

4               If you want to ask him that question, I'll

5      allow you to put him on the stand to ask him that one

6      question.

7               MR. DRANOVE: Thank you.

8               THE COURT: Let's bring the jury out and

9      bring that witness back in and you can tell Mr. Rivera

10     to come back in, we'll put him on the witness stand.

11     And then if you want to ask him anything about that,

12     you may, Ms. Chu.

13             COURT OFFICER: You ready for the jury?

14             THE COURT: Yes.

15             COURT OFFICER: Jury entering.

16             COURT CLERK: Both sides waive the roll call?

17             MR. DRANOVE: Yes.

18             MS. CHU: So waived.

19             COURT CLERK: Mr. Rivera, you're still under

20     oath.

21             THE COURT: Mr. Dranove asked for

22     permission to reopen his questioning of this witness,

23     and I granted it. You may proceed Mr. Dranove.

24 CONTINUED DIRECT EXAMINATION

25 BY MR. DRANOVE:

SW

J. RIVERA - DIRECT/DRANOVE

1       Q    Mr. Rivera, with respect to your conversations

2    with Jahaira and your brother that you testified to, who did

3    you speak to first, Jahaira or your brother?

4       A    Jahaira.

5       Q    Was your brother -- thank you.   Thank you.

6            THE COURT:   Do you want to ask him anything

7       else about that Ms. Chu?

8    RECROSS EXAMINATION

9    BY MS. CHU:

10      Q    Just to clarify the time period, you're talking

11   about after everything happened when you guys left the bar?

12      A    When we left the bar, JP dropped me off at Ninth

13   Street.

14      Q    That's my question, the time period after everyone

15   left the bar, after everyone left?

16      A    After I left.

17      Q    And you said you spoke to Jahaira first?

18      A    First.

19      Q    Okay, thank.

20           MS. CHU:   Nothing further.

21           THE COURT:   Thank you.   You can step down.

22           (At this time, the witness exited the stand.)

23           THE COURT:   You may proceed Mr. Dranove.

24           MR. DRANOVE:   The defense calls Mr. Enrique

25      Rivera.

SW

536

J. RIVERA - DIRECT/DRANOVE

1          (At this time, the defendant takes the

2      stand.)

3          COURT CLERK:  Raise your right hand.

4      Solemnly swear the testimony you are about to give will

5      be the truth, the whole truth, and nothing but the

6      truth?

7          THE DEFENDANT:  Yes, sir.

8          COURT CLERK:  Be seated.  Please state your

9      name.

10          THE DEFENDANT:  Enrique Rivera.

11          COURT CLERK:  And what county do you live in?

12          THE DEFENDANT:  Kings.

13          COURT CLERK:  Thank you.

14          MR. DRANOVE:  May we approach for a moment?

15          THE COURT:  It's okay with me.

16          MR. DRANOVE:  Thank you.

17          THE COURT:  You may examine the witness Mr.

18      Dranove.

19          MR. DRANOVE:  Thank you.

20  E N R I Q U E   R I V E R A, having been duly sworn,

21  testified as follows:

22  DIRECT EXAMINATION

23  BY MR. DRANOVE:

24      Q    Enrique Rivera, how old are you?

25      A    34.

SW

537

E. RIVERA - DIRECT/DRANOVE

1      Q    Where were you born?

2      A    Kings County.

3      Q    You know you're the defendant in this case?

4    You're aware of that?

5      A    Yes.

6      Q    And you're facing very serious charges?

7            MS. CHU:  Objection, your Honor.

8            THE COURT:  Sustained.

9      Q    You were convicted of a felony in 1997?

10     A    Yes.

11     Q    Were you convicted of a felony in 1998?

12     A    No, '98.  '98, not '97.  '93 and '98, not '97.

13     Q    I just want to make sure we have the right

14   information.

15           Excuse me, '98 is one, correct?

16     A    Yes.

17     Q    And '93 you were convicted of a felony, right?

18     A    Yes.

19     Q    Okay.  In the weekend of February 25th, 26th,

20   27th, 2005, were you employed?

21     A    Yes.

22     Q    How were you employed?

23     A    Me and my younger brother own a barber shop.  I

24   cut hair.

25     Q    What's the name of the barber shop?

SW

E. RIVERA - DIRECT/DRANOVE

1    A    Diamond Cuts, A and E Diamond Cuts.

2    Q    A and E?

3    A    A is for Angel, E is for Enrique.

4    Q    Where is that located?

5    A    Thirteenth Street and Fifth Avenue.

6    Q    In Brooklyn?

7    A    Yes.

8    Q    Are you married now?

9    A    Yes.

10   Q    To whom?

11   A    Patricia Glasgow.

12   Q    Which of the ladies in the courtroom is she?

13        MS. CHU:   Objection, your Honor.

14        THE COURT:   Sustained.

15   Q    On Saturday, the 26th of February, 2005, were you

16   in your barber shop at sometime?

17   A    Yes.

18   Q    What were you doing there?

19   A    All day, working.

20   Q    What were you doing?

21   A    Cutting hair.

22   Q    Did there come a time when in the evening your

23   brother Julio arrived?

24   A    About 10, 10 o'clock.  After the shop was closed

25   we were going to sit there and watch a boxing event.

E. RIVERA - DIRECT/DRANOVE

1    Q    Did you watch it?

2    A    Yes.

3    Q    Do you recall who was boxing?

4    A    A boxer by the name Cotto.

5    Q    After the event ended, did you go anywhere?

6    A    We went to 39th Street and Third Avenue.

7    Q    To the El Borinquen Bar?

8    A    Yes.

9    Q    What were you wearing?

10   A    I was wearing, as we already heard, camouflage

11   jacket, the hoodie, the hat, jeans, boots.

12   Q    When you got there, did you meet any friends?

13   A    We were supposed to meet up with Jahaira, my

14   cousin, and she supposed to have bring some friends.

15   Q    Lady friends?

16   A    Lady friends.

17   Q    Do you know somebody by the name of J.P.?

18   A    Yes.

19   Q    Little Julio?

20   A    Yes.

21   Q    Do you recall if they got to the bar that night?

22   A    Yes.

23   Q    What, if you recall, was Little Julio wearing?

24   A    Camouflage jacket.  I'm not sure if he had a

25   hoodie on.

SW

E. RIVERA - DIRECT/DRANOVE

1    Q    What about a hat?

2    A    Or hat, not too sure.

3    Q    Did you enter the bar at some time?

4    A    Yes.

5    Q    Did you go to any bars after you left your

6 barbershop before you entered the Borinquen?

7    A    No, sir.

8    Q    Were you searched before entering the Borinquen?

9    A    Yes.

10    Q    Stand up and tell the jury how you were searched?

11    A    I was patted, frisked up here, waist, back --

12 excuse me.

13    Q    Step back a little.

14    A    Stand out, hold your hands out, you get pat first,

15 check you back.

16    Q    Check what?

17    A    Check your collar, your back, around the waist,

18 around your belt, waist, your inner thighs, down to your

19 ankles, and you pull out everything in your pockets.

20    Q    You what?

21    A    You pull out everything in your pockets, your

22 money, your change, flip your inside pocket out.  They

23 check, make sure you don't have nothing, and they let you go

24 in.

25    Q    What about your jacket?

SW

E. RIVERA - DIRECT/DRANOVE

1   A   They check your jacket.

2   Q   How do they check your jacket?

3   A   They pat it down.  If there's something in there,

4   they want to see what it is.  And you put it back in your

5   pocket and they check it.  That's it.

6   Q   Did you bring a knife into that bar that night?

7   A   No, sir.

8           THE COURT:  Just pull the mike back down,

9   please.

10   Q   Do you recall what time you got to the bar?

11   A   About 12.  12.  Around 12.  Not too sure.  About

12   12, after the fight was over.

13   Q   With Cotto?

14   A   Yeah.  I had closed the shop down and everything.

15   Q   What did you do once you were inside the bar?

16   A   We had sat at the bar and got the first round.

17   Q   Do you recall who got the first round?

18   A   I'm not sure.

19   Q   First rounds of what drink?

20   A   Heinekens.

21   Q   Did you drink the first Heineken?

22   A   Yes.

23   Q   Where did you go with it?

24   A   We -- the first drink we stood at the bar and

25   drank it.

542

E. RIVERA - DIRECT/DRANOVE

1   Q   And where did you go from there?

2   A   We went to the back area of the bar.

3   Q   What did you do there?

4   A   We stood around between the DJ and the restroom

5   and a small dance floor.

6   Q   Were people dancing?

7   A   You might have two.  It was not like a Dancing

8   With The Stars.  It was no party, like it was not crowded

9   like that.  People probably bopping.

10  Q   Do you recall the lighting?

11  A   It was dim.

12  Q   Did you see -- from where you sat, did you see

13  last week's pictures of the inside of the bar?

14  A   Excuse me?

15  Q   Did you see pictures of the inside of the bar that

16  were put into evidence?

17  A   Yes.

18  Q   Did any of them accurately display how dark it was

19  in the bar?

20  A   The only lights you have is the light from the

21  bar.  So when people was there, they try to keep it a little

22  dark.

23  Q   What about music, how loud is the music?

24  A   Pretty loud.

25  Q   Could you and I have a conversation like this?

543

E. RIVERA - DIRECT/DRANOVE

1    A    No.  I would have to come close to you and still

2  shout.

3    Q    Now, was there a second round of beer that was

4  gotten and consumed?

5              MS. CHU:  Objection, your Honor.  He's

6       leading.

7              THE COURT:  What happened next?

8    Q    What happened next?

9    A    We sat around drinking, and one of the other

10  fellows got a round.  I was still drinking.  Came a time

11  when I had to go to the bathroom because I received a phone

12  call.  So I tried to go to the bathroom to at least hear the

13  phone.

14   Q    Tell us what happened?

15   A    And this young man walked in the bathroom.  I

16  wasn't using the bathroom, I was just talking on the phone.

17  So he just continue --

18   Q    Politely describe what he did.

19             MS. CHU:  Objection, your Honor.

20             THE COURT:  I'm sorry, I didn't hear the

21      question.

22             MR. DRANOVE:  I said politely describe what

23      he did.

24             THE COURT:  I'll allow it.  Give your answer.

25   A    He walked in the restroom and nobody was using the

SW

544

E. RIVERA - DIRECT/DRANOVE

1    toilet, and he began urinating.  I was thinking nothing of

2    it.  Then he made a comment, "This ain't no phone booth."

3    So I told the person, call you back.

4         Q    Did you leave the bathroom?

5              MS. CHU:  Objection.

6         A    I just walked out the bathroom.

7         Q    Can you describe that person?

8         A    Not really.

9         Q    Tell us what happened next?

10        A    I stepped out the bathroom.  I was by -- I went

11   back to the group I was with.  We were sitting there,

12   standing there having drinks.  I still had my drink, but

13   J.P. was so called thirsty.  He wanted another round.  I

14   said wait until I finish my drink, I'll get the next round.

15   So while we sitting there, I'm talking to Little Julio, my

16   friend Little Julio.  I'm telling him we got to get out of

17   here.  This place is corny.  But I was waiting for that

18   phone call to make other plans.  If the plan came through, I

19   was going to leave my car with Little Julio and somebody was

20   going to pick me up.

21        Q    Male or female?

22        A    Female.  And through that time while I was talking

23   to Little Julio, that same young man that was in the

24   bathroom had walked out the bathroom and brushed into me.

25   He had enough room, but I figure he drunk, whatever the case

SW

E. RIVERA - DIRECT/DRANOVE

1   may be.  But he had a stare in his face when he was walking

2   by me, looking back.  It was a little aggressive, like --

3   but he's just drunk, pay it no mind.  But I let Little Julio

4   know, and that was that.

5       Q    About what time do you think it was at this

6   moment?

7       A    Maybe about 12:30, 45, I'm not sure.

8       Q    How many beers do you think you consumed by this

9   time in the bar?

10      A    Me?

11      Q    Yeah.

12      A    Probably about my third beer or my second, I'm not

13  sure.

14      Q    Please continue telling us what happened.

15      A    So I finished my drink.  Then J.P. was telling me

16  "What's up with the next round man?  Can we get the next

17  round?  We already got a round.  We already paid for another

18  round.  When you gon get our beers?"  So I go to the bar, I

19  get the two, I ask for the four Heinekens, paid for it,

20  tipped the lady.  But behind you have the kid that was, that

21  I had the little thing in the bathroom with was sitting

22  behind me with his friends.  So after I paid for the

23  Heinekens and everything, I tried to wait for one of them to

24  come get the beers.  By the same token, I turn around to see

25  what was going on behind me, and when I looked and I seen

E. RIVERA - DIRECT/DRANOVE

1  that same young man, he like bopped his head like "What's

2  up?"  So I was just like, this kid, he really got a problem.

3  So I go over to him and I asked him what seems to be the

4  problem?  He said "I ain't got no problem.  You got a

5  problem?  So at the same time, Little Julio coming.  So I'm

6  trying to talk to him.  I had a business card in my back

7  pocket.  So I see how the young man is a little hostility,

8  so I'm trying to talk to him.  I'm just, give him a business

9  card, come see me.  I got a new barbershop in the

10  neighborhood.  But his friend, the gentleman that testified

11  earlier --

12      Q    Do you recall the name or appearance of the one

13  who testified?

14      A    Solomon, the taller guy.

15      Q    Right.

16      A    He approached, he was real close.  So then, so as

17  I was telling Little Julio what was going on, there already

18  was a little tension.  Before it got out of hand, I'm like,

19  chill, hold on.  Let me just talk to this kid, you know what

20  I mean?

21      Q    You have your hands up like you're gesturing now?

22      A    Yeah.

23      Q    Palms open, facing outwards?

24      A    Yes, because his man came over like "What's up?"

25  So now Little Julio, he's like a little Tasmanian devil.

SW

E. RIVERA - DIRECT/DRANOVE

1  You know, like what up?  He's little, but he --

2          MS. CHU:  Objection, your Honor.

3          THE COURT:  Overruled.  Finish your answer.

4      A   He's little, but he's tough.  So I said, yo,

5  chill, chill.  Let me talk to this kid.  But now my brother

6  is coming over, and it gets a little too out of the hand,

7  you know what I mean?

8      Q   No.  Why don't you tell us what you mean?

9      A   The little cursing going back and forth, and we

10 ain't going to talk this way.  We not going to be able to

11 talk.  So when I'm telling him, chill, let me talk to this

12 kid, the taller kid took a swing.  He hit me.  My reaction

13 was to hit back.

14     Q   Did you?

15     A   Yes.

16     Q   Who did you hit?

17     A   The kid in front of me, which I was trying to talk

18 to, and the taller kid.

19     Q   So you hit -- how many people did you hit?

20     A   Two.

21     Q   Tall guy being Solomon?

22     A   Yes.

23     Q   And the other guy, do you know who it is?

24     A   The kid I was talking to.  The gentleman I was

25 talking to.

E. RIVERA - DIRECT/DRANOVE

1  Q   Do you recall when you talked to him if he was
2  tall or short or not?

3  A   About the same height, maybe shorter.

4  Q   Can you be any more definite than that?

5  A   I don't know his height like that.  He was a
6  little shorter, but just about the same height.

7  Q   Do you recall what he was wearing?

8  A   No.

9  Q   So you hit Solomon first or the other guy first?

10  A   I don't recall who I hit first.  I know I swing
11  back on the defense.

12  Q   You hit both of them?

13  A   Yes.

14  Q   One punch or more than one punch that hit both of
15  them?

16  A   I threw a few punches.

17  Q   How many people did you hit?

18  A   I believe I hit the two that were there.

19  Q   Did you have a knife in your hands when you hit
20  the two people?

21  A   No.

22  Q   Did you have a knife with you?

23  A   No.

24  Q   Did you pick up a knife in the place and use it?

25  A   No.

SW

E. RIVERA - DIRECT/DRANOVE

1    Q    After you hit -- you punched him with a closed

2  fist, is that right?

3    A    Yes.

4    Q    Then what happened?

5    A    You know, my brother came, J.P. came.  So the

6  rush, the crowd was moving towards where I was at.  The

7  bouncer came, got between us, one rushed me out the door.

8    Q    A bouncer?

9    A    A bouncer.

10    Q    How did he do that?

11    A    Manhandling me.  He manhandled me to the door.

12    Q    Do you recall what that bouncer looked like?

13    A    A little stockier.  He had braids at the time.

14    Q    Did he testify in this courtroom during this

15  trial?

16    A    No.

17    Q    Did he get -- was this the door on the Third

18  Avenue or 39th Street side?

19    A    39th Street.

20    Q    Did he take you outside?

21    A    Yes.  The door swings open, so all you got to do

22  is force me out.

23    Q    When you were throwing the couple of punches, were

24  you able to observe where Little Julio was?

25    A    Not really, no.

SW

550

E. RIVERA - DIRECT/DRANOVE

1    Q    When you got outside, where did you go?

2    A    I was trying to get back in, really.

3    Q    What did you do?

4    A    I was trying to get back in, but he locked the

5    door.

6    Q    Someone on the other side locked it?

7    A    Yes, the bouncer locked the door.

8    Q    Did you hear anything?

9    A    They were still fighting in there.  They were

10   still fighting.

11   Q    Well, what did you hear?

12   A    Excuse me?

13   Q    What did you hear?

14   A    You know, people screaming, shouting, the chairs

15   being, scratching the floor.  So then I went to my car.  My

16   car was on 39th Street like three, four cars up.

17   Q    On 39th Street?

18   A    Yes.

19   Q    Between which two avenues?

20   A    Between Third and Fourth.

21   Q    Okay.  What did you do?

22   A    I went towards my car to turn it on.

23   Q    Yes?  Then what happened?

24   A    Then they opened the door and more people came

25   out.  But I was trying to go to that direction but they

SW

E. RIVERA - DIRECT/DRANOVE

1    didn't let me go over there --

2         Q    Did you see --

3         A    -- the bouncer.

4         Q    I'm sorry.

5              Did you see Little Julio at the time they opened

6    the door or later?

7         A    Later.

8         Q    When?

9         A    When I went back to the car.

10        Q    Where was he?

11        A    He was coming out.

12        Q    He was let out after they reopened the door?

13        A    Yeah.

14        Q    Where did he go?

15        A    He came to my direction.

16        Q    Beg your pardon?

17        A    He came in my direction.

18        Q    Did you get into your car?

19        A    Yeah.  I was asking where my brother was at.

20        Q    I'm sorry?

21        A    I asked him where's my brother.

22        Q    What did he say?

23        A    He said he should be coming out.  He probably out

24    already.

25        Q    Then what happened?

E. RIVERA - DIRECT/DRANOVE

1    A    I stood there for a few seconds trying to get my
2  brother T.O.  I tried to radio my brother.

3    Q    What?  Slow down a little.

4    A    I tried to radio my brother.

5    Q    What happened?

6    A    I wasn't getting no response.

7    Q    So then what did you do?

8    A    I had my car on still, but I'm not trying to leave
9  until I know what's going on with my brother.

10    Q    Slow down.  Tell us again.

11    A    But I wasn't trying to leave until I know what's
12  going on with my brother, so I know.

13    Q    Please continue.

14    A    He radioed me.  He radioed me back.

15    Q    Your brother?

16    A    Yes.  I said yo, where you at?  He said "I'm about
17  to go to Ninth Street.  Meet me at Ninth Street and Fifth
18  Avenue.  I said you all right?  He said, "Yeah, I'm all
19  right."

20    Q    I'm sorry.  Slow down.  What?

21    A    I asked him was he all right.  He said, "Yeah, I'm
22  all right.  You all right?"  I was like yeah.  He said just
23  meet me on Ninth Street and Fifth Avenue.  I'll meet you
24  right there now.  I'm with J.P.

25    Q    He said he's with J.P.?

SW

553

E. RIVERA - DIRECT/DRANOVE

1    A    Yeah, he's with J.P. He said "I'm going to meet
2    Jahaira on 39th Street -- I mean on Ninth Street." So when
3    I go over there, then Jahaira pull up in this car.

4    Q    Before you left 39th Street --

5    A    Yes.

6    Q    -- what did Little Julio do?

7    A    He got in the car with me.

8    Q    What clothing was he wearing?

9    A    He was wearing camouflage.

10   Q    A jacket?

11   A    Yes.

12   Q    Did you notice anything about his jacket?

13   A    It had blood on it.

14   Q    Did you ask him anything about the blood?

15   A    I said where you get that blood from? Were you
16   bleeding?

17   Q    What did he say?

18   A    He said nah, he wasn't bleeding.

19   Q    What did you do?

20   A    Just drove off.

21   Q    Where did you go?

22   A    To Ninth Street and Fifth Avenue.

23   Q    What did you do there?

24   A    Then I met with my brother and J.P. and he got his
25   car.

SW

E. RIVERA - DIRECT/DRANOVE

1   Q   Who got in whose car?

2   A   Julio.  I call him T.O.  T.O. got his car and he

3   said he was going to drop Jahaira and her boyfriend and her

4   brother home.

5   Q   So when you met --

6   A   Then he said he was going home after that.

7   Q   So when you met your brother, he already had his

8   car keys?

9   A   No.

10  Q   After the incident you said your brother got into

11  this car?

12  A   Yeah, he got in his car.  When I pulled up, they

13  was pulling up too.

14  Q   Okay, so he pulled up by your car?

15  A   Yeah, in J.P. car.

16  Q   Okay, all right.  Then what did you do?

17  A   I asked him what they gonna do.  I thought the

18  night was too young.  They said -- Julio said he was going

19  home, J.P. said he was going home.

20  Q   What did you do?

21  A   I made a phone call.

22  Q   To a female?

23  A   A female friend, and I just dropped Julio off,

24  Little Julio at Nelson Street.

25  Q   Where on --

1    MS. CHU:  Objection.

2    THE COURT:  I think he was going to say

3    something else.  Finish your answer.

4    Q    Please continue.

5    A    And I dropped Little Julio on Nelson Street and

6    when we sat there for a little while.  And then I, when I

7    was ready to leave, my brother was pulling up, I guess he

8    was going to come and get gas because the gas station is

9    right across the street where Little Julio live.  And I saw

10   him, we had words.

11   Q    You and your brother?

12   A    Yeah.

13   Q    Did Little Julio leave you at that time?

14   A    Yes.

15   Q    How did he proceed away?

16   A    He went to his building.

17   Q    He lives over there?

18   A    Yeah.

19   Q    Where on his jacket did you see the blood?

20   A    On his jacket.  It was on his jacket.

21   Q    Well, tell us where on Little Julio's jacket you

22   saw the blood?

23   A    On the chest part, on his shoulder part.  You

24   couldn't tell in the beginning because the jacket is

25   camouflage.  And you could tell that's not a camouflage

SW

E. RIVERA - DIRECT/DRANOVE

1  pattern, it's blood.

2      Q    Did he tell you about how the blood got on there?

3      A    No.

4      Q    Do you know where your hat was when you were in

5  the car with Little Julio?

6      A    I'm not sure.  I wasn't sure.  I usually put it

7  on.  Like if I'm indoors, I try to have it in my hand, but I

8  don't like having it in my hands.  If I have to put it on,

9  I'll put it on.  Probably had it on.

10     Q    You're not sure?

11     A    I'm not sure.

12     Q    Do you recall being hear sitting over at the table

13  there when Ms. Chu read some prior questions and answers

14  which were questions put to you and answers by you?

15     A    Yes.

16     Q    And one of them was "So, that's the victim's blood

17  on your hat" in effect, and you said in affect "Yes?"

18     A    I said, yes, but that's from --

19          MS. CHU:  Objection.

20     A    From hearing --

21          THE COURT:  Sustained.

22          I'm going to have to interrupt this.  I have

23  some other business I need to take care of.  So we'll

24  have to resume this after the lunch break.

25          Ladies and gentlemen, I'm going to excuse you

SW

557

E. RIVERA - DIRECT/DRANOVE

1    until 2:30 when we resume the trial.  Don't discuss the

2    case.  So please be back in the jury room by 2:30.

3    Take charge of the jury.

4            (At this time, the jury exited the

5    courtroom.)

6            THE COURT:  The trial is in recession until

7    2:30.

8            THE DEFENDANT:  Enjoy your hundred.

9            THE COURT:  Thank you.

10           (At this time, there was a luncheon break and

11   the matter subsequently resumed.)

12           A F T E R N O O N   S E S S I O N

13           THE COURT:  Mr. Dranove says he has an

14   application before we continue.

15           What is it, Mr. Dranove?

16           MR. DRANOVE:  With respect to examination of

17   my client to preclude the prosecutor from asking my

18   client if he ever possessed a knife on another

19   occasion.

20           THE COURT:  Do you have any intention to ask

21   that question?

22           MS. CHU:  Well, I was going to ask him

23   regarding what was the statement he gave to the

24   detective and ask him about a knife, and that I was

25   going to ask him whether he ever had a knife before.

SW

COLLOQUY

1          THE COURT:  Well, the statement that he made

2     indicated he had a knife that night.

3          MS. CHU:  Right.

4          THE COURT:  The question was were you ever

5     going to ask whether he ever had a knife.

6          To the extent you're asking me to preclude

7     her from asking about a knife on the date other than

8     the date in question, I'll grant that application.

9     It's probably moot, but I'll grant it.

10         MR. DRANOVE:  The second half of this

11    application, sir, addresses the subject of the other

12    camouflage jacket, which is presenting himself in a

13    jacket which appeared to have blood on it.  I think the

14    subject was not at all mentioned in the last trial,

15    direct, cross, redirect, recross, whatever.  I think

16    the silence about that in the last trial is not

17    permitted to be raised in this trial from impeachment

18    grounds under the case of People versus Vaughn Halt,

19    and I'd like that to be put on the record by this

20    counsel and request the Court instruct the prosecutor

21    if you can point to where this was testified to or

22    asked in the prior trial, do so.  If otherwise unable

23    to do so, to not question my client with respect to

24    this prior proceeding and failure to testify to it at

25    that proceeding.

559

COLLOQUY

1           THE COURT: Ms. Chu?

2           MS. CHU: Yes, your Honor. I do believe that

3 would be fair game as far as cross examination to ask

4 the defendant whether or not on any prior occasion he

5 ever made mention of the fact that Mr. Julio, Little

6 Julio had a camouflage jacket that had blood all over

7 it, that there were several opportunities he had to

8 speak to people and he never mentioned Mr. Julio had

9 blood all over his jacket. I think that's fair game.

10 I don't think I should be precluded from asking him

11 questions about that.

12           THE COURT: I agree with Ms. Chu. It's a

13 material part of the account. And just as the defense

14 counsel can ask a witness who testified in the Grand

15 Jury about an omission, that's material to the account.

16 Same thing is true for the prosecutor when the

17 defendant testifies. That would not be something that

18 she would be precluded from asking about.

19           MR. DRANOVE: Will I be given some

20 opportunity to return to that subject during my

21 examination as long as the Court thinks it's in the

22 realm of reason in light of your Honor's ruling?

23           THE COURT: I'm not precluding you from

24 asking about it either, the fact that he didn't mention

25 it before.

SW

560
COLLOQUY

1           Okay, let's bring the jury out.

2           COURT OFFICER:  Your Honor, you're ready for

3      the jury?

4           THE COURT:  Yes, we are.

5           COURT OFFICER:  Jury entering.

6           COURT CLERK:  Both sides waive the roll call?

7           MR. DRANOVE:  Yes.

8           THE COURT:  Mr. Rivera, you understand you're

9      still under oath?

10          THE WITNESS:  Yes.

11          THE COURT:  Good afternoon ladies and

12     gentlemen of the jury.  We'll now continue with the

13     direct examination of Mr. Rivera.

14          You may proceed.

15          MR. DRANOVE:  Thanks.

16  CONTINUED DIRECT EXAMINATION

17  BY MR. DRANOVE:

18     Q    Mr. Rivera, what I'd like you to do is step over

19  to exhibit --

20          MR. DRANOVE:  What number is the exhibit?

21          COURT OFFICER:  It's 6.

22     Q    -- exhibit Six which is the diagram, please.  Just

23  step down.

24          Now, with respect to the time when you were having

25  words with several people and putting your hands out and

SW

E. RIVERA - DIRECT/DRANOVE

1  said chill, at that time point on the chart to where you

2  were?

3      A      I was around this area right here.

4      Q      That's an area you're pointing to which has the

5  words "Blood Swab, S3," over in that area.

6      A      In that area, all this area right here is where

7  the fight took place at, the rumble took place at

8  (indicating).

9              MS. CHU:  I'm sorry, I can't see.

10             THE COURT:  Just point to it again.

11             THE WITNESS:  Along this area right here.

12     Q      Where in that area was the tall guy who you

13 punched?

14     A      He was right about right here (indicating).

15     Q      Somewhere towards the left side of the print?

16     A      Yes, over here (indicating).

17     Q      Where were you?

18     A      I was right here.

19     Q      So you were somewhere closer to the bar than to

20 the exit door, is that correct?

21     A      In between.

22     Q      In between?

23     A      Yes.

24     Q      Where were the other people you testified to

25 located?

SW

562

E. RIVERA - DIRECT/DRANOVE

1     A    What other people I testified to?

2     Q    The fellows who were with the tall guy?

3     A    Right here.  They was all right here (indicating).

4     Q    That was three guys?

5     A    There was two at the time.

6     Q    Where were the others that were there?

7     A    Like over here, by the jukebox over here

8 (indicating).

9     Q    Now, who was the first of your friends who came to

10 your side?

11    A    Little Julio.

12    Q    Where did he come from, if you know?

13    A    From the back area.  It was like right over here,

14 around the dance floor here (indicating).

15    Q    When he came to your side, if you can remember, do

16 you recall what direction you were facing?

17    A    I was facing this way (indicating).

18    Q    Towards the door?

19    A    Towards the Third Avenue exit.

20    Q    Now, using that exhibit and speaking and pointing,

21 tell us again what happened and where?

22    A    Can we use the picture?

23    Q    Sure.  I don't know which picture.

24           MS. CHU:  People's 4.

25    A    The picture inside the bar.

SW

563

E. RIVERA - DIRECT/DRANOVE

1        THE COURT:  That's People Exhibit number 4.

2        Q    Using Exhibit 4, and if you're referencing a

3   picture A, B, C or D, let us know which one you're talking

4   about, and speak slowly please.

5        A    B, Exhibit B, I was just right over here in this

6   area right here.

7        Q    At the bottom middle of the picture, is that

8   correct?

9        A    Yes, right here.  That would be like this area

10  too.

11       Q    Now, you're pointing -- when you say this area,

12  picture C?

13       A    On picture C.

14       Q    In the lower right?

15       A    The lower right --

16       Q    Yes?

17       A    -- area.  Maybe -- you can't even probably see it

18  from the picture.  A little back more.

19       Q    Please continue.

20       A    Okay, I was right here on Exhibit D right over

21  here, right in the middle, between the middle of the bar,

22  and the two kids were right here.  There were two other kids

23  by this chair between the jukebox and the table when I was

24  talking to the kid right here.  When the taller guy

25  approached, the other mens came a little closer, Little

SW

564
E. RIVERA - DIRECT/DRANOVE

1  Julio came.  And when I seen everybody was trying to gather

2  up, cursing and all that, that's when I tried to break it

3  up, like listen, this ain't got to go this far.  That's when

4  the taller kid -- how do you say, sucker-punched me.

5      Q    Where was your brother Julio when you got

6  sucker-punched?

7      A    He had came too.  That's when he came and

8  everything got out of hand, everybody was cursing.

9      Q    Do you recall when you got sucker-punched if

10  before that moment you had any bouncers in your vision?

11      A    No.  The last bouncer that told me about my hat,

12  he was on the dance floor.

13      Q    He talked to you about your hat?

14      A    He told me about my hat, take my hat off.

15      Q    Speak a little more slowly.

16      A    In this picture here, it's more like the dance

17  floor.  He's not in the picture.

18      Q    And the dance floor with respect to picture D

19  would be over here towards where I'm standing?

20      A    Yes.  And the off duty bouncer, he was at this

21  area.  He testified he was in this area.  I didn't see him

22  here, he was over here.

23      Q    Please say that again.

24      A    He was on this area where there's like a slot

25  machine on this corner.

SW

565

E. RIVERA - DIRECT/DRANOVE

1  Q    All right.  Now, what happened when it all broke
2  out?

3  A    The rush was -- people was going towards like my
4  direction.

5  Q    From where?

6  A    From by the jukebox, they was moving towards this
7  way.

8  Q    Towards?

9  A    Towards the door, the 39th Street door.

10  Q    Towards the 39th Street door?

11  A    They were just fighting.

12  Q    The door in the picture in C opens to which, the
13  street or the --

14  A    This door right here (indicating)?

15  Q    Yeah.

16  A    That opens to 39th -- to Third Avenue.

17  Q    Please continue referencing the picture.

18  A    When the bouncer came, he got between us, and I
19  was forced out the door.  The door swings open right here in
20  this area.

21  Q    Do you know where J.P. was at that moment?

22  A    No.

23  Q    Your brother Julio?

24  A    He was in the rumble.

25  Q    And what about Little Julio?

SW

566

E. RIVERA - DIRECT/DRANOVE

1    A    He was there too.

2    Q    Where were you?

3    A    I was trying to protect myself.  I can't -- I'm

4  trying to swing and trying to duck.  I can't pinpoint where

5  everybody was at.

6    Q    Once -- did the bouncer give you, restrain you in

7  some fashion?

8    A    He manhandled me, yeah.

9    Q    How did he do that?

10   A    Like bear hugged and pushed me out.

11   Q    All right.  Did you see Little Julio exit?

12   A    No.  I just saw him walking towards my car.

13   Q    Was that before -- strike that.

14        Once you were outside -- you can sit down if you

15  like.

16   A    Thank you.

17   Q    Once you're outside, what did you next do?

18   A    I was trying to get back in, but the door was

19  locked.

20   Q    Which door?  Please tell us which picture.

21   A    The 39th Street door, this door (indicating).

22   Q    That's the door in picture D, is that correct?

23   A    Yes.  The door in picture A, the front entrance.

24   Q    All right, thank you.

25        When you were outside, did you see Mr. Little

SW

567

E. RIVERA - DIRECT/DRANOVE

1   Julio outside?

2      A   No.

3      Q   At the time you tried to get back in --

4      A   No.

5      Q   -- did there come some time after you tried to get

6   back in where you observed people exiting the door in

7   picture A?

8      A   When I went to my car and turned the car on.

9      Q   When you went --

10     A   And when I looked back, people was coming out.

11     Q   Were you in your car when you looked back?

12     A   I had to go inside my car to turn it on, yeah.

13     Q   Was anyone in the car with you at that time?

14     A   No.

15     Q   Where is it you next saw Little Julio?

16     A   On the sidewalk.

17     Q   What did he do?

18     A   I was asking where was my brother at.

19     Q   Speak more slowly.

20     A   I asked him where was my brother.  He said he

21   still in side or he probably coming out right now.

22     Q   Then what happened?

23     A   I wasn't trying to leave until I see my brother.

24     Q   Until what?

25     A   I see my brother and make sure he was all right.

568

E. RIVERA - DIRECT/DRANOVE

1    Q    Please try to speak more slowly.

2    A    Okay.

3    Q    And then what happened?

4    A    Then I said just get in the car, get in the car,

5    and I started radioing him and I was getting no answer.

6    Q    You started what?

7    A    Radioing him, Nextel, walkie talkie.

8    Q    Who?

9    A    My brother T.O.  Didn't get no answer.

10   Q    You didn't?

11   A    Didn't get no answer.

12        MS. CHU:  Objection.  He's interrupting.

13   A    I didn't get no answer when I started radioing

14   him.

15   Q    What did you then do?

16   A    Few seconds later, I hear his voice on the radio.

17   Q    Whose voice?

18   A    My brother's, Julio.  I was like, yeah, where you

19   at?  I'm right here on 39th Street.  Where are you?  He said

20   "I'm going at Ninth Street and Fifth Avenue right now."

21   Q    Is there anything on Ninth Street and Fifth Avenue

22   you're aware of?

23   A    It's a diner, there's a newsstand.  But usually --

24   it's a diner there where the neighborhood usually meets up

25   at after they go clubbing.  Be a young crowd there all the

SW

569

E. RIVERA - DIRECT/DRANOVE

1 time, 3 o'clock in the morning, 4 o'clock in the morning.

2     Q    Did you drive to Fifth Avenue and Ninth Street?

3     A    Did I drive?

4     Q    Yeah.

5     A    Yes, I did.

6     Q    Had you noticed anything unusual about Little

7 Julio's camouflage jacket by the time you got to Fifth

8 Avenue and Ninth Street?

9     A    No.

10     Q    What happened at Fifth Avenue and Ninth Street?

11     A    I arrived at Fifth Avenue and Ninth Street, I

12 pulled up behind J.P. car.

13     Q    Yes?

14     A    My brother stepped out.  I'm like, where your car?

15 He was like "Jahaira got it.  She's coming right now," and

16 she pulled beside me.

17     Q    Your brother said Jahaira has it and then what did

18 he say?

19     A    He said she had his car.

20     Q    Then what happened?

21     A    And then when he said that, they pulled up beside

22 of me.

23     Q    Who pulled up?

24     A    Jahaira with my brother's car.

25     Q    Then what happened?

570

E. RIVERA - DIRECT/DRANOVE

1     A   He stepped in the car. I said, where you going?

2  He said "I'm going to drop them off home." I said, where

3  you going after that? He said "I'm going home." I said all

4  right.

5     Q   Then what?

6     A   And I left. My brother went his way, J.P. had

7  left already.

8     Q   And what did you do.

9     A   And I went to Nelson Street and Hampton Avenue.

10    Q   Tell me what happened then?

11    A   I dropped Little Julio off.

12    Q   What was the lighting like at Nelson Street and

13  Hampton Avenue?

14    A   Under the gas station bright like this.

15    Q   Did you observe anything at that time with respect

16  to Little Julio's clothing?

17    A   That's when I seen the blood on his jacket.

18    Q   Now, at any time when you were questioned by the

19  detectives, were you asked if you observed anything on

20  Little Julio's jacket?

21    A   No.

22    Q   In a prior proceeding when you were questioned by

23  Ms. Chu, were you asked by anybody if you saw anything on

24  Little Julio's jacket?

25    A   I don't believe so.

SW

E. RIVERA - DIRECT/DRANOVE

1   Q    Do you recall at the time you were driving and

2   Little Julio was in your car where you had put your hat?

3   A    I can't say.  I could have had it on.

4   Q    You can't say?

5   A    I don't know.  Could have had it on.

6   Q    No guessing.

7        When you were in the club, did you have a hoodie

8   sweatshirt on?

9   A    Yes.

10  Q    What was the location of the hood?

11  A    What do you mean?

12  Q    Was it on your head or not?

13  A    No.

14  Q    Why not?

15  A    I don't like wearing hoodies.  It wasn't cold in

16  there.

17  Q    After you dropped off Little Julio at Nelson and

18  Hampton, you went somewhere, and -- that was before you were

19  married, correct?

20  A    Yes.

21  Q    Where did you go?

22  A    I went to a hotel.

23  Q    When did you leave?

24  A    What do you mean when did I leave?

25  Q    When did you leave the hotel?

SW

E. RIVERA - DIRECT/DRANOVE

1    A    The next morning.

2    Q    Where did you go?

3    A    I went to my mother's house.

4    Q    Yeah?

5    A    To change my clothes.

6    Q    Right?

7    A    And went to open the barbershop up.

8    Q    You went to your Diamond Cuts?

9    A    Yeah, went to my place of business.

10   Q    Okay, what time did you get to Diamond Cuts?

11   A    Twelve, around 12.

12   Q    Do you recall what time it was you left there?

13   A    That Sunday?

14   Q    Yes.

15   A    I usually close about 6 o'clock.

16   Q    Do you remember this particular one?

17   A    I left at 4 o'clock.

18   Q    Where did you go?

19   A    I went to pick up my son.  I usually get my son on

20   Sundays from 6 to 6 the next day.  But his mother had to go

21   out and she needed me to pick my son up a little earlier.

22   So I picked him up at 4 o'clock.

23   Q    What did you do when you picked up your son?

24   A    I met up with Patty.

25   Q    Your wife?

SW

573

E. RIVERA - DIRECT/DRANOVE

1    A    My wife, yes.

2    Q    And where did you go?

3    A    And went to her place and she cooked dinner for my

4    son and her daughter, for us.

5    Q    Did there come a time when you left her place?

6    A    Yes.

7    Q    When was that?

8    A    About 8, 9 o'clock.  I'm not sure.

9    Q    What did you do at that time?

10   A    I had to bring my son back to my mother's house.

11   Q    Did you?

12   A    Yes.

13   Q    Where is that located?  Where was that location?

14   A    34th Street.

15   Q    And from there where did you go?

16   A    I had to stay there, put him to sleep, and I was

17   heading back to Patty's house.

18   Q    Did you get to Patty's house?

19   A    Yes.

20   Q    Did she live alone at that time?

21   A    Yes.  Well, her daughter.

22   Q    Beg your pardon?

23   A    With her daughter.

24   Q    Did you stay at her house until the police

25   arrived?

SW

574

E. RIVERA - DIRECT/DRANOVE

1    A    Yes.

2    Q    How did you come to learn the police were there?

3    A    Were where?

4    Q    At Patty's house?

5    A    Oh, Patty woke me up and told me.

6    Q    What did you say or do?

7    A    Let them in.

8    Q    Then what happened?

9    A    They arrested me right in the living room.

10   Q    Where did they take you?

11   A    To 72nd precinct.

12   Q    Now, they took you to the 72nd precinct in

13   Brooklyn from what location?

14   A    Excuse me?

15   Q    Where is Patty's house?

16   A    Queens.

17   Q    When they took you to the 72nd precinct, did they

18   talk to you at all in the car?

19   A    Not really, no.  It was a quiet drive to the

20   precinct.

21   Q    By the time they had picked you up at her house,

22   had you heard anything about the end result of the incident

23   in the bar?

24              MS. CHU:  Objection.

25              THE COURT:  Overruled.  You may answer.

SW

E. RIVERA - DIRECT/DRANOVE

1    A    I had heard about a incident.  I know the -- I

2    wasn't in a incident.  I was in a bar fight.  But when I was

3    in the barbershop, one of my clients which is J.P.'s

4    partner -- J.P. have a detail shop.  They clean cars and --

5    Q    Yes?

6    A    He was getting a hair cut and he had radioed, J.P.

7    had radioed him, asked him where he was at.  He said he was

8    at Rique's getting a hair cut.  He said "Oh, you there with

9    Rique?"

10   Q    Speak a little slower.

11        MS. CHU:  He's interrupting him.

12   A    He said "Oh, tell Rique I just drove by that bar

13   and they got a police line."

14        MS. CHU:  Objection.  This is hearsay, your

15   Honor.

16        THE COURT:  Sustained.  This is hearsay.

17   Q    About what time on Sunday did you have that

18   conversation?

19   A    That was about 3, 3 in the afternoon.

20   Q    Did you stay at work?

21   A    Yes.

22   Q    Now, when the police brought you to the precinct,

23   about what time was it?

24   A    Sometime in the morning.

25   Q    Do you remember?

576

E. RIVERA - DIRECT/DRANOVE

1    A    Could have been 2, 3 o'clock in the morning.

2    Q    Do you remember?

3    A    No.

4    Q    Do you remember what happened there in the

5  precinct after you arrived?

6    A    I was being interrogated.

7    Q    Tell us where you were first brought in the

8  precinct?

9    A    Brought to a room.  Brought to a room.  There's a

10  table and chair.

11    Q    Were you in the -- you were in the courtroom when

12  the videotape was played?

13    A    Yes.

14    Q    Does that look like the room you were in?

15    A    No, that was not.  That was not the room I was in.

16    Q    You were in a different room?

17    A    Yes.

18    Q    What happened in that room?

19    A    I was told.

20    Q    Who told you?

21    A    Detectives.

22          MS. CHU:  Objection, your Honor.

23    Q    Do you recall which one?

24          THE COURT:  Overruled.  You may answer.

25    A    That me and my brother was being charged.

SW

577

E. RIVERA - DIRECT/DRANOVE

1          MS. CHU:  Objection.

2          THE COURT:  Overruled.  You may finish your

3    answer.

4    A    That me and my brother was being charged with a

5    murder.

6    Q    Yes?  Please continue.

7    A    All right.  He told me that --

8          MS. CHU:  Objection.

9          THE COURT:  Overruled.

10   A    He told me that my brother -- that he found out

11   what happened.

12   Q    Please speak more slowly.

13   A    The detective told me that they know that I was

14   kicked out the bar and my brother was left behind, and you

15   know, that -- first I told them what happened.  They asked

16   me what happened and I told them.  He said well, this is not

17   what happened.  He said somebody got murdered.  I said yeah,

18   but I got know -- I didn't hear no gunshots.  He said nobody

19   got shot.

20   Q    Who was talking to you?

21   A    Detective Darino.

22   Q    Please continue.

23   A    So as I'm talking, he keep interfering.  He said

24   "Listen, we have your brother here being charged with

25   murder, and you're going to be charged with murder too if

SW

578

1  you don't tell me what really happened."  That's what

2  happened.  I don't know nothing else.  So he left the room.

3  He kept coming back and forth.  Then one time he told me

4  that your brother's about to face life in jail just cause he

5  tried to save your ass at a fight that you had and when you

6  can easily just plead self defense and take the weight for

7  it, your brother goes home.  And you -- it's a bar fight.

8  It happens all the time.  Get a little eight to ten years

9  instead of y'all both facing life in prison.

10              MS. CHU:  Objection, your Honor.  Move to

11         strike as all being hearsay.

12              THE COURT:  Overruled.

13    Q    Did you respond when you were told that by

14  Detective Darino?

15    A    I told him I can't take that, I didn't do nothing.

16  And I didn't never see my brother do nothing.

17    Q    Then what happened?

18    A    They just kept leaving the room, kept coming back.

19    Q    When they would come back, what would happen?

20    A    He would come back and "What it's going to be?  I

21  don't have time.  I gotta charge you.  What you gonna do?

22  You gonna take the weight for your brother?  You got

23  felonies already.  You been up north, you know how it goes.

24  You did time before."  I was like I don't know, I can't

25  answer that right now.  "Be back, give you some time to

SW

579

E. RIVERA - DIRECT/DRANOVE

1  think about it."

2       Q    Please continue.

3       A    Then he came back and said "Listen man, this is

4  gonna to be -- you're pulling no time.  Just take the plea,

5  your brother go home, eight to ten years the most.  It's

6  self defense."

7       Q    Yes?  Then what happened?

8       A    And I told him how I'm going to plead self

9  defense.  "Just say what happened, you had a knife and you

10  struck the guy, you know, in self defense."

11       Q    Right?

12       A    So he said "You got to write it down.  You write

13  it down and you sign and everything, then we could just go

14  with that and I'll let your brother go."

15       Q    Did you write down a statement?

16       A    I wrote it, but I'm like, what you want me to say?

17  He said say what happened, you know, "When you had the

18  chance you pulled out a knife and you swung it," and that's

19  what I did.

20       Q    When you signed your name, your first name

21  Enrique, you misspelled it, is that right?

22       A    Yes.

23       Q    Do you often misspell your first name?

24       A    No.  I was nervous.  I was about to take the

25  weight for this.  I just got a business, I got a son, you

SW

580
E. RIVERA - DIRECT/DRANOVE

1    know, I was nervous.  I couldn't -- I wasn't thinking.  I

2    wasn't in the right state of mind at this time.

3        Q    What was your physical condition at the time?

4        A    Tired, exhausted, drinking the day before, a

5    hangover.

6        Q    Do you know was there a clock in the room you were

7    in when Darino and you had these conversations?

8        A    No, no clock in there.

9        Q    Did you have any way to determine how long this

10   back and forth between Darino and you took place?

11       A    No.

12       Q    After --

13       A    I had a watch on.

14       Q    Excuse me?

15       A    I had a watch on.

16       Q    Did they take it from you?

17       A    No.

18       Q    Did they take your shoe laces?

19       A    No.

20       Q    Or your belt?

21       A    No.

22       Q    After you wrote the statement, what next happened

23   to you?

24       A    I thought that was going to be it.  Then he said

25   now you got to sign these papers, the Miranda Rights.  I had

SW

581

E. RIVERA - DIRECT/DRANOVE

1     to sign that and he said you got to talk to the DA.

2         Q     Which came first, the signing of the Miranda or

3     writing the statement?

4         A     When I agreed to writing the statement, he said we

5     gotta do this first.  So he read me my rights, I put my

6     initials on it, and then went with the statement.

7         Q     At any time when he was questioning you before he

8     read you your rights, at any time did he read you any

9     portion of your rights?

10        A     Excuse me?

11        Q     Well, from the time you stepped into the precinct

12    and was put in a room to the time you were about to write

13    your statement, how many times were you read your rights?

14        A     None.

15        Q     When was it you were first read your rights?

16        A     When I agreed to making a statement.  When I was

17    signing the statement he said "Hold on.  I have some more

18    papers for you to sign."

19        Q     Had you already written the statement?

20        A     Yes.

21        Q     How did he approach you with respect to reading

22    you your rights?

23        A     He had it on a piece of paper and he read it.  And

24    then I just said yes and I put my initials on it.

25        Q     Did you sign the statement after you were read the

SW

E. RIVERA - DIRECT/DRANOVE

1   Miranda Rights?

2        A     The statement was made.

3        Q     Already made?

4        A     Yeah.

5        Q     And written?

6        A     Yes.

7        Q     How much time passed after that before you next

8   spoke to anybody in law enforcement?

9        A     Time was like I was in a zone.  So it was like the

10  whole world was on top of my back.  So it's like about a

11  hour two, I don't know.  It seemed like forever.  But the

12  time came when I had to go see the DA.

13       Q     Do you remember you were brought into a room and

14  the video camera was set up?

15       A     Yes.

16       Q     Who brought you to the room?

17       A     Detective Darino.

18       Q     Did you know why you were being brought to that

19  room at the time?

20       A     To have a interview with the DA.

21       Q     Did you expect a videotape?

22       A     No.

23       Q     Did you talk to the DA before that videotaped

24  event which we watched?

25       A     No.

SW

583

E. RIVERA - DIRECT/DRANOVE

1     Q    Do you remember being asked if you wanted to speak

2  to her?

3     A    Excuse me?

4     Q    Do you remember when she read you your rights --

5  you watched the video?

6     A    Yes.

7     Q    And she asked you "Now that I read you your

8  rights, do you want to make a statement," or words to that

9  effect?

10     A    Yes, I recall it.  I seen it on the tape.  I

11  really didn't want to talk.

12     Q    What else?

13     A    I didn't want to make a statement.

14     Q    Why?

15     A    Because I know I was going to do some time.

16     Q    Was it a true statement?

17     A    A false statement.

18     Q    Now, was Detective Darino in the room?

19     A    Yes.

20     Q    Did he tell you in this case about what you should

21  tell the lady prosecutor?

22     A    Just tell her what you wrote down.

23     Q    Did you ever tell the lady prosecutor you wanted

24  to make the statement?

25     A    No.

584

E. RIVERA - DIRECT/DRANOVE

1    Q    Did you do your best to repeat what you had

2    written down?

3    A    Tried to, yes.

4            MR. DRANOVE:  I have no further questions.

5    Now Ms. Chu has a chance.

6            THE COURT:  Cross examination Ms. Chu?

7            MS. CHU:  Thank you.

8    CROSS EXAMINATION

9    BY MS. CHU:

10   Q    When you were on the videotape with A.D.A.

11   Sipress, you never said to her that you didn't want to talk

12   to her, did you?

13   A    No.

14   Q    You never told her at all anything about the fact

15   that you didn't want to do this, did you?

16   A    No.

17   Q    In fact, you never even told her that Detective

18   Darino was telling you what to say, did you?

19   A    No.

20   Q    In fact, she just gave you kind of like an open

21   forum in which to tell what you wanted to say, isn't that

22   true?

23   A    Yes.

24   Q    But you never told her anything about what Darino

25   was doing to you or what you're telling to this jury, did

SW

1    you?

2         A    No.

3         Q    Now, how long have you known Little Julio?

4         A    For a pretty while.

5         Q    You've known him, he's one of your very good

6    friends, isn't that true?

7         A    We used to hang out when he was younger.  My uncle

8    used to live on that block.  Then he moved out and then he

9    went away.  And as we got older, we met up again.  But I

10   know him since we were little, yeah.

11        Q    In fact, you let him hang out at your barbershop

12   that night when you were watching the fight?

13        A    Yes.  He's a client.  I cut his hair.

14        Q    You cut his hair?

15        A    Yes.

16        Q    Did you cut your brother's hair?

17        A    Yeah.

18        Q    You cut J.P.'s hair?

19        A    Yes.

20        Q    Any customer that comes in, right?

21        A    Yes.

22        Q    Because you're in the business to make money?

23        A    Yes.

24        Q    You charge money, don't you?

25        A    Yes.

586

E. RIVERA - CROSS/CHU

1    Q    Now, you said that you knew him since you were

2    little and then you kind of met up with him again, and now

3    you're hanging out.  How long have you been hanging out?

4    How often would you hang out?  Everyday?  Every week?

5    A    Few times a month.  Depends if he's in the

6    barbershop, come back, hang out for a little while.

7    Q    And you said he used to live on your block?

8    A    My brother's block.

9    Q    And what block was that?

10   A    On Nelson Street.

11   Q    And that's right here in Brooklyn?

12   A    Yes.

13   Q    Right down where the B.Q.E. runs over?

14   A    Yes.

15   Q    What's Little Julio's name?

16   A    Julio.

17   Q    He has a last name?

18   A    I can't tell you.  I don't remember.

19   Q    You don't know.  Does he still live on Nelson

20   Street?

21   A    I don't believe so.

22   Q    And so -- but you don't know his name?  I'm sorry,

23   his full name?

24   A    No.

25   Q    Do you know his phone number?

SW

E. RIVERA - CROSS/CHU

1    A    No.

2    Q    You don't know his phone number?

3    A    No.

4    Q    How often would you see him back in 2005?

5    A    He'd come to the barbershop once a week, sometimes

6  twice a week.

7    Q    And you guys used to hang out together, isn't that

8  true?

9    A    Sometimes.  I'd be at work.

10   Q    In fact, that very night?

11   A    Excuse me?

12   Q    That very night, February 27, you were hanging out

13  with Little Julio, weren't you?

14   A    Yes.

15   Q    In fact you guys were dressed similarly, wouldn't

16  that be fair to say?

17   A    Yes.

18   Q    Yes?

19   A    Yes.

20   Q    Now, Little Julio is not as dark as you, is he?

21   A    About the same complexion.

22   Q    He's about the same complexion as you?

23   A    Yes.

24   Q    Well, he's shorter than you, isn't he?

25   A    Yes.

SW

588

E. RIVERA - CROSS/CHU

1    Q    He's significantly shorter than you, isn't he?

2    A    About the nose length.

3    Q    Okay, you're what, six foot?

4    A    No.

5    Q    Five, eleven?

6    A    Five, 10, 5, 11 the most.  5, 10.

7    Q    Well, when you were processed by Detective Darino,

8  you didn't tell him your height was 5, 11?

9              MR. DRANOVE:  Objection.  I don't know if he

10        told him anything.

11              THE COURT:  What's the question, did he tell

12        him that?

13              MS. CHU:  Yes.

14    A    Excuse me?

15    Q    Didn't you tell Detective Darino you were 5, 11,

16  160 pounds?

17    A    Yes.

18    Q    So Little Julio is about 5 foot 5, isn't he?

19  That's why they call him little, right?

20    A    About 5, 7, 5, 6.  He's not no 5, 4, 5.  We call

21  him Little Julio because he's a old -- my age, he's of age

22  but he's just little.  He always stood little.  He always

23  been little.  He didn't grow.

24    Q    Because he's short?

25    A    So we call him Little Julio.

SW

E. RIVERA - CROSS/CHU

1      Q    And you would classify yourself as being kind of a

2 slim guy, right?

3      A    Yes.

4      Q    Your build is slim, right?

5      A    Yes.

6      Q    Would it be fair to say -- withdrawn.

7          Isn't it true that Little Julio is stockier than

8 you?

9      A    No.  He's just Little Julio.

10     Q    He's the same size as you, just squished down?

11     A    Yes, just shorter.

12          MR. DRANOVE:  Objection.

13          THE COURT:  Overruled.

14     Q    You said you were drinking when you were at the El

15 Borinquen Bar at 39th Street and Third?

16     A    Yes.

17     Q    In fact, you said you were on your fourth round

18 when this altercation happened with Mr. Ojeda and his friend

19 Mr. Solomon, correct?

20     A    Yes.

21          MR. DRANOVE:  Objection.  He never said

22     Mr. Ojeda.

23          THE COURT:  Overruled.  That was her

24     question.

25     Q    You had been drinking at your barbershop as well,

SW

E. RIVERA - CROSS/CHU

1    isn't that correct?

2        A    Yes.

3        Q    In fact, you were drinking Heinekens while you

4    were watching the fight, isn't that true?

5        A    Yes.

6        Q    In fact, you were drinking about three or four

7    beers while you were watching the fight, isn't that true?

8        A    I can't recall.

9        Q    Well, you were drinking though?

10       A    Yes.

11       Q    Now, do you remember what the guy that was with

12   Mr. Solomon, you know, the person that we've established as

13   the victim in this case, Mr. Ojeda --

14            MR. DRANOVE:  Objection to "we have

15       established."  It's indefinite.

16            THE COURT:  I'm going to overrule the

17       objection.  She wants to ask a question about the

18       person who was stabbed and died.  You understand that's

19       Mr. Ojeda?

20            THE WITNESS:  Yes.

21            THE COURT:  Go ahead.

22       Q    You know the person that died in this case is

23   Edgar Ojeda, right?

24       A    Yes.

25       Q    Do you remember what he was wearing that night?

SW

591
E. RIVERA - CROSS/CHU

1    A    No, ma'am.

2    Q    Do you remember what color?

3         THE COURT:  What color what?

4    Q    What color of anything he was wearing?

5    A    I can't recall.

6    Q    And what about J.P., do you remember what he was

7    wearing?

8    A    No.

9    Q    What about your brother?  Isn't it true that your

10   brother was wearing like a light or gray colored sweatshirt

11   or sweat jacket?

12   A    Yes.

13   Q    And Jahaira was there, right?

14   A    Yes.

15   Q    Along with her boyfriend Rudy?

16   A    Yes.

17   Q    Now, did those girls get -- the ones you were told

18   were coming, did they ever get there before this altercation

19   took place?

20   A    No.

21   Q    They never got there?

22   A    No.

23   Q    So when you arrived there with J.P., Little Julio

24   and your brother, you said Jahaira and Rudy arrived shortly

25   after you guys?

SW

592

E. RIVERA - CROSS/CHU

1    A    Yes.

2    Q    And they were with her brother and his girlfriend?

3    A    I guess that was his girlfriend.  I don't know.

4    Q    Well, her brother and another woman?

5    A    Yes.

6    Q    So there was eight of you all together?

7    A    I wouldn't say so.  I --

8    Q    There were four of you?

9         MR. DRANOVE:  Objection, interrupting the

10   answer.

11        THE COURT:  Finish your answer.

12   A    I wouldn't say it was all in a group.  I know who

13   I came there with.

14   Q    I understand that.

15   A    I wouldn't say we were -- we was all eight

16   together.

17   Q    My question to you is there's four of you; you,

18   your brother, J.P. and Little Julio, correct?

19   A    Yes.

20   Q    And then you had Jahaira and her boyfriend Rudy,

21   correct?

22   A    Yes.

23   Q    And then you had Jahaira's brother?

24   A    Yes.

25   Q    And then you had the woman that he came with?

SW

E. RIVERA - CROSS/CHU

1      A    Yes.

2      Q    Correct.  So now we're up to eight people,

3   correct?

4      A    The math is correct.

5      Q    So you said you initially you go to the bar and

6   it's just you four that are sitting there or the whole --

7      A    At the beginning it was just us four.  When they

8   arrived, we went to the back.

9      Q    They got their drinks first and then you guys went

10   to the back?

11      A    Yes.

12      Q    Now, did all of you go to the back, meaning you,

13   Julio, J.P. and Little Julio?

14      A    Yes.

15      Q    And what about Jahaira and Rudy, did they go in

16   the back as well?

17      A    Yes.

18      Q    What about her brother and the woman he came with,

19   did they go in the back as well.

20      A    Yes.

21      Q    So eight of you were back there.

22      A    And other people that was around.

23      Q    That's my next question.

24          Was there anyone in the dance floor area when you

25   went back there with your group of eight?

SW

E. RIVERA - CROSS/CHU

1    A    Yes.

2    Q    How many people?

3    A    I can't recall.  They had tables on the side.

4  They placed tables on the side through the dance floor and

5  people sit there, drink.

6    Q    But you can't recall -- there were people there

7  but you just can't recall how many?

8    A    Yes.

9    Q    What about in the front area of the bar by the

10  jukebox and by the tables -- was Mr. Ojeda as well as

11  Mr. Solomon and his friends, were they already at the bar

12  when you arrived?

13    A    I can't recall.

14    Q    Do you remember them coming in?

15    A    No.

16    Q    Do you remember seeing them come in?

17    A    No.

18    Q    So at some point you say that you are now in the

19  bathroom to take a phone call?

20    A    Yes.

21    Q    Did you go to the bathroom to go to the bathroom

22  or did you go to the bathroom to take a phone call?

23    A    Phone call.

24    Q    Now, there's a door in the back of that bar, isn't

25  there?

SW

E. RIVERA - CROSS/CHU

1      A    What do you mean?

2      Q    There's a door that goes out to like a gated area

3  where people go to smoke, isn't a true?

4      A    Yes.  Yes, ma'am.

5      Q    In fact, if you wanted to make a phone call, you

6  could have stepped out in that direction, isn't that true?

7      A    I didn't know about it then.

8      Q    Well, you knew about that -- well, you just

9  mentioned that you knew that there was a door that goes to

10  the back where people smoke?

11      A    Yeah, but it wasn't open at the time.

12      Q    It wasn't open that night?

13      A    It wasn't open at the time.  I didn't know about

14  it.  I don't smoke, so I don't know.

15      Q    Well, you go to the bathroom?

16      A    Yes.

17      Q    To use the phone?

18      A    Yes.

19      Q    Now, can you describe the bathroom for us?

20      A    Little.

21      Q    When you say "little," is it a single toilet?  Is

22  it like a bathroom that you find at your house or it's just

23  a toilet and sink?

24      A    It's a sink and toilet.

25      Q    It's not like a stall?

E. RIVERA - CROSS/CHU

1      A      Like a three by three.

2      Q      If you can let me finish.

3             Is there a stall that's set up and you can lock a

4      door around where the toilet is and you wash your hands

5      someplace else?

6      A      No, there's no stall.

7      Q      So everything is open?

8      A      Yes.

9      Q      So if you're using the restroom or using the

10     toilet, whoever is in that room would be able to see you,

11     right, there's nothing to block your view of the person that

12     would be using the toilet?

13     A      Yes, but he's urinating, you can't see because he

14     got his back towards you.

15     Q      You can see his body?

16     A      Yes.

17     Q      Have you ever been to a bathroom where there's

18     actually a wall and there's a door you can go in and people

19     only see your feet, right?

20     A      Yes.

21     Q      It's not like that kind of bathroom?

22     A      No.

23     Q      When you go in there, where were you standing?

24     A      I was standing in front of the sink looking in the

25     mirror.

SW

597
E. RIVERA - CROSS/CHU

1    Q    Were those the kind of bathroom -- don't they have

2  some sort of -- how do you let someone know someone is using

3  it?

4    A    You lock it.

5    Q    No --

6    A    I wasn't using the bathroom.  I was just on the

7  phone.

8    Q    But you didn't lock the door to let anybody know

9  you were in there?

10   A    No.  I don't think it had a lock.  It's a run down

11 bathroom.  You just shut the door closed.  I don't think it

12 had no lock.

13   Q    So you go inside and you're looking -- at first

14 you're on the phone in the mirror?

15   A    Yes.

16   Q    How long were you on the phone before Mr. Ojeda

17 comes in?

18            MR. DRANOVE:  Objection to Mr. Ojeda coming

19       in.  No testimony whatever has established that.

20            THE COURT:  I'll sustain the objection as to

21       the form of the question.

22   Q    The person that came in to use the bathroom while

23 you were on the phone, is that the same person that was

24 standing with Mr. Solomon?

25   A    Yes.

SW

E. RIVERA - CROSS/CHU

1    Q    Later on you learned Mr. Ojeda, right, was the

2    person that died in this case, correct?

3    A    After.  I learned through the proceedings, yes.

4    Q    So that's the same person that came into the

5    bathroom while you were on the telephone, isn't that

6    correct?

7    A    Yes.

8    Q    So now that we've established that that's

9    Mr. Ojeda, he walks in when you've been on the phone for

10   about a minute, is that what you're saying?

11   A    Yes.

12   Q    You said you're on the phone with a woman by the

13   name of Patty?

14   A    Yes.

15   Q    Now who called who?

16   A    She called me.

17   Q    And when you were on the phone with her, you said

18   about a minute he walks in.  Who initiates or who says

19   something first?

20   A    He said something, but I didn't pay no mind, just

21   walk out the bathroom.

22   Q    And your testimony is he said something about

23   "This ain't a phone booth?"

24   A    Yes.

25   Q    Now, when he said that, did you -- I mean, did you

1   get angry at what he said?

2      A    Not really.  He was probably talking junk.  I

3   wasn't using the bathroom like he expected me, so I just

4   walk out.  I said I'll call you back and walk out.

5      Q    Did you ever call Patty back?

6      A    I didn't get a chance to.

7      Q    So when you walked out the bathroom, you didn't go

8   outside to continue the phone call because there's music

9   playing, right?

10     A    Yes.

11     Q    And you told her you were just going to call her

12  back?

13     A    I'll call you back when I get a chance.

14     Q    You walk to the bathroom but you don't --

15     A    I wanted to know what she was going to do, call me

16  back, I'll call you back.

17     Q    Well, you only had been on the phone about a

18  minute, right?

19     A    Yes.

20     Q    After you got on the phone -- I'm sorry.

21  Withdrawn.

22         The reason why you ended the phone call with her

23  is because this person just told you "This ain't a phone

24  booth," isn't a true?

25     A    Not really.  Yeah, I walk out because he's talking

SW

E. RIVERA - CROSS/CHU

1  reckless, right.

2     Q    So you go to get out of the bathroom and tell her

3  you'll call her back?

4     A    Yes.

5     Q    But you didn't go outside to then call her back

6  and continue the conversation with her, isn't that true?

7     A    Yes.

8     Q    Now, instead what you did?  You stayed by that

9  bathroom, isn't that true?

10    A    No.

11    Q    Well, you stayed in that back area such that when

12 he walked out you said he bumped into you?

13    A    That's where we was located at.  We was in the

14 back area.

15    Q    But the dance floor --

16         MS. CHU:  If I can have People's Number 6,

17    please?

18         May I approach, your Honor?

19         THE COURT:  Yes.

20    Q    If you can just look -- I'm sorry.

21         This area back here, that's where the dance floor

22 was, right?

23    A    Yes.

24    Q    In fact the bathrooms were like, if you're facing

25 the back they'd be on the left-hand corner?

SW

E. RIVERA - CROSS/CHU

1        A     Yes.

2        Q     Now, does the bathroom come to where the dance

3    floor area is or is it recessed?

4        A     There's a door, but you have plywood to cover the

5    bathroom.  You have to come around.

6        Q     So you actually have to go back here to get into

7    the bathroom?

8        A     Yes.

9        Q     And there was a DJ set up in the back, right?

10       A     Yes.

11       Q     In fact, the DJ was close to where it looks like

12   there's a door here?

13       A     Yes, there's a door there.

14       Q     Where were you guys set up?

15       A     We was between the DJ and the bathroom, like this

16   area right here (indicating).

17       Q     Now, you said that there were tables in the back

18   where the dance floor is and they run on either side of the

19   dance floor.  Is that how it was?

20       A     Yes, by the walls.

21       Q     By the walls?

22       A     Yes.

23       Q     Now, where were you standing when you say that

24   Mr. Ojeda came out and then bumped into you?

25       A     I was on this side by the bathroom.  We was

SW

1    behind, up, like straight across right here.  I was on the

2    left-hand side -- on the right-hand side.

3         Q    You were on the right-hand side?

4         A    Yes.

5         Q    Closest to that plywood wall that you were talking

6    about?

7         A    Yes.  Yes.

8         Q    Did you ever walk anywhere in the dance floor to

9    move away from where the bathrooms would be is what I'm

10   asking you?

11        A    No.

12        Q    And you said that he bumped into you?

13        A    Yes.

14        Q    What part of his body touched your body?

15        A    Shoulders touched my arms.

16        Q    So his shoulder touched your arm?

17        A    Yeah, my shoulder brushed arms to arms.

18        Q    In fact, Mr. Ojeda is a little shorter than you,

19   isn't a true?

20        A    I don't know.

21        Q    Well, you heard the testimony of Dr. Frederic,

22   right?

23        A    Yes.

24        Q    And she testified that he was 5 foot 5, right?

25             MR. DRANOVE:  Judge, are we asking for his

SW

E. RIVERA - CROSS/CHU

1      personal opinion or what a doctor testified to?

2                  THE COURT:  No, the question was whether he

3      heard that testimony Mr. Ojeda was 5, 5.

4                  Did you hear that?

5                  THE WITNESS:  Yes.

6      Q    In fact, he was 118 pounds, isn't that correct?

7      A    According to the testimony, yes.

8      Q    You said he walked by and you said he brushed your

9   arm, right?

10     A    My side.

11     Q    Because you're a little smaller than him, right?

12     A    I would say so.

13     Q    When he walks by you say he brushes into you and

14  then what did he do?

15     A    He glanced back.

16     Q    And how did he glance back?

17     A    He gave me that look, like what?

18     Q    Can you show me how he gave you a look?

19     A    He just looked back and he keeps walking.

20     Q    He just looked back at you and said what?

21     A    No, like a what?  No apologize, nothing, just like

22  if there's a problem.

23     Q    And did that make you mad?

24     A    No.

25     Q    That didn't make you mad?

604
E. RIVERA - CROSS/CHU

1      A    No.

2      Q    Even after what he said to you in the bathroom?

3      A    No.

4      Q    You're still not mad?

5      A    No.

6      Q    Okay, and so where do you see him go or do you

7  watch him?

8      A    I see him go where his friends at by the bar.

9      Q    I'm sorry?

10     A    Go by the bar where his friends were at.

11     Q    In fact, he went over by where the jukebox was?

12     A    Yes.

13     Q    That's what your testimony was, right?

14     A    Yes.

15     Q    In fact, he goes by where Mr. Solomon was who you

16 saw testify, right?

17     A    Yes.

18     Q    He goes by where he is?

19     A    Yes.

20     Q    Now, had you seen them -- before Mr. Ojeda

21 actually came to the bathroom, did you notice him in the bar

22 before that?

23     A    No.

24     Q    You didn't notice him?

25     A    No.

SW

E. RIVERA - CROSS/CHU

1    Q    Now, once that happens, you say you then alert

2    Little Julio?

3                    MR. DRANOVE:  Objection to "alert."

4                    THE COURT:  Sustained as to the form of the

5         question.

6    Q    You tell Little Julio what happened?

7    A    We was talking.

8    Q    Well, you called him over, right?

9    A    No, he was right there, right next to me.

10   Q    You said you let him know about --

11   A    Yeah, we're talking.  We're shouting, talking

12   right there.

13   Q    Did you tell anybody else besides Little Julio?

14   A    No.

15   Q    You didn't tell your brother?

16   A    No.

17   Q    You didn't tell J.P.?

18   A    No.

19   Q    Did you tell Jahaira?

20   A    No.  It was nothing, nothing to be broadcasting.

21   Nothing.

22   Q    Nothing to be what?

23   A    Broadcasting.  It was not a big deal.

24   Q    Oh, broadcasting.  I'm sorry, I didn't hear you.

25        You said he was talking reckless in the bathroom,

E. RIVERA - CROSS/CHU

1   right?

2       A    Reckless comment, "It's not a phone booth."  It

3   was more sarcastic, that's what it was.

4       Q    But then after that you have him then bumping into

5   you and then giving you this look, right?

6       A    Yes.

7       Q    And you're still not mad, right?

8       A    He's the one that's mad, not me.

9       Q    It was enough for you to at least tell Little

10  Julio what's going on, right?

11      A    It's not like what's going on.  It was just let

12  him know it was just talk.

13      Q    Isn't it about -- you told Little Julio watch him,

14  you got to watch him?  You didn't tell him that?

15      A    No.  Why he was acting up.  They drunk over there,

16  they're acting up.

17      Q    So you told Little Julio to watch him, right.

18  Keep his eye out on the guy, right?

19      A    We're not from that neighborhood.

20      Q    And now before you had seen -- I'm sorry, when you

21  saw Mr. Ojeda, you know, walk by you and brush you,

22  something like that, did you see him pushing into anybody

23  else?

24      A    No, I didn't.  I didn't keep my eyes on him like

25  that.

SW

E. RIVERA - CROSS/CHU

1    Q    Well, did you see him have a altercation with
2    anybody else in the bar?

3    A    No.

4    Q    Did you see him looking at anybody?

5              MR. DRANOVE:  Let him finish.

6              THE COURT:  We can't talk over each other.
7        Finish the question, let him answer.  Finish your
8        answer now.

9              THE WITNESS:  I forgot what she said.

10             THE COURT:  You want to read back the last
11       question.

12             (At this time, the record was read.)

13             THE COURT:  You want to answer who?

14   A    I don't know what he looking at.

15             THE COURT:  All right, start again.  Ask
16       another question.

17   Q    Did you see him brush into anybody else after he
18   brushed into you when he came out the bathroom?

19   A    I wasn't watching him.

20   Q    Well, you watched him go over to where Solomon
21   was, didn't you?

22   A    I seen where he ended up at.  I didn't watch him
23   every step he took.

24   Q    In fact, while you were telling Little Julio about
25   what happened, you said "Watch him," right?

SW

E. RIVERA - CROSS/CHU

1    How did you let Little Julio know who you were

2 talking about?

3         MR. DRANOVE: Let him answer the question.

4         THE COURT: One question at a time. What's

5    the question?

6    Q    When you were telling Little Julio about the fact

7 that he should watch him, were you looking at Mr. Ojeda?

8    A    No.

9    Q    You weren't looking at him?

10   A    We was talking about the place being corny.

11 There's no girls in here.

12   Q    But?

13   A    And then --

14        MR. DRANOVE: He's still answering.

15        THE COURT: Each of you are speaking on top

16    of the other. So finish your answer, please.

17   A    We was talking about how corner it was. It was

18 not lively. I'm about to break out. I was waiting for this

19 phone call. He was like, yeah, them dudes here, and he was

20 like, yeah, them dudes over there acting up, that's it.

21 Just watch them.

22   Q    How did you indicate to Little Julio which dudes

23 you were talking about?

24   A    The ones at the jukebox.

25   Q    Now, there were two people at the jukebox at that

SW

E. RIVERA - CROSS/CHU

 1    time, isn't that true, yes or no?

 2        A    Yes.

 3        Q    There was Mr. Ojeda and there was Mr. Solomon,

 4    isn't that true, yes or no?

 5        A    Yes.

 6        Q    Did you tell Little Julio which one it was that

 7    you were talking about or did he know?

 8        A    The short one.

 9        Q    So you told him that guy over there, the short

10    one?

11        A    The short one.

12        Q    Did you have to point to him?  I mean --

13        A    No.  I don't point at people.

14        Q    Were there other people in the bar?

15        A    Yes.

16        Q    In fact, you saw Mr. Ojeda's friends,

17    Mr. Domingues and Mr. Carrasquilla in this courtroom also,

18    didn't you?

19        A    Yes.

20        Q    In fact, they're kind of short too, aren't they?

21        A    I wasn't sizing them.

22        Q    You weren't sizing them?

23        A    No.

24        Q    Well, you remember them being at the bar?

25        A    No.

SW

E. RIVERA - CROSS/CHU

1    Q    You don't remember them being there?

2    A    No.

3    Q    But you did have to distinguish between Carlos and

4  Mr. Ojeda to Little Julio, correct?

5    A    Yes.

6    Q    While you saw Mr. Ojeda and Carlos Solomon at the

7  jukebox, did you see Mr. Ojeda bump into anybody when he was

8  there or push anybody while he was standing there with

9  Mr. Solomon?

10   A    There was nobody there.

11   Q    Well, I'm asking you did you see him push anybody

12  when he was there?

13   A    No.

14   Q    Did you see him get into any words with anybody

15  while he was standing there with Mr. Solomon?

16   A    No.  They was just talking.

17   Q    So it was just you?

18   A    Just me I guess.

19   Q    Now, have you ever been to this bar before?

20   A    One time.

21   Q    One time.  For a super bowl thing, right?

22   A    Yes.

23   Q    That night it wasn't very crowded, was it?

24   A    Which night?

25   Q    The night that you were there on February 27,

SW

E. RIVERA - CROSS/CHU

1    2005?

2        A    Not really.

3        Q    And I just wanted to go to when you were at the

4    precinct you said you got taken there by the detective from

5    Patty's house in Queens, right?

6        A    Yes.

7        Q    So you get to the precinct and you said Detective

8    Darino was going in and out of the room?

9        A    Yes.

10       Q    Now, I'm going to -- withdraw that.

11            You said that you had your son from 6 p.m. on

12   Sunday to 6 p.m. on Monday, that's the arrangement?

13       A    That's the arrangement, yes.

14       Q    In fact, you had to pick him up early because his

15   mother was going out that night, right?

16       A    Yes.

17       Q    Sunday night, correct?

18       A    Yes.

19       Q    So you get him at 4 o'clock on Sunday?

20       A    Yes.

21       Q    And then you take him to Patty's house?

22       A    Yes.

23       Q    That's what you said, right?

24       A    Yes.

25       Q    And then you take him back to your mother's house

SW

E. RIVERA - CROSS/CHU

1     at 8?

2          A     Around 8, 9.  I'm not sure of the time.

3          Q     Now, you were supposed to have him for that 12

4     hours -- I mean 24 hours?  Well, 24 hours, 6 p.m. to 6 p.m.,

5     right?

6          A     The court order was that he be supervised with my

7     mother.  He had to stay with my mother, but I took him out

8     with me for the day for a little while.

9          Q     I understand that, but when you left him with your

10    mother --

11         A     I have to.  That's where he stays at.

12         Q     Because you left?

13         A     Yes.

14         Q     But that's your son?

15         A     Yes.

16         Q     And you were supposed to spend the time with him

17    from 6 to 6?

18         A     Yes.

19               MR. DRANOVE:  Objection.

20               THE COURT:  Overruled.

21         Q     And you left to go back to Patty's?

22         A     I put him to sleep and I went back to Patty's,

23    yes.

24         Q     Now, when Detective Darino spoke to you at the

25    precinct, he never told you what anybody had told him as far

SW

613
E. RIVERA - CROSS/CHU

1    as his interviews in the case so far, did he?

2         A    Yes, he did.

3         Q    He told you that you were placed at the bar,

4    right?

5         A    Yes.

6         Q    He told you that you were the first one out, your

7    brother was left in there, correct?

8         A    Yes.

9         Q    He never told you anything about whether or not

10   people saw a knife or didn't see a knife, isn't that true?

11        A    He said my brother did it.

12        Q    He said your brother did it?

13        A    Yes.

14        Q    Well, according to you, you said that he told you

15   your brother was already in custody, isn't that true?

16        A    Yes.

17        Q    And when you were with Detective Darino, did he

18   ever give you any copies of any paperwork he had generated

19   as a result of any injury in this case?

20        A    No.

21        Q    He never showed you any of those things, right?

22        A    No.

23        Q    When he asked you to tell him what happened, you

24   told him what you say happened?

25        A    Yes.

SW

614

E. RIVERA - CROSS/CHU

1   Q    And then at some point he asked you to write it

2   out for him.  I just want to ask you about that.

3   A    I told him what happened, that's the story he

4   wanted to hear.  From what I heard, that my brother stood

5   there, my brother did it and it's all your fault because it

6   was your fight, and now --

7   Q    So he was --

8          MR. DRANOVE:  Let him answer.

9   A    "We're trying to not say nothing, you know.  What

10  happened?  Tell me what really happened?"

11  Q    He was just trying to get the truth from you,

12  correct?

13  A    No.

14         MR. DRANOVE:  Objection.

15         THE COURT:  Sustained as to the form of the

16  question.

17         We need to switch court reporters.

18         (At this time, Sandra Wilkes was relieved by

19  Michelle Walker, as official court reporter.)

20

21

22

23

24

25

SW

E. Rivera - Cross/Chu

615

1    THE COURT:  You may proceed, Miss Chu.

2    CROSS-EXAMINATION

3    BY MS. CHU:  Cont'd

4        Q    Now, you were talking before, the fact

5    that Detective Darino said to you that it was your

6    fault that his -- that your brother was going to be

7    charged with murder; that is what you said?

8        A    No.  He was -- my brother, because of me.

9    Because of my fight, he was trying to protect me.

10       Q    And he wanted you to tell what really

11   happened?

12       A    Tell my brother.

13       Q    I am sorry?

14       A    Tell on my brother.  Tell me what really

15   happened.  He know the story.  He want to hear it

16   from me.

17       Q    Now, when you were at the bar after -- I

18   am sorry.  I am going to go back in time here.

19            We are talking about back at the bar,

20   right, and you say you see Mr. Ojeda with friends,

21   Mr. Solomon, by the jukebox.  You told Little Julio

22   a little bit about what is going on, right?

23       A    Yes.

24       Q    Now, at some point you made your way over

25   to the bar because your turn to by a round, correct?

E. Rivera - Cross/Chu                          616

1        A    Yes.

2        Q    And when you're at the bar, you say that

3   Mr. Ojeda, Mr. Solomon are behind you?

4        A    Yes.

5        Q    So that would mean you would be facing the

6   bar where the bartender is?

7        A    Yes.

8        Q    Yes?

9        A    Yes.

10       Q    And when you were facing the bar, did you

11   turn around to look at them while you were ordering

12   your beers?

13       A    Yes.

14       Q    And you said at that point that is when

15   you saw him Mr. Ojeda still looking at you?

16       A    At the moment he looked at me, yes.

17       Q    And you said something about he nodded his

18   head.  Ask you show us what you mean?   He says,

19   what's up?  Like just like, what's up?

20       A    Yeah, what's up.

21       Q    Kind of like if you see somebody on the

22   street that you know, and you say to them, what's --

23   like what's up, like that?

24       A    No.

25       Q    Like what you mean?

E. Rivera - Cross/Chu                                        617

1          A    Like what's up. Why you looking at him.

2          Q    Why are you looking, that's what you

3     thought him to mean?

4          A    Yes.

5          Q    And when he said that, did you stay where

6     were you?

7          A    Excuse me?

8          Q    Did you stay where you were by the bar?

9          A    No. Walked a little towards him.

10         Q    In fact, you walked right up to him; isn't

11    that true?

12         A    Yes. It's not that far.

13         Q    And you said, what's your problem, right?

14         A    I said, what seem to be the problem.

15         Q    You said, what seems to be the problem?

16         A    Yes.

17         Q    And you said he said back to you, what is

18    your problem, something like that?

19         A    Yeah. He said, no, you got a problem.

20    That's what trying -- what is going on. Like --

21         Q    Now, Mr. Solomon, he's taller than you,

22    right?

23         A    Yes.

24         Q    He is like -- well, you saw him here in

25    court?

E. Rivera - Cross/Chu

618

1    A    Yes.

2    Q    And Mr. Ojeda, we established, is five

3    foot five, right?  But you're talking to Mr. Ojeda?

4    A    Yes.

5    Q    And after he said that to you, as far as

6    you know, what is your problem, then what happens?

7    A    What you mean, what you mean problem?

8    What is going on?  But his friend came over, and

9    Little Julio coming over.  So now the conversation

10   is over now.  Now, I am trying -- cause he want to

11   know what's up.  So I want to know what is --

12   Q    Mr. Solomon, what -- know what's

13   happening?

14   A    And Julio.  Everything all right?

15   Everything all Right.  It ain't nothing.  Ain't

16   nothing.  Ain't nothing.

17   Q    Little Julio and that's what he said,

18   what's happening?  You said, it's nothing, it's

19   nothing?

20   A    It's nothing.  Don't even take it out of

21   context.

22   Q    So when you just said that, you were using

23   your hand, you were putting them up, like palms

24   facing down; is that how you did it?

25   A    Yeah.  Something like that.  Yeah.

E. Rivera - Cross/Chu

619

1       Q    Would it be fair to say, when you did

2   that, Little Julio was to your left and Mr. Solomon

3   was to your right and Mr. Ojeda was in front of you

4   would?  That be fair to say?

5       A    Yes.

6       Q    That is how everything was kind of set up?

7       A    Yes.

8       Q    Yes.

9            In fact, Mr. Ojeda's back would have been

10  to that exit door that leads out to Third Avenue;

11  wouldn't that be correct?

12      A    Right in the middle of the floor.  Right

13  in the middle.

14      Q    My question to you, was his back would

15  have been facing towards that Third Avenue exit; is

16  that true?

17      A    Yes.

18      Q    And your back would have been facing

19  towards the bar; wouldn't that be true?

20      A    Yes.

21      Q    Now, how soon after you said, just chill,

22  just chill, did Mr. Solomon then punch you?

23      A    My brother came over.

24      Q    He came over first?

25      A    My brother came over it was going on.  You

E. Rivera - Cross/Chu

620

1   know, cursing, all that, all that.  I said, just

2   chill.  That's when swung --

3        Q    Who started the cursing?

4        A    They was already cursing.

5        Q    Who was already cursing?

6        A    Little Julio, Solomon.  My brother came.

7   What the fuck going on?

8        Q    Was Mr. Ojeda saying anything at this

9   point?

10       A    I don't recall.  I'm trying -- first

11   started with me and him.  I am trying to talk.  But

12   these guys are not -- everybody drinking.  So they

13   just not thinking.

14       Q    Now, you had mentioned earlier the music

15   was loud enough that when you were talking to

16   Little -- Ojeda, you have to lean in?

17       A    Yes.  Yes.

18            THE COURT:  You have to wait for the

19       question to be finished.  She has to wait for

20       you to finish your answer.  You have to wait

21       for her to finish the question.

22            Go ahead.

23       Q    You said that at some point when you were

24   talking with Little Julio that the music was loud

25   enough that you had to actually lean in to talk to

E. Rivera - Cross/Chu

621

1     them and speak loud enough because of the music
2     being as loud as it was?
3          A     Yes.
4          Q     Correct?
5          A     Yes.
6          Q     Did you also have to do that when you went
7     over to talk to Mr. Ojeda?
8          A     Sort of.
9          Q     Sort of.
10         A     Cause the speakers on the dance floor, so
11    it's not as loud by the bar area.
12         Q     How close were you to Mr. Ojeda when you
13    came up and you asked him what seems to be the
14    problem?
15         A     Like a foot away.
16         Q     So you could have touched him if you
17    reached out?
18         A     Yes.
19         Q     And did you remain that close to him while
20    you were telling Mr. Solomon and Mr. -- and Little
21    Julio just chill, just chill?
22         A     Yes.
23         Q     Nobody moved, right?
24         A     Yeah.  We just stopping moving, everybody
25    coming from the back.  I am trying to stop --

E. Rivera - Cross/Chu

622

```
1        Q    You're trying --
2        A    We being moved.  Yes.
3        Q    But Mr. Ojeda was still in front of you;
4   isn't that true?
5        A    Sort of, yes.
6        Q    And he wasn't -- you said you didn't hear
7   or notice him saying anything at this point,
8   correct?
9        A    Nah, I was trying to stop, break up the
10  conflict.
11       Q    Between Little Julio and Mr. Solomon?
12       A    Yes.
13       Q    So Little Julio would have been to your
14  left?
15       A    Julio.  Older brother.  Tito.
16       Q    Tito comes over.
17            Let's just call Tito --
18            THE COURT:  We are not -- you have to ask
19       a question.  We are not having a conversation.
20       Make it a question, let him answer and then ask
21       the next question.
22       Q    While you were standing there talking to
23  Mr. Ojeda, at some point Little Julio comes over,
24  correct?
25       A    No.
```

E. Rivera - Cross/Chu

623

1      Q    When you went over to ask Mr. Ojeda, what
2  seems to be the problem, and he says, what is your
3  problem?  At some point after that, did Little Julio
4  come over to where you were, yes or no?
5      A    No.
6      Q    Did Little Julio ever come over to where
7  you were?
8      A    Yes.
9      Q    At what point are we talking about?
10      A    Solomon came over.
11      Q    So my question to you is, not talking Mr.
12  Solomon, but while you're standing there in front of
13  Mr. Ojeda, at some point Little Julio comes to stand
14  next to you, correct?
15      A    Yes.
16      Q    And after Mr. Julio -- Mr. Little Julio
17  comes to stand next to you, then your brother, Tito,
18  comes over; isn't that true?
19      A    Yes.
20      Q    So that was the order, correct?
21      A    Yes.
22      Q    As far as your people are concerned?  I am
23  not talking about Mr. Solomon or anything.  As far
24  as your people, it's you first, then Little Julio
25  and then your brother, Tito; isn't that true?

E. Rivera - Cross/Chu

624

1      A    Yes.

2      Q    So would it be fair to say that Tito was

3   the furthest from you with regard to -- I am sorry,

4   withdrawn.

5          Would it be fair to say that Little Julio

6   was standing closer to you than your brother, Tito?

7      A    No.  Tito got in between me.

8      Q    Tito --

9      A    My brother tried -- my -- worrying about

10   me.  So Tito comes and try --

11          MS. CHU:  Objection, you can't say what

12      somebody else is worried about.

13          THE COURT:  Finish your answer.

14      A    Tito trying to come because he was on me.

15   As he come, what the F is going on.  I am not,

16   chill, ain't nothing.  That is when Solomon took the

17   swing on me.

18      Q    My question to you is, where was Tito when

19   he came over, was he standing next to Little Julio

20   or was standing next to you?

21      A    Finish?

22      Q    That was my question.

23      A    He came over to me.  There was no

24   standing.  Just came right over to me.

25      Q    So he stepped in between where you and

E. Rivera - Cross/Chu

625

1    Julio was standing?

2         A    Yes.

3         Q    Yes?

4         A    Yes.

5              MR. DRANOVE:   Julio --

6         A    Between me and Ojeda and Little Julio and

7    Solomon.

8         Q    He steps in front of all of those people?

9         A    Trying to get to the middle see what is

10   going on.

11        Q    Okay.  Did Little Julio stay to your left?

12        A    I am not sure.

13        Q    And you said at that point is when Mr.

14   Solomon swings?

15        A    And all the fight broke out.

16        Q    So then it would be fair to say that Mr.

17   Solomon -- I am sorry.  Withdrawn.

18             Would it fair to say that Tito would have

19   been the closest to Mr. Solomon when he went to

20   swing?

21        A    I got hit.

22        Q    All right.  What hand did Mr. Solomon used

23   to hit you?

24        A    If I knew what hand, I would have ducked

25   it.

E. Rivera - Cross/Chu

626

```
1      Q    What part of your body did it hit?

2      A    My face.

3      Q    What part of your face?

4      A    Me right-hand side.

5      Q    And after he hit you, you said you hit Mr.

6    Ojeda or Mr. Solomon, whichever of the two?

7      A    Hit both of them, yeah.

8      Q    You hit both of them.

9           Do you remember which one you hit first?

10     A    No.

11     Q    Do you remember where you hit Mr. Ojeda?

12     A    I didn't go for his knees, went for his

13   face.

14     Q    You went -- would it be fair to say that

15   you went for the upper part of his body?

16     A    Yes.

17     Q    What about Mr. Solomon?  Where did you hit

18   him?

19     A    Went for his face.

20     Q    He's little taller than you?

21     Q    Yes.

22     Q    You have to reach a little bit?

23     A    Yes.

24     Q    Yes.  Okay.

25          And you went for his upper body as well?
```

E. Rivera - Cross/Chu

627

1    A    Yes.

2    Q    Is that what you're saying?

3    A    Yes.

4    Q    How many times did you try and hit Mr.

5    Ojeda?

6    A    I can't say.  I wasn't counting.

7    Q    Was it more than once?

8    A    I was trying to block too.

9    Q    My question to you, was it more than once

10   that you hit Mr. Ojeda?

11   A    I only got three swings off.

12   Q    When you did that, was Mr. Ojeda trying to

13   hit you back?

14   A    I don't know.  We was in the bar fight.

15   What he tried to do, what I try to do is two

16   different things.

17   Q    And you said you got three swings off?

18   A    Got at least three swings off.

19   Q    And can you just tell me how you had your

20   hands when you were getting those three swings off?

21   A    In knuckle position.

22   Q    Like this (indicating)?

23   A    Yes.

24        THE COURT:  Indicating a fist.

25        MS. CHU:  Thank you.

E. Rivera - Cross/Chu

628

1      Q    Now, you had mentioned that when you went
2    to drop off Little Julio that you noticed for the
3    first time that there was blood on his jacket,
4    right?
5          A    Yes.
6          Q    Where did you see the blood?
7          A    On his jacket.
8          Q    Where?
9          A    On the front of his jacket (indicating).
10         Q    And when --
11              MS. CHU:  Let the record the defendant
12         just went both hands going from --
13              THE WITNESS:  Up on the shoulder part on
14         both sides of his shoulder (indicating).
15         Q    And it was noticeable enough for you to
16    see it, correct?
17         A    Under the light of the gas station, yes.
18         Q    You noticed it, right?
19         A    Yes.
20         Q    And you said it was also on the top of his
21    shoulder or just on the front of the jacket?
22         A    I am not sure.
23         Q    Was -- I am sorry?
24         A    I am not sure, I can't recall.
25         Q    Was the jacket open or closed?

1        A    At the time, it was closed.

2        Q    Do you recall whether or not -- I am

3    sorry, withdrawn.

4             Did you take off your jacket while you

5    were at the bar?

6        A    No.

7        Q    You left it on?

8        A    Yes.

9        Q    Did you have it zipped up or was it open?

10       A    Could have been open.

11       Q    And you had that green hat that we have in

12   evidence as People's number 7, right?  You had that

13   --

14       A    Yes.

15       Q    -- green hat on?

16       A    Yes.

17       Q    That night?

18       A    Yes.

19       Q    In fact, you kept having to take it off

20   during the course of your being inside of the bar;

21   isn't that true?

22       A    Yes.  Yes.

23       Q    Now, when you say there was blood on the

24   front, how much blood are we talking about?

25       A    I don't know.  I didn't analyze the

630

1    jacket.

2        Q    Now, was it soaked in blood or did it look

3    like just blotches, was that just drops?

4        A    Like blotches.  It's wasn't soaked in

5    blood.  It was blotches.

6        Q    Blotches?

7        A    You can tell he had blood on his jacket.

8        Q    Did it appear to be wet or dry?

9        A    Dry almost.  Dry.

10       Q    Dry?

11       A    Yeah.

12       Q    Now, when -- I am sorry.

13            Barbershop, Little Julio was there,

14   correct?

15       A    What day you talking about?

16       Q    When you were watching the fight that very

17   night.

18       A    He came later on, yes, to watch the fight.

19       Q    He was at the barbershop?

20            I am sorry.

21       A    Yes.

22       Q    And he was wearing the same thing he wore

23   to the bar, right?

24       A    Yes.

25       Q    He didn't change -- go home to change

E. Rivera - Cross/Chu

631

1  after you guys left the barbershop to go to the bar?

2      A    No.

3      Q    And when he was there, did you inspect his

4  jacket to see whether or not it had any blood on it?

5      A    We don't do security in my barbershop.

6  No.  I don't inspect nobody's jacket.

7      Q    When he was with you, he was in your car

8  when you guys went to 39th and Third?

9      A    We had a coat hanger, he hang his coat up

10  on the hanger.  We don't check people's stuff.

11      Q    I am saying, he was wearing the coat while

12  you were there, right?

13      A    Yes.

14      Q    And you didn't notice anything on the

15  jacket at that point, correct?

16      A    At what point?

17      Q    At the point that you're at your

18  barbershop?

19      A    No.

20      Q    You didn't notice anything?

21      A    No.

22      Q    And the first time you ever notice was

23  after this altercation that happened at 39th and

24  Third when you were dropping him off by that gas

25  station on Nelson Avenue, correct?

E. Rivera - Cross/Chu                                    632

1          A    Yes.

2          Q    Now, did you ask him about the blood?

3          A    I said, where you get that blood?  He

4    said, from the fight in there.

5          Q    He said probably from the --

6          A    Yeah.  Probably somebody bleeding in

7    there.

8          Q    Did you ask him why would anybody be

9    bleeding like that?

10         A    From a fight.  I was assuming from a

11   fight.

12         Q    You're assuming from the fight?

13         A    Yes.  He didn't say -- didn't say much.

14         Q    Did you -- did he have any blood anywhere

15   else?  Did you see his hands?

16         A    No.  Not that I recall, no.

17         Q    You didn't see blood anywhere else?

18         A    No.

19         Q    When he was sitting in your car, could you

20   see his pants?

21         A    No.  No, I didn't -- no.

22         Q    You weren't looking?

23         A    No.

24         Q    So now, after he leaves and goes, you

25   didn't ask him anything else?

E. Rivera - Cross/Chu

633

1              I am sorry, withdrawn.

2              Did you talk about what happened at the

3    bar at all while you were with Little Julio on

4    Nelson Avenue -- Nelson Street?

5         A    No.  I just wanted to know where he got it

6    from?

7         Q    Where, which guys?

8         A    The guy we just had the fight with.

9         Q    Oh, Mr. Ojeda and Mr. Solomon?

10        A    Yes.

11        Q    And did Little Julio know?

12        A    No.  No.

13        Q    You had never seen them before?

14        A    No.

15        Q    You never had any beef either of them

16   prior to that night?

17        A    No, ma'am.

18        Q    You didn't have a beef any other people

19   during the course of that evening while you were at

20   the bar?

21        A    Had beef with noone.

22        Q    Noone after Mr. Ojeda --

23        A    Had beef with noone.

24        Q    Well, I am saying, when he kind of said to

25   you --

E. Rivera - Cross/Chu

634

1    A    I don't call that no beef.

2    Q    Well, it was something that happened

3    between the two of you that --

4    A    Something ignorant he said.  That's it.

5    Q    It wasn't pleasant?

6    A    He wasn't no beef.

7    Q    Wasn't a beef?

8    A    It wasn't no beef.

9    Q    Okay.  Now, the first time that you

10   learned that Mr. Ojeda's blood was on your hat was

11   sometime in 2006; isn't that correct?

12   A    2006 at a hearing.

13   Q    And his blood was found, not just in one

14   place, but actually found on two places on your hat;

15   isn't that true?

16   A    According to the -- that hearing, yes.

17   Q    In fact, one was on the brim, right, and

18   one was in the back; isn't that true?

19   A    Yes.  That is what I heard.

20   Q    Now, you've had a long time to think about

21   how that blood got on your hat, haven't you?

22   A    Excuse me?

23   Q    You've had a long time to think about how

24   his blood got on your hat haven't you?

25   A    Got on my hat.  Cause I was there.

E. Rivera - Cross/Chu

635

1        Q     That's right.  Now, you recall the
2    testifying at a prior proceeding on June 15 in 2006
3    don't you?
4        A     Excuse me.
5        Q     Do you recall testifying at a prior
6    proceedings on June 15th of 2006?
7        A     Yes.
8        Q     And, in fact, at that time, you swore to
9    tell the truth, didn't you?
10       A     Yes.
11       Q     You had to take an oath and raise your
12   right hand just like you did before this jury,
13   correct?
14       A     Yes.  Yes.
15       Q     In fact, Little Julio was present when you
16   were testifying; isn't that true?
17       A     Yes.
18       Q     He was in the courtroom, right?
19       A     Yes.
20       Q     And you testified for like almost two
21   hours; isn't that true?
22       A     I believe so.  I wasn't watching --
23   clocking.  I wasn't clocking it.
24       Q     And during that testimony you were given
25   the opportunity to tell what happened to you; isn't

1   that true?

2          A    Yes.

3          Q    And during that entire time that you

4   testified, never once did you say that Little Julio

5   had blood all over his jacket, did you, yes or no?

6          A    Noone asked.  Noone asked.

7          Q    But you didn't tell anybody that?

8          A    Noone asked.

9          Q    But you didn't tell --

10         A    I didn't say that.

11         Q    You did not say that, right?

12         A    No.

13         Q    Just today that you said that; isn't that

14  true?

15         A    Yes.

16         Q    And when you were at the precinct with

17  Detectives Darino and Detective Rivera, you never --

18  when they trying to pin this murder on you and your

19  brother, you never said that Little Julio had blood

20  all over his jacket, did you?

21         A    They didn't ask --

22         Q    But you didn't tell them?

23         A    No, they didn't ask.

24         Q    My question to you was, did you or did you

25  not tell them that Little Julio had blood on his

637

1    jacket, yes or no?

2         A    No.

3         Q    And you never wrote it in your statement

4    either, did you?

5         A    No.

6         Q    And when you were video taped by ADA

7    Sipress and she is giving you the opportunity to

8    speak about what happened, you never once mentioned

9    anything about Little Julio having blood on all over

10   his jacket, did you?

11        A    No, that wasn't the deal.

12        Q    I am not asking you what a deal was.  I am

13   asking, you never mentioned at all Little Julio

14   having blood on his jacket until today; isn't that

15   true?

16        A    Yes.

17             MS. CHU:  I have nothing further of this

18        witness.

19             THE COURT:  Any redirect?

20             MR. DRANOVE:  Yes.

21   REDIRECT EXAMINATION

22   BY MR. DRANOVE:

23        Q    Mr. Rivera, is Little Julio in the

24   courtroom today?

25        A    Excuse me?

E. Rivera - Redirect/Dranove

638

1   Q   Is Little Julio in the courtroom today?

2   A   No.

3   Q   Have you figured out how the blood got

4   onto the front and very back of your cap?

5       MS. CHU:  Objection.

6       THE COURT:  Overruled.

7       You may answer.

8   A   I have no idea.  Probably at the bar.

9   Q   What about --

10  A   Could have happened in the bar.  Could

11  have happened in the car.

12  Q   Was the cap in the car?

13  A   Yes.

14  Q   When you left there with Little Julio --

15  A   Yes.  It's my cap.

16  Q   -- was there any blood, to your knowledge,

17  on any item of your clothing except for the two

18  drops, one in the front of your cap and one in the

19  back of your cap?

20  A   That's it.

21  Q   Do you know where in the car your cap was?

22  A   I'm not sure.

23      MR. DRANOVE:  I have no further questions.

24      THE COURT:  Any recross?

25      MS. CHU:  Just couple of questions.

E. Rivera - Redirect/Dranove

639

1    RECROSS-EXAMINATION

2    BY MS. CHU:

3        Q    Mr. Rivera, the cap that has Mr. Ojeda's

4    blood on it, that was on -- that was with you when

5    you were inside that bar; isn't that true?

6        A    It's my hat, yes.

7        Q    And many the items of clothing that are in

8    evidence, that is just the jacket and the sweatshirt

9    and the hat that you were wearing that day; isn't

10   that true?

11       A    Yes.

12       Q    In fact, we never got your pants or your

13   shoes that you were wearing that day, did we?

14       A    I don't believe so.

15            MS. CHU:  I have nothing further.

16            THE COURT:  Thank you, Mr. Rivera.  You

17       may return --

18            MR. DRANOVE:  Judge, may I --

19            THE COURT:  No, that is it.  Two rounds.

20            You may return to your counsel table and

21       join your counsel.

22            (WITNESS EXCUSED)

23            MR. DRANOVE:  Can counsel approach by

24       scheduling matters?

25            THE COURT:  Yes.

A. Rivera - Direct/Dranove

640

1           (Whereupon, there was a discussion held
2      off the record, at sidebar at this time.)
3           THE COURT:  You may proceed, Mr. Dranove.
4           MR. DRANOVE:  Can I have a moment, Judge?
5           THE COURT:  Yes.
6           MR. DRANOVE:  Defense calls Angel Rivera.
7      A N G E L   R I V E R A, having been called as a
8  witness, having been duly sworn, testified as
9  follows:
10          COURT CLERK:  State your name?
11          THE WITNESS:  Angel Rivera.
12          COURT CLERK:  What county do you live?
13          THE WITNESS:  Kings.
14          THE COURT:  You may examine the witness,
15     Mr. Dranove.
16 DIRECT EXAMINATION
17 BY MR. DRANOVE:
18     Q     Mr. Rivera, do you know Enrique Rivera?
19     A     Yes.
20     Q     What, one of your brothers?
21     A     Yes.
22     Q     I want to ask you about Sunday night,
23 February 27, until 28, 2005.  Did there come a time
24 when you had some incident with police?
25     A     Yes.

A. Rivera - Direct/Dranove

641

1     Q    What happened?

2     A    Coming from work, coming out of work, and

3  I was driving about two blocks down.  And all sudden

4  undercover cars just pulled me over.

5     Q    What happened next?

6     A    They came out, like I was walking -- I was

7  going down the street.  When I got to the red light,

8  before I drove off, the light turn green, they

9  surrounded me like probably ten vehicles and they

10  just drawing their guns.  Then I stopped.

11     Q    About what time was that?

12     A    It was like ten, 11, 10:30.

13     Q    On Sunday night?

14     A    Yes.

15     Q    Did you go anywhere with the police?

16     A    Yeah.  They -- after --

17     Q    Where did you go with the police?

18     A    To the precinct.

19     Q    How did you get there?

20     A    They took me in the car.

21     Q    Which car?

22     A    Police car.

23     Q    About what time did you arrive at the

24  precinct?

25     A    About half an hour later.

A. Rivera - Cross/Chu

643

1     A     Negative.

2     Q     That is not the reason?

3     A     Yes.  No.

4     Q     You didn't have a bag of marijuana on you?

5     A     No.

6           MS. CHU:  I have nothing further for this

7     witness.  But I do have an application after --

8           THE COURT:  Any redirect?

9           MR. DRANOVE:  No, your Honor.

10          THE COURT:  Thank you.

11          Mr. Rivera, you may step down from the

12    witness stand.

13          (WITNESS EXCUSED)

14          THE COURT:  You may proceed, Mr. Dranove.

15          MR. DRANOVE:  I have no further questions.

16    That is the defense case.

17          THE COURT:  All right, ladies and

18    gentlemen, we are going to recess the trial for

19    tomorrow morning.  I'll ask you to return

20    tomorrow at ten o'clock.  You're going to get

21    the case for your decision then.

22          Please don't discuss the case.

23          Have a very nice evening.  Ten o'clock

24    tomorrow morning.

25          (Jury Excused)

1          MR. DRANOVE:  If my --

2          THE COURT:  How do we establish that?

3     What is the reason for submitting reckless

4     manslaughter to the jury in this case?

5          There is no reckless theory in the

6     indictment.  There is no way there is any

7     evidence to support that the injuries that

8     caused death were recklessly inflicted.

9          MR. DRANOVE:  Because if the jury is being

10    asked by the prosecutor to credit my client's

11    statement that he had a knife, as he said, and

12    that he swung it, that is foreseeable, if

13    you're swinging a knife at a crowd.  It's like

14    firing a weapon at a crowd.  It's reckless.

15    But it's not a gun.

16         THE COURT:  I don't think that is the

17    People's theory at all.  I don't think it's

18    your theory either.  Neither of you are going

19    with that theory.  They indicted for

20    intentional murder, and intentional

21    manslaughter.  I'm sorry.  Intentional theory.

22    There is no theory of reckless conduct by the

23    People.

24         It's clear Appellate law, two theories,

25    reckless and intent, are inconsistent theories,

```
 1          - - - - - - - - - - - - - - - - x

 2     THE PEOPLE OF THE STATE OF NEW YORK

 3              -against-              Ind#1453/05

 4     ENRIQUE RIVERA, Defendant.

 5          - - - - - - - - - - - - - - - - x

 6

 7     THIS IS TO CERTIFY that after a specific search

 8     of the official stenographic notes taken on May

 9     12, 2009, concerning page 648, line 11, a

10     correction has been made to line 11 of said

11     page, "he had no knife," and now reads "he had

12     a knife," and a new corrected page submitted at

13     this time.

14

15

16     MICHELE J. WALKER,                    6/10/13
       Official Senior Court Reporter

17

18

19

20

21

22

23

24

25
```

656

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:  CRIMINAL TERM: PT 35
-------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK

      - against -          Ind. #1453/05

ENRIQUE RIVERA,           Murder 2

             Defendant.     Trial

-------------------------------------x
          320 Jay Street
          Brooklyn, New York

          May 13, 2009

B E F O R E :  HONORABLE ALAN MARRUS, presiding

    (Appearances same as previously noted.)

                MICHELE J. WALKER,
          OFFICIAL SENIOR COURT REPORTER
- - - - - - - - - - - - - - - - - - - - - - - - - -

     THE COURT:  Before we go forward in front

of the jury, there are several matters that I

want to address.

     First, I believe Mr. Dranove has a blow-up

of one of his exhibits.

     Have you shown that to Miss Chu?

     MR. DRANOVE:  I had offered it to her.  I

believe I did.  She didn't look at it.  It's my

only exhibit.  Exhibit A.

     THE COURT:  I believe you intend to show

Proceedings

657

1     it for illustrative purposes during the

2     summation.

3              MR. DRANOVE:  Yes, sir.

4              THE COURT:  Any objection, by the People?

5              MS. CHU:  No, your Honor.

6              I did look at it, it appears the same as

7     the one -- don't have my original with me, but

8     I trust Mr. Dranove made a duplicate, whatever

9     is the actual chart.

10             THE COURT:  So you may use that at the

11     time you give your summation.  It's an '05

12     blow-up of the Defense Exhibit A, which is a

13.    DNA chart.

14             Now, the second matter that I want to

15     address is, when we left off yesterday, the

16     prosecutor indicated possible intention to call

17     a rebuttal witness.

18             What is your position on that today?

19             MS. CHU:  Yes, your Honor.  I specifically

20     had asked yesterday to put on a rebuttal case

21     with regard to Angel Rivera.

22             However, I was unable to ascertain from

23     the detectives that stopped him the information

24     regarding his summons that he received from the

25     officer who transported him.  So I am not

Proceedings

1      prepared to go forward with that at this time.

2           However, I did have occasion to review

3      what was said by Julio Rivera during his

4      testimony yesterday concerning the fact that

5      ADA Sipress had stopped the tape during the

6      course of his audio tape and had somehow had

7      Detective Rivera coercing him into saying that

8      it was a camouflage jacket during the time of

9      his actual statement.

10          I would -- I have Mrs. Sipress here.  I'd

11     like to put her on as a rebuttal witness to

12     evidence how the tape was a continuous tape.  I

13     actually -- I believe that that opened the door

14     to actually introducing the tape itself of

15     Mr. Julio Rivera so the jury can hear there was

16     no stopping of the tape, and she can also

17     attest to his disposition at the time that she

18     took the statement from him.

19          MR. DRANOVE:  Your Honor, unless Mrs.

20     Sipress is an expert witness and evaluated the

21     tape to see whether or not it was stopped, she

22     can't give a conclusion as to whether or not

23     the tape that she is going to play has been

24     stopped and not stopped.

25          And I would like an opportunity to have a

Proceedings

1      copy of the tape and have it examined by an

2      expert. See if it was stopped.

3              THE COURT: It's my understanding that the

4      People intend to call her to indicate the

5      procedures that were followed with the tape.

6      And to explain that to the jury.

7              I would not allow an opinion as you are

8      suggesting it would be as to the condition of

9      the tape. She couldn't be in a position to

10     offer such an opinion.

11             You intend to ask her the procedure that

12     she used to make the tape recording?

13             MS. CHU: Yes, your Honor.

14             THE COURT: And to, in effect, rebut the

15     defendant's claim that the tape was stopped

16     during the recording session?

17             MS. CHU: That's correct, your Honor.

18             THE COURT: And what else did you intend

19     to do about playing the tape? That is the part

20     I really don't understand.

21             MS. CHU: I would ask her, have you had a

22     chance to review or listen to the audio-taped

23     statement that you took from Mr. Rivera on that

24     date? And is that a fair and accurate

25     recording of your audio-taped conversation with

Proceedings

660

1       him?  And I am going to ask her before we even
2       get to that, did you stop the tape at all?
3       During the time that you were actually audio
4       taping, what is your procedure as far as when
5       you speak to him?

6           Because the standard procedure in our
7       office is that we usually speak to the
8       witnesses first before we actually audio tape
9       them just so we can gather our thoughts as to
10      how the tape is going to progress.  Meaning the
11      flow of the questions that you're going to give
12      the witness and that is what she is going to
13      explain.

14          THE COURT:  You don't intend to play the
15      tape?

16          MS. CHU:  No, I do intend to play the
17      tape.

18          THE COURT:  That is what I just asked you.

19          MS. CHU:  I said I was going to do that
20      before, and once we get to the tape, she will
21      listen to the actual tape that I have with me,
22      and she will authenticate that is a fair and
23      accurate recording of her conversations with
24      Mr. Julio Rivera that were audio taped.

25          THE COURT:  How long will the tape take?

Proceedings

661

1        MS. CHU:  It's only about seven minutes.

2        THE COURT:  Is there any issue as to its

3 audibility?

4        MS. CHU:  No.

5        THE COURT:  What are you going to play on

6 it?

7        MS. CHU:  I have a tape recorder right

8 there.

9        MR. DRANOVE:  Judge, the issue is an

10 expert issue that -- Miss Sipress can say, I

11 didn't do that.

12        THE COURT:  Well --

13        MR. DRANOVE:  I would like an opportunity

14 to have the original examined if there is going

15 to be -- if there is going to be an issue where

16 Miss Sipress says, I didn't stop it. I didn't

17 know this issue was going to arise.  I think I

18 should have an opportunity to establish the

19 forensics if it is in fact --

20        THE COURT:  At this point, I am not going

21 to grant a continuance for an expert

22 examination of the tape.  She is not offering

23 that issue.  The issue is, you have a witness

24 who said the tape was stopped.  And she is

25 going to offer the evidence that it wasn't

Proceedings

662

1    stopped.  And I am not going to allow any
2    opinion about the fact that the tape has been
3    examined by anyone, and there is a conclusion
4    offered based on expert examination of it as to
5    whether it's been stopped.  I think it's within
6    content of a witness that testified what that
7    witness did, the procedure the witness followed
8    and then to play the tape for the jury to
9    listen to it.  To see what's on the tape.
10   Since it has now become an issue at trial.
11        MR. DRANOVE:  I believe there is a
12   transcript of this recording.  I'd like to know
13   if the prosecution has brought it to court.
14        MS. CHU:  Actually the witness has it.  I
15   had given it to her to review.  It actually has
16   some corrections on it cause sometimes --
17   transcribers don't exactly get everything that
18   is said on it.
19        MR. DRANOVE:  Well, I would like to see
20   that.
21        THE COURT:  There is a transcript,
22   certainly.  We are not going to use it for the
23   jurors.
24        MS. CHU:  No.
25        MR. DRANOVE:  Well, the subject whether or

Proceedings

663

1      not this tape has been examined by any experts

2      will be allowed to be raised?

3              THE COURT:  Well, I don't know exactly

4      what you propose to do.  You're talking about

5      making a comment about it in summation?

6              MR. DRANOVE:  At a minimal.

7              THE COURT:  Well, it's fair to comment

8      about what the evidence is or is not in a

9      trial.  I find it hard, in advance, to make a

10     ruling about comments in summation without

11     understanding the context and the actual

12     wording of the comment.  But since this is an

13     issue at the trial, fair comment is allowed

14     about it.

15             MR. DRANOVE:  All right, your Honor,

16     before it's made, will I have an opportunity to

17     read this transcript?

18             THE COURT:  If there is a transcript, she

19     says she has it, you can look it.

20             MS. CHU:  He was provided with a

21     transcript.

22             MR. DRANOVE:  Like to have the one with

23     corrections to make sure --

24             MS. CHU:  I am just saying he was given

25     the original one.  I made my additions or my

Proceedings

664

1    corrections to it subsequent to that.

2        If I can just go outside, I can get my

3    copy from her.

4        THE COURT:  You can.

5        Before you do, I just like to resolve one

6    other thing on the record.  That is yesterday

7    when we left off, another thing that came up

8    was the issue of being instructed on an

9    interested witness.

10       Defense counsel indicated there were

11   federal decisions which made it improper to

12   charge that a defendant is an interested

13   witness.

14       He was kind enough to leave a message with

15   me after court yesterday on my voice mail

16   regarding two federal decisions from the Second

17   Circuit that he asked me to look at.  Which I

18   did.  I previewed those decisions.

19       I've also reviewed other decisions,

20   specifically of our state courts, and, in

21   essence, the language that is condemned in

22   those cases has to do, not with charging the

23   jury regarding interested witness or that a

24   defendant is an interested witness, it's

25   telling a jury that the defendant either has a

Proceedings

1    motive to lie during that instruction or

2    distinguishing between the defendant and anyone

3    else who might be an interested witness and

4    saying the defendant is in a worse situation.

5    Because it's the defendant in terms of

6    evaluating his testimony.

7         Neither of those things occurred during my

8    instruction, and it's not part of the standard

9    instruction in New York, which is allowed and

10   specifically approved by the Court of Appeals

11   and the Appellate Division, which is that a

12   defendant is an interested witness, that others

13   may be interested witnesses also and that a

14   jury should carefully evaluate the interest the

15   witness has in the outcome of the case in

16   evaluating their credibility, but not in anyway

17   distinguishing between the defendant and any

18   other interested witness, or specifically

19   stating that that means the defendant had a

20   motive to lie.  Which I will certainly not say

21   during my instruction.

22        I just want to make sure I have reviewed

23   it, and I will not run afoul of the language

24   that has been condemned by the federal

25   Appellate courts.

Proceedings

1          You can check --

2          MS. CHU:   I do have two other matters that

3     I'd like to put on the record.

4          Number 1, is that when the defendant

5     testified there was a lot of directing and

6     cross-examination regarding a prior proceeding.

7     In fact, we had introduced a portion of his

8     statement at a prior proceeding, and I believe

9     that it was elicited by the defense counsel

10    that I questioned him during that prior

11    proceeding.   But I would like to ask for The

12    Court to give a statement to the jury that at

13    this prior proceedings when the defendant

14    testified that he was questioned by both his

15    attorney as well as an assistant district

16    attorney.   In order to make it fair as far as

17    the fact that he was questioned by both sides.

18         THE COURT:   That wouldn't be an

19    instruction, that would be in the nature of a

20    stipulation.   That is not an instruction on the

21    law.

22         MS. CHU:   I didn't say instruction.   I --

23    just a statement.

24         If defense counsel agrees to a

25    stipulation, I would be happy to draw that up.

Proceedings

667

1     But if he is not agreeable -- I didn't actually

2     get a chance to mention it to him before -- I

3     am raising it to The Court.

4          MR. DRANOVE:  I suggest a proposed

5     stipulation be shown to me at the time --

6          THE COURT:  Stipulation, I told the jury

7     that, was agreed that when the defendant was

8     previously questioned at a prior proceedings,

9     he was questioned both by defense counsel and

10    by the district attorney.

11         MR. DRANOVE:  I have no objection to that,

12    it's true.

13         MS. CHU:  The second matter has to do with

14    the charge of intent.  I am asking for The

15    Court to give expanded version of the intent,

16    which is, there is no premeditation required to

17    be proved.

18         MR. DRANOVE:  Can I see the proposed

19    charge?

20         MS. CHU:  I can go get the minutes, then

21    I'll write out the stipulation.

22         THE COURT:  It's very simple.  Intent is

23    to be formed at the time of the act.  It

24    doesn't have to be formed at any time prior to

25    that.  That's the extent of it.  It's not an

Charge Conference

668

1    expanded charge.  It simply tells the jury that
2    the intent that is required must be formed at
3    the time of the act.  It may not be formed at
4    any time in advance of the act.  That is pretty
5    much what it says.
6         I don't know --
7         MS. CHU:  Do you want me to do the
8    stipulation?
9         THE COURT:  The stipulation is already
10   done.  I indicated what the stipulation is.
11        MS. CHU:  I thought you wanted me to write
12   it out.
13        THE COURT:  No.  It will be stated in the
14   record.
15        MR. DRANOVE:  While we are doing that, if
16   you can hear my question?
17        THE COURT:  Yes.
18        MR. DRANOVE:  With respect to
19   circumstantial evidence, what you're going to
20   charge the jury.
21        First, I object to the circumstantial
22   evidence charge.
23        THE COURT:  Then I won't give it.  You
24   don't want it, I won't give it.
25        Are you telling me you don't want it?

Charge Conference

1          MR. DRANOVE:  I don't want it.

2          THE COURT:  Okay.  I am not going to give

3     it.  When the defense doesn't request one, then

4     I wouldn't give a circumstantial evidence

5     charge.

6          Next?  Anything else?

7          Let's get this show on the road.

8          MS. CHU:  Can I just step out?

9          THE COURT:  Please.

10          MS. CHU:  I wanted to address the issue

11     having to do with circumstantial evidence

12     charge that the defense counsel has requested

13     and not charge to the jury.

14          I do believe that the evidence that was

15     brought out during the course of this trial

16     does not have direct evidence that the

17     defendant used a knife.  I mean you have some

18     people seeing him punch him, then you have the

19     results.  But you don't actually have him --

20     there is no testimony before this jury that has

21     a knife in his hand.  And I just think that the

22     charge would be helpful to the jury in order to

23     explain to them that they can draw reasonable

24     inference from the fact that he was seen

25     punching him, then there is a stab wound after.

Charge Conference

670

1      So I would prefer The Court actually charge him

2      with the circumstantial evidence charge.

3          THE COURT:   The defense don't want it, I

4      am not charging it.   That's my position.

5          MR. DRANOVE:   Your Honor, I've had a

6      chance to review the unmarked document, that's

7      a transcript.

8          I renew my objection to a statement coming

9      in, statement of Mr. Julio Rivera, that was not

10     introduced during the trial.   It allegedly

11     includes words spoken by my client.   My client

12     has finished testifying, and it's not

13     probative -- this tape, transcript and the

14     words on the tape are not probative of the

15     issue raised by the testimony of Mr. Julio

16     Rivera.   And they do not, in anyway, establish

17     whether or not the tape -- the tape recording

18     device was stopped.   Just open the door to

19     words allegedly spoken by my client, which may

20     open the door to my calling Julio Rivera back

21     to the witness stand, or my client back to the

22     witness stand, and all of it is not related to

23     whether Mr. Sipress said, I did or did not stop

24     the machine.

25         THE COURT:   Miss Chu, you want to be heard

Charge Conference

671

1     on that?

2          MS. CHU: Your Honor, I believe that the

3     introduction that the tape itself is extremely

4     probative for this jury to hear that when

5     Mr. Rivera was being audio taped by Miss

6     Sipress, there is no coercion involved, there

7     was no coaching by the detectives and

8     everything that he said was a free-flowing

9     statement given to her voluntarily when he's at

10    the precinct. I believe that he opened the

11    doors to that by putting Mr. Julio Rivera on

12    the stand. He knew about this audio-taped

13    statement put before you, he put Mr. Rivera on

14    the stand he has to assume the risks that when

15    he testifies, if he's testifying to different

16    what actually occurred he is opening himself up

17    to this type --

18          THE COURT: The ruling is, I'll allow the

19    People to play the tape.

20          I am going to give limiting instruction to

21    the jury. The instruction will be the purpose

22    of the admissibility of this evidence is so

23    they can hear the manner in which Mr. Rivera

24    was questioned by the District Attorney, and

25    it's being admitted solely for that purpose,

Charge Conference

1    not for the content. What he said in the trial

2    is what the evidence is. Not what he said on

3    that tape, and that they are allowed to listen

4    to the tape to evaluate the credibility of his

5    account about how the statement was taken by

6    the District Attorney. For that limited

7    purpose only.

8        MR. DRANOVE: Your Honor, let me just read

9    from this in some places.

10       Judge, as you recall, the witness

11   testified there was questions about whether he

12   saw camouflage. Repeated camouflage, the

13   machine wasn't on at that time.

14       I suggest that if there is going to be any

15   playing of the tape, it starts with the

16   question, "what kind of jacket was that person

17   wearing?" Everything before that is a

18   description of what happened in the bar and

19   including what my client supposedly told his

20   brother afterwards on the street later that

21   evening.

22       Then it's a question, I am reading from

23   it. "When the commotion inside the bar?

24   Answer: Ah-huh. Question: You said that --

25   you said you thought someone was coming to hit

1    you from your left-hand side but you did.  Did

2    you see an arm like what -- Answer:  I seen the

3    arm.  I seen the arm.  Question:  Tell what --

4    Answer:  All.  Question:  What kind of jacket

5    was that person wearing?  Answer:  Was like a

6    black jacket.  It's camouflage, black jacket,

7    all right.  That is when I seen -- Question:

8    What did you see?"  A -- I mean, answer:  "On

9    my right.  On my right-hand side, and I see a

10   white shirt coming this way swinging at me."

11        I am interrupting it now.

12        Your Honor, all the testimony about the

13   camouflage, let her play that.  Because it's

14   supposedly was interrupted.  Anything before

15   that includes the description of what happened,

16   what my client supposedly told his brother,

17   what my client's brother told him, which wasn't

18   allowed in during the trial.  And there was a

19   clear statement in the courtroom, questions

20   andanswers about what was the subject matter

21   that was being raised with you and it was

22   constantly the camouflage jacket.  That's when

23   it was stopped.  Now, what happened in the bar

24   afterwards?

25        THE COURT:  Miss Chu, what's your position

Charge Conference

1   on that?

2          MS. CHU: My position remains the same,

3   your Honor. We have to show this jury that the

4   tape is never stopped. That it's continuous

5   interview by Miss Sipress of Mr. Rivera while

6   he's at the precinct. And to cut it off would

7   indicate that there was a break in it. So I

8   think they need to hear it completely.

9          In addition to that, Mr. Rivera testified

10  that it was Detective Rivera that kept

11  harassing him. Detective Rivera wasn't present

12  during the interview that was established at

13  the beginning of the tape when she states who's

14  present during the actual interview on the

15  audio tape.

16         MR. DRANOVE: Wouldn't that be enough.

17         THE COURT: At this point, based on the

18  information that I have, I believe it's

19  appropriate for the DA to be able to play the

20  tape with limited instruction that I will give

21  to the jury. I believe the door was opened by

22  the account given Mr. Rivera when he testified.

23         We are ready for the jury.

24         Let's bring them out, please.

25         COURT OFFICER: Your Honor, ready for the

1      jurors?

2           THE COURT:  Yes.

3           COURT OFFICER:  Jury entering.

4           COURT CLERK:  Both sides waive the roll

5      call?

6           MS. CHU:  Yes.

7           THE COURT:  Waive the roll call, Mr.

8      Dranove?

9           MR. DRANOVE:  Yes.

10          THE COURT:  Good morning, ladies and

11     gentlemen.

12          As you know, yesterday the defense rested

13     its case.  And I put the case over today, and

14     the district attorney has requested permission

15     to call a witness in rebuttal and I have

16     granted that application.

17          You may call the witness.

18          MS. CHU:  The People call Jennifer

19     Sipress.

20     J E N N I F E R  S I P R E S S, assistant

21     district attorney, having been recalled as a

22     witness, having been previously duly sworn,

23     testified as follows:

24          COURT CLERK:  State your name, title, your

25     employer again?

 1              THE WITNESS:  Jennifer Sipress.

 2         S-I-P-R-E-S-S.  I'm an assistant district

 3         attorney.  I'm employed by the Kings County

 4         District Attorney's office.

 5              THE COURT:  You may examine the witness,

 6         Miss Chu.

 7              MS. CHU:  Thank you.

 8    DIRECT EXAMINATION

 9    BY MS. CHU:

10         Q    Good morning, Mr. Sipress.

11         A    Good morning.

12         Q    Do you recall testifying on Monday

13    regarding an investigation that you conducted in

14    relation to the death of a person by the name of

15    Edgar Ojeda?

16         A    Yes.

17         Q    Do you also recall conducting an interview

18    of a person by the name of Julio Rivera on

19    February 28th, 2005 at approximately 11:49 a.m.?

20         A    Yes.

21         Q    Now, when you conducted the interview of

22    Mr. Rivera, were there any detectives with you?

23         A    Yes.

24         Q    Who was with you?

25         A    Detective Gaynor from Homicide.  And

1   Detective Darino.

2       Q    Now, can you tell me, during the course of

3   your interview with Mr. Rivera, did Detective Gaynor

4   or Darino take part in the interview that you were

5   having or the conversations that you were having

6   with Julio Rivera?

7       A    No.

8       Q    Now, when you spoke to Mr. Rivera, did you

9   immediately audio tape him?

10      A    No, I did not.

11      Q    Why is that?

12           MR. DRANOVE:  Objection.

13           THE COURT:  Overruled.

14           You may answer.

15      A    I spoke to him first to see what his story

16  was, then memorialized it on audio tape.

17      Q    How did he appear to you when you were

18  speaking with him?

19      A    He appeared fine.

20      Q    Did he appear to be under any duress at

21  all?

22      A    No.

23      Q    Was he -- I am sorry.

24           Did he appear to be scared at all to speak

25  to you?

Sipress - Rebuttal/Direct                    678

1       A    No.

2       Q    Did there -- was there any time during the

3   course of your being with Mr. Rivera that Detective

4   Gaynor or Detective Darino try to coach him into

5   what to say?

6       A    No.

7       Q    Now, where did the interview actually take

8   place; do you remember?

9       A    On the second floor of the precinct within

10  the detective squad.

11      Q    Now, once -- I am sorry.

12           Did there come a time when you actually

13  began to audio tape him?

14      A    Yes.

15      Q    When you began the audio tape, did you

16  stop the tape at any time during the course of your

17  questioning and then question Mr. Rivera not on the

18  audio tape?

19      A    No.

20      Q    Did you ever stop the tape while it was

21  recording, talk to him and then begin recording

22  again?

23      A    No.

24      Q    Did you ever stop the tape as it's

25  recording and allow the detective to speak to Mr.

Sipress - Rebuttal/Direct

1  Rivera regarding what to say, then resume it again?

2       A    No.

3       Q    Now, have you had a chance to listen to

4  the audio tape recording that you made of Julio

5  Rivera on February 28, 2005?

6       A    Yes.

7       Q    What was the tape number that was assigned

8  to that tape?

9       A    On A030109.

10      Q    Is this a copy of the tape that you have

11 reviewed?

12      A    Yes.

13           MS. CHU:  At this time, your Honor, I ask

14      this be marked People's number 14?

15           THE COURT:  Pursuant to a ruling I

16      previously made out of the presence of the

17      jury, this will be People's Exhibit 14.

18           MR. DRANOVE:  I object to it going into

19      evidence.  I heard the word "copy."

20           THE COURT:  You may ask your question as

21      to the authenticity of it.

22                          (Whereupon, the above-mentioned

23                           item was received and marked as

24                           People's 14, for

25                           identification.)

Sipress - Rebuttal/Direct                    680

1        Q    Miss Sipress, the tape that you have in
2    front of you, that is a tape that you actually
3    listened to?
4        A    Yes.
5        Q    Where did you listen to that tape?
6        A    In your office.
7        Q    Was that tape a fair and accurate
8    recording of the recording you made of the interview
9    with Julio Rivera on February 28th, 2005?
10       A    Yes, it is.
11            MS. CHU:  At this time, I would offer it
12       into evidence as People's number 14.
13            THE COURT:  You want to voir dire?
14            MR. DRANOVE:  I do.
15   VOIR DIRE EXAMINATION
16   BY MR. DRANOVE:
17       Q    Miss Sipress, is that the tape cassette
18   housing housing the original recording which you
19   have before you now?
20       A    I don't believe so.
21            MR. DRANOVE:  I object to it going into
22       evidence.
23            THE COURT:  Overruled.
24            I'll allow the exhibit into evidence, and
25       I am instructing you that when I allow

Sipress - Rebuttal/Direct

681

1    something into evidence, it's for you to

2    consider as to what, if any, weight you will

3    give it.  I am merely allowing the tape into

4    evidence.

5         I am also instructing you that when the

6    tape is played, I am allowing it to be played

7    so that you can hear the manner in which the

8    examination of Mr. Rivera was conducted, not

9    the content of what he said.  He testified here

10   as a witness, and Mr. Rivera's testimony is

11   what the evidence is.  Not what he said on the

12   tape.

13        However, there is an issue in the trial in

14   the manner in which he was questioned and the

15   manner in which the recording was made of his

16   account.  Therefore, I am allowing you to

17   listen to this so that you can hear the actual

18   tape-recorded statement for that purpose and

19   that purpose only.

20        You may play the tape.

21        MS. CHU:  Thank you.

22        (Whereupon, the audio tape was played in

23   open court at this time.)

24        (pause)

25   Q    Miss Sipress, at the end of the tape, did

682

1   you ask a question to someone other than Mr. Rivera?

2       A    Yes, I did.

3       Q    Who did you ask that question to?

4       A    I asked the detectives if they had any

5   questions for the witness.

6       Q    Were there any other questions posed to

7   Mr. --

8       A    There were not.

9            MS. CHU:  Thank you very much.  I have

10           nothing further.

11           THE COURT:  Cross-examination?

12           MR. DRANOVE:  Thank you.

13  CROSS-EXAMINATION

14  BY MR. DRANOVE:

15      Q    Miss Sipress, you said that you spoke to

16  Julio Rivera to see what his story was; am I

17  correct?

18      A    Yes.

19      Q    Did you write down anything whatsoever to

20  indicate what my -- what might be described as what

21  you heard Julio Rivera tell you?

22           MS. CHU:  Objection.

23           THE COURT:  Overruled.

24           Did you write anything down?

25           THE WITNESS:  I did not write anything

Sipress - Rebuttal/Cross                      683

1          down.  I --

2                 MR. DRANOVE:  Thank you.

3          Q     Now, at the time Julio Rivera told you, in

4     quotes, story, what time was that?

5          A     I -- I interviewed him before I started

6     the tape.  Probably maybe five or ten minutes before

7     the tape was started.

8          Q     Once again, does your office provide you

9     with rules with respect to whether you should write

10    down the statement of the supposed witness which

11    statement is given to you during the course of the

12    investigation of a homicide?

13         A     I do write down --

14         Q     Well, where are the notes?

15                MS. CHU:  Objection, your Honor.  Could he

16         let her finish.

17                THE COURT:  I don't think she said she

18         took any notes here.  You asked her about her

19         office policy.  That is different.

20                What is it you want to ask?

21         Q     What I asked you, do you write down --

22                THE COURT:  In this case, or in other

23         cases?

24                MR. DRANOVE:  In general.

25                THE COURT:  Sustained as to what she does

1          in general.

2          Q    In this case, did you write down anywhere

3     what Mr. Julio Rivera told you?

4          A    Yes, I did.

5          Q    Before or after the recording?

6          A    After the recording is made.

7          Q    Did you bring with you what it is you

8     wrote down?

9          A    Yes, I did.

10         Q    May I see it?

11         A    (Indicating)

12         Q    You spoke to Julio Rivera approximately

13    how many minutes before you taped recorded him?

14         A    Maybe five or ten minutes.

15         Q    You recorded him at 11:49?

16         A    Yes.

17         Q    Now, on what you handed me, there is a

18    handwritten notation, 10:27.  Do you recognize the

19    handwriting?

20         A    My handwritten notes says 10:27.  That

21    doesn't --

22         Q    Is that your handwriting?

23         A    Yes.

24         Q    Do you recall what 10:27 refers to?

25         A    That was the time that I started the video

Sipress - Rebuttal/Cross                685

1    tape of the defendant.

2         Q    Of the other -- of Mr. Enrigue Rivera?

3         A    Correct.

4         Q    Was the video tape still there at 11:49

5    when you tape recorded Julio Rivera?

6         A    No.

7         Q    Did you, at any time, swear in Enrigue

8    Rivera?

9              MS. CHU:  Objection.

10             THE COURT:  Sustained.

11        Q    Now, we heard a copy of the original tape

12   today.  Where's the original tape?

13        A    I believe it's in my office.

14        Q    Here in Brooklyn?

15        A    Yes.

16        Q    350 Jay Street?

17        A    Should be.

18        Q    Next door?  Correct?

19        A    Correct.

20             MR. DRANOVE:  No further -- no further

21        questions.

22             THE COURT:  Any redirect?

23             MS. CHU:  No.

24             THE COURT:  Thank you, Miss Sipress.

25        You're excused.  You may step down from the

Summation - Dranove

686

1     witness stand.
2            (WITNESS EXCUSED)
3            THE COURT:  That completes the evidence
4     that you will hear at this trial.
5            The next step in this trial will be the
6     closing arguments by the attorneys.
7            Mr. Dranove, are you ready to proceed with
8     your summation?
9            MR. DRANOVE:  If I can get a cup of water.
10           THE COURT:  You can get as many cups of
11    water as you like.
12           MR. DRANOVE:  Start with one.
13           THE COURT:  Mr. Dranove goes first.
14           Under the law, defense counsel's closing
15    argument is first on behalf of his client.
16    Mr. Rivera.
17           Would you like the table opened up?
18           MR. DRANOVE:  I'd like the table opened,
19    please.  Thank you.
20           Judge Marrus, Miss Chu, Mr. Foreman,
21    members of the jury:
22           This is a case where I think more than a
23    dozen witnesses testified very quickly -- stand
24    back here.
25           I, under our rules, don't have to deliver

Summation - Dranove

687

1    a summation because I don't have to prove

2    anything.  Burden of proof is on the

3    prosecution in every case.  And it hasn't

4    shifted at all because the defense presented a

5    case.

6         In this case, we've learned of a tragedy

7    of a young man, a fine young man, that went out

8    with his friends, smoked marijuana, he was

9    drinking in a strip bar, he went and drank some

10   more and there -- to quote my client's

11   recollection of what Detective Darino told

12   him -- there was a bar fight.  Saturday night

13   bar fight to the detective.  The families

14   destroyed and my client's accused.

15        Now, we heard from different types of

16   witnesses.  Family of my client, detectives,

17   fingerprint expert, medical examiner expert,

18   police who came to the scene, detectives who

19   came to the scene.  Friends of the victim and

20   an off duty bouncer.  And assistant district

21   attorney Sipress.  Whose original tape, by the

22   way, is next door, too much trouble to bring

23   the original.  I don't understand why not.

24   Where's the original testimony has been

25   examined by an expert.  And it's intact, no

Summation - Dranove

1     interruption.  Not before you.  Not even the

2     original tape.

3          The witnesses who were in the bar had all

4     been drinking.  No doubt they'd all been

5     drinking, some of them had been smoking

6     marijuana.  One had five or six Heinkens, was

7     on his third Bacardi, and he was the off-duty

8     bouncer.  I don't know what the on-duty bouncer

9     has to say, he didn't testify.

10         The marijuana smoking from Mr. Solomon and

11    Mr. Ojeda was in the morning.  Supposedly

12    nothing happened in the afternoon.  They

13    started drinking in the evening and continued

14    drinking until the incident, the roucous, to

15    quote one of the witnesses, Mr. Dominguez,

16    Carrasquillo or Mr. Solomon described it, a

17    commotion or the brawl, if you will, in the bar

18    took place.

19         The only place there was light in the bar,

20    was at the bar.  Some witnesses pointed to a

21    picture in Exhibit 4, I believe, the one with

22    the pictures is it was as dark as this, or

23    maybe darker (indicating).  Yes.  I think they

24    pointed to 4B or even -- 4G.  And said it was

25    maybe darker than this.  Here's the bar on the

Summation - Dranove

689

1       left side of the picture, jukebox, and I think

2       you can see the door on the far right corner.

3       (Indicating) Pretty dark. It's pretty dark in

4       there. And they're pretty drunk. How good are

5       their recollections.

6           Carlos Solomon tells you there was a man

7       in white who he went for. A man wearing white

8       who he was so focused upon that he wouldn't

9       have even seen his parents if they were there

10      because he wanted to get that man wearing

11      white. Who else said there was a man in white?

12      We heard a tape. You heard the tape, I don't

13      know. Was Solomon clear headed enough to know

14      if there was a man in white? Julio Rivera was

15      wearing a red shirt, his gray jacket was off.

16      Did anyone say they saw a man wearing a red

17      shirt? No. Who wore the hoodie and ran out

18      wearing a hoodie? Little Julio. Mysterious

19      Little Julio. A man with a tremendous amount

20      of energy. We heard who wore a camouflage

21      jacket and the hoodie. My client testified it

22      was warm in there, he took the hood down.

23          Well, we have a case of science versus

24      drunk witnesses. We really do. Science one

25      side, drunk witnesses the other. Where is this

Summation - Dranove

690

1      overlap, and what can you make of it?  In this
2      case the prosecution and the drunk witnesses
3      want you to believe that my client, who
4      admitted he threw some punches, wasn't throwing
5      punches, he was stabbing a man, three times.
6      My client said he thinks he threw three
7      punches.  The prosecution is going to ask you
8      you to turn three punches into two downward
9      thrusts with a knife in the back and one
10     downward thrust with a knife in the front.

11         Now, medical examiner said a punch, that
12     is ridiculous.  Her words, it couldn't be a
13     punch.  If somehow you could hold a knife in
14     your hand and punch (indicating).  Use your
15     common sense, wrap your fingers, you're
16     bleeding.  It's not going to cause the downward
17     wounds in the back or the front.  It can't.
18     The objective evidence conflicts with the
19     theory that Mr. Enrique Rivera's is a punch or
20     punches, were assaults with a knife.  He is not
21     the one.  And the witness, Dr. Frederic, also
22     testified about the knife.  It would have to
23     have sharp edges on each side.  She said that.
24     Based upon putting the wounds together and
25     examining each, I guess, end of it.  My client,

Summation - Dranove

691

1      you saw what he looked like in that video tape.

2      A beaten man, resigned to make a statement.

3              MS. CHU: Objection, your Honor. There

4          was no evidence about beatings.

5              MR. DRANOVE: I don't mean physically

6          beaten, like --

7              MS. CHU: Objection, he is having a

8          conversation with me.

9              THE COURT: Objection overruled. He can

10         argue what he is arguing.

11             MR. DRANOVE: He wasn't physical beaten,

12         but in ways psychologically beaten. He took --

13         my client says, I took out a pocket knife. You

14         saw him open a pocket knife. Now, it's in the

15         video. You can see it. And said, I swung it.

16             And back to the expert versus my client.

17         Miss Chu asked Dr. Frederic could those wounds

18         be inflicted by someone swinging a knife like

19         that (indicating). And she said, no. They

20         cannot. Now, that's a fact. My client said, I

21         got sucker punched. His brother did. They

22         swung. My client was removed by the bouncer.

23         He don't know what happened when he was

24         removed. His back was to what was going on.

25         There was a brawl going on. There was Jahaira

1       and Rudy, I think, Rudy's sister or brother and

2       a husband.  They were in there.  Mr. Ojeda,

3       Solomon, Dominguez, Carrasquillo, one of those

4       guys who's been getting drug arrests in 2007,

5       2008, it's like a gift to the defense bar, you

6       just keeps coming back for more.  But

7       nonetheless, in that bar that night, my client

8       was punched, threw some punches and was removed

9       by the bouncer who did not testify.

10          Now, you heard Mr. Solomon testify he saw

11      my client put -- he said.  He said, he saw my

12      client -- part of his testimony -- put a hand

13      out.  Palms up.  What did my client said he

14      tried to do.  He talked to this fellow and who

15      he was talking to are addressed.  Chill.  My

16      client had his hand out, chill, this is

17      nothing.  Chill, chill, chill.  (Indicating)

18      His brother came over.  Just chill.  The F

19      word, it's a bar, it's late at night.  Solomon,

20      big mouth, the F word.  Julio stands between

21      his brother and the group.  Tells his brother

22      probably "shut the fuck up."  Let me take care

23      of it.  And he gets punched.  Well, punches

24      start flying.  That is what happens in bar

25      brawls.  The bouncer was there.  At least one

1    bouncer, he took my client out. He can account

2    for that. Noone can account for little Julio.

3    Noone can account for Rudy, Jahaira, their

4    friends. Solomon runs off after a guy in a

5    white jacket. My client's already gone.

6    Solomon comes back after the bouncer won't let

7    him out. Some amount of time has passed and

8    Edgar Ojeda says, I have been stabbed. Ojeda

9    doesn't say who stabbed him. He don't say the

10   guy in the camouflage jacket, short guy, little

11   guy. I have been stabbed. It happened

12   quickly. But Mr. Enrigue Rivera is the one

13   accused. Didn't happen through his efforts.

14       Now, you heard testimony in the precinct,

15   Detective Darino told Julio Rivera, my

16   client -- you have to excuse me. Listen, you

17   started it, we know your brother was there, we

18   know your brother did it. You've been upstate.

19   He hasn't. You did it because you started it.

20   My client testified, I didn't start it. I

21   didn't do it, but the psychologist here amongst

22   those who want this case closed with a

23   conviction from the bar friends, plaintiff,

24   Ojeda is my client started it. Does it matter

25   the right person is going to pay. Someone from

1        his group is going to pay.

2               But we have rules in this court, rules of

3        proof, burden of proof, evidence. Your powers

4        and what you can make of it and how to judge a

5        case of justice is done. Not so that someone

6        says, we got one of them. This is not what

7        we're here for.

8               So in this bar, afterwards, we don't know

9        what happens in great detail except what we

10       know in court. But one of the telling pieces

11       of information that came out and I have been

12       thinking about this for a long time I am sure

13       the prosecution has, and I am sure the family

14       of the victim has and I am sure my client and

15       his family has. What really happened. Well, I

16       ask you to recall the testimony that there was

17       several detectives who went to Julio Rivera's

18       apartment. They went there, and they looked at

19       Julio's clothing. They inspected Julio's

20       jacket. They put his jacket on the table. I

21       think his pants. I am not sure. And they

22       looked at Julio's clothing. What would they be

23       looking for on Julio's clothing? What had they

24       heard? Why are they looking at Julio's

25       clothing. Because, I submit, this is what the

Summation - Dranove

695

1    evidence has shown, all of it, this is not a

2    Colombo moment, but it turns out -- it just

3    turns out that somehow Little Julio, who had

4    blood on his jacket, is somehow, in the words

5    and descriptions, turned into Julio.  Julio

6    Rivera.  Little Julio, who was with Enrigue,

7    somehow becomes Julio Rivera, the guy with the

8    blood on the jacket.

9         Now, that is why they are looking at the

10   jacket.  They are looking at the jacket of

11   Julio Rivera.

12        MS. CHU:  Objection, your Honor.  Calls

13   for speculation.

14        THE COURT:  Overruled.  This is his

15   argument.

16        MR. DRANOVE:  Because they believe Julio

17   Rivera did it, and he'd had blood on his

18   jacket.  They didn't bring the jacket in.  They

19   didn't even voucher it, but they brought in

20   Julio.  And they brought him in handcuffs, and

21   they took his belt and they took his shoe laces

22   and they took his cell phone.

23        Now, that is not an arrest.  That is not a

24   belief that this man is so distraught over what

25   he's done that he is going to kill himself.

1       That is what they thought.  So they had Julio.

2           Another wrong man, and they brought in

3       Angel.  Another wrong man.  And Darino said,

4       and he wasn't brought in the precinct.  And he

5       testified he was brought in at gun point with

6       his family.  Removed from the car and brought

7       in.  And they had Enrigue.  Didn't have little

8       Julio.  Didn't have JP.  Rudy.  Jahaira.  Don't

9       know.

10          How did they find my client?  They went

11      threw his -- ultimately his wife, not them --

12      they went to the house.  Some never said where

13      to find him.  Did they look at the line-up?  I

14      asked.  No.  Who's that person?  Don't know.

15      Why would that person say anything?  Don't

16      know.

17          Questions of Julio.  Your brother tell you

18      he stabbed somebody?  Answer, no.  Did your

19      brother tell you that and then you told that to

20      Jahaira?  Answer, no.  Did Jahaira testify

21      differently?  She didn't even testify.  Not at

22      all.  The tape was played.  Listen to the

23      sequence, it confirms what Mr. Julio Rivera

24      testified to.  He saw Jahaira later after he

25      saw his brother.

Summation - Dranove

697

1        MS. CHU: Objection, that is not offered

2   for it's content.

3        THE COURT: Sustained.

4        MR. DRANOVE: Now, I will turn to the

5   video-taped statement.

6        You can tell I have notes all over the

7   place. I am telling -- putting it together.

8   These aren't all my notes though.

9        So, let's go back to the scientists for a

10  moment. And Detective Gaynor and how he

11  quickly closed the case and ignored the fact

12  that you have the wrong man. That's it, case

13  closed. Let it all sort out later.

14       Detective Darino is what I should have

15  said. Detective Darino never heard a single

16  person say, never had a report, never spoke to

17  a witness who said, Mr. Enrique Rivera punched,

18  pushed, pushed or shoved the victim on the

19  back. Not once. Detective Darino, in official

20  reports, said statement possible by criminal

21  prosecution that the -- that the witnesses saw

22  the defendant repeatedly -- the words

23  repeatedly strike Mr. Ojeda in the chest and

24  back. That is false. Punishable under law.

25  He wasn't punished, he told you. But he closed

1     the case.  Detective Darino said the defendant

2     admitted stabbing the victim.  False.  That is

3     the detective's false statement included in an

4     official report.  The detective put in a

5     document where false statements are punishable

6     as a crime.  The defendant admitted swinging a

7     knife at the victim.  False.  He never admitted

8     that.  He never said that.  But the detective

9     closed his first homicide case very quickly.

10    And incorrect.

11        Now, much was made of the DNA evidence.

12    Nice charts.  Complicated, and a cap.  My

13    client said, looks like my cap.  It is my cap.

14    Okay.  So is the jacket.  The jacket was -- I

15    know it might be here.  It's in a bag.

16        Could someone bring it out for -- I'll

17    just take the bag.

18        That jacket was brought to the DNA people.

19    They looked carefully, looking for blood on the

20    jacket of the main perpetrator.  It's in here

21    (indicating).  If anybody wants to look.  You

22    can look.  But we know there is testimony from

23    Miss Razzano.  She looked carefully.  It's a

24    jacket, cap, maybe of a hoodie, I don't recall.

25    The hoodie, it's a sweatshirt with a hood.  By

Summation - Dranove

1       the way, I think one of the witnesses testified

2       to a different colored sweatshirt. It was dark

3       there. Green versus brown. The jacket, the

4       hood, microscopically. In effect examined by a

5       neutral scientific witness looking for blood.

6       None. Why none? He didn't stab him. The

7       evidence points to somebody else. We know

8       that. The cap, a drop on the front -- may I

9       approach? I am not sure -- I am not sure which

10      exhibit I want to hold up, if any.

11              THE COURT: You may.

12              MR. DRANOVE: It's in Exhibit 2B. A

13      blow-up. And it talks about Mr. Ojeda, stain

14      2A and stain 2B.

15              Now, I don't know if they use the word

16      stain instead of drop. I don't know, that

17      wasn't brought out at this trial. I just don't

18      know. Stain on a baseball cap. Stained 1A.

19      Stain 1B. Stain 2A. Stain 2B. Baseball cap

20      had stains. (Indicating) But how does the

21      blood get to the back of the cap? And the top

22      of the cap. Well, somehow the cap had to be

23      exposed to the blood of the victim. Where

24      could that have happened? Perhaps in the bar

25      if the cap was on the head of someone right up

Summation - Dranove

700

1     against the victim where the blood was flowing
2     into the clothing or happens in the car.
3     Mr. -- where Mr. -- Little Julio was. Where my
4     client was. My client does not -- he didn't
5     say anything. I certainly recall where my cap
6     was, but he don't recall where his cap was.
7     The prosecution read the testimony that he had
8     been asked to take his cap off, put it on. He
9     was asked to take it off, so where was it? He
10    doesn't recall.

11         Somehow blood got on the back of the cap.
12    I submit to you it was in the car with Little
13    Julio. My client didn't know little Julio had
14    blood on his jacket. Noone asked him about
15    Little Julio. Noone asked him at all. You
16    watched the video tape. You listened to
17    Detective Darino. Noone asked him about it.
18    He testified here, Enrigue. I didn't see any
19    blood. Well, he dropped him off on Nelson
20    Street. And he didn't want to talk about it.
21    Julio didn't want to talk about it. You can
22    understand why. Little Julio, not big Julio
23    whose jacket was examined by the police, had
24    someone's blood on him. Lot of them some ended
25    up on the cap of my client. Not the clothing

Summation - Dranove

701

1       of my client.

2                My client -- can I get some water, Judge?

3                THE COURT:  Any time.

4                MS. CHU:  Your Honor, may we approach

5       while he is doing that?

6                THE COURT:  No.

7                (pause)

8                MR. DRANOVE:  We know that -- through the

9       witnesses there was a rush, a rush to close the

10      case.  They closed it incorrectly.

11               Miss Sipress, who swore in Julio Rivera,

12      did not swear in Enrique Rivera.  Did not ask

13      Enrique Rivera, did you stab anybody?  She knew

14      the man was stabbed, she didn't ask him.  did

15      you stab him.  She didn't ask him where's the

16      knife?  The detective did not ask him.  Where's

17      this knife?  The three friends of Mr. Ojeda was

18      together in the car.  They went to the

19      precinct, they -- in the car with their

20      friends.  Bleeding to death.  They are blaming

21      somebody.  You can -- can you not fault them

22      for their human nature being what it is?  One

23      of those guys.  Maybe the guy in the camouflage

24      jacket.  It's his fault.  None of them really

25      know who stabbed the victim.  Simply put and

1       directly and through the evidence.  Detective

2       asked ultimately answered.  Did any witness

3       tell you they saw a knife in the hand of

4       Enrigue Rivera?  Not one witness did.

5           Did any witness tell you they saw Enrigue

6       Rivera touch this man in the back?  Not one

7       witness did.  Mr. Rivera never said, I touched

8       anybody in the back.  Mr. Rivera never said, I

9       stabbed anybody.  But the detective, after

10      interviewing Mr. Rivera and the witnesses and

11      preparing his police reports, said that at 5:15

12      in the morning, Mr. Rivera, after being advised

13      of his rights, made an admission to stabbing

14      the victim in this case.  How does a false

15      statement by a law enforcement officer that

16      helps him close his case without finding the

17      perpetrator.  And case closed is the most

18      important thing to him, I assume.

19          Now, the detective also said his own

20      words, the defendant's deponents states.

21      Deponent says, I've sworn to tell the truth.

22      Deponent states, he further informed by the

23      defendant's own words that defendant pulled out

24      a knife and swung the knife at the victim.

25      Closed quote.  Quote starts before deponent.

1          Well, that is false.  Why is he reaching

2     out to this false statement to make a case

3     against this man?  Cause this case is closed.

4     He is not going to admit he made a mistake

5     that's not good for your career.  Doesn't

6     matter.  Case closed.  That is good for your

7     career.

8          Darino never asked my client where did

9     you -- not even Darino asked, did you strike

10    them?  No.  Did you hit him with a knife?  No.

11    Did you stab him with a knife?  No.  He never

12    asked him.  It didn't matter to him.  Got the

13    man, it's over.  I got enough.  He got a half,

14    enough.  He got half loaf statement, that is

15    enough.  One slice witnesses, and that's it.

16    That's his loaf of bread.

17         Now, the defendant awakened at four in the

18    morning.  At his girlfriend's.  Did he run?

19    No.  Did he show any knowledge or evidence that

20    he had done wrong?  He went to work Sunday.  In

21    his barbershop, in the same neighborhood.  He

22    just went to work.  He left work.  He picked up

23    his son.  He had dinner with his fiance.  He

24    brought his son to his mother's.  He dropped

25    off her, the son and he went back to his

1    fiance.  Went to sleep.  Fiance had a child at

2    home, so he is not sleeping in the bedroom with

3    the fiance.  He's wakened at four in the

4    morning.  He's tired.  He's cuffed.  Brought to

5    a police station.  He's heard already something

6    terrible in the bar because there's crime scene

7    tape around it.  So he learned somebody's been

8    killed.  He didn't hear any shot.  He doesn't

9    know what happened.  He's questioned.

10       Now, of course, the detective says he

11    immediately gave me this statement.

12    Immediately gave me this statement.  At 5:15 or

13    a few minutes later.  But there is no time

14    written on the statement, and my client can't

15    even spell his name, Enrique, correctly.  How

16    many of you misspelled your first name when

17    you're writing?  How many of you can spell your

18    first name?  Exhaustion, fear, resignation.

19    I'm a beaten man, and he starts making a

20    written statement.  He was helped to make.  And

21    his brothers in the police station.  Julio is

22    still there.  The detectives had already spoken

23    to him, and they hold him.  Angel is there.

24    Darino tells Angel -- excuse me -- Julio

25    Rivera, one of you is going to pay or both of

Summation - Dranove

705

1    you are going to pay.  In fact, it starts off

2    that way hours before Enrique is arrested.

3        Julio gives his statements early on the

4    night of Monday morning.  Enrique's brought in,

5    Enrigue, they don't take his shoe laces or belt

6    or strange police evaluation.  Enrigue is

7    questioned, and as he said, once he's giving

8    his statement, he's then told about his Miranda

9    warnings.

10       Now, what was his condition, his physical

11   and mental condition?  More importantly, you

12   look at the video tape and see what it was.

13   Miss Sipress said he looked fine.  Take a look

14   at him, he looks devastated.  Exhausted,

15   emotionally spent and beaten.  He was so

16   controlled in that bar room, cinder block room,

17   no windows, nothing but a bare plastic chair

18   Formica tables, hours detectives coming in and

19   out.  That is not good enough.  We got your

20   brother, we put him upstate, we will put you

21   upstate.  You can do that, you have been there.

22   He can't.  He comes off with a story, but I

23   really don't know what happened.  So he can say

24   what happened.  Explanation reveals, he don't

25   know what happened.  He don't know what

Summation - Dranove

1    happened. He can't say what happened. He

2    don't know what happened. He did his best to

3    state his interlocutors who said, self-defense,

4    he had a knife. He don't know what was done

5    with the knife because he did not do it. There

6    comes a time when Miss Sipress says I

7    questioned him that is the video tape. That is

8    what he looked like. He looked fine. She

9    says, in effect, now that I have read you your

10   rights, are you willing to make a statement?

11   He don't say yes. He don't say no, she says.

12   That means it's voluntary. Totally voluntary.

13   It's voluntary statement in her opinion. You

14   decide if the statement is voluntary. The

15   judge will tell you how to decide that. Want

16   to know all the rules, and what to do. That is

17   your job. You can even listen, and then you

18   will evaluate it, unless you find it's

19   voluntary.

20        Now, how do we know my client's telling

21   the truth about the threats to his brother?

22   His brother wasn't released. Until after my

23   client's statement, and then the brother gave a

24   statement to Miss Sipress, which, for whatever

25   reason, she choose to not write down. This is

1      a homicide investigation, she does not write

2      down what a man said.  Even though she don't

3      know if he is going to make a recorded

4      statement, she don't write it down.  Same way

5      Detective Darino don't write down what he's

6      saying.  Even though he don't know a recording

7      is going to be made thereafter.  What was said,

8      we don't know because they choose to not write

9      it down.  So my client is asked, all right,

10     tell me what happened?  Does he start talking?

11     Take a look at the video tape.  I encourage you

12     to do it.  Puts his head in his hand.  Total

13     abject surrender to an overwhelming force and

14     shakes his head no.  Negative.  And he comes

15     off with a statement.  Then it's over.  He is

16     not asked anything.

17          And curiously, Miss Sipress, who

18     interviewed Julio Rivera before taking his

19     statement, and swore in Julio Rivera, said she

20     never spoke to my client before taking his

21     statement.  That's her choice.  That was late

22     night barroom ball -- brawl.  A ruckus.

23     Commotion.  People don't know what is going on

24     behind them.  People don't know if somebody

25     punched a particular person.  When Mr. Ojeda

Summation - Dranove

1    was stabbed. They don't know what. Before or

2    after my client punched him? We don't know.

3    What we do know, my client punched Mr. Solomon,

4    and what he thinks is Mr. Ojeda. Is Mr. Ojeda.

5    The prosecutor made a great deal of the height

6    of the person. My client had his word with him

7    in the back room, and my client said, I see him

8    eye to eye. Mr. Ojeda is 5'5" apparently,

9    according to the prosecution. My client is

10   5'11". My client doesn't know if he had words

11   with Mr. Ojeda. We don't know. But skillful

12   cross-examination led my client to say, yes.

13   But you don't know, if you listen to her

14   description of who had his words with. Mr.

15   Solomon was intent to getting a man with a

16   white jacket for a reason. He went after

17   someone in a white jacket for a reason. Who is

18   it? Was it Rudy. We don't know. One of

19   Rudy's friends? We don't know. But he went

20   after him.

21        It would be -- let me rephrase it. The

22   cap was obtained four years and three months

23   ago. Four years and few months. About four

24   years the prosecution has known that this is a

25   blow-up of the DNA report I asked Miss Razzano

1        about.  Four years that the cap stains, 2D for

2        example, includes the DNA of somebody who's not

3        Mr. Ojeda and maybe the DNA of yet another

4        person.  Now -- and for four years with a

5        possibility of two other people having handled

6        that cap as recently as that night.  That

7        night.  One being who's DNA is these numbers

8        along stain 2D that go from the first column to

9        the last column (indicating).  The next being

10       whoever has, under the column, the first one,

11       the D3 is number 18 there (indicating).  At 18

12       is neither 15 or 17, and the full DNA count

13       fingerprint, if you wish, of stain 2D for one

14       person is different than the DNA found on that

15       same stain of another person.  Well, either one

16       of them, Mr. Enrigue Rivera?  Maybe not.  Maybe

17       not.  It would be very important for this to

18       have been evaluated by the prosecution.  And

19       it's still is very important.  There are DNA

20       data basis, you don't know.  And 18, who's

21       that?  We don't know.  These are people who

22       handle that cap.  Maybe that night.  They may

23       have handled it in addition to Mr. Rivera.  We

24       just don't know.  And one reason we don't know,

25       I submit, is because case closed ends all

Case 1:15-cv-02657-EK Document 9-1 Filed 12/08/15 Page 681 of 811 PageID #: 1098

1    questions, and you then move on, you got just a

2    typical Saturday night, Saturday night in a

3    Puerto Rican bar, who cares? Case closed.

4         Many people care. And you should care.

5    Bring in your verdict. Just remember, amongst

6    other things, that to find my client guilty of

7    any crime, you have to turn the facts on their

8    head, if not up side down, and ignore that the

9    medical examiner described the nature of the

10   hand gesture that had to have taken place. She

11   was up here. She was seated, Miss Chu was

12   there and she raised her hand up and everybody

13   was looking, everyone, everyone in the jury

14   box, foreperson, three alternates, and it was

15   downwards from up over the shoulder downwards

16   (indicating). And Miss Chu asked if it could

17   have been done -- and she actually kind of

18   copied what you saw my client do. On the video

19   tape. And the witness said, no. And she asked

20   could it have been a punch. I think the

21   witness, Dr. Frederic says that is ridiculous,

22   but I think she meant punch a knife in is still

23   ridiculous because the wounds are downwards.

24   Noone saw my client do that. There was a

25   ruckus, there was a disturbance and a

1    commotion.  People, quite a few people were

2    fighting in this bar.  We know the fighting

3    went on after Julio Rivera was outside.  He

4    heard it.  He tried -- my client tried to get

5    back in, he couldn't get back in.  He heard the

6    noise.  When Julio left, it was still going on.

7    The off duty bouncer testified he thought --

8    initially he said, he saw my client pushed.

9    Actually, if you hear his testimony, he doesn't

10   know for sure.  He said, I'm not sure.  At

11   least he's honest.  He is not sure if he saw my

12   client touch anyone.  He can't fill in the

13   missing evidence or change the conflicting

14   reality that my client didn't swing downwards.

15   Somebody did and got away from it so far.  You

16   can't do that and uphold your oath.

17        My client didn't do it.  It's over four

18   years later.  This chapter in the book, trying

19   to find the perpetrator, has all the clues in

20   it.  But the conclusion is the wrong conclusion

21   if you find my client guilty.  The evidence

22   doesn't show it.  Cannot show it because it's

23   not guilty.  The detective ignored it, medical

24   examiner does not.  DNA evidence does not.

25        Please uphold your oath, follow the law,

1    I'm confident when you do and you evaluate the

2    evidence, don't guess what might have been

3    because it wasn't as far as Rivera, bring back

4    a verdict of not guilty.

5         Thank you very much.

6         THE COURT:  Miss Chu?

7         MS. CHU:  May we approach, your Honor?

8         THE COURT:  You want a recess?

9         MS. CHU:  To tell you something.

10        (Whereupon, there was a discussion off the

11   record at this time.)

12        THE COURT:  We are going to need to take a

13   recess before the prosecutor's summation.  I

14   ask to return to the jury room.  We will be

15   with you in a few moment.

16        Thank you for your patience.

17        (Jury Excused)

18        THE COURT:  The record should reflect at

19   sidebar Miss Chu reminded me that I did not

20   state the stipulation regarding the defendant's

21   prior testimony having been given at a

22   proceeding where both he and -- both the

23   district attorney and his attorney questioned

24   him, and she asked me to give that stipulation

25   now.

Proceedings/Stipulation

1     I indicated I would not do that since

2     summations had already started, and she asked

3     for more time to go over her summations as a

4     result of that.

5          MS. CHU:  Your Honor, I'd also like to add

6     to the record that the People did request the

7     stipulation be read to the jury in a timely

8     fashion.  It was done prior to summations even

9     beginning.

10         I've tried cases many cases in front of

11    your Honor and it's always been my recollection

12    that you've made some comments to the jury

13    prior to defense counsel standing up to do

14    their -- their closing argument.  In this case,

15    that did not happen.

16         I expected that when you gave those

17    instructions to the jury just prior to Mr.

18    Dranove beginning his summation, that you would

19    include in that stipulation that we had both

20    agreed upon.  And it wasn't until Mr. Dranove

21    was already commencing that I realized that you

22    weren't going to give those charges and those

23    instructions to the jury.  I wasn't going to

24    interrupt once he started, but when he went to

25    go for the water break, I tried to approach at

Proceedings/Stipulation

714

1    that point, and you denied my request.  I had

2    to wait until after he was done to come up to

3    you to let you know that the stipulation had --

4    wasn't read to the jury.

5         I don't believe that the defense has

6    suffered any prejudice whatsoever, if you would

7    read stipulation now and say this was failed to

8    put in before because defense counsel made no

9    comments about it in his summation.  So there

10   is nothing that would affect whatsoever how he

11   summed up.

12        This point, I believe, is a very valid

13   point.  It's a very strong point that I've

14   included in my summation.  Based upon your

15   ruling, I anticipated that it would be allowed,

16   and I have it in here.  And I don't think I

17   should be punished because of the fact that

18   there was a mistake that was made.  That has

19   nothing to do with me.

20        THE COURT:  As I said at the sidebar,

21   number 1, it was my mistake, I apologized that

22   the stipulation wasn't read to the jury before

23   summations started.

24        Number 2, having gone through defense

25   counsel's summation, even during summation, it

Proceedings/Stipulation

715

1        would be inappropriate to start telling the

2        jury about a stipulation.

3             Number 3, I don't believe it's prejudicial

4        to the district attorney.

5             And number 4, you need to adopt to the

6        reality of it, which is why I gave you a

7        recess.  Until --

8             MS. CHU:  All do respect, I understand

9        that you don't think it's an important fact.

10       These people are the triers the fact.  You

11       might not think it's important, but they might

12       think it's important.  That is why I wanted to

13       argue it to them.  I don't think that it's fair

14       that I be prejudiced because of the fact that

15       there was a mistake made.  That was through no

16       fault of mine.

17            And defense counsel consented to this

18       stipulation.  It's not like I am trying to

19       force down their throat something that he

20       doesn't agree to.  He agreed to the

21       stipulation.

22            MR. DRANOVE:  Judge, it opens the door to

23       defense having to tell the jury a stipulation

24       was entered.  You could fault the lawyer at

25       that time, but you can't -- do not ask it opens

Proceedings/Stipulation

716

1    the door.  It's plenty of evidence here.  I

2    commented a very long period of time about the

3    evidence.  The prosecution summed up in this

4    case in the past.  She knows the case, let her

5    do her job.

6         THE COURT:  Let me know when you're ready

7    for your summation.

8                   (Whereupon, there was a short

9                   recess at this time.)

10        COURT OFFICER:  Your Honor, ready for the

11   jurors?

12        THE COURT:  Yes, we are.

13        COURT OFFICER:  Jury entering.

14        COURT CLERK:  Both sides waive the roll

15   call?

16        MS. CHU:  So waived.

17        MR. DRANOVE:  Yes.

18        THE COURT:  Miss Chu, you may give your

19   closing argument on behalf of the People of the

20   State of New York.

21        MS. CHU:  Thank you, your Honor.

22        MS. CHU:  Good morning, ladies and

23   gentlemen:

24        After the defendant got off the stand

25   yesterday, I'm sure you had to be asking

Summation - Chu

717

1       yourself a lot of questions about what he said.

2       In an effort to try and make sense of what he

3       was telling you. Because I submit to you,

4       ladies and gentlemen, that a lot of what he

5       said just didn't make sense with all the

6       evidence that you have in this case.

7           I want to point out some of the things

8       that he said that I think don't make sense. I

9       want to talk about them.

10          Number 1, if he admits that the whole

11      fight is between me and Mr. Ojeda, how was it

12      that he was the person that came to be the one

13      that was tossed out? He is not the one doing

14      all the damage during this altercation, then

15      how come he's the only one that was thrown out?

16      If Edgar never left that area of the jukebox.

17      In People's 4 -- if Edgar never left from here,

18      this area by the jukebox, (indicating) how was

19      it that the defendant had this altercation or

20      this dispute with him in the bathroom?

21          Now, after the defendant said he left

22      before Mr. Ojeda actually got injured, how was

23      it that Mr. Ojeda's blood ended up on the

24      defendant's cap? If he's the only one having

25      this dispute with Mr. Ojeda, then why would

1    anyone else want to stab him?  If the

2    detectives already had a Rivera.  Any Rivera.

3    One brother, Angel, Tito, and they thought that

4    Tito did it, why would they even have the

5    defendant confess to anything?  If the

6    detectives are just making a rush to judgment,

7    like defense counsel suggested to you, then why

8    not just charge the first Rivera you get your

9    hands on?  Why wait for Enrique Rivera?  And

10   one of the last things I wanted to ask you,

11   something that just didn't make sense about

12   what he said.  If he didn't do it, then why

13   does his story keep changing?  I submit to you,

14   that none of these questions can be answered in

15   a way that resolve inconsistencies other than

16   the fact that it was Enrique Rivera that killed

17   Edgar Ojeda on February 27, 2005.

18        Now, there are four major components to

19   the People's case that prove and make it

20   crystal clear to you that it was the defendant,

21   and only the defendant, Enrique Rivera, that

22   was responsible for the stabbing death of Edgar

23   Ojeda.

24        The first component is his friend, Carlos

25   Solomon.  You had a chance to see him take the

Summation - Chu

1    stand here and questioned by myself, as well as

2    Mr. Dranove. Now, he sees the only contact

3    that Edgar had with anybody in that bar, by

4    that man (indicating). Enrique Rivera.

5    Because before the defendant walked up to Edgar

6    Rivera -- Edgar Ojeda, it was peaceful. There

7    was no injury to Mr. Ojeda. This is not the

8    case of the only white shirt, the only new

9    white shirt, that has a white mark on it. This

10   is, fine, I have no injury, and after he

11   punches him, I have stab wounds now. That is

12   what we have here.

13       And even though Mr. Solomon couldn't see

14   the knife, it's easy to see how someone

15   punching, and then there is a knife -- stab

16   wound, he had to have something in his hand.

17   It's not rocket science, being able to say, you

18   know what, I didn't have a stab wound, he

19   punches me, I have stab wounds now. Clearly he

20   had something in his hands. I submit to you,

21   Mr. Solomon's testimony regarding him observing

22   the defendant punch Mr. Ojeda in the chest

23   area, and then him ending up with the stab

24   wound. That's something that is reasonable,

25   that you can draw from that. That even though

1    he didn't see the knife, he sees the punches,

2    he sees the contact and if there is a stab

3    wound immediately after that, he had to have

4    something in his knife -- I am sorry -- he had

5    to have a knife in his hand.

6         Now, the defendant is the only person that

7    Carlos Solomon saw touching Mr. Ojeda

8    immediately prior to Mr. Ojeda alerting him

9    that he had been stabbed. He sees him punching

10   him in precisely the area where that vital

11   wounds was according to Dr. Frederic. The

12   five-inch deep stab wound that goes in and

13   punctures his lung.

14        Now, there is no requirement -- when the

15   judge gives you your instructions in a few

16   minutes -- about the fact that someone had to

17   have seen the knife. The only requirement is

18   that we prove that a knife was used. And you

19   have that from the testimony of Dr. Frederic.

20   She said, when I asked her, is there any way

21   that he could have received those injuries by a

22   punch? She said, that is nonsense. That was

23   the word she used, that is nonsense. There is

24   no way. That is a stab wound. That is not a

25   punch. This is not a blunt injury trauma, this

1          is a stab wound.  A puncture wound to the body.

2          There is no if, and or but about it.  In fact,

3          I don't even have to prove to you where this

4          knife came from.

5                We know there was metal detectors at this

6          bar.  We know there was a pat down.  We know

7          Mr. Navarette, who searched the defendant and

8          his crew, didn't have the wounds with him,

9          right.  And we also know -- what else we also

10         know, the women aren't searched.  They check

11         the bags, but they don't pat them down.

12         Jahaira's who?  What relation does she have to

13         this case?  She is the cousin of the defendant.

14         She is the cousin of his brother.  She is the

15         one that gets Tito's car and his keys and meets

16         him later.

17               Now, the fact that Mr. Solomon didn't see

18         the defendant touch him in the back, I submit

19         to you, is reasonable because what did he tell

20         you?  He said, at the time just prior to seeing

21         the defendant's hand come up and punch Mr.

22         Ojeda on the shoulder, his concentration is on

23         the defendant's brother because he's the one

24         that says, mind your f'g business, right, and

25         he says, that is my friend, he is my business.

1   So his attention is no longer on the defendant,

2   who he initially says what is going onto.  His

3   attention is on the brother and Little Julio.

4   Because they're the ones now standing in front

5   of him.  And the defendant was the closest to

6   Edgar.  And closest to what side of Edgar?

7   Closest to Edgar's left side, which is the

8   farthest away from Solomon.  Solomon is here,

9   Edgar is here and the defendant, over there,

10  you can see what is going on with him, and when

11  he leans in like that, he is not paying

12  attention.  (Indicating)  What draws his

13  attention, after he is having this conversation

14  with the defendant's brother, is when the

15  defendant lifts his hand up and goes right to

16  hear (indicating).  He sees the final blow.

17      MR. DRANOVE:  Objection, suggestion made,

18  there was no testimony --

19      THE COURT:  The jurors' recollection will

20  control.

21      MS. CHU:  Now, if the defendant's nearby,

22  how is this a rush to judgment by the

23  detectives?  They are just trying to close this

24  case.  First homicide case, I just want to

25  close, I don't care who gets arrested.  Right?

Summation - Chu

723

1      Why are they trying to frame him? If you're

2      just trying to frame him because you're trying

3      to get done, of course, to say the same thing

4      just try close the story fast, why not get the

5      witnesses, and I mean all of the witnesses,

6      Marcus Carrasquillo, Jonathan Dominguez, Carlos

7      Solomon, Enrique Navarette, get all of them to

8      say, I saw the defendant not only with a knife,

9      but I saw him stab Edgar Ojeda in the back. I

10     saw him stab him in the front. Just one of

11     those episodes done on Law and Order. It's not

12     scripted for you, there's no commercials in

13     between. I submit to you, that is not what

14     happened because they told you the truth.

15          Mr. Solomon -- I submit to you, Mr.

16     Solomon wishes he saw that knife. How happy do

17     you think he would be to be able to tell you,

18     yeah, I saw the knife in his hand. But he

19     didn't tell you that because that is not what

20     he saw. I submit to you, he was bei

21     honest about what he could see and \

22     and who he saw do it because that's

23     doing. Just telling you what I sa\

24     trying to make it better. He wasn

25     make it worse. It is what it is.

Summation - Chu

724

1     same way he didn't have to tell you he was

2     smoking marijuana that day.  There was no blood

3     test done on Ojeda.  He didn't have to tell

4     you.  There was no way to prove he was smoking

5     marijuana.  As open and honest he was about the

6     marijuana he smoked earlier that morning, I

7     submit, that's the way he testified about what

8     he saw and what he didn't see on February 27,

9     2005.  Who he saw doing it and who he didn't

10    see doing it.  The night of February 27, 2005.

11         Now, remember, also that when the

12    defendant testified, he places himself about a

13    foot away from Mr. Ojeda, and you know from the

14    testimony of Mr. Solomon, he was standing right

15    next to him.  So that means he's that close

16    (indicating).  He's almost a foot away from --

17    how's he going to make a mistake about who he's

18    looking at?

19         Now, defense just said the lighting

20    conditions.  Clearly people knew what was going

21    on, you're seeing them, you're up close and

22    personal.  You're a foot away from the person.

23    How are you going to mistake who you're looking

24    at?

25         Now, I am going to ask you when you're

Summation - Chu

1      talking about Mr. Solomon, to say to yourself,

2      what motive does he have to lie and say it was

3      the defendant when in fact it wasn't the

4      defendant?  That it was his brother or that it

5      was Little Julio.  We all know the difference

6      in the stature of Little Julio versus the

7      defendant.  In fact, in his very own words, he

8      tells you, he's always been short.  He is

9      little, that is why we call him little.

10     Defendant called him thin.  Little Julio, short

11     and stocky.  No way you could mistake one for

12     the other.

13         What motive does Carlos Solomon have to

14     lie?  He never saw the defendant before.  He

15     never saw any of those guys before.  He didn't

16     have beef with anybody.  All night not at the

17     place they were at before, not when they came

18     into the bar.  He says he sees the defendant on

19     the dance floor, there is no altercation there.

20     There is nothing happening in the bathroom.  He

21     goes back, and when he is standing there, that

22     is when the defendant walks by and he says he

23     thinks he's leaving, and then he goes up and he

24     says something to Mr. Ojeda.  Initially he

25     don't think anything of it.  He thought Mr.

1     Ojeda knew him.

2          Now, if there is no motive for Mr. Solomon

3     to say that it was the defendant when it wasn't

4     the defendant, then could he be mistaken about

5     what he saw?  We know he couldn't be mistaken

6     about what he saw, because immediately after he

7     sees the defendant do the final blow to

8     Mr. Edgar --

9          MR. DRANOVE:  Same objection to the

10    gesture made by the prosecutor.

11         THE COURT:  Again, the jurors'

12    recollection of the testimony will control.

13         MS. CHU:  The defendant runs out, he's

14    either helped out or he runs out, maybe all

15    together he is helped out the door.  Him and

16    Little Julio.  And what does Mr. Solomon tell

17    you.  He tells you that it's only him and Mr.

18    Ojeda.  That the bouncer -- now there he has to

19    swing over the bouncer when he is going for

20    Tito.  Right.  He swings over the bouncer, and

21    he says Edgar's right there.  There's no one

22    else but him and Edgar.  And at that point,

23    Edgar tugs on him and says, I think I am

24    stabbed.  That is the point.  There is nobody

25    else that touches Edgar Ojeda after the

Summation - Chu

1    defendant does that final blow and then runs

2    out of the place. So I submit to you, ladies

3    and gentlemen, if there is no motive for Mr.

4    Solomon to lie. There is no reason or evidence

5    here that he is mistaken about what he saw when

6    he was there on the night of February 27, 2005.

7    Then the only thing it could be is the truth.

8         Now, I want to move on to the second

9    component of the People's case, which shows you

10   that the defendant is the guilty person here.

11   We have second component being Enrique

12   Navarette. The off-duty bouncer that was at

13   the bar. Now, all accounts of Mr. Navarette is

14   a neutral party. Not that Mr. Carlos Solomon

15   had any reason to want to blame the defendant

16   when he had a bunch of other people that he

17   could have picked from, the brother, Little

18   Julio, whatever. Just the way he went after --

19   I am sorry -- after the brother when he

20   couldn't get to the defendant. Remember he

21   swings over him. But push comes to shove, and

22   he is talking to the police, he says, no, that

23   is not the guy that stabbed him. That is not

24   the guy that I saw punching Edgar Ojeda. That

25   is the guy I saw punching Edgar Ojeda.

1    (Indicating)

2         MR. DRANOVE:  Objection.

3         THE COURT:  Overruled.

4         MS. CHU:  It was the guy with the

5    camouflage jacket.  The taller, thinner one.

6    The defendant, not Little Julio.  The

7    defendant.  Not the brother who was wearing a

8    gray jacket or a light jacket.  Whatever you

9    want to call it.

10        Now, both Mr. Solomon and Mr. Navarette

11   says, it's the tall, slim guy or the guy that's

12   short and stocky.  No, not like despite the

13   fact that Mr. Julio Rivera testified and now

14   all of a sudden anybody same size, everybody

15   same skin tone, everybody looks the same.  You

16   know if Mr. Navarette and Mr. Solomon, there is

17   a disparity in the height.  Between the

18   defendant and Little Julio.  One tall, one

19   short.  One thin, one fat.  They both have the

20   defendant talking with Edgar Ojeda initially.

21   And the defendants would argue that he don't

22   actually say that the defendant actually

23   touches Mr. Ojeda, but if you look in the

24   testimony, or you have the testimony read back

25   for you, you'll hear that Mr. Navarette most

1        certainly says what he says, he is not sure of,

2        he says, the number of times that he sees the

3        defendant touch Mr. Ojeda.  He says, I don't

4        remember whether the hand was open or closed,

5        but he --

6                MR. DRANOVE:  Objection.

7                THE COURT:  Overruled.

8                MR. DRANOVE:  Page 167 --

9                MS. CHU:  Your Honor, I object to that.

10               THE COURT:  Overruled.

11               It's the jurors' recollection that will

12        control.

13               MS. CHU:  He says, Mr. Ojeda was touched

14        by him (indicating).  Only thing he is not sure

15        about is whether the hand was opened or closed

16        or whether or not it's -- the number of times.

17        I think it's twice, maybe.  That is what he

18        says.

19               Now, you know there was reference made to

20        the fact that he was drinking.  He had five

21        beers.  He was drinking Bacardi.  I submit to

22        you, ladies and gentlemen, there is absolutely

23        no evidence in this case to show or lead you to

24        believe that this alcohol impaired his ability

25        to see what he saw.  In fact, his testimony has

Summation - Chu

1    been consistent since he was interviewed in
2    2005.  And there is no evidence whatsoever that
3    his alcohol impaired his abilities to react to
4    the situation so quickly, that he was there to
5    separate Edgar and Mr. Solomon from the
6    defendant and Little Julio had ran out, and
7    then you remember Tito was there too.  Remember
8    he is there.  He says, Solomon punches Tito
9    right when he was there.  That means he got
10   from that corner -- he got from this corner
11   here, where he was by the bar, with his lady
12   friend over there, so fast that he was able to
13   stand in between Mr. Solomon and -- and the
14   defendant's brother (indicating).  So that is
15   how alert he was to everything he was around.
16   There is no evidence whatsoever that his
17   alcohol intake impaired his ability to see that
18   it was the defendant, the taller slim guy and
19   not the short squat guy in the camouflage
20   jacket that did the pushing on Mr. Edgar Ojeda.
21   He wasn't so impaired that he couldn't see the
22   area where the defendant touched Mr. Ojeda.
23   And he didn't know where Mr. Ojeda got injured
24   until afterwards.  When he sees blood coming
25   from him.  Right?  He don't know?  So obviously

Summation - Chu

731

1          he is not so impaired he can see all of those

2          things and be just as alert as normal.

3               Now, both Mr. Solomon and Mr. Navarette,

4          they see the assault coming and it looks like

5          to them like it was a punch or a push. And all

6          that meaning Mr. Navarette and Mr. Solomon say

7          that it was the defendant and only the

8          defendant that touched Mr. Ojeda.

9               And even the defendant himself admits that

10         he punched Mr. Ojeda. He says, I threw at

11         least three punches. At least three punches.

12              MR. DRANOVE: Objection to at least.

13              THE COURT: It's the jurors' recollection

14         that control.

15              MS. CHU: Have that read back to you. He

16         says, I threw at least three punches.

17              Then you have Mr. Navarette and

18         Mr. Solomon's observations being verified by

19         independent line-ups that are conducted, not

20         years later. Not months later. Not weeks

21         later. Not even days later. We are talking

22         about the very next day. February 28, 2005.

23         The line-ups are conducted. And each of them

24         independent of each other, they see -- they see

25         the line-up and they immediately identify the

Summation - Chu

732

1    defendant as being the one they saw touching

2    Mr. Ojeda just before.

3         MR. DRANOVE:   Objection to what they

4    allegedly saw him doing.

5         THE COURT:   Overruled.

6         MS. CHU:   Each of them separately.   They

7    don't get to talk to each other, and, in fact,

8    the defendant's given the opportunity to change

9    his position after each line-up.   He chooses

10   not to, but the witnesses have no idea about

11   that.

12        You also know Mr. Navarette and Mr.

13   Solomon, they don't know each other.

14   Mr. Navarette testified, you know, he don't

15   even know who Mr. Solomon is.   He calls him the

16   tall gentleman.   The tall gentleman that was

17   standing by the victim who had the Mets Jersey

18   on.   Remember that?   Because I am a Mets fan.

19   He said, yo, nice jersey.   Right?   Remember

20   that?   They don't know one another.   No reason

21   for them to deliberate and try to frame the

22   wrong person for doing this crime.   And no way

23   for them to know that they each would pick

24   exactly the same person as the perpetrator of

25   this crime.   That person (indicating).

Summation - Chu

1            MR. DRANOVE:  Objection to perpetrator.

2            THE COURT:  Overruled.  This is her

3       argument.

4            MS. CHU:  The third component of the

5       People's case that proves beyond a reasonable

6       doubt that it was the defendant that committed

7       this crime is the statements the defendant

8       made.  The ones he made to the police and to

9       the assistant district attorney that were on

10      video tape.

11           Now, the third statement he makes is the

12      oral statement which you heard about from

13      Detective Darino.  In that statement, he says,

14      I took the knife out and swung it at the crowd.

15      Then after he's asked to memorialize and put it

16      on a written statement, which he writes out,

17      and, you know, the defense counsel is arguing,

18      well, you know what, he can't even spell his

19      name.  That is how depressed he is.  That is

20      how beaten he is and everything.  How many

21      times have you written your name and you

22      misspelled it?  Just signing your name, maybe

23      wrote an extra element, whatever it is.

24      Doesn't really take that much for you to mess

25      up on a signature.  That is what happened here.

Summation - Chu

734

1    I submit to you, when he wrote this written

2    statement, what does he say now? He says, I

3    took the knife out, and I used it in

4    self-defense. Swinging it at the crowd, that

5    is what he says.

6         And then what do you see on the video

7    tape? You see assistant district attorney give

8    him his rights right on the tape. You actually

9    saw the Miranda sheet that was read to him by

10   Detective Darino, which he signs, which he

11   actually writes under, my rights, puts his

12   initials there. There is the time and date on

13   it. On the video-taped statement to ADA

14   Sipress, he says, I took the knife out, and I

15   waived it at the people in front of him. Then

16   during the testimony, or during the video-taped

17   statement, he says, yes, the little guy was in

18   front of him. The taller guy was next to him.

19   He says when he says was the victim in front of

20   you. He says there were a lot of people in

21   front of me. Then he describes the people that

22   are in front of him. Victim, Mr. Solomon.

23        Now, in those statements the defendant

24   admits to having a knife, and in the

25   video-taped statement, you can see he talked

Summation - Chu

1    about it. He says, well, what kind of knife

2    did you have, is what Miss Sipress asked him.

3    He says, pocket knife. Well, how did -- how

4    did you use it? Just waived it around. Then

5    he says afterwards -- she says, what did you do

6    with the knife? He said, I threw it away.

7    Tell us what you did with it? Now, I submit to

8    you, if this is all like a calculated ruse, we

9    are trying to get him to say something that he

10   don't want to say, he is just talking. He's

11   given the opportunity to say whatever he wants.

12   She's not interrogating him. She says, what

13   did you do with it? He says, I threw it away.

14   She didn't say, isn't it a fact you threw it

15   away? What did you do with it? Didn't you use

16   it on someone? She didn't say anything like

17   that. She asked, what did you do with it? He

18   goes, I threw it away, and that was it.

19   Because she was just trying to get from him

20   what he wanted to say.

21        Now, in those statements, he admits to

22   having a knife, and while he don't say, I

23   stabbed the victim verbatim. You know from his

24   testimony at this trial that he says, I punched

25   Mr. Ojeda. Right? We know that because he

1      testified right before you.  Right before you

2      yesterday.

3           Now, I'm going to talk a little bit about

4      his brother.  Tito Rivera.  The one that

5      testified yesterday, Julio Rivera.  His real

6      name is Julio.  They call him Tito.  All the

7      testimony from his brother about how, you know,

8      they stopped the tape made me say, it's

9      camouflage.  Remember the camouflage jacket,

10     same camouflage.  He said three times that they

11     did this.  He said Hector Rivera that actually

12     was doing that to him, but when you heard from

13     ADA Sipress, he wasn't even in the room when

14     the interview was taking place with ADA

15     Sipress.  It was Detective Gaynor and Darino,

16     it wasn't Hector Rivera.  He wasn't the

17     detective that was in the room when they were

18     doing the audio tape.

19          All that stuff, they made me say

20     camouflage jacket.  All that became moot

21     because after he testified, you heard from the

22     defendant, what did he say?  Yeah, I was

23     wearing camouflage jacket, and yeah, I punched

24     Mr. Ojeda.  So all that, you know, they made me

25     say this, they made me say all that, he didn't

Summation - Chu

1      even know his brother was going to admit that

2      he punched Mr. Ojeda while he was wearing this

3      camouflage jacket.

4           Now, he says that the tape is stopped, and

5      they forced him to say something.  He gets back

6      on the tape and everything.  You heard the

7      tape.  You heard the tape.  And --

8           MR. DRANOVE:  Objection, it's a copy.

9           THE COURT:  Overruled.

10          MS. CHU:  You heard the tape.  She said

11     she listened to that exact tape and that was

12     the recording that she made of Julio Rivera.

13     And you heard it, there are no breaks at all.

14     All voices you hear on that tape are here, and

15     Julio Rivera, what is he allowed to do.  Not

16     asked, in fact, you did this?  Yes or no?

17     Isn't it a fact you did that?  Yes or no?  Not

18     like that she goes, what happened?  And he

19     tells it, in fact, one of the statements that

20     he gives -- one of the answers he gave --

21          MR. DRANOVE:  Objection to the substance

22     of the statements, Judge, not admitted for that

23     purpose.

24          THE COURT:  True.

25          MS. CHU:  I am not arguing about the

1    substance, I am talking about the fact that he

2    gives a narrative. He gives a narrative, that

3    rather long narrative uninterrupted. There is

4    no stopping of that tape. The tape doesn't

5    stop, go back on top. You know, it's very --

6    obviously it's those tapes. You hear it. You

7    didn't hear any of that. While you might have

8    heard the humming from the fact that it's an

9    audio tape and you have old equipment. You

10   heard that. But that was consistent

11   throughout. There is no evidence whatsoever

12   that that tape was stopped and started.

13        You know he was talked to in between. He

14   can say the right thing. He said it during one

15   of his own answers. It was continuous. He

16   interrupted himself when talking, talking.

17   It's a dark jacket. A camouflage dark jacket.

18   He says that. There's no calculation here.

19   The detectives are coaching him? They are not

20   threatening him. He wasn't under any duress.

21   I submit to you, ladies and gentlemen, if he is

22   lying about that, if he is lying about

23   something having to do with the fact that he

24   was forced to make that tape, to say what he

25   said on that tape, then what else is he lying

Summation - Chu

739

1    about? What else is he lying about? The fact

2    that they took Tito's shoe laces and his belt

3    and cell phone. Oh, they were worried that he

4    was going to commit suicide. Apparently they

5    didn't care whether or not the defendant did

6    because they let him have his shoe laces and

7    his belt. They didn't care about the

8    defendant. They cared more about Julio Rivera

9    because they took his. That is ridiculous,

10   ladies and gentlemen. We all know what is

11   going on here. Julio Rivera took the stand

12   because he's trying to cover for his brother.

13   He is trying to do whatever, and I submit to

14   you that was a calculated, orchestrated display

15   for you so he could set the stage for when his

16   brother took the stand to give you his

17   testimony. That is why Julio Rivera took the

18   stand yesterday.

19        Now, did his testimony shed any light on

20   who it was that stabbed Edgar Ojeda. No.

21   Nothing whatsoever on that. Just wanted to

22   create chaos. There is a lot of fighting even

23   after my brother. Everyone fighting me.

24        What did Mr. Navarette tell you? There

25   was 15 people at the bar at most. And let's

Summation - Chu

1      count them.  I asked the defendant, I said, it

2      was eight of you.  No, wasn't eight of them.  I

3      went through the names.  You, your brother, JP,

4      Little Julio, that is four.  Jahaira, Rudy, his

5      brother, his girlfriend, that is eight.  You

6      have Edgar, Carlos, Solomon, Enrique -- I am

7      sorry -- Marcus Carrasquillo, Jonathan

8      Dominguez.  Twelve.  You have the woman

9      bartender, you have the male bartender, that is

10     14.  You have Enrique Navarette, that is 15.

11     Luis Rivera, he works there.  That was the

12     other bouncer.  That is 16 people.  Including

13     the people that actually work there.  Not that

14     many people.  Only -- the most people that were

15     there were from his group.

16            MR. DRANOVE:  Objection to his group.

17            THE COURT:  Overruled.  This is argument.

18            MS. CHU:  Now, as for Angel Rivera, who

19     testified yesterday, he says, I am brought to

20     the precinct.  I submit to you, ladies and

21     gentlemen, you know the questions asked the

22     Detective Darino regarding Angel Rivera, did

23     his name come about in your investigation?

24     Yes, it did.  Did you see him at the precinct?

25     He said, no, I didn't.  Did you see him at the

1          precinct?  Not was he there, but did you see
2          him at the precinct, and the answer was, no.
3              Now, remember what he told you, where's
4          the squad.  The squad's on the second floor of
5          the precinct.  And the testimony of Mr. Rivera
6          was that I was brought to the precinct for what
7          six, seven hours he said.  And I submit to you,
8          the detectives were looking for him.  Enrigue
9          Rivera.  That he were looking for him when they
10         went to Julio Rivera and brought him into the
11         office for -- for an interview.  They were
12         looking for him when they stopped the car that
13         Angel Rivera was driving.  That car was
14         registered to Enrique Rivera.
15             MR. DRANOVE:  No evidence of that at all
16         in this case.
17             THE COURT:  Jurors' recollection will
18         control.
19             MS. CHU:  He was driving the defendant's
20         car, that is why they stopped him.
21             MR. DRANOVE:  Objection.
22             THE COURT:  Overruled.
23             MS. CHU:  And if they are trying to
24         squeeze his brothers or squeeze the defendant
25         into making a confession by holding his

Summation - Chu

1    brother, whatever.  According to him, he says

2    he is arrested or he is brought to the precinct

3    at like 10:30, 11 o'clock at night.  He was

4    kept there for six or seven hours.  If you do

5    the math, six or seven hours from ten or 11

6    o'clock would be about six in the morning.

7    Right when the defendant is being spoken to by

8    Detective Darino.  If they were trying to

9    question him into making a fall confession, why

10    are you letting go of the brother?  Why were

11    you letting go of the brother?  That don't make

12    sense.

13        Same thing goes for Angel Rivera.  Only

14    reason why he's testifying is because he wants

15    to muddy the waters.  Yes, Mr. Rivera was

16    definite -- Enrique was definitely forced to

17    make these confessions because his brothers

18    were being held.

19        Now, at the time the defendant actually

20    spoke with the district attorney, Miss Sipress,

21    on the video tape, as well as she spoke -- as

22    well as when he spoke with Detective Darino,

23    you remember he was never shown any paperwork.

24    He didn't know what Mr. Solomon saw or didn't

25    see.  He didn't know what anybody saw happened

1       at the place when it happened. In fact, the

2       only thing new is that the witnesses placed him

3       there. They placed him leaving the bar first

4       and that his brother was left behind. He knew

5       they had closed because they went to his

6       mother's house. They knew -- I am sorry, I

7       said that already. That he had been kicked out

8       of the bar first. He was the first one to

9       leave. So at the point that he is actually

10      talking to Detective Darino, he knew that there

11      was this huge hole that he had to climb out of

12      in order to explain why he was not guilty. So

13      the next day when he's at the precinct on the

14      28th, what does he say? He says, it's

15      self-defense. And when that's not good enough,

16      he gets on the video tape with ADA Sipress and

17      he says, I was just waving the knife. And you

18      know the defense counsel has argued to you that

19      he was under such stress. The gravity of the

20      situation. I submit to you, any stress that

21      the defendant had when you were watching that

22      video had to do with the fact that he knew that

23      he was caught. He knew that he had to explain

24      why he stabbed an unarmed man for no reason.

25      That's why he is shaking his head. That is why

1        he is leaning over and putting his hand in his

2        head like that (indicating). Because he knows

3        he is screwed up.

4            Then you have yesterday. You have

5        yesterday when he got up there, and he

6        testified before you. He raised his hand, and

7        he said, I swear to tell the truth. I swear.

8        This is going to be the truth. Honest. And

9        went all the way this time. Not only does he

10       say, you know what, all those statements I said

11       to Detective Darino, they made me say them. In

12       fact, they made me say them, and they also made

13       me go on video tape to say to Miss Sipress the

14       same way. Say the same thing.

15           But you heard on the video tape yourself

16       what does he say? He goes, what's this? I

17       think detective couldn't hear. He says, what's

18       this? You hear him, he says, just an

19       interview. That's all he says. It's just an

20       interview. Which is exactly what Detective

21       Darino testified to you. I asked the defendant

22       if he's willing to talk to the assistant

23       district attorney, and he said, yes. And then

24       when on the video he goes, what is this? He

25       says, it's an interview. That's all he said.

1       What you said before. Remember, stick to the

2       script. Remember about the plan. Brothers

3       won't get revealed, you didn't hear any of

4       that. It's just an interview. That's all he

5       says.

6           So now he is on the stand, and he is

7       telling you, okay, these are all the coerced

8       statements. I didn't have a knife. Not only

9       did they make me say this, but I am going to

10      tell you something really important. There was

11      this guy, his name is Little Julio. I have

12      known him all my life. In fact, I even know

13      where he lives, but I don't know his whole

14      name. I don't know his real name. I have

15      known him all my life. He knows he lives on

16      the same place as my brother. But I don't know

17      his last name. Guess what, he had blood all

18      over his jacket. Same jacket I was wearing.

19      Blood all over the jacket. This is someone he

20      hangs out with. Someone he watches the fight

21      with. Someone who he lets in his barbershop

22      when it's closed so they can have beers and

23      watch the fight. Someone he hangs around,

24      someone who he drives around. Someone who

25      would never be mistaken for the defendant

Summation - Chu

1    because he's as tall as the defendant is. That

2    is how short Little Julio is. As thin as the

3    defendant is, that is how stocky Little Julio

4    is.

5         Now, the Judge is going to give you a

6    charge as to an interested witness. And the

7    defendant, by definition, is an interested

8    witness. He is interested in the outcome of

9    this case. He will be directly affected by the

10   outcome of this case. And I want you to keep

11   that in your mind when you're considering

12   whether or not what he told you is truthful.

13   When you compare it to all the other evidence

14   in this case.

15        Now, if he was forced to say that he did

16   it, and he knew anything that could save

17   himself or his brothers' fate, why didn't he

18   tell Detective Darino in 2005 when he was being

19   interviewed or spoken to at the precinct on

20   February 28, 2005? Why didn't he tell

21   Detective Darino? Why didn't he tell him that

22   Little Julio had the blood all over his jacket?

23   He knew where he lived. He could have told the

24   guy, Little Julio, I don't know his last name,

25   but he lives on Nelson. He lives right by my

1       brother.  When he testified at a prior

2       proceeding under oath, he had the opportunity

3       to set the record straight.  Set the record

4       straight.

5               MR. DRANOVE:  Objection.

6               THE COURT:  Overruled.

7               MS. CHU:  He was no longer under the

8       oppresive views in the police station or law

9       enforcement.  While being questioned, he

10      doesn't think it's important to tell his lawyer

11      to bring up the fact that Little Julio had

12      blood all over his jacket.  He don't think that

13      is an important --

14              MR. DRANOVE:  Objection.

15              THE COURT:  Overruled.

16              MS. CHU:  -- thing to talk about.  To get

17      him to ask him the question.

18              What was his answer to me when he said, I

19      didn't say that at the prior proceeding?  What

20      did he say?  They didn't ask.  You heard all

21      the questions defense asked my witnesses about

22      talking to him, talking to them before they

23      took the stand.  You don't think the defendant

24      has an opportunity to talk to his lawyer about

25      what he is going to say.  What he's testifying

1       at a prior proceedings --

2              MR. DRANOVE:  Objection, Judge.

3              THE COURT:  Overruled.

4              MS. CHU:  Don't ask -- doesn't ask him

5       about the bloody jacket.  Cause if you had

6       asked me, I would have said it.  But nobody

7       asked me, so I just didn't say it.  I submit to

8       you, ladies and gentlemen, that flies in the

9       face of common sense.  If you have information

10      like that, why wouldn't you tell anybody about

11      it?

12             Now, you know the defense counsel asked

13      him on his redirect about the fact of whether

14      or not Little Julio was present yesterday when

15      he was testifying.  We brought out the fact

16      that Little Julio was there when he testified

17      at that prior proceeding, and he didn't say

18      anything about him having a bloody jacket.  He

19      asked him whether or not he was present when he

20      was testifying yesterday, and he said he was

21      not present in the room.  I submit to you, that

22      shows you the kind of person the defendant is.

23      That is an under-handed way of blaming your

24      friends who you hang out with all the time.

25      Who you drink beer with, who you go to the bars

1     with, who you drive home with, who you cut your

2     hair.  That is under-handed way of throwing him

3     under the bus.  You wait until he's not here,

4     then -- by the way, that is the guy that had

5     the blood all over his jacket.  Something that

6     could save your fate, save your brother's fate.

7          I submit to you, ladies and gentlemen,

8     what you heard yesterday was a calculated

9     scheme to place blame on someone who the

10    defendant knew could never be prosecuted for

11    this crime.  Because all the witnesses say that

12    it was the defendant, Enrigue Rivera, who did

13    it.  Not Little Julio.  They said it was the

14    defendant who did it.

15         MR. DRANOVE:  Objection.  Who did it, they

16    didn't say --

17         THE COURT:  Overruled.  This is her

18    argument.

19         MS. CHU:  Any case brought against Little

20    Julio they built had reasonable doubt because

21    all the witnesses say it was him.

22         Now, the Judge is going to give you a

23    charge that if you believe that any witness has

24    testified falsely about a material fact in this

25    case, that you have a right to disregard all of

1      their testimony.  And, I submit to you, that is

2      exactly what you should do with the defendant's

3      testimony that you heard yesterday.  He stood

4      here, he raised his hand and he swore to tell

5      the truth and blatantly lied to you.

6          What he wants you to believe that the

7      police, who already had his brother, Tito, at

8      the precinct, who they said to the defendant

9      was the one who really killed Edgar Ojeda.

10     What did they say?  They say, but it's your

11     fault, you need to man up, you been to jail

12     before, you take the heat.  All this

13     information that supposedly is out there, and

14     you have information, not just any information

15     we are talking about, important information

16     about this case regarding the fact that you saw

17     someone who had blood all over their jacket

18     immediately after this fight that happened at

19     the bar and he doesn't tell the police.  And

20     remember, at that point, line-ups hadn't

21     happened yet.  There were no witnesses that

22     identified anybody yet.  In fact, he wants you

23     to believe that he agrees to confess falsely

24     that he committed a crime and go to jail for

25     ten years.  Ten years when he knows who did it

Summation - Chu

1   and that it wasn't him and it wasn't his

2   brother, Tito.  That is what he wants you to

3   believe.  That flies in the face of common

4   sense, ladies and gentlemen.  Why would you

5   know about the bloody jacket, number 1, not

6   tell them, and, number 2, falsely confess to

7   committing that crime?  Why would you do that?

8   Wouldn't that be the most important thing that

9   you wanted to say to whoever wanted to talk to

10   you?  Wouldn't you think that would be the most

11   important thing you would want to say?  When

12   you're talking to the police, when you're

13   talking to the district attorney on the video

14   tape, when you're talking to your own attorney

15   preparing for testimony.  You don't think that

16   would be something you'd want to tell them?

17       He testified for over two hours at that

18   prior proceeding.  Never once mentioned

19   anything about a bloody jacket.  And I want to

20   ask you.  You should ask yourselves, was the

21   reason that he failed to mention that Little

22   Julio had blood all over his jacket because

23   noone ever asked him, or was the reason why he

24   never mentioned anything about Julio's bloody

25   jacket because he didn't know about it until he

Summation - Chu

1    made it up right there for you?  On the witness

2    stand yesterday.  May 12, 2009.

3         Ask yourself why does his story keep

4    changing?  Why does he keep adding on things?

5    I submit to you, he's so desperate for you to

6    believe his lies that it doesn't matter that

7    what he's actually saying to you is not

8    consistent with logic or the truth.  That you

9    know to be from the evidence in this case.

10        Now, if you combine these components, Mr.

11   Solomon, Mr. Navarette's testimony, and the

12   statements of the defendant that were detailed

13   to you written, and video taped statement, all

14   are consistent with the defendant being the

15   perpetrator and being guilty of murdering Edgar

16   Ojeda on February 27, 2005.

17        And now we come to the final component of

18   the People's case that shows that it was indeed

19   the defendant, beyond a reasonable doubt, who

20   killed Edgar Ojeda.  The DNA.  Now, the defense

21   brought in that large chart about, you know,

22   stain 2D.  That was inside the cap.  The fact

23   of the matter is, that is all moot because you

24   know what, the defendant admitted that hat,

25   People's number 7, was the hat that he was

Summation - Chu

753

1    wearing.  Doesn't matter who it belonged to or

2    who owned it or maybe he borrowed it.  Whatever

3    it is.  He said that is the hat that he was

4    wearing.

5         (pause)

6         This hat (indicating).  He says it doesn't

7    matter who's on the inside because he says I

8    was wearing this hat.  And what do you have on

9    this hat.  You have the blood of Edgar Ojeda

10   from here (indicating).  Right where it's

11   circled by Miss Razzano.  And you have it back

12   here (indicating).  Those two spots.

13        Now, what is the explanation that the

14   defendant gives for that?  Cause he had a long

15   time to think about how that blood got there.

16   Right?  And not just one place, but two places.

17   You have it on the brim, on the top, then you

18   have it on the back.  And the explanation that

19   he gives when he throws Little Julio under the

20   bus by saying, he was all bloody, is that

21   despite the fact that he was in the bar in a

22   fight.  He manages to keep possession of his

23   hat because that hat ends up at his mother's

24   house.  Yeah, brought to my mother's house,

25   took off my clothes and I left it there.  That

1    was what I was wearing that night. So even
2    though he was in this bar fight, as he calls
3    it, that hat remains with him, right. And he
4    says that when he's in the bar where the rules
5    are, you got to take it off. Then when he gets
6    outside, there are no rules about keeping it
7    off. Now he can't keep it on his head. So it
8    has to be jumping around in that car, hopping
9    from place to place right onto Little Julio's
10   new bloody jacket. Isn't that convenient. But
11   I submit to you, ladies and gentlemen, that
12   don't make any sense. Because he says it's all
13   over the front of Little Julio's jacket. He
14   says on the front left and right. In the chest
15   area. And if that hat pushed against it, it's
16   like on the top. It's not on the top of the
17   hat. It's over here (indicating). It's not on
18   the top, it's in the back. So if -- in order
19   to get it here on the brim, (indicating) that
20   means the hat would have to be quashed down
21   like this, (indicating) that means all the
22   blood that he says was on Little Julio's
23   jacket, you would have blood all on the top of
24   the hat, and you don't. All you have it is
25   right there and right there (indicating).

1          What else do you know about the DNA?  Dr.

2     Frederic, remember her?  She says that when Mr.

3     Ojeda gets stabbed, she says the blood -- she

4     says the blood would not come gushing out.  She

5     says, it's not like the injury in an artery,

6     not a stab wound that hit an artery, artery

7     don't have a jugular vein.  It's not like the

8     movies.  Not like in the movies.  I submit to

9     you, despite the fact that his friends did say

10     that blood was coming out like that

11     (indicating).  If you see a loved one bleeding

12     from a stab wound, it's going to look like a

13     blood of -- blood to you.  No matter what.  But

14     what did she tell you?  It's not going to

15     squirt out like that.  There will be blood on

16     the knife, but it wouldn't be squirting out at

17     everything.  Right, it's not like one of those

18     gory movies.  Everything goes all over the

19     place.  She says it would be on the knife.  I

20     submit to you, exactly how this blood got on

21     the defendant's hat.  When he ripped that knife

22     out of Edgar Ojeda's chest this way, the blood

23     from the knife splashed onto here and onto here

24     (indicating).  When he pulls it out.  That is

25     exactly how the blood got there.  There is no

Summation - Chu

1    way that that blood got there from some sort of

2    transfer from this bloody jacket that Little

3    Julio was wearing in the car.  No way.  Because

4    you'd have more blood on the hat.  It would be

5    more area of this hat (indicating).

6          Now, what else do you know about the

7    doctor?  She testified about the stab.  I want

8    to talk about this because I just remembered he

9    made some comments that the stab wounds are

10   inconsistent.  I submit to you, ladies and

11   gentlemen, that that's actually not true.

12   Because what did she say?  She says that the

13   stab wounds to the back are from the left side

14   to right.  Back to front and downward.  If you

15   think about it, if this is the body of Mr.

16   Ojeda, let's say he's facing the front and back

17   of him.  This is the left side (indicating).

18   If he go like that, and then come out and do

19   the last one here, how easy is that to do?

20   Because what did we know about Mr. Ojeda?  He's

21   five foot five, a hundred eighteen pounds.  He

22   is a slight person.  He is not like we have

23   barreled chested person.  He's got to go, I am

24   going to the back now.  I got to come to the

25   front.  He is slight, how easy would it be not

Summation - Chu

757

1      only that one of these standard wounds is to

2      actually the back of the shoulder here

3      (indicating).  How easy is it for you to go

4      boom, boom, boom right in a row?  Boom, boom,

5      boom.  Right?  And what did they say, Carlos

6      Solomon and Navarette comes up, and he does the

7      final blow (indicating).

8          MR. DRANOVE:  Objection to the gesture.

9      Inconsistent with the testimony.

10          THE COURT:  Overruled.  This is her

11      argument.

12          MS. CHU:  That's why they see the last

13      one, and they don't see the other one.  Because

14      it's done here, and then it's up.  That is why

15      they see the final one. (Indicating)

16          MR. DRANOVE:  Continuing objection, your

17      Honor.

18          THE COURT:  Overruled.

19          MS. CHU:  That is how he is able to return

20      after and not account, and the witnesses don't

21      know what happened before because the stab

22      wounds in the back happened first.  And if you

23      think about it, all of them would be consistent

24      with the way the doctor says the injuries come.

25      She says the ones to the back are from left to

Summation - Chu

1       right. Downward and going from -- I am

2       sorry -- from back to front. The one in the

3       front over here, in the chest, goes downward,

4       also left to right (indicating). So if he is

5       facing -- I am going left to right like this

6       (indicating). And from front to back. That

7       would be consistent. Now, he is in the front

8       of him, he is going this way (indicating). He

9       is in the back like this, and then front this

10      way (indicating). Exactly consistent with the

11      way Dr. Frederic told you that those injuries

12      and the direction of those wounds, the wounds

13      tracks were.

14      What else did Dr. Frederic tell you? She

15      tells you all the wounds are consistent with

16      having a knife that has either a sharp or a

17      thin edge to it on both sides. One side sharp,

18      other side has to be thin. It's not sharp

19      itself like a double-sided blade like. All

20      consistent with each other. All three done

21      with the same weapon. It has to be a knife,

22      not a punch. That is nonsense. It's a knife.

23      What else do we know about the wounds

24      itself? Remember we talked about the fact it

25      wouldn't be gushing. That it would come out,

Summation - Chu

759

1      but it wouldn't be gushing. It would come out

2      on the knife. What do we know? We know Mr.

3      Solomon, they didn't see the blood until after

4      what? After Edgar moved his scarf, then they

5      saw the blood. Then they saw the blood.

6          And what else do you know? You know from

7      the crime scene photos. You have crime scene

8      photos at the scene. First, we talk about

9      there was one on the sill there (indicating).

10     There was one over here (indicating).

11     People's -- I believe this is E. This one

12     right down here (indicating). 5D and E here

13     (indicating) where they were with respect to

14     that doorway where Edgar and Carlos are

15     standing when this incident took place.

16         What else do we know about from the crime

17     scene photos as far as how he was bleeding? We

18     have People's 1A through E. We have pictures A

19     through E. There is a diagram that was done by

20     Detective Cunningham when he first arrived

21     there. And they had already closed up the bar.

22     All he could do is the outside. They left some

23     evidence. What he said, it looked like it had

24     been cleaned up. He said, there was ice in

25     front of the door, and he said that it looked

Summation - Chu

1    like the sidewalk had been washed because there

2    was ice that was there. But he said there was

3    serology evidence, you know, from Miss Razzano.

4    She tested not only the blood that was inside

5    location by the door right where Mr. Ojeda and

6    Mr. Solomon were. Matched up with Mr. Ojeda.

7    But this blood out on the street also matched

8    up with Mr. Ojeda. To the exclusion of anybody

9    else. You have to be a hundred forty-nine

10   percent of the population in order to get that

11   DNA again. That is Edgar's blood.

12        We know about the blood. If you look in

13   this picture here, People's 1C, you see the

14   drops (indicating). You see the trail. It's

15   just drops, drops, drops, drops. You can see

16   that there is this concentrated area right

17   there (indicating). What does that show you?

18   That means they wait right there (indicating).

19   Because there's droppings, droppings,

20   droppings, and then he paused there for some

21   reason. He's waiting for a car maybe, waiting

22   for the light before they crossed, then the

23   trail continues off the curb. You can see it

24   gets thinner, it's all concentrated in People's

25   number D -- 1D (indicating). That is how he

1    was bleeding.  There is no squirt of blood

2    everywhere.

3         So even the defendant's own statements

4    about how Little Julio had this bloody jacket

5    would be inconsistent with how you know Edgar

6    Ojeda was bleeding.  Because unless Edgar Ojeda

7    was laying on top of Little Julio, Little Julio

8    wouldn't have had that much blood on him.  So

9    even that flies in the face of common sense.

10        Now, remember Mr. Solomon and

11   Mr. Navarette had no way of knowing the hat

12   would fall.  They didn't know his hat got

13   recovered by the detectives.  They had no way

14   of knowing Mr. Ojeda's blood would be found on

15   that brim and in the back of his hat either.

16        Now, there comes a point where your

17   struggle to try and see if the defendant's

18   version could possibly be the truth when you

19   have to say enough.  Enough.

20        The real logic comes from the

21   straight-forward evidence that you heard from

22   the People's case.  Carlos Solomon's testimony

23   that it was only the defendant that he saw

24   punch Edgar in the upper chest area on the

25   left-hand side.  Enrigue Navarette's testimony

Summation - Chu

762

1    that he saw the defendant, and only the

2    defendant, either push or do something to Edgar

3    Ojeda on the upper left chest here

4    (indicating). The defendant's statement in his

5    own writing. His video-taped statement that he

6    had a knife. And was waving it around. And

7    the DNA evidence from his very own cap. That

8    was Edgar Ojeda's blood.

9         Now, the judge is going to charge you in a

10   few moments on Murder in the Second Degree, and

11   the lesser charge of Manslaughter in the First

12   Degree. And, I submit to you, ladies and

13   gentlemen, it's basically a difference in

14   intent between the two.

15        Now, when you determine intent, you can

16   see and you can look at what the defendant did

17   before, during and after the crime. In fact,

18   there is no requirement whatsoever that this be

19   premeditated. This don't have to be a planned

20   murder. Intent can be formed right at the time

21   the act is being committed. And you're going

22   to hear that from the judge.

23        But I submit to you that the injuries that

24   Mr. Ojeda suffered speak for themselves. When

25   you stab somebody you have to get up close and

Summation - Chu

1    personal with someone.  It can't be by accident

2    you stabbed somebody.  Not like that.  And you

3    know he didn't stab Mr. Ojeda just waving the

4    knife around like I said in the video.  Because

5    what did Dr. Frederic say?  No, that couldn't

6    happen that way.  That has to be plunged into.

7    The knife has to be plunged into the body.

8         And let's talk about the stab wounds

9    themselves.  We have two to the back.  One here

10   and one to the upper shoulder (indicating).

11   Two and two and three quarter inches in depth.

12   Then you have the one here (indicating).

13   Five inches deep, going one and a half inches

14   into the lung.  Cuts through -- cuts through a

15   bone.  Think about how hard you have to force

16   that knife into Mr. Ojeda's body to cut threw

17   his rib.  The second rib is cut by that knife.

18        In addition to the depth of the wounds and

19   the fact that it cuts the bone, we are talking

20   about where he was stabbed.  He was not stabbed

21   in the hand.  He is not stabbed in the arm.

22   He's stabbed in the body.  There is a reason

23   why you have ribs here (indicating) to protect

24   the major organs that you have in your body to

25   keep you alive.  I submit to you, his intent

Summation - Chu

764

1      should scream out to you, he didn't want to

2      just seriously injure Mr. Ojeda, he wanted him

3      dead.

4          Whether he was the one that bumped into

5      him at the bathroom and didn't apologize for

6      whatever reason.  All we know is that the

7      defendant is the only one that had any type of

8      dispute with Mr. Ojeda that night.  We all know

9      he wasn't going to pick on Mr. Solomon.  He's

10     five foot four.  Here we have Mr. Ojeda.  He's

11     a good target.  Five foot five, a hundred

12     eighteen pounds.

13         I don't have to prove motive, ladies and

14     gentlemen.  But it's clear that only the

15     defendant had any type of beef with Mr. Ojeda

16     that night.  He is the only one who punched or

17     pushed Mr. Ojeda in the same area where we

18     found that fatal wound to Mr. Ojeda's body.

19         The evidence has proven, beyond a

20     reasonable doubt, that Enrique Rivera

21     intentionally caused the death of Edgar Ojeda

22     on February 27, 2005 at El Borinquen sports

23     lounge on 39th and Third.

24         Now, there's a saying that says that

25     sometimes ordinary people can do extraordinary

1        things.  You have that opportunity now to tell

2        the defendant no more.  No more lies.  Hold him

3        responsible for what we all know he did that

4        night.  Hold him responsible by finding him

5        guilty of murdering Mr. Ojeda.

6             Thank you.

7             THE COURT:  Ladies and gentlemen, you have

8        heard the evidence.  You heard the attorneys

9        sum up.  It's now my job to take just a few

10       more moments of your time.  I can assure you, I

11       will be a lot briefer than the attorneys were

12       in their summations to explain the law that you

13       must apply when you decide the case.

14            As I told you at the beginning of this

15       trial, you are the judges of the facts.  You

16       must decide coolly, calmly and deliberately,

17       without any fear, favor, passion, prejudice or

18       sympathy.  It is your sworn duty to decide

19       whether or not the defendant is guilty solely

20       on the evidence that you heard at this trial.

21            Please don't go into the jury room and try

22       to play detective.  Don't try to guess what

23       could have been done, what might have been

24       done, what you would have done had you been

25       personally involved in this case.

1        Also, you must not consider anything which

2    I may have said during this trial as indicating

3    I have an opinion about whether or not the

4    defendant is guilty.  It is not my job to have

5    an opinion, and I do not have one in this case.

6        I have no power to tell you what happened,

7    whether to believe a witness or not believe a

8    witness, what weight you should give any of the

9    evidence or what the verdict should be.  These

10   are matters that are entirely up to you.

11       Now, you're not obligated to accept any of

12   the arguments that you just heard these

13   attorneys make in their summations.  If you

14   find that any of their arguments were

15   reasonable, logical and consistent with the

16   evidence as you remember it, then you're free

17   to accept those arguments as your own.

18       On the other hand, if you find that any of

19   their arguments were not reasonable, not

20   logical, not consistent with the evidence as

21   you remember it, then you're free to reject

22   those arguments entirely.

23       But when it comes to the law, you don't

24   have that discretion.  You have to follow the

25   law as I give it to you, whether you agree with

Jury Charge

767

1     it or not.

2         Now, one of your chief functions in this

3     case is to determine the credibility of the

4     witnesses who testified.  Why?  Because the

5     facts depends on who you believe.  In making

6     this determination, you should consider the

7     witness' means of knowledge or opportunity to

8     observe what happened.  Consider how probable

9     or improbable the witness' account sounded to

10    you.  Consider the background of the witness,

11    the manner in which the witness answered

12    questions.  Whether the witness previously made

13    statements that may have been inconsistent with

14    the witness' account here at trial.  Whether

15    what a witness told you was supported or

16    contradicted by any of the other evidence in

17    this case.  And most importantly, use your

18    common sense and your good judgment because

19    that is why we have you here.

20        If you determine that a witness willfully

21    testified falsely as to any material fact, then

22    you're free to disregard the entire testimony

23    of that witness.  Or you can decide to accept

24    parts of what a witness told you as being

25    truthful and accurate and reject other parts.

1    It's entirely up to you.

2         Keep in mind that it makes no difference

3    the number of witnesses who testify for one

4    side or the other under our law.  It's not the

5    quantity of testimony that matters, it's the

6    quality that counts.

7         Even the testimony of one witness is

8    sufficient to support a guilty verdict if you

9    believe it beyond a reasonable doubt.

10        Now, you heard police witnesses testified.

11   Use the same test of credibility for them as

12   you use for the non-police witnesses.

13        You heard also testimony by expert

14   witnesses.  An expert is allowed to give you

15   opinions based on their education, training and

16   their experience.

17        A JUROR:  I'm sorry to interrupt.  I

18   really do need to go to the bathroom.

19        THE COURT:  Then go ahead.

20        (pause)

21        THE COURT:  As I was saying before, you

22   heard expert witnesses testify.  The law allows

23   experts to give opinions, based on their

24   education, their training and their experience,

25   but you, and you alone, have the power to form

Jury Charge

1   your own opinions and reach your on

2   conclusions.  You're not obligated to accept

3   the opinions given by the experts at this

4   trial.  Use the same tests of credibility for

5   them as you did for the non-expert witnesses.

6   You heard some evidence at this trial that

7   indicated that the defendant may have been

8   intoxicated during the course of this incident.

9   Evidence of intoxication is not a defense to a

10   crime under our law.  It may be considered,

11   whenever relevant, to negate an element of the

12   crime charged.  Thus, you may consider a

13   defendant's state of intoxication as it might

14   relate to his intent, because you're going to

15   hear that the crime involved an intent to

16   either cause death or cause serious physical

17   injury.  Under our law, you may consider

18   whether or not someone's state of intoxication

19   affected the level of intent that he may have

20   had at the time.

21   Now, the defendant, who testified at this

22   trial, is what we call an interested witness

23   because he has the primary interest in the

24   outcome of the case.

25   Whether any other witness is an interested

1    witness, based on interest, economic or

2    emotional interest in the outcome is also

3    something for you to consider.

4        Now, just because someone is an interested

5    witness does not mean that that witness did not

6    tell you the truth.  But you should carefully

7    consider the interest the witness has in the

8    outcome of the case in evaluating that witness'

9    credibility.

10        Now, in this case, as in all others, the

11    defendant is presumed innocent.  The

12    presumption of innocence remains with the

13    defendant throughout the trial.

14        The burden of proof is on the prosecution

15    to prove his guilt by proof beyond a reasonable

16    doubt.  The People have to prove, not only that

17    a crime has occurred by proof beyond a

18    reasonable doubt, but that it is the defendant

19    who committed the crime.  By proof beyond a

20    reasonable doubt.  Not beyond all possibility

21    of doubt.  Not beyond a shadow of a doubt, but

22    beyond a reasonable doubt.

23        Before you may convict the defendant, you

24    must be satisfied from the credibility that he

25    is the person who did commit this crime.

1        When a doubt of guilt is reasonable.

2   Under our law, a doubt, to be reasonable, must

3   arise because of the nature and quality of the

4   evidence or because of the lack or

5   insufficiency of the evidence.

6        A doubt of guilt is not reasonable if it

7   is based on sympathy for the defendant or it is

8   based on a desire by a juror to avoid

9   performing a disagreeable duty.

10       A doubt, to be reasonable, must arise

11  because of the nature and quality of the

12  evidence or lack of evidence.

13       First, your duty as jurors is to consider

14  all of the evidence and decide what happened.

15  If you have a reasonable doubt, then the

16  defendant is entitled to the benefit of it.

17       A reasonable doubt is an actual doubt, one

18  which you are conscious of having in your mind

19  after you have considered all of the evidence.

20  If after doing, so you feel uncertain, not

21  fully convinced of the defendant's guilt,

22  that's reasonable doubt, and the defendant is

23  entitled to the benefit.

24       So review the evidence and decide what

25  happened.  If you have a reasonable doubt, you

Jury Charge

772

1    must find the defendant not guilty of the

2    crimes charged.

3        If you are satisfied that the People have

4    proven the defendant's guilt, by proof beyond a

5    reasonable doubt, you should find him guilty.

6        Now, as you have become aware during this

7    trial, there's been some evidence regarding

8    statements made by the defendant orally, in

9    writing and on video.  I want to make sure that

10   you understand that before you give any weight

11   to these statements, you must find that they

12   were voluntarily made by the defendant and give

13   credit to those portions that you find to be

14   truthful.

15       Whether a statement is voluntary and

16   truthful is something for you to decide.  The

17   burden is on the prosecution to convince you,

18   beyond a reasonable doubt, that these

19   statements were voluntarily made and truthful.

20       If you fail to believe that they were

21   proved, beyond a reasonable doubt, as

22   voluntarily made and truthful, then you are

23   obligated to strike them from your mind and not

24   consider them at all in reaching your verdict.

25       If you determine they were voluntarily

Jury Charge

773

1   made and were truthful, then you can credit

2   them and rely on them as evidence.

3        Now, in order to determine whether a

4   statement is voluntarily made, you should

5   consider whether or not the defendant was

6   previously advised of what we call his Miranda

7   rights before he made the statement.  These are

8   rights that include, the right to remain

9   silent, that anything he may say may be used

10  against him in a court of law.  That he has the

11  right to consult with a lawyer before answering

12  any questions, and the right to the presence of

13  the lawyer during questioning and that if he

14  cannot afford a lawyer, one will be provided

15  for him prior to any questioning that he so

16  desires.

17        The burden is on the prosecution to prove,

18  beyond a reasonable doubt, that he did, in

19  fact, make knowing and intelligent waiver of

20  his rights.  If they fail to do so, then you

21  must disregard them.

22        Now, you must also consider any improper

23  conduct on the part of a police or undue

24  pressure which may have been applied on the

25  defendant which may have impaired his physical

Jury Charge

1      or mental condition.  And evaluating whether or

2      not these statements were voluntarily made.

3           Consider the defendant's age, his

4      intelligence and his physical and mental,

5      condition.  The conduct of the police during

6      their contact with the defendant, including the

7      number of officers who questioned him, the

8      manner in which he was questioned, his

9      treatment during the periods of questioning and

10     the length of time that he was questioned.  It

11     is for you to evaluate and weigh these factors

12     in determining whether or not you believe that

13     the questioning took place in a coercive

14     atmosphere.

15          If they have showed that the document was

16     voluntarily made, then you should consider

17     those portions of his statement that you

18     believe were truthful.  The burden is on the

19     prosecution to establish that these statements

20     were both voluntarily and truthfully made

21     beyond a reasonable doubt.

22          In reaching your verdict, you may weigh

23     consideration only to those parts of the

24     statement that you believe were truthful and

25     disregard that which you believe to be false.

1   Now, I am not going to make any attempt to

2   summarize the evidence.  These attorneys just

3   went over it with you in their summations.

4   I am going to explain to you now the two

5   charges that are on your verdict sheet for your

6   consideration in this case.  The first charge

7   is Murder in the Second Degree.

8   A person is guilty of Murder in the Second

9   Degree when he causes the death of another

10   person with the intent to cause the death of

11   that person.

12   What is intent?  Intent means the state of

13   mind of the person at the time the act occurs.

14   Intent does not have to be performed at

15   any time in particular before the actual act.

16   You must find the intent existed at the time of

17   the act.

18   For you to find the defendant guilty of

19   Murder in the Second Degree, you must find,

20   beyond a reasonable doubt, each of following

21   two elements:

22   The first is that on or about February 27,

23   2005, here in Kings County, the defendant

24   caused the death of Edgar Ojeda by stabbing him

25   with a dangerous instrument.

Jury Charge

1    And the second element is that the
2    defendant did so with the intent to cause the
3    death of Edgar Ojeda.

4        If you find the People have proved, to
5    your satisfaction, beyond a reasonable doubt,
6    each of those two elements, you should find the
7    defendant guilty of this crime.

8        If you have a reasonable doubt about
9    either or both of those elements, you must find
10   the defendant not guilty of this crime.

11       Now, if you find him guilty of the murder
12   charge, that will end your deliberations.

13       If you find the defendant not guilty of
14   this crime, then you must consider the next
15   charge on your verdict sheet.

16       Manslaughter in the First Degree:

17       A person is guilty of that crime, when,
18   with the intent to cause serious physical
19   injury to another person, he causes the death
20   of that person.

21       Serious physical injury means any
22   impairment of a person's physical condition,
23   which creates a substantial risk of death.

24       Here are two elements that have to be
25   proved beyond a reasonable doubt:

1    First, is that on or about February 27,

2    2005, here in Kings County, the defendant

3    caused the death of Edgar Ojeda by stabbing him

4    with a dangerous instrument.

5    And the second element is that he did so

6    with the intent to cause serious physical

7    injury to Mr. Ojeda.

8    If you find the People have proved to your

9    satisfaction, beyond a reasonable doubt, each

10   of those two elements, then you should find the

11   defendant guilty of Manslaughter in the First

12   Degree.

13   If you have a reasonable doubt about

14   either or both of those elements, you must find

15   the defendant not guilty of this crime.

16   What's the difference between the murder

17   charge and the manslaughter charge?  They both

18   require that you find that it is the defendant

19   who caused the death of Edgar Ojeda.  That is

20   the same.

21   The difference is the intent.  The murder

22   charge requires that you find that at the time

23   of the stabbing, the defendant intended to

24   cause death.  The manslaughter charge requires

25   not that you find he intended to cause death,

Jury Charge

778

1    but rather that he intended to cause serious
2    physical injury at the time of the stabbing.
3         Now, your verdict has to be unanimous.
4    All 12 of you must agree, and once you have
5    arrived at the unanimous verdict, you will
6    check off your verdict sheet under guilty or
7    not guilty.  And then you'll send me a note,
8    you have arrived at a unanimous verdict.  I
9    will ask you to come in the courtroom, announce
10   your verdict through your foreperson, juror
11   number 1.
12        Now, when you go in to deliberate, I don't
13   know what is going to happen.  At this point,
14   neither do you.  There are two possibilities.
15   One, you quickly agree as to what the right
16   verdict should be.  If that happens, there is
17   nothing wrong with that.  I'd be happy to take
18   a quick verdict.  The second possibility is,
19   you can't quickly agree because there are some
20   different opinions amongst yourselves.  If that
21   happens, there is nothing wrong with that
22   either.  Sometime it takes 12 people a while to
23   agree on a verdict.  If that happens, please
24   keep an open mind.  Exchange views.  If you
25   have an opinion and believe you're right in

Jury Charge

779

1    that opinion, noone can force you to change

2    your mind.  But you must not prejudice the

3    result that may be arrived at by refusing to

4    discuss the case with your fellow jurors.  That

5    would not be the right thing to do.

6         Now, if at any time during your

7    deliberations you would like to have any of the

8    testimony of this trial read back to you here

9    in the courtroom, and remember the testimony is

10   what the answers were that the witness gave to

11   the attorneys' questions, not the attorneys'

12   questions, or if you would like to see any of

13   the physical exhibits that were admitted into

14   evidence at this trial, again, or if you want

15   me to go over with you any of these

16   instructions on the law again, all you have to

17   do is send me a note and put on the note

18   exactly what you want.  Not the vote that you

19   may have taken.  I don't want to know any vote

20   results.  I only want to know when you agreed

21   on a verdict.  Please have your foreperson,

22   juror number 1, sign any note that you send out

23   to me.

24        I am going to ask the attorneys if they

25   have any additional instructions they want me

1       to give you.  I don't think that will take too

2       long.  I beg your patience for just another

3       couple of minutes.  Sit in the jury box while

4       the attorneys join me at the sidebar with our

5       court reporter.  We will be right back.

6               Counsel?

7                       (Whereupon, the following

8                       occurred at a sidebar conference

9                       at this time.)

10              THE COURT:  Out of the presence of the

11      jury.

12              Do the People have any exceptions or

13      additional requests for the charge?

14              MS. CHU:  No.

15              THE COURT:  Does the Defense?

16              MR. DRANOVE:  Yes.  No exception.  A

17      request.

18              I request, and I fully apologize for not

19      mentioning this sooner, Judge, a charge on

20      eyewitness identification.

21              THE COURT:  I don't see a reason to give a

22      charge.  Because the witnesses in this case all

23      testified that they saw the defendant at the

24      bar engaged in some sort of encounter in which

25      he pushed or shoved or punched, whatever words

1     they used.

2         It really is not much dispute that the

3     defendant was at the bar and that he got

4     involved in a scuffle of some kind. None of

5     the eyewitnesses said they actually saw him

6     stab the victim, which is what the defense has

7     been. Therefore, this really does not dispute

8     they are eyewitnesses.

9         The only question is whether or not there

10     is testimony, along with all other evidence,

11     that inculpates the defendant in the actual

12     stabbing of the victim.

13         So, I did not give such charge, none was

14     requested and I decline to give one now.

15         Let's go in and give the case to the jury.

16         By the way, you consent to giving physical

17     evidence to the jury if they send out a note

18     for those exhibits that we be allowed to give,

19     other than showing the video tape?

20         MS. CHU: Without reconvening, yes.

21         MR. DRANOVE: Yes.

22         THE COURT: I am going to separate our

23     alternate jurors at this time.

24         (Whereupon, this concluded the sidebar

25     conference at this time.)

Jury Charge

1       THE COURT:  I have good news for you.  I

2   have no more instructions for you, and your

3   lunch has arrived.  So I am going to let you

4   have the case now for deliberations.  We await

5   your verdict.

6       I am going to ask the two alternate

7   jurors, Miss Koteen, Miss Rasado, wait for a

8   moment.  I have some other things I have to

9   tell you.

10      Go have your lunch, commence your

11  deliberations and we will await your verdict.

12      Please take charge of the jury.

13      (Jury Excused)

14      THE COURT:  You can have your lunch too,

15  but after that I am not going to require that

16  you stay here because now that the regular

17  jurors are deliberating, I am not going to

18  require that you wait around.

19      However, I am not going to discharge you

20  because sometimes we do have to substitute a

21  juror in even after deliberations began because

22  of some problem.  I certainly hope nothing will

23  happen here, but until the actual verdict has

24  been rendered, you will not be discharged.  We

25  are going to put you on telephone alert.

Jury Charge

1      You're free to leave, we'll give you

2      instructions about that.  Just don't discuss

3      the case with anyone until we have actually

4      discharged you by phone or in person.  Okay.

5          THE JUROR:  We have the option of staying

6      through the deliberations.

7          THE COURT:  You can.  Obviously you

8      wouldn't be in the room with the jurors.

9          THE JUROR:  Can we be --

10         THE COURT:  No.  You're welcome to stay in

11     the courtroom.  We have a separate room, if you

12     want to wait in that room to see what happens.

13     We are going to give you instructions as to how

14     you can be alerted by telephone as to what is

15     happening.

16         Just don't discuss the case with anyone

17     until we actually discharge you.  I probably

18     won't see you again.  So thank you very much

19     for your service on the case.

20         Have a nice lunch.

21         (Alternate Jurors Excused)

22         THE COURT:  We are in recess for lunch.

23         I will ask counsel to leave a reliable

24     phone number where you can be reached to be

25     alerted to return to court.

Jury Charge

784

1              For those who are attending the court,

2       nothing will happen before 2:45 for lunch

3       break.  Go and have your lunch.  Have a nice

4       lunch.

5                      (Whereupon, there was a luncheon

6                      recess at this time.)

7          A F T E R N O O N   S E S S I O N

8          THE COURT:  For the record, we've received

9       three notes from the jury.

10         One note reads, "can you please define

11      intent as it relates to intent?  Can you please

12      help us to define the perimeters of reasonable

13      doubt?  We are having difficulties defining

14      reasonable doubt with intent to kill."

15         Next note reads, "request to review the ME

16      diagram showing location of wounds".

17         And the third and final note reads.  "We

18      would like the direct examination of Dr.

19      Frederic, please."

20         Now, in response to the note requesting

21      the diagram by the medical examiner showing the

22      location of wounds, that has already been

23      provided to the jury with the prior consent of

24      counsel.

25         As to the note requesting direct

Jury Charge

785

1    examination of Dr. Frederic, I propose to read

2    that back to the jury.

3         As to the note regarding their difficulty

4    defining reasonable doubt with intent to kill,

5    I propose to give them the following

6    instruction:

7         Intent to cause death is one of the

8    elements of Murder in the Second Degree.  You

9    must be convinced, beyond a reasonable doubt,

10   that the defendant intended to kill Mr. Ojeda.

11        Intent does not require any advance

12   planning.  Nor is it necessary that the intent

13   be in a person's mind for any particular period

14   of time.  The intent can be formed and need

15   only exist at the very moment the person

16   engages in prohibited conduct.

17        The question naturally arises as to how to

18   determine whether or not a person has the

19   intent required for the commission of a crime.

20   To make that determination, you must decide if

21   the required intent can be inferred, beyond a

22   reasonable doubt, from the proven facts.  In so

23   doing, you may consider the person's conduct,

24   and all of the circumstances surrounding it's

25   conduct, including, but not limited to, what,

786

1    if anything, did the person do or say, what

2    result, if any, followed the person's conduct

3    and was that result the natural, necessary and

4    probable consequence of that conduct?

5        From the facts you find to have proven

6    beyond a reasonable doubt, you must decide

7    whether or not you can infer the intent to kill

8    in this case.

9        Please keep in mind that reasonable doubt

10   is an actual doubt, one which you're conscious

11   of having in your mind after you have

12   considered all of the evidence.  After doing

13   so, you feel uncertainty and not fully

14   convinced of an intent to kill, then that

15   element would not be proven beyond a reasonable

16   doubt.

17       Do the People have any objection as to how

18   I propose to respond to this note?

19       MS. CHU:  To your original reasonable

20   doubt charge, do you read both what you just

21   read, as well as, if, however, you do find that

22   they've proven -- isn't that both sides of it,

23   if you do find reasonable doubt, then that

24   element would have failed.  But if you don't,

25   then it would have --

1               THE COURT:  You're asking about language.

2       If it has been proven, beyond a reasonable

3       doubt, then they can consider -- they can

4       consider that element to have been proved --

5               MS. CHU:  Yes.

6               THE COURT:  I'll accept that modification.

7               Mr. Dranove, you have any objection to

8       propose to respond to the note?

9               MR. DRANOVE:  No.

10              THE COURT:  So then bring the jury out.

11              We'll do the read back first, then the

12      reinstruction.

13              COURT OFFICER:  Your Honor, are you ready

14      for the jurors?

15              THE COURT:  I am.

16              COURT OFFICER:  Jury entering.

17              COURT CLERK:  Both sides waive the roll

18      call?

19              MS. CHU:  Yes.

20              MR. DRANOVE:  Yes.

21              THE COURT:  You sent me three notes:

22              The first reads, "can you please define

23      intent as it relates to intent?  Can you please

24      help us define the perimeters of reasonable

25      doubt?  We are having difficulties defining

1    reasonable doubt with intent to kill."

2        The second note reads, "request to review

3    the ME diagram showing location of wounds."

4        And the third note reads:  "We would like

5    the direct examination of Dr. Frederic please."

6        Now, in response to these notes, we have

7    already furnished you with the diagram.  So you

8    got that.  That is one note.

9        Now, we are going to read back the direct

10    examination of Dr. Frederic next.

11                    (Whereupon, the testimony was

12                    read in open court as

13                    requested.)

14        THE COURT:  I have one other thing to do.

15    We're not quite there.

16        You asked me intent, the issue of

17    reasonable doubt regarding intent to kill.

18        Intent to cause the death is one of the

19    elements of Murder in the Second Degree charge.

20        You must be convinced, beyond a reasonable

21    doubt, that the defendant intended to kill

22    Mr. Ojeda.

23        Intent does not require any advance

24    planning.  Nor is it necessary that the intent

25    be in a person's mind for any particular period

1    of time.  The intent can be formed and need

2    only exist at the very moment the person

3    engages in the prohibited conduct.

4        Now, the question naturally arises, how do

5    you determine whether or not a person had the

6    required intent to commit the crime?

7        To make that determination, you must

8    decide, if the required intent to kill can be

9    inferred, beyond a reasonable doubt, from the

10   proven facts.  In doing so, you may consider

11   the person's conduct and all of the

12   circumstances surrounding the conduct.

13   Including, but not limited to, what, if

14   anything, did the person do or say?  What

15   result, if any, followed the person's conduct?

16   And was that result the natural, necessary and

17   probable consequence of that conduct?

18       In this case, from the facts proven,

19   beyond a reasonable doubt, you must decide

20   whether you can infer that the defendant had

21   the required intent.  The intent to kill.

22       Remember, a reasonable doubt is an actual

23   doubt.  One which you are conscious of having

24   in your mind after you have considered all of

25   the evidence.  If after doing so, you feel

1    uncertain and not fully convinced, then that is

2    a reasonable doubt and that would mean that the

3    element of intent to kill had not been proven

4    beyond a reasonable doubt.  You would have to

5    find the defendant not guilty of this charge.

6        On the other hand, if you are satisfied,

7    beyond a reasonable doubt, that intent to kill

8    was proven, beyond a reasonable doubt, that

9    would enable you to find the defendant guilty

10   of this charge.

11       You may resume your deliberations.  We

12   await your verdict.

13       (Jury Excused)

14       THE COURT:  We are in recess until we hear

15   from the jury.

16       I ask counsel to wait around the

17   courtroom, in the hallway, whatever you want.

18                   (Whereupon, there was a court

19                    recess at this time while

20                    awaiting jury verdict.)

21       THE COURT:  We are getting close to five

22   o'clock.  The jury has put in a very full day.

23       What I propose to do is to declare a

24   recess in the deliberations and tell the jurors

25   to resume tomorrow morning.

Proceedings

1       Do the People have any objection to that?

2           MS. CHU:  No.

3           THE COURT:  Does the Defense?

4           MS. CHU:  No.

5           THE COURT:  Sergeant, whenever you're

6   ready.  We're ready.

7           COURT OFFICER:  Your Honor, are you ready

8   for the jury?

9           THE COURT:  Yes.

10          COURT OFFICER:  Jury entering.

11          COURT CLERK:  Both sides waive the roll

12  call.

13          MS. CHU:  So waived.

14          MR. DRANOVE:  Yes.

15          THE COURT:  You put in a full day, I

16  promised never to keep you past five o'clock.

17  So I am going to declare a recess in your

18  deliberations and tell you to stop talking

19  about the case right now and have you return

20  tomorrow morning to continue your

21  deliberations.

22          So, please, return tomorrow morning at 10

23  a.m.  Once you're back in the room, you may

24  resume your deliberations at that time.  Ten

25  o'clock.

Proceedings

1          Have a nice evening.

2          (Jury Excused)

3          THE COURT:  I will ask everyone to remain

4      here until the jurors are out.

5          You can take charge of the defendant

6      obviously.

7          And, counsel, make sure we have a reliable

8      number where you can be reached in the morning.

9      If you're not going to actually be here in the

10     courtroom.

11         MR. DRANOVE:  I will make sure of that.

12         (pause)

13         THE COURT:  For the record, the jury has

14     sent out a note.  "May we please continue

15     deliberation until 5:30 p.m.?"

16         After they came -- went out of the

17     courtroom, they told the jury officers they did

18     want to continue staying, so I told the jury to

19     write me a note.  This is the note they've

20     written me.

21         I proposed to write back, Mr. Foreman and

22     members of the jury:  Yes, you may continue

23     deliberating.  Signed Justice Marrus.

24         Do the People have any objection to that?

25         MS. CHU:  No.

Proceedings

1      THE COURT:  Does the Defense?

2      MR. DRANOVE:  No, sir.

3      THE COURT:  We will give this note back to

4  the jury.  And we need that note back because

5  we have to mark it.  Tell them after it's read

6  in the jury room to give it back.

7      (pause)

8      THE COURT:  For the record.  The jury has

9  been deliberating, pursuant to their request,

10  until 5:30.  However, it is now 5:30, and we

11  haven't heard anything from the jurors.  And I

12  don't think it's really appropriate to allow

13  this situation to go on endlessly without, at

14  some point, recessing the deliberations.  They

15  have been here all day.  It's been a very long

16  day.  We have had summations and charge, and

17  since they asked until 5:30, and we haven't

18  heard anything, I think the right thing to do

19  is to bring them in now and say, okay, you have

20  put in a long enough day, it really is time to

21  recess to come back tomorrow and continue

22  deliberations after a good night's sleep.

23      Do the People have any objection to that?

24      MS. CHU:  No.

25      THE COURT:  Does the Defense?

Proceedings

794

1        MR. DRANOVE:  No, sir.

2        THE COURT:  Let's bring the jury out.

3        (pause)

4        THE COURT:  The jury sent out the

5    following note.  Number 1, "may we have 15 more

6    minutes?"  Number 2, "may we start later

7    tomorrow at 11:00 a.m.?"  That is what the

8    notes say.

9        Yes?

10       MR. DRANOVE:  I think, your Honor, you

11   should just -- just call them in and send them

12   home.  They indicate they are not going to

13   settle it today.  This start and stop

14   inordinate pressure on one or more of the

15   jurors.  Whatever way they are leaning.  I

16   think they should be sent home.

17       THE COURT:  I am not putting pressure on

18   them.  I am not sure what is going on in the

19   jury room, so I can't say giving 15 more

20   minutes is going to put more pressure on

21   somebody.  There is just no way of knowing what

22   this means.  We are talking about a few more

23   minutes.

24       I just propose really to say, yes, as to

25   both things.  They can have 15 more minutes,

Proceedings

1     and they can come in tomorrow at 11 a.m.

2         It does not feel like a pressure note.  It

3     doesn't say "or".  There are two questions.

4     "May we have 15 more minutes?" and "May we

5     start later tomorrow at 11 a.m.?"

6         MR. DRANOVE:  I still believe it's

7     appropriate to just send them home after this

8     long day not dribbling and drabbling more

9     minutes at the request of one or more of

10    jurors.

11        THE COURT:  I appreciate your position.

12        I guess my answer is, this seems to be

13    what the jury wants to do.  They want to have

14    fifteen more minutes.  I don't really have any

15    good reason to turn them down.  They are

16    working hard, I am inclined to just say, yes.

17    To send back a note saying, yes, as to both.

18        The People object to that?

19        MS. CHU:  No, your Honor.  I would leave

20    it to The Court's discretion.

21        THE COURT:  You want to object to that?

22        MR. DRANOVE:  Yes.

23        THE COURT:  You're objecting to a later

24    start tomorrow, 11 a.m.?  That is the second

25    question.

Proceedings

1          MR. DRANOVE:  I prefer they start earlier.

2     Why 11?  They must be burned out already.  That

3     is why it's at 11.

4          THE COURT:  Do you want to inquire as to

5     the reason?

6          I am assuming there is a scheduling issue

7     as to at least one juror to take care of

8     something in the morning.  But in any event, I

9     don't see what the reason is.  I can't tell

10    them they can't start at 11.

11         Notwithstanding, your firm objection to

12    the first yes, and your modified objection to

13    the second yes, I am going to say to the jury,

14    yes.

15         Do you require that I bring them in to say

16    yes?  Can I send them a note?

17         You have your objection for the record as

18    to my "yes".  But -- you don't want to send a

19    note --

20         MR. DRANOVE:  I'd like to see what they

21    look like.

22         THE COURT:  All right.  Let's bring the

23    jury in then.

24         COURT OFFICER:  Your Honor, are you ready

25    for the jurors?

Proceedings

1    THE COURT:  Yes.

2    COURT OFFICER:  Jury entering.

3    COURT CLERK:  Both sides waive the roll

4    call?

5    MS. CHU:  Yes.

6    MR. DRANOVE:  Yes.

7    THE COURT:  You sent me a note that reads:

8    "1, May we have 15 more minutes?  2, May we

9    start later tomorrow at 11 a.m.?"

10    Yes to both.  You may go back into the

11    jury room, I'll give you a few more minutes.

12    Please take charge of the jury.

13    (Jury Excused)

14    (Whereupon, there was a court recess while

15    awaiting the jury verdict.)

16    THE COURT:  Sergeant, are you ready to

17    take the verdict?

18    For the record.  We have a note that the

19    jury has reached a verdict.  So I am going to

20    bring the jury in to take the verdict.

21    Now, those who are here all day watching

22    the trial, you have been here before, you've

23    been great.  Obviously, we need your

24    cooperation now.  When the verdict is taken.

25    We need to have complete quiet in the

Verdict

1    courtroom, and the court officers are under

2    instruction to remove anyone who is not quiet.

3    I am sure you won't have that problem.

4         Thank you for your cooperation.

5         Mr. Rivera, I don't know what the verdict

6    is.  If there is a guilty verdict, your lawyer

7    can ask to have the jury polled.  That means

8    each juror will have to say he or she voted

9    guilty.  If you say anything or act out in

10   anyway, you give up that right to have the jury

11   polled.  You understand that?

12        THE DEFENDANT:  Yes, sir.

13        THE COURT:  As soon as the court officers

14   are ready.  We are ready for the verdict.

15        COURT OFFICER:  Your Honor, you're ready

16   for the jurors?

17        THE COURT:  Yes.

18        COURT OFFICER:  Jury entering.

19        COURT CLERK:  Both sides waive the roll

20   call?

21        MS. CHU:  Yes.

22        MR. DRANOVE:  Yes.

23        COURT CLERK:  Foreperson, stand up,

24   please?

25        THE COURT:  Mr. Foreperson, you have to

Verdict

1     stand up, sir.

2          Has the jury agreed upon a verdict?  Have

3     you agreed on a verdict, yes or no?

4          THE FOREPERSON:  Yes.

5          COURT CLERK:  Count number 1, Murder in

6     the Second Degree; what is the verdict?

7          THE FOREPERSON:  The verdict we have

8     found --

9          COURT CLERK:  Count number 1 --

10         THE FOREPERSON:  Count number 1.  Not

11    guilty.

12         COURT CLERK:  As to count number 1A,

13    Manslaughter in the First Degree; what is the

14    verdict?

15         THE FOREPERSON:  Guilty.

16         THE COURT:  Thank you very much.

17         COURT CLERK:  The Court has recorded the

18    following verdict:

19         Count number 1, Murder in the Second

20    Degree, found not guilty.

21         Count 1A, Manslaughter in the First

22    Degree, found guilty.

23         Members of the jury, is that your verdict?

24         THE JURORS:  Yes.

25         THE COURT:  Request by either side the

Verdict

1    jury be polled?

2          MR. DRANOVE:  We do.

3          MS. CHU:  No.

4          THE COURT:  Please poll the jury.

5          COURT CLERK:  Members of the jury:  The

6    verdicts that were announced through your

7    foreperson and recorded by The Court,

8    defendant, Enrique Rivera, under count number

9    1, Murder in the Second Degree, was found not

10   guilty.  Count number 1A, Manslaughter in the

11   First Degree was found guilty.

12         Juror number 1, is that your verdict in

13   all respects?

14         JUROR 1:  Yes.

15         COURT CLERK:  Juror number 2?

16         JUROR 2:  Yes.

17         COURT CLERK:  Juror 3?

18         JUROR 3:  Yes.

19         COURT CLERK:  Number 4?

20         JUROR 4:  Yes.

21         COURT CLERK:  5?

22         JUROR 5:  Yes.

23         COURT CLERK:  6?

24         JUROR 6:  Yes.

25         COURT CLERK:  Number 7?

Verdict

| | |
|---|---|
| 1 | JUROR 7:  Yes. |
| 2 | THE COURT:  Number 8? |
| 3 | JUROR 8:  Yes. |
| 4 | COURT CLERK:  Number 9? |
| 5 | JUROR 9:  Yes. |
| 6 | COURT CLERK:  Number to 10? |
| 7 | JUROR 10:  Yes. |
| 8 | COURT CLERK:  11? |
| 9 | JUROR 11:  Yes. |
| 10 | COURT CLERK:  Number 12? |
| 11 | JUROR 12:  Yes. |
| 12 | COURT CLERK:  Jury has been polled. |
| 13 | THE COURT:  I'm not going to make a long |
| 14 | speech, but it's been a long day.  I want to |
| 15 | thank you sincerely for your work on this case. |
| 16 | I know it's a hardship to come in and take time |
| 17 | from your life to serve on a jury.  It's people |
| 18 | like you who make our system work.  It's a very |
| 19 | serious matter, and you obviously gave very |
| 20 | serious attention.  You really did a great job. |
| 21 | Thank you so much.  You probably never want to |
| 22 | see me again.  If you ever do, if you happen to |
| 23 | see me somewhere, come over and tell me you |
| 24 | were on one of my juries. |
| 25 | It's been a privilege to have you serve |

Verdict

1    with me.  You did a great job.  We really

2    appreciate it.

3         You are discharged.  Have a good evening.

4         Please take charge.

5         (JURY EXCUSED)

6         THE COURT:  We are looking at a sentence

7    date of June 3rd, if that is convenient for

8    everybody.

9         MR. DRANOVE:  Judge, I strongly doubt I

10   will be ready by then.

11        THE COURT:  You know what, I am not going

12   to be here June 3rd.  The following week.

13        MR. DRANOVE:  I don't have a calendar with

14   me.

15        THE COURT:  Monday is June 8.

16        MR. DRANOVE:  Fine.

17        THE COURT:  Good.  June 8 for the

18   sentencing.

19        At this point, you mark it down for 12

20   noon because I think we can schedule it at that

21   time.  If there is a problem for any one of us,

22   we'll let each other know.

23        June 8 for sentence.  I'll order the

24   probation report.

25        The defendant is remanded until that time.

Verdict

1        I thank everyone in the courtroom for your

2    cooperation.

3        *              *              *              *

4        (Adjourned to June 8, 2009)

5    THIS IS TO CERTIFY that the foregoing is a true

6    and accurate transcript of the original

7    stenographic minutes in this case.

8

9

10   MICHELE J. WALKER,
     Official Senior Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

1 SUPREME COURT OF THE STATE OF NEW YORK
  COUNTY OF KINGS : CRIMINAL TERM : PART 35
2 ------------------------------------------x
  THE PEOPLE OF THE STATE OF NEW YORK
3
                              -against-
4

5 ENRIQUE RIVERA,
                         DEFENDANT.
6 ------------------------------------------x
  Indict. No. 1453/2005          320 Jay Street
7 SENTENCE                       Brooklyn, New York
                                 June 8, 2009
8

9 B E F O R E :

10
                   HONORABLE ALAN MARRUS,
11

12                                        Justice.

13
  A P P E A R A N C E S :
14
                   OFFICE OF CHARLES J. HYNES, ESQ.
15                 DISTRICT ATTORNEY - KINGS COUNTY
                   RENAISSANCE PLAZA
16                 BROOKLYN, NEW YORK  11201
                   BY:  PHYLLIS CHU, ESQ.
17
                   JOEL K. DRANOVE, ESQ.
18                 For the Defendant
                   225 Broadway - Suite 2625
19                 New York, Ny 10007

20

21

22

23

24

25                         ELLEN DOHERTY NERI,CSR,RPR,CRR
                           PRINCIPAL COURT REPORTER

1              THE CLERK:   This is calling case Number 1 on the

2    Part 35 calendar, Indictment 1453/2005, Enrique Rivera.

3    Counsel.

4              MR. DRANOVE:   Joel Dranove for Mr. Rivera.

5              Good afternoon, Judge.

6              THE COURT:   Good afternoon.

7              MS. CHU:   For the Office of the District

8    Attorney, Phyllis Chu.

9              Good afternoon, your Honor.

10             THE COURT:   Counsel can be seated.   Defendant can

11   be seated.

12             The case is on for sentencing today.

13             The defendant was convicted of manslaughter in

14   the first degree.

15             And the case was put on for sentencing.

16             I received two letters, one from -- actually,

17   more than two letters.

18             One letter from the D.A. with her sentence

19   recommendation, and another from defense counsel in which

20   he enclosed numerous letters from family members on behalf

21   of the defendant.

22             I read the letters, and also defense counsel

23   indicated he had an intention to prepare a post-verdict

24   motion to set aside the verdict, but told us by, orally and

25   in that letter that he's still investigating the matter and

1    hadn't completed his motion.

2           He had asked for an adjournment of the sentencing

3    to complete his investigation, and my law clerk informed

4    him that we will not adjourn the case, but that we would

5    treat any motion as a 440 motion if and when he makes one

6    at that time.

7           I'll hear the People.  Do you want to say

8    something?

9           MR. DRANOVE:  In light of that, in light of what

10   the law allows, I respectfully request that I be allowed to

11   be able to make an oral 330.30 based on what I learned that

12   what which I heard face-to-face, that which I heard

13   directly from my investigator, and then I will ask your

14   Honor to reconsider denying me the time I need to put the

15   affidavits in.

16           There is a reason.

17           Number one, the denial of a 330 --

18           THE COURT:  Let me just clarify the issue.  The

19   issue is, it's the timing of making a motion.  Okay.  If

20   you are ready to make a motion, then I will hear it and

21   decide it.

22           If you are not ready to make the motion, then

23   don't make it now.

24           MR. DRANOVE:  I will make the motion.

25           THE COURT:  Well, then, I will decide the motion

1    now.

2             MR. DRANOVE:  I understand.

3             THE COURT:  I just want to make sure because the

4    letter seemed to indicate, and the oral communication

5    seemed to indicate you hadn't completed your investigation.

6             MR. DRANOVE:  I have completed interviewing Ms.

7    Serrano.

8             THE COURT:  Okay.

9             MR. DRANOVE:  J-A-H-I-R-A Serrano.

10            THE COURT:  Go ahead.

11            MR. DRANOVE:  Your Honor, I'm making this motion

12   on the grounds indicated initially in my May 6, 2009

13   letter, in that we start with in your robing room after

14   this case on May 4 was sent to this court, the prosecutor

15   informed us that witness Serrano had recanted.

16            And the Prosecutor, when asked what was the

17   recantation, repeated, 'she recanted.'

18            Your Honor was then in the receipt of an

19   application by defense for the appointment of an

20   investigator, since I tried the case pro bono.

21            Since I've known the case for many years, I

22   stayed with it.  An investigator was appointed.

23            Ms. Chu sent me via PDF a letter identifying the

24   contact information for Luis Rivera, Jahira Serrano, Rudy

25   Cordova, and a fourth person whose name escapes me right

1    now.

2            I gave my investigator the information.  I said,

3    please seek Ms. Serrano.  He learned as I did when

4    telephoning that those contact phone numbers were not Ms.

5    Serrano or Jahira.  They were not in operation at the time.

6            My investigator, through old fashioned footwork,

7    since he had been a police officer, then a detective then

8    on a joint Federal State Task Force, went out and

9    ultimately after the verdict in this case have located Ms.

10   Serrano at her place of employment in Brooklyn.

11           He interviewed her.  He told me what she told

12   him, and he asked me what do you want to do.  I said, bring

13   her to my office, I want to take a statement from her.

14   This is last week, Judge.

15           I spoke to Ms. Serrano in my office.

16           Several things come from that interview.  Number

17   one, during this trial, over my objection I think on page

18   207, if I'm correct of the transcript, the prosecutor asked

19   my client's brother, Julio Rivera, did you tell Jahira

20   Serrano that your brother Enrique stabbed someone in the

21   bar.  Julio Rivera said no.

22           Now, your Honor then allowed my client to

23   testify.  "I didn't see my brother after the incident in

24   the bar until after I dropped off or was dropped off by

25   Jahira.  And she was with Rudy, Rudy Cordova."

1        Now, Ms. Serrano told me that she was in, with

2    Rudy, went to the police several days after this incident,

3    but after she learned somebody had died because she read

4    about it in the newspaper.

5        She went with her then two-year-old son, was put

6    in a room, knew that Rudy was put in a different room.

7    Rudy is the father of her son.

8        This was in the morning of that date.  She

9    recalls she and her son didn't have anything to eat or

10   drink for hours, and for hours.

11       She told me she didn't see what happened.  She

12   told the detective who spoke to her she didn't see what

13   happened.  She was in the back dancing with the girls.  And

14   the girls were dancing, because they wanted guys to be

15   interested in them, so she was in the back.

16       Something happened, the lights went on.  She

17   wanted to see what the commotion was, bouncers, or a

18   bouncer or more than one bouncer prevented her from going

19   up front.

20       Then a time came when she was allowed to leave.

21   She saw blood drops, she got a phone call from Julio

22   Rivera.  Julio, you got to bring my jacket and car keys.

23   I'm not allowed back in, or I can't get back in.

24       She then, in the car ended up dropped off at some

25   location, leading Julio in his car.  Julio didn't say a

1    thing about his brother Enrique Rivera in the precinct --

2    excuse me.

3            She said, Julio didn't say anything about his

4    brother except I am going to meet up with him or I'm

5    looking for him, words to that effect.

6            Thereafter, a day or two later, it is four-plus

7    years ago, think it's a day or two later, she ends up in

8    the police station.  She was questioned hours on hours, and

9    she said, I don't know what happened.  I didn't see it

10   happen.

11           The cops would go in and out of the room.  One of

12   them, she remembers, appears Puerto Rican to her.  The

13   others were white, she recalls.

14           And say Rudy said that Julio said that his

15   brother stabbed someone, and she said, no, he didn't.

16           This went on for hours, late in the afternoon;

17   she, with her two-year-old there, heard, and I'm

18   paraphrasing her, "If you don't tell us, we're going to

19   take your kid away from you.

20           "You were there.  Someone died.

21           "As far as we're concerned, you're involved."

22   Words to that effect, "We're going to take your son from

23   you."

24           She told me quite candidly, she had been in

25   foster care when she was a child, taken from her own

1    mother, and did not see her mother until she was 10 years

2    old, after that.

3         And she had just -- that history combined with

4    what she was threatened with, caused her to say, "I'll say

5    what you want to say," and it was then some words were

6    passed, someone came in with a tape recorder, said

7    something, her name, time, and she made her statement.

8         Now, that led me, and this all happened very

9    suddenly, last week after we tracked her down, to take

10   another look at Rudy Cordova's statement, and have my

11   investigator track him down.

12        He was tracked down, and what I've heard from my

13   investigator because I haven't met him is, as he recalls

14   it, he was kept there for an even longer period of time,

15   was told basically Jahira said, you heard, Julio say his

16   brother Enrique stabbed a person.

17        And he said, That's not true, because he didn't

18   say it.  And that this went on for a long time.

19        Now, ultimately, he under pressure, also changed

20   his statement.

21        Rudy Cordova at trial was mentioned by John

22   Dominguez as having been right up there at the bar with

23   Dominguez.  Rudy Cordova in a police report, same report

24   that says Julio Rivera says Enrique says he stabbed him,

25   Cordova says, I was right there.  I saw Enrique.  He

1    punched him.  I saw it.  He didn't have a knife.

2         Now, but for the police misconduct and pressuring

3    and forcing these people to say Julio said his brother said

4    to him, his brother, my client stabbed someone somebody I

5    would have called Rudy Cordova, because I would have known

6    the truth.  I would have been able to establish in Jahira

7    the extraordinary menacing pressure put on her, pressure my

8    client testified to, in which Detective Domino said no

9    pressure, we just asked him to talk.

10        And he said, yes, sure, I'll tell you what

11   happened.

12        And the prosecutor would not have asked my client

13   in the courtroom, Didn't your brother say he stabbed the

14   victim?

15        Now, I couldn't discover this information sooner.

16   And there's more, Judge.  Jahira Serrano told me that after

17   she was at the police station, sometime later but years

18   ago, that's her recollection, I wasn't there, this is her

19   recollection, she came to downtown Brooklyn.  She thinks it

20   was the D.A.'s office.  She spoke to a woman.  She doesn't

21   remember anything about the woman but she told the woman, I

22   don't know what happened that night, and she's not at this

23   moment, Ms. Serrano, clear about what else she told the

24   woman.  That's years ago.

25        So what I submit is, in light of the prosecutor

1   telling us beyond the eve of trial, literally the late

2   morning of the first day of trial that Ms. Serrano

3   recanted, that there's a problem here.

4           Either the recantation is several years old

5   before the first trial and I was entitled to know that as

6   defense trial counsel before the first trial, or at some

7   later sometime.  But certainly not at some amorphous trial

8   and "recant" being the sole word, the word being placed

9   before your Honor and counsel.

10          So I respectfully make this application under

11  330.30 to vacate the conviction on the grounds that had I

12  known this information, I would have been able to present

13  the information, and there would have been a verdict more

14  favorable to the defense.

15          THE COURT:  Ms. Chu, do you wish to make a

16  response?

17          MS. CHU:  Your Honor, I'm not prepared to make

18  -- I'm not accustomed to responding to a 330 motion that's

19  done orally.

20          However, I will say that this sounds remarkably

21  what Julio testified during the course of this trial, where

22  he raised an issue before this Court that somehow the

23  detectives and the ADA did something improper during his

24  presence at the precinct, and during the actual

25  audiotaping.

1      We called ADA Cyprus in to actually play that

2   tape, and it was proven that Julio Rivera was falsely

3   testifying regarding everything that transpired in that

4   precinct.

5      In fact, Detective Rivera wasn't even present for

6   his audiotaping by ADA Cyprus.  So I think that all of

7   this, it sounds remarkably familiar.  I don't have the

8   transcripts in front of me.  I don't have anything to

9   corroborate.

10     What I do know is that I did speak with Ms.

11  Serrano as well as Rudy Cordova on this trial, and on the

12  last trial in '06.  And I actually put Rudy Cordova into

13  the grand jury, and he testified that he had seen, that the

14  defendant was wearing the camouflage jacket, that there was

15  an altercation between him and the victim in this case, Mr.

16  Ojeda, and that he had seen the arm of the person coming

17  over.

18     It's been clear from the very beginning that none

19  of the witnesses ever saw a weapon in the defendant's hand

20  when she saw the hand reaching over to punch or touch or

21  push Mr. Ojeda.

22     That's never been an issue.  We never said

23  anything other than these witnesses merely saw the touching

24  and immediately after the injuries are had, on Mr. Ojeda.

25  What Mr. Cordova and Ms. Serrano told me when they were in

1    my office was, that they really weren't sure what they saw.

2    They weren't willing to say what they had said under sworn

3    testimony on audiotape, as well as in the grand jury by Mr.

4    Cordova, he said whatever he said before.

5              They weren't willing to say it anymore.  And I

6    couldn't as an officer of the court put them on knowing

7    that they were possibly going to commit perjury.

8              For those reasons, your Honor I do not believe

9    that what they told me amounted to what the defense

10   suggested during his letter to the Court regarding

11   sentencing this was some sort of Brady violation.

12             These witnesses, and because of their

13   relationship with the defendant, she is the cousin of the

14   defendant, and that was her -- her baby's father, her

15   boyfriend at the time, clearly told the detectives within

16   their interviews that they were uncomfortable with the

17   situation of their relationship with the defendant, and the

18   fact that they were present when this occurred.

19             In light of the relationship, and the in light of

20   the fact that they said I'm not willing to say that on the

21   stand, I could not put them on the stand, knowing what I

22   knew they testified to under oath on audiotape, as well as

23   in the grand jury.  And for those reasons I stand by the

24   fact that whether Mr. Dranove has had Jahira Serrano and

25   Rudy Cordova's names since 2006.

1          He, that's his cousin.  He had.

2          THE COURT:  You mean the defendant's cousin.

3          MS. CHU:  Defendant's cousin.  He had ample

4    opportunity to reach out to them.  He knew they were there.

5    And I find that the -- well, the People are arguing that

6    the defense's motion has no merit.

7          And I would ask that the Court deny it.

8          MR. DRANOVE:  May I follow up on something the

9    prosecutor just said.

10          THE COURT:  I'll give you a right of reply.

11          MR. DRANOVE:  Thank you, sir.  Unless I misheard,

12   before the conclusion of the first trial the prosecutor

13   knew that there was Giglio material, material the defense

14   is entitled to under Whitely versus a U.S. Supreme Court

15   case.

16          I don't have the cite with me, material that

17   decided to call recantation to your Honor in May of 2009.

18          And they chose to be the judge of whether defense

19   is to have access to this recantation material, and chose

20   to not inform Judge Collini, or the defense before, during

21   or after the first trial, whether the Appellate Division.

22   Court of Appeals level or United States Supreme Court

23   level.

24          And it was only when we were already in this

25   trial part that the prosecutor decided to say, there is a

1    recantation by Jahira Serrano.  Didn't say -- by the way

2    it's over three years old.

3              Now she does.

4              And I'm asking again, as I asked your Honor,

5    please ask the prosecutor if she has any notes, made any

6    notes, made any reports or recorded any of these so-called

7    recantations.  Her word, recantation.  What she thing, may

8    mean somebody is lying.  I believe could mean they're

9    telling the truth, and that they were forced to make false

10   statements in the first place.

11             And the prosecutor chose to keep those very

12   powerful issues concerning a right to present a defense and

13   a right to confront witnesses away from the light of day.

14             So I believe this Court must ask this prosecutor,

15   has Ms. Serrano since 2006, or was that the last time the

16   prosecutor spoke to Ms. Serrano and Rudy Cordova.  And what

17   is it exactly they said was it recorded?

18             In any event, if your Honor chooses to ask any

19   questions of Ms. Chu, why is it she waited until May 4,

20   2009 to raise these facts?

21             THE COURT:  Since you've chosen to make this

22   application now, first I have to know procedurally it's

23   defective.

24             Any motion made on the basis of statements by

25   witnesses, it's hearsay, unless there are affidavits from

EDN

1    those witnesses, so I would know exactly what they would

2    say.

3         Looking beyond that because I don't really wish

4    to deny on a procedural ground, but it's defective on that

5    ground.

6         On the merits of it, it's clear that these two

7    individuals were not witnesses at this trial, so therefore

8    there was no evidence that they gave that resulted in any

9    guilty verdict.

10        I don't think realistically they could have been

11   called as defense witnesses since they previously gave

12   sworn testimony or sworn statements that would have

13   contradicted the account that you are now talking about

14   now.

15        So that they really were useless to both sides,

16   because they've given contradictory accounts, if you accept

17   their, quote, recantations.

18        So they really could would not have been

19   effective witnesses for anyone.

20        And, third, the issue that I'm worried about

21   really was not an issue at this trial.

22        The statement that was allegedly made involving

23   Jahira, it was a denial.  The question was asked, it was a

24   good-faith basis to ask the question, and the witness

25   answered no that statement was not made.

1           And that was the state of the evidence.

2           So there was no evidence offered to be rebutted

3    by calling these witnesses.

4           For all of those reasons, I'm denying the motion.

5           MR. DRANOVE:  Will you ask Ms. Chu when is the

6    last time she spoke to Serrano?

7           THE COURT:  I'm not going to conduct any further

8    investigation about it.

9           She gave you the information she put on the

10   record.

11          There was a recantation before this trial started

12   as far as what she knew and when she knew it.  This is not

13   the Watergate investigation.

14          MR. DRANOVE:  This is an investigation of what

15   she knew and when she --

16          THE COURT:  I understand that.  I've indicated

17   why I don't think I have to conduct an investigation into

18   that, because I already ruled based on the known facts.

19   It's irrelevant whether or not she got certain information

20   on a particular date.

21          All right.

22          Now, as far as the sentencing is concerned, the

23   People have served a statement that indicates the defendant

24   has two prior felony convictions, and also indicates the

25   correctional time that the defendant served as a result of

1    these two felony convictions.

2           Mr. Dranove, have you discussed this statement

3    with your client?

4           MR. DRANOVE:  Yes, sir.

5           THE COURT:  Is there any legal or constitutional

6    defect as far as the convictions, the identity of your

7    client on this form or the prison time that your client

8    served that you wish to contest?

9           MR. DRANOVE:  No, sir.

10          THE COURT:  Mr. Rivera, is it true that you were

11   convicted of these crimes that are indicated here,

12   attempted robbery in the second degree, attempted criminal

13   sale of a controlled substance in the third degree, one in

14   1993 and the other in 1998 here in Kings County?

15          THE DEFENDANT:  Yes, sir.

16          THE COURT:  And to your knowledge was there any

17   violation of your legal or constitutional rights when you

18   were convicted in those cases?

19          THE DEFENDANT:  No, sir.

20          THE COURT:  And you saw the jail time that you

21   served on these matters listed on these forms?

22          THE DEFENDANT:  Yes.

23          THE COURT:  Is that true that you were in prison

24   during those periods of time?

25          THE DEFENDANT:  Yes, sir.

EDN

1      THE COURT: For purposes of sentencing, you are

2   adjudicated a second violent felony offender.

3      And now we'll go forward with the sentencing.

4   Ms. Chu, I'll hear you first.

5      MS. CHU: Yes, your Honor.

6      I had forwarded a copy to the defense counsel as

7   well as to the Court, a sentencing letter having to do with

8   the People's recommendation for sentence of the defendant's

9   manslaughter in the first degree conviction that resulted

10  in May of this year.

11     The People are asking that the defendant be

12  sentenced to the maximum term allowable under the law,

13  which is 25 years.

14     Having presided over the trial, your Honor, while

15  you are familiar with the facts and circumstances of this

16  case, I would like to just highlight some things that

17  occurred during the course of the trial that I think would

18  be relevant to your consideration of what sentence the

19  defendant should receive.

20     There were several witnesses that testified

21  regarding the events of the night. Clearly, as we've

22  already stated in the 330 motion, there were no witnesses

23  that actually saw a weapon in the defendant's hand at the

24  time that the altercation occurred between he and Mr.

25  Ojeda.

1    However, as a result of that, the defendant chose

2    to take the stand.  And in this case he chose to take the

3    stand and I submit to you, perjure himself by taking what

4    he knew the witnesses didn't see, and then manufacturing a

5    story that the detectives had coerced him into making the

6    statements he made on the videotape as well as his written

7    and oral statements to the detectives, that he had a knife

8    and used it in self-defense.

9         I believe that the jury was correct in their

10   rejection of his statements.  I believe that not only did

11   he lie about the fact that he did not have a knife, but he

12   went further in so much as when he testified at this trial,

13   contrary to what happened in 2006, he now added an extra

14   curve to his story.

15        In trying to account for how Mr. Ojeda's blood

16   came to be on his hat, and his story to you, to the jury

17   and to your Honor is that somehow his friend who remarkably

18   was now a twin of his, had blood all over his jacket and

19   that that's how his hat must have obtained the blood from

20   Mr. Ojeda.

21        The fact that the defendant testified in this

22   matter to this jury was compounded by the fact that he had

23   both his brothers testify to continue with the ruse of the

24   detectives trying to pin this murder on innocent people,

25   when in fact we proved Julio Rivera's testimony to be

EDN

1    completely untrue, because he said they made the audiotape

2    and then stopped it, and then berated him, and then said

3    there was someone with a camouflage jacket.

4              And yet still when we had ADA Cyprus testify on

5    rebuttal, it was clear during the course of that audiotape

6    that there was no stopping of that audiotape and neither

7    was Detective Rivera who it was suggested was the one

8    berating him, wasn't even present during that interview.

9              In addition to that, your Honor, I believe that

10   it's quite informative that the defendant in his interview

11   to probation, still nevertheless points out that the

12   defendant states that no witness stated he stabbed the

13   decedent.  And witness stated that they saw him fighting.

14             Basically the defendant is getting his defense or

15   his posture as we sit right now, based upon what he knows

16   the witnesses have already testified to, and what they saw

17   and what they didn't see.

18             I think that he is being untruthful, that he has

19   perjured himself in front of this Court, and there is

20   absolutely no mitigation that should be allowed for this

21   defendant.

22             He sits before your Honor a predicate felon

23   having been convicted of attempted robbery in the second

24   degree, as well as criminal sale of a controlled substance

25   in the third degree.

1          And, you know, there were a lot of letters sent

2     to me by defense counsel from family members of his, and

3     members of the community talking about how he was, how he

4     is a good father and a good husband and good son.

5          And unfortunately none of those things took

6     effect when he was in that bar and he stabbed Mr. Ojeda,

7     who also was a son, and a father and a brother.

8          And for those reasons, your Honor, the People are

9     asking that the Court sentence him to 25 years.  We also

10    have members of Mr. Ojeda's family who would like to

11    address the Court.

12                THE COURT:  Okay.

13          Come up to the first row.  State your name and

14    your relationship to the deceased.

15                A VOICE FROM THE AUDIENCE:  Andrea Ojeda.  And I

16    am his daughter.

17                THE COURT:  You may make your statement.

18                MISS OJEDA:  Five years have passed since my

19    dad's death.  Much has happened, good and bad.  I took it

20    all in and learned from it.  Nothing I learned has stopped

21    me from hurting and remembering.  It's over five years.

22    I've done so much and met so many great people.

23          Then the happiness that comes from those things

24    remind that my Dad isn't here to share it with me.  There

25    were many times I've asked my mom and grandmom, what do you

1    think Daddy would say? Do you think he would be proud of

2    me? The answer would always be how proud he is of me,

3    always.

4            I know it would be the answer without a doubt.

5            But it no longer comes from him. I don't hear

6    his voice anymore.

7            Sometimes it scares me that I forget he wasn't

8    just my Dad. He was my best friend.

9            He taught me so much and the children more. It

10   took me two years to wake up and finally keep my eyes open

11   thinking about it, I know that. Impacted not only my

12   family but also impacted his family and himself.

13           He had a life, a family, something to look

14   forward to, and he threw it away to prove who he was. Look

15   where it got him. Through his whole ordeal I could never

16   hate inside myself, I could never hate him. I never ever

17   hated him, and I truly wanted to make him to make a better

18   person of himself, make something out of himself because he

19   has more than just himself to live for.

20           And I truly do hope he gets the full amount of

21   years, because dying for, or giving up would be so easy.

22   It's been two years to live again. And now I want to know

23   how long it's going to take for you to accept and live

24   again. I truly want you to make a better person of

25   yourself. You owe me so much more because you took so much

1    more from me.

2              THE COURT:  Thank you.

3              Anyone else, Ms. Chu, or is that it.

4              MS. CHU:  Yes, just one more -- I'm sorry, two

5    more.

6              THE COURT:  Please state your name and

7    relationship to the deceased.

8              A VOICE FROM THE AUDIENCE:  Nieves.  I'm the

9    mother.  You have taken so much from my baby.  He was such

10   a good father.  He never deserved that.  And she doesn't

11   deserve to go through her first life without him.  He will

12   never see her play her first piano, Sweet 16, question any

13   of her boyfriends, or be at her wedding to walk her down

14   the aisle.

15             I don't know what makes you think that you had

16   the right to do that.  I hope that you pay for everything.

17   And you are a very lucky person my daughter is as forgiving

18   as she is, and that she doesn't hate you the way I think

19   she should.

20             You are very lucky to still be able to see your

21   children and your family, like my daughter will never see

22   her father.

23             And I hope you pay for everything that you did.

24             THE COURT:  Do you have one more?

25             MS. CHU:  Yes.

1          THE COURT:  Please state your name and your

2     relationship.

3          THE WITNESS:  My name is Ojeda.  I am Edgar's

4     mother.

5          THE COURT:  You may make your statement.

6          THE WITNESS:  Much has been said in this

7     courtroom since the first 2006 and now this last trial.  We

8     heard testimonies from both sides.

9          But no one asked Edgar's mother about February

10    26, or February 27th.  Allow me, his mother, to just a few

11    words to describe my son, who no one knew him best but my

12    family.

13         At the age of 15, he tells me in a very matter of

14    fact way, When I become a father, I know that I will be a

15    very good Dad.

16         True to his word, at the age of 18 he became a

17    father.

18         Life was never the same for him after that.  With

19    every passing day, he knew in his heart he had to become a

20    better person for his daughter's sake.

21         He wanted her to be so proud of him, because her

22    opinion mattered so much.

23         Up to that Saturday afternoon, of February 26, he

24    had, and continued to make, plans towards furthering his

25    career and life in the health care industry.

1          He always was asking me for my opinion, would

2     have long conversations about his goals, and about his

3     daughter.  I miss those talks today.

4              I was very proud of my young father.

5              Edgar left my home that Saturday afternoon after

6     a kiss on the cheek, and I gave him my blessings.

7              The next time I saw Edgar was in a hospital bed,

8     covered by a white sheet, lifeless, a bloody body, hospital

9     tubes to be yet removed by the trauma unit of the hospital.

10             Those are the images that wake me up every night

11    since his death, always at 2:30 in the morning.  Those

12    painful images in my mind.

13             It feels like Edgar keeps knocking at the doors

14    of my heart for help, and for the first time I cannot help

15    him.

16             It just lives in my heart every day, and there

17    are no words to describe that pain.

18             Life as we knew it, has not been the same.

19             The only comfort is in my Heavenly Father and my

20    faith, that I know in my soul I will see him and I will be

21    with my son again.

22             My son was murdered February 27th, by a person

23    who had no regard for life itself.

24             This person acted cowardly in very much like the

25    criminal he is, and always has been.

 1          To you, Mr. Rivera, life is only about yourself;

 2     and how you want things to play out, always for your

 3     enjoyment.

 4          You have no values and much less for life.

 5          I have noticed throughout these four years what a

 6     very cruel person you are with all that comes your way.

 7          But "vengeance is mine," sayeth the Lord, and

 8     your punishment has just begun.

 9          I give you one advice, confess your sin, and your

10     guilt before God, for only he will be able to give you

11     peace of mind, and for all those that kept your guilt

12     quiet, I ask my Heavenly Father that they be punished seven

13     times more than you.

14          May none have peace, for they are the same or

15     more guilty than you are.

16          Although my son is no longer with us his legacy

17     is great, who live in his daughter, will shine in our

18     hearts, whereas with you, Mr. Rivera, all you leave behind

19     is disgrace of yourself and no honor for your family.

20          May God show you no mercy, and no mercy for those

21     that lied for you.

22          I am thankful to the jury that heard this case,

23     and clearly saw the lies.

24          I'm also very thankful to the D.A., Ms. Chu, who

25     believed in my case.

1              And I am thankful to Judge Marrus who displayed

2      great wisdom and integrity.

3              I'll simply ask this Court to see how necessary

4      it is to keep types of criminals away from our society

5      where other families never have to receive such tragic news

6      of their loved ones.

7              Make Mr. Rivera regret every day he was born, for

8      clearly his demeanor speaks for itself.

9              He knows not the value of life.

10             Thank you.

11             MS. CHU:  Thank you, your Honor.

12             THE COURT:  Mr. Dranove?

13             MR. DRANOVE:  Your Honor, I represented Mr.

14     Rivera at the first trial.

15             Interestingly after the mistrial was declared, I

16     spoke to several of the jurors outside.  Very interesting

17     situation.

18             I learned that eight of them said he didn't do

19     it.  And four of them said, someone has gotta pay, might as

20     well be him.

21             But the eight weren't going to compromise.

22             Now, what some see as a hardened heart, they may

23     see differently if they learned, and they may not see

24     differently, how can they, from the day he was arrested

25     through now, he has been trying to maintain a relationship

1    with his child:  Doing his own paperwork to go to Family

2    Court, because he does want his child to know he has a

3    father.

4              Is he guilty?  This jury said yes, of

5    manslaughter.

6              Did anyone see a knife in his hand?  No.

7              Is anyone lying for them if they said they didn't

8    see a knife in his hand?  No.

9              Both sides said there was no knife in his hand.

10             The issues with respect to when Ms. Chu decided

11   to be judge and jury as to exculpatory evidence won't play

12   out here.

13             So we're proceeding today.

14             My client is married; came home from prison,

15   started a business; in fact, the business was profitable.

16             On a Saturday night he went to a local bar, just

17   like the victim did.  He went with friends, just

18   like Mr. Ojeda did.

19             He went to have a good time, just as Mr. Ojeda

20   did.

21             Judge, when I was young I was in a bar when

22   someone was stabbed to death, and I saw it happen.

23             It is -- you don't forget it.  I was there.

24             It was in New Jersey in 1972.  It's not coloring

25   my perception of anything.  It's just -- I didn't lead an

1    ivory tower life, but I've come here today to talk about

2    what's justice. "In God we trust," some say, be a

3    vengeful God.

4            Others say be a merciful God.

5            Others say God doesn't belong in the courtroom.

6            Now I don't know what the answer is.

7            I know nobody went out that night to change their

8    life and their family's life, much less to face meeting

9    their maker prematurely.

10           And yet it happened.

11           So it cannot be undone.  Whatever we do today is

12   not going to undue undo it.

13           The family is destroyed because their son,

14   father, loved one and friend is gone.

15           Another family is destroyed because their son,

16   loved one, friend, father, is going to be in jail for a

17   long time.

18           I don't know what justice is anymore.  Been doing

19   this for too long, Judge, to know what justice is.

20           The more I do it the less I know what justice is.

21           My client spent time in Rikers for such a long

22   time that the inmates thought he was a snitch and he was

23   fearful for his own security there.

24           Nobody believed he was in jail because he was

25   awaiting a second trial, and there were appeals going on.

Case 1:15-cv-02657-EK   Document 9-1   Filed 12/08/15   Page 804 of 811 PageID #: 1221

1          He's lost a razor blade.  Shaves his head, a

2     razor blade went down the drain because he couldn't return

3     it.  He was put in a list of potentially violent.  Special

4     security applies to him because he lost a razor blade.

5     Going to be with him no matter how many years he's in jail.

6          I listen carefully to the family of Mr. Ojeda.

7     My heart, I don't have a heart of stone, either.  Neither

8     does my client.  But he has spoken in court under oath.

9     He's asked me to tell your Honor he will rely upon my

10    words.

11          When you ask him he'll tell you that.

12          I don't know what justice is.  We're not going to

13    change anything.

14          This was an incident between strangers seeking to

15    have a good time in a bar.

16          As to that bar, Judge, I point out about one to

17    two years ago, and -- I'm sorry, I didn't bring the

18    newspaper article, on a Saturday night in the same bar

19    about the same time a young man was stabbed to death,

20    stabbed three times, stabbed to death in that bar.

21    Fortunately the bar is closed now.

22          My client couldn't have committed that crime.

23          There's an outpouring of love for my client.

24    There's an outpouring of love, grief, demands for vengeance

25    for the victim.

1            I don't know what to say, beyond it's your

2    decision to make, Judge, and be wise in your decision.

3            Thank you.

4            THE COURT:  Mr. Rivera, is there anything that

5    you want to say before you are sentenced?

6            THE DEFENDANT:  No, sir.

7            THE COURT:  The evidence in this case established

8    that the defendant stabbed Mr. Ojeda at the bar.

9            While no one saw him with the knife, everyone saw

10   him in a dispute with the victim, and attacking him with a

11   motion with his hand that was consistent with a stabbing

12   motion.

13           Although the witnesses were very careful to say

14   they actually didn't see what the object was that he had,

15   we do know that the victim was stabbed repeatedly slashed,

16   and a drop of his blood was found on the defendant's cap

17   after the homicide.

18           The defendant has made numerous statements, given

19   numerous accounts about what happened, and they've all been

20   inconsistent.

21           I heard the statements that he made to the

22   police.  Whatever the circumstances were of those

23   statements, you know he contradicted himself on those

24   statements, vis-a-vis what he said here at trial.

25           And the jury heard the evidence.  I don't know

Sentence - Rivera                                    32

1      what happened at the first trial.  I certainly can't speak

2      to that.  I wasn't the judge.  I don't know what happened.

3              But this jury really didn't have too much trouble

4      in finding the defendant guilty.

5              It would seem to be a question only of what

6      counts, and ultimately it was determined that the defendant

7      wasn't proven to have acted with an intent to kill, which

8      is why he's now convicted of the manslaughter charge.

9              But as to the accountability of the defendant

10     based on the evidence, it seemed to be pretty compelling,

11     pretty clear, and the defendant's version of it didn't have

12     the ring of truth and was very inconsistent with his prior

13     accounts.

14             Now, as far as the two families that are here, no

15     one who could hear could not be moved by what happened to

16     you and your family.  It's a horrible tragedy.  Obviously

17     had a tremendous impact.  There's nothing I can do to

18     change that.

19             Obviously you came here seeking justice.  And I

20     am going to do the best I can, as far as that's concerned.

21             But I would be less than human to tell you I feel

22     sympathy for you, and I'm very sorry that, you know, you've

23     had to go through this ordeal, two trials over a period of

24     time.

25             I'm sure it was an ordeal for you.

1    So, the best I can tell you from my heart is that

2    I do feel that you have gone through a tremendous amount,

3    both a loss of your loved one, and having to go through,

4    you know, a process where there were two trials.

5    So I'm very sorry for you.  And you've maintained

6    your dignity throughout all these proceedings, and you

7    deserve a lot of credit for that.

8    As far as the family of the defendant,

9    Mr. Rivera, I read the letters that you wrote, and I think

10   Mr. Rivera is a very lucky guy to have people like you

11   sticking with him through thick and thin.

12   He's very lucky to have people like you.  You've

13   been here supporting him.

14   And I read the letters, same kinds of statements

15   I'm hearing from the victim's family:  Beloved father,

16   husband, son, brother.

17   You know, you've stuck with him throughout this.

18   It's very unfortunate, Mr. Rivera, you have a

19   record that speaks for itself.

20   You have a youthful offender adjudication for

21   possessing a gun.

22   That was a felony charge right there but you got

23   a break, because the law didn't treat you as an adult.  The

24   law treated you as a juvenile, and therefore you didn't get

25   a criminal record for that.

EDN

1          But it's a serious felony.

2          Then you have two felony convictions, one

3     involving a robbery, and one involving a drug sale.

4          And as I recall, less than I think six months

5     after you were released on parole from the last one of

6     those convictions, you committed this crime.

7          It's a dreadful record.  And given the support

8     that you have, and all the people that have stood by you,

9     and the opportunities that you've had, you know you've

10    really let down a lot of people here.

11         You really have.

12         MR. DRANOVE:  Just, my client wants me to inform

13    your Honor he was free for three years before he was

14    arrested.

15         THE COURT:  The date of expiration of parole is

16    indicated in the records.

17         MR. DRANOVE:  But he was free for three years.

18         THE COURT:  Right, but right after he got off

19    parole, this crime occurred; that was my point.

20         If I make a mistake, feel free.  I don't want to

21    be interrupted, but I don't think I made a mistake on this

22    one.

23         Beyond the families here, a crime like this has

24    terrible consequences in the communities in which we live.

25    I mean, obviously gets some publicity in the papers in the

1    local communities, and the people that frequent these bars

2    and social clubs where these events happens, it really

3    sends a chilling message that this horrible violence goes

4    on in the community.

5            And it's something that has rippled well beyond

6    the families that are in this courtroom, that someone can

7    go out for a night to relax at a bar, have a couple of

8    drinks, and then wind up dead, being stabbed to death over

9    some petty dispute, which is what this all about.  This I

10   was all petty.

11           To die over that is totally senseless.

12           Based on the record that you've made in the

13   community with your two prior felony convictions, youthful

14   offender adjudication, based on your total lack of

15   accountability for this matter with the inconsistent

16   statements you made in this case, based on the nature of

17   these crime, a cold-blooded, senseless killing in a public

18   place, I'm sentencing you to the maximum sentence I can:

19   Definite term of 25 years imprisonment, followed by five

20   years post-release supervision.

21           There's a mandatory surcharge and related fees.

22   I believe it's $370 in this case.

23           THE CLERK:  $250, $20 and then $50.

24           THE COURT:  $320.

25           Please advise the defendant of his right to

1      appeal.

2                  MR. DRANOVE:  Is he given a sheet with the his

3      rights to appeal?

4                  THE COURT:  The clerk just tells him.

5                  I have a substitute clerk.

6                  You have a right to appear your conviction.  You

7      have to file a notice of appeal to 45 Monroe Place, the

8      Appellate Division, to process your appeal.

9                  Mr. Dranove, I assume you will do that in his

10     behalf.

11                 MR. DRANOVE:  I will.

12                 THE COURT:  All right.

13                 MR. DRANOVE:  I will also request that counsel be

14     appointed for him, because I can't continue pro bono

15     anymore.

16                 THE COURT:  They will assign appellate counsel.

17     That's done by the Appellate Division.

18                 File the notice of appeal.

19                 MR. DRANOVE:  One more request.

20                 Can I ask that the transcripts being provided

21     through today's sentencing proceeding?

22                 THE COURT:  Yes.

23                 MR. DRANOVE:  Thank you.

24                 THE COURT:  So ordered.

25                 You can take charge of the defendant.

1              MR. DRANOVE:  Judge, just so that, there's peace,

2         can we ask, may I ask your Honor one family could leave

3         before the other.

4              OFFICER:  We're already taking care of that.

5              THE COURT:  The court officers will take charge

6         of that.

7              I have excellent court officers, very experienced

8         with these situations, and I rely entirely on them.

9              That's their job.

10             MR. DRANOVE:  I am going to talk to my client in

11        the back.

12             THE COURT:  Thank you.

13             (Defendant remanded.)

14             *              *              *

15

16   It is hereby certified that the foregoing is a true and accurate
     transcript of the proceedings.

17

18   ------------------------------
     ELLEN DOHERTY NERI CSR,RPR,CRR

19   PRINCIPAL COURT REPORTER
     SUPREME COURT-KINGS COUNTY

20

21

22

23

24

25