SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM: PART 35
----------------------------------------X
**THE PEOPLE OF THE STATE OF NEW YORK,**

                         Respondent,

        - against -

**ENRIQUE RIVERA,**

                  Defendant.
----------------------------------------X

                                  **NOTICE OF MOTION
PURSUANT TO C.P.L.
§440.10(1)(b)(f)&(h)
TO VACATE JUDGMENT**

                                  **Ind. No. 1453/2005**

    **PLEASE TAKE NOTICE,** that upon the annexed affidavit and exhibits of **ENRIQUE RIVERA**, and upon all the proceeding had herein, the undersigned will move this Court or on about July _1t_, 2014, at the Supreme Court, Kings County, 320 Jay Street, Brooklyn, New York 11201, at 9:30 a.m., or soon thereafter as the undersigned can be heard, for:

**AN ORDER:** Pursuant to CPL §440.10(1)(b)-(d)-(f)-(h), vacating the judgment entered against the above named defendant on June 8, 2009, based on the facts and argument advanced in the attached affidavit in support, and

**AN ORDER:** Pursuant to CPLR §1101 and §1102, and County Law 722 et seg., assigned an attorney, and

**AN ORDER:** Pursuant to CPL §440.30(5), producing the defendant at any hearing for the purpose of determining this motion, and

**AN ORDER:** For any other and further relief as to this Court may deem just and proper.
Dated: June _11_, 2014
       Stormville, New York 12582
                           Respectfully submitted,

                           Enrique Rivera
                           Green Haven Corr. Fac.
                           P. O. Box 4000
                           Stormville, NY 12582

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM: PART 35
----------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

                    Respondent,

                                              AFFIDAVIT IN SUPPORT
                                              FOR NOTICE OF MOTION
            - against -                       PURSUANT TO C.P.L.
                                              §440.10(1)(b)(f)&(h)
                                              TO VACATE JUDGMENT

ENRIQUE RIVERA,

                                              Ind. No. 1453/2005
                    Defendant.
----------------------------------------X
STATE OF NEW YORK  )
                   )  SS.:
COUNTY OF DUTCHESS )

### INTRODUCTION

ENRIQUE RIVERA, being duly sworn, and hereby states the
following is true and correct:

1.   The  defendant  pro-se  in  the  above  entitled
proceeding. Defendant makes this affidavit in support of
motion, pursuant to CPL §440.10(b)-(d)-(f) & (h). Defendant
respectfully submits that he is a layman—in the matters of
law, and such seeks this Court's indulgence to overlook any
and all technical errors, faults and or defects herein,
pursuant to CPLR §200-1(f), see also Haines v. Kerner, 404
U.S. 519 (1972), People v. Renaud, 145 A.D.2d 367. Every pro-
se defendant ought to be fully and fairly heard for until
justice is made the trial never ends.

### QUESTION PRESENTED

(a) whether People v. Thomas, 2014 NY Slip Op 01208 (N.Y.
2014) this Court erred in denying his motion to suppress his
confession because the use of deception by law enforcement

2

officers in the case at bar denied the defendant due process.

(b) Whether the new process law as announced in **People v. Hamilton,** 115 A.D.3d 12, 979 N.Y.S.2d 97 (2d Dept 2014) call for boldness in challenging long held legal assumption and putting the brakes on in the states CPL §440.10(2)(c) that can lead to a wrongful conviction.

## PROCEDURAL HISTORY

2.     Defendant Enrique Rivera was charged with second degree murder (P.L. §125.25[1]) and criminal possession of a weapon in the fourth degree (P.L. §265.10[2]) in connection with the stabbing death of Edgar Ojeda at a Brooklyn bar in the early morning hours of February 27, 2005.

3.     On May 2009, a judgment was rendered in this Court, convicting defendant, after a jury trial, of first-degree manslaughter (P.L. §125.20[1]). On June 8, 2009, this Court adjudicated defendant a second violent felony offender and sentenced him to a determinate prison term of 25 years to be followed by five years of postrelease supervision.

4.     The Supreme Court, Appellate Division, Second Department unanimously affirmed the judgment of conviction, **People v. Rivera,** 100 A.D.3d 658 (2d Dept 2012), aff'd, ___ N.Y.3d ___ (N.Y.2014).

## STATEMENT OF LAW
## VACATE JUDGMENT

5.     Section 440.10 of the Criminal Procedure Law provides in pertinent part, that a judgment may be vacated upon the ground that:

3

(b)  the  judgment  was  procured  by  duress, misrepresentation or fraud on the part of person acting for or on behalf of the prosecutor; or;

(d) material evidence adduced by the People at trial was procured in violation of the defendant's right under the Constitution of this State and of the United States, or,

(f) improper and prejudiced conduct not appearing in the record occurred during a trial resulting in the judgment which conduct, if it had appeared in the record, would have required a reversal of the judgment upon an appeal therefore, or,

(h) the judgment was obtained in violating of a right of the defendant under the Constitution of this State or of the United States.

### ARGUMENT – POINT ONE
### RIVERA'S CONFESSION WA OBTAINED
### VIOLATION OF DEFENDANT'S MIRANDA RIGHTS

6.  It is hornbook law that statements obtained from a suspect as a result of custodial interrogation may not be admitted into evidence unless the suspect was first apprised of his right pursuant to **Miranda v. Arizona, 384 US 436 (1966)**, and Article 1, §6 of the New York State Constitution permits the individuals accused of a crime to receive a fair trial by affording among other inalienable rights, the suppression of all statement and other evidence obtained as a result of the illegal confession. Even statement made after constitutional error were rectified - **Miranda** warnings were read or counsel was appointed - may be tainted by the prior

4

illegal conduct. It is mandatory that a defendant be granted a new trial under these circumstances.

6.     It is submitted that the time of that verdict, there have been remarkable strides in recognizing the reality or error in the criminal system, including the common phenomenon of a lengthy coercive police interrogation on a subsequent confession, **People v. Guilford**, 21 N.Y.3d 205 (N.Y. 2013), **People v. Thomas**, 2014 N.Y. LEXIS 01208 (N.Y. 2014), **People v. Aveni**, 2014 N.Y. LEXIS 207 (N.Y. 2014), **People v. Zeh**, 2014 N.Y. Slip Op 02097 (N.Y. 2014). There is nothing inherently implausible or contradictory about the defendant allegations. The Court of Appeals did not attempt to establish any bright line rule to delineate the point at which trickery becomes coercive, nor did it back away from its long history of acquiescing to police deception.

7.     On the night of Sunday, February 27, at about 11:30 p.m., the police came to defendant's brother's home and asked what he was wearing in the bar. He offered to get the clothing from his hamper, but the police declined, instead, they went through his clothing and found his jacket (Julio R.: 476, 514, 530). They handcuffed him and, on his consent, brought him to the precinct, without the jacket (477-78, 516).

8.     There, Detective Darino and another detective told defendant's brother he could not leave and he could be charged with murder if he did not help them find defendant (Julio R.: 478-484, 515-529). They briefly interrogated him

5

about defendant's location, the bar events, and description
(481-83, 516, 527, 530). Eventually, the police and a female
A.D.A. conducted and audio taped interrogation before he was
released between 11:30 a.m. and 12:00 noon (485, 487, 517-
18).

9.    Defendant testified that he confessed, after he was
brought to the precinct on February 28th, 2005, because
Detective Darino threatened that if he did not, both he and
his brother Julio would be charged with murder, and Julio
would face life imprisonment (T. 577-78-79). Accordingly to
defendant, Detective Darino told him that the police knew
that he was "kicked out" of the Brooklyn bar and Julio was
left behind, that his brother was now at the precinct, "being
charged with murder" because he tried to protect defendant in
the he fight, and that if defendant "[took] the weight" for
(i.e., confessed to) killing Ojeda in self-defense, and took
responsibility, he told defendant what to say, and promised
to release his brother when defendant wrote and signed a
confession (T. 577-79, 583). Tire, defendant complied after
waiving his **Miranda** rights (579-81). Hours later, he gave
untrue videotape statement to the prosecutor in accordance
with the police instructions and illustrated his knife
swinging (582-84).

10. This Court's investigation is warranted finally to
rescue Rivera from the legal limbo he has found himself in
with regard to Miranda. On the one hand, the Court of Appeals
recognized that, as Chief Judge Jonathan Lippman eloquently

6

stated in **Thomas**, "the choice to speak where speech may incriminate is constitutionally that of the individual, not the government, and the government by any coercive device." Similarly, in **Aveni**, in dismissing the appeal in that case, the Court of Appeals noted that the interrogating officer had used deception about the victim's physical condition, when the victim had died, to obtain incriminating admission from the defendant.

11.  Rivera claim, however, constitutes and independent ground for vacating Rivera's conviction and ordering a new trial. First, the introduction of Rivera's confession at trial violated his federal and state Miranda rights. As noted above, Mr. Rivera's confession was the centerpiece of the prosecution's case. On February 28, 2005, Detective John Darino, the detective assigned to the Edgar Ojeda case, learned from defendant's brother Julio that defendant was at a house in Queens, where the police found him at 4:30 a.m. Detective Darino informed defendant that he was investigating an incident at a Brooklyn bar, and handcuffed and transported him to the precinct, where he was taken to the detective squad interview room.

12.  Detective Darino read defendant his Miranda rights, and defendant agreed to speak with police. Defendant argues at trial that he was not read his Miranda rights until after he made oral and written statements. Detective Darino told defendant that people had placed him in the Brooklyn bar, and he wanted defendant's version of what happened. The

7

prosecution harps on the idea that Defendant's confession was voluntary and free of deception is dubious, or at worst misleading. The Court of Appeals when on to reaffirm the choice to speak where speech may incriminate is constitutionally that of the individuals, not the government, and the government may not effectively eliminate it by any coercive devise.

13. Based on recent Court of Appeals precedent that merits review of such claim in cases represents an early opportunity for trial courts like this one to begin to work out and practice the meaning and concrete application of the new principles of **Thomas/Aveni**, in which usually occurs after the prior court **Huntley** hearing has rendered its new decision in **Thomas/Aveni**, involving issues the prior court has not considered previously, and clarified that case and distinguished it from the case at bar in its earlier decision in **Huntley** hearing. In **People v. Bedessie, 19 N.Y.3d 147 (N.Y. 2012)** ruling is important because it is a judicial validation of the conventional wisdom that false confession can be obtained by prosecution teams that use improper interrogation techniques to obtain confessions and, it will now allow scientific evidence to evaluate questionable confession. Despite the Court of Appeals passed the opportunity to decide whether **Thomas** was entitled to an expert on psychological coercion based on the evidence he educed need not be revisited.

14. In applying **Thomas/Aveni** the Court of Appeals

8

correctly decided the question of deception and subterfuge as a law enforcement officers in the case at hand. The record of the motion to suppress demonstrates that the People failed to carry their heavy burden of proving that defendant's statement were voluntary beyond a reasonable doubt. In **Thomas**, the deception utilizing his wife to undermine the defendant will was improper when defendant continuously denied involvement in the underlying offense. In **Aveni**, the deception directed towards the victim to obtain incriminating admission from the defendant are two of the psychological tactics the Court of Appeals strongly disapproved. The Court dismissed the appeal on technical grounds, allowing the Second Department ruling to stand. [100 A.D.3d 228]. Relying on **Guilford**, the Court concluded that the Appellate Division used the correct legal standard in its reversal. And by determination that the potential to overwhelm defendant's free will was realize was plainly one of fact.

15. The **Bedessie** Court underscores the need to reinvestigate wrongful conviction under the safeguards in place that: (1) transparency of process at every stage, and (2) a standard of review that is clearly pronounced at the start of the investigation in which all safeguards failed in Defendant's case pre **Bedessie**, and amid the Kings County District Attorney's Office is reviewing more than 60 wrongful conviction by the hand of police misconduct. If Kings County District Attorney's Office accept the conventional wisdom advanced by **Bedessie**, if they meet their ethical obligation

9

and conduct the kind of investigation suggested by <u>Hamilton</u> - fairly, with transparency and free of conflicting interest, and if they adhere to an openly announced justice system will be significantly strengthened. The Court of Appeals authorize the lower court to exercise a vehicle to overcome resistance proffered by the prosecution disqualifying expert opinion without specialized knowledge by sufficient aiding the jury in reaching its verdict. See <u>People v. Oddone</u>, 2013 N.Y. Slip Op 08291 (N.Y. 2013). Adopting this approach an expert can provide an opinion by reviewing Kings County admission tendered upon a slew of wrongful conviction (known and unknown), and not predicated on unsavory character witness but directed the constitutional offender and the very same office it attempt to explored at an evidentiary hearing.

### POINT TWO

THE JUDGMENT WAS PROCURED BY DURESS, MISREPRESENTATION AND FRAUD ON THE PART OF A PERSON ACTING FOR OR ON BEHALF OF THE PROSECUTOR.

16. The conviction herein was obtained in violation of the defendant's due process rights under the Constitution of this State and of the United States. The conduct of the police in this case while dealing with Julio Rivera and the defendant constituted a violation of the defendant's constitutional rights. The question of whether article 440 Criminal Procedure Law was enacted to aid in the promotion of justice and the courts have held that a certain amount of flexibility in its application is appropriate. The defendant herein seeks a

statutory remedy. He has complied strictly with the statute herein and has met his burden of proof at the post-judgment hearing conducted by this Court in June 8, 2009. (See Sentence Minutes, pgs. 1-16, Court File).

17. C.P.L. §440.10(h) authorizes a court to vacate a judgment obtained in violation of an accused constitutional rights: C.P.L. §440.10(1)(b) authorize a court to vacate a judgment procured by, inter alia "fraud on the part of the . . . prosecutor or a person acting for or in behalf of a . . . prosecutor", and §440.10(1)(c) authorize a court to vacate a judgment obtained via false material evidence. While it is not claimed that the prosecutor in this case was directly involved or even knew of the actions of Detective Darino, it is clear that, as an agent of New York State law enforcement, that he was acting for or in behalf of the prosecution. His involvement, according to defendant testified that Detective Darino told him that if defendant did not confess, then both defendant and Julio, who was already in custody, would be charged with murder and that Julio would face life imprisonment, "just cause he tried to save your as a fight that you had" (E. Rivera: 562-63, 598, 600). Defendant wrote down a statement, misspelling his firs name because he was nervous (654-65). According to defendant, when he wrote down his statement, he was exhausted and suffering from a hangover (E. Rivera: 565).

18. In a similar case where a Court of Appeals was asked to determine the point at which police deception - a law

11

enforcement tool that the court has sanctioned for nearly 150 years ago, the New York Court of Appeals held that the use of deception, in and of itself, will not render a confession involuntary. **People v. Wentz**, **37 N.Y. 303 (1867)** - is so psychologically coercive as to render a confession involuntary and there unconstitutional. It should be noted, however, that in applying **People v. Thomas**, **2014 WL 641516 (N.Y. 2014)** the Court stressed that a coerced statement is inadmissible whether it is true or false. Further, the court observed, "there is not a single inculpatory fact in defendant's confession that was not suggested to him" by police.

19.   It should be clear from the evidence at trial that Detective Darino was a part of a prosecution team which held together the People's witnesses and much of the physical evidence in the case, such as the created photo arrays and police documents. As a New York City Police Officer he is an arm of the State. Traditionally, the phrase "The People of the State of New York", has been interpreted to include the Police, City and State Corrections Department and various other law enforcement agencies, as well as prosecutors, in determining state action for various different purpose, such as motion pursuant to CPL §330.30.

20.   It should be clear that Detective Darino was one who was acting in behalf of a prosecutor in influencing Julio Rivera to lie in Court, in order to obtain the conviction of Enrique Rivera. He was clearly acting in what he felt to be the prosecution's interest in doing what he did. The People should

12

not now be heard to claim that he was not "a person acting for or in behalf of a prosecutor", because he was successful in keeping his actions secret. Detectives Darino had testified that he had not told defendant that Julio would be charged with murder unless defendant confessed (Darino: 416). Detective Darino also had testified that he had not promised defendant that, if defendant told the police that he killed Ojeda in self defense, then defendant would be sentenced to only eight to ten years (Darino: 416).

21. The language of the statute itself that it was the intent of the legislature to include such activity. CPL §440.10(1)(b) authorizes vacatur of judgment if the judgment was procured by duress, misrepresentation or fraud on the part of a prosecutor or "a person acting <u>for or in behalf of</u> . . . a prosecutor" (emphasis added). For the legislature to distinguish between "for" and "in-behalf of" indicates an intent to include someone with authority who is acting without the actual knowledge of a prosecutor, as in the case at hand.

22. Considering the review ability by the Second Department of CPL §440.10(1)(b) decision as opposed to those under CPL §440.10(1)(g), the Court, discussing a case where, as here, the Jahira Serrano recantation related such testimony as "a now classic ground for relief in CPL §440.10(h) because of the fraud on the court." **People v. Hamilton, 115 A.D.3d 12 (2d Dept 2014)** court id not pigeonhole its decision to fact specific claim of actual innocence but ruled on three discrete provision of New York Constitution which forbid a wrongful

13

conviction in pertinent part at issues herein, holding that:

> "A freestanding claim of actual innocence, is
> rooted in several different concepts,
> including the constitutional right to
> 'substantive' and 'procedural due process',
> and the constitutional right not to be
> subject to cruel and unusual punishment."

23. Because right now, New York courts are fighting 21st century with 20th century tools is just doesn't make sense. The common element to many wrongful conviction - young defendants, false confession, mistaken eyewitness identification. CPL §440.10(b)-(h) is a statutory safety valve which provides for a post sentence review of conviction and sentences to address the problem of a potential wrongful conviction, either as a matter of improper process or as a matter of facts or insufficient evidence to convict. Perhaps the 20th century of acceptance is coming to an end. The firs time in New York State, and appellate court has recognized that a freestanding claim of actual innocence is ground for defendant to challenge their conviction. This again is not something that can be determined without an evidentiary hearing. The Second Department's recent decision in **People v. Jones,** 115 A.D.3d 984 (2d Dept 2014) was of a similar character to the evidence warranting a hearing in **Hamilton**. A hearing necessary to promote justice inasmuch as the issues raised are "sufficiently unusual and suggest searching investigation."

### POINT THREE

THE WITHHOLDING OF BRADY/GIGLIO MATERIAL
REQUIRE THE VACATION OF JUDGMENT AND A NEW
TRIAL.

14

24. Detective Darino perjured himself at defendant's trial when he told defendant that Julio Rivera would be charged with murder unless defendant confessed, (S. 8 - describing Serrano's eyewitness statements). As demonstrated below, by failing to reveal the recantation by Jahira Serrano to the defense, the prosecution violated its federal and state constitutional duties to disclose exculpatory evidence. See **Brady v. Maryland,** 373 US 83 (1963). Additionally, by failing to correct Detective Darino's perjured testimony in this subject, the prosecution violated its constitutional duties to correct false testimony. See, **Giglio v. United States,** 405 US 150 (1972). This Court refused and asked the prosecutor any question of Ms. Chu, why is it she waited until May 4, 2009 to raise these facts?

25. It is axiomatic that for a motion made pursuant to CPL §440.10, as pointed out in **People v. Rodolfo Taylor,** Ind. No. 1185-84, 1355-84, ___ A.D.3d ___ (2nd Dept 2014), the Second Department, reversed the trial court's order, which denied the defendant's motion to set aside verdict based upon a Brady/Rosario material as reasonable possibility that the People's failure to disclose the material contributed to the verdict against him, without a hearing. The Court held that the defendant's motion to vacate the judgments of conviction was supported of conviction was supported by his own sworn allegation that the subject Brady/Rosario material was not provided to the defense at his criminal trials (citing CPL §440.30[1][a]). In addition, the Court in Brady/Rosario,

15

indicated that a hearing is necessary to determine whether the Brady/Rosario material were disclosed to the defense, and if it is determined that they were not, whether there was a reasonable possibility that the nondisclosure contributed to the verdict against the defendant, including whether the Brady/Rosario violations had an impact on the defendant's ability to defend other counts to which they did not directly apply, or otherwise influenced the verdicts on those counts. Id.

26.    There is no dispute here that the discovery, during post-judgment hearing, that the prosecution failed to inform the defense of recantation by the witness Jahira Serrano. It is equally clear that this evidence was "favorable" to the defense because it would have impeached the objectivity and credibility of the case lead interrogator and investigator. Giglio, 405 US at 154 ("favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness."), see also, People v. Taylor, supra ("This Court has held that the Rosario/Brady material are all relevant to the issues of the identification of the defendant as the perpetrator of the robberies, the information contained in that material was not mentioned at the defendant's jury trial, or used by defense counsel to impeach the People's witnesses") (quoting People v. Cardona, 138 A.D.2d 617, 618-619). The defense had no access to this witness or to the information which she supplied during her recantation, C.P.L. 440.10(1)(f).

16

27. Defendant was prejudiced in that it would be fruitless to pursue leads which had become stale with the passage of more than four year. Nor can it be said that the failure to disclose did not contribute to the verdict. When the reliability of the People's witnesses may, as here, be determinative of guilt or innocence, any nondisclosure of evidence affecting credibility would require a new trial and that the good faith or bad faith of the prosecutor is not relevant. Had the recantation by Jahira Serrano been turned over, it could have cast doubt on what Julio Rivera said and might as well have resulted in a different trial strategy. **People v. Vilardi,** 76 N.Y.2d 67, 77 (1990).

28. Additionally, it well established that the due process imperative to disclosure favorable evidence extends to information held only by the police - here, by Detective Darino. As the Supreme Court has recently reaffirmed, "Brady suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor." **Youngblood,** 126 S.Ct. at 2190 (quoting **Kyles v. Whitley,** 514 US 419, 438 [1995]), see also **Kyles,** 514 US at 437 ("[T]he individuals prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.") **Banks v. Drake,** 540 US at 668, 693 (2004). Indeed, if Detective Darino was allowed to conceal unilaterally evidence that would be beneficial to defendant's defense, this would amount to "substitut[ing] the police for the

17

prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trial." **Kyles,** **514 US at 438.** The Due Process Clause tolerates concealment by no government agent.

29. To establish prejudice under Brady, there must be a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." **Kyles, 514 US at 433** (internal quotation marks omitted). This burden is lower than the one applicable to defendant's new trial claim. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermine confidence in the outcome of the trial.'" **Id.** at 434.

30. Defendant's claim plainly satisfies, as detailed in lead Detective Darino was a crucial prosecution witness who not only gave important testimony about defendant's allegedly suspicious demeanor and statements, but also made critical judgments about the direction of the investigation. It was, after all, Darino who decided to push Enrique Rivera for a confessing only two days into the investigation.

31. Given the significant weakness in the prosecution's evidence and given that the jury's verdict was already close, the revelation of Detective Darino's unabashed perjury quite

18

likely would have tipped the verdict in favor of acquittal. Cf. **Napue v. Illinois**, 360 US 264, 269 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determined of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.") Thus, defendant has demonstrated a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different", **Kyles**, 514 US at 433, (internal quotations and citation omitted). At a post-hearing this Court (Marrus, J.) defense counsel placed on the record.

> MR. DRANOVE: [Defense Counsel] Your Honor: I'm making this motion on the grounds indicated initially in my May 6, 2009 letter, in that we start with in your robing room after this case on May 4, sent to this Court, the prosecutor informed us that witness Serrano had recanted.
> And the Prosecutor, when asked what was the recantation, repeated, 'she recanted.' (S. 4, Court files).
> [DEFENSE COUNSEL] I spoke to Ms. Serrano in my office.
> Several things come for that interview Number one, during this trial, over my objection I think on page 207, if I'm correct of the transcript, the prosecutor asked my client's brother, Julio Rivera, did you tell Jahira Serrano that you brother Enrique stabbed someone in the bar. Julio Rivera said no. Now you Honor then allowed my client to testify. "I didn't see my brother after the incident in the bar until I dropped off or was dropped off by Jahira and she with Rudy, Rudy Cordova."
> Now, Ms. Serrano told me she was in, with Rudy, went to the police several days after the incident, but after she learned somebody had died because she read about it in the newspaper. She went with her then two year old son, was put in a room, knew that Rudy

was put in a different room. Rudy is the
father of her son.

This was in the morning of that date. She
recalls she and her son didn't anything to
eat or drink for hours, and for hours. She
told me she didn't see that happened. She
told the detective who spoke to her she
didn't see what happened. She was in the
back dancing with the girls, and the girls
were dancing, because they wanted guys to be
interested in them, so she was in the back.
Something happened, the lights went on, She
wanted to see what the commotion was,
bouncer, or a bouncer or more than one
bouncer prevented her form going up front.
Then a time came when she was allowed to
leave. She saw blood drops, she got a phone
call from Julio Rivera. Julio, you got to
bring my jacket and car keys. I'm not
allowed back in, or I can't get back in. She
the, in the car ended up dropped off at some
location, leading Julio in his car Julio
didn't say a thing about his brother Enrique
in the precinct – excuse me. She said, Julio
didn't say anything about this brother
except I am going to meet up with him or I'm
looking for him, words to that effect.

Thereafter, a day or two later, it is four-
plus years ago, think it's a day or two
later, when ends up in the police station.
She was questioned hours on hours, and she
said, I don't know what happened, I didn't
see it happen. The cops would go in and out
of the room. One of them, she remembers,
appears Puerto Rican to her, the others
where white, she recalls. And say Rudy said
that Julio said that his brother stabbed
someone, and she said, no, he didn't. This
went on for hours, late in the afternoon,
she, with her two year old there, heard, and
I'm paraphrasing her, "If you don't tell us,
we're going to take you kid away from you.
"Your were there. Someone died.

"As far as we're concerned, you're
involved." Words to that effects. "We're
going to take you son from you." She told
quite candidly, she had been in foster care
when she was a child, taken from her own
mother, and id not see her mother until she
was 10 years old, after that. And she had
just – that history combined with what she
was threatened with, caused her to say.
"I'll say what you want to say and it was
then some words were passed, someone came in

with a tape recorder, said something, her
name, time, and she made her statement. Now,
that led me, and this all happened very
suddenly, last week after we tracked her
down, to take another look at Rudy Cordova's
statement, and have my investigator track
him down. He was tracked down, and what I've
heard form my investigator because I haven't
met him is, as he recalls it, he was kept
there for an even longer period of time, was
told basically Jahira said, you heard, Julio
say his brother Enrique stabbed a person.
And he said, that's not true, because he
didn't say it, and that his went for a long
time. Now, ultimately, he under pressure,
also changed his statement.
Rudy Cordova at trial was mentioned by John
Dominguez as having been right up there at
the bar with Dominguez, Rudy Cordova in a
police report, same report that say Julio
Rivera says Enrique says He stabbed him,
Cordova says, I was right there. I saw
Enrique, he punched him. I saw it He didn't
have a knife.
Now, but for the police misconduct and
pressuring and forcing there people to say
Julio said his brother said to him, his
brother, my client stabbed someone somebody
I would have called Rudy Cordova, because I
would have known the truth I would have been
able to establish in Jahira the
extraordinary menacing pressure put on her,
pressure my client testified to, in which
Detective Darino said no pressure, we just
asked him to talk. And he said yes, sure,
I'll tell you what happened, and the
prosecutor would not have asked my client in
the courtroom, didn't your brother say he
stabbed the victim?
Now, I couldn't discover this information
sooner, and there's more, Judge, Jahira
Serrano told me that after she was at the
police station, sometime later but years
ago, that's her recollection, I wasn't
there, this is her recollection, she came to
downtown Brooklyn. She doesn't remember
anything about the woman but she told the
woman, I don't know what happened that
night, and she's not at this moment, Ms.
Serrano, clear about what else she told the
woman. That's years ago.
So what I submit is, in light of the
prosecutor telling us beyond the even of
trial, literally the later morning of the

21

> first day of trial that Ms. Serrano
> recanted, that there's a problem.
> Either the recantation is several years old
> before the first trial and I was entitled to
> know that as defense trial counsel before
> the first trial, or at some later sometime.
> But certainly not at some amorphous trial
> and "recant" being the sole word, the word
> being placed before your Honor and counsel.
> (Sentence Minutes, pgs. 1-12, Court files).

32. Under the circumstances, this was the only way possible for the defense to discover this evidence. If the case were retried today, with Jahira Serrano as a witness for the defense, instead of the prosecution, she would give evidence of how the police tried to frame the defendant Enrique Rivera. Even if the people had presented overwhelming evidence of the defendant's guilt, there is at least a reasonable possibility that the deprivation of the defendant's constitutional right to present a defense might have contribute to the defendant's conviction.

33. The People's theory established that Ojeda was stabbed during a later night bar brawl between two groups of intoxicated men. When several of the People's witnesses attempted to downplay the chaos of the scene, they were impeached with testimony from defendant's first trial, in which they said the stabbing occurred amidst "a big ruckus," with "[p]eople running back and forth," "screaming," and "yelling". The testimony of defendant's brother Julio similarly depicted a melee in which "all the punches [were] going off" so that he was unable to discern the direction from which the blows were coming. Consistent with the depiction of drunken chaos and

22

confusion, none of the four eyewitnesses who testified actually observed a knife in defendant's hand.

34.   Since that, Ms. Serrano's recantation was one which was normally prepared in the regular course of business form information supplied by the witness and was exculpatory in nature, it constituted both **Brady v. Maryland, 373 US 83, People v. Rosario, 9 N.Y.2d 286**, and should have been turned over prior to trial. C.P.L. §440.10(1)(f) are the vehicles for moving against prosecutorial misconduct when it is first discovered after judgment. **People v. Taylor, Id. No. 1185-84, 1355-84, ___ A.D.3d ___ (2nd Dept 2014)** (The County Court erred in denying the motion on the ground that the defendant unduly delayed making the allegation of Brady/Rosario violations, as "[t]here is no time limit on the filing of CPL §440.10 motion"). The claim of the defense counsel that the conclusion of the first trial the prosecutor knew that there was **Giglio** material. The claim of the prosecutor that she had no knowledge of the existence of the document is of no avail where we are dealing, with Brady/Rosario material.

35.   The defendant always maintained that the confession he made was not read his Miranda warning until after he made oral and written statement in question. It was alleged that the statement was the product of deception and subterfuge as a police utilized various means to induce the statement, all of which violated his right. While New York courts had traditionally been tolerant of deception in confession cases. The Court of Appeals recently suppressed a confession by law

23

enforcement officers in that case denied the defendant due process. Judge Lippman wrote for the court. "What transpired during defendant's interrogation was not consonant with and, indeed, completely undermined, defendant's right not to incriminate himself - to remain silent." **Thomas, supra.** Here, these violation were alleged by the defendant at the **Huntley** hearing.

36.  If the prosecution attempt to pigeonhole **Hamilton** to a discrete factual finding and rejects its broad reading which encompass infallibility of witnesses testimony and direct and directed at the constitutional offender the officer of the Kings County, which publicly announced it inherent a throve of questionable cases that its still pouring the prosecution attempt to impress upon this Court must rebuffed. (A copy of recent admission is annexed herewith as Exhibit A-B-C).

37.  In one article dated April 9, 2014, D.A. Kenneth P. Thompson's Office served notice of two more potentially unjust conviction. Here, a study connected to the work of now retired Brooklyn Detective Louis Scarcell uncovered handwritten police notices from 1985 that "could" well exonerate two men. The old notes, revealed for the first time in a letter the D'A Office sent to Brooklyn Chief Administrative Judge, state that two witness say the killing - and named perpetrator other than the two convicted man.

38.  Distinguishable, another new article the defendant recanted his false confession before the DNA match and passed a polygraph requested by the Brooklyn D.A. apart this two

24

unnerving convictions that has no bearing on argument cited in the case law proffered by the prosecution and analogous to the factual predicate now under review by the innocence foundation which aligned cross reference false confession employed herein requires a reinvestigation by a qualified expert to educate this Court whether defendant's confession is the product of false inducement.

39. In every criminal prosecution the defendant enjoys the right to have counsel represent him. To interfere with an intricate aspect of counsel's duties would be to infringe on that right of an accused. The many responsibilities that a defense counsel has often times requires that he conduct an extensive investigation. In order to be able to do as such, the courts of this sovereignty, adhering to the United States Supreme Court's holding in **Brady**, and its progeny, has recognized the enormity of defense counsel's responsibilities with this realization in mind, the United States Supreme Court has found it necessary that the prosecution attorney has some sort of regulatory rule he/she must confront to when disclosing material of significant to defense counsel. Hence, the **Brady/Giglio** was born.

40. For a prosecutor to delay disclosing Brady material that is of sort which should be disclosed to counsel at time when he can explore the may avenues such material creates, would put limits n counsel's ability to perform as counsel afforded an accused via the constitution language mirrors that of the Federal Constitution (compare U.S. Const. 6th ["The

25

accused shall enjoy the right. . . to be confronted with the witnesses against him"), with N.Y. Const. Art. 1, §6 ["the party accused shall be allowed . . . to be confronted with the witnesses against him or her"]. By the prosecutor interfering with counsel's performance, he denies the accused due process of the law and deprives him of his right to counsel. See, **Strickland v. Washington, 466 US 668, 686 (1984)** ("Government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decision about how to conduct the defense.") As such, refuses the accused the benefits for a fair trial.

41. Defendant submit that the prosecutor's failure to turn over the Brady/Giglio material in a timely fashion has served to deprive defendant of his right to counsel. To assume what counsel would have done with such material in his possession. "The presumption that counsel's assistance in essential [necessitates] that a trial unfair if the accused is denied counsel at a critical stage of his trial." **United States v. Cronic, 466 US 648, 659 (1984).** Without access to Serrano recantation concerning reliability of the witness, the defense cannot properly develop and pursue questioning favorable to the defense or address facts and related issues important to the truth finding process.

42. In so holding, CPL §440.10(b)-(f)-(h) - which affords a criminal defendant in New York the right to collateral attack a conviction based on off-the-record-evidence - provides a menu of options for the defendant's motion must not be procedurally

barred by the applicable provision in light of <u>Hamilton</u>, 979 N.Y.S.2d at 104 holding that: "[w]hen there is sufficient showing of possible merit to warrant a fuller exploration by the court."

43. Defendant respectfully submits that the continuation of the defendant conviction for the underlying murder violates his constitutional rights under both the State and Federal Constitution. Consequently, defendant submits that his Court exercise its inherent power to correct and unjust wrong by vacating the judgment of conviction and whether defendant is entitled to a hearing under <u>Hamilton</u> in all respects.

### CONCLUSION

In light of the foregoing, this Court should grant the instant motion and vacate defendant's conviction or, at minimum, schedule an evidentiary hearing to determine whether instant motion should be granted.

Dated: June _11_, 2014.
      Stormville, New York 12582

Respectfully submitted,

*Enrique Rivera*

Enrique Rivera
Green Haven Corr. Fac.
P. O. Box 4000
Stormville, NY 12582

Sworn to before me this
_11_ day of June 2014

*Keith Sposato*
NOTARY PUBLIC

KEITH J. SPOSATO
NOTARY PUBLIC-STATE OF NEW YORK
No. 01SP6248188
Qualified in Putnam County
My Commission Expires September 19, 2015

27

# EXHIBIT
## -A-

# I'm free!



Jonathan Fleming embraces family after exoneration. Below: Disney World, where he was vacationing at time of Brooklyn murder he didn't commit.

AARON SHOWALTER/DAILY NEWS

## Innocent man's joy after 24-yr. ordeal

**BY OREN YANIV**
NEW YORK DAILY NEWS

JONATHAN FLEMING had nearly 25 years in prison to imagine what it would feel like to be a free man.

After more than two decades behind bars for a murder he didn't commit, Fleming was exonerated Tuesday as Brooklyn prosecutors dropped the case.

"The day is finally here. I've dreamt about it many nights," Fleming, 51, said as he walked out of court. "I'm finally a free man."

"I feel wonderful," Fleming said. "I'm going to have dinner with my mother and my family, and I'm going to live the rest of my life."

Fleming, who was vacationing in Disney World when the August 1989 homicide took place, was freed after prosecutors found evidence that was not disclosed during his trial.

The Brooklyn district attorney's office started reviewing his case last year and later uncovered a phone receipt from an Orlando hotel, showing he was there just hours before the murder, and a report from local police, who interviewed hotel staffers who remembered him. Both documents were found in the case file.

"It could not have possibly been a mistake," one of Fleming's lawyers, Taylor Koss, said of those nondisclosures by the authorities before and during his client's trial.

The DA's reinvestigation also discovered police reports that confirmed a recanting witness whose felony case was dropped after she falsely identified Fleming. A source said prosecutors



believed to be the actual killer and may now go after him.

Relatives of Fleming, including his mom and two of his kids, filled the courtroom and erupted in applause and cries of "Thank you, God!" when Brooklyn Supreme Court Justice Matthew D'Emic officially released him.

"I've waited for this so many years," Fleming's mother, Patricia, 72, said through tears after she hugged her son. "I feel like a burden was lifted."

Patricia Fleming, who testified at trial about their vacation, was still frustrated. "An innocent man did all this time," she said. "I was with him, and that's what hurts so bad."

Prosecutors at the 1990 trial were able to convince a jury that Fleming — who had videos and photos from the Disney vacation — could have hopped on one of 53 flights, shot dead Darryl Rush, 22, in a Williamsburg housing project, take a flight

Brooklyn again the next day.

Brooklyn District Attorney Kenneth Thompson, who took office at the beginning of the year, said the decision to drop the charges was based on "a careful and thorough review."

Thompson has inherited a trove of questionable cases that a revamped conviction review unit is still poring over.

On Tuesday, the unit's work was praised.

"This is a glorious day," said Fleming's ex-wife, Valerie Brown, 46, who also testified during the trial about the Florida trip.

"Somebody heard our cries and today is a new beginning," she said. "It's going to be a process, but we're a strong family."

Fleming and his family gathered for a joyous meal at a nearby steakhouse, where the freed man ordered a T-bone steak and a piña colada.

"I don't drink alcohol, but I tried it today," he said with a smile.

oyaniv@nydaily...

## Union: firing by DA political payback

A CITY DETECTIVES union is blasting Brooklyn District Attorney Kenneth Thompson's firing of a low-level investigator it says was given the boot because he's related to one of former DA Charles Hynes' top lieutenants.

New York City Detective Investigators Association president John Fleming said the dismissal of 26-year-old Andrew Vecchione — son of former Rackets Bureau Chief Michael Vecchione — from his $55,000-a-year job was "based solely on political payback."

"He was a grunt ... the most basic of low-level investigators, and he was called into the chief's office and was told that he had to resign or get fired," Fleming said about the younger Vecchione's termination.

Thompson targeted the elder Vecchione in his campaign against Hynes, claiming that the bureau chief had intimidated witnesses.

Thompson said he would fire Michael Vecchione once he took office, but the seasoned prosecutor retired at the end of last year before Thompson became DA.

The DA's office did not immediately return a call for

# EXHIBIT
## -B-

Friday, February 7, 2014 24

# Murder verdict tossed after 22 yrs.

The judge vacated his triple-murder conviction, the guards unlocked his hand and foot shackles, the courtroom broke into tears and applause. And for the first time in nearly 22 years, Tony Yarbough was a free man.

One week before his 40th birthday, he hugged his aunt Sandra Vivas and cousin Sylvia Vivas and walked with stunted steps like he was still shackled out into the hallway of the 19th-floor Kings County Supreme Court building. He staggered into a storm of cameras and turned into a lawyer-client conference room with Phil Smallman and Zach Margulis-Ohuma, who worked four tenacious years to spring him.

He plopped in a chair in an crazy daze of freedom. I asked him what he missed most.

"My mom and my little sis-



**DENIS HAMILL**

ter," he said on Thursday. "I did 22 years for killing them and my little niece, which I never did. And now that I'm free, I still miss them. I always, always will. I don't even know where they're buried."

He dropped his head in his arms and sobbed softly and then excused himself as he knelt and rested his head in his hands on his chair and said a prayer as his big body rattled with the electrified emotions of liberty and exoneration.

"Forgive me," he said. "I said a prayer to my mom. Asked her to watch over me as I try to make the best of the rest of my life. My mother was a lady with problems like we all have. But she had a wonderful heart."

On the morning of June 18, 1992, Yarbough came home from a night of partying in Manhattan with his friend Sharif Wilson to find the bodies of his mother, Annie Yarbough, 40, her daughter, Chavonn Barnes, and Latasha Knox, both 12, stabbed and strangled with electrical wires.

He was arrested for those crimes although there were no witnesses, physical evidence or real motive connecting him to the crimes. Wilson, a scared boy of 15, would eventually confess to committing the murders with Yarbough. But in 1999, while both were still in prison, another woman was murdered in Brooklyn in similar fashion.

Last year, the medical examiner's office discovered that the DNA found in the woman murdered in 1999 matched the DNA found under Yarbough's mother's fingernails in 1992.



Anthony Yarbough enjoys some pineapple cheesecake at Junior's restaurant Thursday after a judge vacated his conviction for the 1992 killings of his mother, half-sister and her friend.

## TASTE OF FREEDOM

The two lawyers who had been working on the case for four years appealed to the court and the Brooklyn district attorney's office to free both men. Wilson recanted his false confession before the DNA match and passed a polygraph requested by the Brooklyn DA.

On Thursday — 7,905 days after Tony Yarbough was incarcerated — Justice Raymond Guzman vacated the conviction with the blessing of the new Brooklyn DA, Kenneth Thompson.

"I cannot thank my two lawyers enough," Yarbough said. "They believed in me, stuck by me, fought for me."

He took a deep breath and said, "If there had been a death penalty in New York I would be dead by now. But instead I have lived long enough to get my freedom and be exonerated."

He walked from the room and spoke to the press and rode the elevator down stairs and stepped out onto frigid Jay St. where he gulped the free winter air of Brooklyn. "I want the person who did this to my family to be caught and have to live through the hell I went through for 22 years," he said. "I want to start my life with a clean slate."

Yarbough will reside in a Fortune Society residence until he can find employment. The

group helps former inmates adjust to life on the outside.

Someone dialed a cell phone, something he'd never used, and he spoke to his grandmother who still lives in the Coney Island Houses where the murders occurred.

"Grandma, it's Tony," he said. "I'm out. I'm free. I love you. And I will be seeing you soon."

Then Tony Yarbough walked through the streets of downtown Brooklyn to Junior's on Flatbush Ave. to eat his first meal as a free man.

"God is good," he said. "It just feels so weird walking on the streets of Brooklyn again as a free man."

Welcome home.

PHOTO BY: JESSE WAR[?]

# EXHIBIT
## -C-

24  Wednesday, April 9, 2014

## DAILY NEWS
## EDITORIAL

# Too much faith

A cardinal and nine bishops walk into the state Capitol — and the very bad joke was on them.

Timothy Cardinal Dolan of the Archdiocese of New York, Bishop Nicholas DiMarzio of Brooklyn and Bishop William Murphy of Long Island were among the Catholic prelates who traveled to Albany to seek tax credits for private school donations.

It was their top priority, a crucial step toward rescuing financially troubled parochial schools. In a year when lawmakers were focusing on education, the cardinal and bishops had reason to believe their timing was right.

They met with Gov. Cuomo, Assembly Speaker Sheldon Silver and Senate co-leaders Dean Skelos and Jeff Klein. The elected officials smiled and nodded and gave assurances.

And the bishops came away feeling suckered. The politicians led them to believe one thing, then did another.

"No guts in Albany," was the suitably stinging headline in The Tablet, the newspaper of the Brooklyn Diocese. "Though Gov. Andrew Cuomo had indicated he would support (education tax credits), in the midst of closed-door horse trading, he meekly backed away from the effort," a Tablet editorial read. Also righteously angry was Catholic New York, the newspaper of Dolan's archdiocese.

"Winter may finally be over, but Catholic schools and Catholic school families are still out in the cold as far as Gov. Cuomo and state lawmakers are concerned," the editors wrote.

"We're at a loss to understand why this tax credit was left out of the budget," they added. "It had the support of 80% of lawmakers, of the governor, and some 80 other organizations, including faith groups, business leaders and labor unions."

In his column for The Long Island Catholic, Murphy, too, was puzzled as to why the needs of Catholic and other private schools were "thrown under the bus."

"We do know that, to the end, Sen. Skelos was firm in his commitment and in his support arguing for the education tax credit.

"We do know that Speaker Silver offered 'extra help' in giving us money we already are owed. He did not support the education tax cred t.

"We do know that the public teachers unions are politically very strong and continue to have a visceral negative attitude to any school that is not a government school.

"And we also know that the governor verbally supported us whenever the bishops o  New York spoke with him (last on March 18) or t e cardinal contacted him."

Now these men of faith also know better than to have faith in the men who run New York.

# Thompson's tough task

Taking over as district attorney is a big job. Taking over one of the country's largest prosecutorial offices is harder still. Taking over the mess left by former Brooklyn DA Joe Hynes is about as rough as it gets.

Three months into the job, DA Ken Thompson has the burden of combing through Hynes' case files in search of miscarriages of justice. Of which there appear to be more than a few.

The new DA will need unerring judgment in distinguishing between wrongfully convicted defendants and those who have fantastic stories to tell. Of which the supply is limitless.

On Tuesday, Thompson secured dismissal of charges against Jonathan Fleming, who spent 24 years in prison on a murder conviction.

Early in Hynes' tenure, the DA's office indicted Fleming for allegedly shooting dead a man named Darryl Rush in Williamsburg in 1989.

From the start, Fleming maintained that he was in Florida when the murder took place. The key witness against him was a crack addict who recanted after his trial — saying she was pressured by the cops, who dropped felony charges against her after she fingered Fleming.

Prosecutors began reviewing the case last year. They confirmed that the charges against the witness had indeed been dismissed. Further, they came up with a telephone receipt that put Fleming in Orlando just hours before the shooting.

Thompson's office has also served notice of two more potentially unjust convictions.

A broad-based study connected to the work of now-retired Brooklyn Detective Louis Scarcella uncovered handwritten police notes from 1985 that could well exonerate two men.

Alvena Jennette was convicted and served almost 21 years in prison. His brother Darryl Austin, also convicted, died there.

The old notes, revealed for the first time in a letter the DA's office sent to Brooklyn's chief administrative judge, state that two witnesses saw the killing — and named perpetrators other than the two convicted men.

Knowingly withholding exculpatory evidence would be a profound perversion of justice.

A single innocent man serving decades in prison is a travesty. This happening to multiple men is a horror. Thompson has tapped Harvard Prof. Ronald Sullivan to head an expanded conviction review unit, which will seek to determine whether anyone else has been wrongly jailed.

It's a herculean and sensitive job for which Sullivan — a former public defender, private practice lawyer, veteran of Harvard and Yale law schools, and specialist in criminal law and criminal procedure — seems well-suited.

The task is to uphold the honor of the office's many professional prosecutors while changing a culture that permitted corner-cutting and worse.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:   CRIMINAL TERM PART 35

THE PEOPLE OF THE STATE OF NEW YORK,

          -against-

ENRIQUE RIVERA,

                  Defendant.

AFFIRMATION IN
OPPOSITION TO MOTION TO
VACATE JUDGMENT OF
CONVICTION

Kings County
Indictment Number
1453/2005

      SOLOMON NEUBORT, an attorney admitted to practice in the State of New York and an Assistant District Attorney in the County of Kings, affirms the following to be true under the penalties of perjury:

      1.   I submit this affirmation in opposition to defendant's pro se motion, dated June 11, 2014, made pursuant to Criminal Procedure Law § 440.10, to vacate the judgment of conviction under Kings County Indictment Number 1453/2005.

      2.   I affirm the following statements on information and belief, based on the records and files of the Kings County District Attorney's Office.

      3.   On February 27, 2005, sometime before 2:00 a.m., inside of the El Borinquen Bar located at 314 39th Street in Brooklyn, defendant, in front of eyewitnesses, repeatedly stabbed Edgar Ojeda, puncturing Ojeda's lung and causing his death. Defendant was arrested on February 28, 2005, and he confessed to the police

1

orally, in writing, and on videotape, that he had swung a knife in the victim's presence.

4.    For the above acts, defendant was charged, under Kings County Indictment Number 1453/2005, with murder in the second degree (P.L. § 125.25[1]) and criminal possession of a weapon in the fourth degree (P.L. § 265.01[2]).

5.    Commencing on June 6, 2006, a pretrial Payton/Wade/Huntley hearing was conducted, after which defendant's motion to suppress evidence was denied.

6.    Defendant's first trial ended in a mistrial as a result of a hung jury.   See Rivera v. Firetog, 11 N.Y.3d 501 (2008).

7.    Defendant filed a motion in the Appellate Division, pursuant to Article 78 of the Civil Practice Law and Rules, to prohibit retrial of defendant on the indictment.

8.    By decision and order dated October 23, 2007, the Appellate granted defendant's motion, and ordered that the People were prohibited from retrying defendant on the present indictment, but held that nothing prevented the People from re-presenting any appropriate charges to another grand jury.   Rivera v. Firetog, 44 A.D.3d 957 (2d Dep't 2007).

9.    By decision and order dated December 2, 2008, the Court of Appeals reversed the decision of the Appellate Division, and held that the People were permitted to retry defendant on the

2

present indictment.   Rivera v. Firetog, 11 N.Y.3d 501 (2008), cert. denied, 129 S. Ct. 2012 (2009).

10.   On or about May 4, 2009, the prosecutor informed the defense that defendant's cousin Jahaira Serrano had recanted her pretrial sworn statement to the police, in which she had stated that she had observed the barroom brawl and that defendant's brother had informed her after the brawl that defendant had confessed to stabbing the victim.

11.   On May 5, 2009, jury selection for defendant's second trial commenced.

12.   At defendant's second trial, defendant took the stand and testified that he did not have a knife on the night of the homicide, that he did not stab the victim, and that his confession was coerced by a detective who allegedly threatened him that, if he did not confess to the stabbing, then defendant's brother would be charged for the homicide.   Defendant's brother also testified at that trial.   On cross-examination, the prosecutor asked defendant's brother whether he told Serrano that defendant stabbed the victim, and defendant's brother denied telling that to Serrano.

13.   On May 13, 2009, the jury found defendant guilty of manslaughter in the first degree (P.L. § 125.20[1]).

14.   On June 8, 2009, defendant appeared for sentencing. Prior to the imposition of sentence, defendant moved orally,

3

pursuant to Criminal Procedure Law § 330.30, to set aside the verdict, or, in the alternative, to adjourn the sentencing for the defense to perform further investigation to enhance its motion to set aside the verdict.

15. In support of the motion, defense counsel asserted that, after the prosecutor informed him that Serrano had recanted, defense counsel retained an investigator, who located Serrano only after the verdict had already been reached. According to defense counsel, Serrano told him that she had not observed the barroom brawl and that, it was only because the police had threatened to have her child removed from her custody if she did not say that defendant's brother implicated defendant in the stabbing, that she reported falsely to the police and the prosecutor that defendant's brother told her that defendant stabbed the victim.

16. Defense counsel further asserted that, after interviewing Serrano, he asked the investigator to locate Serrano's boyfriend, Rudy Cordova. Prior to trial, Cordova reported to the police, and gave a sworn audiotaped statement to a prosecutor, that he had observed the barroom brawl, that he had not seen a knife in defendant's hands, and that defendant's brother later informed him that defendant had stabbed the victim.

17. According to defense counsel, the investigator located Cordova, who told the investigator that the police had pressured

4

him to say falsely that defendant's brother had implicated defendant in the stabbing.

18. Defense counsel asserted that if he had learned prior to the conclusion of the trial about the police's purported pressure on Serrano and Cordova, then he would have called them as witnesses to testify about the purported police pressure.

19. In response, the prosecutor pointed out that Serrano was defendant's cousin and that Cordova was Serrano's boyfriend and father of her child, and that therefore those witnesses had always been available to the defense. The prosecutor also noted that Cordova, in addition to having given a sworn audio-recorded statement, testified before the grand jury. The prosecutor explained that the reason why she did not call Serrano and Cordova as witnesses at trial was because they told her that they were no longer sure about what they had seen in the bar. (The prosecutor could not have called Serrano or Cordova to testify that defendant's brother had implicated defendant in the stabbing, because that would have constituted inadmissible hearsay).

20. This Court denied defendant's motion to set aside the verdict, because, as a preliminary matter, defendant failed to submit affidavits from any of the purported witnesses. Additionally, this Court denied defendant's motion because it was meritless as well. First, neither Serrano nor Cordova testified at trial, and therefore their recantation could not have

5

influenced the outcome of the trial. Second, neither Serrano nor Cordova had anything material to offer at trial as defense witnesses. Both Serrano and Cordova gave sworn pretrial statements that they had observed the barroom brawl and that defendant's brother had told them that defendant stabbed the victim. Because their pretrial statements were not elicited at trial, calling Serrano and Cordova as trial witnesses to recant their pretrial statements could not have aided the defense, and in any event their trial testimony recanting their pretrial statements would have been subject to significant impeachment, given that their pretrial statements had been made under oath. Third, regardless of whether Serrano and Cordova recanted their prior sworn statements, the fact remains that they made those statements. Accordingly, the prosecutor had a good-faith basis for asking defendant's brother at trial whether he told Serrano that defendant stabbed the victim. Moreover, because at trial defendant's brother denied telling Serrano that defendant stabbed the victim, and because no evidence was elicited at trial that defendant's brother had in fact made that statement to Serrano, there was no evidence in that regard for the defense to rebut. Therefore, even if the prosecution would have disclosed the recantation earlier, and thereby have permitted the investigator to have been able to perform his investigation earlier, the

6

defense still would have had no reason to call Serrano or Cordova to rebut an allegation that was not in evidence.

21.   This Court sentenced defendant to a term of imprisonment of 25 years and a period of post-release supervision of 5 years (Marrus, J., at trial and sentence).

22.   Defendant appealed from the judgment of conviction to the Appellate Division, Second Department, claiming that the trial court erred in failing to submit manslaughter in the second degree as a lesser-included offense.   Defendant also claimed that the sentence was harsh and excessive.

23.   On November 27, 2012, the Appellate Division affirmed the judgment of conviction.   People v. Rivera, 100 A.D.3d 658 (2d Dep't 2012).   The Appellate Division held that no reasonable view of the evidence -- even when viewing the evidence in the light most favorable to defendant -- supported a finding that defendant might have committed the lesser offense of second-degree manslaughter.   The Appellate Division also held that defendant's sentence was not excessive.   Id.

24.   On March 1, 2013, Associate Judge Victoria A. Graffeo of the Court of Appeals granted defendant's application for leave to appeal to the Court of Appeals from the order of the Appellate Division.   People v. Rivera, 20 N.Y.3d 1103 (2013).

25. By decision and order dated April 8, 2014, the Court of Appeals affirmed the judgment of conviction. <u>People v. Rivera</u>, 2014 N.Y. Slip Op. 2379, 2014 N.Y. LEXIS 706 (Apr. 8, 2014).

26. In his papers filed in support of his motion to vacate the judgment of conviction, defendant claims that (a) his pretrial statements were coerced, (b) he was denied a fair trial by the People's allegedly delayed disclosure that a witness who did not testify at trial had recanted, and (c) he is actually innocent.

27. Defendant is incarcerated pursuant to the judgment of conviction.

For the reasons set forth in the accompanying memorandum of law, defendant's motion should be denied without a hearing.


Dated:  Brooklyn, New York
        July 29, 2014

                        _Solomon Neubort_ (signature)
                        Solomon Neubort
                        Assistant District Attorney
                        Office of the Kings County
                        District Attorney
                        350 Jay Street
                        Brooklyn, New York  11201
                        (718) 250-2514

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:  CRIMINAL TERM PART 35

THE PEOPLE OF THE STATE OF NEW YORK,

-against-                          MEMORANDUM OF LAW

ENRIQUE RIVERA,

                          Defendant.

## POINT I

DEFENDANT'S CLAIM THAT HIS PRETRIAL STATEMENTS WERE COERCED SHOULD BE DENIED AS PROCEDURALLY BARRED AND MERITLESS.

Defendant's claim that his pretrial statements were coerced should be denied as procedurally barred.  A "court must deny a motion to vacate a judgment when:  . . . (c) Although sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's . . . unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him."  C.P.L. § 440.10(2)(c).  Prior to trial, this Court conducted a Huntley hearing, in which defendant claimed that his pretrial statements should be suppressed on the ground that they were not voluntarily made.  Although defendant did not specifically allege during that hearing that a detective had threatened him,

the video recording of defendant's statements to the assistant district attorney was introduced into evidence as a hearing exhibit. Accordingly, because the video recording of defendant's statements was part of the record on appeal, defendant could have claimed on appeal from the judgment of conviction that his pretrial statements were not voluntarily made and could have asked the Appellate Division to review his videotaped statement to study defendant's demeanor to determine whether the videotaped statement appeared to be made voluntarily. Hence, because defendant could have raised on appeal his claim that his pretrial statements should be suppressed on the ground that they were not voluntarily made, but defendant unjustifiably failed to raise the claim on appeal, defendant's claim that his pretrial statements were not voluntarily made must be denied.

Furthermore, a court may deny a motion to vacate a judgment, without conducting a hearing, when: "(b) The ground or issue raised upon the motion was previously determined on the merits upon a prior motion or proceeding in a court of this state, other than an appeal from the judgment." C.P.L. § 440.10(3)(b) (emphasis added). At trial defendant took the stand and raised this allegation of coercion. This Court instructed the jurors that if they believed that defendant's pretrial statements were not voluntarily made, then they should

2

discredit those statements (Trial Transcript: 772-74). Accordingly, because the jury in this case, in reaching a verdict of guilty, necessarily decided either that defendant's statements were voluntarily made or that the evidence even without defendant's pretrial statements proved defendant's guilt beyond a reasonable doubt, this court should not reconsider defendant's claim that his pretrial statements should have been suppressed and that he is entitled to relief because the verdict would have been different but for their admission.

Moreover, a court may deny a motion to vacate a judgment, without conducting a hearing, when:

> (a) Although facts in support of the ground or issue raised upon the motion could with due diligence by the defendant have readily been made to appear on the record in a manner providing adequate basis for review of such ground or issue upon an appeal from the judgment, the defendant unjustifiably failed to adduce such matter prior to sentence and the ground or issue in question was not subsequently determined upon appeal.

C.P.L. § 440.10(3)(a). At the Huntley hearing, defendant could have taken the stand and have alleged, as he did at trial, that a detective had threatened him that defendant's brother would be charged with the homicide unless defendant confessed. Accordingly, because defendant could with due diligence have raised this specific allegation at the pretrial hearing, but defendant unjustifiably failed to do so, his motion herein should be denied without a hearing for that reason as well.

3

In any event, defendant's claim is unfounded. A review of defendant's videotaped pretrial statements to an assistant district attorney shows that defendant made those statements voluntarily and of his own accord. Defendant's demeanor when making those statements does not reflect coercion. Also the content of defendant's statements does not reflect coercion. Indeed, in all of his pretrial statements defendant denied being aware of having stabbed anyone. But, if, as defendant asserts, the police were willing to engage in misconduct by coercing defendant to make a statement, then, presumably, they would have sought to coerce a full confession from defendant, and would not have been satisfied with defendant's continual denial of being aware that he had stabbed someone.

In sum, defendant's claim that the police coerced him to make incriminating statements is procedurally barred and meritless. Accordingly, the claim should be denied without an hearing.

4

## POINT II

DEFENDANT'S CLAIM THAT HE WAS DENIED A FAIR TRIAL
BECAUSE THE PEOPLE ALLEGEDLY DELAYED DISCLOSURE OF
PURPORTED BRADY MATERIAL IS PROCEDURALLY BARRED HEREIN
ON A MOTION TO VACATE THE JUDGMENT OF CONVICTION AND
MERITLESS.

Defendant's claim -- that he was denied a fair trial by the
People's allegedly delayed disclosure of purported Brady
material is procedurally barred herein on a motion to vacate the
judgment of conviction. A "court must deny a motion to vacate a
judgment when: . . . (c) Although sufficient facts appear on the
record of the proceedings underlying the judgment to have
permitted, upon appeal from such judgment, adequate review of
the ground or issue raised upon the motion, no such appellate
review or determination occurred owing to the defendant's . . .
unjustifiable failure to raise such ground or issue upon an
appeal actually perfected by him." C.P.L. § 440.10(2)(c). In
this case, at the sentencing proceeding, defendant raised this
claim in an oral motion made pursuant to Criminal Procedure Law
§ 330.30 to set aside the verdict. Accordingly, because the
allegations of fact underlying defendant's claim were raised on
the record at sentencing, defendant could have raised this claim
on direct appeal. Indeed, defendant's claim herein is virtually
identical to the claim that he raised in his motion to set aside
the verdict. Therefore, because defendant could have raised

5

this claim on appeal, his claim is procedurally barred herein on a motion to vacate the judgment of conviction.[1]

Furthermore, a court may deny a motion to vacate a judgment, without conducting a hearing, when: "(b) The ground or issue raised upon the motion was previously determined on the merits upon a prior motion or proceeding in a court of this state, other than an appeal from the judgment." C.P.L. § 440.10(3)(b). This Court already considered defendant's claim when he raised it in his motion to set aside the verdict, and this Court denied defendant's claim because defendant failed to provide affidavits in support of the motion and because the claim was meritless. Accordingly, because this Court has

---

[1] Alternatively, if this Court finds -- and it should not so find -- that defendant failed to make a sufficient record to have claimed on appeal that his motion to set aside the verdict should not have been summarily denied, then this Court should still deny defendant's motion, because a court may deny a motion to vacate a judgment of conviction where the defendant with due diligence could have readily elicited sufficient facts on the record to enable appellate review. C.P.L. § 440.10(3)(a) (court may deny motion to vacate without conducting a hearing where "[a]lthough facts in support of the ground or issue raised upon the motion could with due diligence by the defendant have readily been made to appear on the record in a manner providing adequate basis for review of such ground or issue upon an appeal from the judgment, the defendant unjustifiably failed to adduce such matter prior to sentence and the ground or issue in question was not subsequently determined upon appeal"). And in this case, defendant could readily with due diligence have elicited sufficient record facts to have enabled appellate review of the claim (assuming, of course, the veracity of defendant's allegations of fact), but he unjustifiably failed to do so.

6

already decided defendant's claim adversely to defendant, this court should not reconsider defendant's claim.

Additionally, defendant's claim should be denied without a hearing for yet another reason.  Defendant's claim rests on allegations of fact that the police coerced Serrano and Cordova to state that defendant's brother told them that defendant stabbed the victim.  But defendant has not filed any affidavits from either of those witnesses, even though Serrano is defendant's cousin and Cordiva was Serrano's boyfriend.  Indeed, defendant has not even supplied an affidavit from his investigator, who allegedly interviewed Serrano and Cordova and to whom these assertions of coercion were allegedly made.  See C.P.L. § 440.30(4).

In any event, defendant's claim is meritless.  In support of his motion, defendant asserts that Serrano told the defense team that it was only because the police had threatened her -- that, if she did not say that defendant's brother implicated defendant in the stabbing, then they would have her child removed from her custody -- that she reported falsely to the police and the prosecutor that defendant's brother told her that defendant stabbed the victim.  Defendant further asserts that after the defense interviewed Serrano, defense counsel asked the investigator to locate Serrano's boyfriend Rudy Cordova.  Prior to trial, Cordova reported to the police, and gave a sworn

7

audiotaped statement to an assistant district attorney, that he had observed the barroom brawl, that he had not seen a knife in defendant's hands, and that defendant's brother later informed him that defendant had stabbed the victim. According to defense counsel, the investigator located Cordova, who told the investigator that the police had pressured him to say falsely that defendant's brother had implicated defendant in the stabbing.

First, the assertion that the police coerced defendant's cousin Serrano and her boyfriend Cordova to say that defendant's brother told them that defendant stabbed the victim is absurd. Surely, if the police had wanted to coerce Serrano and Cordova to implicate defendant, then they would have pressured Serrano and Cordova to say either that they personally witnessed defendant stab the victim or that that defendant himself confessed to them that he stabbed the victim. Indeed, coercing Serrano and Cordova to say that defendant's brother told them that defendant stabbed the victim would have been essentially valueless, because what defendant's brother told Serrano and Cordova would have been inadmissible at trial -- in that what Serrano and Cordova heard from defendant's brother was mere hearsay. Accordingly, if the defense -- in order to buttress defendant's testimony that the police coerced him to give an implicating statement -- would have called Serrano and Cordova

to testify at trial that the police pressured them to implicate defendant, then Serrano's and Cordova's testimony undoubtedly would have been discredited. Moreover, defendant's trial testimony that the police coerced him to give an incriminating statement was itself incredible on its face for two different reasons: first, a review of the video shows that defendant's demeanor was not one that reflected coercion, and second, if the police had intended to coerce an incriminating statement from defendant, then presumably they would not have been satisfied with defendant's statement that he was unaware whether he had stabbed anyone.

Second, as the prosecutor pointed out in response to defendant's motion to set aside the verdict, Serrano was defendant's cousin and Cordova was Serrano's boyfriend and father of her child, and therefore those witnesses presumably were always available to the defense.

Third, as this Court has already held in denying defendant's motion to set aside the verdict, because neither Serrano nor Cordova testified at trial, their recantations of their pretrial statements could not have influenced the outcome of the trial. Moreover, neither Serrano nor Cordova had anything material to offer at trial as defense witnesses. Both Serrano and Cordova gave sworn pretrial audiotaped statements that they had observed the barroom brawl and that defendant's

9

brother had told them that defendant stabbed the victim. Because their pretrial statements were not elicited at trial, calling Serrano and Cordova as trial witnesses to recant their pretrial statements could not have aided the defense.

Fourth, as this Court has already held, Serrano's and Cordova's trial testimony recanting their pretrial statements would have been subject to significant impeachment, given that their pretrial audiotaped statements had been made under oath.

Fifth, as this Court has already held, regardless of whether Serrano and Cordova recanted their prior sworn statements, the fact remains that they made those statements. Accordingly, the prosecutor had a good-faith basis for asking defendant's brother at trial whether he told Serrano that defendant stabbed the victim. Moreover, because at trial defendant's brother denied telling that to Serrano, and because no other evidence in that regard was elicited at trial, there was no evidence presented at trial that defendant's brother had implicated defendant to Serrano. Therefore, even if the prosecution would have disclosed Serrano's recantation earlier, and thereby have permitted the investigator to have been able to perform his investigation earlier, the defense still would have had no reason to call Serrano or Cordova to rebut an allegation that was not in evidence.

10

POINT III

DEFENDANT'S CLAIM OF ACTUAL INNOCENCE IS MERITLESS.

Defendant asserts that he is actually innocent, but he has not provided any evidence to support that assertion. Accordingly, defendant's motion should be denied without a hearing.

Although the question whether the incarceration of an actually innocent person violates the Due Process Clause of the federal constitution has not been answered, see McQuiggin v. Perkins, 133 S. Ct. 1924, 1931 (2013) (citing Herrera v. Collins, 506 U.S. 390, 404-05 [1993]), the Appellate Division, Second Department, has held that the incarceration or the punishing of a person for a crime that he or she did not commit violates both the Due Process and the Cruel and Unusual Punishments Clauses of the New York State Constitution. People v. Hamilton, 115 A.D.3d 12, 26 (2d Dep't 2014); see N.Y. Const., art I, §§ 5-6. Consequently, "a freestanding claim of actual innocence may be addressed pursuant to CPL 440.10(1)(h), which provides for vacating a judgment which was obtained in violation of an accused's constitutional rights." Hamilton, 115 A.D.3d at 26.

The term "'actual innocence' means factual innocence, not mere legal sufficiency of evidence of guilt." People v. Hamilton, 979 N.Y.S.2d 97, 105 (2d Dep't 2014). Actual innocence "must be based upon reliable evidence which was not presented at the trial." Id. When a defendant has been convicted at trial, he or

11

she "no longer enjoys the presumption of innocence, and in fact is presumed to be guilty." Id. at 108. Accordingly, the standard a defendant must meet to show that he or she is actually innocent is clear and convincing evidence. Id.

"A prima facie showing of actual innocence is made out when there is a sufficient showing of possible merit to warrant a fuller exploration by the court." Id. (internal quotations and citations omitted). If a prima facie showing is made, then a hearing should be held where "all reliable evidence, including evidence not admissible at trial based upon a procedural bar . . . should be admitted." Id. at 109.

Here, defendant fails to submit any evidence in support of his assertion of actual innocence. Additionally, even without defendant's pretrial statements, the evidence of defendant's guilt, which included the testimony of several eyewitnesses, was overwhelming. Moreover, none of the eyewitnesses who testified at trial recanted his testimony. Cf. Hamilton, 979 N.Y.S.2d at 108-09 (prima facie case of actual innocence established because, in part, the sole inculpatory witness at trial recanted).

\*   \*   \*

In any event, although, for the reasons stated above, this Court may deny defendant's motion without conducting a hearing, this Court may not grant defendant's motion without conducting a

12

hearing, because the People dispute defendant's allegations of fact.  See C.P.L. § 440.30(5).

CONCLUSION

FOR   THE   REASONS   STATED   ABOVE,   DEFENDANT'S   MOTION
SHOULD BE DENIED WITHOUT A HEARING.


Respectfully submitted,

KENNETH P. THOMPSON
District Attorney
Kings County


LEONARD JOBLOVE
SOLOMON NEUBORT
Assistant District Attorneys
      of Counsel

14

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK )
COUNTY OF DUTCHESS ) ss.:

I, Enrique Rivera, being duly sworn depose and says:

1. That on August 15, 2014, I did in fact place the designated copies of the attached application for reply motion in response to response answer to defendant CPL §440.10 in the mailbox at Green Haven Correctional Facility to be duly carried to the following parties:

Original

Clerk of the Court
Supreme Court, Kings County
320 Jay Street
Criminal Term Part 35
Brooklyn, NY 11201

Copy

Kenneth P. Thompson
Kings County District Attorney
350 Jay Street
Brooklyn, N.Y 11201

Very Truly Yours

Enrique Rivera

Sworn to before me this
15th day of August, 2014

Notary Public

JENNIFER L HOTALING
NOTARY PUBLIC STATE OF NEW YORK
COLUMBIA COUNTY #01HO6223283
COMM. EXP.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMNAL TERM PART 35
----------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

                Respondent,        MEMORANDUM OF LAW

      -against-             Kings County
                                 Ind. No. 1453/2005

ENRIQUE RIVERA,

                Defendant.
----------------------------------------X
STATE OF NEW YORK  )
COUNTY OF DUTCHESS )  ss.:

## REPLY AFFIDAVIT IN RESPONSE TO
## DEFENDANT'S C.P.L. §440.10

### INTRODUCTION

    ENRIQUE RIVERA, being duly sworn, and hereby states the following is true and correct:

    1. I affirm under the penalty of perjury that I am the above named defendant in the instant cause of action, and as such, familiar with the fact relative to the matter before this Court.

    2. All information attested to or alleged herewith is specifically based upon defendant's own knowledge, the trial records, and other files directly related to the instant cause of action.

    3. This is a "Reply" motion in response to respondent's Answer to defendant CPL §440.10, to vacate the judgment of conviction on the grounds that: (a) his pretrial statements were coerced; (b) he was denied a fair trial by the prosecutor who informed the defense counsel that defendant's cousin Jahaira Serrano had recanted her pretrial sworn statement to the police,

-1-

in which she had stated that she had observed the barroom brawl and that defendant's brother had informed her after the brawl that defendant had confessed to stabbing the victim (See Resp pg-3 ¶10); and he is actually innocent. Respondent's contention in their answers are not on point - this again is not something than can be determined without an evidentiary hearing. See People v. Hill, 114 AD3d 1169 (4th Dept 2014). The argument made in the People's affirmation in opposition to motion to vacate judgment on conviction is without merit.

## ARGUMENT

### POINT I

#### RIVERA COULD NOT DEVELOP HIS PRETRIAL
#### STATEMENTS CLAIM ON DIRECT APPEAL

4. Because defendant has raised new claims of error in his motion, which involve off-the-record facts and therefore could not have been raised on direct appeal, his claims are not procedurally barred by C.P.L. §440.10(2)(c), it may not have before it all the information relevant to determining whether Rivera confessed to the police orally, in writing, and on videotape, that he had swung a knife in the victim's presence were obtained in violation of Miranda right: were involuntarily made in the traditional due process sense and in contravention of C.P.L:. §60.45.

5. The application of doctrine of res ipsa loquiter in People v. Zeh, 2014 WL 1237456 (N.Y. 2014), held that, lawyers sought to suppress defendant's 26 hours interrogation or evidence

-2-

derived from the search and the lower court erred not granting an evidentiary hearing based on the facts set forth identified in the Appellate Division's first brief (Id). Since defense counsel was not ineffective in failing to bring it to the court's attention during the Huntley hearing, this Court should grant a hearing so that these issues can now be resolved.

6. At any time of a criminal judgment, the defendant may move to vacate that judgment on various grounds as listed in Section §440.10(1)(f) provides a vehicle by which a defendant must bring matters dehors the record to the attention of a court and thereby seek reversal of the judgment, it is difficult for an incarcerated defendant to conduct any kind of investigation that might reveal the type of misconduct or improperly (such as police coerced statements through the use of deception techniques to obtain confession) that would provide the basis for a §440 motion. It is equally clear that, had this issues been introduced at the Huntley hearing and credited by the hearing court, it would have resulted in being suppressed.

7. The record is completely devoid of any reference to the fact that defense counsel did not specifically allege during that hearing that a detective in this case deliberately employed oppressive tactics mean to overcome Rivera's will to reist and force him to confess. See People v. Thomas, 22 NY3d 629 (N.Y. 2014). If the evidence obtained by coercion is sound and the defendant would have been indicted, found guilty, and sentenced without it (though in fact he was innocent), the only victim of

-3-

government misconduct is the witness who was coerced. Under these
circumstances, Rivera's statements were not the product of a free
and unconstrained choice; they were made as direct result of the
treatment police subjected him to, and were obtained in violation
of due process.

8. Following the statutory construction which is aimed to
prevent the prosecution for knowingly misrepresent the facts, and
as demonstrated herein, there is verified critical evidence the
proffered testimony went uncorrected, and a degree of certainly
the prosecution knew was false satisfies the requirement of
C.P.L. §440.10(1)(b), and when protection dissipated by virtue of
the prosecution's failure to conform to the reasonable standard
of competence, another protection erects by C.P.L. §440.10(1)(h),
under federal and state constitutional due process provision, and
neglected by trial counsel's ineptitude. See People v. Payton,
110 AD3d 786 (2d Dept 2012)("the doctrine of the law of the case
"applies to determination which were necessarily resolved on the
merits in a prior order").

9. Accordingly, because one of the branches of his claim
involves matters not appearing on the record, the C.P.L. §440.10
proceeding is the appropriate forum for raising all branches.

-4-

\*     \*     \*     \*

No Procedural Bar Prevents This

Court From Granting  Relief For

Pretrial Statement Were Coerced

10 . The A.D.A argue (at mem of law, pg-1-2) that Rivera's claim is procedural barred, citing C.P.L. §440.10(2)(c). Yet, the A.D.A largely ignores Rivera's argument for why, even if the provision applies, the Court should exercise its discretion to nevertheless adjudicate his claims. Under §440.10(3) and §440.10(3)(b), this Court may adjudicate Rivera's claim for "good cause show" and in the "interest of justice." In People v. Zeh, 2014 WL 1237456 (N.Y. 2014), it cannot be said that there is no reasonable possibility that defendant's allegations are true - a 440 judge is not statutorily authorized to deny a C.P.L. §440. motion without a hearing to bring about the resolution by pretrial counsel's inactions that otherwise warrant vacatur of the conviction. C.P.L. §440.10(3)(a).

11. Adjudication is warranted here because Rivera's claims strike at the heart of the public's faith on the criminal system. Rivera is the victim of outright perjury by the lead investigator and the interrogator who forced his false confession. Because of cousin Jahaira Serrano who did not testify at trial had recanted, Rivera's counsel was unable to elicit for the jury Serrano told him that she had not observed the barroom brawl and that, it was only because the police had threatened to have her child removed from her custody if she did not say that Rivera's brother implicated Rivera in the stabbing, after the verdict had already been reached.

-5-

12. The Court of Appeals in People v. Zeh, 2014 WL 1237456 (N.Y. 2014); People v. Thomas, 2014 WL 641516 (N.Y. 2014); People v. Aveni, 2014 N.Y. LEXIS 207 (N.Y. 2014); clarified the distinctions among "coerced testimony," "fabricated testimony" and "false testimony." "Coerced testimony is testimony that a witness is forced by improper means to give; the testimony may be true or false' Fabricated testimony is testimony that is made up, it is invariably false," and "[f]alse testimony is the equivalent" of fabricated testimony, "it is testimony known to be untrue by the witness and whoever cajoled or coerced the witness to give it."

13. Indeed, experiments demonstrate that innocent people under certain forms of stress, including aggresive accusatory questioning, confess to things they did not do. To explain this phemomenon of false confessions is genuine [and] has moved from the realm of startling hypothesis into that of common knowledge, if not conventional wisdom. In People v. Bedessie, 19 NY3d 147 (2012) the Court of Appeals recently held that testimony of experts in disciplines like psychiatry, psychology and other social sciences may be admitted in evidence to test claims of false confession.

14. Given this new precedent, defendant, here, has demonstrated that there has been a change in the law that would change the prior determination regarding his pretrial Huntley hearing was conducted, after which defendant motion to suppress evidence was denied.

-6-

## POINT II

CONTRARY TO THE RESPONDENT ALLEGATIONS,
THE PEOPLE'S VIOLATED RIVERA'S FEDERAL
AND STATE BRADY, MATERIAL IS NOT
PROCEDURALLY BARRE

1. Procedural Due Process

15. Under Article 1, Section 6 of the New York State Constitution, "No person shall be deprived of life, liberty or property without due process of law." "(N)or shall any state deprive any person of life, liberty, or property without due process of law." (US Const., 14th Amendment). Defendant submits that the record speaks for itself on this issue: the prosecution failed to inform the defense that Jahaira Serrano had recanted her pretrial sworn statement to the police - it is based on matters that are not on the record and could only be developed through a new evidentiary hearing is necessary to promote justice inasmuch as the issues raised are sufficiently unusual and subject searching investigation.

16. The ADA to dispute the bulk of Rivera's arguments supporting these claim. First, did not dispute that the Second Department has instructed that "Brady suppression occurs when the government fails to turn over evidence that is known only to police investigators and not to be the prosecutor." Even if cases did not reveal an actually innocent person being wrongfully convicted, they nevertheless often reveal troubling due process violations that may result in a defendant being denied a fair trial. People v. Hubbard, 01617-2010, ___ AD3d ___ (2d Dept

-7-

2014)(The Court reversed a murder conviction after finding the defense was never told that a "pivotal" prosecution witness - a police detective who took an incrimating statement from the teenaged defendant - was accused of securing a false confession in an unrelated case). [See Exhibit A].

17. Second, the ADA does not contest that Rivera has demonstrated prejudice under Brady. That, the ADA does deny that the police coerced Serrano and Cordova to state that defendant brother told that defendant stabbed the victim. It has been held that the failure to give the defense exculpatory evidence, which the prosecutor had for several months, until the eve of trial was inexcusable. People v. Baba-Ali, 179 AD2d at 729-30.

18. Third, the significant weaknesses in the prosecution's evidence, and given that the jury's verdict was already close, the revelation of defendant's brother's unabashed perjury quite likely would have tipped the verdict in favor of acquittal. Cf. Napue v. Illinois, 360 US 264, 269 (1959)("The jury's estimate of the truthfulness and reliability of a given witness may well be determined of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.") have long established "that a government lawyer's fabricating evidence against a criminal defendant [violates] due process." Thus, Rivera has demonstrate a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles, 514 US at 433 (internal quotations and citation omitted).

-8-

## POINT III

DEFENDANT'S CLAIM OF ACTUAL INNOCENCE HAS MERIT

20. It is clear that a hearing should be ordered, under the serious nature of his claim, and the lack of any response by trial counsel, the allegation should not have been summary dismissed - rather, they should at the very least have been addressed at a hearing. The right circumstances must include, pertinent part, nonrecord facts that are material and, if established, could entitled defendant to the request relied. In People v. Hamilton, 115 AD3d 12 (2d Dept 2014), the Court held that a freestanding claim of actual innocence cannot actively bar inflicting cruel and unusual punishment, and while the Hamilton court did not limit its application only to actual innocence claim inasmuch to catalog the standing into several different concept this Court is free to order additional briefing in this matter in whether the Hamilton case runs counter to New York State Constitution. The Second Department's recent decision in People v. Jones, 115 AD3d 984 (2d Dept 2014) was of a similar character to the evidence warrating a hearing in Hamilton.

21. With respect to his argument, defendant contends that the police coerced defendant's cousin Serrano and her boyfriend Cordova to say that defendant's brother told them that defendant stabbed the victim. Here, the record often requires supplemental via live testimony, Hamilton, at 109 held that, "at the hearing the defendant should also be afforded an opportunity to prove, by a prepoderence of the evidence (citing CPL §440.60[6]). Defendant

-9-

urges this Court to reopen his prior CPL §330.30, to set aside the verdict.

22. In 2014, as a matter of first impression in the Second Department, "the Court concluded that at the hearing all reliable evidence, including evidence not admissible at trial based upon a procedural bar." In Hamilton opinion is important because it erodes the presumption of guilt that drives the actual innocence standard and replaces it with a wrokable standard to review claim of wrongful conviction. And opens the way to an avenue of relief when no judicial remedies are available for the wrongful conviction.

## CONCLUSION

WHEREFORE, the foregoing reasons and those outlined in defendant's C.P.L. §440.10 motion the required should be granted, at the very least an evidentiary hearing. C.P.L. §440.30(5).

*Enrique Rivera*

Respectfully submitted,

*Enrique Rivera*

Enrique Rivera
Green Havne Corr. Fac.
P.O. Box 4000
Stormville, NY 12582-4000

Sworn to before me this

15th day of August, 2014

*Jennifer L Hotaling*

Notary Public

JENNIFER L HOTALING
NOTARY PUBLIC STATE OF NEW YORK
COLUMBIA COUNTY LIC #01HO6223
COMM. EXP.

-10-

JENNIFER L HOTALING
NOTARY PUBLIC STATE OF NEW YORK
COLUMBIA COUNTY LIC #01HO6223263
COMM. EXP.

EXHIBIT A

# Prosecution's Brady Failure Leads to Reversed Murder Conviction

**BY JOEL STASHENKO**

A JUDGE reversed a murder conviction after finding the defense was never told that a "pivotal" prosecution witness—a police detective who took an incriminating statement from the teenaged defendant—was accused of securing a false confession in an unrelated case.

The allegations against Suffolk County Police Det. Ronald Tavares constituted *Brady* material that could have "materially influ-



**Justice Efman**

enced" jurors at Gabriel Hubbard's 2012 trial for a gang-related slaying, Supreme Court Justice Martin Efman ruled.

"Without it, the jury was deprived of its right to fairly assess the credibility of an important witness, consider the contents of defendant's statements and the circumstances under which they were rendered and arrive at an independent conclusion," Efman wrote in *People v. Hubbard*, 01617-2010.

Had the jury known of the accusations, there is a "reasonable probability" that it may not have found Hubbard guilty of second-degree murder in the shooting death of Jaquan Jones in Wyandanch, wrote Efman, who also presided over the trial.

Hubbard, who was 15 at the time of the July 5, 2008 killing, was sentenced to a 15-years-to-life sentence as a juvenile offender.

Efman, ruling from Riverhead, set aside the guilty verdict and ordered a new trial.

The Suffolk County District Attorney's Office said they would retry Hubbard, now Nov. 21.

Hubbard allegedly made criminal admissions about Jones' death to Tavares on April 26, 2010, in North Carolina, where Long Island authorities said Hub- *» Page 2*

**Online**

✈ The Suffolk Supreme Court decision is posted at nylj.com.

# Brady

*« Continued from page 1*

bard had fled after the shooting. The statement was witnessed by another Suffolk County detective, Charles Leser.

Efman, ruling on Hubbard's CPL §440.10 motion, noted that in the run-up to the subsequent murder trial, prosecutors answered a "demand to produce" from the defense that specifically had asked for "any evidence which tends to impeach any prospective prosecution witness" or any information indicating a prosecution witness had made "false or misleading reports of criminal or otherwise improper conduct."

Between the time of the 2010 demand to produce and the 2011 *Huntley* decision, Tavares became involved in another case where an off-duty county police officer shot cab driver Thomas Moroughan in February 2011.

Investigating the case on behalf of Nassau County authorities, Tavares took a confession from the shooting victim, who was charged with assault and reckless endangerment. The charges against Moroughan were ultimately dropped.

In May 2011, Moroughan filed a notice of claim against the Nassau and Suffolk County police departments, claiming that they took a false confession from him. In July 2011, he testified at a hearing that Tavares and Leser had taken the false statement.

Also, on Feb. 3, 2012—prior to the start of Hubbard's murder trial—Moroughan filed a civil suit in the Eastern District accusing Tavares and Leser of creating the false statement.

"At no time during the pendency of the Hubbard case did the prosecution disclose information to the defense relating to the involvement of Det. Tavares and Det. Leser in the Moroughan case," Efman wrote.

During closing arguments, Assistant District Attorney Raphael Pearl underscored the importance to the prosecution of Hubbard's statement and of Tavares' veracity, Efman said.

"A 27-year career, did you hear one question posed to him about how he's ever been accused of wrongdoing, an IAB [Internal Affairs Bureau] investigation, sued by a defendant for violating their right?" Efman's ruling said, quoting Pearl from the trial transcript. "If it existed, don't you think you would have heard it at this trial?"

Efman noted that the focus of jurors' deliberations was clearly on Hubbard's statement. The judge said nine of the 14 notes sent by the jury during its three days of deliberations requested legal or evidentiary information. Of the nine, eight were about the written statement, he said.

Hubbard's attorney on appeal, Louis Mazzola of the Suffolk County Legal Aid Society, said he discovered what Efman determined to be a *Brady* violation by accident.

Finding that the same assistant district attorney worked on both the Moroughan and Hubbard cases, Mazzola said he found on Newsday's website links to documents in the internal affairs investigations of the Moroughan case that referred to the allegations against Tavares and Leser for allegedly falsifying Moroughan's confession.

Mazzola said those documents, in turn, led him to see that Tavares was accused of wrongdoing in the Nassau County case at the same time prosecutors in Suffolk County were saying they knew of no such allegations against Tavares or any of their other witnesses.

Prosecutors denied knowing about complaints of Tavares' role in the Moroughan case.

"I think that this was the right decision to make, and frankly, I am happy to have found the judge with the courage to make that decision," Mazzola said in an interview Wednesday. "It is not always easy for judges to do it."

Assistant Suffolk County District Attorney Michael Miller represented the prosecution on the 440.10 motion.

A spokesman for the district attorney's office, Robert Clifford, said Hubbard will be retried.

@ Joel Stashenko can be reached at jstashenko@alm.com. Twitter: @JoelStashenko

MEMORANDUM

SUPREME COURT : KINGS COUNTY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

PEOPLE OF THE STATE OF NEW YORK,

vs

ENRIQUE RIVERA,

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

CRIMINAL TERM, PART 35

By: MARRUS, J.

Dated: September 4, 2014

Indictment No. 1453/05

DECISION and ORDER

By pro se motion dated June 11, 2014, the defendant has moved for an order pursuant to CPL 440.10(1)(b) (d) (f) (h), vacating his judgment of conviction. By answer dated July 29, 2014, the District Attorney opposes the application. The defendant submitted a reply dated August 15, 2014.

The defendant contends that his pretrial statements were coerced and that he was denied a fair trial because there was a delayed disclosure of Brady material which prejudiced his defense. Both of these claims, however, are procedurally barred because there were sufficient facts in the record to provide for appellate review of them and the defendant has offered no justification for his failure to raise them on his recently concluded judgment appeal. CPL 440.10 (2)( c). Indeed the defendant had a chance to litigate any alleged coercion of his pretrial statements at his Huntley hearing, but never raised such a claim, and already has litigated his claim of delayed disclosure of Brady material in a motion to set aside the verdict. This court previously rejected his claims of involuntariness regarding the statements and prejudice as to delayed disclosure of Brady material as meritless.

Finally defendant has offered no evidence in support of his claim that he is actually innocent. Absent any facts in support of the claim, a hearing on this issue

is pointless.

The defendant's motion is therefore denied.

_____
J. S. C.

ENTERED

SEP 04 2014

NANCY T. SUNSHINE
COUNTY CLERK

2

*appeals*

Mr. Enrique Rivera-09-A-3190
Green Haven Corr. Fac.
P.O. Box 4000
Stormville, NY 12582

Dated: December 1, 2014

Hon. Aprilanne Agostino
Clerk of the Court
App. Div. 2nd Dept
45 Monroe Plaza
Brooklyn, NY 11201

Re: People v. Rivera,
    Kings County
    Ind. No. 1453/05
    A.D. No. 2014-09557

**RECEIVED**

2014 DEC -8  A 10: 26

KINGS COUNTY D.A. OFFICE
APPEALS BUREAU

Dear Hon. Agostino:

This letter in in regard to the above reference matter; to
amend this case was in the same posture as <u>People v. Grubstein</u>,
No. 193, ___ NY3d ___ (Nov. 18, 2014) that a due process calls
boldness in challenging long held assumption and putting the
brakes on significant development in Honorable Judge Marrus
invocation of procedural bars under C.P.L. §440.10(2)(c).
[Decision at 1].

In his papers filed in support of his motion to vacate the
judgment of conviction, appellant claims that (i) his pretrial
statements were coerced, (ii) he was denied a fair trial by the
People's allegedly delayed disclosure that a witness who did not
testify at trial had recanted, and (iii) he is actually
innocence.

Judge Marrus's stated that the appellant's claim - that his
pretrial statements were coerced and that denied a fair trial
because there was a delayed disclosure of <u>Brady</u> material which
prejudiced his defense is procedurally bars under CPL
§44010(2)(c). (Decision at 1).

First, appellant contends that his pretrial statements
should be suppressed on the ground that they were not voluntarily
made. Cf. <u>People v. Thomas</u>, 22 NY3d 629, 641-642 (2014), the
Court of Appeals held that "the choice to speak where speech may
incriminate is constitutionally that of the individual, not the
government, and the government may not effectively eliminate it
by any coercive device," Chief Judge Jonathan Lippman wrote for
the court. "What transpired during defendant's interrogation was
not consonant with and, indeed, completely undermined,
defendant's right not to incriminate himself - to remain silent,"
The ruling overturns the Appellate Division, Third Department,
which had unanimously affirmed Thomas' conviction.

-1-

Second, appellant's claim - that he was denied a fair trial by the People's allegedly delayed disclosure of purported Brady obligation because they constituted impeached evidence. See People v. Wagstaffe, 992 NYS2d 340 (2d Dept 2014). The prosecution would have disclosed Ms. Serrano's recantation, Ms. Serrano told the defense team that it was only because the police had threatened her - that, if she did not say that defendant's brother implicated defendant in the stabbing, then they would have her child removed from her custody - that she reported falsely to the police and the prosecutor that defendant's brother told her that defendant stabbed the victim.

Appellant further asserts that after the defense interviewed Serrano, defense counsel asked the investigator to locate Serrano's boyfriend Rudy Cordova. Prior to trial, Cordova reported to the police, and gave a sworn audiotaped statement to an assistant district attorney, that he had observed the barroom brawl, that he had not seen a knife in defendant's hands, and that defendant's brother later informed him that defendant has stabbed the victim. According to defense counsel, the investigator located Cordova, who told the investigator that the police had pressured him to say falsely that defendant's brother had implicated defendant in the stabbing.

Defendant's case is a good illustration of, Grubstein the Court of Appeals went to detail the standard by which such a claim should be adjudicated on the merit. Mr. Rivera's, is not a skilled attorneys, and is not responsible for his previous attorney inaction, and therefore should not be penalized procedurally for his own ignorance of the law, under CPL §440.10(2)(c).

Thank you for your time and consideration in this matter. Please feel free to contact me at your earliest convenience.

Very Truly Yours,

*Enrique Rivera*

Enrique Rivera

cc: (1) Kings County District Attorney
    file

- 2 -

**Supreme Court of the State of New York**
**Appellate Division : Second Judicial Department**

RECEIVED

2015 FEB 19 A 8M 27271
jr/

KINGS COUNTY D.A. OFFICE.
APPEALS BUREAU

N. E. 2/19/15

L. PRISCILLA HALL, J.

2014-09557

DECISION & ORDER ON APPLICATION

The People, etc., plaintiff,
v Enrique Rivera, defendant.

(Ind. No. 1453/05)

       Application by the defendant, pursuant to CPL 450.15 and 460.15 for a certificate granting leave to appeal to this Court from an order of the Supreme Court, Kings County, dated September 4, 2014, which has been referred to me for determination.

       Upon the papers filed in support of the application and the papers filed in opposition thereto, it is

       ORDERED that the application is denied.

       L. PRISCILLA HALL
       Associate Justice

February 17, 2015

PEOPLE v RIVERA, ENRIQUE

# Supreme Court of the State of New York
## Appellate Division : Second Judicial Department

M187271

jr/

L. PRISCILLA HALL, J.

2014-09557

DECISION & ORDER ON APPLICATION

The People, etc., plaintiff,

v Enrique Rivera, defendant.

(Ind. No. 1453/05)

Application by the defendant, pursuant to CPL 450.15 and 460.15 for a certificate granting leave to appeal to this Court from an order of the Supreme Court, Kings County, dated September 4, 2014, which has been referred to me for determination.

Upon the papers filed in support of the application and the papers filed in opposition thereto, it is

ORDERED that the application is denied.

RECEIVED
2015 FEB 20  P 4: 57
KINGS COUNTY D.A. OFFICE
APPEALS BUREAU

L. PRISCILLA HALL
Associate Justice

February **17**, 2015

PEOPLE v RIVERA, ENRIQUE

*APPEALS.*

Mr. Enrique Rivera-09-A-3190
Green Haven C.F.
P.O. Box 4000
Stormville, NY 12582

KINGS COUNTY
DISTRICT ATTORNEY
CLERKS OFFICE

Dated: March, 3, 2015
2015 MAR -9 P 4: 13

Honorable Jonathan Lippman
Chief Judge
New York Court Appeals
20 Eagle Street
Albany, NY 12207

Re: People v. Enrique Rivera
    Kings County
    Ind. No. 1453/05
    A.D. No. 2014-09557

Dear Hon. Lippman:

Appellant Enrique Rivera, appearing herein pro-se, seek permission to appeal a decision entered in the aforementioned case, dated February 17, 2015, denying the Appellant permission to appeal to the Appellate Division (Hon. L. Priscilla Hall, J), from an order of Kings County dated September 4, 2014 which denied the motion, without a hearing. This Certificate is sought under the provisions of CPL §460.20[2] and [3][b]; §450.90[1].

Appellant states that this case presents a question of law and procedure that warrants relief based on the following facts:

Appellant was convicted in Kings County Court for Manslaughter in the First Degree (P.L. §125.25[1]) and was subsequently sentenced to a term of 25 years and a period of post-release supervision of 5 years (Marrus, J., at trial and sentence).

An appeal was taken in regards to the aforementioned and on November 27, 2012, the Appellate Division affirmed the judgment of conviction. People v. Rivera, 100 AD3d 658 (2d Dep't 2012).

On March 1, 2013, Associate Judge Victoria A. Graffeo of this Court granted defendant's application for leave to appeal to this Court from the order of the Appellate Division. People v. Rivera, 20 NY3d 1103 (2013).

By decision and order dated April 8, 2014, this Court affirmed the judgment of conviction. People v. Rivera, 2014 N.Y. Slip Op. 2374 (April 8, 2014).

-1-

·In or about June 11, 2014 Appellant filed a Motion to Vacate
· under provision of CPL §440.10[1][b]-[f]-[h] on the ground(s)
that: (i) his pretrial statements were coerced, (ii) he was
denied fair trial by the People's alleged delayed disclosure that
a witness who did not testify at trial had recanted, and (iii) he
is actually innocent.

Justice Marrus denied the motion, without a hearing, in part,
on a finding that: both the claims, were procedurally barred
because there were sufficient facts in the record to provide
appellate review of them, and because the defendant has offered
no justification for his failure to raise them on his recently
concluded judgment appeal. Justice Marrus are set forth in CPL
§440.10[2][c], which require that a motion be denied when the
time to appeal is over and the defendant could have but
unjustifiably did not raise the issue advanced in the motion on
appeal, and CPL §440.10[3][a], which permits denial of a motion
where facts in support thereof could with due diligence have been
made to appear on the record but the defendant unjustifiably
failed to adduce them, i.e., failed to preserve the issue. The
purpose of these procedural bars is to prevent a pro-se defendant
from substituting a §440.10 motion for a direct appeal by raising
issues ascertainable from the trial record. [See: People v. Cooks
, 67 NY2d 100, 103 [1986]).

## PROCEDURAL BARS

Because defendant has raised new claim[s] of error in his
motion, which involve off the record facts and therefore could
not have been raised on direct appeal, his claim[s] are not
procedurally barred by CPL §440.10[2][c]. This Court have not
hesitated to remit for a hearing when plausible allegations are
inadequately refute. Here, even under the best of circumstances,
Mr. Rivera, by reasons of his incarceration and non-lawyer
background, places him at disadvantage. (See: Tervino v. Thaler,
133 S.Ct. 1911 [2013]; Mattinez v. Ryan, 132 S.Ct. 1309 [2012]).
At the very least, the lower court is require to conduct an
evidentiary hearing, On Mr. Rivera's motion in all respects.

Any practitioner of criminal law who frequently indulges in
post-conviction motion practice knows the value of Criminal
Procedure Law §440.10. That section is entitled <Motion to Vacate
Judgment>, and it wields enormous power because of its
versatility. Indeed, a motion pursuant to CPL §440.10 can
challenge a conviction on any of eight enumerated grounds. The
first seven are issue-specific (CPL §440.10[1][a-g]), but the
last ground is so broad that it covers almost any issues (CPL
§440.10[1][h]).

Despite the popularity and versatility of a motion pursuant
to CPL §440.10, obtaining adequate review of the issues raised is
not as easy as it might, at first, seem. Not only are there
numerous grounds for relief under CPL §440.10, but also there are
numerous procedural bars just waiting to be implemented. In fact,

prosecutors frequently, if not always, raise one or more of those procedural bars in an effort to thwart any hopes of the issues' review on the merits. This is a wise practice on their part, since it can end the litigation rather quickly.

Under CPL §440.10[2] and [3], there are seven procedural grounds for either mandatory and discretionay denial of the motion. Since the focus of this argument is the term <unjustifiable failure,> only the procedural bars under CPL §440.10[2][c] are mentioned. [Decision at 1].

A review of this section reveals that the term "unjustifiable failure" appears three times. Despite the blatant existence of this term, many criminal defense attorneys, prosecutors, and judges seem oblivious to its presence. The inclusion of the term "unjustifiable failure" in this section clearly indicates that a defendant's motion should not be denied on procedural grounds if the attorney can show that the failure to have taken some statutorily-specified action was "justifiable."

When a prosecutor raises the procedural bar CPL §440.10[2][c] in opposition to a motion to Vacate judgment [Respondent Mem of Law at 1 and 5], defense attorneys' usually do not file a reply to counter those assertions. This leaves the outcome of the motion to the court without any further attempt at persuasion of clarification. Ignoring the term "unjustifiable failure" is a recipe for <disaster>. That term is a valuable weapon in the arsenal of any pro-se defendant seeking to vacate a judgment via CPL §440.10[1][b][f][h]. If a practitioner is to successfully litigate in CPL §440.10 proceedings, it is imperative that he or she learn the procedural bars that exist and how to circumvent then when raised, even if only to set the stage for future appellate review in state or federal courts. (See: People v. Jones, 2014 WL 7069803 (Dec. 16, 2014), this Court reversed part of its decision in People v. Crimmins (38 NY2d 407), holding simply that it has the power to review lower court decisions denying CPL §440.10 motions based on newly-discovred evidence under the Court of Appeals' abuse of discretion standard); Wilson v. Mazzuca, 570 F.3d 490 (2d Cir. 2009)(highly deferential standard of review applies to state court claims adjudicated on the merits, even if federal habeas corpus conducts its own evidentiary hearing).

Surprisingly, not much attention has been given to the term "unjustifiable failure." The Court of Appeals & Appellate Courts have made passing references to "unjustifiable failures," but they have never interpreted the term. See e.g., People v. Felton, 239 AD2d 120, appeal denied, 91 NY2d 872. In fact, the only reputable mention of it comes from Peter Preiser's Practice Commentary for CPL §440.10. (11-A McKinney's Consolidated Laws of New York Annotated 250 [2005]). Even there, however, the mention of the term is only fleeting. In his Practice Commentaries, professor Preiser aptly labels the term as an <escape hatch> and

provides two examples to show how a defendant's failure to take some statutorily-specified action might justify the court's circumvention of the procedural bar. The first is the ineffective assistance of counsel, and the second is where an appeal seemed to be futile due to the state of the law and the time, and subsequent retroactive changes occurred that would be applicable if the defendant's trial had occurred today.

The two examples listed in the CPL §440.10 Practice Commentaries are not comprehensive. Because there is not appellate rubric interpreting the term "unjustifiable failure," the possibilities of justification are endless. Almost any type of reason can be proffered in an effort to dislodge the prosecutor's attempt at summary denial based on <unjustifiable failure.> For example, besides arguing that prior failure to take a statutorily-specified action was the result of ineffective assistance of counsel, a post-conviction attorney can also argue that the failure to comply was due to a mental defect or physical impossibility of some sort.

Whatever the reason an attorney employs to combat the prosecutor's attempt at invoking CPL §440.10[2][c], it must be stated in a reply as soon as possible. Even if it seems that the court is unlikely to accept an attorney's reasons for justification, he or she must follow this path nonetheless. Many times, the motion pursuant to CPL §440.10 is not an end, per se, but a beginning. Post-conviction motions frequently set the foundation for future appellate litigation in the Court of Appeals. See People v. Grubstein, 2014 N.Y. Slip Op. 07924 (2014); People v. Jones, 2014 WL 7069803 (2014). If an attorney argues in a reply that a certain action was <justifiable,> an appellate court will have the opportunity to expound upon that issue[s], thus not only clarifying the matter for the immediate litigation, but also for the litigation of countless others that will inevitably follow.

A usually overlooked fact is that the pro se defendant will probably seek to have his conviction reviewed by a federal court via a petition for federal habeas corpus. If a prosecutor raises a procedural bar under CPL §440.10[2][c], and the attorney does not file a reply explaining how the pro-se defendant's prior failure to carry out some statutorily-specified action was justified, the federal court will not review the CPL §440.10 issues. This occurs because a procedural bar is an "adequate and independent state ground" that is not usually subject to federal review. See e.g., Coleman v. Thompson, 501 U.S. 722, 750 (1991)(procedural default doctrine applies to "cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule").

-4-

Since the legislature intended the procedural bar under CPL §440.10[2][c] and [3][a] to apply only where an "unjustifiable failure" to complete a statutorily-specified action occurred, an exception exists when the <failure> is <justifiable.> Because no Court of Appeals and Appellate Courts have explicitly interpreted the term <unjustifiable failure> and, therefore, have not limited its application, almost any reason implying justification in a motion pursuant to CPL §440.10 will suffice to enable federal review on procedurally defaulted issues.

Whenever a prosecutor raises a procedural bar under CPL §440.10[2][c] and [3][a], the defense attorney should take care to submit a reply that explicates that any prior failure to take a statutorily-specified action was <justifiable>. Not only will that ensure that the court is apprised of how it can still reach the merits of the issue despite the procedural objection, but also it will lay the foundation for adequate appellate review in state and federal courts. Post-conviction litigation, especially a motion pursuant to CPL §440.10, is a skill to be honed, and knowing how to navigate and overcome the procedural bars mentioned herein is integral to a successful outcome.

Here, Mr. Rivera had no access to any of the new Court of Appeals decision, People v. Thomas, 2014 N.Y. Slip Op. 01208 (2014); People v. Guilford, 21 NY3d 205 (2013); People v. Aveni, 2014 N.Y. LEXIS 207 (2014), People v. Zeh, 21 NY3d 1144 (2014); People v. Bedessie, 19 NY3d 147 (2012) presently in his §440 prior to finding the lower court (Decision at 1). Given the importance of CPL §440.10 the application presents several questions of fact and law that ought to be reviewed by this Court. Mr. Rivera, is not an skilled attorney, and should not be held responsible for his own ignorance of the law as defendant is a layman in the matters of law, and as such, seeks this court's indulgence to overlook any and all technical errors, faults and or defects herein, pursuant to CPLR §2101[f]. Every pro se defendant ought to be fully and fairly heard, for until justice is made, the trial never ends.

Pursuant to O'Sullivan v. Boerkel, 526 U.S. 838 [1999]), Mr. Rivera also expressly urges that leave to appeal be granted to review all other issues raised in his CPL §440.10 motion in all respects.

For all of the foregoing reasons Appellant should be granted a certificate to allow him to appeal the decision of the lower courts.

Oral argument of this application is not being requested.

Respectfully submitted,

*Enrique Rivera*

Mr   Enrique Rivera


cc: Mr. Kenneth P. Thompson, Esq,
    Kings County District Attorney
    350 Jay Street
    Brooklyn, NY 11201
    Enclosures:
    Appellate Division Decision and Order 2/27/2015
    Defendant Notice of Motion, Affidavit in Support pursuant CPL
    §440.10 motion
    Affirmation in Opposition by Assistant Attorney Mr. Solomon
    Beubort
    Defendant Reply

*1453/05*
*Newbort*

# State of New York
# Court of Appeals

BEFORE: HON. SHEILA ABDUS-SALAAM, Associate Judge

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

-against-

ENRIQUE RIVERA,

Appellant.

**ORDER
DISMISSING
LEAVE**

Ind. No. 1453/05

Appellant having applied for leave to appeal to this Court pursuant to Criminal Procedure

Law (CPL) § 460.20 from an order in the above-captioned case;*

UPON the papers filed and due deliberation, it is

ORDERED that the application is dismissed because the order sought to be appealed

from is not appealable under CPL 450.90 (1).

Dated:  **MAY 1 2 2015**

*Sheila Abdus-Salaam*
Associate Judge

*Description of Order:  Order of a Justice of the Appellate Division, Second Department, dated
February 17, 2015, denying leave to appeal to the Appellate Division from an order of Supreme
Court, Kings County, dated September 4, 2014.

*(to be argued by)*
LEILA HULL

*(15 minutes)*

# Court of Appeals

### STATE OF NEW YORK,

RECEIVED
KINGS COUNTY D.A. OFFICE
APPEALS BUREAU

13  MAY 29  P 3 :47

PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

*- against -*

ENRIQUE RIVERA,

*Defendant-Appellant.*

## BRIEF FOR DEFENDANT-APPELLANT

LYNN W. L. FAHEY
LEILA HULL
Attorneys for
  Defendant-Appellant
2 Rector Street, 10th Floor
New York, N.Y. 10006
(212) 693-0085

May 29, 2013

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................... iii

PRELIMINARY STATEMENT ........................................................... 1

QUESTION PRESENTED ................................................................. 2

SUMMARY OF ARGUMENT ........................................................... 2

STATEMENT OF FACTS ................................................................. 4

    Introduction ................................................................................. 4

    The Conclusion of Appellant's First Trial in a Mistrial ................ 5

    The People's Case at the Second Trial. ..................................... 6

        The Eye-Witness Accounts ................................................. 6

        Appellant's Statement to Police ......................................... 9

        The Medical Evidence. ...................................................... 10

    The Defense Case .......................................................................... 11

    The Charge Conference, Jury Charge, Deliberations, and Verdict ........... 13

    The Appellate Division Decision .................................................. 15

i

ARGUMENT .......................................................................................................... 16

> THE COURT VIOLATED APPELLANT'S DUE
> PROCESS RIGHT TO A FAIR TRIAL WHEN IT
> REFUSED TO CHARGE SECOND-DEGREE
> MANSLAUGHTER TO THE JURY AS A
> LESSER INCLUDED OFFENSE OF SECOND-
> DEGREE MURDER, ALTHOUGH THERE
> WAS A REASONABLE VIEW OF THE
> EVIDENCE THAT APPELLANT, WHO HAD
> BEEN DRINKING, RECKLESSLY KILLED
> THE DECEASED DURING A BARROOM
> BRAWL.............................................................................. 16

A. The Legal Standard for Submitting a Lesser Included Offense to
   the Jury ............................................................................................................ 17

B. The Reasonable View of the Evidence Supporting Submission of
   Second-Degree Manslaughter to Appellant's Jury ..................................... 20

CONCLUSION ...................................................................................................... 31

# TABLE OF AUTHORITIES

## CASES

*People v. Alexis*, 65 A.D3d 1160 (2d Dep't 2009) .................................................... 27

*People v. Asan*, 22 N.Y.2d 526 (1968) ................................................................ 18, 29

*People v. Barnes*, 265 A.D.2d 169 (1st Dep't 1999) ........................................... 15, 27

*People v. Brown*, 82 N.Y.2d 869 (1993) ........................................................ 29

*People v. Butler*, 84 N.Y.2d 627 (1994) .................................................3, 20, 24, 26

*People v. Butts*, 72 N.Y.2d 746 (1988) ......................................................... 29

*People v. Cabassa*, 79 N.Y.2d 722 (1992) .................................................... 31

*People v. Collins*, 290 A.D.2d 457 (2d Dep't 2002) ...................................... 27

*People v. Dabney*, 231 A.D.2d 431 (1st Dep't 1996) ................................... 27

*People v. Edwards*, 95 N.Y.2d 486 (2000) ................................................. 31

*People v. Flack*, 125 N.Y. 324 (1891) ...................................................... 2, 19

*People v. Glover*, 57 N.Y.2d 61 (1982) ................................................... 17, 18

*People v. Green*, 56 N.Y.2d 427 (1982) ........................................ 17, 18, 19, 30

*People v. Heide*, 84 N.Y.2d 943 (1994) ......................................................... 3, 25

*People v. Heide*, 206 A.D.2d 875 (4th Dep't 1994) ........................................... 25

*People v. Henderson*, 41 N.Y.2d 233 (1976) .............................................. 2, 18

*People v. Lee*, 35 N.Y.2d 826 (1974) ........................................................... 3, 24

*People v. Lopez*, 72 A.D.3d 593 (1st Dep't 2010) ..................................... 15, 27

*People v. Martin*, 59 N.Y.2d 704 (1987) .................................................. 3, 18

*People v. Murry*, 40 N.Y.2d 327 (1976) ......................................................... 22

*People v. Mussenden*, 308 N.Y. 558 (1955) .......................................... 2, 19

*People v. Negron*, 91 N.Y.2d 788 (1998) ..................................................... 18

*People v. Perry*, 19 N.Y.3d 70 (2012) ......................................................... 17

*People v. Pizarro*, 89 A.D.3d 871 (2d Dep't 2011) ..................................... 15

*People v. Porter*, 161 A.D.2d 811 (2d Dep't 1999) .................................................... 15, 27

*People v. Rodriguez*, 33 A.D.3d 730 (2d Dep't 2006) ................................................ 26

*People v. Scarborough*, 49 N.Y.2d 364 (1980) ..................................................... 2, 18, 19

*People v. Stanford*, 87 A.D.3d 1367 (4th Dep't 2011) ............................................. 27

*People v. Steele*, 26 N.Y.2d 526 (1970) ................................................................. 29

*People v. Suarez*, 6 N.Y.3d 202 (2005) ........................................................... 2, 20, 23

*People v. Sullivan*, 68 N.Y.2d 495 (1986) ......................................................... 4, 17, 26

*People v. Tai*, 39 N.Y.2d 894 (1979) ................................................................. 3, 22

*People v. Tai*, 48 A.D.2d 933 (2d Dep't 1975) .................................................... 22

*People v. Van Norstrand*, 85 N.Y.2d 131 (1995) .................................................. 18

*People v. Vega*, 68 A.D.3d 665 (1st Dep't 2009) .................................................. 27

*Policano v. Herbert*, 7 N.Y.3d 588 (2006) .......................................................... 20

*Rivera v. Firetog*, 11 N.Y.3d 501 (2008) ........................................................ 4, 5, 28

*People v. Ivisic*, 95 A.D.2d 308 (2d Dep't 1983) ................................................ 29

## CONSTITUTIONS

N.Y. Const. Art. 1, § 6 .................................................................................. 16

U.S. Const., Amend. V, XIV ....................................................................... 16

U.S. Const., Amend. XIV ............................................................................ 16

## STATUTES

C.P.L. § 300.50(1), (2) ................................................................................. 17

C.P.L. § 450.90(2)(a) ................................................................................... 1

C.P.L. § 300.50(1) ....................................................................................... 18

COURT OF APPEALS
THE STATE OF NEW YORK

---------------------------------------------------------------------------

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

-against-

ENRIQUE RIVERA,

Defendant – Appellant.

---------------------------------------------------------------------------

PRELIMINARY STATEMENT

By permission of the Honorable Victoria A. Graffeo, Judge of the Court
of Appeals, granted on March 1, 2013, appellant Enrique Rivera appeals from a
November 7, 2012, order of the Appellate Division, Second Department,
which affirmed a June 8, 2009, judgment of the Supreme Court, Kings County,
convicting him, after jury trial, of manslaughter in the first degree and
sentencing him to a determinate prison term of 25 years and 5 years of post-
release supervision.

On March 21, 2013, this Court granted appellant poor person relief and
assigned Lynn W. L. Fahey as counsel. No stay has been sought. Appellant is
incarcerated pursuant to the judgment.

The Court has jurisdiction to entertain this appeal and to review the
issue raised pursuant to C.P.L. § 450.90(2)(a). The issue is preserved by defense

1

counsel's request that the trial court submit second-degree manslaughter to the jury (A631-33).[1]

## QUESTION PRESENTED

Did the court violate appellant's due process right to a fair trial when it refused to charge second-degree manslaughter to the jury as a lesser included offense of second-degree murder, although there was a reasonable view of the evidence that appellant, who had been drinking, recklessly killed the deceased during a barroom brawl?

## SUMMARY OF ARGUMENT

The standard for submission of a lesser included offense to a jury is purposely generous, requiring only that a reasonable view of the evidence provide an identifiable basis for the jury to convict the defendant of the lesser offense, but not the greater. *See People v. Scarborough,* 49 N.Y.2d 364, 368-74 (1980); *People v. Henderson,* 41 N.Y.2d 233, 236 (1976); *People v. Mussenden,* 308 N.Y. 558 562-63 (1955). Underscoring this rule is the long-standing principle that the "question of intent can never be ruled as question of law, but must always be submitted to the jury." *People v. Flack,* 125 N.Y. 324, 334 (1891); *accord People v. Suarez,* 6 N.Y.3d 202, 212 n.6 (2005).

A rare exception exists in homicide cases when the extreme nature of the injuries forecloses any finding other than that the defendant intended to cause

---

[1]       Parenthetical numbers preceded by "A" will refer to pages of the Appendix.

the deceased's death or serious physical injury. *See People v. Butler*, 84 N.Y.2d 627, 629 (1994) (*inter alia*, 34 stab wounds, 9 potentially fatal). Accordingly, the refusal to instruct the jury on second-degree manslaughter as a lesser included offense of murder is error unless the record, viewed in the light most favorable to the defendant, *People v. Martin*, 59 N.Y.2d 704, 705 (1987), completely excludes the possibility that the defendant acted recklessly.

Here, a defense eye-witness testified that Edgar Ojeda was killed during a sudden barroom brawl among people who had been drinking, during which appellant was surrounded by several angry men and numerous people threw punches. This evidence of a chaotic fight involving multiple people, as well as evidence of appellant's intoxication, provided a reasonable basis for the jury to conclude that appellant's *mens rea* was reckless rather than intentional. *See People v. Tai*, 39 N.Y.2d 894, 895 (1979); *People v. Lee*, 35 N.Y.2d 826, 826-27 (1974).

Contrary to the trial court's view, Ojeda's injuries, which consisted of one fatal stab wound to his upper chest and shoulder area that punctured his lung and two shallower wounds to his shoulder and upper back, did not make this the rare case in which the injuries were so extreme that they conclusively established an intent to cause death or serious physical injury. Nor did the medical examiner's opinion that the wounds required some force, rather than merely "waving a knife around," necessarily mean that appellant had the conscious objective to kill or seriously injure Ojeda. *See People v. Heide*, 84

3

N.Y.2d 943, 944 (1994) (deliberate stab did not necessarily indicate intend to kill or seriously injure); *People v. Sullivan*, 68 N.Y.2d 495, 500-03 (1986) (shots deliberately fired at deceased's body mass consistent with reckless homicide).

Because a reasonable view of the evidence in the light most favorable to the defendant provided a basis to submit second-degree manslaughter to appellant's jury, the court erred in refusing to do so and appellant is entitled to a new trial.

## STATEMENT OF FACTS

### Introduction

Appellant was indicted for second-degree murder and related offenses in connection with the February 2005 Brooklyn barroom confrontation that resulted in the death of Edgar Ojeda. At appellant's first trial, before the Honorable Robert J. Collini, the court submitted second-degree manslaughter to the jury as a lesser included offense of murder. The jury deadlocked, and, after six days of deliberations during which the jurors asked repeatedly about the reckless as well as intentional homicide counts, the court declared a mistrial.

This Court subsequently held that double jeopardy did not bar a retrial. *Rivera v. Firetog*, 11 N.Y.3d 501, 508 (2008). At the retrial, before the Honorable Alan Marrus, the court issued an intoxication charge and submitted first-degree manslaughter to the jury as a lesser included offense of second-degree murder.

4

It refused defense counsel's request to submit second-degree manslaughter to the jury, however, primarily on the theory that Ojeda's injuries showed that the homicide could only have been intentional. On the second day of deliberations, after requesting reinstruction on intent and reasonable doubt, the jury acquitted appellant of second-degree murder but convicted him of first-degree manslaughter.

### The Conclusion of Appellant's First Trial in a Mistrial

At appellant's first trial, at which he testified, the court submitted to the jury the second-degree murder count along with the lesser included offenses of first- and second-degree manslaughter. *See Rivera v. Firetog*, 11 N.Y.3d at 503. The jury deliberated for six days until the court declared a mistrial, determining that the jury was hopelessly deadlocked. *Id.* at 503-05. During those six days, the jury submitted several notes to the court requesting, *inter alia*, reinstruction "on all three counts." *Id.* at 504. It also sought "clarification of the terms 'bodily harm' and 'reckless action,'" which the court interpreted as referring to "the two manslaughter counts." *Id.* at 504. On the sixth day, the jury announced for the third time that it was deadlocked and the court declared a mistrial. *Id.* at 505.

5

<u>The People's Case at the Second Trial</u>

<u>The Eye-Witness Accounts</u>

At approximately 11:30 or 11:45 p.m. on February 26, 2005, off-duty bouncer <u>Enrique Navarette</u>, who had had about three or four beers at dinner, arrived at the darkly-lit El Borinquen Bar (A118, A120, A145, A158-61). After having several more drinks, he noticed a group of men, including appellant, being "patted down" for weapons as they entered the bar (A125, 156-57, A159). The group bought beers, then went to the back of the bar, where Jahaira, another bar patrol, was standing (A123-24, A157).

Meanwhile, <u>Jonathan Dominguez</u>, <u>Carlos Solomon</u>, <u>Marcus Carrasquillo</u>, and Edgar Ojeda had spent an hour or two at a nearby strip club, where they each drank two or three beers before arriving at El Borinquen Bar between 1:00 and 1:30 a.m. (A174-72, A209, A208-09, A274-76). After settling in at the bar, the group began drinking by a jukebox near the bar's exit, about ten feet away from Navarette (A126).

The People's four eye witnesses – Carrasquillo, Dominguez, Solomon, and Naverette – described a fight, after which appellant and his group left the bar and Ojeda realized that he had been stabbed.

Carrasquillo left his friends briefly to order his second beer at the bar when he heard a "commotion" and "feet moving" "back and forth" behind him (A279-81). He approached the commotion and, following a remark by Solomon, chased two men out of the bar (A280-82, A287, A289). Although he denied seeing his friends fighting (A287-90), he was impeached with his testimony from appellant's first trial, in which he described turning around and seeing a chaotic fight involving all of his companions:

> From when I was waiting for my Heinekens there was a big ruckus. I turned around, I seen everybody. There was a lot of just a ruckus. So I didn't know who was involved in the ruckus. I was moving people out of my way to make sure the people I was involved with were not involved. I saw they were involved. . . . I saw Carlos [Solomon] and Jonathon [Dominguez] fighting some guys (A289).

Dominguez, who had drunk several beers, was standing between the bar and the jukebox speaking with "Rudy" when, over "pretty loud" music, he heard a "scuffle," by which he meant "people arguing" (A177-79, A194, A197). He turned around and saw the on-duty bouncer evict appellant and one of his companions from the bar and then lock the exit door (A179-82, A190-91). Dominguez then realized that Ojeda had been stabbed, prompting him and Solomon to attack a companion of appellant's who had remained behind in the bar (A179, A180, A191-92).

Solomon, who was standing near Ojeda by the jukebox, denied that he witnessed any "commotion" inside the bar (A212-13, A259-61), although he was impeached with his testimony at the prior trial that there was a frantic melee with "stuff going on everywhere. . . . People running back and forth, People screaming. People yelling" (A260).

Solomon claimed that, while Dominguez and Carrasquillo were at the bar, appellant whispered something in Ojeda's ear and Ojeda responded (A214-16, A264-65). When two of appellant's friends came over, Solomon asked one of them "if there was a problem," and the man said that Solomon should "mind [his] fucking business" (A217-18, A244-46, A250-51). At this point, Dominguez and Carrasquillo joined Solomon and Ojeda (A241). When Solomon responded that "my friend's business is my business," appellant suddenly struck or placed "his hand on" Ojeda twice "around the top of his shoulder" or "chest area" (A218-20, A244-46, A250-51). Appellant and another man then ran out the exit; the bouncer stopped a third member of appellant's group from leaving, and Solomon tried to punch him over the bouncer's shoulder (A220-21, A254-55).

As he was sitting at the bar, Navarette glanced over at the jukebox and, "[a]ll of a sudden," saw appellant "push" Ojeda, prompting the on-duty bouncer and Naverette to intervene (A128-29). Navarette could not say "exactly" what happened, but he thought that appellant touched Ojeda

8

"maybe" "twice" in the left "shoulder, chest area" (A129-30). Appellant walked to the exit door followed by the on-duty bouncer while Solomon continued to swing over Navarette at one of appellant's friends (A129-30, A148). Navarette blocked Ojeda and Solomon from following appellant out of the bar to ensure that the opposing groups remained separated (A129-31).

After appellant left, Ojeda, who was bleeding, said he had been stabbed (A132-33, A180, A222, A282). His friends brought him to the hospital, where he later died (A116, A165-66, A182-84, A223-26, A274-75).

### Appellant's Statement to Police

The following day, the police arrested and interrogated appellant after he waived his *Miranda* rights (A344-52). Appellant said that he went to El Borinquen with his brother and a couple of friends to have a few drinks (A351). When he got "looks" from someone who said, "What's up[?]," appellant responded, "What's your problem?" (A351). When he felt "grabbing and punching," appellant took out a knife and "started swinging at the crowd" (A351). He did not know "that he [had] actually hit or hurt anyone" (A351-52).

Appellant gave the police a substantially similar written statement, adding that the confrontation took place after appellant had had a drink, and that he swung the knife in self-defense at the crowd that had risen up against him (A352-54; People's Ex. 10 [statement]). Appellant additionally wrote:

9

> I didn't mean it. I was just scared. I know by saying sorry is not going to bring that person back, but I really didn't mean this to go down this way. I'm very sorry (A356; People's Ex. 10).

A few hours later, appellant gave a videotaped statement to an assistant district attorney that was substantially the same as his written statement (A423; People's Ex. 12 [videotaped statement]). The People read into evidence a portion of appellant's testimony from his first trial, in which he admitted having worn a hat that the police recovered from his mother's home, which had traces of Ojeda's blood on it (A437-39).

### The Medical Evidence

Ojeda, who was approximately 5'5" tall and had been drinking and smoking marijuana, sustained three stab wounds, one of which was fatal (A55-63; A166). The medical examiner could not determine the order in which the wounds had been inflicted (A55). The fatal wound was located on Ojeda's shoulder or upper chest, 11 ½ inches below the top of Ojeda's head, and 3 ¼ inches to the left of the anterior of his neck. It penetrated his chest cavity by approximately five inches, perforating the upper lobe of his left lung and cutting his second rib (A55).

Another wound was two inches deep, to the back of Ojeda's left shoulder, approximately ¾ of an inch lower than the fatal wound, and penetrated only skin and muscle (A57). The remaining wound was on the left-

10

side of Ojeda's back, about 4 ½ to 5 inches lower than the fatal wound and approximately 2 ¼ inches deep, penetrating only the "subcutaneous tissue" and "muscle of the left side of the back" (A56).

All three wounds had a downward trajectory and required some force; they were not consistent with someone simply "waving a knife around" (A55-56, A61-62, A69). Dr. Frederick explained, "you [would] have to stab the person," and demonstrated by holding her right hand at shoulder level and gesturing "downwards" (A61).

The Defense Case

On the night of February 26, 2005, appellant's brother, Julio Rivera, arrived at El Borinquen Bar where he met appellant and two mutual friends nicknamed "Little Julio" and "JP" (A447-48, A486). Inside the dimly-lit bar, the group joined appellant's cousin Jahaira, her boyfriend Rudy, her brother, and his date (A451). The four newcomers got the first of several rounds of drinks and everyone went to the back of the bar with Jahaira's group (A451-52).

Later that night, when appellant had returned to the bar to buy another round of drinks, Julio saw three to five men surrounding and cursing at appellant and Little Julio, who were standing near the jukebox and side exit door of the bar (A452-53, A483, A487-92, A494-95). When some of the group made "hand gestures" and "point[ed] fingers" at appellant, Julio and JP

11

approached them (A453). Julio had to "push around toward the guys" who were confronting appellant (A453). He asked Ojeda and his friends "what the F [is] wrong with you guys," then turned to ask appellant the same question (A453, A455-56, A484-85, A491-95, A501).

"As soon as" Julio turned back again, he "got punched in the face," at which point "all the punches started going off" (A453, A455, A496-98). Julio and "everyone" started to fight (A454). He recalled that a punch was even thrown "over [his] back" (A453, A496-98). Eventually, Julio saw the bouncer escort appellant to the exit (A454, A456-57). He and JP followed appellant outside as a chair was thrown nearby (A454, A456-57, A500).

Appellant Enrique Rivera testified that he had been drinking beer prior to arriving at the bar (A574-75). He went to the bathroom to use his cell phone and encountered Ojeda, who commented, "This ain't no phone booth" (A528-29, A589, A585). Appellant left the bathroom and, after ordering his fourth beer since arriving at the bar, he walked over to the Ojeda, who had been staring at him aggressively, to ask him what was wrong (A531, A574-75). Things got "out of hand" as a crowd "gather[ed] up" and people began cursing at appellant (A532, A549, A604-05). While appellant asked the people near him to "chill," Solomon punched appellant, who responded by punching Solomon and Ojeda (A532-34, A549, A608-12). As the bouncer "rushed" him out,

12

appellant heard ongoing fighting and cursing inside the bar (A534-35). He denied stabbing Ojeda (A533-34).

According to Julio, Jahaira, who remained behind at the bar, later informed him that someone had been stabbed (A461, A507-08). The following day, February 28, 2005, the police arrested appellant (A558-59, A561). At the stationhouse, appellant gave an oral and written statement to the police and a videotaped statement to a prosecutor (A564-69). At trial, he denied the truth of the statements, asserting that he made them only because the police had threatened to charge his brother with murder unless he confessed and suggested that he claim he acted in self-defense (A462).

The Charge Conference, Jury Charge, Deliberations, and Verdict

Without objection, the court proposed submitting first-degree manslaughter to the jury as a lesser included offense of second-degree murder (A631). Defense counsel requested that the court also submit second-degree manslaughter to the jury, arguing that swinging a knife, as appellant admitted in his statements that the People placed in evidence, would be reckless (A631-32). The court denied that request, noting that the People had indicted appellant for an intentional murder, that appellant denied the stabbing, and that the medical examiner testified that the stab wounds "could not have been inflicted by someone just swinging a knife around" (A632-33). Because the wounds "had to

13

have been . . . caused by intentional infliction" there was, in the court's view "no basis to submit a reckless count on the evidence in th[e] case" (A633). Nevertheless, because "there was evidence of intoxication," the court would charge the jury "as to how [intoxication] relates to someone's intent" (A633).

The court instructed the jury on intoxication as follows:

> You have heard some evidence at this trial . . . indicat[ing] that the defendant may have been intoxicated during the course of this incident. Evidence of intoxication is not a defense to a crime under our law. It may be considered, whenever relevant, to negate an element of the crime charged. Thus, you may consider a defendant's state of intoxication as it might relate to his intent . . . . Under our law, you may consider whether or not someone's state of intoxication affected the level of intent that he might have had at the time (A753).

The court submitted, in the alternative, the counts of second-degree murder and first-degree manslaughter to the jury (A759-62).

The jury requested that the court "define intent" and "define the p[ara]meters of reasonable doubt" because it was "having difficult[y] defining reasonable doubt with intent to kill"; the court complied (A763-74). The jury also requested and was given the diagram showing the location of Ojeda's wounds and the direct testimony of the medical examiner (A768-74). It acquitted appellant of second-degree murder but convicted him of first-degree manslaughter (A782-85).

14

The Appellate Division Decision

On appeal, appellant argued, *inter alia*, that the court violated his due process right to a fair trial when it refused to submit second-degree manslaughter to the jury as a lesser included offense because a reasonable view of the evidence supported the conclusion that he killed Ojeda recklessly. On November 7, 2012, the Appellate Division, Second Department, affirmed the conviction, ruling that "there was no reasonable view of the evidence that would support a finding that the defendant acted recklessly when he stabbed the victim," citing *People v. Pizarro*, 89 A.D.3d 871 (2d Dep't 2011); *People v. Lopez*, 72 A.D.3d 593 (1st Dep't 2010); *People v. Barnes*, 265 A.D.2d 169 (1st Dep't 1999); and *People v. Porter*, 161 A.D.2d 811 (2d Dep't 1999) (A2).

On March 1, 2013, the Honorable Victoria A. Graffeo granted appellant leave to appeal.

15

## ARGUMENT

> THE COURT VIOLATED APPELLANT'S DUE PROCESS RIGHT TO A FAIR TRIAL WHEN IT REFUSED TO CHARGE TO THE JURY SECOND-DEGREE MANSLAUGHTER AS A LESSER INCLUDED OFFENSE OF SECOND-DEGREE MURDER, ALTHOUGH THERE WAS A REASONABLE VIEW OF THE EVIDENCE THAT APPELLANT, WHO HAD BEEN DRINKING, RECKLESSLY KILLED THE DECEASED DURING A BARROOM BRAWL.

Viewed in the light most favorable to the defense, there was a reasonable view of the evidence that appellant acted recklessly in causing Edgar Ojeda's death during a chaotic barroom brawl, which defense witness Julio Rivera described, among numerous men all of who had been drinking. This was not, as the trial judge believed, the rare case in which the nature of the wounds themselves ruled out all but an intentional homicide. Indeed, appellant's first jury appears to have struggled for days over precisely the issue of whether the homicide here was intentional or reckless, although the nature of Ojeda's wounds obviously did not change between the first trial and the second. Accordingly, the trial court's denial of defense counsel's request to submit second-degree manslaughter to the jury denied appellant his federal and state due process rights to a fair trial. U.S. Const., Amend. V, XIV; N.Y. Const. Art. 1, § 6.

16

A. The Legal Standard for Submitting a Lesser Included Offense to the Jury

A court "must" grant a party's request to submit a lesser included offense to the jury if "there is a reasonable view of the evidence which would support a finding that the defendant committed" the lesser, but not the greater, offense. C.P.L. § 300.50(1), (2); *see also People v. Perry*, 19 N.Y.3d 70, 72 (2012) ("Defendant was entitled to have the lesser count submitted if there was 'a reasonable view of the evidence which would support a finding that the defendant committed such lesser offense but did not commit the greater'").

In *People v. Glover*, 57 N.Y.2d 61, 63-64 (1982), this Court set forth a two-pronged test for deciding whether a court should charge a requested lesser included offense. First, the requested offense must be of a "lesser grade" and it must be "impossible to commit the greater crime without concomitantly, by the same conduct, committing the lesser offense." *Id.* That first prong was satisfied here because "reckless manslaughter is a lesser included offense of intentional murder." *People v. Green,* 56 N.Y.2d 427, 433 (1982); *accord People v. Sullivan*, 68 N.Y.2d at 502.

"That established," the party seeking submission of the lesser offense "must then show that there is a reasonable view of the evidence in the particular case that would support a finding that [the defendant] committed the lesser offense but not the greater." *Glover*, 57 N.Y.2d at 63. This second prong of the test requires determining whether, "under *any* reasonable view of the

17

evidence, it is possible for the trier of facts to acquit defendant on the higher count and still find him guilty of the lesser one." *People v. Van Norstrand*, 85 N.Y.2d 131, 136 (1995) (emphasis added); *accord* C.P.L. §300.50(1); *Glover*, 56 N.Y.2d at 64.

This inquiry "is not directed at whether persuasive evidence of guilt of the greater crime exists." *Van Norstrand*, 85 N.Y.2d at 136. "[T]he court's evaluation of the persuasiveness of the evidence of guilt of the greater crime is irrelevant." *Green*, 56 N.Y.2d at 434.

The appropriate inquiry is whether the evidence, viewed "in the light most favorable to the defendant," *People v. Martin*, 59 N.Y.2d. 704, 705 (1987), provides a "rational basis" to convict him of the lesser but not the greater offense. *People v. Henderson*, 41 N.Y.2d 233, 236 (1976). The court must allow for the possibility that the jury can "accept or reject part or all of the defense or prosecution evidence," so long as there is a rational basis for doing so. *People v. Scarborough*, 49 N.Y.2d 364, 372-73 (1980) (citing *Henderson*, 41 N.Y.2d at 236). The jury "is entitled to assess the credibility of witnesses and determine . . . what portion of their testimony to accept." *People v. Negron*, 91 N.Y.2d 788, 792 (1998); *see also People v. Asan*, 22 N.Y.2d 526, 532 (1968) ("[A] jury may properly find a lesser included offense from *any portion* of the defense and prosecution evidence, or from any part of the total proof" (emphasis added)).

18

In order to satisfy the second prong of the test for submission of a lesser included offense, a party must demonstrate that a rational view of the evidence, rather than a purely hypothetical view, would establish guilt of the lesser, but not the greater, offense. *Scarborough*, 49 N.Y.2d at 368-74; *People v. Mussenden*, 308 N.Y. 558, 562-63 (1955) (submission of a lesser requires "some basis in the evidence for finding the accused innocent of the higher crime, and yet guilty of the lower one"). This standard, however, is purposely generous, and in homicide cases requires only an "identifiable basis" on which the jury may find that the defendant acted with either of two states of mind. *Scarborough*, 49 N.Y.2d at 369. Only when submitting the lesser "would force the jury to resort to sheer speculation" should the court refuse to do so. *Id.* at 371.

The *Scarborough* standard incorporates this Court's long-standing rule that questions of intent are particularly a jury matter. As the Court declared long ago, "[h]owever clear the proof may be, or however incontrovertible may seem to the judge to be the inference of a criminal intention, the question of intent can never be ruled as a question of law, but must always be submitted to the jury." *People v. Flack*, 125 N.Y. 324, 334 (1891). Determining a defendant's mental state depends on discerning between "fine gradations along . . . a single spectrum of culpability" based on inferences "from the facts and circumstances prove[n]" at trial. *Green,* 56 N.Y.2d at 432 (1982). Accordingly, this Court has

19

consistently held that "the question of the defendant's state of mind" is "a classic matter for the jury." *Policano v. Herbert,* 7 N.Y.3d 588, 598 (2006).

Thus, a court should submit second-degree manslaughter as a lesser offense of intentional homicide unless the evidence entirely excludes the possibility that the defendant caused the death recklessly. Only in a truly "exceptional case" will the wounds themselves be so numerous or extreme that they can be relied on to rule out a reckless homicide. *People v. Butler,* 84 N.Y.2d 627, 631 (1994) (involving 34 stab wounds, 9 of them potentially fatal). Notably, the Court has held that the evidence supported recklessness even in a case involving a one-on-one stabbing that resulted in a fatal chest wound, observing that "[i]t is up the jury to decide in a particular case whether the defendant acted intentionally, recklessly, or negligently (or not at all)." *People v. Suarez,* 6 N.Y.3d 202, 212 n.6 (2005) (evidence of a fatal stab wound from a one-on-one confrontation "was certainly sufficient to support a finding of reckless manslaughter").

## B. The Reasonable View of the Evidence Supporting Submission of Second-Degree Manslaughter to Appellant's Jury

Viewing the record in the light most favorable to appellant, as the law requires, a reasonable view of the evidence supported a finding that appellant recklessly killed Edgar Ojeda in the course of a chaotic bar fight involving multiple patrons, all of whom had been drinking. Appellant testified that he

20

had been drinking prior to meeting his brother at the bar and that, by the time the fight occurred, he was on his fourth beer since entering the bar (A530-31, A473-75). His brother, Julio Rivera, confirmed that they drank several rounds of beer at the bar (A451-52). The People's witnesses had also been drinking heavily (A194, A234-36, A276).

Julio Rivera provided a detailed account of the barroom brawl during which Ojeda was stabbed, describing it as a hectic encounter with several patrons striking one another (A452-57). In particular, he testified that several men surrounded appellant and his friend, "Little Julio," and that they were cursing and gesturing (A452-62, A488-600). Julio and another friend attempted to intervene, having to "push around towards the guys" to do so (A453). Turning first to Ojeda and his friends, Julio asked, "what the F [is] wrong with you guys" before turning to ask appellant the same question (A453). "As soon as" Julio turned back to Ojeda's group, Julio "got punched in the face," at which point "all the punches started going off" (A453, A496, A498). He testified that "everyone" was throwing "punches" (A453, A496-98). Indeed, there was such a melee that Julio recalled a "punch" being thrown "over [his] back" (A453, A496-98). Thus, Julio's testimony described the quintessential, fast-moving bar brawl in which allowing a jury to consider reckless manslaughter as an alternative to intentional murder or manslaughter is particularly appropriate.

21

Even when a less chaotic struggle or fight than the one Julio described results in a death, this Court has held that reckless manslaughter should be submitted to the jury. In *People v. Tai*, 39 N.Y.2d at 895, the defendant testified that, after an argument, the deceased assaulted him with a knife and, in the ensuing struggle, "sustained stab wounds that resulted in her death." *People v. Tai*, 48 A.D.2d 933, 933 (2d Dep't 1975) (Hopkins J., dissenting), *rev'd* 39 N.Y.2d 894 (1996). The Court held that "the jury could reasonably have" accepted that Tai "inflicted the fatal wounds" during the course of the struggle in attempting to repel the deceased's attack. *Tai*, 39 N.Y.2d at 895. As a result, "the jury might have found that defendant acted recklessly" and "committed acts constituting manslaughter in the second degree, but did not act with the intent to cause serious physical injury as required by manslaughter in the first degree." *Id.* (internal citations omitted). It was, therefore, error to refuse to submit second-degree manslaughter to Tai's jury.

In *People v. Murry*, 40 N.Y.2d 327, 335 (1976), a reasonable view of the evidence also supported submitting reckless manslaughter to the jury. The defendant, contradicting his prior confession, testified at trial that, in the course of a disagreement with the deceased over drugs, the two struggled and he stabbed the deceased in self-defense. *Id.* Citing *Tai*, the Court held that "on this record," the trial court's refusal to charge second-degree manslaughter was reversible error. *Id.*

22

In *People v. (McPherson) Suarez,* 6 N.Y.3d at 206, the deceased and the defendant argued over child support, and when the deceased "raised his hand as if to hit" the defendant, she "unzipped her purse, pulled out a knife" and "swung" at him, fatally "stabbing him once in the chest." The Court found the evidence "certainly sufficient to support a finding of reckless manslaughter." *Id.* at 212 n.6. As these cases demonstrate, submission of reckless manslaughter is required when there is a reasonable view of the evidence that a struggle or fight resulted in the accidental death of a participant. It is even clearer that such a charge is appropriate when, as in appellant's case, a fight involving several people led to a fatal act. According to Julio Rivera, appellant was confronted by several hostile men, and, between appellant's group and Ojeda's group, at least seven people were involved in the altercation that led to Ojeda's death. The fight Julio described was a fast-moving, frightening, and confusing event, with appellant surrounded and punches flying, making it especially unlikely that appellant could have formed the calculated intent to kill or serious injure Ojeda. If the jury credited Julio, they could have easily determined that appellant stabbed Ojeda in this chaos and accidently caused his death while attempting to repel an attack by him or his group as a whole.

That appellant and the other participants had been drinking heavily provided even more reason to submit second-degree manslaughter to the jury. The trial court appropriately gave an intoxication charge to explain that

23

evidence of appellant's intoxication could negate intent (A633, A753). *See Lee*, 35 N.Y.2d at 826-27 (given the evidence that defendant "was intoxicated" when he perpetrated the "bizarre" sidewalk stabbing of a victim "previously unknown" to him, second-degree manslaughter should have been submitted to the jury, which could have found that, "at the time of the stabbing[,] the defendant was too intoxicated to have intended either to kill his victim or to cause her serious physical injury").

Concededly, the issuance of an intoxication charge does not "mechanically trigger a corresponding obligation for the trial court to" submit second-degree manslaughter to the jury. *Butler*, 84 N.Y.2d at 629-31, 634 (evidence of intoxication did not mandate reckless manslaughter charge when death resulted from "three head contusions and 34 kitchen knife stab wounds, of which nine" were potentially fatal). Nevertheless, an intoxication charge and the submission of reckless manslaughter are often "intertwined," and the Court has recognized that, "in a great many cases in which an intoxication instruction may be warranted and is given, some corresponding lesser-included offense instruction might be necessitated." *Id.* at 630.

Here, the evidence that Ojeda was killed during a chaotic barroom brawl involving several individuals, all of whom had been drinking, presents the quintessential situation in which second-degree manslaughter should have been submitted to the jury. Indeed, at appellant's first trial, it was submitted and the

24

jury struggled long and hard over whether appellant had killed Ojeda intentionally or recklessly. Nevertheless, the court at appellant's second trial refused defense counsel's request for the lesser offense because it believed that the nature of Ojeda's wounds foreclosed any finding that appellant acted recklessly and because appellant denied stabbing Ojeda (A632-33). Neither basis justified its refusal to give the charge.

Neither the nature of Ojeda's injuries, nor the medical examiner's assertion that the stab wounds required some force beyond "waving a knife around" (A61) negated the reasonable view of the evidence that appellant recklessly killed Ojeda in the course of a chaotic, multi-person fight. The fact that Ojeda's death might have resulted from a deliberate act did not mean that appellant consciously intended to kill or seriously injure him. In *People v. Heide*, 84 N.Y.2d 943 (1994), for example, the defendant testified that he deliberately stabbed the deceased in the groin "so that he would release his grip on defendant." 206 A.D.2d 875, 875 (4th Dep't) (Doerr, J. dissenting) *aff'd*, 84 N.Y.2d 943 (1994). The Court concluded that submission of criminally negligent homicide as a lesser offense was appropriate, holding that "the fact that [the] defendant intentionally stabbed" the deceased "does not preclude finding" that he committed an unintentional homicide. *Heide*, 84 N.Y.2d at 944. In other words, the proper inquiry is not whether someone intended to stab the deceased, but whether he intended to kill or seriously injure him.

25

Similarly, in *People v. Sullivan*, 68 N.Y.2d 495, 498, 502 (1986), this Court held that evidence that a police officer deliberately "aimed at [a woman's] body mass" did not demonstrate conclusively that he intended to kill or seriously injure her so as to invalidate an indictment for reckless manslaughter. Emphasizing that intentional homicide depends on a "finding of a specific design to effect death – not merely an intent to shoot," the Court held that, "in the tension and confusion of the situation," the officer could have "consciously disregarded the danger" of his actions. *Id.* at 502; *see also People v. Rodriguez*, 33 A.D.3d 730, 731-32 (2d Dep't 2006) (reducing depraved indifference murder to reckless manslaughter when a prison inmate, rebuffing unwanted sexual advances, deliberately pursued and stabbed the deceased three times, with one wound penetrating his heart; although he deliberately "stabbed the victim three times," the record did not support that "such action was done with an intent or 'conscious objective' to kill"). Similarly here, if the jury found that appellant deliberately stabbed Ojeda, it could have nevertheless found that, acting in the midst of confusing and fraught circumstances, appellant caused Ojeda's death recklessly.

Ojeda's wounds bore no resemblance to those that have been found so numerous or extreme as to rule out anything but an intentional homicide. *Butler* involved three head contusions and 34 stab wounds, nine of which were potentially fatal, thus conclusively establishing that the defendant acted with the

26

intent to kill the deceased. 84 N.Y.2d at 629-31, 634; *see also People v. Vega*, 68 A.D.3d 665, 665 (1st Dep't 2009) (proper not to submit reckless manslaughter when the defendant "inflicted 49 stab wounds, mostly to the victim's neck and chest," penetrating the "heart, lung, liver and spleen"); *People v. Alexis*, 65 A.D3d 1160, 1160-61 (2d Dep't 2009) (same, when deceased's throat was slashed 14 times, and two wounds severed the jugular vein, causing death); *People v. Collins*, 290 A.D.2d 457, 458 (2d Dep't 2002) (same, when deceased was stabbed six times, and five of the wounds could have been fatal). Here, in stark contrast, there were a total of three wounds, two of which were relatively superficial.

Nor did Ojeda's wounds suggest that appellant targeted vital areas so as to establish an intent to cause death or serious physical injury. *See People v. Stanford*, 87 A.D.3d 1367, 1368 (4th Dep't 2011) (four stab wounds in the neck, one severing major blood vessels); *Lopez*, 72 A.D.3d at 593 (very deep stab wound to victim's "vital organs"); *Barnes*, 265 A.D.2d at 169 (stab of abdomen "with great force," perforating liver and cutting blood vessels); *People v. Dabney*, 231 A.D.2d 431, 431 (1st Dep't 1996) (stab to the throat directly over the jugular vein); *Porter*, 161 A.D.2d at 811 (5 ½-inch-deep neck wound lacerating the aorta and pulmonary artery).

In contrast to such injuries, Ojeda's wounds were entirely consistent with appellant having acted recklessly. They obviously did not target vital areas

27

such as Ojeda's heart, liver, abdomen, or neck. One was to his upper back, another was to the back of his shoulder, and one was to his upper chest or shoulder area, 3 ¼ inches from the anterior of his neck (A55-57). They were consistent with a man who had been drinking striking out recklessly in an effort ward off people he perceived to be attacking him during a brawl.

Moreover, whatever difference might have existed between the eye-witness accounts from appellant's first and second trials, the nature and severity of Ojeda's injuries remained constant. The jury at appellant's first trial, which considered both first- and second-degree manslaughter as lesser included offenses of second-degree murder, deadlocked after six days of deliberations. It clearly struggled with the question of whether appellant's actions constituted reckless or intentional homicide, asking for "clarification of the terms 'bodily harm' and 'reckless action.'" *Rivera v. Firetog*, 11 N.Y.3d at 504. Notably, the jury in the instant case also struggled over the question of intent, asking the court for further instruction on intent and reasonable doubt because they were "having difficult[y] defining reasonable doubt with intent to kill" (A768-74).

That both juries faced difficulties is unsurprising because Ojeda's death as a result of stab wounds to his shoulder area and upper back bore the hallmarks of a reckless act. Erratic movement consistent with a fight or a struggle explained why Ojeda sustained one deep and two shallower wounds to the front and back of his shoulder area. For example, forward movement while

28

attempting to punch appellant or a third-party could easily explain how the blade penetrated his body as deeply as it did. *See People v. Ivisic*, 95 A.D.2d 308, 312 (2d Dep't 1983) (evidence about the trajectory of fatal bullet consistent with recklessness). Thus, the decision of the court below, relying on the nature of Ojeda's injuries, that there was no reasonable view of the evidence that appellant acted recklessly incorrectly ignored the fundamental rule that it was the jury's responsibility, not the trial court's, to determine whether evidence of a violent melee and intoxication, combined with the nature of Ojeda's injuries, proved whether appellant's conduct was intentional or reckless.

Finally, contrary to the trial court's reasoning, appellant's denial at trial that he had stabbed Ojeda did not justify the court's refusal to charge second-degree manslaughter. *See Asan (Freeman)*, 22 N.Y.2d at 532 (court's refusal to charge a lesser because the defendant "denied ownership or use of a knife" was error when the record contained other evidence that he made "slashing movements at the complainant"); *People v. Brown,* 82 N.Y.2d 869, 871 (1993) ("Defendant's testimony denying that he committed the proscribed conduct does not alone support or defeat the requested charge"); *People v. Butts*, 72 N.Y.2d 746, 748 (1988) (noting "established New York case law that a defendant's entitlement to a charge on a claimed defense is not defeated solely by reason of its inconsistency with some other defense raised or even with the defendant's outright denial that he was involved in the crime"); *People v. Steele*,

29

26 N.Y.2d 526, 529 (1970) (because "the jury may believe portions of both the defense and prosecution's evidence," defendant's alibi testimony did not justify court's refusal to charge justification when other record evidence supported self-defense). That appellant denied stabbing Ojeda is of no consequence to the question of whether a reasonable view of the evidence supported charging reckless manslaughter. That inquiry is not based on the persuasiveness of the evidence, but whether evidence exists in the record to support the charge, which it did here.

\* \* \*

In sum, the trial record contained ample support for submitting second-degree manslaughter to the jury as a lesser-included offense. The court's error in refusing to do so requires reversal of appellant's conviction and a new trial. Because the jury acquitted appellant of second-degree murder, but convicted him of first-degree manslaughter, this error cannot be deemed harmless. *See Green*, 56 N.Y.2d at 435 ("[o]nly if defendant were convicted of the higher offense charged . . . and acquitted of the lower offense charged . . . would the failure to charge an even lesser offense . . . be harmless").

Defense counsel preserved this issue for appellate review, having requested that the trial court submit second-degree manslaughter to the jury, along with first-degree manslaughter, as lesser-included offenses of second-

degree murder (647-49). *See People v. Cabassa*, 79 N.Y.2d 722, 730 (1992) (counsel's motion to submit lesser-included offense preserved court's refusal for appellate review). Moreover, the trial court "expressly decided" the issue when it denied defense counsel's request to give the charge to the jury, citing, *inter alia*, its interpretation of the medical examiner's testimony that the stab wounds were caused by the "intentional infliction" of force (648-49). C.P.L. § 470.05(2); *see also People v. Edwards*, 95 N.Y.2d 486, 491 n.2 (2000) (matter preserved when "the trial court 'expressly decided' the question in response to a 'protest by a party'"). Notably, in its ruling, the Appellate Division, Second Department, never disputed that the matter was preserved for review.

## CONCLUSION

FOR THE REASONS STATED ABOVE, APPELLANT'S CONVICTION MUST BE REVERSED AND A NEW TRIAL ORDERED.

Respectfully submitted,
LYNN W.L. FAHEY
Attorney for Defendant-Appellant

Leila Hull
*Of Counsel*
May 2013

31

To be argued by:
MICHAEL BRENNER
(15 Minutes)

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

                          Respondent,

            -against-

ENRIQUE RIVERA,

                 Defendant-Appellant.

Appellate Term
Docket Number
09/05779

Kings County
Indictment Number
1453/05

RESPONDENT'S BRIEF

LEONARD JOBLOVE
SOLOMON NEUBORT
MICHAEL BRENNER
Assistant District Attorneys
      of Counsel

May 7, 2012

**CHARLES J. HYNES**
**DISTRICT ATTORNEY KINGS COUNTY**
RENAISSANCE PLAZA
350 JAY STREET
BROOKLYN, NEW YORK 11201-2908
(718) 250-2000

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................... 3

STATEMENT OF FACTS ............................................... 4
    Introduction ............................................... 4
    The Trial .................................................. 4
        The People's Case .................................... 4
        The Defense Case .................................... 8
    Charge COnference, Summations and Jury Verdict ........... 10

POINT I
    THE TRIAL COURT PROPERLY REFUSED TO SUBMIT TO THE
    JURY MANSLAUGHTER IN THE SECOND DEGREE AS A LESSER
    INCLUDED OFFENSE OF MURDER IN THE SECOND DEGREE. .......... 12

POINT II
    THE SENTENCE IS APPROPRIATE AND SHOULD NOT BE MODIFIED. ... 29

CONCLUSION
    FOR THE ABOVE REASONS, THE JUDGMENT OF CONVICTION SHOULD
    BE AFFIRMED ............................................... 32

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

                          Respondent,

           -against-

ENRIQUE RIVERA,

              Defendant-Appellant.

Appellate Division
Docket Number
09-05779

Kings County
Indictment No. 1453/05

## RESPONDENT'S BRIEF

### PRELIMINARY STATEMENT

Defendant Enrique Rivera appeals from a judgment of the Supreme Court of New York, Kings County, rendered June 8, 2009, convicting him, after a jury trial, of Manslaughter in the First Degree (P.L. 125.20[1]) and sentencing him to a term of imprisonment of 25 years and a period of post-release supervision of 5 years (Marrus, J., at trial and sentence).

Defendant is currently incarcerated. There were no codefendants.

STATEMENT OF FACTS

Introduction

On February 27, 2005, sometime before 2:00 a.m., inside of the El Borinquen Bar located at 314 39th Street in Brooklyn, defendant repeatedly stabbed Edgar Ojeda, puncturing Ojeda's lung and causing his death. Defendant was arrested on February 28, 2005 and confessed to the police that he had swung a knife in the victim's presence.

For this conduct, the defendant was charged under Kings County Indictment Number 1453/2005 with Murder in the Second Degree (P.L. § 125.25[1]) and Criminal Possession of a Weapon in the Fourth Degree (P.L. § 265.01[2]).

The Trial

The People's Case

On February 27, 2005, sometime between 1:00 and 1:30 a.m., JONATHAN DOMINGUEZ, CARLOS SOLOMON, MARCUS CARRASQUILLO, and Edgar Ojeda arrived at the El Borinquen Bar, formerly known as Amanacers, located at 314 39th Street in Brooklyn (Dominguez: 191; Solomon: 224-25; Carrasquillo: 290).[1] Before arriving at the bar, Dominguez, Solomon, and Carrasquillo spent a period of time at Cocktails, a strip club, where each one drank two or three beers (Dominguez: 191, Solomon: 224, Carrasquillo: 290).

---

[1] Dominguez admitted that he had a criminal record of one felony, three misdemeanors, and a violation (Dominguez: 186-87).

4

Sometime before that, a group of four individuals, including defendant and another patron, who were wearing camouflage jackets, entered the bar (Navarette: 136, 138). All were patted down by the on-duty bouncer for concealed weapons (Navarette: 140, 167).[2]

Ojeda, Solomon, Dominguez, and Carrasquillo began drinking at the jukebox near the bar's entrance (Navarette: 141; Solomon: 225). A short time later, defendant and one or two other individuals approached Ojeda (Navarette: 142; Solomon: 230, 232-33). Defendant whispered something in Ojeda's ear (Solomon: 230-31). Suddenly, defendant struck Ojeda twice in the shoulder and chest area (Solomon: 233-34, 267; Navarette: 144). None of the witnesses focused on defendant's hands and no knife was observed (Solomon: 267; Navarette: 144, 168, 169; see Darino: 403-04). As Navarette attempted to get in between defendant's group and Ojeda's group, Solomon, who had consumed one drink, swung at defendant over Navarette (Navarette: 146; Solomon: 235-36). Dominguez recalled throwing a punch as well (Dominguez: 196). Defendant then ran out the door of the bar (Solomon: 267). Ojeda said that he had been stabbed and was bleeding (Solomon: 237; Dominguez: 194; Navarette: 147). Ojeda's neck

---

[2] The bouncer, Enrique Navarette, testified that he had had four to six beers and was on his third Bacardi drink (Navarette: 174). Navarette was off-duty that night.

5

was bleeding heavily (Solomon: 237; Dominguez: 195). Carrasquillo observed Ojeda's wounds and "went into shock" (Carrasquillo: 297). Solomon drove Ojeda to Lutherman Medical Center and Ojeda was unconscious by the time they arrived there. (Dominguez 198-99; Solomon 239; Carrasquillo: 298). Ojeda's body was identified by his brother, MATTHEW OJEDA (Ojeda: 129-132).

Ojeda died as a result of three stab wounds. He sustained a five-inch-deep stab wound to the upper left chest, near the clavicle, and two shallow wounds, one to the upper left back and the other to the back of the left shoulder (Dr. FREDE FREDERICK 70-71). The five-inch wound went "inside of the left chest cavity, cut the second rib deep" and "perforate[d] the upper lobe of the left lung" (Frederick: 70). The wound was "back to front, right to left, and downward" (Frederick: 70). This wound was consistent with stabbing and not with "waving" (Frederick: 76). It was also inconsistent with "punching" without a knife (Frederick: 77). It was the wound that killed Ojeda because it caused him to bleed to death (Frederick: 75). All three wounds had a downward trajectory and required some force to inflict (Frederick: 70-72, 76-77, 84).

The next day, DETECTIVE JAMES GAYNOR went to defendant's residence, located at 30 Bush Street, apartment 1D, in Brooklyn, and conducted a search (Gaynor: 117). During the search, Gaynor

6

recovered several items of clothing, including a green army hat (Gaynor: 120-21). These items were sent to the DNA lab for analysis and, along with blood samples recovered from the crime scene, were analyzed by CRIMINALIST LINDA RAZZANO (Gaynor: 122; Razzano 316). Razzano found blood on the brim and on the back of the hat (Razzano 316-17). The DNA profile of the blood stains on the hat conclusively matched that of Edgar Ojeda (Razzano 319).

That same day, DETECTIVE JOHN DARINO went to 172-18 Everington Avenue in Queens, arrested defendant, brought him to the 72 precinct and placed in the detective squad interview room (Darino: 358, 360). Defendant was given Miranda warnings (Darino: 362-65, People's Exhibit 9). After Darino advised defendant of his Miranda rights and after defendant waived those rights, defendant stated that when he was at the bar, he was getting looks from an individual who then asked him "what's up[?]" and to which defendant responded, "what's your problem[?]" (Darino: 366). Defendant stated that he then felt grabbing and punching (Darino: 366). Defendant told Darino that he took out a knife and started swinging at the crowd (Darino: 366). Defendant claimed that he did not know that he had hit anyone (Darino: 366). Defendant then wrote out his statement and signed it (Darino: 367, 371; People's Exhibit 10). Defendant also repeated his statement on videotape to ADA

7

JENNIFER SIPRESS (Sipress: 434-42; People's Exhibit 12). At trial, Darino denied telling defendant that his brother, Julio Rivera, was at the precinct or that Julio would be charged (Darino: 416).

Later that morning, Navarette, Solomon, and Dominguez viewed defendant in a lineup, and Solomon and Navarette recognized defendant from the bar as the person who punched Ojeda (Navarette: 149; Solomon: 243-44; Darino: 380-83).

The Defense Case

Defendant, ENRIQUE RIVERA, testified on his own behalf. Defendant testified that at 10:00 p.m. on February 26, 2005, he was at the barbershop he owned with his brother Angel, when his other brother, Julio, came by to watch a fight on television (E. Rivera: 538). Defendant testified that after the fight ended, defendant and Julio went to the El Borinquen Bar, where they met Little Julio (E. Rivera: 539). Defendant testified that he and his brother Julio arrived at the bar at about 12:00 a.m. (E. Rivera: 541). Defendant said he was searched upon entering the bar and that he was unarmed (E. Rivera: 540-41).

Defendant testified that after drinking a beer, he went to use the bathroom and began talking on his cellphone (E. Rivera: 543). Defendant said that Ojeda, who was also in the bathroom, told him the bathroom was not a phone booth (E. Rivera: 543-44) Defendant said he then left the bathroom (E. Rivera: 544).

8

Defendant testified that Ojeda, upon leaving the bathroom, brushed by him and gave him an aggressive stare (E. Rivera: 545). Defendant testified that at this point, he was on his second or third beer (E. Rivera: 545).

Defendant said that, as he was buying a round of Heinekens, Ojeda "bopped [Ojeda's] head" (E. Rivera: 546). Defendant testified that he walked up to Ojeda and asked him what the problem was (E. Rivera: 546). Defendant testified that he told Little Julio what was going on (E. Rivera: 546). Defendant said that Carlos Solomon approached him and asked what was up (E. Rivera: 546). Defendant testified that both his brother Julio and Little Julio came over and were cursing each other, and that defendant told Ojeda to "chill" (E. Rivera: 546-47). Defendant said that Solomon hit him, and that defendant then hit Ojeda and Solomon (E. Rivera: 547). Defendant said that he swung at Ojeda at least three times, but claimed that he was not holding a knife or even armed with a knife at that time, and denied using a knife in the bar at all. (E. Rivera: 548, 627). Defendant testified that the bouncer came and carried him to the door, took him outside, and locked the door (E. Rivera: 549).

Defendant testified that he and Little Julio got into defendant's car and that he noticed Little Julio had blood on his jacket (E. Rivera: 553, 570, 630-632). Defendant admitted that at a prior proceeding, he had said nothing about the blood

9

on Little Julio's jacket (E. Rivera 636). In his trial
testimony, defendant also claimed that his oral, written, and
videotaped statements to detectives and ADA Sipress at the 72
precinct were false (E. Rivera: 583).

Defendant's brother, JULIO RIVERA, testified that he saw
five men surround defendant, that there were "hand gestures,"
and that there was cursing (J. Rivera: 467-68, 470-71, 493-98,
502-05, 507, 509-10). Rivera testified that Carlos Solomon threw
the first punch and that "everybody" was punching (J. Rivera:
469, 511). Rivera said that he did not see a knife (J. Rivera:
470). Rivera testified that he, the defendant, and Little Julio
learned that someone had been stabbed when they received a call
from Jahaira, a cousin they had met in the bar (J. Rivera: 524).

### Charge Conference, Summations and Jury Verdict

At the charge conference, defendant requested that the
court submit a count of second-degree manslaughter to the jury,
arguing that the People were proceeding in part on the theory
that defendant had recklessly swung his knife (648). The court
denied defendant's application, saying: "I don't think that is
the People's theory at all. I don't think it's your theory
either. Neither of you are going with that theory. . . There is
no theory of reckless conduct by the People" (648). The court
also concluded that the submission of that count was unwarranted
because the medical evidence had established that the stab

10

wounds must have been inflicted intentionally (649). The court informed both side that it would charge the jury on intoxication and did so (649, 769).

After deliberating, the jury convicted defendant of First Degree Manslaughter (799-801).

Sentencing

On June 8, 2009, defendant was adjudicated a second felony offender and was sentenced to a determinate term of 25 years of imprisonment to be followed by five years of post-release supervision (Sentencing Minutes: 18, 35). The court gave several reasons for why it was imposing this sentence, including defendant's two prior felony convictions, his youthful offender adjudication, the nature of the crime, and his "total lack of accountability for this matter with the inconsistent statement [he] made in this case," which the court deemed "a cold-blooded, senseless killing in a public place" (Sentencing Minutes: 35).

POINT I

THE TRIAL COURT PROPERLY REFUSED TO SUBMIT
TO THE JURY MANSLAUGHTER IN THE SECOND
DEGREE AS A LESSER INCLUDED OFFENSE OF
MURDER IN THE SECOND DEGREE.

The trial court properly refused to submit to the jury manslaughter in the second degree as a lesser-included offense of murder in the second degree. The trial court's refusal was proper, because no reasonable view of the evidence supported a finding that defendant was guilty of second-degree reckless manslaughter but not guilty of second-degree intentional murder or first-degree intentional manslaughter.

Defense counsel asked the trial court to charge the jury on manslaughter in the second degree as a lesser-included offense of second-degree intentional murder (647). Defense counsel maintained that there was sufficient evidence to permit a reasonable finding that defendant had acted solely recklessly -- in that, in counsel's view, the evidence supported a reasonable finding that defendant had swung the knife indiscriminately -- and thus warranted a submission to the jury of second-degree manslaughter (648). The trial court denied defendant's request, because neither party was advancing at trial a version of events that comported with that theory (648) -- indeed both parties were affirmatively disavowing any version of events that might have comported with that theory. The trial court further held

12

that the submission of that charge was unwarranted for the additional reason that "[t]here is no way there is any evidence to support that the injuries that caused death were recklessly inflicted" (648). The trial court explained that the medical examiner had testified "that these were stab wounds that could not have been inflicted by someone just swinging a knife around" and that these wounds were consistent solely with "intentional infliction" (649). The trial court's ruling was correct.

"There is a two-part test to determine whether a lesser included offense charge should be submitted to a jury." People v. Barney, 99 N.Y.2d 367, 371 (2003) (citation omitted). "First, defendant must establish that it is impossible to commit the greater crime without concomitantly committing the lesser offense by the same conduct. Secondly, there must be a reasonable view of the evidence to support a finding that the defendant committed the lesser offense but not the greater." People v. Van Norstrand, 85 N.Y.2d 131, 135 (1995); see also C.P.L. § 300.50(1), (2). If the jury would have to "resort to sheer speculation" to find that the defendant committed the lesser offense but not the greater, then the court should not charge the jury on the lesser included offense. People v. Butler, 84 N.Y.2d 627, 631-32 (1994). "To warrant a refusal to submit [the lesser included offense] 'every possible hypothesis' but guilt of the higher crime must be excluded." People v.

13

Henderson, 41 N.Y.2d 233, 236 (1976) (quoting People v. Shuman, 37 N.Y.2d 302, 304 [1975]).

In determining whether a reasonable view of the evidence exists that would support a finding that a defendant committed the lesser-included offense but not the greater offense, the court must view the evidence in the light most favorable to the defendant. People v. Martin, 59 N.Y.2d 704, 705 (1983). ·The court must also consider that the jury is free to accept or reject all or part of the defense or prosecution evidence. People v. Johnson, 45 N.Y.2d 546, 549 (1978). However, the court may not selectively dissect the integrated testimony of a single witness unless there exists in the record an identifiable basis upon which the jury might reasonably differentiate between segments of a witness's testimony. People v. Negron, 91 N.Y.2d 788, 792 (1998).

In this case, the trial court correctly denied defendant's request because neither party was advancing at trial a version of events comporting with defendant's pretrial statements and because "[t]here is no way there is any evidence to support that the injuries that caused death were recklessly inflicted" (648). The court's refusal to submit reckless manslaughter was proper because defendant in his trial testimony affirmatively disavowed his pretrial statements and because defendant's pretrial statements were refuted by the indisputable medical evidence,

14

which conclusively showed that defendant killed the victim by plunging a knife into him five inches deep with such force that the knife cut entirely through the bone of a rib (Frederick: 70-71). Additionally, the medical evidence showed that defendant had also stabbed the victim another two times, and each of those stab wounds were two inches deep and had also required the use of force to inflict (Frederick: 70-72, 76-77, 84). Finally, the medical evidence showed that the wounds were inflicted by a knife that had been thrust each time at an acute angle, which was inconsistent with a finding that defendant had stabbed the victim by swinging the knife indiscriminately (Frederick: 73-74, 76). See People v. Porter, 161 A.D.2d 811 (2d Dep't 1990) (court properly declined to submit reckless manslaughter where defendant lacerated the victim's aorta and pulmonary artery, despite evidence that defendant and victim had argued verbally prior to the stabbing and that victim was intoxicated and verbally abusive to defendant); People v. Vargas, 125 A.D.2d 512 (2d Dep't 1986) (court properly refused to charge reckless manslaughter where defendant stabbed victim four times, fled the scene, and disposed of the knife); see also People v. Lopez, 72 A.D.3d 593 (1st Dep't 2010) (court properly declined to submit reckless manslaughter where defendant's conduct in inflicting stab wound to victim's vital organs could only be interpreted as deliberate design to cause death or grave

15

injury); People v. Barnes, 265 A.D.2d 169 (1st Dep't 1999) (evidence that defendant strode up to deceased and without warning forcefully stabbed him negated any theory of recklessness) (citation omitted); People v. Dabney, 231 A.D.2d 431 (1st Dep't 1996) (evidence that, clenching a concealed weapon in his fist and without warning or provocation, defendant walked up to the victim and drove his weapon two to three inches into the victim's throat directly over the jugular vein, negated any theory of recklessness); People v. Pizarro, 89 A.D.3d 871 (2d Dep't 2011).

Accordingly, because both the People and defendant were affirmatively disavowing defendant's pretrial statements, and defendant's pretrial statements that he had swung the knife indiscriminately were flatly refuted by the undisputable and uncontested medical evidence, the trial court correctly concluded that submitting reckless manslaughter as a lesser-included offense was unwarranted -- because, even when viewing the evidence in the light most favorable to defendant, there was no reasonable view of the evidence that would have supported a finding that defendant had committed the lesser but not the greater offense.

Defendant asserts that the prosecutor conceded at trial that there was a reasonable view of the evidence that defendant was guilty of acting only recklessly (Defendant's Br.: 17, 24).

16

Defendant mischaracterizes the record in making that assertion. At trial, after the court denied defendant's request for a charge of reckless manslaughter, the prosecutor asked whether defendant was intending to request a justification charge. The trial court asked the prosecutor what had prompted the prosecutor to conclude that defendant might seek a justification charge, to which the prosecutor replied:

> I was just asking whether or not the defendant would be asking for justification in light of the fact that he asked for Manslaughter in the Second Degree, stating that, assuming the jury believed the statement that was put forward by the detectives on the video tape, they could believe that his actions were reckless and they could also believe he was acting in self-defense. I don't know whether he was asking, I just wanted to clarify so I can change my summation accordingly.

(654-55). Accordingly, when read in context, the prosecutor merely restated what defendant's position was, that is, that defendant had argued that he was entitled to the submission of reckless manslaughter as a lesser-included offense on the ground that his pretrial statements supported the submission of such a charge. The record, however, does not support a conclusion that the prosecutor himself was conceding that defendant's pretrial statements entitled defendant to a reckless manslaughter charge.

Defendant's reliance on People v. Rodriguez, 33 A.D.3d 730 (2d Dep't 2006), is misplaced. As a preliminary matter, the issue in Rodriguez was whether the evidence was legally

17

sufficient to support the defendant's conviction of depraved indifference murder, and not, as in this case, whether the submission of a lesser-included charge was warranted. In Rodriguez this Court held that the fact that the defendant had stabbed the victim three times did not compel the conclusion that he must have intended to kill the victim, but this Court did not hold that the defendant's acts of stabbing the victim would not have compelled the conclusion that the defendant had intended to cause at least serious physical injury to the victim. Accordingly, Rodriguez does not stand for defendant's proposition that three stab wounds to the torso does not compel the conclusion that defendant intended to cause at least serious physical injury. Additionally, unlike this case, in Rodriguez, the conclusion that the defendant might not have intended to cause death -- but rather that he may have intended only to inflict serious physical injury and was reckless with respect to the death -- was not inconsistent with the medical evidence or the other evidence in that case. Notably, in Rodriguez, although the evidence showed that the defendant had intended to cause at least serious physical injury to the victim, that evidence was not inconsistent with this Court's decision to reduce defendant conviction from depraved indifference murder to second degree manslaughter, because a defendant can intend to cause a victim serious physical injury while at the same time

18

act recklessly with respect to death. See Suarez v. Byrne, 10 N.Y.3d 523 (2008) ("depraved indifference murder and intentional manslaughter are not inconsistent counts: a defendant can recklessly cause a grave risk of death while intentionally inflicting serious physical injury"). Also, in this case, unlike the defendant in Rodriguez, defendant affirmatively disavowed his pretrial statements.

Defendant cites several cases for the proposition that a jury charge may still be warranted even if the charge would be inconsistent with the defense's trial theory (Defendant's Br. at 28-30), but his reliance on those cases is misplaced. In this case, unlike the cases cited by defendant, his request for the reckless manslaughter charge was not only inconsistent with his trial theory, it was also rebutted by the incontrovertible medical evidence, which showed that the victim was not killed by a person swinging a knife indiscriminately, but rather the victim was killed by a person who had repeatedly used force to plunge a knife into the victim at an acute angle, and one of those stabs was inflicted with such force that it had plunged five inches deep and cut entirely through a rib.

In any event, any error in the court's failure to submit to the jury reckless manslaughter as a lesser-included offense was harmless in light of the overwhelming evidence of defendant's guilt and the fact that the only evidence that supported that

19

charge was solely defendant's pretrial statements, which defendant himself later affirmatively disavowed and which was inconsistent with the irrefutable medical evidence. See People v. Rodriguez, 16 N.Y.3d 341, 346 (2001) ("the error of not giving the justification charge with respect to the vehicular manslaughter and vehicular assault counts, which include as an element the operation of a motor vehicle while intoxicated, was harmless, and defendant is not entitled to a new trial to correct the error"); People v. Petty, 7 N.Y.3d 277 (2006) ("Because there was overwhelming evidence disproving the justification defense and no reasonable possibility that the verdict would have been different had the charge been correctly given, the error in the trial court's justification charge was harmless"); People v. Jones, 3 N.Y.3d 491, 497 (2004) ("The overwhelming evidence disproved the justification defense, and there is no reasonable possibility that the verdict would have been different had the court given the requested instruction"); People v. Crimmins, 36 N.Y.2d 230 (1975); People v. Aiken, 6 A.D.3d 236, 237 (1st Dep't 2004) ("if there were any error in the refusal to give the requested charge, such error would have been harmless in view of the overwhelming evidence that defendant unjustifiably attacked the victim outside of defendant's apartment, which evidence leaves no significant probability, or

20

even a reasonable possibility, that the verdict would have been different had the requested charge been given").

The overwhelming evidence of defendant's guilt in this case included the eyewitness testimony of two eyewitnesses who saw defendant suddenly hit the victim, and although, neither witness saw defendant's knife, immediately after defendant hit the victim, the victim was bleeding from stab wounds in the area that defendant had hit him.

Moreover, submission of the lesser-included offense would not have affected the outcome of the trial. At trial, defendant testified that he did not stab the victim, that he did not even have a weapon, and that he did not know how the victim was stabbed. By contrast, the People's evidence at trial was that defendant stabbed the victim with little provocation and that defendant and the victim were not struggling or scuffling at the moment when defendant suddenly stabbed the victim (Solomon: 233-34, 267; Navarette: 144). When defendant was confronted at trial with his pretrial statements, defendant affirmatively disavowed those statements, asserting in essence that the statements were not voluntarily made. Accordingly, there is no reason to conclude that the jury would have rejected both the version of events advanced by the People's witnesses at trial and the version of events advanced by defendant's trial

21

testimony in favor of a version of events that both parties were affirmatively disavowing.

Furthermore, defendant's pretrial statements were inconsistent with the unrebutted and irrefutable medical evidence. In his pretrial statements, defendant alleged that he had swung the knife to ward off people who were attacking him. The unrebutted medical evidence however was that the victim did not die from stab wounds that were inflicted by a swinging knife, but rather that the victim died from a knife wound that had plunged five inches deep into his body, and which had required the use of force to penetrate so deeply and cut through bone. The medical evidence further showed that the victim sustained two additional stab wounds, each of which was two inches deep and each of which had also required the use of force to inflict, again demonstrating that defendant was not merely swinging his knife to and fro, but rather was stabbing the victim at an acute angle (Frederick: 73-74, 76). Additionally, the fact that defendant stabbed the victim three times shows that defendant was not swinging the knife indiscriminately but rather was intending to stab the victim. Irrespective of whether a jury might reasonably find that a single stab wound could be the result of an indiscriminate swinging of a knife, a jury could not reasonably find that three stab wounds to the same person were the result of indiscriminate swinging of a

22

knife. Accordingly, any error in the court's failure to submit the requested charge was harmless.

Defendant's alternate claim, that he was entitled to the submission of reckless manslaughter as a lesser-included offense based solely on the People's case at trial, is unpreserved for appellate review. At trial defendant argued only that he was entitled to the submission of reckless manslaughter based on his pretrial statements (647-48), but defendant did not argue that he was entitled to the submission of that count based on the People's case. Accordingly, because defendant did not move for the submission of that count based on the specific ground that he now raises for the first time on appeal, the claim is unpreserved for appellate review. See C.P.L. § 470.05(2); People v. Lynn, 27 A.D.3d 381 (1st Dep't 2006) ("Since defendant requested submission of a lesser included offense on a completely different theory from the one he advances on appeal, his present argument is unpreserved").

Moreover, reversal is not required in the interest of justice. First, the People's witnesses testified that, at the moment defendant stabbed the victim, there was no scuffle, but rather that defendant's actions were sudden (Navarette: 144; Solomon: 233-34, 267). Second, again, the medical evidence showed conclusively that defendant stabbed the victim deliberately, and not that defendant was swinging the knife

23

indiscriminately to ward off attackers. Third, contrary to defendant's assertion (Defendant's Br. at 25), the fact that two of the stab wounds were not fatal and were to the victim's back, does not suggest that the stabs were "wildly" inflicted or bear the "hallmarks of a classically reckless act." To the contrary, as the medical examiner and the trial court correctly concluded, the stab wounds were inflicted in a manner that was consistent solely with a deliberate act. Accordingly, the People's case did not warrant the submission of reckless manslaughter as a lesser-included offense.

Defendant also alternatively claims that he was entitled to the submission of the lesser-included offense of reckless-manslaughter because there was evidence, in defendant's view, that he was intoxicated (Defendant's Br. at 21). Defendant's claim is unpreserved for appellate review, and defendant concedes as much (Defendant's Br. at 32). See C.P.L. § 470.05(2); People v. Lynn, 27 A.D.3d 381 (1st Dep't 2006) ("Since defendant requested submission of a lesser included offense on a completely different theory from the one he advances on appeal, his present argument is unpreserved").

Moreover, reversal is not required in the interest of justice. Defendant asserts on appeal that there was evidence that he had consumed a "great deal" of alcohol on the night of the stabbing (Defendants Br. 26-27). Defendant overstates the

24

record.  There was no testimony that defendant had consumed a "great deal" of alcohol.  A review of the record does not show that defendant had consumed any more than three to four drinks after entering the El Bourinquen Bar (E. Rivera: 542-47, J. Rivera: 466-67).  Notably, defendant did not testify that he was intoxicated or that intoxication led him to act recklessly, and he made no such allegation in his pretrial statements either. Indeed, defendant testified that he did not stab the victim at all.  Additionally, even if defendant was intoxicated, he did not show that his intoxication acted to diminish his capacity to form the intent to cause serious physical injury.  To the contrary, defendant's actions surrounding the stabbing belie the contention that he was too intoxicated to have been able to form the intent to cause serious physical injury.  Again, the fact that defendant maintained the dexterity to stab his victim three times and with force itself belies the contention that he was overly intoxicated.  Additionally, the fact that defendant fled the scene after the stabbing tends to show that he was capable of appreciating the consequences of his actions and therefore presumably capable of forming an intent to cause serious physical injury.

This Court's decision in People v. Cintron, 74 A.D.2d 457 (2d Dep't 1980), is instructive.  In Cintron, this Court held that the mere fact that the trial record included evidence that

25

the defendant had consumed alcohol was insufficient to require the submission of reckless manslaughter as a lesser-included offense. In Cintron, this Court quoted a longstanding decision of the Court of Appeals, People v. Leonardi, 143 N.Y. 360, 365-366 (1894), which stated:

> That a man may be even grossly intoxicated and yet be capable of forming an intent to kill or do any other criminal act is indisputable, and if, while so intoxicated, he forms an intent to kill and carries it out with premeditation and deliberation, he is without doubt guilty of murder in the first degree, and the jury should, when such a defense is interposed, be so instructed * * * [W]here the criminal act is fairly and clearly proved, the fact of intoxication as furnishing evidence of the want of the criminal intent which the proof might otherwise show, should be considered by it with the greatest care, caution and circumspection, and such fact ought not to be allowed to alter the character or grade of the criminal act unless they have a fair and reasonable doubt of the existence of the necessary criminal purpose or intent after a consideration of such evidence of intoxication.

Cintron, 74 A.D.2d at 461 (brackets and asterisks in original). This Court concluded in Cintron that "[t]he foregoing indicates that there is an undeniable subjective element of intoxication, and that even an inebriated individual may be capable of forming an intent." Id. This Court in concluding that the evidence did not support the submission of the reckless manslaughter charge as a lesser-included offense noted that the record had demonstrated that defendant had still retained physical "dexterity" at the

26

time of the homicide, which undermined his claim that he was too intoxicated to have informed an intent. Id. at 463.

Thus, reversal in this case is not required in the interest of justice, because although the defense presented evidence that defendant had consumed some alcohol, there was no evidence that defendant was intoxicated or that his intoxication rendered him unable to form the requisite intent to seriously injure the victim. In sum, submission of reckless manslaughter as a lesser-included offense was unwarranted, because there was no reasonable view of the evidence to support submission of that charge. See People v. Echevarria, 17 A.D.3d 204 (1st Dep't 2005); People v. Rivera, 2 A.D.3d 542 (2d Dep't 2003) ("the evidence, viewed most favorably to the defendant, did not support the defendant's contention that his alcohol consumption affected his mental capacity to commit intentional murder"); People v. Spina, 275 A.D.2d 902 (4th Dep't 2000) ("court properly determined that the nature and number of injuries suffered by the victims was indicative of a brutality inconsistent with recklessness or criminal negligence and therefore, despite the alleged intoxication of defendant, no reasonable jury could conclude that defendant did not intend to cause the death of his victims").

Defendant's claim that the trial court was required to submit reckless manslaughter as a lesser-included offense

27

because the trial court submitted an intoxication charge is meritless. The decision to submit an intoxication charge does not inexorably bind a court to submit a lesser-included offense, irrespective of whether the submission is warranted. See People v. Butler, 84 N.Y.2d 627, 632 (1994) (decision to submit intoxication instruction does not "inexorably bind[] the trial court to instruct automatically on lesser-included manslaughter offenses, irrespective of particularized evidentiary evaluation.").

## POINT II

### THE SENTENCE IS APPROPRIATE AND SHOULD NOT BE MODIFIED.

Defendant's sentence of a determinate term of twenty-five years and a period of post-release supervision of five years on the manslaughter count is not excessive.

"[A] sentencing determination is a matter committed to the exercise of the sentencing court's discretion, for it is that court's primary responsibility." People v. Suitte, 90 A.D.2d 80, 83 (2d Dep't 1982) (citations omitted). Sentencing involves consideration of the crimes charged, the particular circumstances of the offender, and the purposes of the penal sanction (i.e., deterrence, rehabilitation, retribution and isolation). Id.

The reviewing Court, in the exercise of discretion, may reverse or modify a sentence in the interest of justice where it concludes that the "'sentence, though legal, was unduly harsh or severe.'" People v. Thompson, 60 N.Y.2d 513, 519 (1983) (quoting C.P.L. § 470.15[6][b]). However, the sentencing court's decision should be "afforded high respect" because the appellate court lacks some of the first hand knowledge of the case that the sentencing judge is in a position to obtain. Suitte, 90 A.D.2d at 85.

29

The sentence adjudged in this case was appropriate under these standards. Defendant was convicted of first-degree manslaughter, a class B violent felony. See P.L. § 70.02(1)(a). Defendant stabbed Ojeda intentionally with the intent to cause serious physical injury, and Ojeda died as a result.

Defendant, in 1992, was adjudicated a youthful offender for criminal possession of a weapon in the third degree and sentenced to six months jail and five years probation (Presentencing Report: 3). Defendant violated the terms of his probation, and his parole was revoked (Presentencing Report: 3). In addition to the instant case, defendant has two felony convictions, one for attempted criminal sale of a controlled substance in the third degree and one for attempted robbery in the second degree, a violent felony for which defendant was sentenced to serve three to six years in jail. For these reasons, defendant was adjudicated a second violent felony offender (Sentencing Minutes: 18). Defendant committed the instant crime less than six months after being released on parole.

In addition, defendant showed what the court deemed a "total lack of accountability for this matter with the inconsistent statements" defendant made in this case (Sentencing Minutes: 35). Defendant perjured himself at trial, and continued to maintain, when interviewed by the Probation

30

Department, that he had not had a knife on him and had not stabbed Ojeda (Presentencing Report: 2).

Defendant is a man with a violent temper. His inability to control his temper resulted in the senseless death of Edgar Ojeda. The imposed sentence of imprisonment of twenty-five years and five years post-release supervision is appropriate in order to deter defendant and others from committing similar crimes and to isolate defendant from society.

Therefore, the sentence imposed by the court below should be affirmed.

## CONCLUSION

FOR THE ABOVE REASONS, THE JUDGMENT OF CONVICTION SHOULD BE AFFIRMED.

Dated: Brooklyn, New York
       May 7, 2012

                              Respectfully submitted,

                              CHARLES J. HYNES
                              District Attorney
                              Kings County


SOLOMON NEUBORT
MICHAEL L. BRENNER
Assistant District Attorneys
      of Counsel

Certificate of Compliance
Pursuant to 22 NYCRR § 670.10.3(f)

This brief was prepared on a computer. A monospaced typeface was used, as follows:

    Name of typeface: Courier New
    Point size:  12
    Line spacing:  Double

According to the word count of the word processing system used to prepare the brief, the total number of words in the brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules, regulations, etc., is 6012.

                          Michael Brenner
                          Assistant District Attorney

**AFFIDAVIT OF MAILING**

file Copy

STATE OF NEW YORK)
COUNTY OF KINGS   )

I, ROSE HODGES, being sworn, state: I am employed in the Office of the

District Attorney for Kings County and am over the age of 18.

On the 7th day of May 2012, I served this document by enclosing 2 copies of in a

postpaid envelope addressed to Warren S. Landau, Esq., Appellate Advocates, 2 Rector

Street – 10th Floor, New York, NY 10006, attorney for Enrique Rivera, at his office and

by causing that envelope to be deposited in an official depository of the United States

Postal Service within the State of New York.

LINDA BREEN
NOTARY PUBLIC, State of New York
No. 02BR4732111
Qualified in New York County
Commission Expires August 31, 20___

Sworn to before me this 7th
day of May 2012

*To be argued by*
LEILA HULL
*(15 minutes)*

# Court of Appeals

### STATE OF NEW YORK,

_____

### PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

*- against –*

### ENRIQUE RIVERA,

*Defendant-Appellant.*

## REPLY BRIEF FOR DEFENDANT-APPELLANT

LYNN W. L. FAHEY
LEILA HULL
Attorneys for
    Defendant-Appellant
2 Rector Street, 10th Floor
New York, N.Y. 10006
T. (212) 693-0085
F. (212) 693-0878

October 7, 2013

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................ii

PRELIMINARY STATEMENT ............................................................................1

ARGUMENT .........................................................................................................1

           APPELLANT'S CLAIM THAT A REASONABLE VIEW OF
           THE EVIDENCE SUPPORTED SUBMITTING SECOND-
           DEGREE MANSLAUGHTER TO THE JURY IS BOTH
           PRESERVED FOR REVIEW AND MERITORIOUS, AND
           THE PEOPLE'S ATTEMPT TO REDEFINE THE
           HARMLESS ERROR RULE AS IT APPLIES TO LESSER
           INCLUDED OFFENSES SHOULD BE REJECTED.......................................1

CONCLUSION......................................................................................................12

i

## TABLE OF AUTHORITIES

### CASES

*People v. Borrello*, 52 N.Y.2d 952 (1981) ................................................................. 3
*People v. Buckley*, 75 N.Y.2d 843 (1990) .................................................................. 3
*People v. Cabassa*, 79 N.Y.2d 722 (1992) ................................................................. 3
*People v. Castro*, 76 A.D.3d 421 (1st Dep't 2010)................................................ 7, 8
*People v. Chestnut*, 19 N.Y.3d 606 (2012) ............................................................... 2
*People v. Concepcion*, 17 N.Y.3d 192 (2011) ........................................................... 6
*People v. Davis*, 90 A.D.3d 461 (1st Dep't 2011)...................................................... 8
*People v. Discala*, 45 N.Y.2d 38 (1978) ............................................................... 5, 6
*People v. Dodt*, 61 N.Y.2d 408 (1984) ...................................................................... 6
*People v. Echevarria*, 17 A.D.3d 204 (1st Dep't 2005) ............................................ 8
*People v. Flack*, 125 N.Y. 324 (1891) ..................................................................... 10
*People v. Gallagher*, 69 N.Y.2d 525 (1987) ...................................................... 10, 11
*People v. Gray*, 86 N.Y.2d 10 (1995) ................................................................... 2, 3
*People v. Green*, 56 N.Y.2d 427 (1982)................................................................. 8, 9
*People v. Heide*, 84 N.Y.2d 943 (1994) .................................................................... 7
*People v. LaFontaine*, 92 N.Y.2d 470 ....................................................................... 6
*People v. Lynn*, 27 A.D.3d 381 (1st Dep't 2006)....................................................... 4
*People v. Monroe*, 90 N.Y.2d 982 (1997) .................................................................. 4
*People v. Mussenden*, 308 N.Y. 558 (1995) ............................................................. 11
*People v. Navarette*, 131 A.D.2d 326 (1st Dep't 1987)............................................. 8
*People v. Petty*, 7 N.Y.3d 277 (2006)...................................................................... 10
*People v. Resek*, 3 N.Y.3d 385 (2004)....................................................................... 3
*People v. Robinson*, 36 N.Y.2d 224 (1975)............................................................... 4
*People v. Rodriguez*, 26 N.Y.2d 341 (2001)............................................................... 9
*People v. Sirico*, 17 N.Y.3d 744 (2011) .................................................................... 7
*People v. Spina*, 275 A.D.2d 902 (4th Dep't 2000) ................................................... 8
*People v. Sullivan*, 68 N.Y.2d 495 (1986) ................................................................. 7
*Policano v. Herbert*, 7 N.Y.3d 588 (2006) .............................................................. 10

### STATUTES

C.P.L. § 300.50(1) .................................................................................................. 9, 11
C.P.L. § 470.05(2) ......................................................................................................... 2
C.P.L. § 470.15(1) .................................................................................................... 2, 6

## PRELIMINARY STATEMENT

This brief is submitted in reply to the Brief for Respondent, received by Defendant-Appellant on September 13, 2013.

## ARGUMENT

> APPELLANT'S CLAIM THAT A REASONABLE VIEW OF THE EVIDENCE SUPPORTED SUBMITTING SECOND-DEGREE MANSLAUGHTER TO THE JURY IS BOTH PRESERVED FOR REVIEW AND MERITORIOUS, AND THE PEOPLE'S ATTEMPT TO REDEFINE THE HARMLESS ERROR RULE AS IT APPLIES TO LESSER INCLUDED OFFENSES SHOULD BE REJECTED.

The People claim that appellant's arguments on appeal are unpreserved. They also argue that there was no reasonable view of the evidence to justify submitting second-degree manslaughter to the jury. Finally, they argue that any error in refusing to submit the lesser included offense was harmless because the evidence against appellant was overwhelming. The People are incorrect on all fronts.

Counsel's request for submission of the lesser included offense to the jury and the court's decision preserved the issue for appellate review. Although Julio Rivera did not see the fatal stabbing, his description of the chaotic fight that led to Ojeda's death gave rise to a reasonable view of the evidence that appellant's conduct was reckless. Evidence that appellant was intoxicated further supported the view that his actions were reckless, and the People's

1

arguments that the court erred in giving an intoxication charge are unpreserved as well as unreviewable on appeal under Criminal Procedure Law § 470.15(1). Finally, an error in refusing to submit a lesser included offense that was supported by a reasonable view of the evidence cannot be considered harmless based on the theory that the evidence of the greater offense was overwhelming. The People's invitation to adopt this novel harmless error rule, which would remove a critical decision from the jury, should be rejected.

(A)

The People claim that appellant's argument is unpreserved because counsel did not marshall the specific facts appellant relies on in his appeal (Resp. Br. at 34-37). However, counsel's specific request for a charge of second-degree manslaughter and the court's explicit ruling that there was "no way there is any evidence to support that the injuries that caused death were recklessly inflicted" preserved this issue for review (A632).

The purpose of the preservation rule "is to bring the claim to the trial court's attention." *People v. Gray*, 86 N.Y.2d 10, 20-21 (1995); *see also People v. Chestnut*, 19 N.Y.3d 606, 611 n.2 (2012) ("preservation rule's 'specific objection' requirement should not be applied in [an] overly technical way . . . ; nor should a party's adherence to this requirement focus on minutiae or emphasize form over substance"). Under C.P.L. § 470.05(2), moreover, an issue is preserved if, "in response to a protest by a party, the court expressly decided the question

2

raised on appeal." Once that occurs, defense counsel does not need to protest the ruling or make additional arguments. *See People v. Resek*, 3 N.Y.3d 385, 388 n.1 (2004) ("We will not impose a preservation rule so extreme that defendant, to succeed, would have to antagonize the court or test its patience even further" because "such a rule would do nothing to advance the objectives of our preservation doctrine").

When the issue is the defendant's entitlement to submission of a lesser included offense, this Court has found a lack of preservation only when counsel *never* requested its submission. *See People v. Cabassa*, 79 N.Y.2d 722, 730 (1992) (defendant who did not join co-defendant's request for a lesser failed to preserve the matter for appellate review); *accord People v. Buckley*, 75 N.Y.2d 843, 846 (1990); *see also People v. Borrello*, 52 N.Y.2d 952, 953 (1981) (counsel never "requested the charge and therefore the point is not preserved for" review).

As these cases suggest, a lessers issue must be considered preserved once counsel makes an application for that specific lesser included offense, and certainly once the court makes clear that it understands which element of the offense is at issue. This comports with the Court's analogous holding in *People v. Gray*, 86 N.Y.2d at 20-21, that counsel must identify the particular element of a crime that the People have failed to prove to preserve a legal sufficiency claim.

3

Here, counsel specified the degree and offense he wished submitted (second-degree manslaughter) and the court acknowledged that his motion was premised on the claim that evidence supported a theory of reckless homicide (A631). The court immediately rejected counsel's request, ruling that "there is no reckless theory in the indictment" and "there is no way there is any evidence to support that the injuries that caused death were recklessly inflicted" (A632). Faced with the court's ruling, counsel pointed to appellant's statement as an example of record evidence that supported the charge (A632).  The court promptly rejected this argument as well (A632).

Contrary to the People's argument (Resp. Br. at 37), the failure of counsel or the court to refer specifically to Julio Rivera's testimony or appellant's consumption of alcohol does not mean that the court did not decide the precise issue raised: whether a reasonable view of the trial evidence supported finding that appellant was guilty of only a reckless homicide.[1]

---

[1] None of the cases the People cite refute this conclusion (*see* Resp. Br. at 36-37). *People v. Monroe*, 90 N.Y.2d 982, 984 (1997), ruled that the jury's viewings of evidence outside presence of the judge was not preserved when counsel advanced an entirely different legal theory on appeal. *People v. Robinson*, 36 N.Y.2d 224, 228 (1975), involved counsel's failure to object at all. Finally, the First Department's decision in *People v. Lynn*, 27 A.D.3d 381 (1st Dep't 2006), includes insufficient facts to indicate what the lack of preservation consisted of. At most, these cases hold that an argument is unpreserved when it is based on a separate and distinct legal theory than the one advanced at trial. Here, however, appellant asserts the same legal argument that counsel made and the court recognized at trial: that a reasonable view of the evidence entitled him to submission of second-degree manslaughter on the theory that he was guilty of only a reckless homicide and not an intentional one.

4

(B)

The People argue that Julio Rivera's description of a chaotic, multi-person melee and the evidence of appellant's alcohol consumption did not yield a reasonable view of the evidence that appellant recklessly caused Ojeda's death (Resp. Br. at 41-48). They also contend that Ojeda's injures were consistent only with an intent to seriously injure or kill him (Resp. Br. at 38-40, 48-49). Neither claim is availing.

The People mistakenly assert that, because Julio Rivera never saw appellant stab Ojeda, his testimony "did not shed any light regarding how Ojeda's wounds were inflicted" (Resp. Br. at 40-41). They ignore Rivera's description of the immediate circumstances surrounding the stabbing as a chaotic barroom brawl. That Rivera did not see the stabbing itself because he was too distracted by the many punches that were flying further supported a reasonable view of the evidence that Ojeda was stabbed in the midst of a confused melee involving several bar patrons and therefore that appellant's actions were reckless rather than intentional.

The People cite *People v. Discala*, 45 N.Y.2d 38, 43 (1978), for their contention that the jury would have to "resort to 'sheer speculation'" to conclude that Julio Rivera's testimony supported the view that appellant acted recklessly (Resp. Br. at 41). The Court in *Discala* found, however, that "charging the lesser included offense would force the jury to resort to sheer speculation"

5

because "the evidence essential to support a verdict of guilt of the lesser *necessarily prove[ed] guilt of the greater crime as well.*" *Id.* at 43 (emphasis added). This was not the situation in appellant's case, where Julio Rivera's testimony about the melee contributed to a reasonable view of the evidence that appellant caused Ojeda's death recklessly *rather than* intentionally.

Nor was appellant's drinking irrelevant. As the People concede, appellant had drunk an unspecified quantity of beer prior to arriving at the bar and drank three beers at the bar (Resp. Br. at 42). Accordingly, alcohol was a factor that the jury could have considered when judging appellant's *mens rea* in the context of all of the relevant circumstances that led to Ojeda's death (*see* Appellant's Main Brief at 20-30).

This Court should reject the People's attempt to relitigate the propriety of the court's decision to give an intoxication charge to the jury (Resp. Br. at 41-48). Because the court's ruling that the evidence warranted this instruction (A633) was not adverse to appellant, the question of whether the instruction was proper is not cognizable on appeal. *See* C.P.L. § 470.15(1); *People v. Concepcion,* 17 N.Y.3d 192 (2011); *People v. LaFontaine,* 92 N.Y.2d 470, 473–74 (1998). Moreover, the People never objected at trial to the intoxication charge (A633), rendering their argument unpreserved. *See People v. Dodt,* 61 N.Y.2d 408, 416 (1984) (the People may not raise on appeal a new legal claim to counter appellant's arguments when they had a full opportunity to make the same

6

argument below). For these reasons, the People's reliance on *People v. Sirico*, 17 N.Y.3d 744, 745-46 (2011), and other cases that relate solely to the propriety of an intoxication instruction is misplaced and offers no basis for this Court to reject appellant's lessers argument.

Claiming that appellant targeted Ojeda's vital organs, the People contend that the "medical evidence showed that" appellant stabbed Ojeda three times in the upper torso "with the intent to cause serious physical injury or death" (Resp. Br. at 38-39). The medical evidence, however, established that, although Ojeda sustained three wounds, two were relatively minor wounds to his upper back and shoulder, and the one fatal wound was to his upper chest or shoulder area (A55-57). These injuries, which all centered on his shoulder area, can hardly be considered evidence that appellant targeted Ojeda's vital organs (*see* Appellant's Main Brief at 27-28).

The People's argument also entirely ignores the well-established rule that intentional infliction of a wound does not necessarily establish that a person acted with the conscious objective to seriously injure or kill. *See People v. Heide*, 84 N.Y.2d 943, 944 (1994) (deliberate stab did not necessarily indicate intent to kill or seriously injure); *People v. Sullivan*, 68 N.Y.2d 495, 500-03 (1986) (shots deliberately fired at deceased's body mass were consistent with reckless, and not intentional, homicide).

7

The Appellate Division cases on which the People rely (Resp. Br. at 39) are distinguishable from the instant case. *People v. Castro*, 76 A.D.3d 421 (1st Dep't 2010), involved "six sharp-force" machete wounds to a victim's "head, neck, and shoulders" that "perforated her spine." Notably, the Appellate Division specifically distinguished *Castro* from *People v. Navarette*, 131 A.D.2d 326, 329 (1st Dep't 1987), in which evidence of a struggle that led to the defendant fatally stabbing his wife twice in the chest warranted submission of second-degree manslaughter to the jury. *See Castro*, 76 A.D.3d at 421. *People v. Echevarria*, 17 A.D.3d 204 (1st Dep't 2005), and *People v. Spina*, 275 A.D.2d 902, 904 (4th Dep't 2000), fail to specify what wounds were involved. *People v. Davis*, 90 A.D.3d 461 (1st Dep't 2011), involved intent "to cause physical injury as opposed to serious physical injury," and thus had nothing to do with intent versus recklessness.[2]

(C)

Finally, this Court should reject the People's novel assertion that any error was harmless based on a theory that the evidence of appellant's guilt of first-degree manslaughter was overwhelming (Resp. Br. at 55). The People ask this Court to jettison the rule it set forth in *People v. Green*, 56 N.Y.2d 427, 435

---

[2] In his main brief, appellant has already addressed the other cases the People cite to support their argument with respect to Ojeda's injuries (*See* Resp. Br. at 39-40; Appellant's Main Brief at 27).

8

(1982), that only if a "defendant were convicted of the higher offense . . . and acquitted of the lower offense charge . . . would the failure to charge an even lesser offense . . . be harmless."[3] The People's argument ultimately fails because the strength and weakness of the proof as to any crime is subsumed within the reasonable view test. Once either party establishes that a reasonable view of the evidence supports a lesser included charge, the evidence, by definition, is not overwhelming and the decision between the charges supported by a reasonable view of the evidence is the jury's to make. *See* C.P.L. § 300.50(1) (a court *must* submit a lesser offense on request if there is a reasonable view of the evidence that supports its submission).

Nothing in the Court's decision in *Green* supports a different rule (Resp. Br. at 56-59). Nor have the People pointed to a single case in which this Court has held that an error in refusing to submit a lesser included offense was harmless because of "overwhelming evidence" of the greater offense. *People v. Rodriguez*, 26 N.Y.2d 341, 346 (2001), actually undercuts the People's argument. In *Rodriguez*, 26 N.Y.2d at 346, a justification charge error was harmless because the jury's verdict convicting the defendant of certain counts made it clear that it had rejected justification. Thus, its holding was akin to the rule in *Green*: that a

---

[3] The People imply that appellant consciously omitted relevant portions of the Court's decision in *People v. Green* from his main brief (Resp. Br. at 55). Appellant omitted only the particular crimes at issue in that case, not anything that changed the meaning of the quoted text.

charge error will be harmless when *the jury's decision shows* that it did not matter and could not have mattered.

In *People v. Petty*, 7 N.Y.3d 277, 286 (2006), the court's incorrect justification charge was harmless because the shooting "was unjustified" and thus there was no "reasonable possibility that the verdict would have been different" with a correct charge. In other words, no reasonable view of the evidence supported giving a justification charge. Here, in contrast, there was a reasonable view of the evidence that supported submission of the lesser. Once that was so, the choice among the counts was up to the jurors.

Ultimately, whenever different views of what the evidence proves are both reasonable, it is the jury's responsibility to determine a defendant's *mens rea*, and to accept the People's argument would be to usurp the jury's role as fact-finder. This Court has long held that "the question of intent can never be ruled as a question of law" and "must always be submitted to the jury." *People v. Flack*, 125 N.Y. 324, 334 (1891); *see also Policano v. Herbert*, 7 N.Y.3d 588 (2006) ("the question of the defendant's state of mind" is "a classic matter for the jury"). For this reason, the Court held in *People v. Gallagher*, 69 N.Y.2d 525, 530 (1987), that the Appellate Division could not remedy the trial court's failure to charge intentional and depraved indifference murder in the alternative by simply modifying the judgment on appeal:

10

> It is not for the Appellate Division in the first
> instance to determine whether defendant acted
> intentionally or recklessly at the time of the crime.
> *That is the jury's function.* Because the jury here failed
> to make the critical determination of defendant's
> mental state, an omission that cannot be cured by
> the Appellate Division's exercise of interest of justice
> jurisdiction, *the error has not been rendered academic.*

*Id.* at 531 (emphasis added).

Furthermore, the People's claim is inconsistent with the Legislature's intent. C.P.L. § 300.50(1). One of the purposes of the statue is to permit the jury to extend mercy to a defendant even though the evidence may favor guilt of the greater offense, providing that there is a rational evidentiary basis for the jury to convict of the lesser. *See People v. Mussenden*, 308 N.Y. 558, 562-63 (1995).

\* \* \*

In sum, a reasonable view of the evidence supported submission of second-degree manslaughter to the jury as a lesser included offense, and the court's refusal to do so warrants reversal of appellant's conviction and a new trial.

11

## CONCLUSION

FOR THE REASONS STATED ABOVE AND IN
APPELLANT'S MAIN BRIEF, APPELLANT'S
CONVICTION MUST BE REVERSED AND A
NEW TRIAL ORDERED.

Respectfully submitted,
LYNN W.L. FAHEY
Attorney for Defendant-Appellant

Leila Hull
*Of Counsel*
October 2013

12

*To be argued by*
LEILA HULL

*(15 minutes)*

# Court of Appeals

## STATE OF NEW YORK,

PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

- *against* —

ENRIQUE RIVERA,

*Defendant- Appellant.*

## BRIEF FOR DEFENDANT-APPELLANT

LYNN W. L. FAHEY
LEILA HULL
Attorneys for
    Defendant-Appellant
2 Rector Street, 10th Floor
New York, N.Y. 10006
(212) 693-0085

May 29, 2013

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.............................................................................................iii

PRELIMINARY STATEMENT .......................................................................................1

QUESTION PRESENTED................................................................................................2

SUMMARY OF ARGUMENT.........................................................................................2

STATEMENT OF FACTS ................................................................................................4

    Introduction ...................................................................................................................4

    The Conclusion of Appellant's First Trial in a Mistrial....................................5

    The People's Case at the Second Trial. ...................................................................6

        The Eye-Witness Accounts............................................................................6

        Appellant's Statement to Police....................................................................9

        The Medical Evidence. ................................................................................ 10

    The Defense Case ...................................................................................................... 11

    The Charge Conference, Jury Charge, Deliberations, and Verdict .......... 13

    The Appellate Division Decision........................................................................ 15

ARGUMENT.................................................................................................................... 16

>THE COURT VIOLATED APPELLANT'S DUE
>PROCESS RIGHT TO A FAIR TRIAL WHEN IT
>REFUSED TO CHARGE SECOND-DEGREE
>MANSLAUGHTER TO THE JURY AS A
>LESSER INCLUDED OFFENSE OF SECOND-
>DEGREE MURDER, ALTHOUGH THERE
>WAS A REASONABLE VIEW OF THE
>EVIDENCE THAT APPELLANT, WHO HAD
>BEEN DRINKING, RECKLESSLY KILLED
>THE DECEASED DURING A BARROOM
>BRAWL.............................................................................. 16

A. The Legal Standard for Submitting a Lesser Included Offense to
the Jury ........................................................................................................................ 17

B. The Reasonable View of the Evidence Supporting Submission of
Second-Degree Manslaughter to Appellant's Jury ............................................. 20

CONCLUSION ............................................................................................................... 31

## **TABLE OF AUTHORITIES**

<u>CASES</u>

*People v. Alexis*, 65 A.D3d 1160 (2d Dep't 2009) ................................................. 27

*People v. Asan*, 22 N.Y.2d 526 (1968)............................................................... 18, 29

*People v. Barnes*, 265 A.D.2d 169 (1st Dep't 1999) ........................................... 15, 27

*People v. Brown*, 82 N.Y.2d 869 (1993) ......................................................... 29

*People v. Butler*, 84 N.Y.2d 627 (1994)................................................... 3, 20, 24, 26

*People v. Butts*, 72 N.Y.2d 746 (1988) .......................................................... 29

*People v. Cabassa*, 79 N.Y.2d 722 (1992) ...................................................... 31

*People v. Collins*, 290 A.D.2d 457 (2d Dep't 2002)....................................... 27

*People v. Dabney*, 231 A.D.2d 431 (1st Dep't 1996) ...................................... 27

*People v. Edwards*, 95 N.Y.2d 486 (2000) ................................................... 31

*People v. Flack*, 125 N.Y. 324 (1891) ....................................................... 2, 19

*People v. Glover*, 57 N.Y.2d 61 (1982) ....................................................... 17, 18

*People v. Green*, 56 N.Y.2d 427 (1982) ................................................. 17, 18, 19, 30

*People v. Heide*, 84 N.Y.2d 943 (1994) ..................................................... 3, 25

*People v. Heide*, 206 A.D.2d 875 (4th Dep't 1994) ....................................... 25

*People v. Henderson*, 41 N.Y.2d 233 (1976) ............................................... 2, 18

*People v. Lee*, 35 N.Y.2d 826 (1974).......................................................... 3, 24

*People v. Lopez*, 72 A.D.3d 593 (1st Dep't 2010) ........................................ 15, 27

*People v. Martin*, 59 N.Y.2d 704 (1987) .................................................... 3, 18

*People v. Murry*, 40 N.Y.2d 327 (1976) ..................................................... 22

*People v. Mussenden*, 308 N.Y. 558  (1955)................................................ 2, 19

*People v. Negron*, 91 N.Y.2d 788 (1998) ..................................................... 18

*People v. Perry*, 19 N.Y.3d 70 (2012) ......................................................... 17

*People v. Pizarro*, 89 A.D.3d 871 (2d Dep't 2011) ....................................... 15

iii

*People v. Porter*, 161 A.D.2d 811 (2d Dep't 1999) ............................................. 15, 27

*People v. Rodriguez*, 33 A.D.3d 730 (2d Dep't 2006) ............................................... 26

*People v. Scarborough*, 49 N.Y.2d 364 (1980).................................................... 2, 18, 19

*People v. Stanford*, 87 A.D.3d 1367 (4th Dep't 2011) ............................................. 27

*People v. Steele*, 26 N.Y.2d 526 (1970) ............................................................... 29

*People v. Suarez*, 6 N.Y.3d 202 (2005)............................................................ 2, 20, 23

*People v. Sullivan*, 68 N.Y.2d 495 (1986)......................................................... 4, 17, 26

*People v. Tai*, 39 N.Y.2d 894 (1979)................................................................. 3, 22

*People v. Tai*, 48 A.D.2d 933 (2d Dep't 1975) ....................................................... 22

*People v. Van Norstrand*, 85 N.Y.2d 131 (1995)..................................................... 18

*People v. Vega*, 68 A.D.3d 665 (1st Dep't 2009)..................................................... 27

*Policano v. Herbert*, 7 N.Y.3d 588 (2006) ............................................................ 20

*Rivera v. Firetog*, 11 N.Y.3d 501 (2008) ........................................................ 4, 5, 28

*People v. Ivisic*, 95 A.D.2d 308 (2d Dep't 1983) ..................................................... 29

## CONSTITUTIONS

N.Y. Const. Art. 1, § 6............................................................................................. 16

U.S. Const., Amend. V, XIV .................................................................................. 16

U.S. Const., Amend. XIV .................................................................................... 16

## STATUTES

C.P.L. § 300.50(1), (2)............................................................................................. 17

C.P.L. § 450.90(2)(a) ................................................................................................. 1

C.P.L. § 300.50(1)..................................................................................................... 18

COURT OF APPEALS
THE STATE OF NEW YORK

-------------------------------------------------------------------------

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

-against-

ENRIQUE RIVERA,

Defendant – Appellant.

-------------------------------------------------------------------------

PRELIMINARY STATEMENT

By permission of the Honorable Victoria A. Graffeo, Judge of the Court of Appeals, granted on March 1, 2013, appellant Enrique Rivera appeals from a November 7, 2012, order of the Appellate Division, Second Department, which affirmed a June 8, 2009, judgment of the Supreme Court, Kings County, convicting him, after jury trial, of manslaughter in the first degree and sentencing him to a determinate prison term of 25 years and 5 years of post-release supervision.

On March 21, 2013, this Court granted appellant poor person relief and assigned Lynn W. L. Fahey as counsel. No stay has been sought. Appellant is incarcerated pursuant to the judgment.

The Court has jurisdiction to entertain this appeal and to review the issue raised pursuant to C.P.L. § 450.90(2)(a). The issue is preserved by defense

1

counsel's request that the trial court submit second-degree manslaughter to the jury (A631-33).[1]

## QUESTION PRESENTED

Did the court violate appellant's due process right to a fair trial when it refused to charge second-degree manslaughter to the jury as a lesser included offense of second-degree murder, although there was a reasonable view of the evidence that appellant, who had been drinking, recklessly killed the deceased during a barroom brawl?

## SUMMARY OF ARGUMENT

The standard for submission of a lesser included offense to a jury is purposely generous, requiring only that a reasonable view of the evidence provide an identifiable basis for the jury to convict the defendant of the lesser offense, but not the greater. *See People v. Scarborough,* 49 N.Y.2d 364, 368-74 (1980); *People v. Henderson,* 41 N.Y.2d 233, 236 (1976); *People v. Mussenden,* 308 N.Y. 558 562-63 (1955). Underscoring this rule is the long-standing principle that the "question of intent can never be ruled as question of law, but must always be submitted to the jury." *People v. Flack,* 125 N.Y. 324, 334 (1891); *accord People v. Suarez,* 6 N.Y.3d 202, 212 n.6 (2005).

A rare exception exists in homicide cases when the extreme nature of the injuries forecloses any finding other than that the defendant intended to cause

---

[1]     Parenthetical numbers preceded by "A" will refer to pages of the Appendix.

2

the deceased's death or serious physical injury. *See People v. Butler*, 84 N.Y.2d 627, 629 (1994) (*inter alia*, 34 stab wounds, 9 potentially fatal). Accordingly, the refusal to instruct the jury on second-degree manslaughter as a lesser included offense of murder is error unless the record, viewed in the light most favorable to the defendant, *People v. Martin*, 59 N.Y.2d 704, 705 (1987), completely excludes the possibility that the defendant acted recklessly.

Here, a defense eye-witness testified that Edgar Ojeda was killed during a sudden barroom brawl among people who had been drinking, during which appellant was surrounded by several angry men and numerous people threw punches. This evidence of a chaotic fight involving multiple people, as well as evidence of appellant's intoxication, provided a reasonable basis for the jury to conclude that appellant's *mens rea* was reckless rather than intentional. *See People v. Tai*, 39 N.Y.2d 894, 895 (1979); *People v. Lee*, 35 N.Y.2d 826, 826-27 (1974).

Contrary to the trial court's view, Ojeda's injuries, which consisted of one fatal stab wound to his upper chest and shoulder area that punctured his lung and two shallower wounds to his shoulder and upper back, did not make this the rare case in which the injuries were so extreme that they conclusively established an intent to cause death or serious physical injury. Nor did the medical examiner's opinion that the wounds required some force, rather than merely "waving a knife around," necessarily mean that appellant had the conscious objective to kill or seriously injure Ojeda. *See People v. Heide*, 84

3

N.Y.2d 943, 944 (1994) (deliberate stab did not necessarily indicate intend to kill or seriously injure); *People v. Sullivan*, 68 N.Y.2d 495, 500-03 (1986) (shots deliberately fired at deceased's body mass consistent with reckless homicide).

Because a reasonable view of the evidence in the light most favorable to the defendant provided a basis to submit second-degree manslaughter to appellant's jury, the court erred in refusing to do so and appellant is entitled to a new trial.

## STATEMENT OF FACTS

### Introduction

Appellant was indicted for second-degree murder and related offenses in connection with the February 2005 Brooklyn barroom confrontation that resulted in the death of Edgar Ojeda. At appellant's first trial, before the Honorable Robert J. Collini, the court submitted second-degree manslaughter to the jury as a lesser included offense of murder. The jury deadlocked, and, after six days of deliberations during which the jurors asked repeatedly about the reckless as well as intentional homicide counts, the court declared a mistrial.

This Court subsequently held that double jeopardy did not bar a retrial. *Rivera v. Firetog*, 11 N.Y.3d 501, 508 (2008). At the retrial, before the Honorable Alan Marrus, the court issued an intoxication charge and submitted first-degree manslaughter to the jury as a lesser included offense of second-degree murder.

4

It refused defense counsel's request to submit second-degree manslaughter to the jury, however, primarily on the theory that Ojeda's injuries showed that the homicide could only have been intentional. On the second day of deliberations, after requesting reinstruction on intent and reasonable doubt, the jury acquitted appellant of second-degree murder but convicted him of first-degree manslaughter.

### The Conclusion of Appellant's First Trial in a Mistrial

At appellant's first trial, at which he testified, the court submitted to the jury the second-degree murder count along with the lesser included offenses of first- and second-degree manslaughter. *See Rivera v. Firetog*, 11 N.Y.3d at 503. The jury deliberated for six days until the court declared a mistrial, determining that the jury was hopelessly deadlocked. *Id.* at 503-05. During those six days, the jury submitted several notes to the court requesting, *inter alia*, reinstruction "on all three counts." *Id.* at 504. It also sought "clarification of the terms 'bodily harm' and 'reckless action,'" which the court interpreted as referring to "the two manslaughter counts." *Id.* at 504. On the sixth day, the jury announced for the third time that it was deadlocked and the court declared a mistrial. *Id.* at 505.

The People's Case at the Second Trial

### The Eye-Witness Accounts

At approximately 11:30 or 11:45 p.m. on February 26, 2005, off-duty bouncer Enrique Navarette, who had had about three or four beers at dinner, arrived at the darkly-lit El Borinquen Bar (A118, A120, A145, A158-61). After having several more drinks, he noticed a group of men, including appellant, being "patted down" for weapons as they entered the bar (A125, 156-57, A159). The group bought beers, then went to the back of the bar, where Jahaira, another bar patrol, was standing (A123-24, A157).

Meanwhile, Jonathan Dominguez, Carlos Solomon, Marcus Carrasquillo, and Edgar Ojeda had spent an hour or two at a nearby strip club, where they each drank two or three beers before arriving at El Borinquen Bar between 1:00 and 1:30 a.m. (A174-72, A209, A208-09, A274-76). After settling in at the bar, the group began drinking by a jukebox near the bar's exit, about ten feet away from Navarette (A126).

The People's four eye witnesses – Carrasquillo, Dominguez, Solomon, and Naverette – described a fight, after which appellant and his group left the bar and Ojeda realized that he had been stabbed.

Carrasquillo left his friends briefly to order his second beer at the bar when he heard a "commotion" and "feet moving" "back and forth" behind him (A279-81). He approached the commotion and, following a remark by Solomon, chased two men out of the bar (A280-82, A287, A289). Although he denied seeing his friends fighting (A287-90), he was impeached with his testimony from appellant's first trial, in which he described turning around and seeing a chaotic fight involving all of his companions:

> From when I was waiting for my Heinekens there was a big ruckus. I turned around, I seen everybody. There was a lot of just a ruckus. So I didn't know who was involved in the ruckus. I was moving people out of my way to make sure the people I was involved with were not involved. I saw they were involved. . . . I saw Carlos [Solomon] and Jonathon [Dominguez] fighting some guys (A289).

Dominguez, who had drunk several beers, was standing between the bar and the jukebox speaking with "Rudy" when, over "pretty loud" music, he heard a "scuffle," by which he meant "people arguing" (A177-79, A194, A197). He turned around and saw the on-duty bouncer evict appellant and one of his companions from the bar and then lock the exit door (A179-82, A190-91). Dominguez then realized that Ojeda had been stabbed, prompting him and Solomon to attack a companion of appellant's who had remained behind in the bar (A179, A180, A191-92).

7

Solomon, who was standing near Ojeda by the jukebox, denied that he witnessed any "commotion" inside the bar (A212-13, A259-61), although he was impeached with his testimony at the prior trial that there was a frantic melee with "stuff going on everywhere. . . . People running back and forth, People screaming. People yelling" (A260).

Solomon claimed that, while Dominguez and Carrasquillo were at the bar, appellant whispered something in Ojeda's ear and Ojeda responded (A214-16, A264-65). When two of appellant's friends came over, Solomon asked one of them "if there was a problem," and the man said that Solomon should "mind [his] fucking business" (A217-18, A244-46, A250-51). At this point, Dominguez and Carrasquillo joined Solomon and Ojeda (A241). When Solomon responded that "my friend's business is my business," appellant suddenly struck or placed "his hand on" Ojeda twice "around the top of his shoulder" or "chest area" (A218-20, A244-46, A250-51). Appellant and another man then ran out the exit; the bouncer stopped a third member of appellant's group from leaving, and Solomon tried to punch him over the bouncer's shoulder (A220-21, A254-55).

As he was sitting at the bar, Navarette glanced over at the jukebox and, "[a]ll of a sudden," saw appellant "push" Ojeda, prompting the on-duty bouncer and Naverette to intervene (A128-29). Navarette could not say "exactly" what happened, but he thought that appellant touched Ojeda

8

"maybe" "twice" in the left "shoulder, chest area" (A129-30). Appellant walked to the exit door followed by the on-duty bouncer while Solomon continued to swing over Navarette at one of appellant's friends (A129-30, A148). Navarette blocked Ojeda and Solomon from following appellant out of the bar to ensure that the opposing groups remained separated (A129-31).

After appellant left, Ojeda, who was bleeding, said he had been stabbed (A132-33, A180, A222, A282). His friends brought him to the hospital, where he later died (A116, A165-66, A182-84, A223-26, A274-75).

### Appellant's Statement to Police

The following day, the police arrested and interrogated appellant after he waived his *Miranda* rights (A344-52). Appellant said that he went to El Borinquen with his brother and a couple of friends to have a few drinks (A351). When he got "looks" from someone who said, "What's up[?]," appellant responded, "What's your problem?" (A351). When he felt "grabbing and punching," appellant took out a knife and "started swinging at the crowd" (A351). He did not know "that he [had] actually hit or hurt anyone" (A351-52).

Appellant gave the police a substantially similar written statement, adding that the confrontation took place after appellant had had a drink, and that he swung the knife in self-defense at the crowd that had risen up against him (A352-54; People's Ex. 10 [statement]). Appellant additionally wrote:

9

I didn't mean it. I was just scared. I know by saying sorry is not going to bring that person back, but I really didn't mean this to go down this way. I'm very sorry (A356; People's Ex. 10).

A few hours later, appellant gave a videotaped statement to an assistant district attorney that was substantially the same as his written statement (A423; People's Ex. 12 [videotaped statement]). The People read into evidence a portion of appellant's testimony from his first trial, in which he admitted having worn a hat that the police recovered from his mother's home, which had traces of Ojeda's blood on it (A437-39).

The Medical Evidence

Ojeda, who was approximately 5'5" tall and had been drinking and smoking marijuana, sustained three stab wounds, one of which was fatal (A55-63; A166). The medical examiner could not determine the order in which the wounds had been inflicted (A55). The fatal wound was located on Ojeda's shoulder or upper chest, 11 ½ inches below the top of Ojeda's head, and 3 ¼ inches to the left of the anterior of his neck. It penetrated his chest cavity by approximately five inches, perforating the upper lobe of his left lung and cutting his second rib (A55).

Another wound was two inches deep, to the back of Ojeda's left shoulder, approximately ¾ of an inch lower than the fatal wound, and penetrated only skin and muscle (A57). The remaining wound was on the left-

10

side of Ojeda's back, about 4 ½ to 5 inches lower than the fatal wound and approximately 2 ¼ inches deep, penetrating only the "subcutaneous tissue" and "muscle of the left side of the back" (A56).

All three wounds had a downward trajectory and required some force; they were not consistent with someone simply "waving a knife around" (A55-56, A61-62, A69). Dr. Frederick explained, "you [would] have to stab the person," and demonstrated by holding her right hand at shoulder level and gesturing "downwards" (A61).

The Defense Case

On the night of February 26, 2005, appellant's brother, Julio Rivera, arrived at El Borinquen Bar where he met appellant and two mutual friends nicknamed "Little Julio" and "JP" (A447-48, A486). Inside the dimly-lit bar, the group joined appellant's cousin Jahaira, her boyfriend Rudy, her brother, and his date (A451). The four newcomers got the first of several rounds of drinks and everyone went to the back of the bar with Jahaira's group (A451-52).

Later that night, when appellant had returned to the bar to buy another round of drinks, Julio saw three to five men surrounding and cursing at appellant and Little Julio, who were standing near the jukebox and side exit door of the bar (A452-53, A483, A487-92, A494-95). When some of the group made "hand gestures" and "point[ed] fingers" at appellant, Julio and JP

11

approached them (A453). Julio had to "push around toward the guys" who were confronting appellant (A453). He asked Ojeda and his friends "what the F [is] wrong with you guys," then turned to ask appellant the same question (A453, A455-56, A484-85, A491-95, A501).

"As soon as" Julio turned back again, he "got punched in the face," at which point "all the punches started going off" (A453, A455, A496-98). Julio and "everyone" started to fight (A454). He recalled that a punch was even thrown "over [his] back" (A453, A496-98). Eventually, Julio saw the bouncer escort appellant to the exit (A454, A456-57). He and JP followed appellant outside as a chair was thrown nearby (A454, A456-57, A500).

Appellant Enrique Rivera testified that he had been drinking beer prior to arriving at the bar (A574-75). He went to the bathroom to use his cell phone and encountered Ojeda, who commented, "This ain't no phone booth" (A528-29, A589, A585). Appellant left the bathroom and, after ordering his fourth beer since arriving at the bar, he walked over to the Ojeda, who had been staring at him aggressively, to ask him what was wrong (A531, A574-75). Things got "out of hand" as a crowd "gather[ed] up" and people began cursing at appellant (A532, A549, A604-05). While appellant asked the people near him to "chill," Solomon punched appellant, who responded by punching Solomon and Ojeda (A532-34, A549, A608-12). As the bouncer "rushed" him out,

12

appellant heard ongoing fighting and cursing inside the bar (A534-35). He denied stabbing Ojeda (A533-34).

According to Julio, Jahaira, who remained behind at the bar, later informed him that someone had been stabbed (A461, A507-08). The following day, February 28, 2005, the police arrested appellant (A558-59, A561). At the stationhouse, appellant gave an oral and written statement to the police and a videotaped statement to a prosecutor (A564-69). At trial, he denied the truth of the statements, asserting that he made them only because the police had threatened to charge his brother with murder unless he confessed and suggested that he claim he acted in self-defense (A462).

The Charge Conference, Jury Charge, Deliberations, and Verdict

Without objection, the court proposed submitting first-degree manslaughter to the jury as a lesser included offense of second-degree murder (A631). Defense counsel requested that the court also submit second-degree manslaughter to the jury, arguing that swinging a knife, as appellant admitted in his statements that the People placed in evidence, would be reckless (A631-32). The court denied that request, noting that the People had indicted appellant for an intentional murder, that appellant denied the stabbing, and that the medical examiner testified that the stab wounds "could not have been inflicted by someone just swinging a knife around" (A632-33). Because the wounds "had to

13

have been . . . caused by intentional infliction" there was, in the court's view "no basis to submit a reckless count on the evidence in th[e] case" (A633). Nevertheless, because "there was evidence of intoxication," the court would charge the jury "as to how [intoxication] relates to someone's intent" (A633).

The court instructed the jury on intoxication as follows:

> You have heard some evidence at this trial . . .
> indicat[ing] that the defendant may have been
> intoxicated during the course of this incident.
> Evidence of intoxication is not a defense to a crime
> under our law. It may be considered, whenever
> relevant, to negate an element of the crime charged.
> Thus, you may consider a defendant's state of
> intoxication as it might relate to his intent . . . .
> Under our law, you may consider whether or not
> someone's state of intoxication affected the level of
> intent that he might have had at the time (A753).

The court submitted, in the alternative, the counts of second-degree murder and first-degree manslaughter to the jury (A759-62).

The jury requested that the court "define intent" and "define the p[ara]meters of reasonable doubt" because it was "having difficult[y] defining reasonable doubt with intent to kill"; the court complied (A768-74). The jury also requested and was given the diagram showing the location of Ojeda's wounds and the direct testimony of the medical examiner (A768-74). It acquitted appellant of second-degree murder but convicted him of first-degree manslaughter (A782-85).

14

The Appellate Division Decision

On appeal, appellant argued, *inter alia*, that the court violated his due process right to a fair trial when it refused to submit second-degree manslaughter to the jury as a lesser included offense because a reasonable view of the evidence supported the conclusion that he killed Ojeda recklessly. On November 7, 2012, the Appellate Division, Second Department, affirmed the conviction, ruling that "there was no reasonable view of the evidence that would support a finding that the defendant acted recklessly when he stabbed the victim," citing *People v. Pizarro*, 89 A.D.3d 871 (2d Dep't 2011); *People v. Lopez*, 72 A.D.3d 593 (1st Dep't 2010); *People v. Barnes*, 265 A.D.2d 169 (1st Dep't 1999); and *People v. Porter*, 161 A.D.2d 811 (2d Dep't 1999) (A2).

On March 1, 2013, the Honorable Victoria A. Graffeo granted appellant leave to appeal.

ARGUMENT

THE COURT VIOLATED APPELLANT'S DUE
PROCESS RIGHT TO A FAIR TRIAL WHEN IT
REFUSED TO CHARGE TO THE JURY
SECOND-DEGREE MANSLAUGHTER AS A
LESSER INCLUDED OFFENSE OF SECOND-
DEGREE MURDER, ALTHOUGH THERE
WAS A REASONABLE VIEW OF THE
EVIDENCE THAT APPELLANT, WHO HAD
BEEN DRINKING, RECKLESSLY KILLED
THE DECEASED DURING A BARROOM
BRAWL.

Viewed in the light most favorable to the defense, there was a reasonable

view of the evidence that appellant acted recklessly in causing Edgar Ojeda's

death during a chaotic barroom brawl, which defense witness Julio Rivera

described, among numerous men all of who had been drinking. This was not,

as the trial judge believed, the rare case in which the nature of the wounds

themselves ruled out all but an intentional homicide. Indeed, appellant's first

jury appears to have struggled for days over precisely the issue of whether the

homicide here was intentional or reckless, although the nature of Ojeda's

wounds obviously did not change between the first trial and the second.

Accordingly, the trial court's denial of defense counsel's request to submit

second-degree manslaughter to the jury denied appellant his federal and state

due process rights to a fair trial. U.S. Const., Amend. V, XIV; N.Y. Const. Art.

1, § 6.

A. The Legal Standard for Submitting a Lesser Included Offense to the Jury

A court "must" grant a party's request to submit a lesser included offense to the jury if "there is a reasonable view of the evidence which would support a finding that the defendant committed" the lesser, but not the greater, offense. C.P.L. § 300.50(1), (2); *see also People v. Perry*, 19 N.Y.3d 70, 72 (2012) ("Defendant was entitled to have the lesser count submitted if there was 'a reasonable view of the evidence which would support a finding that the defendant committed such lesser offense but did not commit the greater'").

In *People v. Glover*, 57 N.Y.2d 61, 63-64 (1982), this Court set forth a two-pronged test for deciding whether a court should charge a requested lesser included offense. First, the requested offense must be of a "lesser grade" and it must be "impossible to commit the greater crime without concomitantly, by the same conduct, committing the lesser offense." *Id.* That first prong was satisfied here because "reckless manslaughter is a lesser included offense of intentional murder." *People v. Green,* 56 N.Y.2d 427, 433 (1982); *accord People v. Sullivan*, 68 N.Y.2d at 502.

"That established," the party seeking submission of the lesser offense "must then show that there is a reasonable view of the evidence in the particular case that would support a finding that [the defendant] committed the lesser offense but not the greater." *Glover*, 57 N.Y.2d at 63. This second prong of the test requires determining whether, "under *any* reasonable view of the

17

evidence, it is possible for the trier of facts to acquit defendant on the higher count and still find him guilty of the lesser one." *People v. Van Norstrand*, 85 N.Y.2d 131, 136 (1995) (emphasis added); *accord* C.P.L. §300.50(1); *Glover*, 56 N.Y.2d at 64.

This inquiry "is not directed at whether persuasive evidence of guilt of the greater crime exists." *Van Norstrand*, 85 N.Y.2d at 136. "[T]he court's evaluation of the persuasiveness of the evidence of guilt of the greater crime is irrelevant." *Green*, 56 N.Y.2d at 434.

The appropriate inquiry is whether the evidence, viewed "in the light most favorable to the defendant," *People v. Martin*, 59 N.Y.2d. 704, 705 (1987), provides a "rational basis" to convict him of the lesser but not the greater offense. *People v. Henderson*, 41 N.Y.2d 233, 236 (1976). The court must allow for the possibility that the jury can "accept or reject part or all of the defense or prosecution evidence," so long as there is a rational basis for doing so. *People v. Scarborough*, 49 N.Y.2d 364, 372-73 (1980) (citing *Henderson*, 41 N.Y.2d at 236). The jury "is entitled to assess the credibility of witnesses and determine . . . what portion of their testimony to accept." *People v. Negron*, 91 N.Y.2d 788, 792 (1998); *see also People v. Asan*, 22 N.Y.2d 526, 532 (1968) ("[A] jury may properly find a lesser included offense from *any portion* of the defense and prosecution evidence, or from any part of the total proof" (emphasis added)).

18

In order to satisfy the second prong of the test for submission of a lesser included offense, a party must demonstrate that a rational view of the evidence, rather than a purely hypothetical view, would establish guilt of the lesser, but not the greater, offense. *Scarborough*, 49 N.Y.2d at 368-74; *People v. Mussenden*, 308 N.Y. 558, 562-63 (1955) (submission of a lesser requires "some basis in the evidence for finding the accused innocent of the higher crime, and yet guilty of the lower one"). This standard, however, is purposely generous, and in homicide cases requires only an "identifiable basis" on which the jury may find that the defendant acted with either of two states of mind. *Scarborough*, 49 N.Y.2d at 369. Only when submitting the lesser "would force the jury to resort to sheer speculation" should the court refuse to do so. *Id.* at 371.

The *Scarborough* standard incorporates this Court's long-standing rule that questions of intent are particularly a jury matter. As the Court declared long ago, "[h]owever clear the proof may be, or however incontrovertible may seem to the judge to be the inference of a criminal intention, the question of intent can never be ruled as a question of law, but must always be submitted to the jury." *People v. Flack*, 125 N.Y. 324, 334 (1891). Determining a defendant's mental state depends on discerning between "fine gradations along . . . a single spectrum of culpability" based on inferences "from the facts and circumstances prove[n]" at trial. *Green*, 56 N.Y.2d at 432 (1982). Accordingly, this Court has

consistently held that "the question of the defendant's state of mind" is "a classic matter for the jury." *Policano v. Herbert,* 7 N.Y.3d 588, 598 (2006).

Thus, a court should submit second-degree manslaughter as a lesser offense of intentional homicide unless the evidence entirely excludes the possibility that the defendant caused the death recklessly. Only in a truly "exceptional case" will the wounds themselves be so numerous or extreme that they can be relied on to rule out a reckless homicide. *People v. Butler,* 84 N.Y.2d 627, 631 (1994) (involving 34 stab wounds, 9 of them potentially fatal). Notably, the Court has held that the evidence supported recklessness even in a case involving a one-on-one stabbing that resulted in a fatal chest wound, observing that "[i]t is up the jury to decide in a particular case whether the defendant acted intentionally, recklessly, or negligently (or not at all)." *People v. Suarez,* 6 N.Y.3d 202, 212 n.6 (2005) (evidence of a fatal stab wound from a one-on-one confrontation "was certainly sufficient to support a finding of reckless manslaughter").

B. The Reasonable View of the Evidence Supporting Submission of Second-Degree Manslaughter to Appellant's Jury

Viewing the record in the light most favorable to appellant, as the law requires, a reasonable view of the evidence supported a finding that appellant recklessly killed Edgar Ojeda in the course of a chaotic bar fight involving multiple patrons, all of whom had been drinking. Appellant testified that he

20

had been drinking prior to meeting his brother at the bar and that, by the time the fight occurred, he was on his fourth beer since entering the bar (A530-31, A473-75). His brother, Julio Rivera, confirmed that they drank several rounds of beer at the bar (A451-52). The People's witnesses had also been drinking heavily (A194, A234-36, A276).

Julio Rivera provided a detailed account of the barroom brawl during which Ojeda was stabbed, describing it as a hectic encounter with several patrons striking one another (A452-57). In particular, he testified that several men surrounded appellant and his friend, "Little Julio," and that they were cursing and gesturing (A452-62, A488-600). Julio and another friend attempted to intervene, having to "push around towards the guys" to do so (A453). Turning first to Ojeda and his friends, Julio asked, "what the F [is] wrong with you guys" before turning to ask appellant the same question (A453). "As soon as" Julio turned back to Ojeda's group, Julio "got punched in the face," at which point "all the punches started going off" (A453, A496, A498). He testified that "everyone" was throwing "punches" (A453, A496-98). Indeed, there was such a melee that Julio recalled a "punch" being thrown "over [his] back" (A453, A496-98). Thus, Julio's testimony described the quintessential, fast-moving bar brawl in which allowing a jury to consider reckless manslaughter as an alternative to intentional murder or manslaughter is particularly appropriate.

21

Even when a less chaotic struggle or fight than the one Julio described results in a death, this Court has held that reckless manslaughter should be submitted to the jury. In *People v. Tai*, 39 N.Y.2d at 895, the defendant testified that, after an argument, the deceased assaulted him with a knife and, in the ensuing struggle, "sustained stab wounds that resulted in her death." *People v. Tai*, 48 A.D.2d 933, 933 (2d Dep't 1975) (Hopkins J., dissenting), *rev'd* 39 N.Y.2d 894 (1996). The Court held that "the jury could reasonably have" accepted that Tai "inflicted the fatal wounds" during the course of the struggle in attempting to repel the deceased's attack. *Tai*, 39 N.Y.2d at 895. As a result, "the jury might have found that defendant acted recklessly" and "committed acts constituting manslaughter in the second degree, but did not act with the intent to cause serious physical injury as required by manslaughter in the first degree." *Id.* (internal citations omitted). It was, therefore, error to refuse to submit second-degree manslaughter to Tai's jury.

In *People v. Murry*, 40 N.Y.2d 327, 335 (1976), a reasonable view of the evidence also supported submitting reckless manslaughter to the jury. The defendant, contradicting his prior confession, testified at trial that, in the course of a disagreement with the deceased over drugs, the two struggled and he stabbed the deceased in self-defense. *Id.* Citing *Tai*, the Court held that "on this record," the trial court's refusal to charge second-degree manslaughter was reversible error. *Id.*

22

In *People v. (McPherson) Suarez*, 6 N.Y.3d at 206, the deceased and the defendant argued over child support, and when the deceased "raised his hand as if to hit" the defendant, she "unzipped her purse, pulled out a knife" and "swung" at him, fatally "stabbing him once in the chest." The Court found the evidence "certainly sufficient to support a finding of reckless manslaughter." *Id.* at 212 n.6. As these cases demonstrate, submission of reckless manslaughter is required when there is a reasonable view of the evidence that a struggle or fight resulted in the accidental death of a participant. It is even clearer that such a charge is appropriate when, as in appellant's case, a fight involving several people led to a fatal act. According to Julio Rivera, appellant was confronted by several hostile men, and, between appellant's group and Ojeda's group, at least seven people were involved in the altercation that led to Ojeda's death. The fight Julio described was a fast-moving, frightening, and confusing event, with appellant surrounded and punches flying, making it especially unlikely that appellant could have formed the calculated intent to kill or serious injure Ojeda. If the jury credited Julio, they could have easily determined that appellant stabbed Ojeda in this chaos and accidently caused his death while attempting to repel an attack by him or his group as a whole.

That appellant and the other participants had been drinking heavily provided even more reason to submit second-degree manslaughter to the jury. The trial court appropriately gave an intoxication charge to explain that

23

evidence of appellant's intoxication could negate intent (A633, A753). *See Lee*, 35 N.Y.2d at 826-27 (given the evidence that defendant "was intoxicated" when he perpetrated the "bizarre" sidewalk stabbing of a victim "previously unknown" to him, second-degree manslaughter should have been submitted to the jury, which could have found that, "at the time of the stabbing[,] the defendant was too intoxicated to have intended either to kill his victim or to cause her serious physical injury").

Concededly, the issuance of an intoxication charge does not "mechanically trigger a corresponding obligation for the trial court to" submit second-degree manslaughter to the jury. *Butler*, 84 N.Y.2d at 629-31, 634 (evidence of intoxication did not mandate reckless manslaughter charge when death resulted from "three head contusions and 34 kitchen knife stab wounds, of which nine" were potentially fatal). Nevertheless, an intoxication charge and the submission of reckless manslaughter are often "intertwined," and the Court has recognized that, "in a great many cases in which an intoxication instruction may be warranted and is given, some corresponding lesser-included offense instruction might be necessitated." *Id.* at 630.

Here, the evidence that Ojeda was killed during a chaotic barroom brawl involving several individuals, all of whom had been drinking, presents the quintessential situation in which second-degree manslaughter should have been submitted to the jury. Indeed, at appellant's first trial, it was submitted and the

24

jury struggled long and hard over whether appellant had killed Ojeda intentionally or recklessly. Nevertheless, the court at appellant's second trial refused defense counsel's request for the lesser offense because it believed that the nature of Ojeda's wounds foreclosed any finding that appellant acted recklessly and because appellant denied stabbing Ojeda (A632-33). Neither basis justified its refusal to give the charge.

Neither the nature of Ojeda's injuries, nor the medical examiner's assertion that the stab wounds required some force beyond "waving a knife around" (A61) negated the reasonable view of the evidence that appellant recklessly killed Ojeda in the course of a chaotic, multi-person fight. The fact that Ojeda's death might have resulted from a deliberate act did not mean that appellant consciously intended to kill or seriously injure him. In *People v. Heide*, 84 N.Y.2d 943 (1994), for example, the defendant testified that he deliberately stabbed the deceased in the groin "so that he would release his grip on defendant." 206 A.D.2d 875, 875 (4th Dep't) (Doerr, J. dissenting) *aff'd*, 84 N.Y.2d 943 (1994). The Court concluded that submission of criminally negligent homicide as a lesser offense was appropriate, holding that "the fact that [the] defendant intentionally stabbed" the deceased "does not preclude finding" that he committed an unintentional homicide. *Heide*, 84 N.Y.2d at 944. In other words, the proper inquiry is not whether someone intended to stab the deceased, but whether he intended to kill or seriously injure him.

25

Similarly, in *People v. Sullivan*, 68 N.Y.2d 495, 498, 502 (1986), this Court held that evidence that a police officer deliberately "aimed at [a woman's] body mass" did not demonstrate conclusively that he intended to kill or seriously injure her so as to invalidate an indictment for reckless manslaughter. Emphasizing that intentional homicide depends on a "finding of a specific design to effect death – not merely an intent to shoot," the Court held that, "in the tension and confusion of the situation," the officer could have "consciously disregarded the danger" of his actions. *Id.* at 502; *see also People v. Rodriguez*, 33 A.D.3d 730, 731-32 (2d Dep't 2006) (reducing depraved indifference murder to reckless manslaughter when a prison inmate, rebuffing unwanted sexual advances, deliberately pursued and stabbed the deceased three times, with one wound penetrating his heart; although he deliberately "stabbed the victim three times," the record did not support that "such action was done with an intent or 'conscious objective' to kill"). Similarly here, if the jury found that appellant deliberately stabbed Ojeda, it could have nevertheless found that, acting in the midst of confusing and fraught circumstances, appellant caused Ojeda's death recklessly.

Ojeda's wounds bore no resemblance to those that have been found so numerous or extreme as to rule out anything but an intentional homicide. *Butler* involved three head contusions and 34 stab wounds, nine of which were potentially fatal, thus conclusively establishing that the defendant acted with the

26

intent to kill the deceased. 84 N.Y.2d at 629-31, 634; *see also People v. Vega*, 68 A.D.3d 665, 665 (1st Dep't 2009) (proper not to submit reckless manslaughter when the defendant "inflicted 49 stab wounds, mostly to the victim's neck and chest," penetrating the "heart, lung, liver and spleen"); *People v. Alexis*, 65 A.D3d 1160, 1160-61 (2d Dep't 2009) (same, when deceased's throat was slashed 14 times, and two wounds severed the jugular vein, causing death); *People v. Collins*, 290 A.D.2d 457, 458 (2d Dep't 2002) (same, when deceased was stabbed six times, and five of the wounds could have been fatal). Here, in stark contrast, there were a total of three wounds, two of which were relatively superficial.

Nor did Ojeda's wounds suggest that appellant targeted vital areas so as to establish an intent to cause death or serious physical injury. *See People v. Stanford*, 87 A.D.3d 1367, 1368 (4th Dep't 2011) (four stab wounds in the neck, one severing major blood vessels); *Lopez*, 72 A.D.3d at 593 (very deep stab wound to victim's "vital organs"); *Barnes*, 265 A.D.2d at 169 (stab of abdomen "with great force," perforating liver and cutting blood vessels); *People v. Dabney*, 231 A.D.2d 431, 431 (1st Dep't 1996) (stab to the throat directly over the jugular vein); *Porter*, 161 A.D.2d at 811 (5 ½-inch-deep neck wound lacerating the aorta and pulmonary artery).

In contrast to such injuries, Ojeda's wounds were entirely consistent with appellant having acted recklessly. They obviously did not target vital areas

27

such as Ojeda's heart, liver, abdomen, or neck. One was to his upper back, another was to the back of his shoulder, and one was to his upper chest or shoulder area, 3 ¼ inches from the anterior of his neck (A55-57). They were consistent with a man who had been drinking striking out recklessly in an effort ward off people he perceived to be attacking him during a brawl.

Moreover, whatever difference might have existed between the eye-witness accounts from appellant's first and second trials, the nature and severity of Ojeda's injuries remained constant. The jury at appellant's first trial, which considered both first- and second-degree manslaughter as lesser included offenses of second-degree murder, deadlocked after six days of deliberations. It clearly struggled with the question of whether appellant's actions constituted reckless or intentional homicide, asking for "clarification of the terms 'bodily harm' and 'reckless action.'" *Rivera v. Firetog*, 11 N.Y.3d at 504. Notably, the jury in the instant case also struggled over the question of intent, asking the court for further instruction on intent and reasonable doubt because they were "having difficult[y] defining reasonable doubt with intent to kill" (A768-74).

That both juries faced difficulties is unsurprising because Ojeda's death as a result of stab wounds to his shoulder area and upper back bore the hallmarks of a reckless act. Erratic movement consistent with a fight or a struggle explained why Ojeda sustained one deep and two shallower wounds to the front and back of his shoulder area. For example, forward movement while

28

attempting to punch appellant or a third-party could easily explain how the blade penetrated his body as deeply as it did. *See People v. Ivisic*, 95 A.D.2d 308, 312 (2d Dep't 1983) (evidence about the trajectory of fatal bullet consistent with recklessness). Thus, the decision of the court below, relying on the nature of Ojeda's injuries, that there was no reasonable view of the evidence that appellant acted recklessly incorrectly ignored the fundamental rule that it was the jury's responsibility, not the trial court's, to determine whether evidence of a violent melee and intoxication, combined with the nature of Ojeda's injuries, proved whether appellant's conduct was intentional or reckless.

Finally, contrary to the trial court's reasoning, appellant's denial at trial that he had stabbed Ojeda did not justify the court's refusal to charge second-degree manslaughter. *See Asan (Freeman)*, 22 N.Y.2d at 532 (court's refusal to charge a lesser because the defendant "denied ownership or use of a knife" was error when the record contained other evidence that he made "slashing movements at the complainant"); *People v. Brown,* 82 N.Y.2d 869, 871 (1993) ("Defendant's testimony denying that he committed the proscribed conduct does not alone support or defeat the requested charge"); *People v. Butts*, 72 N.Y.2d 746, 748 (1988) (noting "established New York case law that a defendant's entitlement to a charge on a claimed defense is not defeated solely by reason of its inconsistency with some other defense raised or even with the defendant's outright denial that he was involved in the crime"); *People v. Steele*,

29

26 N.Y.2d 526, 529 (1970) (because "the jury may believe portions of both the defense and prosecution's evidence," defendant's alibi testimony did not justify court's refusal to charge justification when other record evidence supported self-defense). That appellant denied stabbing Ojeda is of no consequence to the question of whether a reasonable view of the evidence supported charging reckless manslaughter. That inquiry is not based on the persuasiveness of the evidence, but whether evidence exists in the record to support the charge, which it did here.

* * *

In sum, the trial record contained ample support for submitting second-degree manslaughter to the jury as a lesser-included offense. The court's error in refusing to do so requires reversal of appellant's conviction and a new trial. Because the jury acquitted appellant of second-degree murder, but convicted him of first-degree manslaughter, this error cannot be deemed harmless. *See Green*, 56 N.Y.2d at 435 ("[o]nly if defendant were convicted of the higher offense charged . . . and acquitted of the lower offense charged . . . would the failure to charge an even lesser offense . . . be harmless").

Defense counsel preserved this issue for appellate review, having requested that the trial court submit second-degree manslaughter to the jury, along with first-degree manslaughter, as lesser-included offenses of second-

30

degree murder (647-49). *See People v. Cabassa*, 79 N.Y.2d 722, 730 (1992) (counsel's motion to submit lesser-included offense preserved court's refusal for appellate review). Moreover, the trial court "expressly decided" the issue when it denied defense counsel's request to give the charge to the jury, citing, *inter alia,* its interpretation of the medical examiner's testimony that the stab wounds were caused by the "intentional infliction" of force (648-49). C.P.L. § 470.05(2); *see also People v. Edwards,* 95 N.Y.2d 486, 491 n.2 (2000) (matter preserved when "the trial court 'expressly decided' the question in response to a 'protest by a party'"). Notably, in its ruling, the Appellate Division, Second Department, never disputed that the matter was preserved for review.

## CONCLUSION

FOR THE REASONS STATED ABOVE, APPELLANT'S CONVICTION MUST BE REVERSED AND A NEW TRIAL ORDERED.

Respectfully submitted,
LYNN W.L. FAHEY
Attorney for Defendant-Appellant

Leila Hull
*Of Counsel*
May 2013

To be argued by:
SOLOMON NEUBORT
(15 Minutes)

COURT OF APPEALS
STATE OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

-against-

ENRIQUE RIVERA,

Defendant-Appellant.

Kings County
Indictment Number
1453/2005

RESPONDENT'S BRIEF

AND APPENDIX

LEONARD JOBLOVE
SETH M. LIEBERMAN
SOLOMON NEUBORT
Assistant District Attorneys
    of Counsel

September 12, 2013

Telephone:  718-250-2514
Facsimile:  718-488-6627

**CHARLES J. HYNES**
**DISTRICT ATTORNEY KINGS COUNTY**
RENAISSANCE PLAZA
350 JAY STREET
BROOKLYN, NEW YORK 11201-2908
(718) 250-2000

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................. i

QUESTIONS PRESENTED ............................................. iv

PRELIMINARY STATEMENT ........................................... 1

STATEMENT OF FACTS .............................................. 3
    Introduction ............................................... 3
    The Trial .................................................. 3
        The People's Case ...................................... 3
        The Defense Case ...................................... 20
    The Verdict and the Sentence .............................. 30
    The Appeal ................................................ 30

ARGUMENT –

    NONE OF DEFENDANT'S ARGUMENTS IN SUPPORT OF HIS CLAIM
    THAT HE WAS ENTITLED TO THE SUBMISSION OF THE LESSER-
    INCLUDED OFFENSE OF SECOND-DEGREE MANSLAUGHTER IS
    PRESERVED FOR APPELLATE REVIEW.  MOREOVER, DEFENDANT'S
    CLAIM IS MERITLESS.  IN ANY EVENT, ANY ERROR IN THE
    COURT'S REFUSAL TO SUBMIT THE LESSER OFFENSE WAS
    HARMLESS. ................................................ 32

        A.  Defendant's Arguments in Support of His Claim
            Are Unpreserved. .................................. 34

        B.  Defendant's Arguments in Support of His Claim
            Are Meritless. .................................... 37

        C.  Any Error in the Trial Court's Failure to Submit
            Second-Degree Manslaughter Was Harmless. ........... 53

CONCLUSION –

    FOR ALL OF THE ABOVE REASONS, THE ORDER OF THE APPELLATE
    DIVISION AND THE JUDGMENT OF CONVICTION SHOULD BE
    AFFIRMED. ................................................ 63

APPENDIX –

    Corrected Transcript .................................... RA1

    Sentencing Transcript .................................. RA3

    Certification Pursuant to C.P.L.R. § 2105 ............... RA6

TABLE OF AUTHORITIES

Pages

CASES

Delaware v. Van Arsdall, 475 U.S. 673 (1986) .................. 60

People v. Alvarez, 51 A.D.3d 167 (1st Dep't 2008) ............. 57

People v. Barney, 99 N.Y.2d 367 (2003) ........................ 37

People v. Boettcher, 69 N.Y.2d 174 (1987) ..................... 60

People v. Butler, 84 N.Y.2d 627 (1994) ................... 48, 60

People v. Castro, 76 A.D.3d 421 (1st Dep't 2010) .............. 39

People v. Cintron, 74 A.D.2d 457 (2d Dep't 1980) .............. 47

People v. Crimmins, 36 N.Y.2d 230 (1975) ...................... 53

People v. Davis, 90 A.D.3d 461 (1st Dep't 2011) ............... 39

People v. Discala, 45 N.Y.2d 38 (1978) ................... 38, 41

People v. Echevarria, 17 A.D.3d 204 (1st Dep't 2005) .......... 47

People v. Franco, 144 A.D.2d 581 (2d Dep't 1988) .......... 45, 47

People v. Gaines, 83 N.Y.2d 925 (1994) ........................ 43

People v. Goetz, 73 N.Y.2d 751 (1988) ......................... 60

People v. Gray, 86 N.Y.2d 10 (1995) ........................... 36

People v. Green, 56 N.Y.2d 427 (1982) ..... 38, 55, 56, 57, 58, 59

People v. Kent, 19 N.Y.3d 290 (2012) .......................... 50

People v. Lopez, 72 A.D.3d 593 (1st Dep't 2010) ............... 39

People v. Lynn, 27 A.D.3d 381 (1st Dep't 2006) ................ 37

People v. Martin, 59 N.Y.2d 704 (1987) ........................ 38

People v. Matos, 19 N.Y.3d 470 (2012) ......................... 50

i

TABLE OF AUTHORITIES (cont'd)

Pages

People v. McKinnon, 15 N.Y.3d 311 (2010) ...................... 50

People v. Monroe, 90 N.Y.2d 982 (1997) ....................... 36

People v. Mussenden, 308 N.Y. 558 (1955) ..................... 60

People v. Petty, 7 N.Y.3d 277 (2006) ......................... 54

People v. Porter, 161 A.D.2d 811 (2d Dep't 1990) ............. 40

People v. Porter, 82 A.D.3d 1412 (3d Dep't 2011) ............. 43

People v. Rivera, 100 A.D.3d 658 (2d Dep't 2012) .......1, 30, 31

People v. Rivera, 20 N.Y.3d 1103 (2013) .................... 1, 31

People v. Robinson, 36 N.Y.2d 224 (1975) ..................... 36

People v. Rodriguez, 16 N.Y.3d 341 (2001) .................... 53

People v. Rodriguez, 76 N.Y.2d 918 (1990) ............ 42, 43, 48

People v. Scarborough, 49 N.Y.2d 364 (1980) .................. 38

People v. Sirico, 17 N.Y.3d 744 (2011) ....................... 47

People v. Smith, 97 N.Y.2d 324 (2002) ........................ 61

People v. Spina, 275 A.D.2d 902 (4th Dep't 2000) ............. 47

People v. Stanfield, 36 N.Y.2d 467 (1955) .................... 59

People v. Van Norstrand, 85 N.Y.2d 131 (1995) ................ 37

People v. Vargas, 125 A.D.2d 512 (2d Dep't 1986) ............. 40

People v. Wolff, 103 A.D.3d 1264 (4th Dep't 2013) ............ 54

Rivera v. Firetog, 11 N.Y.3d 501 (2008) ....................... 3

TABLE OF AUTHORITIES (cont'd)

                                                              Pages

STATUTES

C.P.L. § 1.20 ............................................... 59

C.P.L. § 300.50 ........................................ 37, 59, 61

C.P.L. § 470.05 .......................................... 36, 37

P.L. § 125.20 ............................................. 1, 30

P.L. § 125.25 ................................................ 3

P.L. § 265.01 ................................................ 3


CONSTITUTIONAL PROVISIONS

N.Y. Const. art. VI, § 3(a) ................................. 36

QUESTIONS PRESENTED

1.    Whether defendant's claim -- that the trial court erred in refusing to submit manslaughter in the second degree as a lesser-included offense -- is unreviewable by this Court, because defendant, at trial, moved for the submission of that offense on a ground different from the grounds he now raises on appeal, and because the trial court's ruling did not expressly decide the grounds that defendant now raises on appeal.

2.    Whether, in any event, the trial court properly refused to submit manslaughter in the second degree as a lesser-included offense, because no reasonable view of the evidence supported the submission of that count.

3.    Whether, even if the trial court erred in refusing to submit manslaughter in the second degree as a lesser-included offense, the failure to submit that offense was harmless in light of the overwhelming evidence that, when defendant killed the victim, defendant acted with the intent to cause either serious physical injury or death.

COURT OF APPEALS
STATE OF NEW YORK

---

THE PEOPLE OF THE STATE OF NEW YORK,

                              Respondent,

              -against-

ENRIQUE RIVERA,

                    Defendant-Appellant.

---

Kings County
Indictment Number
1453/2005

RESPONDENT'S BRIEF

PRELIMINARY STATEMENT

Defendant, Enrique Rivera, appeals from an order of the Appellate Division, Second Department, entered on November 27, 2012.  People v. Rivera, 100 A.D.3d 658 (2d Dep't 2012).  That order affirmed a judgment of the Supreme Court, Kings County, rendered June 8, 2009, convicting defendant, after a jury trial, of manslaughter in the first degree (P.L. § 125.20[1]) and sentencing him, as a second violent felony offender, to a term of imprisonment of twenty-five years and a period of post-release supervision of five years (Marrus, J., at trial and sentence).

On March 21, 2013, Associate Judge Victoria A. Graffeo granted defendant's application for leave to appeal to this

Court from the order of the Appellate Division.    People v. Rivera, 20 N.Y.3d 1103 (2013).

Defendant is incarcerated pursuant to the judgment of conviction.    There were no codefendants.

STATEMENT OF FACTS

Introduction

On February 27, 2005, between 1:00 and 2:00 a.m., inside of the El Borinquen Bar located at 314 39th Street in Brooklyn, defendant repeatedly stabbed Edgar Ojeda, puncturing Ojeda's lung and causing his death. Defendant was arrested on February 28, 2005. He confessed to the police, and, in a videotaped statement to an assistant district attorney, that he had swung a knife in the victim's presence.

For these acts, defendant was charged, under Kings County Indictment Number 1453/2005, with murder in the second degree (P.L. § 125.25[1]) and criminal possession of a weapon in the fourth degree (P.L. § 265.01[2]).[1]

The Trial

The People's Case

On February 26, 2005, between 11:30 and 11:45 p.m., ENRIQUE NAVERETTE arrived at the El Borinquen Bar ("El Borinquen") on 39th Street and Third Avenue in Brooklyn (Naverette: A118-20,

---

[1]  Defendant was tried twice on Kings County Indictment Number 1453/2005.  The first trial ended in a mistrial as a result of a hung jury.  See Rivera v. Firetog, 11 N.Y.3d 501 (2008).

3

A159).[2]  From the perspective of a person facing the back of El Borinquen, there was a bar near the entrance alongside the left wall.  Alongside the right wall, near the entrance, was a row of three tables, and further along that wall toward the back was a side-exit door and then a jukebox (Naverette: A120).  In the back of El Borinquen was a dance floor, and at the back of the dance floor was a bathroom (Naverette: A120).[3]

Before that night, Naverette had occasionally worked as a bouncer at El Borinquen, but that night he was there as a patron interested in "hanging out with friends having a couple of drinks" (Naverette: A119, A120).  Prior to arriving at El Borinquen, Naverette had consumed between two to four beers during a dinner with friends that had started earlier that evening, at about 8:30 p.m. (Naverette: A159).

While sitting at the bar, Naverette saw defendant, together with three other males, enter El Borinquen (Naverette: A121, A123).  Defendant was wearing a camouflage jacket with a hoodie

---

[2] Numbers in parentheses preceded by "A" refer to the pages of defendant's appendix and numbers preceded by "RA" refer to the pages of respondent's appendix, which is attached to this brief.  Names in parentheses refer to witnesses whose testimony is cited.

[3] The bar had previously been called "Amanacer" (Naverette: A134), and during the trial, El Borinquen was sometimes referred to as "Amanacer."

underneath (Naverette: A121-23; CARLOS SOLOMON: A217).[4]   Another man in defendant's group was wearing either a camouflage hoodie or a camouflage jacket (Naverette: A121-22; Solomon: A217-18, A238).[5]   A third man in the group was wearing either a gray hoodie or a white jacket, was bald, had a dark-skinned complexion similar to defendant's, and was about six feet tall (Naverette: A121-122, A130, A148; Solomon: A217-18).[6]   Defendant was slightly taller and slightly thinner than the man in the camouflage hoodie (Naverette: A122).   One of the men in the group was wearing a green hat, but, at trial, Naverette could not recall which person that was (Naverette: A144).

As defendant's group entered the bar, the bouncer, Luis Rivera, patted them down for weapons (Naverette: A119).   After entering, defendant's group stood at the bar for about minute

---

[4]   Carlos Solomon was a witness who saw defendant in El Borinquen on the early morning of February 27, 2005 (see infra 6-12).

[5]   Naverette testified that this man had been wearing a "camouflage hoody" (Naverette: A122).   Carlos Solomon testified that this man had been wearing a "camouflage jacket" (Solomon: A217-18, A238).   To avoid confusion, throughout the remainder of this brief, this man will be referred to as "the man in the camouflage hoodie."

[6]   Naverette testified that this man had been wearing a "gray hoody" (Naverette: A121-122, A130, A148).   Solomon testified that this man had been wearing a "white jacket" (Solomon: A217-18).   To avoid confusion, throughout the remainder of this brief, this man will be referred to as "the man in the gray hoodie."

and then proceeded to the dance floor (Naverette: A123-24).   On the dance floor was a woman named "Jahaira" (Naverette: A123-24, A157).

Meanwhile, between 11:30 p.m. and 12:00 midnight, Edgar Ojeda, JONATHAN DOMINGUEZ, CARLOS SOLOMON, and MARCUS CARRASQUILLO, who were all friends, had gone together to a strip club where they had each consumed between one and three beers (Dominguez: A170-71, A176, A194; Solomon: A205, A208-09, A210, A236; Carrasquillo: A274, A276).[7]   Between 1:00 and 1:30 a.m., Ojeda's group left the strip club and arrived at El Borinquen, which was about two blocks away from the strip club (Dominguez: A176, A190, A194, A196; Solomon: A209, A210, A234; Carrasquillo: A275-76).   When Ojeda's group arrived at the bar, they were patted down for weapons (Dominguez: A195-96, A199; Solomon: A232-33).   Inside the bar, Ojeda's group ordered beers (Dominguez: A177; Solomon: A236; Carrasquillo: A276-77).

Shortly after arriving at the bar, Solomon went to the bathroom at the back of the bar (Solomon: A211).   While heading

---

[7]   Dominguez had been convicted in 2000 of attempted third-degree sale of a controlled substance, in 2003 of third-degree aggravated unlicensed operation of a vehicle, in 2006 of driving while intoxicated, and in 2008, in separate cases of, respectively, seventh-degree criminal possession of a controlled substance and disorderly conduct (Dominguez: A171-73). Carrasquillo had been convicted in 2000 of seventh-degree criminal possession of a controlled substance (Carrasquillo: A273-74).

to the bathroom, Solomon saw defendant dancing with a female on the dance floor (Solomon: A211, A214, A217).  After returning from the bathroom, Solomon stood with Ojeda in front of the side-exit door near the jukebox (Solomon: A212-13; Carrasquillo: A278, A285-86).  Defendant left the dance floor area, came up to Ojeda, and whispered something in his ear (Solomon: A215-16, A264-65).  Defendant and Ojeda then engaged in a conversation, which Solomon could not hear because of the loud music in the bar (Solomon: A216, A237-38).

Defendant was then joined by the man in the gray hoodie and the man in the camouflage hoodie (Solomon: A217-18, A238). Solomon asked the man in the gray hoodie, "Is there a problem?" (Solomon: A218, A239).  The man in the gray hoodie told Solomon "to mind [his] fucking business" (Solomon: A218, A238).  Solomon told the man in the gray hoodie, referring to Ojeda, "[T]hat's my friend.  His business is my business" (Solomon: A246, A249). While Solomon and the man in the gray hoodie were speaking, Solomon was not aware of what defendant was doing (Solomon: A218, A245, A266).

Meanwhile, Naverette glanced around the bar (Naverette: A125-26).  By that point, while at El Borinquen, Naverette had consumed one beer and was on his third drink of rum and

cranberry (Naverette: A158, A159).[8]   While glancing around the bar, Naverette's attention was drawn to two groups (Naverette: A125-26, A128).   In the first group were just two men, Ojeda and a taller man with a darker complexion (Naverette: A126-27, A145, A128, A156).[9]   Ojeda and the taller man were standing in front of the side-exit door, between the jukebox and the tables (Naverette: A126, A128, A131).   In the second group were three or four men, including defendant, as well as the man in the gray hoodie and the man in the camouflage hoodie (Naverette: A126-27).   Defendant's group approached Ojeda's group, and between the two groups there were "[a]bout five or six people in total" (Naverette: A126-27, A149).   No one outside of the two groups was standing in their immediate vicinity (Naverette: A131).   Ojeda had his back to the side-exit door, and defendant and the man in the camouflage hoodie were facing Ojeda (Naverette: A128).   The people in "the two groups [were] talking" (Naverette: A128).

---

[8] At trial, Naverette testified that he did not believe that he had been "impaired" that night, and that he had driven home within minutes after Ojeda had been stabbed (Naverette: A133, A160, A161).

[9] The man whom Naverette saw with Ojeda apparently was Carlos Solomon (see, e.g., infra at 11; see also Defendant's Brief at 9).

Naverette saw defendant suddenly, with one hand, "push" Ojeda, "twice, maybe[?]" in the "shoulder, chest area" (Naverette: A128-29, A152).   At trial, Naverette demonstrated for the jury the part of Ojeda's body that defendant had "push[ed]," and the trial court described Naverette as having "indicat[ed] on the upper left hand corner of [Ojeda's] chest right where it's adjacent to his shoulder, in that area" (A130).

Solomon saw defendant suddenly "strike" or "punch" Ojeda twice in Ojeda's shoulder or chest (Solomon: A219, A245, A250-52).   Solomon and Naverette did not notice whether there was anything in defendant's hands (Naverette: A153, A154; Solomon: A219-20, A252).

At trial, Naverette could not recall whether defendant had "pushed" Ojeda with an open hand or with a closed fist (Naverette: A152-53).   Naverette had not observed defendant strike Ojeda in the back (Naverette: A153-54).   Naverette's attention had not been drawn specifically to defendant until he had seen defendant "push" Ojeda, and Naverrate did not know whether defendant had done anything to Ojeda before defendant had "pushed" Ojeda (Naverette: A154).

The bouncer, followed by Naverette, approached the two groups to keep them apart (Naverette: A130, A156).   While Naverette stood between the two groups, he saw defendant and the

man in the camouflage hoodie leave the bar (Naverette: A130; Solomon: A220, A252).  The bouncer followed defendant and the man in the camouflage hoodie, while Naverette remained standing in front of Ojeda and Solomon to prevent them from attempting to pursue defendant's group (Naverette: A130-31, A148-49; Solomon: A220, A244, A254-55).[10]  The man in gray hoodie did not leave with defendant (Naverette: A130; Solomon: A221, A254, A263).

Dominguez asked Solomon and Ojeda what was going on, and Ojeda told him that he had been stabbed (Dominguez: A179). Dominguez saw blood "leaking down" from Ojeda's neck near his right shoulder (Dominguez: A180).

Solomon, in retaliation for defendant's having attacked Ojeda, tried to punch the man in the gray hoodie, but Solomon

---

[10] At trial, Dominguez testified that he was at the bar, talking to "Rudy," a person whom he knew from the neighborhood, when Dominguez heard people arguing behind him; that Dominguez turned around and saw the bouncer escorting two men from the bar; and that one of the two men being escorted from the bar was wearing a hoodie and an army jacket (Dominguez: A178-79, A180-81, A187, A190-91, A194-95, A197-98).  In addition, at trial, Carrasquillo testified that he was sitting at the bar when he heard a commotion behind him and the sound of feet moving "[b]ack and forth," that he pushed a "couple of people" so that he could see what was happening, that he asked Solomon what had happened, that after Solomon said something, Carrasquillo saw two people run out of the bar, and that Carrasquillo attempted to pursue the two people who had run out of the bar, but the bouncer prevented Carrasquillo from leaving (Carrasquillo: A278-81, 285-87).  Solomon testified at trial, however, that Dominguez and Carrasquillo had come over to the jukebox area after the man in the gray hoodie had told Solomon "to mind [his] fucking business," but before defendant had struck or punched Ojeda (Solomon: A240, A241, A268).

did not know whether he successfully landed the punch, because Naverette was in the way (Naverette: A131, A148-49; Solomon: A221, A254, A263). Dominguez, in retaliation for Ojeda's stabbing, also attempted to hit the same man that Solomon had attempted to punch, because Dominguez believed that that man was a companion of the two men whom Dominguez had seen being escorted out of the bar by the bouncer (Dominguez: A181, A191-92). After being swung at, the man in the gray hoodie left the bar, about twenty or thirty seconds after defendant had left (Naverette: A130, A132). Naverette went to the entrance of the bar to see if the bouncer was "okay" (Naverette: A132).

Ojeda told Solomon, "I think I got stabbed" (Solomon: A222). When Naverette returned from the front of the bar, he heard Ojeda say, "Oh, I think I am bleeding" (Naverette: A132). Naverette saw that Ojeda was bleeding from his upper-chest area (Naverette: A132-33). Solomon also saw blood on Ojeda, and when he removed a scarf from around Ojeda's neck, blood began to spurt from his neck (Solomon: A222). Ojeda told Carrasquillo that Ojeda had been stabbed and showed Carrasquillo his wounds (Carrasquillo: A282). Solomon covered the wound to Ojeda's neck (Solomon: A222).

At trial, Carrasquillo testified that he had not observed any fighting in the bar (Carrasquillo: A287). At trial, Solomon

11

did not recall whether there had been screaming and yelling inside the bar that night (Solomon: A259).[11]

Ojeda and his group left the bar and entered Solomon's car, and Solomon drove to Lutheran Hospital (Dominguez: A182-84; Solomon: A22-25; Carrasquillo: A281-84). On the way to the hospital, Ojeda lost consciousness and stopped moving (Dominguez: A184). They arrived at the hospital within a few minutes after Ojeda had been stabbed (Solomon: 223; Dominguez: A183-84).

On February 27, 2005, Dr. FREDE FREDERIC, an expert in pathology, performed an autopsy on Ojeda's body (Frederic: A51-54).[12] Ojeda had sustained three stab wounds (Frederic: A55-57).

One stab wound was in the upper left chest and was about five inches deep and one and one-quarter inches long (Frederic: A55-56). The wound continued into the chest cavity, piercing the upper lobe of the left lung and cutting through the second rib (Frederic: A55-56, A66). The wound went from the front of

---

[11] At a prior proceeding, Solomon had testified that he had seen people running back and forth and had heard yelling and screaming (Solomon: A260). Where and when he had made those observations was not specified at trial (Solcmon: A259-60).

[12] On February 28, 2005, MATTHEW OJEDA went to the Office of the Chief Medical Examiner, where he identified Edgar Ojeda's body from a photograph (Ojeda: A116-17).

12

the body to the back of the body (Frederic: A55, A58-59, A69, A70). That stab wound had caused Ojeda to bleed to death (Frederic: A60, A66, A68).

A second stab wound was to the left upper back (Frederic: A56). That stab wound was about two and one-quarter inches deep and about one and one-quarter inches long (Frederic: A56). The third wound was to the back of the left shoulder (Frederic: A57). That stab wound was about two inches deep and about one and one-quarter inches long (Frederic: A57). These latter two stab wounds each went from the back of the body to the front of the body (Frederic: A56-59, A66, A69).

All three stab wounds went from left to right and downward, at an acute angle (Frederic: A55-59, A69, A70). In addition, all three wounds were consistent with having been inflicted with the same knife (Frederic: A62).

At trial, while Dr. Frederic was on the witness stand, the prosecutor "made a waving motion with her hand as if she was holding the knife in her hand waving it" and asked Dr. Frederic whether Ojeda's wounds could have been inflicted by someone waving a knife in that manner (A61). In Dr. Frederic's opinion, the wounds could not have been inflicted by a knife being waved in that manner, because a knife being waved "cannot go through somebody" and "wouldn't have been able to penetrate five inches

13

into the body" (Frederic: A61). The wounds were consistent only with stabbing (Frederic: A61, A69). At trial, Dr. Frederic demonstrated how the perpetrator must have inflicted the wounds by "gestur[ing] with her right hand from up around the shoulder area downwards toward the tabletop" (A61).

According to Dr. Frederic, after having been stabbed, Ojeda would have remained conscious for as much as five or six minutes and would have been able to speak during that period (Frederic: A60-61, A67-69).

Early on the morning of February 28, 2005, Detectives Hopkins and Heyward went to defendant's home on Bush Street, in search of defendant (Detective JOHN DARINO: A369, A372, A378, A382, A387).[13] At defendant's home, the detectives met defendant's brother, Julio Rivera, and asked him to come with them to the 72nd Precinct (Darino: A369, A382, A387).[14] Julio Rivera voluntarily went with the detectives to the precinct (Darino: A368-69).

Later that morning, at about 1:20 a.m., Detective JAMES GAYNOR, together with three other detectives, also arrived at

---

[13] Detectives Hopkins and Heyward did not testify at trial. Detective Darino, as the detective assigned to the case, testified at trial about their activities.

[14] Julio Rivera was variously referred to at trial as "Tito" and "T.O."

14

defendant's home on Bush Street (Gaynor: A100-02). Detective Gaynor knocked on the door to defendant's home, and defendant's mother opened the door (Gaynor: A103). After Detective Gaynor identified himself as a detective, he was led into the apartment (Gaynor: A104). Inside the apartment, Detective Gaynor saw, on the floor of a bedroom, a green camouflage jacket, a brown hoodie sweat jacket, and a green army hat (Gaynor: A105-06, A108). Detective Gaynor took those items of clothing to the precinct, vouchered them under voucher number M621135, and sent the items to a lab for analysis (Gaynor: A106-07).

Later that morning, at about 3:00 a.m., while Julio Rivera was still at the precinct, Detective JOHN DARINO learned that defendant was at a private house on Everington Avenue in Flushing, Queens (Darino: A343, A369). Detective Darino went to that house, arriving there at about 4:20 a.m. (Darino: A344). Detective Darino knocked on the door, and a woman came to the door (Darino: A344). Detective Darino identified himself as a police detective and inquired about defendant's whereabouts (Darino: A344). The woman opened the door and said that defendant was "right there on the couch" (Darino: A344). Detective Darino asked defendant to step outside, and defendant complied (Darino: A344-45). Detective Darino handcuffed defendant, told defendant that he was a detective and was

15

investigating an incident at a bar, and drove defendant to the 72nd Precinct (Darino: A345, A402).

When they arrived at the precinct -- at about 5:00 a.m. -- Detective Darino placed defendant inside the detective squad's interview room, uncuffed him, and then left the room (Darino: A345-46). Detective Darino did not tell defendant that Julio Rivera was at the precinct (Darino: A370).

At about 5:15 a.m., Detective Darino returned to the interview room with Detective Gaynor (Darino: A346, A407-08). Detective Darino informed defendant of his Miranda rights from a preprinted Miranda form (Darino: A347, A352, A395; People's Trial Exhibit 9 [Miranda Form], entered into evidence at A348). Defendant wrote "Yes" and his initials on the form, to indicate that he understood each of the rights that he was waiving (Darino: A349-50). Defendant also signed his name at the bottom of the form (Darino: A350).

Defendant agreed to waive his Miranda rights, and told the detectives that he had gone to the bar with his brother and a couple of friends (Darino: A351). Defendant said that he went up to the bar to buy a few drinks and got "looks" from an individual, who asked him, "What's up?" (Darino: A351). Defendant said that he asked the individual, "What's your problem?" (Darino: A351). Defendant said that he then "felt

16

grabbing and punching," took out a knife, and "started swinging [it] at the crowd" (Darino: A352). Defendant said that he then left the bar, got into his car, and left the scene (Darino: A352). Defendant claimed that he did not know that he had actually hit anybody or hurt anyone (Darino: A351).

Detective Darino asked defendant whether he would be willing to write down his statement, and defendant said that he would (Darino: A352). Defendant then wrote down and signed the following statement:

> On the night of February 27, 2005, I, Enrique Rivera, went out for a few drinks. The bar was located at 39th Street and Third Avenue. While I was there having a few drinks I had a small confrontation with a guy. It was just words, but as the night goes on, I'm getting these eyes contacted [sic], but nothing to it. Now, as I go to the bar to get my second round, the guy is still looking at me and I happen to look back at him. So he said "What's up?" and I asked him what seems to be the problem. And right away the crowd rose. Then I felt punches and grabbing. So I take out a knife, used it in self defense, swinging it at the crowd not knowing that I really hurt anyone. I got out of there, got in my car and went home. I didn't know someone was hurt. It was self defense. I didn't mean it. I was just scared. I know by saying sorry is [sic] not going to bring that person back, but I really didn't mean this to go down this way. I'm very sorry.

(Darino: A356; People's Trial Exhibit 10 [Defendant's Written Statement], entered into evidence at A355).

Defendant finished writing down his statement at about 6:00 a.m. (Darino: A357). Detective Darino asked defendant whether

17

he would be willing to speak to someone from the District Attorney's Office, and defendant said that he would (Darino: A357). Detective Darino also asked defendant for his pedigree information, and defendant told him that he was five feet and eleven inches tall and weighed 160 pounds (Darino: A371).

That morning, at about 10:30 a.m., defendant gave a videotaped statement to Assistant District Attorney ("ADA") JENNIFER SIPRESS (Sipress: A419-27; People's Trial Exhibit 12 [DVD copy of videotaped statement], entered into evidence at A425). Detective Darino was present during defendant's statement (Darino: A396). ADA Sipress informed defendant of his Miranda rights. After defendant waived those rights, he gave a statement that largely mirrored his written statement, but which had the following relevant additions. Defendant said that he had gone to the bar at 314 39th Street with his brother Julio and his friends "Little Julio" and "J.P." (People's Trial Exhibit 12).[15] Defendant, who was sitting during the statement, demonstrated how he had swung the knife in the bar. Defendant swung his arm -- at mid-chest level -- from right to left at a slightly downward angle (People's Trial Exhibit 12). Defendant stated that, after leaving the bar, he got into his car and

---

[15] The People are providing to this Court a copy of People's Trial Exhibit 12.

18

drove away (People's Trial Exhibit 12).  Defendant also stated that, after leaving the bar, he threw away the knife (People's Trial Exhibit 12).

Later that day, at about 4:20 p.m., Detective Darino arranged a six-person lineup (Darino: A361, A363-67).  Defendant chose to place himself in position number four in the lineup (Darino: A361, A363-67).  Naverette viewed the lineup and identified defendant (Naverette: A133-35; Darino: A366).  About a minute later, Solomon viewed the lineup and identified defendant (Solomon: A227-29; Darino: A366-67).  About two minutes later, Dominguez viewed the lineup, but he was unable to identify anyone (Dominguez: A185-86; Darino: A367).

LINDA RAZZANO, an expert in forensic biology in the employ of the Chief Medical Examiner, found two bloodstains on the green hat that was vouchered under voucher number M621135 (Razzano: A294-302).  One stain was on the brim and one was on the back (Razzano: A302-03).  Razzano compared the DNA profile of a blood sample that had been taken from Ojeda with the DNA profiles of the bloodstains on the green hat and found that the DNA profiles of the hat's bloodstains conclusively matched Ojeda's DNA profile (Razzano: A304-07, A316-17).

At trial, defendant's testimony from a prior proceeding regarding what defendant had been wearing during the "brawl" was

admitted into evidence and read into the record (A437-39). During that proceeding, defendant had testified that, during the "brawl," he had been wearing a camouflage jacket, jeans, boots, a hoodie sweatshirt, and an army hat (A437-38). Defendant admitted that, on the night of the "brawl," he had been wearing the hat with Ojeda's blood on it, the camouflage jacket, and the hoodie sweatshirt, all of which "the detective" later retrieved from defendant's mother's home (A438-49).

### The Defense Case

Defendant's brother, JULIO RIVERA testified that, on the evening of February 26, 2005, he drank beer while watching with his brothers -- Angel Rivera and defendant -- a boxing match on television at a barbershop owned by defendant and Angel (J. Rivera: A444-46). While at the barbershop, Julio received a telephone call from his cousin Jahaira (J. Rivera: A446). Jahaira told Julio that she intended to go to a bar on Third Avenue, and invited Julio and defendant to join her there (J. Rivera: A446, A472-73). After Jahaira spoke to defendant on the telephone, Julio and defendant left the barbershop separately, and met again in front of El Borinquen (J. Rivera: A446-48, A481, A486). Defendant was wearing a camouflage jacket and a hat (J. Rivera: A451, A494).

In front of the bar, Julio and defendant also met "Little Julio" and "J.P." (J. Rivera: A448). Julio was wearing a red shirt, a gray football jacket, and jeans (J. Rivera: A450, A492). Little Julio was wearing a black hoodie, a camouflage jacket, and a "solid camouflage hat" (J. Rivera: A450-51). Between 11:45 p.m. and midnight, the foursome entered the bar (J. Rivera: 457-58). Upon their entering the bar, a bouncer patted them down for weapons (J. Rivera: A448-49, A476-78).

After entering the bar, the foursome ordered drinks and went to the dance floor in the back, where they danced and drank (J. Rivera: A451-52, A480-81). After the foursome had consumed three rounds of beers, defendant and Little Julio went to the bar to buy a fourth round of beers (J. Rivera: A452, A473-74, A479-80).

Julio testified that, after defendant had gone to the bar, Julio he looked toward the bar to see where defendant was (J. Rivera: A452-53, A483, A487-88, A489). Defendant was standing in front of the side door, Little Julio was standing to the right of defendant, and three men were in front of them and facing them (J. Rivera: A452-53, A483, A487-88, A489, A491-92). The three men were closer to the door than defendant and Little Julio were (J. Rivera: A489). The man standing farthest to the left was wearing white, and the man in the middle was tall, dark

skinned, and wearing dark-colored clothes (J. Rivera: A456, A484). There were two other men near the group facing defendant, but Julio did not know whether those two men were part of the group facing defendant (J. Rivera: A452-53, A490).

Julio testified that he had heard cursing, had observed "hand gestures" and "pointing fingers," and that he had "proceeded towards them" and "just got in the middle" (J. Rivera: A453, A492, A494-95). Julio pushed defendant back and then turned and pushed the men in the other group (J. Rivera: A453). Julio asked the men in that group, "What the F wrong with you guys?," and then "turned back" and asked defendant the same question (J. Rivera: A453, A495-96). As soon as Julio "turned back," the tall dark-skinned man punched Julio, and Julio punched that man back (J. Rivera: A453-54, A496). Immediately thereafter, "all the punches started going off" (J. Rivera: A453-54). Someone with a dark jacket threw a punch over Julio's shoulder, toward the direction of the tall dark-skinned man (J. Rivera: A454, A455, A498, A504). J.P. then "grabbed" Julio, "trying to get" him out of the bar (J. Rivera: A454, A497).

Julio told J.P. that he was not leaving without defendant (J. Rivera: A454). Julio then saw that defendant, together with one of the bouncers, was already "almost out of the door"

(J. Rivera: A454, A497-500, A516).   At about 1:00 a.m., "just seconds" after defendant had left, Julio and J.P. left the bar (J. Rivera: A455, A459, A497-98, A500).   As Julio was leaving the bar, someone threw a chair that nearly hit him (J. Rivera: A457).   At that time, Julio also heard cursing and saw unbroken "bottles rolling toward the bar" (J. Rivera: A457).

After leaving the bar, Julio tried to return to the bar to retrieve his jacket and car keys, but he was unable to reenter the bar because "they closed the door" (J. Rivera: A455).   Julio did not see defendant outside the bar (J. Rivera: A457).   Julio got into J.P.'s car, and Julio telephoned defendant and arranged to meet defendant at Ninth Street and Fifth Avenue (J. Rivera: A454-55, A458).   Julio telephoned Jahaira, who had remained at the bar, and asked her to retrieve his jacket and car keys (J. Rivera: A507-08).   Jahaira and her boyfriend, Rudy, drove Julio's car to Ninth Street and Fifth Avenue, where they met Julio and defendant (J. Rivera: A473, A507, A509-10).   Jahaira told Julio that someone had been stabbed at the bar during the fight (J. Rivera: A509-10).

Defendant ENRIQUE RIVERA testified on his own behalf. Defendant had two prior felony convictions (E. Rivera: A522). Defendant said that on February 26, 2005, at about 10:00 p.m., his brother Julio met him at a barbershop that defendant owned

together with another brother (E. Rivera: A522-23). In the barbershop, defendant and Julio watched a boxing match on television and drank beer (E. Rivera: A523-24, A575). After the boxing match ended, defendant and Julio went to El Borinquen to meet their cousin Jahaira (E. Rivera: A524). Upon entering the bar, at about 12:00 midnight, defendant was patted down for weapons (E. Rivera: A525-26). Defendant testified that he did not bring a knife with him to the bar (E. Rivera: A526).

Defendant testified that at the bar, he met his friends Little Julio, J.P., Jahaira, and Rudy (E. Rivera: A524, A529, A576). Little Julio was wearing a camouflage jacket (E. Rivera: 524). At trial, defendant testified that he was "not sure" whether Little Julio had also been wearing a hoodie and that defendant was "not too sure" whether Little Julio had been wearing a hat (E. Rivera: A524-25). Defendant was wearing the camouflage jacket, the hoodie, and the green hat that were entered into evidence at trial (E. Rivera: A556, A614, A624).

Defendant testified that he and his friends drank a round of beers while standing at the bar and then went to the dance floor in the back (E. Rivera: 526-27, A578). Defendant and his friends "sat around" drinking another round of beer (E. Rivera: A528). At some point, defendant received a telephone call (E. Rivera: A528). The music in the bar was loud (E. Rivera:

24

A527).   Defendant went to the bathroom so that he could hear the person on the telephone (E. Rivera: A528, A579-80).   While defendant was in the bathroom talking on the telephone, Ojeda walked into the bathroom (E. Rivera: A529, A582-83).   While Ojeda was urinating, he told defendant, "This ain't no phone booth" (E. Rivera: A528-29, A583, A591).   Defendant hung up, left the bathroom, and returned to his friends (E. Rivera: A529).

Defendant testified that he was drinking his second or third beer, when J.P. told him that J.P. was "thirsty" and wanted another round of beer (E. Rivera: A529-30, A574). Defendant told J.P. to wait until defendant finished his beer and that defendant would buy the next round (E. Rivera: A530). Meanwhile, Ojeda came out of the bathroom.   Ojeda "brushed into" defendant, as Ojeda walked by him (E. Rivera: A529, A587-88). Ojeda stared at defendant "a little aggressive[ly]" and walked away without apologizing (E. Rivera: A530, A588).   Defendant assumed that Ojeda was drunk, because Ojeda had ample room to pass by defendant without brushing into him (E. Rivera: A529-30).

Defendant finished his drink and went to the bar to buy another round of beers (E. Rivera: A530).   After purchasing four beers, defendant looked around for someone to help him carry the

beers (E. Rivera: A530). While turning around, defendant saw Ojeda (E. Rivera: A530-31). Ojeda nodded his head and asked, "What's up?" (E. Rivera: A531, A601). Defendant testified that Ojeda had not asked the question in a friendly manner, and that he had understood Ojeda's question to mean that Ojeda wanted to know why defendant was looking at him (E. Rivera: A601-02). Defendant approached Ojeda and asked him, "[W]hat seems to be the problem?" (E. Rivera: A531, A602). Ojeda said, "I ain't got no problem. You got a problem?" (E. Rivera: A531, A602-03). To diffuse the tension, defendant took out a business card for his barbershop, gave it to Ojeda, and told him to come see defendant at the new barbershop (E. Rivera: A531). While defendant was talking to Ojeda, Carlos Solomon approached and stood "real close" (E. Rivera: A531). Meanwhile, Little Julio came over, and defendant told Little Julio what was happening (E. Rivera: A531, A547).

By this point, defendant's brother Julio was approaching, and there was "a little cursing going back and forth" and "a little tension" (E. Rivera: A531-32, A603-04). Defendant testified that Little Julio was a "tough" person, "a little Tasmanian Devil" (E. Rivera: A531-32). Defendant, who wanted to diffuse the social tension, asked Little Julio to "chill," told Little Julio that the confrontation that defendant was having

26

with Ojeda was about "nothing," asked Little Julio not to "take it out of context," and asked Little Julio to let defendant talk to Ojeda (E. Rivera: A532, A545-46, A549, A603, A606). Solomon then "took a swing" and hit defendant (E. Rivera: A532, A549, A604). Defendant reacted by throwing a few punches, hitting Ojeda and Solomon (E. Rivera: A532-34, A546, A611-12). Defendant aimed for their faces and upper body and "got at least three swings off" (E. Rivera: A611-12). Defendant testified that he did not know whether Ojeda tried to hit him back (E. Rivera: A612). At trial, defendant denied that defendant had had a knife at that time (E. Rivera: A533).

Defendant testified that, after he threw the punches, a crowd that was cursing and fighting moved toward where he was (E. Rivera: A534-35, A549-550). A bouncer came between defendant and the approaching crowd, "manhandled" defendant, and pushed him out of the bar (E. Rivera: A534-35, A549-551). After he was pushed out of the bar, defendant could hear sounds coming from the bar of screaming, shouting, and chairs being dragged (E. Rivera: A535). Defendant then went to his car, which was parked about four cars away from the bar. As defendant was starting the car, he saw the door to the bar open (E. Rivera: A535-36). Little Julio exited the bar and headed toward defendant's car (E. Rivera: A536, A552). Defendant asked Little

27

Julio where defendant's brother Julio was.   Little Julio said that he did not know (E. Rivera: A536).   Defendant told Little Julio that he did not want to leave until he knew that Julio was "all right" (E. Rivera: A552).

Defendant testified that he then telephoned Julio, and learned that Julio was with J.P. near Ninth Street and Fifth Avenue (E. Rivera: A537, A539, A553).   Julio told defendant that Julio was going to meet Jahaira at a diner on Ninth Street and Fifth Avenue (E. Rivera: A538, A553).   Defendant and Little Julio drove to Ninth Street and Fifth Avenue, where defendant met J.P., Julio, and Jahaira (E. Rivera: A538-39, A554).

Defendant testified that, after he had dropped Julio off, and while Julio was standing under the bright lights of a gas station, defendant saw "blotches" of blood on the chest or shoulder area of Little Julio's jacket (E. Rivera: A538, A540-41, A555, A628, A615).   Defendant asked Little Julio whether he was bleeding, and Little Julio said that he was not bleeding (E. Rivera: A538, A540-41, A615).   At trial, defendant admitted that, at a prior proceeding in which he had testified, he had not mentioned seeing blood on Little Julio's jacket (E. Rivera: A555, A621).

The police arrested defendant on February 28, 2005, and took him to the 72nd Precinct (E. Rivera: A559).   Defendant told

Detective Darino his version of events (E. Rivera: A562-63, A598, A600). Defendant testified that Detective Darino told him that if defendant did not confess, then both defendant and Julio, who was already in custody, would be charged with murder and that Julio would face life imprisonment, "just cause he tried to save your ass at a fight that you had" (E. Rivera: A562-63, A598, A600). Defendant also testified that Detective Darino promised him that, if defendant said that he killed Ojeda in self-defense, then Julio would be freed and defendant would face a prison term of only eight to ten years (E. Rivera: A563-64).[16] Defendant wrote down a statement, misspelling his first name because he was nervous (E. Rivera: A654-65). According to defendant, when he wrote down his statement, he was exhausted and suffering from a hangover (E. Rivera: A565).

---

[16] Detective Darino had testified that he had not told defendant that Julio would be charged with murder unless defendant confessed (Darino: A401). Detective Darino also had testified that he had not promised defendant that, if defendant told the police that he killed Ojeda in self-defense, then defendant would be sentenced to only eight to ten years (Darino: A401).

## The Verdict and the Sentence

The jury acquitted defendant of murder and found him guilty of manslaughter in the first degree (P.L. § 125.20[1]) (A783-85).[17]

On June 8, 2009, the court adjudicated defendant a second violent felony offender and sentenced him to a determinate prison term of twenty-five years and five years of post-release supervision (RA4).

## The Appeal

Defendant appealed from the judgment of conviction to the Appellate Division, Second Department. Defendant claimed that the trial court erred in failing to submit to the jury manslaughter in the second degree as a lesser-included offense of the murder count. Defendant also claimed that the sentence was harsh and excessive.

On November 27, 2012, the Appellate Division affirmed the judgment of conviction (A2-3). People v. Rivera, 100 A.D.3d 658 (2d Dep't 2012). The Appellate Division held that no reasonable view of the evidence supported a finding that defendant

---

[17] The trial court submitted manslaughter in the first degree as a lesser-included offense of the murder count, without objection from the parties, but refused defense counsel's request to submit manslaughter in the second degree and criminally negligent homicide (A631, RA1, A760-62).

committed the lesser offense of second-degree manslaughter (A3). 100 A.D.3d at 660.    The Appellate Division also found that defendant's sentence was not excessive.    Id.

On March 1, 2013, Associate Judge Victoria A. Graffeo granted defendant's application for leave to appeal to this Court from the order of the Appellate Division (A1).    People v. Rivera, 20 N.Y.3d 1103 (2013).

ARGUMENT

NONE OF DEFENDANT'S ARGUMENTS IN SUPPORT OF HIS CLAIM
THAT HE WAS ENTITLED TO THE SUBMISSION OF THE LESSER-
INCLUDED OFFENSE OF SECOND-DEGREE MANSLAUGHTER IS
PRESERVED FOR APPELLATE REVIEW. MOREOVER, DEFENDANT'S
CLAIM IS MERITLESS. IN ANY EVENT, ANY ERROR IN THE
COURT'S REFUSAL TO SUBMIT THE LESSER OFFENSE WAS
HARMLESS.

Defendant claims that the trial court erred in refusing to submit to the jury a count of second-degree manslaughter as a lesser-included offense of the second-degree murder count. The arguments that defendant makes on appeal in support of that claim are unpreserved for appellate review, because defendant did not make those arguments at trial. At trial, in support of his request to submit second-degree manslaughter, defendant argued only that he was entitled to submission of that offense because he had alleged in his pretrial statements that he had swung the knife at a crowd. On appeal, defendant has abandoned his reliance on his pretrial statements that he swung the knife at a crowd, and instead relies on the testimony of his brother, Julio Rivera, that there was a bar fight, and on evidence that defendant had consumed a few bottles of beer prior to stabbing Ojeda. Accordingly, because defendant's appellate arguments are different from his trial argument, defendant's appellate arguments are unpreserved for appellate review.

32

In any event, defendant's appellate arguments are meritless. Julio Rivera's testimony did not require the submission of second-degree manslaughter, because Julio did not testify that he saw defendant physically interact with Ojeda. Julio testified that some people threw punches, that he was one of them, and that defendant was present when the punching began. Moreover, the nature of Ojeda's wounds -- particularly the five-inch-deep wound that cut a rib and pierced a lung -- compels the conclusion that, irrespective of whether defendant was involved in a bar fight, defendant stabbed Ojeda with, at the very least, the intent to cause serious physical injury, and thus that defendant was guilty, at the very least, of first-degree manslaughter and not merely second-degree manslaughter.

The evidence that defendant had consumed a few bottles of beer prior to stabbing Ojeda also did not support submission of second-degree manslaughter. The evidence showed that, despite any alcohol that defendant might have consumed, he had retained the physical dexterity to stab Ojeda three times. Moreover, defendant's testimony and his pretrial statements regarding his purported conduct on the night of the stabbing contradicted any notion that defendant's consumption of alcohol that night rendered him incapable of forming an intent to cause serious physical injury or death.

Furthermore, any error in the trial court's failure to submit second-degree manslaughter was harmless in light of the overwhelming evidence that defendant stabbed Ojeda with the intent to cause serious physical injury or death.

## A. Defendant's Arguments in Support of His Claim Are Unpreserved.

At trial, in support of his request to submit second-degree manslaughter as a lesser-included offense of the second-degree murder count, defendant argued only that he was entitled to that submission because he had alleged in his pretrial statements that he had swung the knife at a crowd, which, according to defendant, was a reckless act. On this appeal, defendant has abandoned that argument, and instead raises two other arguments, namely, that Julio Rivera's testimony that there was a bar fight supported a reasonable finding that defendant stabbed Ojeda recklessly and that there was a reasonable view of the evidence that defendant was too intoxicated to have formed an intent to cause serious physical injury or death (Defendant's Brief at 20-25).

At the charge conference at trial, defense counsel asked the court to submit second-degree manslaughter and criminally negligent homicide as lesser-included offenses of the second-degree murder count (A631). The trial court asked defense

34

counsel, "Why?" (A631).   Defense counsel asked for a "statute

book," and the court said that it would give one to him (A631).

The following colloquy then ensued:

> THE COURT:  Manslaughter in the Second Degree is
> recklessly causing the death of another.   And
> Criminally Negligent Homicide is causing the death of
> another by criminal negligence.
>
> [DEFENSE COUNSEL]:  If my --
>
> THE COURT:  How do we establish that?   What is
> the reason for submitting reckless manslaughter to the
> jury in this case?
>
> There is no reckless theory in the indictment.
> There is no way there is any evidence to support that
> the injuries that caused death were recklessly
> inflicted.
>
> [DEFENSE COUNSEL]:  Because if the jury is being
> asked by the prosecutor to credit my client's
> statement that he had a knife, as he said, and that he
> swung it, that is foreseeable, if you're swinging a
> knife at a crowd.   It's like firing a weapon at a
> crowd.  It's reckless.  But it's not a gun.
>
> THE COURT:  I don't think that is the People's
> theory at all.   I don't think it is your theory
> either.   Neither of you are going with that theory.
> They indicted for intentional murder, and intentional
> manslaughter.  I'm sorry.  Intentional theory.   There
> is no theory of reckless conduct by the People.
>
> It's clear [a]ppellate law, two theories,
> reckless and intent are inconsistent theories, they
> are not going to be given to a jury where it's clearly
> an intentional act.
>
> The medical examiner testified in this case that
> these were stab wounds that could not have been
> inflicted by someone just swinging a knife around.
> They had to have been stabbed -- stabbing wounds
> caused by intentional infliction.   So there is no

35

basis to submit a reckless count on the evidence in this case. So I am denying that application.

(A631, RA1).

Thus, at trial, in support of his request for the submission of second-degree manslaughter, defense counsel referred only to defendant's pretrial statements that he had swung a knife at a crowd (A632). Accordingly, defendant did not make at trial the arguments that he now makes on appeal. Indeed, defendant conceded in his brief to the Appellate Division that his claim that he was entitled to submission of second-degree manslaughter based on evidence that suggested that he might have been intoxicated was unpreserved for appellate review (Defendant's App. Div. Br. at 32). Consequently, because defendant did not make the arguments at trial that he now makes on appeal, those arguments are unpreserved and therefore not reviewable by this Court. See N.Y. Const. art. VI, § 3(a); C.P.L. § 470.05(2); People v. Monroe, 90 N.Y.2d 982, 984 (1997) (where, on appeal, defendant objected to jury's several viewings of evidence outside presence of judge but, at trial, defendant either voiced no objection to the viewings or, "when he finally did lodge a protest to a prospective viewing, it was on different grounds than advanced [on appeal]," defendant's claim was unpreserved); People v. Gray, 86 N.Y.2d 10, 19 (1995); People v. Robinson, 36 N.Y.2d 224, 228 (1975); People v. Lynn,

27 A.D.3d 381 (1st Dep't 2006) ("Since defendant requested submission of a lesser included offense on a completely different theory from the one he advances on appeal, his present argument is unpreserved").

Defendant argues in part that his appellate arguments are preserved, because, in defendant's view, the trial court, in ruling on defendant's application for submission of second-degree manslaughter, "expressly decided" the questions that defendant now raises on appeal (Defendant's Brief at 31). See C.P.L. § 470.05(2). Defendant is wrong. The trial court, in deciding defendant's application, did not refer to Julio's testimony or to defendant's consumption of beer. Accordingly, the trial court did not expressly decide either of the questions that defendant now raises on appeal.

B. Defendant's Arguments in Support of His Claim Are Meritless.

In any event, defendant's claim is meritless. A trial court may not submit to a jury a lesser-included offense of a count charged in the indictment unless there is a reasonable view of the evidence to support a finding that the defendant committed the lesser offense but not the greater. See C.P.L. § 300.50(1); People v. Barney, 99 N.Y.2d 367, 371 (2003); People v. Van Norstrand, 85 N.Y.2d 131, 135 (1995); People v. Green,

56 N.Y.2d 427, 430 (1982). In determining whether a defendant is entitled to the submission of a lesser-included offense, the evidence must be viewed "in the light most favorable to the defendant." People v. Martin, 59 N.Y.2d. 704, 705 (1987). But a defendant is not entitled to the submission of a lesser-included offense where "charging the lesser included offense would force the jury to resort to sheer speculation." People v. Discala, 45 N.Y.2d 38, 43 (1978) (internal quotation marks and citation omitted). Thus, for example, submission of a lesser-included offense cannot be predicated on "arbitrary sorting of the testimony of a single witness -- as if, with scissors and paste, [the fact-finder] might construct a wholly artificial line of testimony to support one crime while discarding the portions which it had seen fit to cut away." People v. Scarborough, 49 N.Y.2d 364, 373-74 (1980).

In this case, the undisputed medical evidence showed that defendant stabbed the victim with the intent to cause serious physical injury or death. One of the stab wounds to Ojeda was five inches deep and had cut through a rib (A55-56). Common sense compels the conclusion that, to plunge a knife that deeply and to cut through a rib, defendant must have used significant and deliberate force in inflicting that stab wound. The medical evidence also established that the five-inch stab wound pierced

38

Ojeda's chest cavity and punctured a vital organ, namely, Ojeda's lung (A55). Moreover, defendant stabbed Ojeda three times in the upper torso (A55-57). The fact that defendant stabbed Ojeda that many times in the upper torso shows that he specifically targeted Ojeda's upper torso, a section of the body in which two of the most vital organs -- the lungs and the heart -- are located. Accordingly, the nature of Ojeda's wounds was consistent solely with a finding that defendant stabbed Ojeda with the intent to cause serious physical injury or death. See People v. Davis, 90 A.D.3d 461, 462 (1st Dep't 2011) (submission of lesser-included charge unwarranted, because "given the violence of the attack, there is no reasonable view of the evidence under which defendant intended to cause physical injury as opposed to serious physical injury"); People v. Castro, 76 A.D.3d 421, 425 (1st Dep't 2010) (defendant not entitled to submission of lesser-included charge of reckless manslaughter, because defendant "slashed [victim] multiple times about the head, neck, and shoulders with a machete"); People v. Lopez, 72 A.D.3d 593 (1st Dep't 2010) (submission of reckless manslaughter unwarranted, because "[d]efendant's conduct in inflicting a very deep stab wound to the victim's vital organs could only be interpreted as evincing a deliberate design to cause the victim's death, or at least gravely injure him, and the crime

39

was intentional or nothing"); People v. Porter, 161 A.D.2d 811 (2d Dep't 1990) (court properly declined to submit reckless manslaughter, where defendant lacerated victim's aorta and pulmonary artery); People v. Vargas, 125 A.D.2d 512 (2d Dep't 1986) (court properly refused to charge reckless manslaughter, where defendant stabbed victim four times, fled the scene, and disposed of the knife).

Defendant argues that he was entitled to submission of second-degree manslaughter based on the testimony of Julio Rivera, a defense witness (Defendant's Brief at 21-23), but that argument is meritless. Julio Rivera's testimony did not entitle defendant to the submission of that offense, because, according to his testimony, Julio did not observe Ojeda being stabbed.

Julio Rivera testified in relevant part that, while he was inside the bar, his attention was drawn to defendant when there were three men facing defendant (A452-53), that he observed "pointing fingers" and "hand gestures" and heard cursing (A452-53, A496), that he approached defendant (A467), that Julio himself pushed someone (A453), that shortly after that, someone punched Julio (A453, A496), that others then began throwing punches (A453-54), and that when Julio looked around to find defendant, he saw defendant being led out of the bar by the bouncer (A453-54, A495-98). Notably, Julio Rivera did not

40

testify that he saw Ojeda being stabbed, that he knew when Ojeda was stabbed, or even that he saw defendant and Ojeda having any physical interaction whatsoever. Accordingly, because Julio Rivera did not testify that he saw Ojeda's being stabbed or anyone having any physical interaction with Ojeda, Julio Rivera's testimony did not shed any light regarding how Ojeda's wounds were inflicted. Therefore -- because the jury, in considering Julio Rivera's testimony, would have had to resort to "sheer speculation" in concluding from that testimony that defendant stabbed Ojeda without intending to cause serious physical injury or death -- Julio's testimony did not entitle defendant to the submission of second-degree manslaughter. See Discala, 45 N.Y.2d at 43.

Insofar as defendant is arguing that the evidence reasonably supported a finding that, when he stabbed Ojeda, he was too intoxicated to have formed an intent to cause serious physical injury or death (Defendant's Brief at 23-34), that argument is also meritless. Evidence supports a reasonable finding that a defendant was too intoxicated to have formed an intent with respect to a result (1) "if the record contains evidence of the recent use of intoxicants of such nature or quantity to support the inference that their ingestion was sufficient to affect [the] defendant's ability to form the

41

necessary criminal intent," or (2) if the record contains evidence showing that the defendant's mental capacity was in fact diminished by intoxicants. People v. Rodriguez, 76 N.Y.2d 918, 920-21 (1990). In this case, the evidence regarding the amount of alcohol that defendant had consumed was insufficient to support an inference that his consumption of alcohol had affected his ability to form an intent to cause serious physical injury or death. The evidence showed only that defendant had consumed no more than three beers while at the bar and that he had consumed an unspecified quantity of beer in the hours prior to his having arrived at the bar (see supra at 24-25). There was also no evidence at trial showing that defendant's mental capacity was in fact diminished by his consumption of alcohol.

The evidence showed that defendant, who was five feet and eleven inches tall and weighed 160 pounds (A371), had consumed no more than three beers while inside the bar. Defendant also testified that before going to the bar, while at the barbershop watching a boxing match, he had consumed beer, but, at trial, he could not recall how much beer he had consumed while watching the match (A574-75). There was also no evidence at trial regarding whether defendant had consumed the beer on an empty or full stomach. Accordingly, defendant failed to show that his consumption of beer was "of such nature or quantity to support

the inference that [its] ingestion was sufficient to affect defendant's ability to form the necessary criminal intent." See Rodriguez, 76 N.Y.2d at 920; see also People v. Gaines, 83 N.Y.2d 925, 927 (1994) (defendant was not entitled to intoxication charge, despite evidence of witness's "statement that defendant was 'high'" and of "police officer's comments that defendant had glassy eyes and alcohol on his breath," because defendant failed to adduce evidence of, among other facts, "the number of drinks" he consumed and "whether he consumed alcohol on an empty stomach, whether his drinks were high in alcoholic content, and the specific impact of the alcohol upon his behavior or mental state"); People v. Porter, 82 A.D.3d 1412, 1415 (3d Dep't 2011) (defendant was not entitled to intoxication charge, where "[d]efendant testified that he had consumed beer throughout the night, but never testified to facts that would support the theory that his alcohol consumption that night had impacted his ability to form intent").

The evidence in this case also did not show that defendant's mental capacity was in fact diminished by the beer that, according to defendant's trial testimony, he had consumed on the night of the homicide. No evidence was adduced at trial showing that defendant had appeared intoxicated, that he had swayed or staggered while walking, that he had been clumsy or

uncoordinated, that his speech had been slurred, or that he had not appeared to know what he was doing. To the contrary, the evidence at trial showed that defendant's actions that night had been purposeful and deliberate and that he had retained physical dexterity and mental acuity.

Indeed, defendant's testimony fatally contradicted any notion that he had been too intoxicated to form an intent to cause serious physical injury or death to Ojeda. Defendant testified that he had attempted to ease the social "tension" between his group and Ojeda's group by giving Ojeda defendant's business card, by telling Little Julio, "It's nothing," when Little Julio asked defendant what was going on, by asking Little Julio to "chill," by asking Little Julio not to "take [defendant's confrontation with Ojeda] out of context," and by asking Little Julio to allow defendant to talk to Ojeda (A531-32, A545-46, A549, A603-04, A606). This purported conduct of defendant was simply not the conduct of a person who was too intoxicated to be able to form an intent to cause serious physical injury or death. Defendant's purportedly taking appropriate steps in attempting to diffuse social tension in the bar was inconsistent with the conclusion that his consumption of alcohol rendered him incapable of forming an intent to cause serious physical injury or death.

Defendant also testified that, after he had left the bar, when he was in his car outside the bar, he asked Little Julio where defendant's brother Julio was, and told Little Julio that defendant did not want to leave until he was sure that Julio was "all right" (A535-36, A552). Defendant testified that, when Little Julio told him that Little Julio did not know where Julio was, defendant telephoned Julio and learned that Julio was with J.P. at a distance from the bar (A536-39, A552). Defendant further testified that, after leaving the bar, he noticed there was blood on Little Julio's jacket and that he asked Little Julio how Little Julio had gotten blood on that jacket (A538, A540-41, A555, A615, A628). These purported actions and observations of defendant also evinced that, despite the beer that defendant had consumed, he was capable of forming an intent to cause serious physical injury or death. Furthermore, defendant's purported ability to recall in such great detail the events surrounding the stabbing of Ojeda was inconsistent with the notion that defendant's alcohol consumption rendered him incapable of forming an intent to cause serious physical injury or death. See People v. Franco, 144 A.D.2d 581 (2d Dep't 1988) (defendant's contention that he was entitled to intoxication charge was belied by fact that defendant gave statements to police four days after crime was committed, indicating that he

had clear and vivid recollection of events preceding and following commission of that crime).

The fact that defendant had maintained the dexterity to stab Ojeda three times and with such force that in one instance he inflicted a five-inch-deep stab wound, cutting through a rib, also belies the contention that defendant was overly intoxicated.

Defendant's pretrial statements also contradicted any notion that defendant's consumption of alcohol rendered him incapable of forming an intent to cause serious physical injury or death. Defendant stated that he had pulled out a knife and had swung it to ward off a "crowd" (A352, A356; People's Trial Exhibit 10; People's Trial Exhibit 12). Defendant's purported conduct -- swinging a knife to ward off a "crowd" -- was not the conduct of someone who was too intoxicated to know what he was doing, but rather was the conduct of someone acting deliberately and with purpose. Defendant also stated in his videotaped statement that he threw away his knife after he had left the bar (People's Trial Exhibit 12), thus evincing that, despite his beer consumption, he had been aware that he had done something wrong.

Hence, the evidence regarding defendant's consumption of alcohol did not warrant submission of second-degree manslaughter

as a lesser-included offense.  See People v. Sirico, 17 N.Y.3d 744, 746 (2011) (defendant was not entitled to intoxication charge, because defendant's "overall behavior on the day of the incident was purposeful"); People v. Echevarria, 17 A.D.3d 204 (1st Dep't 2005) (submission of second-degree manslaughter as lesser-included offense unwarranted, because "nature and multiplicity of the wounds defendant inflicted upon each victim, as well as defendant's overall course of conduct, negated any reasonable view that, by reason of intoxication or otherwise, he only acted recklessly or with intent to cause serious physical injury"); People v. Spina, 275 A.D.2d 902, 904 (4th Dep't 2000) ("court properly determined that the nature and number of injuries suffered by the victims was indicative of a brutality inconsistent with recklessness or criminal negligence and therefore, despite the alleged intoxication of defendant, no reasonable jury could conclude that defendant did not intend to cause the death of his victims"); Franco, 144 A.D.2d at 581; People v. Cintron, 74 A.D.2d 457, 462-63 (2d Dep't 1980) (defendant was not entitled to intoxication charge based merely

on evidence that defendant had consumed alcohol; defendant's dexterity during crime undermined intoxication-charge claim).[18]

Insofar as defendant is arguing that the medical evidence did not negate the possibility that he was guilty of second-degree manslaughter -- because, in defendant's view, the injuries to Ojeda could have been caused by "forward movement" by Ojeda during the stabbing, which could have caused the knife to plunge as deeply as it did (Defendant's Brief at 28) -- the argument is meritless. First, if Ojeda's five-inch-deep stab wound had been caused by forward movement by Ojeda, then the direction of the wound should have been horizontal, or approximately horizontal, not downward at an acute angle, as the evidence showed (see supra at 13-14). Second, the two other stab wounds were to Ojeda's back, and therefore could not have been the result of "forward movement" of Ojeda toward defendant.

---

[18] As defendant acknowledges (Defendant's Brief at 24), the trial court's decision to submit an intoxication charge (A753) did not by itself require the court to submit second-degree manslaughter as a lesser-included offense. See People v. Butler, 84 N.Y.2d 627, 632 (1994) (decision to submit intoxication instruction does not "inexorably bind[] the trial court to instruct automatically on lesser-included manslaughter offenses, irrespective of particularized evidentiary evaluation"). And, in fact, in light of the lack of any evidence that defendant was so intoxicated that he could not form an intent to kill or to cause serious physical injury (see supra at 41-48), the court should not have instructed the jury on intoxication. See Rodriguez, 76 N.Y.2d at 920-21.

Defendant also suggests that the fact that his first trial, in which second-degree manslaughter was submitted, ended in a mistrial after the jury could not reach a verdict, was due to -- in defendant's view -- the jury having struggled with the question of whether defendant's actions constituted intentional or reckless homicide, and that the result in the first trial therefore shows that second-degree manslaughter should have been submitted at his second trial (Defendant's Brief at 28). That suggestion is meritless.

It is entirely speculative why the jury at the first trial could not reach a verdict, and thus there is no basis to assume, as defendant does, that the jury at that trial "struggled with" the question of whether defendant was guilty of only second-degree manslaughter (Defendant's Brief at 28). Moreover, it is irrelevant to this Court's determination of defendant's claim -- that second-degree manslaughter should have been submitted -- whether, and to what extent, the jury at the first trial may have considered the second-degree manslaughter charge. Even if that jury had seriously considered the second-degree manslaughter charge, that would not mean that, in doing so, that jury was acting reasonably. After all, on numerous occasions, jury guilty verdicts are reversed on the ground that there was no reasonable view of the evidence to support the verdict. See,

49

e.g., People v. Matos, 19 N.Y.3d 470 (2012); People v. Kent, 19 N.Y.3d 290 (2012); People v. McKinnon, 15 N.Y.3d 311 (2010).

Defendant also relatedly argues that the fact that the jurors in this case, during deliberations, asked the court to define intent and the "perimeters of reasonable doubt," stating that they were "having difficulties defining reasonable doubt with intent to kill" (A768), supports the conclusion that defendant was entitled to the submission of second-degree manslaughter (Defendant's Brief at 28). That argument is also meritless. That jury note could have been submitted for any number of reasons, such as: a single juror might have been confused about the court's instructions; the jurors might have had trouble recalling all of the detailed instructions that they had received relating to reasonable doubt and intent to kill; or the jurors might have been confused about whether intent to kill requires premeditation, how another person's subjective intent can be proven, or how to decide whether defendant acted with the intent to kill or with the intent to cause serious physical injury.

Notably, defendant does not argue on this appeal that his pretrial statements supported submission of second-degree manslaughter. And defendant has good reason not to do so, since such an argument would also be meritless.

50

In his pretrial statements, defendant alleged that he was unaware that he had stabbed anyone. Defendant also alleged that he had swung a knife to ward off a "crowd," and demonstrated in his videotaped statement how he had swung the knife at the crowd. Defendant, who was sitting while he made his videotaped statement, demonstrated by swinging -- at mid-chest level -- his arm in front of his body from right to left, with only a slight downward angle (People's Trial Exhibit 12). Defendant's swinging a knife in that manner would have resulted in Ojeda's suffering slash wounds, not the stab wounds at an acute downward angle that Ojeda in fact suffered (A61-62, A69). Hence, the undisputed medical evidence was inconsistent with Ojeda's injuries having been inflicted in the manner that defendant demonstrated. Accordingly, if defendant's pretrial statements were credited, then the jury would have had to conclude that defendant's conduct did not cause Ojeda's stab wounds, and consequently would have had to acquit defendant of any charges based on Ojeda's homicide.

Defendant's statements to the authorities did not require submission of second-degree manslaughter for another reason as well: Those statements were incredible. First, as argued above (see supra at 38-40, 48), the undisputed medical evidence was inconsistent with Ojeda's injuries having been inflicted in the

manner that defendant demonstrated in his videotaped statement. Second, the fact that only one victim in the purported crowd was stabbed, coupled with the fact that the single victim was stabbed three separate times, completely belies defendant's assertion in his pretrial statements that he swung the knife merely to ward off a crowd and that he did not target any single individual. Third, defendant's insistence in his pretrial statements that he had been unaware that he had stabbed anyone at the bar was also incredible. The medical evidence in this case established that Ojeda was killed by a knife that was plunged five inches deep into his body while cutting through a rib (A55-56). It is inconceivable that defendant, in plunging a knife that deeply and with that much force, did not realize that he had done so either when plunging the knife into, or when withdrawing it from, Ojeda's body.

The conclusion that defendant's pretrial statements did not support submission of second-degree manslaughter is also underscored by (1) the fact that defendant himself at trial sought to disavow these statements, by testifying that the statements were false, and instead testifying that he had not had a knife at all and had not stabbed Ojeda; and (2) the fact that defense counsel did not argue to the jurors that, if they credited defendant's statements, then they should find defendant

not guilty of either murder or first-degree manslaughter. Accordingly, this Court should not hold that defendant's pretrial statements required submission of second-degree manslaughter.

*   *   *

In sum, there was no reasonable view of the evidence to support submission to the jury of second-degree manslaughter. Accordingly, defendant's claim to the contrary should be rejected.

C.  Any Error in the Trial Court's Failure to Submit
    Second-Degree Manslaughter Was Harmless.

In any event, any error in the court's failure to submit to the jury second-degree manslaughter as a lesser-included offense was harmless in light of the overwhelming evidence that defendant, in inflicting Ojeda's wounds, acted with, at the very least, the intent to cause serious physical injury, and thus that defendant was guilty, at the very least, of first-degree manslaughter and not merely second-degree manslaughter. Accordingly, any error in the trial court's failure to submit second-degree manslaughter was harmless. See People v. Crimmins, 36 N.Y.2d 230 (1975).

The harmless error doctrine is generally applied to claims involving the failure to submit a requested jury charge. See,

53

e.g., People v. Rodriguez, 16 N.Y.3d 341, 346 (2001) (error of not giving justification charge with respect to vehicular manslaughter and vehicular assault counts was harmless); People v. Petty, 7 N.Y.3d 277, 286 (2006) ("Because there was overwhelming evidence disproving the justification defense and no reasonable possibility that the verdict would have been different had the charge been correctly given, the error in the trial court's justification charge was harmless"); People v. Wolff, 103 A.D.3d 1264, 1267 (4th Dep't 2013) (failure to give intoxication charge was harmless).

Moreover, defendant's claim is, in part, that he was entitled to submission of second-degree manslaughter because, in his view, there was a reasonable view of the evidence that he was too intoxicated to have formed an intent to cause serious physical injury or death to Ojeda (Defendant's Brief at 23-25). But it stands to reason that, because harmless error analysis is applied to a court's failure to give an intoxication charge, Wolff, 103 A.D.3d at 1267, harmless error analysis should likewise be applied where a court failed to submit second-degree manslaughter as a lesser-included offense of intentional murder, when submission of that lesser offense allegedly was warranted on the basis of a reasonable view of the evidence that the defendant was intoxicated.

The evidence overwhelmingly demonstrated that defendant stabbed Ojeda with the intent to cause Ojeda's death or to cause Ojeda to suffer serious physical injury (see supra at 37-53). Given that overwhelming evidence, there is no significant probability that the jury would have acquitted defendant of both second-degree murder and first-degree manslaughter had the court submitted to the jury the option of finding defendant guilty of second-degree manslaughter.

Defendant argues that "[b]ecause the jury acquitted appellant of second-degree murder, but convicted him of first-degree manslaughter, this error cannot be deemed harmless" (Defendant's Brief at 30). In making that argument, defendant cites only to People v. Green, 56 N.Y.2d 427 (1982) (Defendant's Brief at 30), and quotes with omissions a single sentence from that decision: "Only if defendant were convicted of the higher offense charged . . . and acquitted of the lower offense charged . . . would the failure to charge an even lesser offense . . . be harmless" (Defendant's Brief at 30) (quoting Green, 56 N.Y.2d at 435). But defendant's citation to that sentence is taken out of the context in which it was written.

In Green, this Court rejected the notion that a trial court's error of refusing to submit a lesser-included offense should be deemed harmless just because the jury, in convicting

the defendant of the greater crime, found beyond a reasonable doubt that the defendant was not guilty of the lesser-included crime. This Court rejected that notion, but added, in the sentence quoted by defendant, that the notion would be correct under a different set of circumstances:

> Nor can it be said that the error in failing to submit the lesser crime was harmless. Only if defendant were convicted of the higher offense charged (attempted murder in the second degree) and acquitted of the lower offense charged (assault in the first degree) would the failure to charge an even lesser offense (second degree assault) be harmless. The fact that defendant was convicted of both offenses charged (attempted murder and first degree assault) does not establish that there was no significant probability the jury would have acquitted him of those charges and convicted him of second degree assault if that option were available to it.

Id. at 435-36 (parentheses in original; emphasis added).

Thus, when read in context, this Court's statement that "Only if defendant were convicted of the higher offense charged . . . and acquitted of the lower offense charged . . . would the failure to charge an even lesser offense . . . be harmless" was written to address when a jury's verdict by itself would render harmless a trial court's failure to submit a lesser-included offense. But, this Court was not addressing, in the sentence in Green quoted by defendant, whether a court's failure to submit a lesser-included offense may be found harmless for a different reason: namely, that -- because the evidence adduced at trial

56

overwhelmingly showed that the defendant committed the greater offense and not merely the lesser-included offense -- there is no significant probability that, if the trial court had submitted the lesser-included offense, then the jury would have acquitted the defendant of the greater offense and instead would have convicted him of the lesser offense. See People v. Alvarez, 51 A.D.3d 167, 183 (1st Dep't 2008) (even if trial court erred in failing to submit lesser-included offense, "such error was harmless in light of the overwhelming evidence of defendant's guilt").

Indeed, this Court, in Green, suggested that a harmless error analysis based on whether there was overwhelming evidence of the greater crime would be appropriate. In Green, this Court, in a footnote, hinted at a rationale for why the fact that a defendant was convicted of the charged offense does not in itself render harmless the failure to submit the lesser-included offense. This Court stated:

> In Keeble v. United States (412 US 205, 212-213), Justice Brennan succinctly explained the benefit received by an accused when the jury is provided with the "third option" of convicting on a lesser included offense: "[It] is no answer to petitioner's demand for a jury instruction on a lesser offense to argue that a defendant may be better off without such an instruction. True, if the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense instruction is offered, the jury must, as a theoretical matter, return a verdict of acquittal.

> But a defendant is entitled to a lesser offense
> instruction * * * precisely because he should not be
> exposed to the substantial risk that the jury's
> practice will diverge from theory. Where one of the
> elements of the offense charged remains in doubt, but
> the defendant is plainly guilty of *some* offense, the
> jury is likely to resolve its doubts in favor of
> conviction."

56 N.Y.2d at 433 n.5 (asterisks and emphasis on word "some" in Keeble, remaining emphasis added). The quote of Justice Brennan suggests that, in a case in which, because of the overwhelming evidence of guilt, none of the elements of the offense charged remains in doubt, there would be no reason to fear that, in the absence of a lesser offense to consider, the jurors would convict the defendant of the greater offense despite having doubts regarding whether an element of the charged offense had been established. Accordingly, under that circumstance, an error in failing to submit a lesser-included offense should be deemed harmless.

In addition, this Court's statement in Green -- that "[f]rom the perspective of the accused, submission of a lesser included offense enables the jury to extend mercy by providing a less drastic alternative than the choice between acquittal and conviction of the offense charged," 56 N.Y.2d at 433 -- does not support the conclusion that the failure to submit a lesser-included offense to a jury should not be subject to a harmless

error analysis based on whether the evidence of the defendant's guilt of the greater crime was overwhelming.

The statement at issue in Green regarding the jury's being able to extend mercy was merely part of a discussion of why this Court, in People v. Stanfield, 36 N.Y.2d 467 (1955), interpreted C.P.L. § 1.20(37) (which sets forth the statutory definition of "lesser included offense") and C.P.L. § 300.50 (which sets forth the rules for submission of lesser-included offenses to a jury) to mean that where "both the lesser and the greater offenses require demonstration of a culpable mental state, the fact that the degree of culpability specified for each differs from the other does not foreclose giving a lesser included charge on impossibility grounds." See Green, 56 N.Y.2d at 432-33. Hence, this Court's reference in Green to a jury's being able to extend mercy pertained to the scope of the statutory provisions governing the submission of lesser-included offenses, not to whether appellate courts should be precluded from applying conventional harmless error analysis -- which includes analysis of whether there is overwhelming evidence of a defendant's guilt -- to the failure to submit a lesser-included offense to a jury.

And there is good reason not to rely on the power of juries to dispense mercy as a basis for precluding the application of conventional harmless error analysis to the failure to submit a

lesser-included offense: As this Court has recognized, when a jury extends mercy to a defendant, the jury, in effect, is avoiding its "proper function or duty," which "consists solely of applying the legal definitions of crime, as laid down by the trial court, to the evidence and of convicting of the crime charged, if that is established beyond a reasonable doubt." People v. Mussenden, 308 N.Y. 558, 562 (1955); see also People v. Boettcher, 69 N.Y.2d 174, 183 (1987) ("it is the duty of the jury not to reach compromise verdicts based on sympathy for the defendant," but rather "to render a just verdict by applying the facts it finds to the law it is charged"). This Court has also noted that "the jury's power to dispense mercy, by favoring the defendant despite the evidence, should not be allowed so to dominate the trial proceedings as to impede or interfere with the jury's primary fact-finding function." Mussenden, 308 N.Y. at 562; see Butler, 84 N.Y.2d at 632; see also People v. Goetz, 73 N.Y.2d 751, 752 (1988) (a "jury's so-called 'mercy-dispensing power' . . . is not a legally-sanctioned function of the jury and should not be encouraged by the court"). At the same time, this Court, quoting Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986), has noted that "[t]he harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or

60

innocence and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." People v. Smith, 97 N.Y.2d 324, 330 (2002) (internal asterisks in Smith omitted). Given that a jury's power to dispense mercy is in tension with the jury's proper duty, while conventional harmless error analysis promotes "the central purpose of a criminal trial," the jury's power to dispense mercy should not serve as a basis for placing limitations on the application of conventional harmless error analysis.

The conclusion that the erroneous failure to submit a lesser-included offense was harmless if there was overwhelming evidence of the defendant's guilt of the greater crime is also consistent with the fact that the Legislature limited the requirement to submit a lesser-included offense to where submission of the lesser-included offense would be supported by a reasonable view of the evidence that the defendant committed the lesser, but not the greater, offense. See C.P.L. § 300.50(1), (2). Thus, even though a jury, if given the choice, might choose to dispense mercy -- by convicting of only a lesser-included offense -- irrespective of what the evidence reasonably showed, the Legislature chose to limit a jury's ability to dispense mercy in that manner to cases in which there

is a reasonable view of the evidence that the defendant committed the lesser, but not the greater, offense. Accordingly -- consistent with that limitation -- where the evidence overwhelmingly showed that the defendant committed the greater offense, and a jury finding that the defendant committed the lesser offense consequently would be unreasonable, then the failure to submit a lesser-included offense, under that circumstance, should be subject to harmless error analysis.

In sum, any error in the court's failure to submit to the jury second-degree manslaughter as a lesser-included offense was harmless in light of the overwhelming evidence that defendant, in inflicting Ojeda's wounds, intended to cause serious physical injury or death. Accordingly, any error in the trial court's failure to submit second-degree manslaughter was harmless.

CONCLUSION

FOR ALL OF THE ABOVE REASONS, THE ORDER OF THE APPELLATE DIVISION AND THE JUDGMENT OF CONVICTION SHOULD BE AFFIRMED.

Dated:  Brooklyn, New York
        September 12, 2013

                    Respectfully submitted,


                    CHARLES J. HYNES
                    District Attorney
                    Kings County



LEONARD JOBLOVE
SETH M. LIEBERMAN
SOLOMON NEUBORT
Assistant District Attorneys
    of Counsel

63

APPENDIX

Charge Conference

1       MR. DRANOVE:  If my --

2       THE COURT:  How do we establish that?

3   What is the reason for submitting reckless

4   manslaughter to the jury in this case?

5       There is no reckless theory in the

6   indictment.  There is no way there is any

7   evidence to support that the injuries that

8   caused death were recklessly inflicted.

9       MR. DRANOVE:  Because if the jury is being

10  asked by the prosecutor to credit my client's

11  statement that he had a knife, as he said, and

12  that he swung it, that is foreseeable, if

13  you're swinging a knife at a crowd.  It's like

14  firing a weapon at a crowd.  It's reckless.

15  But it's not a gun.

16      THE COURT:  I don't think that is the

17  People's theory at all.  I don't think it's

18  your theory either.  Neither of you are going

19  with that theory.  They indicted for

20  intentional murder, and intentional

21  manslaughter.  I'm sorry.  Intentional theory.

22  There is no theory of reckless conduct by the

23  People.

24      It's clear Appellate law, two theories,

25  reckless and intent, are inconsistent theories,

**RA1**

Case 1:15-cv-02657-EK   Document 10   Filed 12/08/15   Page 276 of 298 PageID #: 1504

```
1          - - - - - - - - - - - - - - - - x

2          THE PEOPLE OF THE STATE OF NEW YORK

3                    -against-              Ind#1453/05

4          ENRIQUE RIVERA, Defendant.

5          - - - - - - - - - - - - - - - - x

6

7          THIS IS TO CERTIFY that after a specific search

8          of the official stenographic notes taken on May

9          12, 2009, concerning page 648, line 11, a

10         correction has been made to line 11 of said

11         page, "he had no knife," and now reads "he had

12         a knife," and a new corrected page submitted at

13         this time.

14

15         Michele J. Walker 6/10/13

16         MICHELE J. WALKER,
           Official Senior Court Reporter

17

18

19

20

21

22

23

24

25
```

RA2

1

```
1   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF KINGS : CRIMINAL TERM : PART 35
2   -----------------------------------------x
    THE PEOPLE OF THE STATE OF NEW YORK
3
                        -against-
4
5   ENRIQUE RIVERA,
                        DEFENDANT.
6   -----------------------------------------x
    Indict. No. 1453/2005          320 Jay Street
7   SENTENCE                       Brooklyn, New York
                                   June 8, 2009
8
9   B E F O R E :
10
                  HONORABLE ALAN MARRUS,
11
12                                         Justice.
13
    A P P E A R A N C E S :
14
                    OFFICE OF CHARLES J. HYNES, ESQ.
15                  DISTRICT ATTORNEY - KINGS COUNTY
                    RENAISSANCE PLAZA
16                  BROOKLYN, NEW YORK  11201
                    BY:  PHYLLIS CHU, ESQ.
17
                    JOEL K. DRANOVE, ESQ.
18                  For the Defendant
                    225 Broadway - Suite 2625
19                  New York, Ny 10007
20
21
22
23
24
25                   ELLEN DOHERTY NERI,CSR,RPR,CRR
                     PRINCIPAL COURT REPORTER
```

EDN

**RA3**

1          THE COURT:  For purposes of sentencing, you are

2     adjudicated a second violent felony offender.

3          And now we'll go forward with the sentencing.

4     Ms. Chu, I'll hear you first.

5          MS. CHU:  Yes, your Honor.

6          I had forwarded a copy to the defense counsel as

7     well as to the Court, a sentencing letter having to do with

8     the People's recommendation for sentence of the defendant's

9     manslaughter in the first degree conviction that resulted

10    in May of this year.

11         The People are asking that the defendant be

12    sentenced to the maximum term allowable under the law,

13    which is 25 years.

14         Having presided over the trial, your Honor, while

15    you are familiar with the facts and circumstances of this

16    case, I would like to just highlight some things that

17    occurred during the course of the trial that I think would

18    be relevant to your consideration of what sentence the

19    defendant should receive.

20         There were several witnesses that testified

21    regarding the events of the night.  Clearly, as we've

22    already stated in the 330 motion, there were no witnesses

23    that actually saw a weapon in the defendant's hand at the

24    time that the altercation occurred between he and Mr.

25    Ojeda.

1    local communities, and the people that frequent these bars

2    and social clubs where these events happens, it really

3    sends a chilling message that this horrible violence goes

4    on in the community.

5            And it's something that has rippled well beyond

6    the families that are in this courtroom, that someone can

7    go out for a night to relax at a bar, have a couple of

8    drinks, and then wind up dead, being stabbed to death over

9    some petty dispute, which is what this all about.  This I

10   was all petty.

11           To die over that is totally senseless.

12           Based on the record that you've made in the

13   community with your two prior felony convictions, youthful

14   offender adjudication, based on your total lack of

15   accountability for this matter with the inconsistent

16   statements you made in this case, based on the nature of

17   these crime, a cold-blooded, senseless killing in a public

18   place, I'm sentencing you to the maximum sentence I can:

19   Definite term of 25 years imprisonment, followed by five

20   years post-release supervision.

21           There's a mandatory surcharge and related fees.

22   I believe it's $370 in this case.

23           THE CLERK:  $250, $20 and then $50.

24           THE COURT:  $320.

25           Please advise the defendant of his right to

COURT OF APPEALS
STATE OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK,

                              Respondent,

          -against-

ENRIQUE RIVERA,

                    Defendant-Appellant.

Kings County
Indictment Number
1453/2005

## CERTIFICATION PURSUANT TO C.P.L.R. § 2105

I, Solomon Neubort, an attorney admitted to practice in the State of New York and an assistant district attorney in Kings County, certify that I have compared the content of this respondent's appendix with a corrected page of the trial transcript, and with the relevant pages of the sentence transcript, provided by the official court reporters, and that the content of this respondent's appendix is a true copy of those documents.

Dated:     Brooklyn, New York
           September 12, 2013

                         Solomon Neubort
                         Assistant District Attorney
                         Kings County

*To be argued by*
LEILA HULL
*(15 minutes)*

# Court of Appeals

**STATE OF NEW YORK,**

---

**PEOPLE OF THE STATE OF NEW YORK,**

*Respondent,*

- *against* –

**ENRIQUE RIVERA,**

*Defendant-Appellant.*

## REPLY BRIEF FOR DEFENDANT-APPELLANT

LYNN W. L. FAHEY
LEILA HULL
Attorneys for
    Defendant-Appellant
2 Rector Street, 10th Floor
New York, N.Y. 10006
T. (212) 693-0085
F. (212) 693-0878

October 7, 2013

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................ii

PRELIMINARY STATEMENT ........................................................................... 1

ARGUMENT............................................................................................................ 1

               APPELLANT'S CLAIM THAT A REASONABLE VIEW OF
               THE EVIDENCE SUPPORTED SUBMITTING SECOND-
               DEGREE MANSLAUGHTER TO THE JURY IS BOTH
               PRESERVED FOR REVIEW AND MERITORIOUS, AND
               THE PEOPLE'S ATTEMPT TO REDEFINE THE
               HARMLESS ERROR RULE AS IT APPLIES TO LESSER
               INCLUDED OFFENSES SHOULD BE REJECTED......................................1

CONCLUSION......................................................................................................... 12

i

## TABLE OF AUTHORITIES

### CASES

*People v. Borrello*, 52 N.Y.2d 952 (1981) .................................................................. 3

*People v. Buckley*, 75 N.Y.2d 843 (1990) ................................................................... 3

*People v. Cabassa*, 79 N.Y.2d 722 (1992) .................................................................. 3

*People v. Castro*, 76 A.D.3d 421 (1st Dep't 2010) .................................................. 7, 8

*People v. Chestnut*, 19 N.Y.3d 606 (2012) ................................................................. 2

*People v. Concepcion*, 17 N.Y.3d 192 (2011) ............................................................. 6

*People v. Davis*, 90 A.D.3d 461 (1st Dep't 2011) ...................................................... 8

*People v. Discala*, 45 N.Y.2d 38 (1978) .................................................................. 5, 6

*People v. Dodt*, 61 N.Y.2d 408 (1984) ....................................................................... 6

*People v. Echevarria*, 17 A.D.3d 204 (1st Dep't 2005) .............................................. 8

*People v. Flack*, 125 N.Y. 324 (1891) ...................................................................... 10

*People v. Gallagher*, 69 N.Y.2d 525 (1987) ......................................................... 10, 11

*People v. Gray*, 86 N.Y.2d 10 (1995) ...................................................................... 2, 3

*People v. Green*, 56 N.Y.2d 427 (1982) ................................................................... 8, 9

*People v. Heide*, 84 N.Y.2d 943 (1994) ...................................................................... 7

*People v. LaFontaine*, 92 N.Y.2d 470 ........................................................................ 6

*People v. Lynn*, 27 A.D.3d 381 (1st Dep't 2006) ........................................................ 4

*People v. Monroe*, 90 N.Y.2d 982 (1997) ................................................................... 4

*People v. Mussenden*, 308 N.Y. 558 (1995) ............................................................... 11

*People v. Navarette*, 131 A.D.2d 326 (1st Dep't 1987) .............................................. 8

*People v. Petty*, 7 N.Y.3d 277 (2006) ....................................................................... 10

*People v. Resek*, 3 N.Y.3d 385 (2004) ....................................................................... 3

*People v. Robinson*, 36 N.Y.2d 224 (1975) ................................................................ 4

*People v. Rodriguez*, 26 N.Y.2d 341 (2001) ............................................................... 9

*People v. Sirico*, 17 N.Y.3d 744 (2011) ..................................................................... 7

*People v. Spina*, 275 A.D.2d 902 (4th Dep't 2000) .................................................... 8

*People v. Sullivan*, 68 N.Y.2d 495 (1986) .................................................................. 7

*Policano v. Herbert*, 7 N.Y.3d 588 (2006) ............................................................... 10

### STATUTES

C.P.L. § 300.50(1) ...................................................................................................... 9, 11

C.P.L. § 470.05(2) ........................................................................................................ 2

C.P.L. § 470.15(1) ..................................................................................................... 2, 6

PRELIMINARY STATEMENT

This brief is submitted in reply to the Brief for Respondent, received by Defendant-Appellant on September 13, 2013.

ARGUMENT

APPELLANT'S CLAIM THAT A REASONABLE VIEW OF THE EVIDENCE SUPPORTED SUBMITTING SECOND-DEGREE MANSLAUGHTER TO THE JURY IS BOTH PRESERVED FOR REVIEW AND MERITORIOUS, AND THE PEOPLE'S ATTEMPT TO REDEFINE THE HARMLESS ERROR RULE AS IT APPLIES TO LESSER INCLUDED OFFENSES SHOULD BE REJECTED.

The People claim that appellant's arguments on appeal are unpreserved. They also argue that there was no reasonable view of the evidence to justify submitting second-degree manslaughter to the jury. Finally, they argue that any error in refusing to submit the lesser included offense was harmless because the evidence against appellant was overwhelming. The People are incorrect on all fronts.

Counsel's request for submission of the lesser included offense to the jury and the court's decision preserved the issue for appellate review. Although Julio Rivera did not see the fatal stabbing, his description of the chaotic fight that led to Ojeda's death gave rise to a reasonable view of the evidence that appellant's conduct was reckless. Evidence that appellant was intoxicated further supported the view that his actions were reckless, and the People's

1

arguments that the court erred in giving an intoxication charge are unpreserved as well as unreviewable on appeal under Criminal Procedure Law § 470.15(1). Finally, an error in refusing to submit a lesser included offense that was supported by a reasonable view of the evidence cannot be considered harmless based on the theory that the evidence of the greater offense was overwhelming. The People's invitation to adopt this novel harmless error rule, which would remove a critical decision from the jury, should be rejected.

(A)

The People claim that appellant's argument is unpreserved because counsel did not marshall the specific facts appellant relies on in his appeal (Resp. Br. at 34-37). However, counsel's specific request for a charge of second-degree manslaughter and the court's explicit ruling that there was "no way there is any evidence to support that the injuries that caused death were recklessly inflicted" preserved this issue for review (A632).

The purpose of the preservation rule "is to bring the claim to the trial court's attention." *People v. Gray*, 86 N.Y.2d 10, 20-21 (1995); *see also People v. Chestnut*, 19 N.Y.3d 606, 611 n.2 (2012) ("preservation rule's 'specific objection' requirement should not be applied in [an] overly technical way . . . ; nor should a party's adherence to this requirement focus on minutiae or emphasize form over substance"). Under C.P.L. § 470.05(2), moreover, an issue is preserved if, "in response to a protest by a party, the court expressly decided the question

2

raised on appeal." Once that occurs, defense counsel does not need to protest the ruling or make additional arguments. *See People v. Resek*, 3 N.Y.3d 385, 388 n.1 (2004) ("We will not impose a preservation rule so extreme that defendant, to succeed, would have to antagonize the court or test its patience even further" because "such a rule would do nothing to advance the objectives of our preservation doctrine").

When the issue is the defendant's entitlement to submission of a lesser included offense, this Court has found a lack of preservation only when counsel *never* requested its submission. *See People v. Cabassa*, 79 N.Y.2d 722, 730 (1992) (defendant who did not join co-defendant's request for a lesser failed to preserve the matter for appellate review); *accord People v. Buckley*, 75 N.Y.2d 843, 846 (1990); *see also People v. Borrello*, 52 N.Y.2d 952, 953 (1981) (counsel never "requested the charge and therefore the point is not preserved for" review).

As these cases suggest, a lessers issue must be considered preserved once counsel makes an application for that specific lesser included offense, and certainly once the court makes clear that it understands which element of the offense is at issue. This comports with the Court's analogous holding in *People v. Gray*, 86 N.Y.2d at 20-21, that counsel must identify the particular element of a crime that the People have failed to prove to preserve a legal sufficiency claim.

3

Here, counsel specified the degree and offense he wished submitted (second-degree manslaughter) and the court acknowledged that his motion was premised on the claim that evidence supported a theory of reckless homicide (A631). The court immediately rejected counsel's request, ruling that "there is no reckless theory in the indictment" and "there is no way there is any evidence to support that the injuries that caused death were recklessly inflicted" (A632). Faced with the court's ruling, counsel pointed to appellant's statement as an example of record evidence that supported the charge (A632). The court promptly rejected this argument as well (A632).

Contrary to the People's argument (Resp. Br. at 37), the failure of counsel or the court to refer specifically to Julio Rivera's testimony or appellant's consumption of alcohol does not mean that the court did not decide the precise issue raised: whether a reasonable view of the trial evidence supported finding that appellant was guilty of only a reckless homicide.[1]

---

[1] None of the cases the People cite refute this conclusion (*see* Resp. Br. at 36-37). *People v. Monroe*, 90 N.Y.2d 982, 984 (1997), ruled that the jury's viewings of evidence outside presence of the judge was not preserved when counsel advanced an entirely different legal theory on appeal. *People v. Robinson*, 36 N.Y.2d 224, 228 (1975), involved counsel's failure to object at all. Finally, the First Department's decision in *People v. Lynn*, 27 A.D.3d 381 (1st Dep't 2006), includes insufficient facts to indicate what the lack of preservation consisted of. At most, these cases hold that an argument is unpreserved when it is based on a separate and distinct legal theory than the one advanced at trial. Here, however, appellant asserts the same legal argument that counsel made and the court recognized at trial: that a reasonable view of the evidence entitled him to submission of second-degree manslaughter on the theory that he was guilty of only a reckless homicide and not an intentional one.

4

(B)

The People argue that Julio Rivera's description of a chaotic, multi-person melee and the evidence of appellant's alcohol consumption did not yield a reasonable view of the evidence that appellant recklessly caused Ojeda's death (Resp. Br. at 41-48). They also contend that Ojeda's injures were consistent only with an intent to seriously injure or kill him (Resp. Br. at 38-40, 48-49). Neither claim is availing.

The People mistakenly assert that, because Julio Rivera never saw appellant stab Ojeda, his testimony "did not shed any light regarding how Ojeda's wounds were inflicted" (Resp. Br. at 40-41). They ignore Rivera's description of the immediate circumstances surrounding the stabbing as a chaotic barroom brawl. That Rivera did not see the stabbing itself because he was too distracted by the many punches that were flying further supported a reasonable view of the evidence that Ojeda was stabbed in the midst of a confused melee involving several bar patrons and therefore that appellant's actions were reckless rather than intentional.

The People cite *People v. Discala*, 45 N.Y.2d 38, 43 (1978), for their contention that the jury would have to "resort to 'sheer speculation'" to conclude that Julio Rivera's testimony supported the view that appellant acted recklessly (Resp. Br. at 41). The Court in *Discala* found, however, that "charging the lesser included offense would force the jury to resort to sheer speculation"

5

because "the evidence essential to support a verdict of guilt of the lesser *necessarily prove[ed] guilt of the greater crime as well.*" *Id.* at 43 (emphasis added). This was not the situation in appellant's case, where Julio Rivera's testimony about the melee contributed to a reasonable view of the evidence that appellant caused Ojeda's death recklessly *rather than* intentionally.

Nor was appellant's drinking irrelevant. As the People concede, appellant had drunk an unspecified quantity of beer prior to arriving at the bar and drank three beers at the bar (Resp. Br. at 42). Accordingly, alcohol was a factor that the jury could have considered when judging appellant's *mens rea* in the context of all of the relevant circumstances that led to Ojeda's death (*see* Appellant's Main Brief at 20-30).

This Court should reject the People's attempt to relitigate the propriety of the court's decision to give an intoxication charge to the jury (Resp. Br. at 41-48). Because the court's ruling that the evidence warranted this instruction (A633) was not adverse to appellant, the question of whether the instruction was proper is not cognizable on appeal. *See* C.P.L. § 470.15(1); *People v. Concepcion*, 17 N.Y.3d 192 (2011); *People v. LaFontaine*, 92 N.Y.2d 470, 473–74 (1998). Moreover, the People never objected at trial to the intoxication charge (A633), rendering their argument unpreserved. *See People v. Dodt*, 61 N.Y.2d 408, 416 (1984) (the People may not raise on appeal a new legal claim to counter appellant's arguments when they had a full opportunity to make the same

6

argument below). For these reasons, the People's reliance on *People v. Sirico*, 17 N.Y.3d 744, 745-46 (2011), and other cases that relate solely to the propriety of an intoxication instruction is misplaced and offers no basis for this Court to reject appellant's lessers argument.

Claiming that appellant targeted Ojeda's vital organs, the People contend that the "medical evidence showed that" appellant stabbed Ojeda three times in the upper torso "with the intent to cause serious physical injury or death" (Resp. Br. at 38-39). The medical evidence, however, established that, although Ojeda sustained three wounds, two were relatively minor wounds to his upper back and shoulder, and the one fatal wound was to his upper chest or shoulder area (A55-57). These injuries, which all centered on his shoulder area, can hardly be considered evidence that appellant targeted Ojeda's vital organs (*see* Appellant's Main Brief at 27-28).

The People's argument also entirely ignores the well-established rule that intentional infliction of a wound does not necessarily establish that a person acted with the conscious objective to seriously injure or kill. *See People v. Heide*, 84 N.Y.2d 943, 944 (1994) (deliberate stab did not necessarily indicate intent to kill or seriously injure); *People v. Sullivan*, 68 N.Y.2d 495, 500-03 (1986) (shots deliberately fired at deceased's body mass were consistent with reckless, and not intentional, homicide).

7

The Appellate Division cases on which the People rely (Resp. Br. at 39) are distinguishable from the instant case. *People v. Castro*, 76 A.D.3d 421 (1st Dep't 2010), involved "six sharp-force" machete wounds to a victim's "head, neck, and shoulders" that "perforated her spine." Notably, the Appellate Division specifically distinguished *Castro* from *People v. Navarette*, 131 A.D.2d 326, 329 (1st Dep't 1987), in which evidence of a struggle that led to the defendant fatally stabbing his wife twice in the chest warranted submission of second-degree manslaughter to the jury. *See Castro*, 76 A.D.3d at 421. *People v. Echevarria*, 17 A.D.3d 204 (1st Dep't 2005), and *People v. Spina*, 275 A.D.2d 902, 904 (4th Dep't 2000), fail to specify what wounds were involved. *People v. Davis*, 90 A.D.3d 461 (1st Dep't 2011), involved intent "to cause physical injury as opposed to serious physical injury," and thus had nothing to do with intent versus recklessness.[2]

(C)

Finally, this Court should reject the People's novel assertion that any error was harmless based on a theory that the evidence of appellant's guilt of first-degree manslaughter was overwhelming (Resp. Br. at 55). The People ask this Court to jettison the rule it set forth in *People v. Green*, 56 N.Y.2d 427, 435

---

[2] In his main brief, appellant has already addressed the other cases the People cite to support their argument with respect to Ojeda's injuries (*See* Resp. Br. at 39-40; Appellant's Main Brief at 27).

8

(1982), that only if a "defendant were convicted of the higher offense ... and acquitted of the lower offense charge ... would the failure to charge an even lesser offense ... be harmless."[3]  The People's argument ultimately fails because the strength and weakness of the proof as to any crime is subsumed within the reasonable view test.  Once either party establishes that a reasonable view of the evidence supports a lesser included charge, the evidence, by definition, is not overwhelming and the decision between the charges supported by a reasonable view of the evidence is the jury's to make. *See* C.P.L. § 300.50(1) (a court *must* submit a lesser offense on request if there is a reasonable view of the evidence that supports its submission).

Nothing in the Court's decision in *Green* supports a different rule (Resp. Br. at 56-59). Nor have the People pointed to a single case in which this Court has held that an error in refusing to submit a lesser included offense was harmless because of "overwhelming evidence" of the greater offense. *People v. Rodriguez*, 26 N.Y.2d 341, 346 (2001), actually undercuts the People's argument. In *Rodriguez*, 26 N.Y.2d at 346, a justification charge error was harmless because the jury's verdict convicting the defendant of certain counts made it clear that it had rejected justification.  Thus, its holding was akin to the rule in *Green*: that a

---

[3] The People imply that appellant consciously omitted relevant portions of the Court's decision in *People v. Green* from his main brief (Resp. Br. at 55). Appellant omitted only the particular crimes at issue in that case, not anything that changed the meaning of the quoted text.

charge error will be harmless when *the jury's decision shows* that it did not matter and could not have mattered.

In *People v. Petty*, 7 N.Y.3d 277, 286 (2006), the court's incorrect justification charge was harmless because the shooting "was unjustified" and thus there was no "reasonable possibility that the verdict would have been different" with a correct charge. In other words, no reasonable view of the evidence supported giving a justification charge. Here, in contrast, there was a reasonable view of the evidence that supported submission of the lesser. Once that was so, the choice among the counts was up to the jurors.

Ultimately, whenever different views of what the evidence proves are both reasonable, it is the jury's responsibility to determine a defendant's *mens rea*, and to accept the People's argument would be to usurp the jury's role as fact-finder. This Court has long held that "the question of intent can never be ruled as a question of law" and "must always be submitted to the jury." *People v. Flack*, 125 N.Y. 324, 334 (1891); *see also Policano v. Herbert*, 7 N.Y.3d 588 (2006) ("the question of the defendant's state of mind" is "a classic matter for the jury"). For this reason, the Court held in *People v. Gallagher*, 69 N.Y.2d 525, 530 (1987), that the Appellate Division could not remedy the trial court's failure to charge intentional and depraved indifference murder in the alternative by simply modifying the judgment on appeal:

10

> It is not for the Appellate Division in the first instance to determine whether defendant acted intentionally or recklessly at the time of the crime. *That is the jury's function.* Because the jury here failed to make the critical determination of defendant's mental state, an omission that cannot be cured by the Appellate Division's exercise of interest of justice jurisdiction, *the error has not been rendered academic.*

*Id.* at 531 (emphasis added).

Furthermore, the People's claim is inconsistent with the Legislature's intent. C.P.L. § 300.50(1). One of the purposes of the statue is to permit the jury to extend mercy to a defendant even though the evidence may favor guilt of the greater offense, providing that there is a rational evidentiary basis for the jury to convict of the lesser. *See People v. Mussenden,* 308 N.Y. 558, 562-63 (1995).

* * *

In sum, a reasonable view of the evidence supported submission of second-degree manslaughter to the jury as a lesser included offense, and the court's refusal to do so warrants reversal of appellant's conviction and a new trial.

11

## CONCLUSION

FOR THE REASONS STATED ABOVE AND IN
APPELLANT'S MAIN BRIEF, APPELLANT'S
CONVICTION MUST BE REVERSED AND A
NEW TRIAL ORDERED.

> Respectfully submitted,
> LYNN W.L. FAHEY
> Attorney for Defendant-Appellant

Leila Hull
*Of Counsel*
October 2013

12

MEMORANDUM

SUPREME COURT : KINGS COUNTY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

PEOPLE OF THE STATE OF NEW YORK,

vs

ENRIQUE RIVERA,

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

CRIMINAL TERM, PART 35

By: MARRUS, J.

Dated: September 4, 2014

Indictment No. 1453/05

DECISION and ORDER

By pro se motion dated June 11, 2014, the defendant has moved for an order pursuant to CPL 440.10(1)(b) (d) (f) (h), vacating his judgment of conviction. By answer dated July 29, 2014, the District Attorney opposes the application. The defendant submitted a reply dated August 15, 2014.

The defendant contends that his pretrial statements were coerced and that he was denied a fair trial because there was a delayed disclosure of <u>Brady</u> material which prejudiced his defense. Both of these claims, however, are procedurally barred because there were sufficient facts in the record to provide for appellate review of them and the defendant has offered no justification for his failure to raise them on his recently concluded judgment appeal. CPL 440.10 (2)( c). Indeed the defendant had a chance to litigate any alleged coercion of his pretrial statements at his <u>Huntley</u> hearing, but never raised such a claim, and already has litigated his claim of delayed disclosure of Brady material in a motion to set aside the verdict. This court previously rejected his claims of involuntariness regarding the statements and prejudice as to delayed disclosure of <u>Brady</u> material as meritless.

Finally defendant has offered no evidence in support of his claim that he is actually innocent. Absent any facts in support of the claim, a hearing on this issue

is pointless.

The defendant's motion is therefore denied.

_____
J. S. C.

ENTERED

SEP 04 2014

NANCY T. SUNSHINE
COUNTY CLERK

2