UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x

ENRIQUE RIVERA,

                Petitioner,                  **MEMORANDUM & ORDER**
                                                    15-CV-2657(EK)

        -against-

THOMAS GRIFFIN,

                Respondent.

-------------------------------------x

I. Introduction ............................................... 2

II. Background ................................................ 3

  A. Rivera's Arrest and Questioning ......................... 3

  B. Suppression Hearing ..................................... 5

  C. Petitioner's First Trial ................................ 7

  D. Pretrial Hearings Before Petitioner's Second Trial ...... 7

  E. The State's Case ........................................ 9

    1. The State's Medical Evidence .......................... 9

    2. The State's Eyewitness Testimony ..................... 10

    3. Defense's Cross-Examination of Eyewitnesses .......... 14

    4. Petitioner's Statement ............................... 15

    5. Cross-Examination of Detective Darino ................ 16

  F. Defense's Case ......................................... 16

    1. Julio's Testimony .................................... 16

    2. State's Cross-Examination Regarding Julio's  Statements to Ms. Serrano and Mr. Cordova ......................... 19

    3. Defendant's Testimony ................................ 19

  G. Cross Examination of Petitioner ........................ 23

  H. The Charge Conference and Verdict ...................... 24

  I. Sentencing ............................................. 24

  J. Post-Conviction Proceedings ............................ 27

III. Legal Analysis .......................................... 28

  A. Failure to Charge Lesser-Included Offense .............. 28

  B. Petitioner's *Miranda* Claim ........................... 30

C. Petitioner's *Brady/Giglio* Claim ........................... 36

D. Excessive Sentence ....................................... 40

E. Actual Innocence ........................................ 44

IV. Conclusion ............................................. 45

ERIC KOMITEE, United States District Judge:

## I.    Introduction

Petitioner Enrique Rivera seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner was convicted of first-degree manslaughter in New York Supreme Court, Kings County, for the stabbing death of Edgar Ojeda during a bar fight in Brooklyn on February 27, 2005.  In June 2009, Petitioner was sentenced to twenty-five years in prison, to be followed by five years of supervised release.  He has been incarcerated for over fifteen years, and is currently at the Green Haven Correctional Facility in Stormville, New York.

Petitioner raises five arguments in his petition: first, the trial court violated his due process rights by failing to charge the lesser-included offense of second-degree manslaughter; second, the prosecution committed a *Brady/Giglio* violation by delaying the disclosure that two witnesses recanted their testimony; third, the trial court should have suppressed his post-arrest statements because they were involuntary; fourth, his sentence is excessively long; and fifth, he is actually innocent.  *See* Petition, ECF No. 1 (incorporating by reference Petitioner's state-court appellate briefs).

2

## II.  Background

### A.   Rivera's Arrest and Questioning

At approximately 4:20 a.m. on February 28, 2005, two detectives — John Darino (72nd Precinct Detective Squad) and James Gaynor (Brooklyn South Homicide Squad) — located Petitioner at a friend's home in Flushing, New York.  H1[1] 17:4-19:15[2] (Darino).  Detectives Darino and Gaynor brought Petitioner to the 72nd Precinct in handcuffs.  H1 20:3-6 (Darino).  At roughly 5:00 a.m., the detectives placed Petitioner in an interview room, where they uncuffed him.  H1 20:7-19 (Darino).  Approximately fifteen minutes later, detectives Darino and Gaynor began speaking with Petitioner.  H1 20:20-21:5; 25:7-15 (Darino).

During questioning, Petitioner, who was approximately thirty years old at the time, stated that he wielded a knife during a fight at the bar on the date of Mr. Ojeda's death.  H1 24:10-25:2 (Darino).  Petitioner then handwrote a document acknowledging that he had stabbed Mr. Ojeda, but claiming he had done so in self-defense:

> On the night of February 27, 2005, I, Enrique Rivera, went out for a few drinks.  The bar was located at

---

[1] "H1" refers to the suppression hearing held before Justice Collini on June 6, 2006.

[2] All pagination cited in this Order reflects the transcript of the identified part of the record rather than the "ECF" pages of the files submitted on the docket.

39th Street and Third Avenue.  While I was having a few drinks I had a small confrontation with a guy.  It was just words, but as the night goes on, I'm getting these eyes . . . contacted but nothing to it.  Now, as I go to the bar to get my second round, the guy is still looking at me and I happen to look back at him.  So he said 'What's up?' and I asked him what seems to be the problem.  And right away the crowd rose.  Then I felt punches and grabbing.  So I take out a knife, used it in self defense, swinging it at the crowd not knowing that I really hurt anyone.  I got out of there, got in my car and went home.  I didn't know someone was hurt.  It was self defense.  I didn't mean it.  I was just scared.  I know by saying sorry is not going to bring that person back, but I really didn't mean this to go down this way.  I'm very sorry."

Darino[3] 371:3-20 (reading Petitioner's statement into the trial record).

Several hours later, Petitioner spoke with Assistant District Attorney Jennifer Sipress at the police station, where he substantially repeated his written statement.

Petitioner was charged with murder in the second degree, N.Y. Penal Law § 125.25(1), and criminal possession of a weapon in the fourth degree, N.Y. Penal Law § 265.01(2).  Kings County Indictment Number 1453/2005.  Petitioner's case was assigned to Justice Robert J. Collini.

---

[3] Citations to a name indicate testimony given by that witness during the trial before Justice Marrus on May 6 through May 13, 2009.  "Tr." denotes non-testimonial portions of the trial record.

4

B.   Suppression Hearing

On June 6, 2006, Justice Collini held a pre-trial suppression hearing.  As relevant here, Petitioner sought to suppress his statements as involuntary.

The prosecution called Detective Darino, who testified that he read Petitioner his *Miranda* rights from a preprinted document at the police station before speaking with Petitioner in the interrogation room.  H1 21:6-13 (Darino).  Petitioner initialed the so-called *Miranda* rights form, responding "yes" (in writing and orally) to each question as Detective Darino read the document aloud to Petitioner.  H1 21:19-22:25 (Darino).  Petitioner signed the document.  H1 24:5-6.  This document was admitted into evidence.  H1 22:4-13.

After completing the *Miranda* sheet, Petitioner agreed to speak to the detectives.  H1 24:7-9 (Darino).  Detective Darino informed Petitioner that "we are conducting an investigation of an incident that occurred at El Borinquen Bar on 39th and Third Avenue."  H1 25:12-15 (Darino).  He testified to Petitioner's oral statement, which was consistent with the written one.  *See* H1 24:12-25:6 (Darino).

After Petitioner made this statement, Detective Darino gave Petitioner a pen and paper and asked him to write down the statement he had made.  H1 25:22-26:1 (Darino).  Petitioner and Detectives Darino and Gaynor signed the document after

Petitioner completed his written statement.  H1 26:13-27:1 (Darino).  This document was admitted into evidence.  H1 27:5-14.

Following Petitioner's interview with the detectives, around 10:00 a.m., Petitioner spoke to ADA Sipress from the Kings County District Attorney's Office at the police station. H1 27:20-24.  Detective Darino attended the interview and testified that the entire conversation was videotaped. H1 27:25-28:8.  The videotape was admitted into evidence and played at the hearing.  H1 28:14-30:2 (Darino).  It showed that ADA Sipress read Petitioner's *Miranda* rights and then asked him whether he wished to answer her questions.  H1 43:16-18. Petitioner replied, "We here."  H1 44:26-4 (Darino).  He then proceeded to answer the ADA's questions, giving a similar statement to his prior statement to the detectives.  H1 44:25-45:4 (Darino); Sipress 448:15-18.

Justice Collini denied Petitioner's motion to suppress his statements.  He concluded that Petitioner "willingly proceeded to make a statement and answer questions during interrogation."  H1 109:8-10.  Justice Collini also noted that the state "was absolutely correct that the Defendant indicated his acquiescence" to ADA Sipress' questioning by stating "we here."  H1 46:2-9.

C.   Petitioner's First Trial

On June 27, 2006, Petitioner's first trial resulted in a hung jury and dismissal (by the Judge) of the weapons charge. *See Rivera v. Firetog*, 11 N.Y.3d 501 (2008). On October 23, 2007, the Appellate Division, Second Department granted Petitioner's motion to prevent retrial on the same indictment, but the New York Court of Appeals reversed. *Rivera v. Firetog*, 44 A.D.3d 957 (N.Y. App. Term 2007), *rev'd* 11 N.Y.3d 501 (2008).

D.   Pretrial Hearings Before Petitioner's
     Second Trial

Justice Alan Marrus presided over Petitioner's second trial. The same counsel (Mr. Joel Dranove) represented Petitioner throughout all aspects of his first and second trials. Petition at 12; H1 2:3-4 (Mr. Dranove entering his appearance at Petitioner's suppression hearing before the first trial).

On May 4, 2009, Justice Marrus held a pre-trial hearing before Petitioner's second trial. H2[4] 2:1-20. The following day, immediately before jury selection, the prosecution disclosed that they no longer intended to call two witnesses on their witness list:  Ms. Jahaira Serrano (Petitioner's cousin) and Mr. Rudy Cordova (Ms. Serrano's

---

[4] "H2" refers to the second pretrial hearing, held before Justice Marrus on May 4 and May 5, 2009.

boyfriend).  H2 21:16-22:25.  Neither of these witnesses testified at the prior trial, but Mr. Cordova testified before the grand jury prior to Petitioner's first trial.  S.[5] 11:12-12:4.

The state explained that these witnesses had previously made "oral sworn statements" to the DA's Office and detectives inculpating Petitioner.  H2 22:6-13.  But when the witnesses "were later interviewed" "in the middle of" the first trial, they "recant[ed]" their testimony, stating that they "didn't see what they said they saw" and "couldn't remember" what happened.  H2 22:13-23:3.

In response, the defense noted that this revelation was occurring thirty-five months after the last trial, and that counsel "wrote to the prosecution and asked her [for] any favorable evidence" "two weeks ago."  H2 27:25-28:5.  Counsel requested the witnesses' contact information, stating that "I think they're, at a minimum, able to present evidence that is favorable to the defense."  H2 27:21-24.  Justice Marrus noted that the witnesses' inconsistent statements "probably makes them useless witnesses for anyone," but directed the state to turn over their "contact information."  H2 29:11-25; 30:16-24.

---

[5] "S" refers to the transcript of the sentencing before Justice Marrus on June 8, 2009.

Justice Marrus then called the jurors into the courtroom for *voir dire*.  H2 33:3-9.

On May 6, 2009 (the next day), immediately before the jury entered for the first day of trial, defense counsel stated that he had faxed a request to the court earlier that morning for "assignment of an investigator."  Tr. 4:4-8.  Counsel stated that he was unable to "track down" some of the individuals "from the phone number" the state provided.  Tr. 4:13-14.

Justice Marrus granted the defense's application for a court-appointed investigator on the condition that the defense submit an affirmation as to Petitioner's indigency, which defense counsel stated they would present on "Monday" — five days later (May 11).  Tr. 4:15-5:5.  The jury then entered for the first day of trial.  Tr. 5:6-7.

E.    The State's Case

In its case-in-chief, the state presented, among other evidence: (1) eyewitness testimony of Petitioner fighting with the victim; (2) forensic testimony that the victim's blood was found on the hat Petitioner wore to the bar on the night in question; and (3) Petitioner's statement that he waved a knife in self-defense during the fight.

1.    The State's Medical Evidence

Dr. Frede Frederic (the forensic pathologist who autopsied the victim's body) testified that the victim was

9

killed by a five-inch-deep stab wound to the "left side of the chest" that punctured his lung.  Frederic 66:17-67:2; 69:17-22; 70:11-22; 75:2-11.  There were two other, shallower stab wounds on the victim's back.  Frederic 71:13-22; 72:4-14.  The wounds were not caused by someone "waving a knife around," but were consistent with someone "punching" the victim using a "knife or [] sharp instrument."  Frederic 76:8-12; 77:1-11; 77:12-16.  Dr. Frederic also testified that the victim would not have "gush[ed]" blood but the instrument used to stab the victim would have had blood on it.  Frederic 79:9-24.

The state also called Linda Razzano, a forensic scientist, who testified that the victim's blood was found on the hat Petitioner wore to the bar that night.  Razzano 319:5-19; 323:13-18.  Police recovered Petitioner's hat from his mother's apartment the day after the incident while investigators were attempting to locate Petitioner.  Gaynor 116:18-117:7; 120:17-121:1; 121:16-122:4.  Petitioner did not dispute that he wore the hat to the bar or that the victim's blood was found on it.  Petitioner 634:9-25.

### 2.  The State's Eyewitness Testimony

The state called four witnesses who were present at the bar that night.  Three of those witnesses were the victim's friends who accompanied the victim to the bar — Jonathan Dominguez, Carlos Solomon, and Marcus Carrasquillo — and one was

10

a bouncer at the bar who was off-duty that day — Enrique
Navarette.

     The witnesses testified as follows.  All male patrons
were "patted down" for weapons upon entering the bar.  Navarette
140:1-21; Dominguez 210:13-211:3; Solomon 247:25-248:6.  At some
point that night, a man, whom Mr. Solomon identified as
Petitioner, approached the victim.  Solomon 229:2-230:12.  Mr.
Solomon stood next to the victim as Petitioner and the victim
exchanged words.  Solomon 230:12-14; 230:18-21; 231:14-21
(Petitioner "whispered something into" the victim's ear and the
victim responded with words).  Solomon 230:12-14.  As Petitioner
and the victim spoke, two men who would be identified at trial
as Petitioner's brother Julio and their friend "Little Julio"
joined Petitioner's side.  Solomon 231:22-232:9.

     A fight then erupted.  Navarette 143:25-144:4 ("I saw
the two groups talking.  And then all of a sudden there was a
couple of, you know, there was a push.").  Various witnesses
testified as to what happened next:  Mr. Navarette (the off-duty
bouncer) testified that he saw Petitioner "push" the victim
"twice, maybe" in the "shoulder, chest" area.  Navarette 144:5-
145:4.  Similarly, Mr. Solomon, who was standing beside the
victim talking to Julio, testified that "all of a sudden" Mr.
Solomon "seen the defendant strike my friend" in the "chest
area" or "top of [his] shoulder" twice.  Solomon 233:6-13;

11

233:21-234:5; 264:15-265:4.  No witness testified that anyone other than Petitioner made contact with the victim.  These statements constituted the most explicit witness testimony in support of the inference that Petitioner stabbed the decedent.  The other two prosecution witnesses did not see the fight, but confirmed that the victim reported having stab wounds immediately after the fight ended.  Dominguez 194:9-195:16; Carrasquillo 297:10-17.  No witness saw a knife in Petitioner's hands,  Navarette 144:15-17; 162:14-19; 168:5-10 (acknowledging that he saw Petitioner's hand but did not see a knife); Solomon 267:2-7; Darino 403:12-24, or saw him strike the victim's back, where two stab wounds were found, Navarette 168:20-169:3; Solomon 265:5-9.

Moments later, the on-duty bouncer disrupted the fight.  Navarette 145:6-11 (Mr. Navarette and the on-duty bouncer "came over and we split everybody . . . up"); Dominguez 195:19-21.  Petitioner exited the bar either with Little Julio or shortly before him.  Navarette 145:8-13; 164:18-25; Dominguez 194:20-22 (witnessing "two guys" being "kick[ed] [] out"); Solomon 235:3-6 (two men "ran out the door"); Carrasquillo 295:22-23 ("two people r[a]n towards the door").  Bouncers then blocked the exit, trapping Julio (Petitioner's brother) inside for "maybe 20, 30 seconds" until bouncers let him leave. Navarette 145:8-21; *see also* Dominguez 197:7-9; 206:18-24;

12

Solomon 235:7-235:11.  During this interval, Mr. Solomon and Mr. Dominguez attempted to strike Julio.  Solomon 235:12-236:17 (stating that he "threw a punch" at Julio).  The entire episode took "like a minute."  Dominguez 212:13-15.

Immediately after the fight dissipated, the victim told his friends he had been stabbed.  Navarette 147:14-21; Dominguez 194:20-23; Solomon 237:8-13; Carrasquillo 297:9-13. Witnesses observed blood leaking from the victim's upper body. Navarette 147:22-148:2 ("upper chest area"); Dominguez 195:2-10 (observing blood "leaking down" from the victim's "neck by the shoulder blade"); Solomon 237:14-20 ("blood starting shooting from his neck in the air"); Carrasquillo 297:12-16.  They rushed the victim to Mr. Solomon's car to get the victim to the nearest hospital, where he died shortly after arrival.  Dominguez 197:1-4; 197:22-199:25; Solomon 238:1-242:12; Carrasquillo 297:23-299:13.

The day after the incident, Mr. Navarette and Mr. Solomon identified Petitioner in a lineup at the police station. Navarette 148:21-150:2; Solomon 242:16-244:11.  After viewing the lineup, Mr. Solomon told police what he "remember[ed] [Petitioner] doing" during the fight.  Solomon 244:12-15.  Mr. Navarette testified that he identified Petitioner as being "part of the altercation," and that he had previously told police what

he saw Petitioner "doing."  Navarette 149:16-150:17; 152:14-153:16.

### 3.   Defense's Cross-Examination of Eyewitnesses

On cross-examination, the defense elicited testimony that the bar was "dark."  Navarette 161:3-25.  Each witness acknowledged that they did not see a knife in Petitioner's hands.  Navarette 144:15-17, 162:14-19, 168:5-10; Solomon 267:2-7; Darino 403:12-24.

The defense also established that Little Julio and Petitioner were both wearing dark camouflage jackets on the night in question, Navarette 137:12-14 ("One gentleman had on a camouflage jacket with a hoody, and the other gentleman, if I'm not mistaken, was a camouflage hoody."); Solomon 232:10-233:5; 282:3-7 (the two were wearing "same type of pattern" camouflage jackets); Julio 465:20-466:5 (testifying for the defense that Petitioner and Little Julio both wore "camouflage jackets" and hats), and that Mr. Solomon, who threw at least one punch at Julio, had the "same complexion," "facial structure," and height as Petitioner, and also wore camouflage attire.  Navarette 163:2-164:3; Solomon 248:8-11 (Mr. Solomon wore a "camouflage shirt").

However, the state's witnesses also testified that Little Julio was "shorter" and "chubbier" than Petitioner. Navarette 137:18-138:10 ("One gentleman was taller and thinner.

14

The other was a little shorter and stockier.") (identifying
Petitioner as the "taller and thinner" man wearing a "camouflage
jacket with the hoody"); Solomon 233:3-5 (describing Little
Julio as "short" and "chubby").

### 4.  <u>Petitioner's Statement</u>

The state introduced Petitioner's post-arrest
statements into evidence — both his written statement, and the
videotaped statement to ADA Sipress, which was played at trial.
Sipress 440:17-23.  As he did during the suppression hearing,
Detective Darino testified that he read Petitioner his *Miranda*
rights from a preprinted form at the police station and that the
victim both orally and in writing waived his rights.  Darino
362:1-369:21.  Detective Darino further testified that he did
not prompt Petitioner to make the statements in question.
Darino 366:6-13 (saying it was "more of a narrative"); *but see*
H1 25:3-6 (Darino) (saying it was a "question and answer" and
not a "narrative").

Detective Darino also testified that he questioned
Julio the same morning while Petitioner was also at the police
station.  Detective Darino testified that Julio "voluntarily
came back" to the precinct with detectives that were looking for
Petitioner and willingly answered questions.  Darino 383:19-
384:5.

5.   <u>Cross-Examination of Detective Darino</u>

On cross-examination, the defense established that Detective Darino did not know of any contemporaneous notes made by detectives regarding their unrecorded conversations with Julio or Petitioner.  Darino 395:18-21; 400:15-20.  Detective Darino also acknowledged that he wrote in a contemporaneous police report that Petitioner "made an admission to stabbing the victim" even though Detective Darino had not himself heard Petitioner say as much.  Darino 428:1-25.  However, Detective Darino categorically denied telling Petitioner that his brother Julio was at the police station or that Julio would be charged for murder unless Petitioner made false statements.  Darino 383:16-18; 416:11-417:7.

F.   <u>Defense's Case</u>

In its case, the defense argued that (1) investigators (primarily Detective Darino) coerced Petitioner into making false statements by threatening to charge his brother Julio with murder; and (2) in closing, that Petitioner's friend Little Julio may have been the culprit, Tr. 694:8-695:11; 699:12-701:1. In support of this theory, the defense called Julio and Petitioner to testify.

1.   <u>Julio's Testimony</u>

Julio (Petitioner's brother) testified that he went to the bar with Petitioner and two friends, Little Julio and JP,

16

where they met Petitioner's cousin, Ms. Serrano, and her boyfriend, Mr. Cordova, at the bar.  Julio 461:12-463:3.

At some point on the night in question, Julio turned around and saw three men surrounding Petitioner (with Little Julio at Petitioner's side).  Julio 467:9-25.  Julio came over and placed himself between and in front of Petitioner and Little Julio, facing Mr. Solomon and the victim.  Julio 468:8-18.  As the group exchanged words, a "dark", "skinny," "tall" man (Mr. Solomon) struck Julio and a fight erupted.  Julio 468:16-469:5. Julio testified (consistent with his statement to investigators) that he witnessed a punch come over his shoulder toward the victim, and that the sleeve "could have" been camouflage.  Julio 469:1; 470:6-18.  Shortly thereafter, the bouncer grabbed Petitioner to break up the fight.  Julio 512:21-513:9.

Julio testified that he left the bar shortly after Petitioner, and that the group reunited on the sidewalk a few blocks away.  Julio 473:4-16.  Petitioner, Little Julio, and Julio briefly met Ms. Serrano and Mr. Cordova there before everyone decided to go home.  Julio 474:20-21; 524:5-7; 525:12-13.  Julio testified that, while they were there, he spoke with Petitioner for about "five minutes" about the fight, and that Petitioner appeared "fine."  Julio 473:24-474:14.

Julio testified that police (including Detective Darino) came to his home early on the morning of February 28 and

17

brought him in handcuffs to the police station.  Julio
477:6-7.  At the police station, Detective Darino and another
detective, Hector Rivera, placed Julio in a room where they
removed his shoelaces and belt.  Julio 478:21-23.  The
detectives questioned Julio without recording the
conversation.  Julio 481:1-13.  During this conversation,
Detective Rivera told Julio "about three times" (in Detective
Darino's presence) that if Julio did not help them find
Petitioner, Julio "could be charged with the murder."  Julio
480:10-17; 484:15-21.

        Julio testified that he was questioned again at the
police station by "a lady" (ADA Sipress) in the presence of
detectives Darino and Rivera.  Julio 484:22-485:7; Sipress
443:23-24.  During questioning, Julio testified, "the lady"
repeatedly stopped and started the tape, and when the tape was
stopped, Detective Rivera asked Julio whether it was a
"camouflage jacket" that Julio saw punch over him.  Julio
486:1-21.  Julio replied, "four or five times" that it "could
have been."  Julio 4:22-487:1.  This testimony, however, was
disputed.  At the close of argument, the state recalled ADA
Sipress, who testified that she never "stopped and started" the
tape during her conversation with Julio.  Sipress 678:15-679:2.
The state then played the tape, which apparently was continuous.
Sipress 681:20-24.

> 2.   State's Cross-Examination Regarding Julio's
> Statements to Ms. Serrano and Mr. Cordova

On cross-examination, the state asked Julio questions designed to elicit the pre-trial statements Ms. Serrano and Mr. Cordova had apparently recanted: namely, that Julio told Ms. Serrano (in the presence of Mr. Cordova) that Petitioner told Julio he had stabbed the victim.   Julio 523:23-526:1 (asking whether Julio told Ms. Serrano on the street after the bar that Petitioner "had stabbed the guy several times," "got him jigged in the arm . . . and in the neck," or that Petitioner "went crazy and start[ed] stabbing the guy").   Julio denied each of these questions and testified that Ms. Serrano told *him* that "somebody got stabbed."   Julio 524:25-525:17.

The next day, the defense questioned Julio as to whether he spoke to Ms. Serrano or Petitioner first after the fight.   Julio 535:1-5.   Julio testified that he spoke to Ms. Serrano before speaking to Petitioner.   Julio 533:1-535:19.

> 3.   Defendant's Testimony

Petitioner testified in his own defense; he described the night as follows.   At some point, Petitioner went to the bar's restroom to take a phone call.   Petitioner 543:9-13.   A young man entered and told Petitioner "this ain't no phone booth."   Petitioner 543:24-544:3.   Petitioner did not respond and left the bathroom to rejoin his friends outside.   Petitioner

544:10-12.  While talking to Little Julio, the man "walked out
of the bathroom and brushed into [Petitioner]," giving him an
"aggressive" "stare."  Petitioner 544:22-545:4.  Then, as
Petitioner was buying drinks, he turned around and saw the man
again.  When they made eye contact, the man "bopped his head
like 'what's up?'"  Petitioner 545:24-546:2.

In response, Petitioner approached the man and asked
him "what seems to be the problem?"  Petitioner 546:3-4.  The
man responded "I ain't got no problem.  You got a problem?"
Petitioner 546:4-5.  Little Julio then came over "like a little
Tasmanian devil."  Petitioner 546:5-25; 563:20-564:4.  As
Petitioner told Little Julio to "chill," the "taller kid" (Mr.
Solomon) "took a swing" at Petitioner.  Petitioner 547:8-
13.  Petitioner reacted with "at least three" closed-fist
punches aimed at Mr. Solomon and the victim's faces.  Petitioner
547:17-549:2; 626:5-24.  Petitioner testified that he did not
have a knife.  Petitioner 548:19-25.

Around the time Petitioner threw a punch, Julio and JP
arrived.  Petitioner 549:5-11 (Julio arrived "after" Petitioner
threw a punch); 564:5-8 (Julio arrived "when" Petitioner threw a
punch).  The bouncer then "manhandled" Petitioner "to the door."
Petitioner 549:6-11.  Petitioner attempted to "get back in," but
the bouncers prevented Petitioner from re-entering.  Petitioner

550:1-7.  Inside, he heard "people screaming, shouting, the chairs being, scratching the floor."  Petitioner 550:13-16.

Unable to enter, Petitioner went toward his car, which was parked nearby.  Petitioner 550:21-22.  He then saw Little Julio leave the bar and walk in his direction. Petitioner 551:4-17.  The two entered Petitioner's car and Petitioner attempted to contact Julio.  Petitioner 551:18-552:12.  Julio told Petitioner to meet him, JP, and Ms. Serrano at a nearby intersection.  Petitioner 552:13-553:3.  Petitioner drove Little Julio to reunite with the group (Julio, JP, Ms. Serrano, and Mr. Cordova).  Petitioner 552:11-553:3; 554:1-4; 570:14-24.  After meeting, everyone decided to go home for the night.  Petitioner 554:16-19.

Petitioner testified that, at some point while Little Julio was in his car, Petitioner noticed "dry" "blotches" of blood on the "chest" or "shoulder part" of Little Julio's jacket.  *Compare* Petitioner 553:4-20 (Petitioner noticed blood on Little Julio's jacket before driving to meet Julio); 569:6-9 (Petitioner did not notice "anything unusual about" Little Julio's jacket before meeting Julio); 570:11-17; 628:16-18; 630:2-11; 631:22-632:1 (Petitioner noticed the blood under the lights of a gas station when dropping off Little Julio at his home after meeting Julio).  Petitioner also testified that he

was "not sure" where in the car he put his hat, but that he "probably had it on."  Petitioner 556:4-9; 571:1-5.

Petitioner testified that he did not know the outcome of the bar fight until around 3 p.m. on February 27, when his friend JP (who was also at the bar the night before) informed Petitioner that there was a "police line" at the bar. Petitioner 574:21-575:13.  Later, in the early hours of February 28, detectives brought Petitioner to the police station and began questioning him in an interrogation room.  Petitioner 575:22-576:17.

At the police station, Petitioner testified, he denied responsibility for the homicide.  Petitioner 577:13-19.  In response, Detective Darino "kept coming back and forth" into the room, telling Petitioner "we have your brother here being charged with murder" and that "your brother's about to face life in jail just cause he tried to save your ass at a fight . . . when you can easily just plead self defense . . . . Get a little eight to ten years instead of y'all both facing life in prison."  Petitioner 576:18-579:6.

Eventually, Petitioner told Detective Darino "how I'm going to plead self defense" and asked "what you want me to say?"  Petitioner 579:8-19.  Detective Darino told Petitioner to write that "you had a knife and struck the guy, you know, in self defense," and "I'll let your brother go."  Petitioner

22

579:12-14.   Petitioner wrote the statement, misspelling his own first name in the process.   Petitioner 579:15-580:2.   When Petitioner was about to sign his written statement, Detective Darino told Petitioner to "hold on" because he had "more papers for you to sign."   Petitioner 580:24-581:18.   Detective Darino then read Petitioner his *Miranda* rights for the first time off a preprinted sheet after Petitioner's statement was written. Petitioner 581:21-582:6.

Detective Darino then took Petitioner to another room to meet with ADA Sipress.   Detective Darino told Petitioner to repeat "what you wrote down."   Petitioner 583:20-22.   Petitioner then gave ADA Sipress a "false statement."   Petitioner 583:15-17.

G.   Cross Examination of Petitioner

On cross-examination, Petitioner repeated that he threw "at least three" closed-fist "swings" at the "faces" and "upper body" of the victim and Mr. Solomon, who were standing in front of Petitioner during the fight.   Petitioner 626:5-627:24. Petitioner also acknowledged that he had never mentioned the blood on Little Julio's jacket during the first trial (at which Petitioner testified for two hours) or to detectives during the initial investigation into the victim's death.   Petitioner 635:1-637:18.

H.   The Charge Conference and Verdict

Justice Marrus held a charge conference after the jury was excused at the close of argument.  The defense requested that the court submit instructions on second-degree manslaughter on the grounds that the jury could find Petitioner acted recklessly but not intentionally.  Justice Marrus refused because "[t]here is no reckless theory in this indictment" and "neither" side was "going with that theory."  Tr. 648:2-23. Accordingly, Justice Marrus instructed the jury on second-degree murder and first-degree manslaughter.  On May 13, 2009, the day argument closed, the jury found Petitioner guilty of first-degree manslaughter but acquitted him on the second-degree murder charge.

I.   Sentencing

Sentencing occurred approximately a month after the verdict.  There, defense counsel made an "oral 330.30" motion to set aside the verdict and asked the court "to reconsider denying [me] the time I need to put the affidavits in."  S. 3:9-15.  It was not entirely clear what the affidavits would have said. Nevertheless, the court agreed to hear the oral motion if the defense was "ready" to make it.  S. 3:18-23.  Defense counsel agreed to make the motion.  S. 3:24.

The defense moved "on the grounds indicated initially in my May 6, 2009 letter" regarding the "recant[ation]" of Ms.

24

Serrano.  S. 4:11-15.  Defense counsel explained that an "investigator was appointed," and that defense counsel gave the investigator the contact information the state provided for witnesses Ms. Serrano and Mr. Cordova on May 6.  S. 4:23-5:3. The investigator subsequently learned that the contact number for at least Ms. Serrano was "not in operation."  S. 5:5.

The investigator found Ms. Serrano at her workplace after the verdict was rendered.  S. 5:6-10.  Defense counsel interviewed Ms. Serrano the week before sentencing.  S. 5:11-15. Ms. Serrano told counsel that she "went to the police several days after" the incident after learning about it in a "newspaper."  S. 6:4.  Ms. Serrano said that she initially told the police she "didn't see what happened" and "Julio didn't say anything about his brother" stabbing someone.  S. 6:11-7:5. After the police interrogated her for "hours on hours" and threatened to "take her kid away," Ms. Serrano falsely stated that Julio told her that Petitioner stabbed someone that night. S. 7:6-9:7.

After hearing from Ms. Serrano, counsel directed the investigator to locate Mr. Cordova.  S. 8:8-11.  The investigator reported to counsel that Mr. Cordova gave a similar story about police pressure.  S. 8:12-9:1.  Counsel acknowledged he had not yet spoken to Mr. Cordova at the time of sentencing. S. 8:12-16.

Counsel argued that he would have called Ms. Serrano and Mr. Cordova "to establish" the "extraordinary menacing pressure put on [Ms. Serrano], pressure my client testified to," in order to impeach Detective Darino's testimony that there was "no pressure" and to prevent the prosecution from questioning Julio about inculpatory statements he (allegedly) made to Ms. Serrano.  S.  9:2-14.  Counsel further argued that "he couldn't discover this information sooner" and was entitled to know about it before the "late morning of the first day of trial." S. 9:15; 10:1-14.

The state replied that Mr. Cordova testified before the grand jury in the first case that he had seen "the defendant was wearing the camouflage jacket, that there was an altercation between him and the victim in this case . . . and that he had seen the arm of the person coming over."  S. 11:10-17.  At least some of Ms. Serrano or Mr. Cordova's sworn statements were also audiotaped.  S. 12:2-4.  Given the witnesses' prior inconsistent statements, the state explained that it refused to call the witnesses because they were "possibly going to commit perjury." S. 12:5-7.

The court denied Petitioner's oral motion.  First, Justice Marrus found that the oral motion was "procedurally defective" because it was based on hearsay without affidavits. S. 14:21-15:5.  On the merits, Justice Marrus noted that the

26

witnesses did not testify at trial so "there was no evidence that they gave that resulted in any guilty verdict."  S. 15:5-9. Moreover, "realistically they could [not] have been called as defense witnesses" given their prior inconsistent statements, making them "useless to both sides."  S. 15:10-17.  Finally, there was "no evidence offered to be rebutted by calling these witnesses" because Julio denied telling Ms. Serrano that Petitioner stabbed the victim.  S. 15:22-16:4.

Justice Marrus then sentenced Petitioner to the statutory maximum prison term of twenty-five years. S. 35:18-20.  He noted that Petitioner's testimony "didn't have the ring of truth and was very inconsistent with his prior accounts."  S. 32:9-13.  Justice Marrus also noted Petitioner's "dreadful" criminal record, including convictions for possession of a gun, robbery, and drug dealing.  S. 33:18-34:10.

J.    Post-Conviction Proceedings

On direct appeal, Petitioner argued that the trial court's failure to charge the lesser-included offense violated due process and that his sentence was excessive, but he did not assert any *Miranda* or *Brady/Giglio* claims.  The Appellate Division, Second Department and Court of Appeals affirmed Petitioner's conviction.  *See People v. Rivera*, 100 A.D.3d 658 (N.Y. App. Term 2012), *aff'd* 23 N.Y.3d 112 (2014).

On June 11, 2014, Petitioner moved under N.Y. Criminal Procedure Law Section 440.10 to vacate his conviction.  ECF No. 10 at 1.  In this proceeding, Petitioner raised *Miranda* and *Brady/Giglio* claims and argued that he was actually innocent. *See id.* at 4-26.  On September 4, 2014 the Supreme Court, Kings County denied his motion on procedural grounds.  *See* Section 440.10 Sup. Ct. Order at 1-2, ECF No. 10 at 69-70.  The Appellate Division, Second Department summarily affirmed, *see* Section 440.10 Second Department Order at 1, and the Court of Appeals denied leave to appeal, *see* Section 440.10 Court of Appeals Order at 1, ECF No. 10 at 81.

### III. Legal Analysis

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides that a reviewing court may grant a writ of habeas corpus only if the state's "adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).

A.   Failure to Charge Lesser-Included Offense

As discussed above, Justice Marrus declined to submit a second-degree manslaughter instruction to the jury because he

found there was no theory of the case under which the jury could find recklessness (rather than intent).  Tr. 648:2-23. Accordingly, Justice Marrus submitted secoxjnd-degree murder (intent to kill) and first-degree manslaughter (intent to cause serious bodily harm) charges to the jury.

On direct appeal, Petitioner argued that the refusal to charge the lesser-included offense of second-degree manslaughter violated the Due Process Clause of the U.S. Constitution, given the facts of this case.  Petitioner's Second Department Direct Br. at 21-35, ECF No. 21; Petitioner's Court of Appeals Direct Br. at 16-31, ECF No. 10 at 82-117.  He argued that a jury could have found Petitioner's actions to have been merely reckless, given that the stabbing occurred in a "chaotic barroom brawl."  Petitioner's Court of Appeals Direct Br. at 16. The state appellate courts rejected Petitioner's argument on the merits.  *See People v. Rivera*, 100 A.D.3d 658, 660 (N.Y. App. Term 2012), *aff'd* 23 N.Y.3d 112, 122-24 (2014).  Petitioner now brings this claim here.

To succeed under the AEDPA, Petitioner must show that the trial court's refusal to charge second-degree manslaughter was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d).  "[C]learly established Federal law" includes "holdings, as opposed to the

29

dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Loliscio v. Goord*, 263 F.3d 178, 191 (2d Cir. 2001) (the rule must be found in "clearly established Supreme Court precedent"); *Delvalle v. Armstrong,* 306 F.3d 1197 (2d Cir. 2002) (Second Circuit precedent is not sufficient).

No Supreme Court precedent requires the submission of lesser-included offenses to the jury in non-capital cases. While the Supreme Court has required courts to submit lesser-included offenses in capital cases, this rule has not been extended further. *See Beck v. Alabama*, 447 U.S. 625, 637-38 & n.14 (1980) (holding that courts must instruct the jury on lesser-included offenses "in a capital case," but stating that "[w]e need not and do not decide whether the Due Process Clause would require the giving of such instructions in a noncapital case"). Because the trial court's refusal to charge second-degree manslaughter did not violate "clearly established Federal law," this claim does not survive the AEDPA's strict standard of review.

B.   Petitioner's *Miranda* Claim

Petitioner argues that his statement to law enforcement should have been suppressed for three reasons: first, he was not read his *Miranda* rights before making his oral and written statements to detectives; second, he did not consent

30

to answer ADA Sipress' questions after she read him his *Miranda*
rights following his conversations with detectives; and third,
the entire questioning was tainted because Detective Darino (and
others) pressured him to make false statements by threatening to
charge his brother Julio with murder.  The first two claims fall
within *Miranda*'s ambit.  *See Miranda v. Arizona*, 384 U.S. 436,
441-42 (1966) (holding that *Miranda* warnings are necessary to
"secure the privilege against self-incrimination"), but the
third claim implicates the more general due process inquiry into
whether Petitioner's statements were "voluntary."  *Dickerson v.
United States*, 530 U.S. 428, 434 (2000) (holding that, despite
*Miranda*, the Court has "never abandoned" its "due process
jurisprudence," and "continue[s] to exclude confessions that
were obtained involuntarily"); *see Schneckloth v. Bustamonte*,
412 U.S. 218, 226 (1973) (the due process inquiry into "whether
a defendant's will was overborne" considers "the totality of the
surrounding circumstances — both the characteristics of the
accused and the details of the interrogation").[6]

Although Petitioner raised each of these arguments
(including police coercion) in his post-conviction briefs, he

---

[6] In his Section 440.10 brief before Justice Marrus, Petitioner also
argued that the state violated due process because his conviction was
"procured by duress, misrepresentation and fraud on the part of a person
acting for or on behalf of the prosecution."  *See* Petitioner's Section 440.10
Sup. Ct. Br. at 10-14.  This claim, which is based on Detective Darino's

did not raise any on direct appeal.  *See* Petitioner's Section 440.10 Sup. Ct. Br. at 4-14.  In Petitioner's Section 440.10 proceeding, the State argued that Petitioner's claim was therefore procedurally barred under Sections 440.10(2)(c) and 440.10(3)(a).  *See* State's Section 440.10 Sup. Ct. Br. at 1-3.  Section 440.10(2)(c) provides that a post-conviction court "must deny a motion to vacate a judgment" if the claimant could have raised the argument on direct appeal but "unjustifiabl[y] fail[ed]" to do so.  N.Y. Crim. Proc. Law § 440.10(2)(c).  Section 440.10(3)(a) supplements Section 440.10(2)(c) by adding that a post-conviction court "may" also deny such a motion if it rests on a basis that *could have* been raised on direct appeal, had the claimant acted with "due diligence" in developing the record at trial.  N.Y. Crim. Proc. Law § 440.10(3)(a).

In rejecting Petitioner's claim as procedurally barred, Justice Marrus (the Section 440.10 and trial-court judge) found that "there were sufficient facts in the record to provide for appellate review" of Petitioner's *Miranda* claim "and the defendant has offered no justification for his failure to raise" the argument on direct appeal.  Section 440.10 Sup. Ct. Order at 1 (citing N.Y. Crim. Proc. Law § 440.10(2)(c)).  Adopting the state's argument, Justice Marrus further concluded

---

allegedly coercive conduct, rises and falls with Petitioner's "*Miranda*" claim, and ultimately cannot succeed for the same reason.

that "the defendant had a chance to litigate any alleged coercion of his pretrial statements at his [pre-trial suppression] hearing, but never raised such a claim." *Id.* (not citing N.Y. Crim. Proc. Law § 440.10(3)(a)).  The Appellate Division summarily affirmed the post-conviction ruling, *see* Section 440.10 Second Department Order at 1, and the New York Court of Appeals denied Petitioner's leave for appeal under Section 440.90(1).  Section 440.10 Court of Appeals Order at 1.

A federal habeas court may not review the judgment of a state court that rests on a ground of procedural default that is "independent of the federal question and adequate to support the judgment." *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  To be "independent" of federal law, the court's "reliance on state law must be clear from the face of the opinion." *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir. 2009) (internal quotations omitted).  Such a state-law basis is "adequate" if it is premised on a state-law rule that is "firmly established and regularly followed" by courts of the state.  *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999). Finally, where (as here) a state appellate court affirms the denial of a claim without comment, federal habeas courts must review the last "reasoned" state-court opinion to assess the basis for the denial.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("[W]here . . . the last reasoned opinion on the claim

explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits.").

Applying this test, the Court finds that Petitioner's *Miranda* and due process claims are procedurally barred.  As Justice Marrus was last to opine on this claim, his decision forms the basis of this Court's review.  That decision relied on an independent state-law basis to dismiss Petitioner's claim as procedurally barred — namely, default under Sections 440.10(2)(c) and 440.10(3)(a) of the New York state procedural code.[7]  This basis for decision was also an "adequate" one because Sections 440.10(2)(c) and 440.10(3)(a) are "firmly established and regularly followed" rules in New York state courts.  *See, e.g.*, *Williams v. Goord*, 277 F. Supp. 2d 309, 318-19 (E.D.N.Y. 2003) ("The Second Circuit and this Court have previously held that the denial of a § 440.10 motion for failure to raise a claim on direct appeal represents the application of a 'firmly established and regularly followed' New York rule."); *Campbell v. Lee*, 11-cv-7737, 2016 WL 6901425, at *5 (S.D.N.Y.

---

[7] Although Justice Marrus did not specifically cite N.Y. Crim. Proc. Law § 440.10(3)(a) in his opinion, "it is clear" that the court was relying on that provision given the briefing before him.  *See Martinez v. Connelly*, 09-cv-648, 2011 WL 5252750, at *8 n.4 (S.D.N.Y. July 5, 2011) (state court denied Section 440.20 motion (to set aside a sentence as excessive) where trial court's decision substantially tracked the procedural-bar language in Section 440.20(2), even though the decision did not explicitly cite that provision), *report and recommendation adopted* 2011 WL 5252749 (S.D.N.Y. Nov. 3, 2011).

Sept. 29, 2016) ("Even though CPL § 440.10(3)(a) is permissive, it is a procedural rule that is firmly established and regularly followed and can be the basis for a procedural bar."), *report and recommendation adopted* 2016 WL 6892766 (S.D.N.Y. Nov. 21, 2016); *see also Murden v. Artuz*, 497 F.3d 178, 193 (2d Cir. 2007) ("The statutory grant of discretion does not prevent Section 440.10(3) from operating as a procedural bar."). Accordingly, these claims are procedurally barred.

To overcome default, Petitioner must either "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Galdamez v Keane*, 394 F.3d 68, 73 (2d Cir. 2005). The instant Petition does not satisfy this exacting standard.

Petitioner argues that the Court should excuse his default because he was unrepresented during his Section 440.10 proceeding and on this habeas petition. Petitioner's Reply 1-4, ECF No. 16; Petitioner's Affidavit in Support of Motion to Amend Traverse at 5, ECF No. 12-1 (arguing that the Section 440.10 court should not have found procedural default "based on lack of due diligence").

This argument falters because Petitioner's *Miranda* argument was defaulted on direct appeal, not in his Section

35

440.10 proceeding.  Petitioner was represented at that stage (by Warren Landau, Esq.) and therefore any default was not the result of his being unrepresented.  *See* Petition at 12. Likewise, Petitioner's default on his due process claim occurred at the suppression hearing before his first trial, when Petitioner was represented by Mr. Dranove (who also represented Petitioner at his second trial).  *Id.*  Because Petitioner does not argue that either counsel was constitutionally inadequate, he offers no cause for these defaults.  *See Coleman*, 501 U.S. at 753-54 (for purposes of assessing "cause," "[s]o long as a defendant is represented by counsel whose performance is not constitutionally ineffective . . . we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default" on appeal); *see also Murray v. Carrier*, 477 U.S. 478, 492 (1986) ("[C]ause for a procedural default on appeal ordinarily requires a showing of some external impediment preventing counsel from constructing or raising the claim.").[8]

## C.    Petitioner's *Brady/Giglio* Claim

---

[8] In any event, it is far from clear that Petitioner's *Miranda* and due process arguments would succeed on the merits.  Even if Petitioner made statements to police before he was read *Miranda* warnings, it is undisputed that ADA Sipress read Petitioner his rights before Petitioner made materially similar statements to her.  And at the suppression hearing before Petitioner's first trial, Justice Collini specifically found (based on Petitioner's videotaped statements) that Petitioner "absolutely" "indicated his acquiescence" to ADA Sipress' questioning.  *See* H1 46:2-9; 109:25-110:5.

Petitioner claims that the prosecution violated *Brady v. Maryland*[9] and *Giglio v. United States*[10] by waiting until the morning of jury selection in the second trial to disclose that Ms. Serrano and Mr. Cordova had recanted their prior inculpatory statements.  Petitioner argues that, had the defense known of the recantation earlier, the defense would have called Ms. Serrano and Mr. Cordova as witnesses to buttress the defense's theory that investigators (specifically, Detective Darino) "framed" Petitioner in a rush to judgment, as well as to impeach Detective Darino.  There is no indication that the witnesses told the state that their statements were coerced when they recanted.

Petitioner did not raise this claim on direct appeal, but did raise it in his Section 440.10 briefs.  *See* Petitioner's Section 440.10 Sup. Ct. Br. at 14-27.  Like Petitioner's *Miranda* claim, Justice Marrus denied Petitioner's *Brady* claim as "procedurally barred" under Section 440.10(2)(c) because "there were sufficient facts in the record to provide for appellate review of [Petitioner's claims] and the defendant has offered no justification for his failure to raise them on his recently

---

[9] 373 U.S. 83 (1963).

[10] 405 U.S. 150, 151 (1972) (holding that exculpatory evidence under *Brady* includes evidence that could be used to impeach a key government witness, provided the evidence is "material" to the outcome of trial within the meaning of *Brady*).

concluded judgment appeal." Section 440.10 Sup. Ct. Order at

1-2. Justice Marrus further noted that Petitioner "already has

litigated this claim of delayed disclosure of *Brady* material in

a motion to set aside the verdict," which he had "rejected . . .

as meritless." *Id*.

Because Justice Marrus clearly relied on Section

440.10(2)(c) in dismissing this claim, Petitioner's *Brady* claim

is procedurally barred for the same reasons as his *Miranda*

claim.[11]

Petitioner cannot bypass this default. Even assuming

the state's untimely disclosure constitutes "cause" to overcome

default, Petitioner cannot demonstrate prejudice. To establish

a claim under *Brady/Giglio*, the evidence in question must be

(1) "favorable to the accused, either because it is exculpatory,

or because it is impeaching"; (2) "suppressed by the State"; and

(3) result in "prejudice." *Strickler v. Greene*, 527 U.S. 263,

281-82 (1999).

---

[11] Although Justice Marrus' opinion may be read to rely, in the alternative, on a substantive assessment of Petitioner's *Brady* claim, that fact does not strip the decision of its independent reliance on the state procedural bar found in Section 440.10(2)(c). *See Green v. Travis*, 414 F.3d 288, 294 (2d Cir. 2005) ("[F]ederal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim.") (quoting *Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir. 1996)).

In assessing the prejudice emanating from an alleged
*Brady/Giglio* violation, the question is whether "in the absence
of the undisclosed evidence, the accused 'received a fair trial,
understood as a trial resulting in a verdict worthy of
confidence.'"  *Boyette v. Lefevre*, 246 F.3d 76, 92 (2d Cir.
2001) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *see
also United States v. Bagley*, 473 U.S. 667, 682 (1985) (a
claimant is denied of a fair trial where "there is a reasonable
probability that, had the evidence been disclosed to the
defense, the result of the proceeding would have been
different").  As the analysis of prejudice under *Brady/Giglio*
overlaps with the standard for excusing default in a habeas
petition, the Court will consider this factor under the
*Brady/Giglio* prejudice rubric set out in *Boyette* and *Bagley*.
*See Banks v. Dretke*, 540 U.S. 668, 681 (2004) ("[P]rejudice
within the compass of the 'cause and prejudice' requirement
exists when the suppressed evidence is 'material' for *Brady*
purposes.").

Even assuming the state failed to disclose the
witnesses' recantation "in time for its effective use at trial,"
*United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001), this
evidence was not *Brady* material because the fact that these
witnesses recanted had no "independent exculpatory value."
*Boyette v. Lefevre*, 246 F.3d 76, 91 (2d Cir. 2010).  This is

because the recantations did not, in and of themselves, indicate
that Petitioner was innocent.  They merely removed what might
have been *inculpatory* evidence from the state's case.  *See,
e.g.*, *Penick v. Filion*, 144 F. Supp. 2d 145, 154 (E.D.N.Y. 2001)
("Where, as here, the recantation is unsworn, and is repudiated
by sworn testimony, there is an even greater need for
skepticism.").

Petitioner thus cannot show — under *Brady* or *Giglio* —
that there is a "reasonable probability that the suppressed
evidence would have produced a different verdict" if disclosed.
*Strickler*, 527 U.S. at 280.

D.   Excessive Sentence

On direct appeal, Petitioner argued to the Second
Department that his sentence (twenty-five years, plus five years
of supervised release) is excessively long, and moved the Court
to modify the sentence pursuant to N.Y. Crim. Proc. Law § 470.15
(which allows an appellate court to modify a defendant's
sentence if it finds the sentence was "illegal or unduly harsh
or severe").  Petitioner's Second Department Direct Br. at 33-
35, ECF No. 21

To receive federal habeas relief, petitioners must
have "exhausted the remedies available in the courts of the
State."  28 U.S.C. § 2254(b).  To do so, a petitioner must
present his federal claim to the highest court of the state.

40

*Grey v. Hoke*, 933 F.2d 117, 119 (2d Cir. 1991).  A petitioner

may do so by either "raising the federal claim on direct appeal

to the state's highest court or by collateral attack of the

conviction and subsequent appeal of the denial of that

application to the state's highest court."  *Harris v. Hollins*,

No. 95-cv-4376, 1997 WL 5909, at *2 (S.D.N.Y. Jan. 7, 1997).

        In doing so, the claim also must be "fairly presented"

to the state courts.  *Picard v.* Connor, 404 U.S. 270, 275

(1971).  A claim is "fairly presented" where the Petitioner

"placed before the state court essentially the same legal

doctrine he asserts in his federal petition."  *Daye v. Att'y*

*Gen. of State of N.Y.*, 696 F.2d 186, 192 (2d Cir. 1982).

Accordingly, a petitioner's state-court briefs must:

> rel[y] on pertinent federal cases employing
> constitutional analysis, (b) rel[y] on state cases
> employing constitutional analysis in like fact
> situations, (c) assert[] . . .  the claim in terms so
> particular as to call to mind a specific right protected
> by the Constitution, [or] (d) alleg[e] . . . a pattern of
> facts that is well within the mainstream of
> constitutional litigation."

*Id.*

        Here, Petitioner presented his excessive-sentence

claim to the Second Department as a matter of state law only and

did not raise the claim to the Court of Appeals.  In his Second

Department brief, Petitioner relied exclusively on state-law

precedent and fashioned his argument as a claim for relief under

41

Section 470.15 (to modify his sentence).  Petitioner's Second
Department Direct Br. at 33-35, ECF No. 21.  Because Petitioner
did not invoke the Eighth Amendment or otherwise indicate to any
state court that he intended to present a federal question, this
claim was not fairly presented to the state courts.  *See
Andrango v. Chappius*, No. 14-cv-7716, 2015 WL 4039839, at *15
(S.D.N.Y. July 1, 2015) (citing *Edwards v. Marshall*, 589 F.
Supp. 2d 276, 290 (S.D.N.Y. 2008) ("[A] petitioner's reliance on
a state procedural law granting courts discretionary authority
to reduce sentences does not fairly present a federal
constitutional claim in state court that would be cognizable on
federal habeas review.") (internal quotations omitted); *see also
Paul v. Ercole*, 07-cv-94262, 2010 WL 2899645, at *5 (S.D.N.Y.
June 10, 2010) ("[A] claim that a sentence should be reduced in
the interest of justice does not allege a violation of a
federally protected right.").

          Nevertheless, the claim is exhausted because there are
no remedies available to Petitioner if he returned to state
court.  "For exhaustion purposes, a federal habeas court need
not require that a federal claim be presented to a state court
if it is clear that the state court would hold the claim
procedurally barred."  *Reyes v. Keane*, 118 F.3d 136, 139 (2d
Cir. 1997) (internal quotations omitted).  "In such a case, a
petitioner no longer has 'remedies available in the courts of

the State' within the meaning of 28 U.S.C. 2254(b)." *Grey*, 933 F.2d at 120.  Accordingly, such claims are "deemed exhausted." *Reyes*, 118 F.3d at 139.

Here, Petitioner's Eighth Amendment claim would be procedurally barred if it were raised again in state court. Petitioner has no right to take another direct appeal, *Aparicio v. Artuz*, 269 F.3d 78 (2d Cir. 2001) ("Petitioner was entitled to one (and only one) appeal to the Appellate Division and one request for leave to appeal to the Court of Appeals"), and Section 440.10(2)(c) prevents Petitioner from raising the claim by way of post-conviction collateral attack.  *Reyes*, 118 F.3d at 139-40 (deeming claim exhausted because it would be barred by Section 440.10(2)(c)); *Thomas v. Greiner*, 111 F. Supp. 2d 271, 276-77 n.5 (S.D.N.Y. 2000) (finding that Section 440.10(2)(c) barred the petitioner's excessive-sentence claim because the petitioner failed to raise the claim on direct appeal).  For these reasons, the Court deems Petitioner's Eighth Amendment claim exhausted, and denies it as procedurally barred.  *See Grey*, 933 F.2d at 139-40.[12]

---

[12] This argument would likely fail on the merits, anyway, because Petitioner was sentenced to a term within the state's statutory range (albeit the maximum term allowable).  *See White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law.").

E.    Actual Innocence

Lastly, Petitioner argues that the Court should grant his petition because he is actually innocent.  The Supreme Court has "never expressly held that a petitioner may qualify for habeas relief based solely on a showing of actual innocence." *Rivas v. Fischeri,* 687 F.3d 514, 540 (2d Cir. 2012).  However, "the Supreme Court has recognized that, in rare cases, an assertion of innocence may allow a petitioner to have his accompanying constitutional claims heard despite a procedural bar."  *Olivares v. Ercole*, 975 F. Supp. 2d 345, 352 (S.D.N.Y. 2013); *see also McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) ("[A] credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief.").  This is because a sufficient showing of actual innocence constitutes a fundamental "miscarriage-of-justice" worthy of excusing procedural default.  *See House v. Bell*, 547 U.S. 518, 536-37 (2006).

To meet this standard, petitioners "must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (internal quotations omitted).  In making this showing, petitioners must present "credible" and "reliable"

evidence that was not presented at trial. *Schlup*, 513 U.S. at 324.

Here, the only "new" evidence Petitioner presents is his assertion that the NYPD pressured Ms. Serrano and Mr. Cordova into implicating Petitioner. But for the reasons explained in the analysis of Petitioner's *Brady/Giglio* claim, this Court cannot conclude that this testimony, if introduced at trial, would have made it "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327. Accordingly, this is not one of those "rare," "extraordinary" instances where a claim of actual innocence excuses default. *See Calderon v. Thompson*, 523 U.S. 538, 559 (1998).

## IV.  Conclusion

The Court deems all of Petitioner's claims exhausted and denies them as either meritless or procedurally barred. Accordingly, Petitioner's habeas petition is dismissed in its entirety. Because Petitioner has not made a "substantial showing of the denial of a constitutional right," a certificate of appealability will not issue. 28 U.S.C. § 2253. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and *in forma pauperis* status is therefore denied for purposes of an appeal. *Coppedge v. United States*, 369 U.S. 438, 444-45 (1962). Petitioner, however, has a

right to seek a further certificate of appealability from the

Court of Appeals for the Second Circuit. *See* 28 U.S.C.

§ 2253(c)(1).


         SO ORDERED.

                              _____s/Eric Komitee_____
                              ERIC KOMITEE
                              United States District Judge


Dated:    September 30, 2020
          Brooklyn, New York